WOLLMUTH MAHER & DEUTSCH LLP
David H. Wollmuth (DW-9618)
William A. Maher (WM-9470)
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

OSEN & ASSOCIATE, LLC
Gary M. Osen (GO-5790)
Peter Raven-Hansen, Of Counsel
*(pro hac vice motion to be filed)*
700 Kinderkamack Road
Oradell, New Jersey 07649
(201) 265-6400

SAYLES, LIDJI & WERBNER
Mark S. Werbner
*(pro hac vice motion to be filed)*
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

WECHSLER HARWOOD LLP
Andrew D. Friedman (AF-6222)
488 Madison Avenue
New York, New York 10022
(212) 935-7400



**CV  04  2799**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

COURTNEY LINDE, COURTNEY LINDE FOR THE ESTATE OF
JOHN LINDE JR., FRANCIS BOLAND, KIMBERLY JASPER,
JENNIFER HAWKINSON, STEVEN AVERBACH, JULIE
AVERBACH, TAMIR AVERBACH, DEVIR AVERBACH, SEAN
AVERBACH AND ADAM AVERBACH, DR. DAVID
AVERBACH, MAIDA AVERBACH, EUGENE GOLDSTEIN,
LORRAINE GOLDSTEIN, MICHAEL GOLDSTEIN, RICHARD
GOLDSTEIN, BARBARA INGARDIA, CHANA NATHANSEN,
MATANYA NATHANSEN, MATANYA AND CHANA
NATHANSEN FOR THE ESTATE OF TEHILLA NATHANSEN,
SHOSHANA NATHANSEN, YEHUDIT NATHANSEN,
HEZEKIAL TOPOROWITCH, PEARL B. TOPOROWITCH,
YEHUDA TOPOROWITCH, DAVID TOPOROWITCH, RIVKA
TOPOROWITCH, SHAINA CHAVA NADEL, BLUMY ROM,
FREDERICK MANDELL, SHERRI MANDELL, FREDERICK
MANDELL AND SHERRI MANDELL FOR THE ESTATE OF
JACOB MANDELL, DANIEL MANDELL, ELIANA MANDELL,
AND AVRAHAM MANDELL,

                  Plaintiffs,

          -against-

ARAB BANK, PLC,

                  Defendant.

------------------------------------------------------------x

Case No.



**COMPLAINT**

**GERSHON, J.**

**CHREIN, J.**

Plaintiffs Courtney Linde, Courtney Linde for the Estate of John Linde Jr., Francis Boland, Kimberly Jasper, Jennifer Hawkinson, Steven Averbach, Julie Averbach, Tamir Averbach, Devir Averbach, Sean Averbach and Adam Averbach, Dr. David Averbach, Maida Averbach, Eugene Goldstein, Lorraine Goldstein, Michael Goldstein, Richard Goldstein, Barbara Ingardia, Chana Nathansen, Matanya Nathansen, Matanya and ChanaNathansen for the Estate of Tehilla Nathansen, Shoshana Nathansen, Yehudit Nathansen, Hezekial Toporowitch, Pearl B. Toporowitch, Yehuda Toporowitch, David Toporowitch, Rivka Toporowitch, Shaina Chava Nadel, Blumy Rom, Frederick Mandell, Sherri Mandell, Frederick Mandell and Sherri Mandell for the Estate of Jacob Mandell, Daniel Mandell, Eliana Mandell, and Avraham Mandell, by their attorneys, allege the following upon information and belief:

## NATURE OF THE ACTION

1.      This is a complaint for damages arising out of the conduct of the Arab Bank, PLC ("Arab Bank") – a Jordanian banking institution with a branch office in New York – in knowingly administering the distribution of financial benefits to terrorists, the families of terrorists and Foreign Terrorist Organizations (as that term is defined in 8 U.S.C. § 1189) as part of a scheme to encourage and facilitate acts of international terrorism as defined by 18 U.S.C. § 2331. By these acts, defendant Arab Bank has aided and abetted said acts of international terrorism, resulting in the killing, attempted killing and maiming of scores of American citizens in Israel since September, 2000, and has violated the prohibitions on providing material support for acts of international terrorism set forth in the Anti-Terrorism Act (18 U.S.C. §§ 2339A, 2339B & 2339C) and is therefore civilly liable under § 2333 of that Act to those American citizens and their survivors who have been injured in their person, property or business by reason of such acts of international terrorism.

2

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, 28 U.S.C. § 1332(a)(2), and by 18 U.S.C. §§ 2333 and 2334, as a civil action brought by nationals of the United States who have been injured by reason of acts of international terrorism.

3.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. § 1391 because it is a district in which Arab Bank and one or more of the plaintiffs reside.

## THE PARTIES

### A.    The Plaintiffs

### The Linde Family

4.      Plaintiff Courtney Linde is a United States citizen and a citizen of the state of Texas.  She is the widow of John Linde, Jr.

5.      She is a plaintiff in this action both in her own capacity and on behalf of the estate of her late husband.

6.      John Linde, Jr. was a United States citizen and a citizen of the state of Texas.

7.      He was thirty (30) years old at the time of his death.

8.      John was a third generation Marine and a parachute jumpmaster, who left the Marine Corp after eight and a half years of active duty and two years of duty as a full time reservist to join the Virginia-based private security firm DynCorp in order to earn more money to support his young wife who had recently been diagnosed with bone cancer.

9.      John Linde, Jr. and two other security officers were part of a detail escorting U.S. diplomats on their way to interview Palestinian applicants for Fulbright scholarships when the car he was in was blown up by a remote-controlled bomb near the Beit

3

Hanoun junction in northern Gaza on October 15, 2003.

10. Courtney Linde was diagnosed with bone cancer on July 10, 2002, less than two weeks before she and John Linde, Jr. planned to be married.

11. They married on July 22, 2002 in Texas.

12. John Linde tried to find a way to pay for his wife's medical expenses. He accepted a position as a security contractor for DynCorp in Israel. John Linde left for a one-week training session in Washington, D.C. on August 27, 2003.

13. Following this training, he traveled to Tel Aviv and began his position as a security contractor.

14. Courtney Linde was notified of his death by a telephone call from DynCorp at 4:00 a.m. on October 15, 2003.

15. The murder of John M. Linde, Jr. caused Courtney Linde to suffer severe physical and mental anguish and extreme emotional distress.

16. Plaintiff Francis Boland is a citizen of the United States and a citizen of the state of Missouri. She is the mother of John Linde, Jr.

17. She was notified of the bombing on October 15, 2003 by a friend of Courtney Linde.

18. Francis Boland was later notified by representatives of DynCorp, the company for which her son worked.

19. Later that day she saw videotape footage of the scene of the terrorist attack which was broadcast on the evening news in the United States, including discussions of the wreckage and the difficulty in identifying the remains of the victims.

