WOLLMUTH MAHER & DEUTSCH LLP
David H. Wollmuth (DW-9618)
William A. Maher (WM-9470)
500 Fifth Avenue
New York, New York 10110
(212) 382-3300

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------------x
COURTNEY LINDE, COURTNEY LINDE FOR THE ESTATE    :
OF JOHN LINDE JR., FRANCES BOLAND, JOHN LINDE, SR.,    :
KIMBERLY JASPER, JENNIFER HAWKINSON, MATTHEW    :
PARSONS, STEVEN AVERBACH, JULIE AVERBACH, TAMIR    :
AVERBACH, DEVIR AVERBACH, SEAN AVERBACH, ADAM    :
AVERBACH, DAVID AVERBACH, MAIDA AVERBACH,    :    Case No. CV 04 2799
MICHAEL AVERBACH, EILEEN SAPADIN, EUGENE    :    (NG) (ASC)
GOLDSTEIN, LORRAINE GOLDSTEIN, BARBARA    :
GOLDSTEIN INGARDIA, RICHARD GOLDSTEIN, MICHAEL    :
GOLDSTEIN, CHANA FREEDMAN, MATANYA NATHANSEN,    :
CHANA NATHANSEN, MATANYA AND CHANA    :
NATHANSEN FOR THE ESTATE OF TEHILLA NATHANSEN,    :    **FIRST AMENDED**
YEHUDIT NATHANSEN, SHOSHANA NATHANSEN,    :    **COMPLAINT**
HEZEKIEL TOPOROWITCH, PEARL B. TOPOROWITCH,    :
YEHUDA TOPOROWITCH, DAVID TOPOROWITCH, SHAINA    :
CHAVA NADEL, BLUMY ROM, RIVKA TOPOROWITCH,    :
FREDERICK MANDELL, SHERRI MANDELL, FREDERICK    :
MANDELL AND SHERRI MANDELL FOR THE ESTATE OF    :
JACOB MANDELL, ELIANA MANDELL, AVRAHAM    :
MANDELL, DANIEL MANDELL, RAN ZILBERSTEIN, CHAYA    :
BEN-ZAKEN ZILBERSTEIN, CLARA BEN-ZAKEN, GLORIA    :
KUSHNER, JASON KIRSCHENBAUM, ISABELLE    :
KIRSCHENBAUM, MARTIN KIRSCHENBAUM, JOSHUA    :
KIRSCHENBAUM, SHOSHANAH BURGETTE, DAVID    :
KIRSCHENBAUM, DANIELLE TEITELBAUM, NETANEL    :
FENICHEL, ILANIT FENICHEL, MOSHE FENICHEL, DEBORAH:
FENICHEL, REBECCA NEVIES and NAPHTALI NEVIES,    :
    :
                            Plaintiffs,    :
            -against-    :
    :
ARAB BANK, PLC,    :
                            Defendant.    :
-----------------------------------------------------------------------------------x

Plaintiffs Courtney Linde, Courtney Linde for the Estate of John Linde Jr.,

Frances Boland,  John Linde, Sr., Kimberly Jasper, Jennifer Hawkinson, Matthew Parsons,

Steven Averbach, Julie Averbach, Tamir Averbach, Devir Averbach, Sean Averbach, Adam

Averbach, David Averbach, Maida Averbach, Michael Averbach, Eileen Sapadin, Eugene

Goldstein, Lorraine Goldstein, Barbara Goldstein Ingardia, Richard Goldstein, Michael

Goldstein, Chana Freedman, Matanya Nathansen, Chana Nathansen, Matanya and Chana

Nathansen for the Estate of Tehilla Nathansen, Yehudit Nathansen, Shoshana Nathansen,

Hezekial Toporowitch, Pearl B. Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina

Chava Nadel, Blumy Rom, Rivka Toporowitch, Frederick Mandell, Sherri Mandell, Frederick

Mandell and Sherri Mandell for the Estate of Jacob Mandell, Eliana Mandell, Avraham Mandell,

Daniel Mandell, Ran Zilberstein, Chaya Ben-Zaken Zilberstein, Clara Ben-Zaken, Gloria

Kushner, Jason Kirschenbaum, Isabelle Kirschenbaum, Martin Kirschenbaum, Joshua

Kirschenbaum, Shoshanah Burgette, David Kirschenbaum, Danielle Teitelbaum, Netanel

Fenichel, Ilanit Fenichel, Moshe Fenichel, Deborah Fenichel, Rebecca Nevies and Naphtali

Nevies, by their attorneys, allege the following upon information and belief:.

## NATURE OF THE ACTION

1.      This is a complaint for damages and equitable relief arising out of the

conduct of the Arab Bank, PLC ("Arab Bank") – a Jordanian bank headquartered in Amman,

Jordan with a federally licensed and regulated branch office in the state of New York – pursuant

to which it has and is continuing to knowingly and willfully provide, distribute, and administer

the distribution of financial benefits, money and financial services to (a) terrorists who have

killed, injured and maimed civilians, or attempted to do so, (b) the families and beneficiaries of

such terrorists, and (c) Foreign Terrorist Organizations (as that term is defined in 8 U.S.C. §

1189 of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")) as part of a scheme to encourage and facilitate acts of international terrorism as defined by 18 U.S.C. § 2331. By these acts, defendant Arab Bank has aided and abetted and conspired to commit said acts of international terrorism, resulting in the killing, attempted killing and maiming of scores of American citizens in Israel since September 2000, and has violated the prohibitions on providing material support for acts of international terrorism set forth in the Anti-Terrorism Act as amended by the AEDPA ("ATA") (see e.g., 18 U.S.C. §§ 2339A, 2339B and 2339C) and is civilly liable under § 2333 of the ATA to those American citizens (and their estates, survivors and heirs) who have been killed or injured in their person, property or business by reason of such acts of international terrorism.

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332(a)(2), and 18 U.S.C. §§ 2333 and 2334, as a civil action brought by citizens of the United States, their estates, survivors, and heirs who have been killed or injured by reason of acts of international terrorism. This Court also has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2). The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

3.      Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§ 1391(b) and 1391(d).

4.      Arab Bank is subject to personal jurisdiction in the state of New York pursuant to N.Y. CLPR § 301 because, among other things, it continuously and systematically does business in the state of New York. Arab Bank also is subject to personal jurisdiction in the

State of New York pursuant to N.Y. CPLR § 302 because, based on the facts alleged herein and upon information and belief, Arab Bank (a) transacts business within the State of New York; (b) contracts to supply goods and services in the State of New York; (c) has committed tortious acts within the State of New York and (d) has committed tortious acts outside the State of New York causing injury within the State of New York and (i) derives substantial revenue from goods used or consumed in the State of New York or (ii) expected or should reasonably have expected such acts to have consequences in the State of New York and derived substantial revenue from international commerce.  Arab Bank also is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a).

## THE PARTIES

### A.    The Plaintiffs

### The Linde Family

5.    Plaintiff Courtney Linde is a United States citizen and a citizen of the state of Texas.  She is the widow of John Linde, Jr.

6.    She is a plaintiff in this action both in her own capacity and on behalf of the estate of her late husband.

7.    John Linde, Jr. was a United States citizen and a citizen of the state of Texas.

8.    He was 30 years old at the time of his death.

9.    John Linde, Jr. was a third generation United States Marine and a parachute jumpmaster.  John Linde, Jr. left the United States Marine Corps after eight and a half years of active duty and two years of duty as a full time reservist to join the Virginia-based private security firm DynCorp in order to earn more money to support his young wife who had

recently been diagnosed with bone cancer.

10.    Courtney Linde was diagnosed with bone cancer on July 10, 2002, less than two weeks before she and John Linde, Jr. planned to be married.

11.    They married on July 22, 2002 in Texas.

12.    John Linde, Jr. tried to find a way to pay for his wife's medical expenses. He accepted a position as a security contractor for DynCorp in Israel.

13.    John Linde, Jr. and two other DynCorp employees were part of a security detail escorting U.S. diplomats on their way to interview Palestinian applicants for Fulbright scholarships when the car he was in was blown up by a remote-controlled bomb near the Beit Hanoun junction in northern Gaza on October 15, 2003.

14.    Courtney Linde was notified of her husband's death when she received a telephone call from DynCorp at 4:00 a.m. local time on October 15, 2003.

15.    The murder of John Linde, Jr. caused Courtney Linde to suffer severe mental anguish and extreme emotional distress.

16.    Plaintiff Frances Boland is a citizen of the United States and a citizen of the state of Missouri.  She is the mother of John Linde, Jr.

17.    She was notified of the bombing on October 15, 2003 by a friend of Courtney Linde.  Frances Boland was later notified of the bombing by representatives of DynCorp, the company for which her son worked.

18.    Later that day, Frances Boland and her husband, Thomas Boland, saw videotape footage of the scene of the terrorist attack which was broadcast on the evening news in the United States, including discussions of the wreckage and the difficulty in identifying the remains of the victims.

19.     Both the death of her beloved son and the experience of watching the newscasts and seeing the images of the charred remains of the vehicle have caused Mrs. Boland to suffer severe mental anguish and extreme emotional distress.

20.     John Linde, Sr. is a citizen of the United States and a citizen of the state of Missouri.

21.     Mr. Linde is also a former United States Marine.

22.     On the day of his son's death, Mr. Linde was on vacation and had turned off the ringer on his home telephone.

23.     A family member eventually drove to Mr. Linde's house and informed Mr. Linde of his son's death.

24.     Despite his immense personal grief, Mr. Linde naturally felt compelled to watch reports of his son's death on television and to view the videotape footage of the crime scene and the charred remains of the vehicle that John Linde Jr. had been riding in at the time of the attack.

25.     Both the death of his beloved son and the experience of watching the newscasts and seeing the images of the charred remains of the vehicle have caused Mr. Linde to suffer severe mental anguish and extreme emotional distress.

26.     Plaintiff Kimberly Jasper is a citizen of the United States and a citizen of the state of Missouri.  She is the oldest sister of John Linde, Jr.

27.     She was notified of the bombing on October 15, 2003 by her stepfather, Thomas Boland.

28.     Later that day Mrs. Jasper saw videotape footage of the scene of the terrorist attack that was broadcast on the evening news in the United States, including

6

discussions of the wreckage and the difficulty in identifying the remains of the victims.

29.    Both the death of her beloved brother and the experience of watching the newscasts and seeing the images of the charred remains of the vehicle have caused Mrs. Jasper to suffer severe mental anguish and extreme emotional distress.

30.    Plaintiff Jennifer Hawkinson is a citizen of the United States and a citizen of the state of Missouri.  She is the older sister of John Linde, Jr.

31.    Her husband informed her of her brother's death when he went to her office and told her the tragic news at work.  Later that day, she saw videotape footage of the scene of the terrorist attack that was broadcast on the evening news in the United States, including discussions of the wreckage and the difficulty in identifying the remains of the victims.

32.    Mrs. Hawkinson was also interviewed on local television in Missouri and eulogized her brother at a time when her family was shocked and emotionally devastated by her brother's death.  As a result of her brother's murder, she has suffered severe mental anguish and extreme emotional distress.

**The Parsons Family**

33.    Mark Parsons was a citizen of the United States and a citizen of the state of Colorado.  He was 31 years old at the time of his death.

34.    Mark Parsons and two other DynCorp employees, including John Linde, Jr., were part of a security detail escorting U.S. diplomats on their way to interview Palestinian applicants for Fulbright scholarships when the car he was in was blown up by a remote-controlled bomb near the Beit Hanoun junction in northern Gaza on October 15, 2003.

35.    Plaintiff Matthew Parsons is a citizen of the United States and a citizen of the state of New Jersey.  He is the older brother of Mark Parsons.

36.     On October 15, 2004, Matthew Parsons' mother telephoned Matthew's wife and informed her that Mark had been the victim of a bombing in Israel. Matthew Parsons' wife telephoned Matthew at work and asked that he return home. Upon his arrival at home, Matthew learned that his younger brother had been killed.