20. Both the death of her beloved son and the experience of watching the

newscasts and seeing the images of the charred remains of the vehicle have caused Mrs. Boland to suffer severe physical and mental anguish and extreme emotional distress.

21.     Plaintiff Kimberly Jasper is a citizen of the United States and a citizen of the state of Missouri. She is forty years old and the older sister of John Linde, Jr.

22.     Ms. Jasper saw the images of the bombing on television before she was notified that her brother was murdered in the attack.

23.     She was notified of the bombing on October 15, 2003 by her stepfather, Thomas Boland.

24.     Later that day she saw videotape footage of the scene of the terrorist attack which was broadcast on the evening news in the United States, including discussions of the wreckage and the difficulty in identifying the remains of the victims.

25.     Both the death of her beloved brother and the experience of watching the newscasts and seeing the images of the charred remains of the vehicle have caused Mrs. Jasper to suffer severe physical and mental anguish and extreme emotional distress.

26.     Plaintiff Jennifer Hawkinson is a citizen of the United States and a citizen of Missouri. She is thirty-five years old and the older sister of John Linde, Jr.

27.     She was notified of the bombing on October 15, 2003 by her husband who went to her office and told her the tragic news at work. Later that day, she saw videotape footage of the scene of the terrorist attack which was broadcast on the evening news in the United States, including discussions of the wreckage and the difficulty in identifying the remains of the victims.

28.     Mrs. Hawkinson was also interviewed on local television in Missouri and eulogized her brother at a time when her family was shocked and emotionally devastated by her brother's death. As a result of her brother's murder, she has suffered severe physical and mental

anguish and extreme emotional distress.

### The Averbach Family

29.     Plaintiff Steve Averbach is a citizen of the United States and of Israel.

30.     He is 38 years old and presently resides in the Tel Hashomer
Rehabilitation Center near Tel Aviv, Israel.

31.     He is the married father of four boys ranging in age from three to fourteen.
Steve and his wife, Julie, were married in 1994 and have two sons together, Sean (age 8) and
Adam (age 3).

32.     Steve's older sons, Tamir (age 14) and Devir (age 11) are from a prior
marriage.

33.     On May 18, 2003, Steve Averbach was seated on a commuter bus heading
for Jerusalem when he noticed an Arab board the bus dressed as a religious Jew and became
immediately suspicious.

34.     As Steve approached him, the bomber detonated his explosives.   The
Islamic Resistance Movement (hereinafter known as "Hamas") claimed responsibility for the
bombing.

35.     Steve absorbed a substantial amount of the impact of the explosion and a
large quantity of shrapnel.

36.     Seven (7) people were killed by the explosion, ranging in age from 35 to
68.  Steve Averbach was one of twenty (20) people injured.  The bomber was later identified by
his family as Bassem Jamil Tarkrouri.

37.     Steve sustained a critical wound when a ball bearing originally packed
with the bomber's explosives, lodged between his C3 and C4 vertebrae.  It penetrated through his

6

skin, lodged in his spinal cord and was eventually removed during surgery, but not before causing severe damage to his spine.

38.     Following surgery he was moved to intensive care where he almost died several times because of an extremely high fever and from the blast injury to his lungs. He has since undergone numerous operations for his back, groin, tracheotomy, gastric intestines and for damage caused by the tracheotomy.

39.     Steve returned to the Intensive Care Unit twice with complications.

40.     Steve is paralyzed from his neck down. On more than one occasion, Steve pleaded with doctors and family members to take him off life support.

41.     To this day, Steve does not have the use of his arms or legs, cannot brush his own teeth or scratch his own nose.

42.     He is completely dependent on the 24-hour care provided to him and has no immediate hope of recovery.

43.     Steve Averbach has suffered severe physical and mental anguish and extreme emotional distress from the attack.

44.     Plaintiff Julie Averbach is a citizen of Israel. She is the wife of Steve and the mother of Sean and Adam Averbach.

45.     As the result of the injuries sustained by Steve, Julie has had to relocate her family to be closer to the rehabilitation center where Steve resides. She is now, in most respects, a single parent and cannot enjoy the normal companionship and day-to-day assistance and mutual support that she previously received from her husband.

46.     As a result of the attacks, she has suffered severe physical and mental anguish and extreme emotional distress.

7

47.     Plaintiff Tamir Averbach is a citizen of the United States.

48.     He is the fourteen (14) year old son of Steve Averbach and his first wife.

49.     Tamir has experienced severe physical and mental anguish and extreme emotional distress from witnessing his father's relentless and painful suffering and from seeing him nearly die several times.

50.     Plaintiff Devir Averbach is a citizen of the United States and of Israel. He is the eleven (11) year old son of Steve Averbach and his first wife.

51.     Devir and his elder brother, Tamir, remember what it was like when their father was an able-bodied man. Devir has suffered severe physical and mental anguish and extreme emotional distress from the attack that left his father paralyzed from the neck down.

52.     Plaintiff Sean Averbach is a citizen of the United States and of Israel. He is the eight (8) year old son of Steve and Julie Averbach.

53.     He presently resides in Tel Aviv. As a result of the brutal attack on his father he has been emotionally traumatized and has lost the sense of protection and safety he once enjoyed from his father.

54.     Due to the severity of his father's injuries, ordinary companionship and simple pleasures of traveling with or playing sports with his father have been denied to him, and will in all likelihood be denied to him for the remainder of his father's life. As a result, he has suffered severe physical and mental anguish and extreme emotional distress.

55.     Plaintiff Adam Averbach is a citizen of the United States and of Israel. He is the three (3) year old son of Steve and Julie Averbach and he presently resides in Tel Aviv. As a result of the brutal attack on his father he has been emotionally traumatized and will in all likelihood never possess memory of a time when his father was capable of using his arms and

8

legs. Due to the severity of his father's injuries ordinary companionship and simple pleasures of walking together, driving in a car with or playing sports with his father have been denied to him and will in all likelihood be denied to him for the remainder of his father's life.

56.     As a result of the attacks, Adam has suffered severe physical and mental anguish and extreme emotional distress.

57.     Plaintiffs Dr. David Averbach and his wife Maida Averbach are United States citizens and citizens of the state of New Jersey.

58.     They returned home late on May 17, 2003 from a dinner honoring Dr. Averbach. Mrs. Averbach switched on Fox News and learned that a bus had been bombed in Jerusalem on Sunday morning in Israel. Mrs. Averbach recognized her son's hand leaning out of a stretcher on the news footage but decided not to inform her husband until the next morning.

59.     After a sleepless night, Mrs. Averbach answered the telephone on Sunday morning in New Jersey at 5:50 a.m. Her daughter-in-law and a social worker from Hadassah Hospital were on the phone explaining that Steve had been grievously wounded by the explosion and had a ball bearing lodged between his C3 and C4 vertebrae.