37.     Later that day, Matthew Parsons saw videotape footage of the scene of the terrorist attack that was broadcast on the evening news in the United States, including discussions of the wreckage and the difficulty in identifying the remains of the victims. He also saw photographs of the incident on the internet when he went online later that day.

38.     Both the death of his beloved brother and the experience of watching the newscasts containing the images of the charred remains of the vehicle have caused Matthew Parsons to suffer severe mental anguish and extreme emotional distress.

**The Averbach Family**

39.     Plaintiff Steven Averbach is a citizen of the United States and of the State of Israel.

40.     He is 38 years old and presently resides near Tel Aviv, Israel after spending nearly a year in the hospital and a rehabilitation center. He is a married father of four sons ranging in age from three to fourteen. Steve and his wife, Julie, were married in 1994 and have two sons together, Sean (age 8) and Adam (age 3).

41.     Steve's older sons, Tamir (age 14) and Devir (age 11) are from a prior marriage.

42.     On May 18, 2003, Steve Averbach was seated on a commuter bus heading for Jerusalem when he noticed an Arab board the bus dressed as a religious Jew and became immediately suspicious.

43.     As Steve approached him, the bomber detonated his explosives.   The Islamic Resistance Movement (hereinafter known as "HAMAS") claimed responsibility for the bombing.

44.     Steve absorbed a substantial amount of the impact of the explosion and multiple pieces of shrapnel.

45.     Seven (7) people were killed by the explosion, ranging in age from 35 to 68.  Steve Averbach was one of twenty (20) people injured.

46.     The bomber was later identified by his family as Bassem Jamil Tarkrouri.

47.     Steve sustained a critical wound when a ball bearing originally packed together with the bomber's explosives, penetrated through the skin and muscles of his neck and lodged between his C3 and C4 vertebrae.  The ball bearing lodged in his spinal canal causing severe compression damage to the spinal cord.  The object was eventually removed during surgery, but not before it had caused severe damage to his spinal cord that rendered him a quadriplegic.

48.     Following surgery, Steve was moved to intensive care where he almost died several times because of an extremely high fever and from the blast injury to his lungs.  He has since undergone numerous operations to his back, groin and gastric intestines.  He has also undergone a tracheotomy and had a gastric feeding tube inserted as a result of the damage caused by the tracheotomy.

49.     Over the past year Steve returned to the Intensive Care Unit twice with complications.

50.     Steve is paralyzed from his neck down.

51.     On more than one occasion, Steve pleaded with his doctors and family

members to take him off of life support.

52.     To this day, Steve does not have the use of his arms or legs, cannot brush his own teeth or scratch his own nose.

53.     He is completely dependent on the 24-hour care provided to him and has no foreseeable hope of recovery.

54.     He lives in constant pain and battles depression.

55.     Steve Averbach has suffered severe physical and mental anguish and extreme emotional distress as a result of the attack.

56.     Plaintiff Julie Averbach is a citizen of the State of Israel.  She is the wife of Steve Averbach and the mother of Sean and Adam Averbach.

57.     As the result of the injuries sustained by Steve, Julie has had to relocate her family to be closer to the rehabilitation center where Steve resided for nearly a year.  Steve moved home from the rehabilitation center in July of 2004, but requires continuous 24-hour care.  Julie is now, in most respects, a single parent and cannot enjoy the normal companionship and day-to-day assistance and mutual support that she previously received from her husband.

58.     As a result of the attacks, Julie Averbach has suffered severe mental anguish and extreme emotional distress.

59.     Plaintiff Tamir Averbach is a citizen of the United States and a citizen of the State of Israel.

60.     He is the fourteen (14) year old son of Steve Averbach and Steve's first wife.

61.     Tamir Averbach has experienced severe mental anguish and extreme emotional distress from witnessing his father's relentless and painful suffering, his repeated

surgeries and brushes with death, his negative prognosis and his permanent physical state.

62.     Plaintiff Devir Averbach is a citizen of the United States and a citizen of the State of Israel.  He is the eleven (11) year old son of Steve Averbach and Steve's first wife.

63.     Devir and his elder brother, Tamir, remember what it was like when their father was an able-bodied man.  Devir has suffered severe mental anguish and extreme emotional distress as a result of his father's relentless and painful suffering, repeated surgeries and brushes with death, his negative prognosis and his permanent physical state.

64.     Plaintiff Sean Averbach is a citizen of the United States and a citizen of the State of Israel.  He is the eight (8) year old son of Steve and Julie Averbach.

65.     He presently resides near Tel Aviv.  As a result of the brutal attack on his father he has been emotionally traumatized and has lost the sense of protection and safety he once enjoyed from his father.

66.     Due to the severity of his father's injuries, ordinary companionship and simple pleasures of traveling with or playing sports with his father have been denied to him, and will in all likelihood be denied to him for the remainder of his father's life.  As a result, Sean Averbach has suffered severe mental anguish and extreme emotional distress.

67.     Plaintiff Adam Averbach is a citizen of the United States and a citizen of the State of Israel.  He is the three (3) year old son of Steve and Julie Averbach and he presently resides near Tel Aviv.  As a result of the brutal attack on his father he has been emotionally traumatized and will in all likelihood never possess memory of a time when his father was capable of using his arms and legs.  Due to the severity of his father's injuries, ordinary companionship and simple pleasures of walking together, driving in a car with, or playing sports with his father have been denied to him and will in all likelihood be denied to him for the

remainder of his father's life.

68.    As a result of the attacks, Adam Averbach has suffered severe mental anguish and extreme emotional distress.

69.    Plaintiffs Dr. David Averbach and his wife, Maida Averbach, are United States citizens and citizens of the state of New Jersey.  They are the parents of Steve Averbach.

70.    They returned home late on May 17, 2003, from a dinner honoring Dr. Averbach.  Mrs. Averbach switched on Fox News and learned that a bus had been bombed in Jerusalem on Sunday morning in Israel.  Mrs. Averbach recognized her son's hand leaning out of a stretcher on the news footage but decided not to inform her husband until the next morning.

71.    After a sleepless night, Mrs. Averbach answered the telephone on Sunday morning in New Jersey at 5:50 a.m.  Her daughter-in-law and a social worker from Hadassah Hospital were on the phone and explained that Steve had been grievously wounded by the explosion and had a ball bearing lodged between his C3 and C4 vertebrae.

72.    As a respected surgeon with many years of experience, Dr. Averbach immediately understood the severity of his son's injuries.

73.    Dr. and Mrs. Averbach have partially retired from their jobs so they may spend more time with Steve and his children.

74.    Dr. David Averbach and Maida Averbach have experienced severe mental anguish and extreme emotional distress as a result of the terrorist attack, and in the case of Maida Averbach, from the moment she saw her son's hand on television on May 17, 2003.

75.    Steve's continued inability to use his hands and legs, his inevitable battle with depression and the emotional effect it has had on Steve's four young children are a constant source of continued anguish to both of his parents.

76.     Michael Averbach is a United States citizen and a citizen of the state of New Jersey.

77.     He is the brother of Steve Averbach.

78.     Michael Averbach has always looked up to his brother and admired him. The injuries his brother has sustained have been a severe emotional blow to Michael.

79.     Since the date of the attack Michael has flown to Israel repeatedly, often at his brother's request, simply to sit by Steve's bedside and talk.

80.     As a result of the terrorist attack, Michael Averbach has suffered severe mental anguish and extreme emotional distress.

81.     Eileen Sapadin is a United States citizen and a citizen of the state of New Jersey.

82.     She is the sister of Steve Averbach.

83.     Mrs. Sapadin was staying at her parent's home with her husband and three of her four children on the morning her mother received notification of the attack.

84.     Eileen Sapadin has experienced tremendous emotional pain and sadness as a result of the severity of the injuries that Steve sustained as a result of the attack.

85.     She suffers from anxiety and depression, has trouble sleeping and cries every day.

86.     In the past year, she has lost more than thirty pounds and has suffered physical exacerbations of a colitis condition which was in remission prior to the attack that severely injured her brother.

87.     As a result of the terrorist attack, Eileen Sapadin has suffered severe physical and mental anguish and extreme emotional distress.

**The Goldstein Family**

88.    Howard Goldstein was a citizen of the United States and a citizen of the State of Israel.

89.    He was murdered on June 20, 2003 while driving his car with his parents on Route 60 in Israel.

90.    Mr. Goldstein was in the process of picking up his parents from Jerusalem where they had stayed the night following the wedding of Howard's son, David.

91.    Howard's father, Eugene Goldstein was seated in the front passenger seat, and his mother, Lorraine Goldstein was seated behind her husband.

92.    At some point, as Howard was driving, his father, Eugene, noticed two individuals on the side of the road with their backs turned toward the car.  As their car approached, the men turned around and began rapidly firing their guns at the Goldsteins' vehicle.

93.    Howard Goldstein was shot first in the chest, left lung, kidney and liver.

94.    He died almost immediately and his body slumped over the wheel.

95.    HAMAS claimed responsibility for the attack.

96.    Plaintiff Eugene Goldstein is a citizen of the United States and of the state of New York.

97.    Eugene was shot in the back, head and shoulder with a bullet.

98.    The top of the bullet grazed Eugene Goldstein's head.  The remainder exploded in one of his lungs, leaving behind shrapnel in his lung, liver and kidneys.  The bullet lodged between his heart and his lungs.

99.    Somehow, Eugene managed to steer the car until it ultimately overturned in a ditch.

100.     As a result of the terrorist attack, Eugene Goldstein still has several bullet fragments lodged in his chest.  He must undergo an x-ray every three (3) months to monitor the condition of the bullet fragments encapsulated in his chest.

101.     He has since returned to his job where he missed three (3) months of work as a result of his injuries.

102.     He blames himself for taking his wife to attend his grandson's wedding.

103.     As a result of the attack, Eugene Goldstein has suffered severe physical and mental anguish and extreme emotional distress.

104.     Plaintiff Lorraine Goldstein is a citizen of the United States and a citizen of the state of New York.  She is the mother of Howard Goldstein and the wife of Eugene Goldstein.

105.     She was also shot and severely injured.

106.     She was struck by a bullet which entered her body through her back, grazed her carotid artery and lodged in her jaw bone.  She has three bullet holes in her back.

107.     Shrapnel also lodged throughout her body, especially in her back.  She also suffered a shattered nose and septum as well as various lacerations resulting from the car crash.

108.     Presently, Lorraine Goldstein still requires physical therapy because the scar tissue in her jaw prevents her from opening it fully.  She still suffers from pain and headaches.

109.     She has had 11 teeth pulled and extensive periodontal and dental work.  She must also deal with the harmful effects of shrapnel lodged throughout her body.

110.     As a result of the terrorist attack, Lorraine Goldstein has suffered severe

physical and mental anguish and extreme emotional distress.

111.    The Goldsteins' family in New York received notice of the attack by two cousins, one of whom saw images of the attack on the internet and sent an instant message to the immediate family.

112.    The Goldsteins' family sat in horror as they watched images of the attack on the Cable News Network (CNN) shortly after the attack occurred.  The video broadcast showed Howard, his wife Michal, Eugene and Lorraine Goldstein being pulled from the wreckage of the car Howard Goldstein had been driving.

113.    Lorraine Goldstein's face and hair were covered with blood.

114.    After learning of the attack, plaintiff Richard Goldstein telephoned his sister, Barbara Goldstein Ingardia, at work and asked her to return home immediately.  When she arrived, her extended family was present.  They shared the tragic news that their parents and brother had been attacked.  Barbara then made plans to fly to Israel to care for her parents.

115.     Eugene and Lorraine Goldstein remained in Jerusalem at Hadassah Hospital for approximately ten (10) days and were unable to return home when they were discharged from the hospital because the airline did not give Mr. Goldstein permission to fly due to the poor condition of his lungs.