60.     As a respected surgeon with many years of experience, Dr. Averbach immediately understood the severity of his son's injuries.

61.     Presently, although his condition is stable, Steve is not able to do the simplest things for himself.

62.     He lives in constant pain and battles depression.

63.     His parents have partially retired from their jobs so they may spend more time with him and his children.

64.     Both parents have experienced severe physical and mental anguish

and extreme emotional distress as a result of the terrorist attack, in the case of Maida Averbach, from the moment she saw her son's hand on television on May 17, 2003.

65.     Steve's continued inability to use his hands and legs, his inevitable battle with depression and the emotional effect it has had on Steve's four young children are a constant source of continued anguish to both parents.

### The Goldstein Family

66.     Howard Goldstein was a citizen of the United States and of Israel.

67.     He was murdered on June 20, 2003 while driving his car on Route 60 in Israel with his wife and parents in the car.

68.     Mr. Goldstein was in the process of picking up his parents from Jerusalem where they had stayed the night following the wedding of Howard's son, David, and his new wife.

69.     Howard's father, Eugene Goldstein was seated in the front passenger seat, and his mother, Lorraine Goldstein was seated behind her husband.

70.     At some point, as Howard was driving, his father, Eugene, noticed two Arabs on the side of the road with their backs turned toward them. As the car approached, the men turned around and began rapidly firing their guns at the Goldsteins' vehicle. Hamas has claimed responsibility for the attack.

71.     Howard Goldstein was hit first in the chest, left lung, kidney and liver.

72.     He died almost immediately and his body slumped over the wheel.

73.     Plaintiff Eugene Goldstein is a citizen of the United States and of the State of New York.

74.     He was also hit in the back, head and shoulder with a bullet.

75.    The top of the bullet grazed Eugene Goldstein's head.  The remainder exploded in his lung leaving behind shrapnel in his lung, liver and kidneys.

76.    Somehow, Eugene managed to steer the car until it ultimately overturned in a ditch.

77.    Plaintiff Lorraine Goldstein is a citizen of the United States and of New York.

78.    She was also shot and severely injured.

79.    During the terrorist attack, the bullet entered her body through her back, grazed her carotid artery and lodged in her jaw bone.  She has three bullet holes in her back.

80.    Shrapnel also lodged all over her body, especially in her back.  She also suffered a shattered nose and septum as well as various lacerations resulting from the car crash.

81.    Presently, Lorraine Goldstein still requires physical therapy because the scar tissue in her jaw prevents her from opening it fully and she still suffers from pain and headaches.

82.    She has had eleven (11) teeth pulled and extensive periodontal and dental work.  She sees a surgeon in Great Neck, New York for the injuries to her teeth and jaw.

83.    She must also deal with the harmful effects of shrapnel lodged throughout her body.  As a result of the terrorist attack, Lorraine Goldstein has suffered severe physical and mental anguish and extreme emotional distress.

84.    As a result of the terrorist attack, Eugene Goldstein still has several bullet fragments lodged in his chest.  He must go for an x-ray every three (3) months to monitor the condition of the bullet fragments encapsulated in his chest.

85.    He has since returned to his job where he missed three (3) months of work

as a result of his injuries.

86.     He blames himself for taking his wife to attend his grandson's wedding.

87.     Eugene Goldstein has suffered severe physical and mental anguish and extreme emotional distress.

88.     The Goldsteins' family in New York was notified of the attack by two cousins, one of whom saw images of the attack on the internet and sent an instant message to the immediate family.

89.     The Goldsteins' family sat in horror as they watched images of the attack on the Cable News Network (CNN) shortly after the attack occurred.  The broadcast video showed Howard, Mindy, Eugene and Lorraine Goldstein being pulled from the wreckage of the car Howard Goldstein had been driving.

90.     Lorraine Goldstein's face and hair were covered with blood.

91.     After learning of the attack, plaintiff Richard Goldstein phoned his sister, Barbara Goldstein Ingardia, and asked her to return home immediately.  When she arrived, her extended family was present.  They shared the tragic news that their parents and brother had been attacked.  Barbara then made plans to fly to Israel to care for her parents.

92.     Mr. and Mrs. Goldstein remained in Jerusalem at Hadassah Hospital approximately ten (10) days and were unable to return home when they were discharged from the hospital because the airline did not give Mr. Goldstein permission to fly due to the condition of his lungs.

93.     Plaintiff Barbara Goldstein Ingardia is a citizen of the United States and a citizen of the state of New York.

94.     She is the daughter of Eugene and Lorraine Goldstein and the sister of

12

Howard Goldstein.

95.     She left her job and family behind and traveled to Israel to care for them during their recovery and to mourn the loss of her brother.

96.     In addition to grappling with the devastating emotional consequences of her brother's death, she was forced to deal with the uncertainty of her mother's recovery due to her severe injuries and age.

97.     At one point, Lorraine Goldstein was placed on life support.

98.     Barbara Goldstein Ingardia blames herself for encouraging her parents to attend the wedding. As a result of the terrorist attack, Barbara Goldstein Ingardia suffered severe physical and mental anguish and extreme emotional distress.

99.     Richard Goldstein is a citizen of the United States and of New York. He is the son of Eugene and Lorraine Goldstein and the brother of Howard Goldstein. Richard Goldstein suffered severe physical and mental anguish and extreme emotional distress because of the death of his brother and the life-threatening injuries of both of his elderly parents.

100.    Mr. and Mrs. Goldstein and their daughter were unable to attend Howard's funeral. However, Mr. Goldstein and Barbara were able to visit his grave seven (7) days after his died.

101.    Chana Freedman is a citizen of the United States and of Israel.

102.    She is the daughter of Howard and Mindy Goldstein.

103.    She and her husband were eating lunch at a mall in Jerusalem when they learned that her father and grandparents had been attacked.

104.    Chana's husband received a telephone call from his father informing the couple to go directly to Hadassah Hospital.

105. When Chana and her husband arrived at Hadassah Hospital, a social worker informed them that Chana's father had died in the attack.

106. Chana informed her brother, Daniel and his wife of the attack when they arrived at the hospital.

107. Daniel and Chana and their spouses waited an hour to enter the emergency room, where Mindy Goldstein, their mother, was waiting.

108. As a result of her father's death, Chana Freedman has suffered severe physical and mental anguish and extreme emotional distress.

109. Plaintiff Michael Goldstein is a citizen of the United States and of Florida. He is the brother of Howard Goldstein and the son of Eugene and Lorraine Goldsten. As a result of the terrorist attack, Michael suffered severe mental anguish and extreme emotional distress because of the death of his brother and the life-threatening injuries of both of his elderly parents.