116.    Plaintiff Barbara Goldstein Ingardia is a citizen of the United States and a citizen of the state of New York.

117.    She is the daughter of Eugene and Lorraine Goldstein and the sister of Howard Goldstein.

118.    She left her job and her immediate family behind and traveled to Israel to care for her parents in Israel during their recovery and to mourn the loss of her brother.

119.    In addition to grappling with the devastating emotional consequences of her brother's death, she was forced to deal with the uncertainty of her mother's recovery due to her severe injuries and age.

120.    At one point during her hospital stay, Lorraine Goldstein was placed on life support.

121.    Barbara Goldstein Ingardia blames herself for encouraging her parents to attend the wedding.  As a result of the terrorist attack, Barbara Goldstein Ingardia has suffered severe mental anguish and extreme emotional distress.

122.    Plaintiff Richard Goldstein is a citizen of the United States and of the state of New York.  He is the son of Eugene and Lorraine Goldstein and the brother of Howard Goldstein.  As a result of the terrorist attack, Richard Goldstein has suffered mental anguish and extreme emotional distress caused by the death of his brother and the life-threatening injuries to both of his parents.

123.    Plaintiff Michael Goldstein is a citizen of the United States and a citizen of the state of Florida.

124.    He is the brother of Howard Goldstein and the son of Eugene and Lorraine Goldstein.  As a result of the terrorist attack, Michael Goldstein has suffered severe mental anguish and extreme emotional distress because of the death of his brother and the life-threatening injuries of both of his parents.

125.    Plaintiff Chana Freedman is a citizen of the United States and a citizen of the State of Israel.

126.    She is the daughter of Howard and Michal Goldstein.

127.    She and her husband were eating lunch at a mall in Jerusalem when they

learned that her father and grandparents had been involved in what they believed to be an automobile accident.

128.    Chana's husband received a telephone call from his father informing the couple to go directly to Hadassah Hospital.

129.    When Chana and her husband arrived at Hadassah Hospital, a social worker informed them that Chana's father had died in the terrorist attack.

130.    Chana informed her brother Daniel and his wife, who had just been married, of the attack when they arrived at the hospital.

131.    As a result of her father's death, Chana Freedman has suffered severe mental anguish and extreme emotional distress.

### The Nathansen Family

132.    Tehilla Nathansen was a citizen of the United States and of the State of Israel.  She was three (3) years old when she was murdered in a suicide bomb attack that occurred when she was sitting on her mother's lap on the No. 2 bus in Jerusalem on August 19, 2003.

133.    The Nathansen family boarded the bus at the Kotel (Wailing Wall) in the Old City of Jerusalem, where her parents had just completed their prayers at Judaism's holiest site.

134.    HAMAS has claimed responsibility for the attack.

135.    Plaintiffs Matanya and Chana Nathansen bring this action both individually and on behalf of their three (3) year old daughter's estate.

136.    Chana Nathansen, Tehilla's mother, is a citizen of the United States and of the State of Israel.

137.    Chana Nathansen was severely injured in the explosion that killed her daughter and is partially crippled as a result of her injuries.  Chana Nathansen had seven (7) ball bearings removed from her body which left bullet holes in her chest, leg and arm. She is also now hearing impaired in one ear.  Chana Nathansen sustained severe physical and mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of her three year old daughter, witnessing the severe injuries sustained by her baby daughter, Shoshana Nathansen, in addition to the injuries she herself sustained.

138.    Plaintiff Matanya Nathansen, Tehilla's father, is a citizen of the State of Israel.

139.    Matanya Nathansen was injured by the explosion.  He suffered fractures in both feet and in his collar bone, and sustained injuries to his lungs, eye and finger.  He is now hearing impaired and is no longer able to walk properly.

140.    In addition to the injuries he sustained as a result of the explosion, Mr. Nathansen has sustained severe physical and mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of his three-year old daughter, as well as the severe injuries sustained by his wife and young daughters.

141.    Plaintiff Yehudit Nathansen is a citizen of the United States and of the State of Israel.  She is the six year old sister of Tehilla Nathansen and the daughter of Matanya and Chana Nathansen.  At the time of the explosion, Yehudit was sitting with her aunt, apart from her parents.  Yehudit sustained physical injuries from the explosion and was treated at Bikur Cholim in Jerusalem.

142.    Yehudit has suffered physical and severe mental anguish and extreme emotional distress from witnessing and experiencing first-hand the death of her three-year old

sister, as well as the severe injuries sustained by her mother and baby sister and injuries to her father.

143.    Plaintiff Shoshana Nathansen is a citizen of the United States and a citizen of the State of Israel.

144.    She is the one (1) year old sister of Tehilla Nathansen.

145.    Shoshana Nathansen was sitting on her mother's lap at the time of the explosion.  Shoshana was five (5) months old at that time.  As a result of the explosion, Shoshana suffered fractures in her leg and hip, deep lacerations in her arm that have left permanent scars and slight scars on her face and legs.  She also sustained severe physical injuries requiring the removal of numerous ball bearings from her legs.  The full effect of her injuries on her, including her ability to walk, will not be fully known until she is older.

146.    As a result of the terrorist attack, Shoshana Nathansen has suffered severe physical and mental anguish and extreme emotional distress.

147.    Plaintiff Hezekial Toporowitch is a citizen of the United States and of the State of Israel.

148.    He resides with his family near Haifa, Israel.

149.    He is the father of Plaintiff Chana Nathansen and grandfather of the three Nathansen girls.

150.    In the middle of the night he was notified by telephone of the bombing that killed his granddaughter, Tehilla Nathansen, and crippled his daughter, Chana Nathansen.  On the night of the bombing he traveled with his wife and son to Jerusalem.  He was supposed to travel on to the central morgue in Holon to attempt to identify his granddaughter's body, but was in too much shock to continue.

151.    He was initially told to identify the bodies of <u>two</u> granddaughters since Shoshana had not yet been identified at the hospital and was thought to be deceased.

152.    As a result of the terrorist attack, Hezekial Toporowitch has suffered severe mental anguish and extreme emotional distress from experiencing the death of his three-year old granddaughter, as well as the severe injuries sustained by his daughter and other granddaughter and injuries to his son-in-law.

153.    Plaintiff Pearl B. Toporowitch is a United States citizen and mother of plaintiff Chana Nathansen and grandmother of the three Nathansen girls.

154.    Mrs. Toporowitch resides with her husband near Haifa, Israel.

155.    She was notified by telephone in the middle of the night of the bombing that killed her granddaughter and crippled her daughter.

156.    On the night of the bombing she traveled with her husband to the Jerusalem Hospital where her daughter Chana was being treated.  She attempted to obtain further details about the condition of her son-in-law and her granddaughters.

157.     In the aftermath of the bombing, Chana, her husband, and her children were transferred to different hospitals thereby complicating the family's efforts to locate them.

158.    As a result of the terrorist attack, Pearl B. Toporowitch, has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three-year old granddaughter, as well as the severe injuries sustained by her daughter and other granddaughter and injuries to her son-in-law.

159.    Plaintiff Yehuda Toporowitch is a citizen of the United States and of the State of Israel.

160.    He resides in Israel in an apartment near his parents.

161.    He is the brother of plaintiff Chana Nathansen and the uncle of the three Nathansen girls.

162.    In the middle of the night he was notified by telephone of the bombing that killed his niece and crippled his sister.

163.    On the night of the bombing, he was at working at a resort and quickly rushed to a nearby television where graphic images of the bombsite were being broadcast by Israeli television.

164.    Yehuda rushed home and traveled with his parents to the Tel Aviv area and stopped at the home of one of his sisters.  He then took a taxicab to the central morgue and attempted to identify his niece's remains, but unfortunately a positive identification was not possible because of the nature and extent of Tehilla's injuries.

165.     Yehuda then made arrangements for the necessary DNA testing which ultimately confirmed his niece's identity.

166.    As a result of the terrorist attack, Yehuda Toporowitch has suffered severe mental anguish and extreme emotional distress from the death of his three-year old niece and the attempt to identify her remains, as well as the severe injuries sustained by his sister and other niece and injuries to his brother-in-law.

167.    Plaintiff David Toporowitch is a citizen of the United States and a citizen of  the State of Israel.

168.    He presently resides with his parents in Israel.

169.    He is the brother of plaintiff Chana Nathansen and the uncle of the three Nathansen girls.  He was not present when his parents were notified by telephone of the bombing that killed his niece and crippled his sister.  Instead, he had to piece together the events by

himself after his family had already left for Jerusalem.

170.    Like the rest of his immediate family, David visited his sister and niece in the hospital and experienced the shock and severe mental anguish and extreme emotional distress resulting from the emotional trauma of burying his young niece and dealing with the pain and loss experienced by his sister.

171.    As a result of the terrorist attack, David Toporowitch has suffered severe mental anguish and extreme emotional distress from experiencing the death of his three year old niece, as well as the severe injuries sustained by his sister and other niece.

172.    Plaintiff Shaina Chava Nadel is a citizen of the United States and a citizen of the State of Israel.

173.    She is the sister of plaintiff Chana Nathansen and the aunt of the three Nathansen girls.

174.    Like the rest of her immediate family, Shaina visited her sister and niece in the hospital and experienced the shock and mental anguish resulting from the emotional trauma of burying her young niece and dealing with the pain and loss experienced by her sister.

175.    As a result of the terrorist attack, Shaina Chava Nadel has suffered severe mental anguish and extreme emotional distress from experiencing the death of her three year old niece, as well as the severe injuries sustained by her sister and other niece and injuries to her brother-in-law.

176.    Plaintiff Blumy Rom is a citizen of the United States and of the State of Israel.

177.    She is the sister of plaintiff Chana Nathansen and the aunt of the three Nathansen girls.  Like the rest of her immediate family, Blumy visited her sister and niece in the

hospital and experienced the shock and mental distress resulting from the emotional trauma of

burying her young niece and dealing with the pain and loss experienced by her younger sister.

178.    As a result of the terrorist attack, Blumy Rom has suffered severe mental

anguish and extreme emotional distress from experiencing the death of her three year old niece,

as well as the severe injuries sustained by her sister and other niece and moderate injuries to her

brother-in-law.

179.    Plaintiff Rivka Toporowitch is a citizen of the United States and of the

State of Israel.

180.    She is the sister of plaintiff Chana Nathansen and the aunt of the three

Nathansen girls.

181.    Like the rest of her immediate family, Rivka visited her sister and niece in

the hospital and experienced severe mental anguish and extreme emotional distress from burying

her young niece and dealing with the pain and loss experienced by her older sister and moderate

injuries to her brother-in-law.

182.    She stayed with her baby niece Shoshana, caring for her during the two

weeks that she was hospitalized and for two months after her discharge from the hospital.

Having to change the dressings on her niece's wounds, caring for her various injuries and taking

her to doctors has emotionally affected her deeply.

183.    As a result of the terrorist attack, Rivka Toporowitch has suffered severe

mental anguish and extreme emotional distress from experiencing the death of her three year-old

niece, as well as the severe injuries incurred by her sister and other niece.

**The Mandell Family**

184.    Jacob (Koby) Mandell was a citizen of the United States and a citizen of

the State of Israel.

185.    On May 8, 2001, Koby, an eighth-grader from Tekoa, Israel, skipped school and went hiking with his friend near the Mandells' family home.

186.    He and his friend were savagely murdered by Palestinian terrorists, who set upon the boys near a series of caves and beat them to death with rocks and mutilated their bodies beyond recognition.

187.    On the evening of Koby's disappearance, the Mandell family, their neighbors and the police searched the hills near Tekoa and searched through the night for the missing boys.

188.    Koby's body was located the following day by search and rescue volunteers.

189.    A splinter Palestinian terrorist group calling itself "Palestinian Hezbullah" claimed responsibility for the murders, but the murders have been widely credited to the "Popular Resistance Committees." The killers have not yet been apprehended.