**The Nathansen Family**

110. Tehilla Nathansen was a citizen of the United States and of Israel. She was three (3) years old when she was murdered in a suicide bomber's attack that occurred when she was sitting on her mother's lap on the No. 2 bus in Jerusalem on August 19, 2003. The Nathansen family boarded the bus at the Kotel (Wailing Wall) in the Old City of Jerusalem, where her parents had just completed their prayers at Judaism's holiest site. Hamas has claimed responsibility for the attack.

111. Plaintiffs Matanya and Chana Nathansen bring this action both individually and on behalf of their three (3) year old daughter's estate.

112. Chana S. Nathansen, Tehilla's mother, is a citizen of the United States and of Israel. She was severely injured in the explosion that killed her daughter and is partially

crippled as a result of her injuries. She is also now hearing impaired in one ear. In addition, Mrs. Nathansen sustained severe physical and mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of her three year old daughter, as well as the severe injuries incurred by her baby, Shoshana Nathansen.

113.    Plaintiff Matanya Nathansen, Tehilla's father, is an Israeli citizen. He was moderately injured by the explosion. He is now hearing impaired and is no longer able to walk properly. Despite sustaining only minor physical injuries from the explosion, Mr. Nathansen sustained severe physical and mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of his three-year old daughter, as well as the severe injuries incurred by his wife and young daughters.

114.    Plaintiff Yehudit Nathansen is a citizen of the United States and of Israel. She is the six year old sister of Tehilla Nathansen and the daughter of Matanya and Chana Nathansen. Yehudit was sitting apart from her parents with an eight-year old aunt at the time of the explosion. Yehudit sustained relatively minor physical injuries from the explosion and was treated and released from Bikur Cholim in Jerusalem.

115.    She suffered severe physical and mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of her three-year old sister, as well as the severe injuries incurred by her mother and baby sister.

116.    Plaintiff Shoshana R. Nathansen is a citizen of the United States and of Israel. The one (1) year old child was sitting on her mother's lap at the time of the explosion. Shoshana suffered fractures in her leg and hip, deep lacerations in her arm that have left permanent scars and slight scars on her face and legs. She also sustained severe physical injuries requiring the removal of numerous ball bearings from her skull. The full effect of her injuries on

her brain functions and cognitive abilities will not be fully known for some time.

117.     Plaintiff Hezekial Toporowitch is a citizen of the United States and of Israel. He is the father of Plaintiff Chana Nathansen and grandfather of the three Nathansen girls. He was notified by telephone of the bombing that killed his granddaughter and crippled his daughter. On the night of the bombing he traveled with his wife and son to Jerusalem. He was supposed to travel on to the central morgue in Jerusalem to attempt to identify his granddaughter's body, but was in too much shock to continue.

118.     Initially, he was told to identify the bodies of two granddaughters since Shoshana was not identified yet at the hospital and was thought to be deceased.

119.     As a result of the terrorist attack, he has suffered severe physical and mental anguish and extreme emotional distress from experiencing the death of his three-year old granddaughter, as well as the severe injuries incurred by his daughter and other granddaughter.

120.     Plaintiff Pearl B. Toporowitch is a United States citizen and mother of Plaintiff Chana Nathansen and grandmother of the three Nathansen girls. She was notified by telephone in the middle of the night of the bombing that killed her granddaughter and crippled her daughter. On the night of the bombing she traveled with her husband and her family to the Jerusalem Hospital where her daughter Chana was being treated. She attempted to obtain further details about the condition of her son-in-law and her granddaughters. She stopped at a home of a friend to organize her family and obtain this information. In the aftermath of the bombing, Chana, her husband, and children were transferred to different hospitals thereby complicating the family's efforts to locate them.

121.     As a result of the terrorist attack, she has suffered severe physical and mental anguish and extreme emotional distress from experiencing the death of her three-year old

granddaughter, as well as the severe injuries incurred by her daughter and other granddaughter.

122.   Yehuda Toporowitch is a citizen of the United States and Israel.

123.   He is the brother of plaintiff Chana Nathansen and the uncle of the three Nathansen girls. He was notified by telephone of the bombing that killed his niece and crippled his sister. On the night of the bombing, he was working at a resort and quickly rushed to a nearby television where graphic images of the bombsite were being broadcast by Israeli television.

124.   Yehuda rushed home and drove his parents to the Tel Aviv area and stopped at the home of one of his sisters. He then drove on to the central morgue and attempted to identify his niece's remains, but unfortunately a positive identification was not possible because of the nature and extent of the child's injuries.

125.   Yehuda then made arrangements for the necessary DNA testing which ultimately confirmed his niece's identity.

126.   As a result of the terrorist attack, Yehuda Toporowitch has suffered severe physical and mental anguish and extreme emotional distress from the death of his three-year old niece and attempting to identify her remains, as well as the severe injuries incurred by his sister and other niece.

127.   David Toporowitch is a dual citizen of the United States citizen and of Israel.

128.   He is the brother of plaintiff Chana Nathansen and the uncle of the three Nathansen girls. He was not present when his parents were notified by telephone of the bombing that killed his niece and crippled his sister, but instead, had to piece together the events by himself after his family had already left for Jerusalem.

17

129.    Like the rest of his immediate family, David visited his sister and niece in the hospital and experienced the shock and severe mental anguish and extreme emotional distress resulting from the emotional trauma of burying his young niece and dealing with the pain and loss experienced by his sister.

130.    As a result of the terrorist attack, David Toporowitch has suffered severe physical and mental anguish and extreme emotional distress from experiencing the death of his three year old niece, as well as the severe injuries incurred by his sister and other niece.

131.    Shaina Chava Nadel is a dual citizen of the United States and Israel and the sister of plaintiff Chana Nathansen and the aunt of the three Nathansen girls.  Like the rest of her immediate family, Shaina visited her sister and niece in the hospital and experienced the shock and mental anguish resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her sister.

132.    As a result of the terrorist attack, Shaina Chava Nadel has suffered severe physical and mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries incurred by her sister and other niece.

133.    Blumy Rom is a citizen of the United States and of Israel and the sister of plaintiff Chana Nathansen and the aunt of the three Nathansen girls.  Like the rest of her immediate family, Blumy visited her sister and niece in the hospital and experienced the shock and mental distress resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her younger sister.

134.    As a result of the terrorist attack, Blumy Rom has suffered severe physical and mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries incurred by her sister and other niece.

18

135.    Rivka Toporovitch is a citizen of the United States and of Israel and the sister of plaintiff Chana Nathansen and the aunt of the three Nathansen girls. Like the rest of her immediate family, Rivka visited her sister and niece in the hospital and experienced severe mental anguish and extreme emotional distress from burying her young niece and dealing with the pain and loss experienced by her older sister.

136.    She stayed with her baby niece Shoshana, caring for her during the two weeks that she was hospitalized and for two months after her discharge from the hospital.

137.    As a result of the terrorist attack, Rivka Toporovitch has suffered severe physical and mental anguish and extreme emotional distress from experiencing the death of her three year-old niece, as well as the severe injuries incurred by her sister and other niece.