190.    Plaintiffs Frederick and Sherri Mandell bring this suit in their individual capacities and on behalf of the Estate of Jacob Mandell for wrongful death and severe physical and mental anguish resulting from his brutal murder.

191.    Plaintiff Frederick Mandell is a citizen of the United States and of the State of Israel and a resident of Tekoa, Israel. He is the father of Jacob Mandell. As a result of the terrorist attack that killed his son, plaintiff Frederick Mandell has experienced severe mental anguish and extreme emotional distress.

192.    Plaintiff Sherri Mandell is a citizen of the United States and of the State of Israel and a resident of Tekoa, Israel. She is the mother of Jacob Mandell. As a result of the

terrorist attack that killed her son, Plaintiff Sherri Mandell has experienced severe mental anguish and extreme emotional distress.

193.    Plaintiff Eliana Mandell is a citizen of the United States, a citizen of the State of Israel and a resident of Tekoa, Israel.  She is the sister of Jacob Mandell.  Since the terrorist attack, Eliana has lost ordinary companionship and simple pleasures of spending time with her older brother.  As a result of the tragic and horrific death of her brother, she has suffered severe mental anguish and extreme emotional distress.

194.    Plaintiff Avraham Mandell is a citizen of the United States and of the State
of Israel and a resident of Tekoa, Israel.  He is the brother of Jacob Mandell.  Since the terrorist attack, Avraham has lost ordinary companionship and simple pleasures of spending time with his older brother.  As a result of the tragic and horrific death of his brother, he has suffered severe mental anguish and extreme emotional distress.

195.    Plaintiff Daniel Mandell is a citizen of the United States and of the State of Israel and a resident of Tekoa, Israel.  He is the brother of Jacob Mandell.  Since the terrorist attack, Daniel has lost ordinary companionship and simple pleasures of spending time with his older brother.  As a result of the tragic and horrific death of his brother, he has suffered severe mental anguish and extreme emotional distress.

### The Ben-Zaken and Zilberstein Families

195.    Plaintiff Ran Zilberstein is a citizen of the State of Israel.  He is the husband of plaintiff Chaya Ben-Zaken Zilberstein, a citizen of the United States and a citizen of the State of Israel.

196.    Ran was sitting at a table with his pregnant wife and parents at a table in

the Maxim Restaurant in Haifa, Israel when a female suicide bomber detonated an explosive

charge.  His mother was killed along with nineteen (19) other individuals.

197.    Palestinian Islamic Jihad claimed responsibility for the attack.

198.    Chaya Ben-Zaken Zilberstein, who was six months pregnant at the time of

the attack, suffered severe wounds to her legs.

199.    She was hospitalized at the Rothschild Hospital in Haifa for one (1) week

and experienced substantial physical pain and suffering as a result of her injuries.  Initially, it

was not clear if she would ever walk again or if the child she was carrying in utero had been

injured.

200.    As a result of the injuries to his pregnant wife, Ran Zilberstein suffered

severe mental anguish and extreme emotional distress.

201.    As a result of the deep wounds to her legs, Chaya Ben-Zaken Zilberstein

was temporarily paralyzed.  As a result of both her physical condition and the uncertainty of the

health and well being of her unborn child, in addition to her physical injuries, Chaya Ben-Zaken

Zilberstein suffered both severe physical and mental anguish and extreme emotional distress

202.    Plaintiff Clara Ben-Zaken is a citizen of the United States and a citizen of

the State of Israel.  She is the sister of Chaya Ben-Zaken Zilberstein.

203.    Clara learned of the attack at the Maxim restaurant while out of the

country on vacation.  The injuries sustained by Clara's pregnant sister caused Clara to suffer

severe mental anguish and extreme emotional distress.

204.    Clara's mental anguish was intensified by the fact that she herself was a

victim of a prior suicide bombing at the Sbarro's Pizzeria in Jerusalem on August 9, 2001.

205.    On that day, Clara had been waiting for a friend outside of the crowded

pizzeria shortly before the attack.  Suddenly, she heard a loud explosion and the body of a dead

man flew through the window of Sbarro's and landed on top of her. Clara pulled herself free of

the corpse and ran away from the restaurant.

206.    She later went to the hospital where she was treated for her cuts and

bruises.

207.    HAMAS claimed responsibility for the attack.

208.    As a result of the Sbarro's attack, coupled with the suicide bombing that

injured her pregnant sister 2 years later, Clara Ben-Zaken has suffered physical and severe

mental anguish and extreme emotional distress.

**Gloria Kushner**

209.    Plaintiff Gloria Kushner is a citizen of the United States and a citizen of

the state of Florida.

210.    She was injured by a suicide bomber in Netanya, Israel on May 19, 2002.

211.    HAMAS and the Popular Front for the Liberation of Palestine both

claimed responsibility for the attack.

212.    Gloria Kushner was walking in an open air market when a suicide bomber

blew himself up between the stalls, killing three individuals and wounding more than fifty (50)

people.

213.    Ms. Kushner was approximately one hundred and fifty feet away from the

suicide bomber when he detonated.  As the bomb exploded, nails, screws and bolts flew in every

direction and glass shattered on the main street from the buildings surrounding the market.

214.    Ms. Kushner was thrown against a vegetable stand, injuring her spine,

right knee and right ear.  The permanent bridge in her mouth cracked and a shard of glass

imbedded itself in her chin.

215.    She had to undergo surgery to remove the resulting lump and she
continues to suffer from headaches and numbness in her fingers due to the injury to her neck.

216.    She suffers from post traumatic stress disorder and still has flashbacks and
nightmares whenever she hears an ambulance or fire truck.

217.    As a result of the terrorist attack, Gloria Kushner has experienced severe
physical and mental anguish and extreme emotional distress.

**The Kirschenbaum Family**

218.    Plaintiff Jason Kirschenbaum is a United States citizen and a citizen of the
state of New York.

219.    Jason Kirschenbaum was injured on Ben Yehuda Street in Jerusalem on
December 1, 2001 during a double suicide bombing.  That attack killed ten (10) people and
injured more than one hundred (100) individuals, including Jason.

220.    HAMAS claimed responsibility for the attack.

221.    As a result of the first explosion, Jason was thrown to the ground.  As he
stood up, the second suicide bomber detonated his explosives and Jason was thrown in another
direction.

222.    When he got up the second time he felt numb. Jason saw his left arm
dangling back and forth and held it because he thought it might fall off.  When he began running
up the street for help, he felt a sharp pain in his leg and back.

223.    Jason was taken to Shaare Tzedek Hospital in Jerusalem where he
underwent two operations.  Surgeons removed eight (8) metal bolts from his arm, leg and back.

224.    Jason had to undergo several months of physical therapy for the injuries to

his arm, leg and back. He still has scarring where he was branded by the bolts that penetrated his skin.

225. Jason Kirschenbaum has suffered severe physical and mental anguish and extreme emotional distress as a direct result of the terrorist attack.

226. Plaintiff Isabelle Kirschenbaum is a United States citizen and a citizen of the state of New York. She is the mother of Jason Kirschenbaum.

227. Isabelle first learned of the double suicide bombing while watching the Cable News Network (CNN). After numerous telephone conversations, she ultimately received a telephone call confirming that Jason had been injured in the attack. As a result of the attack, Isabelle Kirschenbaum has suffered severe mental anguish and extreme emotional distress.

228. Plaintiff Martin Kirschenbaum is a United States citizen and a citizen of the state of New York and of the State of Israel. He is the father of Jason Kirschenbaum. He learned of the attack when he and Isabelle Kirschenbaum received the telephone call confirming that Jason had been injured in the attack.

229. As a result of the attack, Martin Kirschenbaum has suffered severe mental anguish and extreme emotional distress.

230. Plaintiff Joshua Kirschenbaum is a United States citizen and a citizen of the state of New York. He is the brother of Jason Kirschenbaum.

231. Joshua Kirschenbaum was in Tel Aviv, Israel at the time of the attack. Martin and Isabelle Kirschenbaum telephoned Joshua to advise him that his brother, Jason, had been injured in the attack in Jerusalem. Hours later, he finally located his brother in the emergency room at Shaare Tzedek Hospital in Jerusalem.

232. As a result of the terrorist attack, Joshua Kirschenbaum has suffered

severe mental anguish and extreme emotional distress

233.    Plaintiff Shoshanah Burgette is a United States citizen and a citizen of the state of New York.

234.    She is the older sister of Jason Kirschenbaum.

235.    As a result of the attack, Shoshanah Kirschenbaum has suffered severe mental anguish and extreme emotional distress.

236.    Plaintiff David Kirschenbaum is a United States citizen and a citizen of the state of New York.

237.    He is the older brother of Jason Kirschenbaum.

238.    As a result of the attack, David Kirschenbaum has suffered severe mental anguish and extreme emotional distress.

239.    Plaintiff Danielle Teitelbaum is a United States citizen and a citizen of the state of New Jersey.

240.    She is the older sister of Jason Kirschenbaum.

241.    As a result of the attack, Danielle Teitelbaum has suffered severe mental anguish and extreme emotional distress.

### The Fenichel Family

242.    Plaintiff Netanel Fenichel is an eighteen (18) year old citizen of the United States and a citizen of the State of Israel.  He is a resident of the Israeli city of Efrat.

243.    He was seated in his parents' automobile on March 31, 2002 while his mother was driving past the local supermarket and medical center when a suicide bomber detonated his explosives.

244.    The Al Aqsa Martyrs Brigade claimed responsibility for the attack which

wounded five people, including four paramedics from the nearby medical center.

245.    Shrapnel from the blast pierced the roof of the Fenichels' family car and fractured the top of Netanel's skull.

246.    Netanel was rushed to the nearby medical center and was quickly operated on at Hadassah Hospital in Jerusalem.

247.    He has a permanent hole in the top of his skull.

248.    As a result of the attack, Netanel Fenichel has suffered severe physical and mental anguish and extreme emotional distress.

249.    Plaintiff Ilanit Fenichel is a citizen of the United States and a citizen of the State of Israel.  She is a resident of the Israeli city of Efrat.

250.    Ilanit Fenichel is the twin sister of plaintiff Netanel Fenichel.

251.    Ilanit was seated in the car with her brother, Netanel.  She was not physically injured in the suicide attack, but has been psychologically traumatized by the attack. For more than one week following the attack she would not agree to leave her parents' house.

252.    The sound of emergency vehicles or news about additional recent terrorist attacks trigger Ilanit's recurring anxiety attacks.

253.    As a result of the attack that injured her brother, Ilanit Fenichel has suffered severe mental anguish and extreme emotional distress.

254.    Plaintiff Moshe Fenichel is the father of Netanel and Ilanit Fenichel.

255.    He is a citizen of the United States and a citizen of the State of Israel.  He is a resident of the Israeli city of Efrat.

256.    As a result of the attack that seriously injured his son, he has suffered severe mental anguish and extreme emotional distress.

257.    Plaintiff Deborah Fenichel is the mother of Netanel and Ilanit Fenichel and the wife of Moshe Fenichel.

258.    She is a citizen of the United States and a citizen of the State of Israel. She is a resident of the Israeli city of Efrat.

259.    Deborah was driving her car with her two children in the vehicle when the suicide bomber detonated his explosive charge and the shrapnel seriously injured her son.

260.    She spent eight (8) hours in clothing soaked with her son's blood, unaware of his prognosis.  She has provided care to her son during his continued recovery from his injuries.

261.    As a result of the attack that seriously injured her son, Deborah Fenichel has suffered severe mental anguish and extreme emotional distress.

**The Nevies Family**

262.    Plaintiff Rebecca Nevies is a thirty five (35) year old citizen of the United States and of the State of Israel and a resident of Israel.