### The Mandell Family

141.    Jacob (Koby) Mandell was a citizen of the United States and of Israel.

142.    On May 8, 2001, Koby, an eighth-grader from Tekoa, Israel, skipped school and went hiking with his friend near the Mandells' family home.

143.    He and his friend were savagely murdered by Palestinian terrorists, who set upon the boys near a series of caves and beat them to death with rocks and mutilated their bodies beyond recognition.

144.    On the day of Koby's disappearance, the family, their neighbors and the police set about a search of the hills near Tekoa and searched through the night for the missing boys.

145.    Koby's body was located the following day by search and rescue volunteers.

146.    A splinter Palestinian terrorist group calling itself "Palestinian Hezbullah"

claimed responsibility for the murders, but the killers have not yet been apprehended. Both the Israelis authorities and the Palestinian terrorist groups, such as the Hamas and PIJ Enterprises, while treating the killers as member of the "Popular Resistance," have not directly claimed responsibility for the atrocity.

147.   Plaintiffs Frederick and Sherri Mandell bring this suit on behalf of the Estate of Jacob Mandell for wrongful death and severe physical anguish resulting from his brutal murder.

148.   Plaintiff Frederick Mandell is a citizen of the United States and of Israel and a resident of Tekoa, Israel. He is the father of Jacob Mandell. He brings this action in his individual capacity. As a result of the terrorist attack that killed his son, Plaintiff Frederick Mandell has experienced severe physical and mental anguish and extreme emotional distress.

149.   Plaintiff Sherri Mandell is a citizen of the United States and of Israel and a resident of Tekoa, Israel. She is the mother of Jacob Mandell. She brings this action in her individual capacity. As a result of the terrorist attack that killed her son, Plaintiff Sherri Mandell has experienced severe physical and mental anguish and extreme emotional distress.

150.   Plaintiff Eliana Mandell is a citizen of the United States and of Israel and a resident of Tekoa, Israel. She is the sister of Jacob Mandell. Since the terrorist attack, Eliana has lost ordinary companionship and simple pleasures of spending time with her brother, Koby. As a result of the tragic and horrific death of her older brother she has suffered severe physical and mental anguish and extreme emotional distress.

151.   Plaintiff Avraham Mandell is a citizen of the United States and of Israel and a resident of Tekoa, Israel. He is the brother of Jacob Mandell. Since the terrorist attack, Avraham has lost ordinary companionship and simple pleasures of spending time with brother,

Koby. As a result of the tragic and horrific death of his older brother he has suffered severe physical and mental anguish and extreme emotional distress.

152. Plaintiff Daniel Mandell is a citizen of the United States and of Israel and a resident of Tekoa, Israel. He is the brother of Jacob Mandell. Since the terrorist attack, Daniel has lost ordinary companionship and simple pleasures of spending time with his brother, Koby. As a result of the tragic and horrific death of his older brother he has suffered severe physical and mental anguish and extreme emotional distress.

**B.    The Defendant**

153. Defendant Arab Bank, PLC is a Jordanian banking institution with offices and branches worldwide, including several branches that are situated in Palestinian Authority-controlled territories and one branch that is located in and does business in New York, with its principal place of business located at 520 Madison Avenue, New York, New York, and that is registered to conduct business under the laws of the State of New York.

154. Arab Bank PLC has operated a federally chartered branch in New York since 1983.

155. The New York branch of Arab Bank PLC is designated as a wholesale bank.

156. It is principally engaged in providing clearing and correspondent bank services to the Arab Bank Group and other foreign banks.

## FACTUAL ALLEGATIONS

157. Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably the Palestinian Islamic Jihad (the "PIJ") and the Islamic Resistance Movement ("Hamas").

158. The PIJ knowingly, willfully, and unlawfully combines, conspires, confederates, and agrees together and with other persons, both known and unknown, to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and providing material support to Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

159. For example, the organization has committed numerous terrorist attacks, including several that have killed and injured Americans citizens. Since September of 2000, the PIJ has conducted and taken credit for at least 28 murderous attacks, including at least seven mass murder bombings that have killed over 90 civilians, including U.S. citizens.

160. On October 8, 1997, the PIJ was designated as a Foreign Terrorist Organization by the U.S. government under the Anti-Terrorism and Effective Death Penalty Act of 1996 and the designation has since been renewed every two years, including in 2003.

161. Hamas is an acronym for "Harakat Muqawama Islamiyya," the Islamic Resistance Movement, which was founded in December, 1987.

162. The organization is nominally divided into two separate wings, the political wing and the paramilitary wing, Itz-al-Din al Qassam Brigade.

163. Hamas is a foreign organization that uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people.

164. Hamas knowingly, willfully, and unlawfully combines, conspires,

22

confederates, and agrees together and with other persons, both known and unknown to commit numerous acts of international terrorism activities as defined by 18 U.S.C. § 1331 and 18 U.S.C. § 2332 and other related acts of murder, attempted murder, solicitation to commit murder and to provide material support to Foreign Terrorist Organizations in violation of 18 U.S.C. 2339B and other provisions of the federal criminal code of the United States.

165.    Since September 2000, Hamas has launched hundreds of attacks including over twenty (20) mass murders that have killed more than three hundred (300) civilians.  Hamas has claimed responsibility for the attacks on Steve Averbach, Howard, Eugene, and Lorraine Goldstein and Tehilla Natharson.

166.    Hamas was designated as a Foreign Terrorist Organization by the U.S. government in August 2003.

## The Al Aqsa Intifada or Intifada Al Quds

167.    Following the collapse of the peace negotiations at the presidential retreat at Camp David in the summer of 2000, Palestinian terror organizations launched a broad-based terror campaign against the State of Israel at the end of September 2000.

168.    This explosion of violence was widely termed the so-called *Al Aqsa Intifada* or *Intifada Al Quds*.

169.    This new Intifada was both qualitatively and quantitatively different from prior waves of Palestinian terrorism.

170.    Whereas the total number of attacks from 1993-2000 totaled less than 1,000, approximately 21,000 attacks since September 2000 have been attempted by various Palestinian terrorists which have claimed more than 6,000 casualties, including over 800 civilian deaths.  These indiscriminate acts of violence have likewise resulted in the death of at least 30

U.S. citizens and caused serious bodily injury to scores of others.

171.    The preferred method of mass murder used by Palestinian terrorist groups is the suicide bombing which involves an individual carrying an explosive device which he or she detonates in a bus, restaurant or other crowded public gathering place.

172.    The device is typically packed with nails, bolts and ball bearings, which, when detonated, lodge themselves deep within the bodies of those unfortunate individuals who happen to be inside the blast radius, causing cruel and horrific injuries.  The suicide bomber is thereby regarded as a "martyr" or "Shahid" by the terrorist groups and their sympathizers.