263.    She is the mother of four children.

264.    She was riding the No. 14 bus in Jerusalem on Sunday, February 22, 2004 when a suicide bomber detonated his explosives, murdering eight (8) people and wounding more than sixty (60) others, including Rebecca.  Rebecca suffered a shrapnel injury to her foot, acute hearing loss, and cuts and burns to her legs and face.

265.    Al Aqsa Martyrs Brigade claimed responsibility for the attack.

266.    Rebecca Nevies suffered significant physical injuries as a result of the attack as well as severe mental anguish and extreme emotional distress which was intensified by the horrific scene she witnessed in the aftermath of the explosion.

267.    Plaintiff Naphtali Nevies is a citizen of Great Britain and a citizen of the State of Israel.  He is a resident of Israel.  Naphtali Nevies is the husband of plaintiff Rebecca Nevies.

268.    As a result of the attack, and as the father of four small children, Naphtali Nevies has suffered severe mental anguish and extreme emotional distress.

**B.    The Defendant**

269.    Defendant Arab Bank is Jordanian bank with headquarters in Amman, Jordan, the common stock of which is publicly traded on the Amman Stock Exchange.  Arab Bank is majority owned and controlled by the shareholders of Arab Bank Group, a Jordanian holding company.  Arab Bank and Arab Bank Group constitute a single Jordanian banking institution.  Arab Bank owns, controls and/or operates bank branches worldwide, including several branches that are situated in Palestinian Authority controlled territories and a wholly owned branch office located at 520 Madison Avenue, New York, New York, that is regulated by the Controller of the Currency of the United States Treasury Department.  Arab Bank conducts business in, and is registered to conduct business under, the laws of the state of New York.

270.    Arab Bank has operated its federally chartered branch in New York since 1983.  The New York branch is designated as a wholesale bank, and among the banking and financial services that it conducts in New York is the provision of clearing and correspondent bank services to its foreign bank branch offices and affiliated banking institutions that are also owned and/or controlled by the Arab Bank Group as well as other foreign banks.

271.    Arab Bank and Arab Bank Group are majority owned and/or controlled by members of the Shoman family, including Abdul Majeed A.H. Shoman, who is the Chairman of Arab Bank and Arab Bank Group, Abdel Hamid A.M. Shoman, who is Deputy Chairman and

Chief Executive Officer of Arab Bank and Arab Bank Group.

## FACTUAL ALLEGATIONS

272.    Several prominent terrorist organizations operate in Palestinian-controlled territory, most notably the Palestinian Islamic Jihad (the "PIJ"), the Islamic Resistance Movement ("HAMAS") and the Al Aqsa Martyrs Brigade ("AAMB").

273.    PIJ and HAMAS are both primarily radical Islamist terrorist organizations that are committed to the globalization of Islam through violent "Jihad" or holy war.

274.    Both groups are formally committed to the destruction of the State of Israel and are committed to achieving their objectives by violent means, including acts of terrorism.  The HAMAS Charter states that the very purpose of HAMAS is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad.

275.    AAMB is a paramilitary offshoot of the governing Fatah movement which nominally functions as the one party government of the Palestinian Authority.

276.    AAMB's political lineage is therefore secular and not Islamist in orientation, but since its inception it has adopted both the religious rhetoric of its radical Islamist counterparts and their murderous tactics.

277.    The PIJ knowingly, willfully, and unlawfully combines, conspires, confederates, and agrees together to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and providing material support to Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

278.    For example, the organization has committed numerous terrorist attacks, including several that have killed and injured American citizens.  Since September 2000, the PIJ

has conducted and taken credit for at least 28 murderous attacks, including at least seven mass murder bombings that have killed over 90 civilians, including U.S. citizens.

279.    On October 8, 1997, the PIJ was designated as a Foreign Terrorist Organization by the U.S. government under the AEDPA.  The designation has since been renewed every two years, including in 2003.

280.    HAMAS is an acronym for "Harakat Muqawama Islamiyya," the Islamic Resistance Movement, which was founded in December 1987.

281.    The organization is nominally divided into two separate wings, the political wing which supports the so-called "Dawa" (its social service or humanitarian component) and the paramilitary wing known as the Izz-el-Din al Qassam Brigade.  Although these two components have separate responsibilities, the organization operates seamlessly, with each component working to conduct the operations and achieve the illegal objectives of the terrorist group as a whole.

282.    HAMAS' social services are, in large part, administered by local "zakat," committees and other charitable organizations ("Zakat" means charity in Arabic).  These committees and organizations are controlled by HAMAS by, inter alia, HAMAS members, operatives and activists sitting as members of their governing committees.

283.    Due to the substantial expenditures of the HAMAS organization and the fungible nature of money, significant sums of monies collected externally under charitable and humanitarian banners are routed for HAMAS' military and other operational uses, in addition to being used to free up other funds for specific terrorists' acts.  HAMAS uses such funds for, among other things, the provision of weapons, explosives, transportation services, safehouses, and salaries for its terrorist operatives and for terrorist recruiters.

284.    Like PIJ, HAMAS is a foreign organization dedicated to radical Islamist principles and the destruction of the State of Israel.  It also uses violence, principally suicide bombings, and threats of violence to pressure Israel to cede territory to the Palestinian people.

285.    HAMAS knowingly, willfully, and unlawfully combines, conspires, confederates and agrees to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and numerous other acts of international terrorism activities as defined by 18 U.S.C. § 1331 and 18 U.S.C. § 2332 and other related acts of murder, attempted murder, solicitation to commit murder and providing material support to designated Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

286.    Since September 2000, HAMAS has launched hundreds of attacks targeting civilians that have resulted in the deaths and injury of hundreds of individuals, including over twenty (20) mass murders that have killed more than three hundred (300) civilians, including numerous American citizens.  HAMAS has claimed responsibility for the attacks on plaintiffs Steven Averbach, Howard Goldstein, Eugene Goldstein, and Lorraine Goldstein, Tehilla Nathansen, Shoshana Nathansen, Chana Nathansen Clara Ben-Zaken and Gloria Kushner and Jason Kirschenbaum.

287.    On January 25, 1995, HAMAS was designated as a Specially Designated Terrorist and, on October 8, 1997, by publication in the Federal Register, the United States Secretary of State designated HAMAS as a Foreign Terrorist Organization pursuant to Section 219 of the Immigration and Nationality Act (the "INA") and the AEDPA.

288.    The formal designation has been renewed every two years since 1997, including a renewal in August 2003.

289.    Al Aqsa Martyrs Brigade emerged at the outset of the post-September 2000 Palestinian Intifada (uprising).

290.    AAMB knowingly, willfully, and unlawfully combines, conspires, confederates and agrees together to commit numerous acts of international terrorism and other related criminal activity, including murder, attempted murder, solicitation to commit murder and providing material support to Foreign Terrorist Organizations in violation of the federal criminal code of the United States.

291.    For example, the organization has committed numerous terrorist attacks, including several that have killed and injured Americans citizens.  Since September 2000, AAMB has conducted and taken credit for dozens of murderous attacks, including a pair of January 2003 suicide bombings in downtown Tel Aviv that killed 23 people and injured approximately a hundred others and a string of other attacks that have killed more than 70 civilians and wounded more than five hundred (500) others, including U.S. citizens such as Netanel Fenichel and Rebecca Nevies.

292.    On March 21, 2002, the Secretary of State of the United States officially designated AAMB as a Foreign Terrorist Organization pursuant to Section 219 of the INA and the AEDPA.

**The Al Aqsa Intifada or Intifada Al Quds**

293.     Following the collapse of the peace negotiations at the presidential retreat at Camp David in the summer of 2000, Palestinian terror organizations launched a broad-based terror campaign against the State of Israel at the end of September 2000.

294.    This explosion of violence was widely termed the so-called *Al Aqsa Intifada* or *Intifada Al Quds.*

295.     This new Intifada was both qualitatively and quantitatively different from prior waves of Palestinian terrorism.

296.     Whereas the total number of attacks from 1993-2000 totaled less than 1,000, since September 2000 various Palestinian terrorists have attempted approximately 21,000 attacks, which have claimed more than 6,000 casualties, including over 800 civilian deaths. These indiscriminate acts of violence have likewise resulted in the deaths of at least 30 U.S. citizens and caused serious bodily injury to scores of others.

297.     The preferred method of mass murder used by Palestinian terrorist groups is the suicide bombing which involves an individual carrying an explosive device which he or she detonates in a bus, restaurant or other crowded public gathering place.

298.     The device is typically packed with nails, bolts and ball bearings, which, when detonated, lodge themselves deep within the bodies of those unfortunate individuals who happen to be inside the blast radius, causing cruel and horrific injuries.  The suicide bomber is thereby regarded as a "martyr" (or "Shahid" in Arabic) by the terrorist groups and their sympathizers.

299.     The objectives of the Al Aqsa Intifada terror campaign include intimidating and coercing the civilian population of Israel and attempting to influence the policy of the Israeli government by compelling Israel to withdraw from territory it presently controls.

300.     In fact, because many suicide bombers are stopped and killed before they can successfully detonate their explosive charges and others have died as a result of premature or accidental detonations, the term "martyr" has generally been used by these organizations to include both suicide bombers and all others killed in the course of attempts to commit acts of violence against Israeli or Western targets.

301.    The eruption of the Al Aqsa Intifada in late September 2000 changed the

dynamics of Palestinian terrorism in four material respects:

    A.    The Intifada, from its inception, was marked by a massive escalation of violence, which quickly transformed the tactics of the Islamist terrorist groups from the margins to the mainstream of Palestinian politics.

    B.    The unrestrained violence of the Intifada and the increasing credibility and prestige it provided for the Islamist groups forced other (secular) Palestinian terrorist groups to adopt Islamist rhetoric and tactics.

    C.    The main rival terrorist groups began cooperating and coordinating their activities.

    D.    The Intifada coalesced Saudi financial support for HAMAS into a more ambitious and more formal structure through the formation of the Saudi Committee in Support of the Intifada Al Quds.

**The Conspiracy to Finance Palestinian Terrorism**

302.    On or about October 16, 2000, the Saudi Committee in Support of the

Intifada Al Quds (hereinafter referred to as "Saudi Committee") was established as a private

charity registered with the Kingdom of Saudi Arabia.

303.    According to the Saudi Committee, its purpose was to support the

"Intifada Al Quds" and "all suffering families – the families of the martyrs and the injured

Palestinians and the disabled."

304.    In practice, the Saudi Committee constitutes a professional fundraising

apparatus intended to subsidize the Intifada Al Quds, i.e., to subsidize the Palestinian terror

campaign and to bankroll HAMAS and the PIJ and their related front organizations in the West

Bank and Gaza.

305.    These goals are accomplished in two ways, both of which depend on the

knowing participation and substantial assistance of the defendant Arab Bank.

306.    The first goal is accomplished by providing a comprehensive insurance benefit of $5,316.06 for the families of Palestinian terrorists, guaranteeing "universal coverage" to terrorists and their beneficiaries whenever a terrorist is killed.

307.    Lesser benefits are also provided if the terrorist is injured either by Israeli security forces or captured as a result of his or her criminal conduct.

308.    The Saudi Committee has provided millions of dollars as benefits to the families of the so-called "martyrs," i.e., the families of suicide bombers and individuals killed by Israeli forces during the commission or attempted commission of terrorist acts and to the families of Palestinians wounded during violent confrontations with Israel's security forces as well those activists held in Israeli custody.  This type of support is critical to HAMAS' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure solidifying HAMAS's position within Palestinian society.

309.    Moreover, the insurance benefit not only provides universal coverage for specific members of preferred terrorist organizations such as HAMAS, but is intended as universal coverage available to terrorists belonging to any terrorist organization or to none at all, thereby incentivizing and rewarding all terrorists in Israel and eliminating the potential distinctions between terrorist groups, between individual (freelance) terrorists and the more established terrorist cells, and between the secular and radical Islamist terrorist organizations.

310.    Defendant Arab Bank administers the comprehensive terrorist insurance scheme by distributing the benefits in accordance with lists of families of "martyrs" and others eligible for "coverage."