173.    The objective of the Al Aqsa Intifada terror campaign is to intimidate and coerce the civilian population of Israel and to influence the policy of the Israeli government by compelling Israel to withdraw from territory it presently controls.

174.    In fact, because many suicide bombers are stopped and killed before they can successfully detonate their explosive charges and others have died as a result of premature or accidental detonations, the term "martyr" has generally been used to include both suicide bombers and all others killed in the course of attempts to commit acts of violence against Israeli or Western targets.

175.    The eruption of the Al Aqsa Intifada in late September 2000 changed the dynamics of Palestinian terrorism in four material respects:

> A.    The Intifada, from its inception, was marked by a massive escalation of violence, which quickly transformed the tactics of the Islamist terrorist groups from the margins to the mainstream of Palestinian politics.

> B.    The unrestrained violence of the Intifada and the increasing credibility and prestige it provided for the Islamist groups forced other (secular) Palestinian terrorist groups to adopt Islamist rhetoric and tactics.

C. The main rival terrorist groups began cooperating and coordinating their activities.

D. The Intifada coalesced Saudi financial support for the Hamas Enterprise into a more ambitious and more formal structure through the formation of the Saudi Committee in Support of the Intifada Al Quds.

## The Conspiracy to Finance Palestinian Terrorism

176. On or about October 16, 2000, the Saudi Committee in Support of the Intifada Al Quds (hereinafter referred to as "Saudi Committee") was established as a private charity registered with the Kingdom of Saudi Arabia.

177. According to the Saudi Committee, its purpose was to support to the "Intifada Al Quds" and "all suffering families - the families of the martyrs and the injured Palestinians and the disabled."

178. In practice, the Saudi Committee constitutes a professional fundraising apparatus intended to subsidize the Intifada Al Quds, i.e., subsidize the Palestinian terror campaign and to bankroll Hamas and the PIJ and their related front organizations in the West Bank and Gaza.

179. These goals are accomplished in two ways – both of which depend on the substantial assistance of the defendant Arab Bank.

180. The first goal is accomplished by providing a comprehensive insurance benefit of $5,316.06 for the families of Palestinian terrorists, guaranteeing "coverage" to terrorists and their beneficiaries whenever a terrorist is killed.

181. Lesser benefits are also provided if the terrorist is injured either by Israeli security forces or captured as a result of his or her criminal conduct.

25

182.  The Saudi Committee has provided millions of dollars as benefits to the families of the so-called "martyrs," i.e., the families of suicide bombers and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts and to the families of Palestinians wounded during violent confrontations with Israel's security forces as well those activists held in Israeli custody.

183.  Moreover, the insurance benefit not only provides universal coverage for specific members of preferred terrorist organizations such as Hamas, but is intended as universal coverage available to terrorists belonging to any terrorist organization or to none at all, thereby eliminating the potential distinctions between terrorist groups, between individual (freelance) terrorists and the more established terrorist cells and between the secular and Islamist terrorist organizations.

184.  The defendant Arab Bank administers the comprehensive terrorist insurance scheme by distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage." The defendant processes identification numbers for the family members, personal information and details concerning the date and manner of death and other information provided to it by the Saudi Committee and representatives of the leading terrorist groups.

185.  Arab Bank, in consultation with the Saudi Committee and local representatives of Hamas, finalizes the lists, maintains a database of persons eligible under this universal coverage plan and opens a dollar account for each beneficiary. Every Palestinian family eligible under this universal coverage plan is encouraged to collect the terrorism benefits through a local branch of the Arab Bank in the West Bank or Gaza.

186.  The conspiracy between Arab Bank, the Saudi Committee and Hamas and

others is ultimately designed to provide substantial material support to Palestinian terrorist organizations and to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance."

187.    Thus, any person who chooses to participate in a suicide bombing or other terrorist attack does so secure in the knowledge that if he or she is killed in that attack, the financial needs of his or her family will be more than met for some time.

188.    Similarly, such persons are virtually assured of receiving a substantial stipend if they are injured or detained.

189.    In short, the Saudi Committee raises funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocates payments to the Arab Bank to fulfill its public pledge of universal insurance coverage to Palestinian terrorists.

190.    The terrorist organizations, through their charitable fronts, collect data on their own operatives as well as all other terrorists killed, injured or in Israeli custody and transmit the information to the Saudi Committee and the Arab Bank.

191.    Through the program administered by the Arab Bank, the Saudi Committee paid death benefits to at least approximately 200 fallen "martyrs" in the first year of its existence alone. In November 2001, the Saudi Committee paid more than forty-two million dollars ($42,000,000) to terrorists and/or their beneficiaries.

192.    Arab Bank serves as the exclusive administrator for the Saudi Committee's universal coverage plan for Palestinian terrorists and their families.

193.    Indeed, in its original website, the Saudi Committee openly declared that its funds were distributed to the families of martyrs through local branches of the Arab Bank in

27

Palestine.

195.   The bank provides a convenient means for distributing this blood money across Palestinian controlled territories that would be far more difficult if attempted by other means such as courier.  Israeli territory separates Gaza from the West Bank and Israeli military checkpoints often separate one Palestinian city from another.

196.   Defendant Arab Bank makes it possible for the terrorist groups to transcend physical obstacles and to provide an organized and professional distribution system that literally underwrites the terror campaign.

197.   Arab Bank knows the criminal purpose that the accounts it opens and maintains for the Saudi Committee are intended to serve.

198.   The Saudi Committee and local Hamas charitable front organizations have publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website, all of which are known to or should be known to Arab Bank and all of which are calculated to – and do – reach terrorists and potential terrorists. For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been injured during the Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee...";

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a Hamas charitable front organization in Ramallah announced that the Saudi Committee "requests that the families of the martyrs whose names

are listed herein to go to a branch of the Arab Bank in their place of residence to receive the tenth payment offered by the Saudi Committee in the amount of $5,316.06 ...."

199.   Because the Saudi Committee raises its funds in Saudi currency which cannot conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), those funds are primarily converted into dollars through the New York branch of the Arab Bank and then routed to the local branches of the Bank in the West Bank and Gaza. Arab Bank's role is essential to the furtherance of the criminal conspiracy in two (2) important respects.

200.   Firstly, Arab Bank provides both professionalism and transparency to the process thereby reassuring wealthy Saudi and Gulf State donors that the money they are contributing with not be siphoned off by corrupt officials, but will in fact reach the families of terrorists as intended.

201.   Secondly, Arab Bank, through its network of local branches in the West Bank and Gaza, provides an ideal distribution system that offers both convenience to the families of the terrorists who are able to bypass both the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier and the certainty of an accounting system that minimizes the risk of duplicate payments and unreliable record-keeping.