311.    Arab Bank actively participates in a formalized process which requires the families of so-called martyrs to obtain an official certification of their deceased relative's status

as a bona fide martyr, replete with an individualized identification number.

312.    Arab Bank, in turn, is provided relatively detailed lists consisting of the names of the martyrs, personal information and details concerning the date and manner of death and other information provided to it by the Saudi Committee and representatives of the leading terrorist groups via their charitable front organizations.

313.    Arab Bank, in consultation with the Saudi Committee and local representatives of HAMAS, finalizes the lists, maintains a database of persons eligible under this universal coverage plan, and opens a dollar account for each beneficiary.  Every Palestinian family eligible under this universal coverage plan is encouraged to collect the terrorism benefits through a local branch of the Arab Bank in the West Bank or Gaza.

314.    If they choose to collect the insurance benefit, the families are required to present to the bank an "official" certification from the Palestinian Authority (replete with a unique identification number) establishing the bona fides of the martyr.

315.    If the documentation proves satisfactory, Arab Bank issues a receipt to the designated recipient of the martyrdom insurance benefit.  For example, Dia A-Tawil perpetrated a suicide bombing attack on March 27, 2001 on behalf of HAMAS.  He was designated Palestinian Authority Martyr No. 449.  His father, Hussien Mohamed Favah Tawil, presented the "official" certification to the defendant Arab Bank, and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah.

316.    The conspiracy between Arab Bank, the Saudi Committee and HAMAS and others is ultimately designed to provide substantial material support to Palestinian terrorist organizations and to provide a meaningful incentive both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the

"popular resistance."  Arab Bank knew, and knows, that the purpose of the conspiracy and acts taken pursuant thereto is to encourage others to engage in terrorist activities, and to support the continued commission of terrorist activities.

317.    Arab Bank was and is aware of the methods and means by which HAMAS and other Foreign Terrorist Organizations seek to carry out their objectives.  In fact, Arab Bank's own support of, and commitment to, the violent goals of its co-conspirators are embodied by the personal commitment of Arab Bank's Chairman, Abdul Majeed Shoman who, according to published reports in *Al Bayan* (a newspaper in the United Arab Emirates), traveled to Qatar to a meeting to raise money to finance and support the Al Aqsa Intifada.

318.    In a published report in July 2000 in the Jordanian daily newspaper *Addustour,* Abdul Majeed Shoman is described as favoring the destruction of the State of Israel.

319.    A published report in an October 2000 issue of the Jordanian daily newspaper *Addustour,* stated that both the management and employees of Arab Bank were donating funds to support the Intifada.

320.    Accordingly, neither the ideology nor the actual conduct of the Arab Bank is passive or indifferent to the goals of, and means employed by, the terrorists.

321.    By diligently implementing the "universal insurance" scheme, defendant Arab Bank knowingly, willingly and substantially assists in the recruitment of terrorists.

322.    Any person who chooses to participate in a suicide bombing or other terrorist attack does so secure in the knowledge that if he or she is killed in that attack, the financial needs of his or her family will be more than met for some time.

323.    Similarly, such persons are virtually assured of receiving a substantial stipend if they are injured or detained.

324.    On several occasions, the "martyr" designation has even been extended to Palestinians killed by *other Palestinians* during the commission of terrorist attacks.

325.    In short, the Saudi Committee raises funds from private donors in Saudi Arabia and elsewhere in the Persian Gulf region and then allocates payments to defendant Arab Bank to fulfill its public pledge of universal insurance coverage to Palestinian terrorists.

326.    The terrorist organizations, through their charitable fronts, collect data on their own operatives as well as all other terrorists killed, injured or in Israeli custody and transmit the information to the Saudi Committee and defendant Arab Bank.

327.    Through the program administered by Arab Bank, the Saudi Committee paid death benefits to at least approximately 200 fallen "martyrs" in the first year of its existence alone.  As of November 2001, the Saudi Committee paid more than forty-two million dollars ($42,000,000) to terrorists and/or their beneficiaries.

328.    Arab Bank serves as the exclusive administrator for the Saudi Committee's universal insurance coverage plan for Palestinian terrorists and their families.

329.    Indeed, in its original website, the Saudi Committee openly declared that its funds were distributed to the families of martyrs through local branches of the Arab Bank in Palestine.  Although it has since been removed from the internet, the original archived webpage located at www.alquds-saudia.org\indexa.htm provided a list under the caption: "What has been done with your donations?"

330.    Item number ten (10) on the web page responds with the answer: "Opening a bank account for every entitled [Palestinian] through the Arab Bank in Palestine."

331.    The website further listed numerous "martyrs" whose cause of death was listed as "suicide attack."

332.    Similarly, in the annual report issued by the Saudi Committee and published in the Saudi newspaper *Al-Jazira* on February 11, 2001, the Saudi Committee identifies payments made to Palestinian prisoners as well as Palestinian "martyrs." Notably, Table 4, Column 10 of the report helpfully identifies the cause of death for each martyr.

333.    For example, Musa Abd al-Qadir Ghanimat, the HAMAS operative who perpetrated a suicide attack at the Apropo restaurant in Tel Aviv is listed as an illustrative martyr.

334.    Accordingly, there can be no confusion as to whether the insurance plan includes the families of suicide bombers and no question that defendant Arab Bank possesses knowledge of this fact.

335.    Defendant Arab Bank provides a convenient means for distributing this universal coverage death and dismemberment benefit across Palestinian controlled territories that would be far more difficult if attempted by other means such as courier. Israeli territory separates Gaza from the West Bank and Israeli military checkpoints often separate one Palestinian city from another.

336.    Arab Bank makes it possible for the terrorist groups to transcend physical obstacles and to provide an organized and professional distribution system that literally underwrites the terror campaign.

337.    Arab Bank knows the criminal purpose that the accounts it opens and maintains for the Saudi Committee are intended to serve.

338.    The Saudi Committee and local HAMAS charitable front organizations have publicly and repeatedly advertised that purpose in both Saudi and Palestinian newspapers, on television and on the Saudi Committee's website, all of which are known to or should be

known to Arab Bank and all of which are calculated to – and do – reach terrorists and potential

terrorists.  For instance:

- In the February 10, 2001 edition of the Saudi newspaper *Al-Jazirah*, the Saudi Committee published an annual report in which it listed the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits;

- In a November 23, 2001 edition of the Palestinian newspaper, *Al Quds*, the Saudi Committee placed an announcement listing the names of more than 1,000 individuals who had been injured during the Intifada or held in Israeli custody and invited them or their families "to go to the branches of the Arab Bank in their places of residence to receive their allocations donated by the Committee..."; and

- In a February 18, 2002 advertisement in the Palestinian newspaper *Al Hayyat Al Jedida*, a HAMAS charitable front organization in Ramallah announced that the Saudi Committee "requests that the families of the martyrs whose names are listed herein to go to a branch of the Arab Bank in their place of residence to receive the tenth payment offered by the Saudi Committee in the amount of $5,316.06 …."

339.    Since the Saudi Committee raises its funds in Saudi currency, which

cannot conveniently be converted into Israeli currency (most commonly used in Palestinian

controlled areas), those funds are primarily converted into U.S. dollars through the New York

branch of Arab Bank and then routed to the local branches of Arab Bank in the West Bank.

Arab Bank's role is material and essential to the furtherance of the criminal conspiracy in two (2)

important respects.

340.    Firstly, Arab Bank provides both professionalism and transparency to the

process thereby reassuring wealthy Saudi and Gulf State donors that the money they are

contributing will not be siphoned off by corrupt officials, but will in fact reach the families of

terrorists as intended.

341.    Secondly, Arab Bank, through its network of local branches in the West

Bank and Gaza, provides an ideal distribution system that offers both convenience to the families

of the terrorists who are able to bypass both the corruption of the Palestinian Authority and the uncertainty of cash payments delivered by courier and the certainty of an accounting system that minimizes the risk of duplicate payments and unreliable record-keeping.

342.    By knowingly and actively participating in this process, Arab Bank and its co-conspirators, the Saudi Committee and others, have knowingly aided and abetted each and every terrorist act committed by Palestinian terrorists since the formation of the Saudi Committee's universal insurance coverage scheme in October 2000 in violation of 18 U.S.C. § 2332, 18 U.S.C. § 2339A, 18 U.S.C. § 2339B and 18 U.S.C. § 2339C.  Arab Bank has knowingly participated in the process for the purpose of supporting and providing financial assistance to terrorists, including, but not limited to HAMAS and other designated Foreign Terrorist Organizations, agents of HAMAS and other HAMAS controlled organizations, families of HAMAS operatives and the families of other terrorists.

**Defendant Arab Bank Provides Material Support To Foreign Terrorist Organizations**

343.    Both HAMAS and the PIJ raise funds to support their terrorist acts through charitable front organizations which they control.

344.    Arab Bank knowingly provides banking services to these charitable committees and affirmatively assists them in distributing funds to support the Intifada terror campaign.

345.    Arab Bank knowingly provides banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut which collects funds directly in the name of HAMAS, and through charitable front organizations controlled by HAMAS which Arab Bank affirmatively assists in distributing funds to support the terror campaign.

346.    The United States Department of Justice has, for example, identified the website: www.palestine-info.com as the "official" website of HAMAS.  The website itself solicits funds and asks contributors to send money to its Al-Mazra Branch Account # 3-810-622473-0330 at the Arab Bank in Beirut, but it also asks donors "to cite only the account number and not the name of the [Palestine Information] Center or any other names."

347.    This request is necessary because Account # 3-810-622473-0330 is one of the few accounts that Arab Bank operates on behalf of HAMAS and which HAMAS controls and maintains directly.  To assist it in carrying out its terrorist activities, HAMAS has established numerous front organizations, including:

     i.   Al-Ansar Charity;

     ii.   Ramallah Charitable Committee;

     iii.   Tulkarem Charitable Committee;

     iv.   the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya;

     v.   Al Mujama Al-Islami;

     vi.   Nablus Charitable Committee;

     vii.   Jenin Charitable Committee; and

     viii.   Islamic Charity Society of Hebron.

Arab Bank provides direct financial services to Al-Ansar Charity, Ramallah Charitable Committee, Tulkarem Charitable Committee, the Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya, Nablus Charitable Committee and Jenin Charitable Committee.

348.    The Tulkarem Charitable Committee, Nablus Charitable Committee, Ramallah Charitable Committee, Jenin Charitable Committee and Islamic Charity Society of Hebron have all been identified by United States Department of Justice as HAMAS front

organizations and the management of each of these "charities" is in fact controlled by HAMAS operatives.

349.    The Tulkarem, Ramallah and Jenin Charitable Committees and Islamic Charity Society of Hebron were all designated as "Unlawful Organizations" by the government of Israel in February 2002 because of their connection to HAMAS.

350.    The PIJ has established numerous front organizations, including:

      i.      Al-Ihsan Charitable Society; and

      ii.     Islamic An-Naqqa Society for Women, Bethlehem.

Arab Bank provides direct financial services to Al-Ihsan Charitable Society.

351.    The HAMAS charitable front, Al-Ansar Charity maintains a website proclaiming that:

> Al-Ansar Society opens its doors to the families of the martyrs who intend to register their dead who, with their splendid blood, saturated pure Palestine and drew the lines of liberty and the coming dawn.  The Al-Ansar Society is following in their footsteps and shares in the sorrow and the hopes of the families of the martyrs and their relatives.

352.    The website further boasts that it has given money to Palestinians whom were wounded, incarcerated or killed during the Intifada, including $6,000.00 to the family of Iz Aldin (also spelled: "Azzadin") Al Masri, the suicide bomber who massacred 15 people, including 7 children, and injured more than one hundred people (including plaintiff Clara Ben-Zaken and several other U.S. citizens that were killed or injured) at the Sbarro pizzeria in downtown Jerusalem on August 9, 2001.