202.   By knowingly and actively participating in this process, Arab Bank and its co-conspirator, the Saudi Committee and others, have knowingly aided and abetted each and every terrorist act committed by Palestinian terrorists since the formation of the Saudi Committee's universal insurance coverage scheme in October 2000 in violation of 18 U.S.C. § 2332, § 2339B, 18 U.S.C. § 2339A and 18 U.S.C. § 2339C.

## The Defendant Provides Material Support To Foreign Terrorist Organizations

203.    Both Hamas and the PIJ raise funds to support their terrorist acts through charitable front organizations which they control.

204.    Arab Bank knowingly provides banking services to these charitable committees and affirmatively assists them in distributing funds to support the Intifada terror campaign.

205.    Arab Bank knowingly provides banking services to Hamas directly through its El-Mazra Branch Account # 3-810-622473-0330 in Beirut which collect funds directly in the name of Hamas, and through charitable front organizations controlled by Hamas which Arab Bank affirmatively assists in distributing funds to support the terror campaign.

206.    The United States Department of Justice has, for example, identified the website: www.palestine-info.com as the "official" website of Hamas.  The website itself solicits funds and asks contributors to send money to its El-Mazra Branch Account # 3-810-622473-0330 at the Arab Bank in Beirut, but it also asks donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

207.    This request is necessary because Account # 3-810-622473-0330 is one of the few accounts which Arab Bank operates on behalf of Hamas which Hamas controls and maintains directly.  To assist it in carrying out its terrorist activities, Hamas has established numerous front organizations, including:

> i.   the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya;
>
> ii.  Al Mujama Al-Islami;
>
> iii. Tulkarem Charitable Committee; and

           iv.   Al-Ansar Charity.

208.   The PIJ has established numerous front organizations, including:

           i.      Al-Ihsan Charitable Society; and

           ii.     Islamic An-Naqqa Society for Women, Bethlehem.

209.   One Hamas charitable front, for example, is known as the Al Ansar

Charity.  It also maintains a website proclaiming that:

> Al-Ansar Society opens its doors to the families of the fallen who intend to
> register their dead who, with their splendid blood, saturated pure Palestine
> and drew the lines of liberty and the coming dawn.  The Al-Ansar Society is
> following in their footsteps and shares in the sorrow and the hopes of the
> families of the fallen and their relatives.

210.   The web site further boasts that it has given money to Palestinians

wounded, incarcerated or killed during the Intifada, including $6000 to the family of Iz Aldin

(also spelled: "Azzadin") Al Masri, the suicide bomber who massacred 15 people, including 7

children, and injured about 130 others including several U.S. citizens killed or injured at the

Sbarro pizzeria in downtown Jerusalem on August 9, 2001.

211.   The website of Al Ansar helpfully explains that:

> The Director General of the El-Ansar Charitable Society and the person in
> charge of the portfolio for the care of the fallen at the Society's website
> said that the Society has furnished the management of the Arab Bank with
> lists of names of the fallen and the families of the entitled beneficiaries, in
> order to pay the monies to which the fallen are entitled.

## Cultivation of the Culture of Death

212.   The charitable front organizations play a central role in financing the terror

campaign by providing the means of raising funds to maintain the institutions that serve as

recruiting grounds for terrorist organizations.

31

213.  As set forth in an internal Hamas memorandum recently captured
by the Israeli army during a raid of the offices of the Hebron Charitable Committee, Hamas has
arranged for the "transfer [of] large sums" to the charitable committee and other Hamas front
organizations through the "charity activities" of thei operatives abroad.

214.  The memorandum emphasizes that Hamas "require[s] new
bank account numbers for money transfers" and promises that the Hamas will:

> invest efforts to transfer money for the martyrs (the shahids) and
> prisoners, via the transfer [to] charitable institutions.  This is a
> primary goal in the framework of the effort to transfer aid money to
> these institutions, so that these budgets are released in the best
> manner and in order to bring about an improvement in the level of
> the movement's performance.

The memorandum concludes with the promise that Hamas will continue to "build up the
activities and operations" of its front organizations by, among other things, ***taking advantage of
the conditions and the atmosphere of death.***"

215.  The financial support provided by the Saudi Committee via the Arab Bank
as well as the accounts maintained by the terror organizations' charitable fronts constitutes the
backbone of the donor base and operational budgets of Hamas and the PIJ, and has allowed them
to expand their operations, attract more recruits, and professionalize their financial distribution
channels.

216.  Each of these front organizations officially holds itself out to the public as a
charitable organization with a purely humanitarian and benign purpose.  In fact, however, the
primary mission of these organizations is to raise and launder funds for terrorist organizations
and otherwise to coordinate and conduct activities that are essential to the conduct of terrorist
operations and to the material support of terrorist operations.  All funds raised by the charitable

front organizations are fungible and allocated in part to terrorist activities.

217.     In addition to the Saudi Committee's universal coverage plan, contributions from individual and corporate sponsors abroad are primarily made to the charitable front organizations. The front organizations make those contributions available to Hamas and the PIJ in accordance with the instruction of their leaders. These organizations then disburse a percentage of the funds they receive from their front organizations to purchase weapons and explosive materials, to recruit and train operatives and otherwise to plan and carry out terrorist attacks.

218.     By knowingly providing banking and administrative services to charitable front organizations that are controlled and directed by designated Foreign Terrorist Organizations, including collecting, transferring and laundering funds for those organizations through its New York branch, Arab Bank has substantially assisted Hamas and the PIJ in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism as defined by 18 U.S.C. §2331 and 18 U.S.C. § 2332 and has committed numerous overt acts in furtherance of the conspiracy.

219.   Indeed, had the doors of Arab Bank not been opened to Hamas or the PIJ during the past three and a half years, the leaders of these terrorist organizations would have had to make far more onerous arrangements for transfer of foreign contributions to terrorists within Palestinian-controlled territory and the great bulk of those funds would likely have never reached their destination.

## CLAIMS FOR RELIEF

### COUNT ONE

## AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER AND SERIOUS BODILY INJURY TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); AND 18 U.S.C. § 2332(c)

220.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

221.   Each of the plaintiffs has been injured in his person, property or business by reason of acts committed by Palestinian terrorists that involve violence or are dangerous to human life and that violate the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily injury to U.S. nationals as set forth in 18 U.S.C. § 2332.

222.   The acts of the Palestinian terrorists in killing, and attempting to kill U.S. nationals and other persons were and are intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the Government of Israel by intimidation or coercion, and (c) to affect the conduct of the Government of Israel by mass destruction and murder.

223.   The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were injured or killed by reason of those acts.

224.   The extraordinary financial and administrative services that Arab Bank has provided to the terrorists, their families, and Hamas and the PIJ, including administering universal coverage insurance to the families of suicide bombers and other terrorists, provides

substantial assistance to Hamas and the PIJ and others in recruiting and incentivizing suicide bombers and other terrorists and thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to the plaintiffs.