353.    The website of Al-Ansar helpfully explains that:

> The Director General of the Al-Ansar Charitable Society and the person in charge of the portfolio for the care of the martyrs at the Society's website said that the Society has furnished the management of the Arab Bank with lists of names of the

martyrs and the families of the entitled beneficiaries, in order to
pay the monies to which the martyrs are entitled.

354.    Al-Ansar maintains an account with the Arab Bank in Gaza.

355.    Defendant Arab Bank has also knowingly laundered funds for the Holy

Land Foundation For Relief and Development ("HLF"), a Texas based "charity" which has

raised funds in the United States for HAMAS for more than a decade.  Arab Bank, in turn,

channeled tens of thousands of dollars for HLF through its New York branch to the Ramallah

Charitable Committee, an agent of HAMAS.

356.    HLF and its officers have been criminally indicted in the United States

District Court for the Northern District of Texas for providing material support to a designated

Foreign Terrorist Organization (HAMAS) – including for specific transactions involving

payments made by HLF to the Ramallah Charitable Committee, Tulkarem Zakat Committee, and

the Islamic Charity Society of Hebron.

357.    The indictment specifies particular financial transactions initiated by HLF

which resulted in monetary transfers to the Ramallah Charitable Committee which violate 18

U.S.C. §2339B.

358.    On May 6, 1997, the government of Israel designated HLF as a HAMAS

front organization and declared that HLF "deals in the practice of transferring monies to families

of HAMAS activists, who carried out deadly attacks …."

359.    Nonetheless, Arab Bank continued to provide financial services to HLF

and its New York branch continued to wire thousands of dollars to the Ramallah Charitable

Committee at HLF's behest.

360.    On January 10, 2001 a federal district court in Illinois rendered a decision

declining to grant a motion to dismiss in a case initiated by the parents of David Boim, who was

killed by a HAMAS terrorist in 1997. The Boims had sued, among others, HLF, for providing material support to HAMAS, a designated Foreign Terrorist Organization.

361.    Nonetheless, Arab Bank continued to deposit HLF fund transfers and credit the Arab Bank account of the Ramallah charitable front even after the *Boim* case placed the defendant on further notice of HLF's criminal activities.

362.    Similarly, the New York branch of the Arab Bank has facilitated the transfer of significant sums to Tulkarem Charitable Committee despite the fact that in some cases both the "donor" of the funds as well as the recipient had been previously formally designated as "Unlawful Organizations" by the government of Israel.

363.    Moreover, following the Israeli army's military operations in the spring of 2002, the government of Israel obtained and subsequently disclosed extensive materials (most of them available on the internet) demonstrating the Tulkarem Charitable Committee's connections to HAMAS and the Islamist movement.

364.    Nonetheless, Arab Bank and its New York branch continued to convert substantial sums of money and forward tens of thousands of dollars from New York to the Tulkarem account of the Tulkarem Charitable Committee at the Arab Bank.

365.    One of the signatories on the Tulkarem Charitable Committee account is Ammar Tawfiq Ahmad Badawi, a prominent member of the Muslim Scholars Association who was a signatory on the infamous *Fatwa* – or Islamic religious ruling – declaring that suicide bombings are permitted by Islamic law. Mr. Badawi is a leading figure in HAMAS.

**Cultivation of the Culture of Death**

366.    The charitable front organizations play a central role in financing the terror

campaign by providing the means of raising funds to maintain the institutions that serve as recruiting grounds for terrorist organizations.

367.    As set forth in an internal HAMAS memorandum recently captured by the Israeli army during a raid of the offices of the Hebron Charitable Committee, HAMAS has arranged for the "transfer [of] large sums" to the charitable committee and other HAMAS front organizations through the "charity activities" of their operatives abroad.

368.    The memorandum emphasizes that HAMAS "require[s] new bank account numbers for money transfers" and promises that the HAMAS will:

> invest efforts to transfer money for the martyrs (the shahids) and prisoners, via the transfer [to] charitable institutions.  This is a primary goal in the framework of the effort to transfer aid money to these institutions, so that these budgets are released in the best manner and in order to bring about an improvement in the level of the movement's performance.

The memorandum concludes with the promise that HAMAS will continue to "build up the activities and operations" of its front organizations by, among other things, "***taking advantage of the conditions and the atmosphere of death***."

369.    The financial support provided by the Saudi Committee via the Arab Bank as well as the accounts maintained by the terror organizations' charitable fronts constitutes the backbone of the donor base and operational budgets of HAMAS and the PIJ, and has allowed them to expand their operations, attract more recruits, and professionalize their financial distribution channels.

370.    Each of these front organizations officially holds itself out to the public as a charitable organization with a purely humanitarian and benign purpose.  In fact, however, the primary mission of these organizations is to raise and launder funds for terrorist organizations and otherwise to coordinate and conduct activities that are essential to the conduct of terrorist

operations and to the material support of terrorist operations. Funds raised by the charitable front organizations are fungible and are allocated in part to terrorist activities.

371.    In addition to the Saudi Committee's universal coverage plan, contributions from individual and corporate sponsors abroad are primarily made to the charitable front organizations. The front organizations make those contributions available to HAMAS and the PIJ in accordance with the instruction of their leaders. These organizations then disburse a percentage of the funds they receive from their front organizations to purchase weapons and explosive materials, to recruit and train operatives and otherwise to plan and carry out terrorist attacks.

372.    By recklessly or knowingly providing banking and administrative services to charitable front organizations that are controlled and directed by designated Foreign Terrorist Organizations, including collecting, transferring and laundering funds for those organizations through its New York branch, Arab Bank has substantially assisted HAMAS and the PIJ in the furtherance of a murderous conspiracy to commit multiple acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2332 and has committed numerous overt acts in furtherance of the conspiracy.

373.    Indeed, had the doors of Arab Bank not been opened to HAMAS or the PIJ during the past three and a half years, the leaders of these terrorist organizations would have had to make far more onerous arrangements for transfer of foreign contributions to terrorists within Palestinian-controlled territory and the great bulk of those funds would likely have never reached their destination.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## AIDING AND ABETTING THE MURDER, ATTEMPTED MURDER AND SERIOUS BODILY INJURIES TO UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c)  AND 18 U.S.C. § 2333

374.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

375.    Each of the plaintiffs has been injured in his person, property or business by reason of acts committed by Palestinian terrorists that involve violence or are dangerous to human life and that violate the criminal laws of the United States, including the prohibition on killing, attempting to kill, causing serious bodily injury or attempting to cause serious bodily injury to U.S. citizens as set forth in 18 U.S.C. § 2332.

376.     The acts of the Palestinian terrorists in killing, and attempting to kill U.S. nationals and other persons were and are intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel by intimidation or coercion, and (c) to affect the conduct of the government of Israel by mass destruction and murder.

377.    The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

378.    The extraordinary financial and administrative services that Arab Bank has provided to the terrorists and their families, and to HAMAS, the PIJ and AAMB, including administering universal coverage insurance to the families of suicide bombers and other

terrorists, provides substantial assistance to HAMAS, the PIJ and AAMB and others in recruiting and incentivizing suicide bombers and other terrorists and since money is fungible, in freeing up funds for use in military operations and the commission of violent acts resulting in death and injury, thereby preparing and facilitating acts of terrorism in violation of 18 U.S.C. § 2332 that have caused injuries to the plaintiffs.

379.    The defendant Arab Bank knows, or has recklessly disregarded, that it is providing material support for acts of international terrorism, as is evidenced by its close contact with the Saudi Committee and its coordination of the payment schedules and lists of martyrs, and the repeated public advertisement of the activities of the Saudi Committee in various Palestinian newspapers as set forth above.

380.    As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

381.    Throughout the period in which it has provided these extraordinary financial and administrative services to HAMAS, the PIJ, AAMB and to individual terrorists and their families, the Arab Bank knew or recklessly disregarded the fact that the charitable front organizations of the terrorist organizations have played a major role in raising funds for HAMAS and the PIJ, which have committed numerous criminal acts including suicide bombings intended to intimidate and coerce the civilian population of Israel and to influence the policy of the Israeli Government.

382.    Throughout the period in which it has been involved in activities assisting the PIJ, HAMAS and AAMB and individual terrorists and their families, Arab Bank knew or recklessly disregarded the fact that those activities have substantially assisted and encouraged

dangerous and criminal acts set forth herein.

383.    By aiding and abetting violations of 18 U.S.C. § 2332 that have caused each of the plaintiffs to be injured in his or her person, property, or business, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs have sustained as a result of such injuries.

## SECOND CLAIM FOR RELIEF

### CONSPIRACY TO COMMIT MURDER AND ATTEMPTED MURDER OF UNITED STATES CITIZENS IN VIOLATION OF 18 U.S.C. §§ 2332(b) and 2333

384.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

385.    Each of the plaintiffs has been injured in his person, property or business by reason of acts committed by Palestinian terrorists that involved murder or attempted murder in violation of the criminal laws of the United States, including the prohibition on killing or attempting to kill U.S. citizens as set forth in 18 U.S.C. § 2332.

386.    The acts of the Palestinian terrorists in killing or attempting to kill U.S. citizens and other persons were intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel by intimidation or coercion, and (c) to affect the conduct of the government of Israel by mass destruction and murder.

387.    The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of, and intention to, cause extreme physical pain and suffering to any and all persons within the close proximity of the attack and extreme emotional distress to the family members of those who were injured or killed by reason of those acts.

388.    Arab Bank agreed to combine with other persons to act unlawfully, in the

manner set forth in this complaint and committed overt acts in furtherance of the conspiracy.   At

all relevant times, Arab Bank knew of the conspiracy and knew and knows, in particular, of the

roles of the charitable front organizations and their leaders in furtherance of that conspiracy, or,

at a minimum, recklessly disregarded the nature and purposes of the conspiracy.

389.    Arab Bank knowingly and purposefully agreed to perform extraordinary

banking and administrative services for the Saudi Committee, HAMAS, the PIJ and AAMB with

the knowledge, and for the purpose, that such services facilitate the activities of its leaders and

support terrorist activities pursuant to a common scheme to encourage and incentivize acts of

terrorism.  Arab Bank's actions, in fact, facilitated the conspirational scheme because, as set

forth more fully above, but for the actions of the Arab Bank, the funding of the universal

coverage death and dismemberment benefit plans for terrorists and their families would have

been substantially more difficult to implement.

390.    By conspiring to act with the Saudi Committee, HAMAS the PIJ and

AAMB, and their respective charitable front enterprises to support, encourage and facilitate

violations of 18 U.S.C. § 2332 that have injured each plaintiff's respective person, property, or

business, Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all

damages that plaintiffs have sustained as a result of such injuries.

## THIRD CLAIM FOR RELIEF

### PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333

391.    Plaintiffs repeat and re-allege each and every allegation of the foregoing

paragraphs as if fully set forth herein.

392.    The extraordinary financial and administrative services that Arab Bank

has knowingly provided to the terrorists, their families, and HAMAS, the PIJ and AAMB, including serving as the exclusive administrator of universal coverage insurance to the families of suicide bombers and other terrorists, provides material support to the preparation and carrying out of numerous acts of international terrorism which have caused direct injury to the plaintiffs.

393.    As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

394.    By participating in the commission of violations of 18 U.S.C. § 2339A that have caused each of the plaintiffs to be injured in his or her person, business or property, defendant Arab Bank is jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that plaintiffs have sustained as a result of such injuries.

## FOURTH CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(1) AND 18 U.S.C. § 2333

395.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

396.    By knowingly transferring funds from and to agents of HAMAS, including  the Holy Land Foundatition, the Tulkarem Charitable Committee and the Ramallah Charitable Committee, defendant Arab Bank's New York branch office has provided material support to a designated Foreign Terrorist Organization under the Anti-Terrorism and Effective Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(2)(a) and 2339B(2)(b).