225.   By virtue of its close contact with the Saudi Committee and its coordination of the payment schedules and lists of martyrs, and by virtue of repeated public advertisement of the activities of the Saudi Committee in various Palestinian newspapers as set forth above, the defendant Arab Bank knows or has recklessly disregarded that it is providing material support for acts of international terrorism.

226.   As forth more fully above, but for the assistance provided by the Arab Bank, the funding of universal coverage death and dismemberment benefits plan to terrorists and the families of terrorists would be substantially more difficult to implement.

227.   Throughout the period in which it has provided these extraordinary financial and administrative services to Hamas and the PIJ and to individual terrorists and their families, the Arab Bank knew or recklessly disregarded that the charitable front organizations of the terrorist organizations have played a major role in raising funds for Hamas and the PIJ, including suicide bombings intended to intimidate and coerce the civilian population of Israel and to influence the policy of the Israeli Government.

228.   Throughout the period in which it has been involved in activities assisting the PIJ and Hamas and individual terrorists and their families, Arab Bank knew or recklessly disregarded that those activities have substantially assisted and encouraged dangerous and criminal acts set forth herein.

229.   By aiding and abetting violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person, property, or business Arab Bank is jointly

35

and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs have sustained as a result of such injuries.

## COUNT TWO

## CONSPIRACY TO COMMIT MURDER AND ATTEMPTED MURDER OF UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(b)

230. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

231. Each of the plaintiffs has been injured in his person, property or business by reason of acts committed by Palestinian terrorists that involved murder or attempted murder in violation of the criminal laws of the United States, including the prohibition on killing or attempting to kill U.S. nationals as set forth in 18 U.S.C. § 2332.

232. The acts of the Palestinian terrorists in killing or attempting to kill U.S. nationals and other persons were intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the Government of Israel by intimidation or coercion, and (c) to affect the conduct of the Government of Israel by mass destruction and assassination.

233. The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within the close proximity of the attack and extreme emotional distress to the family members of those who were injured or killed by reason of those acts.

234. Arab Bank agreed to combine with other persons to act unlawfully, in the manner set forth in this complaint and committed overt acts in furtherance of the conspiracy. At all relevant times, the Arab Bank knew of the conspiracy and knew and knows, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy.

Arab Bank knowingly and purposefully agreed to perform extraordinary banking and administrative services for the Saudi Committee, Hamas and the PIJ, with the knowledge that such services facilitate the activities of its leaders.

235.   By conspiring to act with the Saudi Committee, Hamas and the PIJ, and their respective charitable front enterprises to support, encourage and facilitate violations of 18 U.S.C. § 2332 that have injured each plaintiff's respective person, property, or business, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs have sustained as a result of such injuries.

## COUNT THREE

## COMMITTING ACTS OF INTERNATIONAL TERRORISM IN VIOLATION OF 18 U.S.C. § 2339B AND 18 U.S.C. § 2333

236.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

237.   By knowingly providing banking services to Hamas via its E-Mazra Branch Account # 3-810-622473-0330 in Beirut, Arab Bank provides material support to a designated Foreign Terrorist Organization under the Anti-Terrorism and Effective Death Penalty Act of 1996.

238.   Based on the defendant's level of sophistication and presence as a registered financial institution in the United States, the defendant not only knew of the unlawful activities of Hamas but also knew or recklessly disregarded its actual designation as a Foreign Terrorist Organization.  By providing material support to a designated Foreign Terrorist Organization, Arab Bank is involved in activities that constitute international terrorism pursuant to 18 U.S.C § 2331(1)(a) and 18 U.S.C § 2331(1)(B)(i)(ii) and (iii) and is therefore civilly liable for damages to plaintiffs Steven Averbach, Julie Averbach, Sean Averbach, Adam Averbach,

Devir Averbach, Tamir Averbach, Dr. David Averbach, Maida Averbach, Eugene Goldstein, Lorraine Goldstein, Michael Goldstein, Richard Goldstein, Barbara Ingardia, Matanya and Chana Nathansen For The Estate of Tehilla Nathansen, Chana Nathansen, Matanya Nathansen, Shoshana Nathansen, Yehudit Nathansen, Hezekial Toporowitch, Pearl B. Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina Chava Nadel and Blumy Rom for their injuries pursuant to 18 U.S.C. § 2333.

## COUNT FOUR

### PROVISION OF MATERIAL SUPPORT WITH INTENT TO VIOLATE 18 U.S.C. § 2332 IN VIOLATION OF 18 U.S.C. §§ 2333 AND 2339A

239. Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

240. The extraordinary financial and administrative services that Arab Bank has knowingly provided to the terrorists, their families, and Hamas and PIJ, including serving as the exclusive administrator of universal coverage insurance to the families of suicide bombers and other terrorists, provides material support to the preparation and carrying out of numerous acts of international terrorism including the violations of 18 U.S.C. § 2332 which have cause direct injury to the plaintiffs.

241. By participating in the commission of violations of 18 U.S.C. §§ 2332 and 2339A that have caused each of the plaintiffs to be injured in his or her person, business or property, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs have sustained as a result of such injuries.

## COUNT FIVE

## FINANCING OF TERRORISM IN VIOLATION
## OF 18 U.S.C. §§ 2339C, 2332 and 2333

242.   Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

243.   The financial services that Arab Bank has willfully provided to Hamas, the PIJ and the Saudi Committee include the collection of funds with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint, who were not taking part in any armed conflict.

244.   The acts committed against the plaintiffs were intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the Government of Israel by intimidation or coercion, and (c) to affect the conduct of the Government of Israel by mass destruction and murder.

245.   By willfully violating 18 U.S.C. § 2339C, Arab Bank has committed acts of international terrorism as defined by 18 U.S.C. § 2331 and is therefore jointly and severally liable to the plaintiffs who have suffered injuries to their business, person or property by reason of such acts under 18 U.S.C. §§ 2333.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray that this Court:

(a)   Accept jurisdiction over this action;

(b)   Enter judgment against Arab bank and in favor of each plaintiff for compensatory damages in amounts not less than those set forth herein and additional sums in

amounts to be determined at trial;

(c)     Enter judgment against Arab Bank and in favor of each plaintiff for treble damages pursuant to 18 U.S.C. § 2333;

(d)     Enter judgment against Arab Bank and in favor of each plaintiff for any and all costs incurred in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333.

(e)     Order such preliminary and permanent injunctive relief as may be necessary and appropriate to prevent Arab Bank from continuing to engage in the unlawful practices set forth herein; and

(f)     Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Dated:  July 2, 2004
        New York, New York

WOLLMUTH MAHER & DEUTSCH LLP

By _____
        David H.  Wollmuth (DW-9618)
        William A.  Maher (WM-9470)

500 Fifth Avenue
New York, New York 10110
(212) 382-3300

Attorneys for Plaintiffs