397.    As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists

and the families of terrorists would have been substantially more difficult to implement.

398.    Based on the defendant's level of sophistication and presence as a federally regulated financial institution in the United States, defendant Arab Bank not only knew of the unlawful activities of HAMAS but also knew or recklessly disregarded its actual designation as a Foreign Terrorist Organization.  By providing material support to a designated Foreign Terrorist Organization, Arab Bank is therefore civilly liable for damages to plaintiffs Steven Averbach, Julie Averbach, Tamir Averbach, Devir Averbach, Sean Averbach, Adam Averbach, David Averbach, Maida Averbach, Michael Averbach, Eileen Sapadin, Eugene Goldstein, Lorraine Goldstein, Barbara Goldstein Ingardia, Richard Goldstein, Michael Goldstein, Chana Freedman, Matanya and Chana Nathansen For The Estate of Tehilla Nathansen, Chana Nathansen, Matanya Nathansen, Yehudit Nathansen, Shoshana Nathansen, Hezekial Toporowitch, Pearl B. Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina Chava Nadel, Blumy Rom, Rivka Toporowitch, Clara Ben-Zaken, Gloria Kushner, Jason Kirschenbaum, Isabelle Kirschenbaum, Martin Kirschenbaum, Joshua Kirschenbaum, Shoshanah Burgette, David Kirschenbaum and Danielle Teitelbaum for their injuries pursuant to 18 U.S.C. § 2333.

## FIFTH CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18 U.S.C. § 2339B(2) AND 18 U.S.C. § 2333

399.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

400.    By knowingly transferring funds from and to agents of HAMAS, including  the Holy Land Foundatition, the Tulkarem Charitable Committee and the Ramallah Charitable Committee, defendant Arab Bank's New York branch office has provided material

support to a designated Foreign Terrorist Organization under the Anti-Terrorism and Effective

Death Penalty Act of 1996 in violation of 18 U.S.C. §§ 2339B(2)(a) and 2339B(2)(b).

401.    Based on the defendant's level of sophistication and presence as a

federally regulated financial institution in the United States, defendant Arab Bank not only knew

of the unlawful activities of HAMAS but also knew or recklessly disregarded its actual

designation as a Foreign Terrorist Organization.  The defendant also knew or recklessly

disregarded information that would have caused it to know that HLF and the Tulkarem

Charitable Committee were agents of HAMAS.

402.    As a federally regulated financial institution in the United States,

defendant Arab Bank had and legal obligation to retain possession of, or maintain control over,

all funds belonging to or destined to be transferred to agents of HAMAS  and to report to the

Secretary the existence of such funds in accordance with regulations issued by the Secretary.  By

failing to do so, Arab Bank has violated 18 U.S.C. §§ 2339B(2) and has proximately caused

injury to, and is therefore civilly liable for damages to, plaintiffs Steven Averbach, Julie

Averbach, Tamir Averbach, Devir Averbach, Sean Averbach, Adam Averbach, David Averbach,

Maida Averbach, Michael Averbach, Eileen Sapadin, Eugene Goldstein, Lorraine Goldstein,

Barbara Goldstein Ingardia, Richard Goldstein, Michael Goldstein, Chana Freedman, Matanya

and Chana Nathansen For The Estate of Tehilla Nathansen, Chana Nathansen, Matanya

Nathansen, Yehudit Nathansen, Shoshana Nathansen, Hezekial Toporowitch, Pearl B.

Toporowitch, Yehuda Toporowitch, David Toporowitch, Shaina Chava Nadel, Blumy Rom,

Rivka Toporowitch, Clara Ben-Zaken, Gloria Kushner, Jason Kirschenbaum, Isabelle

Kirschenbaum, Martin Kirschenbaum, Joshua Kirschenbaum, Shoshanah Burgette, David

Kirschenbaum and Danielle Teitelbaum for their injuries pursuant to 18 U.S.C. § 2333.

## SIXTH CLAIM FOR RELIEF

### FINANCING OF TERRORISM IN VIOLATION
### OF 18 U.S.C. § 2339C and 18 U.S.C. § 2333

403.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

404.    The financial services that Arab Bank has willfully and unlawfully provided to HAMAS, the PIJ, AAMB and the Saudi Committee include the collection of funds with the knowledge that such funds have been and will be used, in part, to facilitate acts intended to cause death or serious bodily injury to civilians such as the victims of the terrorist acts described in this complaint, who were not taking part in any armed conflict.

405.    The acts committed against the plaintiffs were intended (a) to intimidate or coerce the civilian population of Israel, (b) to influence the policy of the government of Israel by intimidation or coercion, and (c) to affect the conduct of the government of Israel by mass destruction and murder.

406.    As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been substantially more difficult to implement.

407.    By willfully violating 18 U.S.C. § 2339C, Arab Bank is therefore jointly and severally liable to the plaintiffs who have suffered injuries to their business, person or property by reason of such acts under 18 U.S.C. § 2333.

## SEVENTH CLAIM FOR RELIEF

### COMMITTING ACTS OF INTERNATIONAL TERRORISM
### IN VIOLATION OF 18. U.S.C. § 2333

408.    Plaintiffs repeat and re-allege each and every allegation of the foregoing

paragraphs as if fully set forth herein.

409. Defendant Arab Bank's acts of providing banking and other services, including the provision of death benefits, to HAMAS, the PIJ, the AAMB and other international terrorists, were "a criminal violation if committed within the jurisdiction of the United States or of any State" and "appear to be intended to intimidate or coerce a civilian population . . . to influence the policy of a government by intimidation or coercion or to affect the conduct of a government by mass destruction" within the meaning of 18 U.S.C. § 2331.

410. The extraordinary financial and administrative services that Arab Bank has provided to the terrorists, their families, and HAMAS, the PIJ and AAMB including administering universal coverage insurance to the families of suicide bombers and other terrorists, provides substantial assistance to HAMAS, the PIJ, AAMB and others in recruiting and incentivizing suicide bombers and other terrorists and thereby preparing and facilitating acts of international terrorism in violation of 18 U.S.C. § 2333 that have caused injuries to the plaintiffs.

411. Arab Bank's acts were dangerous to human life, by their nature and as evidenced by their consequences.

412. Arab Bank's acts either occurred primarily outside the territorial jurisdiction of the United States or transcended national boundaries in terms of the means by which they were accomplished.

413. Accordingly, Arab Banks' acts constitute acts of international terrorism as defined by 18 U.S.C. §§ 2331 and 2333.

414. Arab Bank knowingly provided substantial assistance to acts of international terrorism and accordingly, its acts constitute aiding and abetting acts of

international terrorism.

415.     Arab Bank also agreed to combine with other persons to act unlawfully in the manner set forth above and committed overt acts in furtherance of the conspiracy.  At all relevant times, Arab Bank knew of the conspiracy and knew, and knows, in particular, of the roles of the charitable front organizations and their leaders in furtherance of that conspiracy.

416.     As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of  the universal coverage death and dismemberment benefits plan for terrorists and the families of terrorists would have been  substantially more difficult to implement.

417.     The acts of terrorism set forth herein are extreme and outrageous and were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts.

418.     Throughout the period in which it has been involved in activities assisting the PIJ, AAMB and HAMAS and individual terrorists and their families, Arab Bank knew or recklessly disregarded the fact that those activities have substantially assisted and encouraged dangerous and criminal acts set forth herein.

419.    For the reasons set forth above, Arab Bank is therefore civilly liable for damages to plaintiffs for injuries to their person, person, property or business by reason of the acts of international terrorism  pursuant to 18 U.S.C. § 2333.

## EIGHTH CLAIM FOR RELIEF

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

420.    Plaintiffs repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

421.    Defendant Arab Bank's acts of providing banking and other services, including the provision of death benefits and other extraordinary financial and administrative services to terrorists, their families, HAMAS , AAMB and the PIJ, including administering universal coverage insurance to the families of suicide bombers and other terrorists, were willful malicious, deliberate, or were done with reckless indifference to the likelihood that such behavior would cause severe emotional distress and with utter disregard for the consequences of such actions.

422.    The acts of terrorism set forth herein were committed with the knowledge of and intention to cause extreme physical pain and suffering to any and all persons within close proximity of the attack and extreme emotional distress to the family members of those who were killed or injured by reason of those acts, or were done with reckless indifference to the likelihood that such behavior would cause such severe emotional distress and with utter disregard for the consequences of such actions.

423.    As set forth more fully above, but for the assistance provided by the Arab Bank, the funding of  the universal coverage death and dismemberment benefits plan for

terrorists and the families of terrorists would have been  substantially more difficult to implement.

424.    Arab Bank's conduct was unreasonable and outrageous and exceeds the bounds usually tolerated by decent society, and was done willfully, maliciously and deliberately, or with reckless indifference, to cause Plaintiff severe mental and emotional pain, distress, and anguish and loss of enjoyment of life.

425.    As a direct, foreseeable and proximate result of the conduct of Defendant Arab Bank as alleged hereinabove, plaintiffs have suffered non-pecuniary damages in amounts to be proven at trial.

426.    Arab Bank's actions were undertaken willfully, wantonly, maliciously and in reckless disregard for Plaintiff's rights, and as a direct, foreseeable and proximate result thereof plaintiffs suffered economic and emotional damage in a total amount to be proven at trial, therefore plaintiffs seeks punitive damages in an amount sufficient to deter Arab Bank and others from similar future wrongful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray that this Court:

(a)    Accept jurisdiction over this action;

(b)    Enter judgment against Arab Bank and in favor of each plaintiff for compensatory damages in amounts not less than those set forth herein and additional sums in amounts to be determined at trial;

(c)    Enter judgment against Arab Bank and in favor of each plaintiff for treble damages pursuant to 18 U.S.C. § 2333;

(d)    Enter judgment against Arab Bank and in favor of each plaintiff for any

and all costs sustained in connection with the prosecution of this action, including attorneys' fees, pursuant to 18 U.S.C. § 2333;

(e)      Order such preliminary and permanent injunctive relief as may be necessary and appropriate to prevent Arab Bank from continuing to engage in the unlawful practices set forth herein, including but not limited to:

(i)      Freezing certain identified accounts maintained by Arab Bank that are owned and/or controlled by HAMAS, other Foreign Terrorist Organizations or their agents for use by HAMAS or other designated Foreign Terrorist Organizations;

(ii)      Freezing the accounts of, and barring the execution of any further transactions for, on behalf of, or for the benefit of entities that have provided funds to HAMAS or other Foreign Terrorist Organizations or their agents; and

(iii)      Compelling Arab Bank to fulfill the various statutory reporting requirements with respect to all funds in its possession, custody or control ". . . in which a [Foreign Terrorist Organization], or its agent, has an interest." 18 U.S.C. § 2339B(a)(2).

(f)      Enter an Order declaring that Arab Bank has violated, and is continuing to violate, the Anti-Terrorism Act, 18 U.S.C. § 2331 et seq.; and

(g)      Grant such other and further relief as justice requires.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.


Dated: August 10, 2004
      New York, New York

                        WOLLMUTH MAHER & DEUTSCH LLP


                        By_____/s/ David H. Wollmuth_____
                              David H. Wollmuth (DW-9618)
                              William A. Maher (WM-9470)

                              500 Fifth Avenue
                              New York, New York 10110
                              (212) 382-3300

                              Attorneys for Plaintiffs

Of Counsel:

SAYLES WERBNER
Mark S. Werbner
*(pro hac vice motion to be filed)*
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270
(214) 939-8700

OSEN & ASSOCIATE, LLC
Gary M. Osen (GO-5790)
Peter Raven-Hansen, Of Counsel
*(pro hac vice motion to be filed)*
700 Kinderkamack Road
Oradell, New Jersey 07649
(201) 265-6400

WECHSLER HARWOOD LLP
Andrew D. Friedman (AF-6222)
488 Madison Avenue
New York, New York 10022
(212) 935-7400