UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
COURTNEY LINDE, et al.,                    :

                    Plaintiffs,            :          04 CV 2799 (NG)(ASC)

          -against-                        :

                                                     **NOTICE OF MOTION**

ARAB BANK plc,                             :

                    Defendant.             :

-------------------------------------------------------X

PLEASE TAKE NOTICE that upon the accompanying Defendant's Memorandum

of Law in Support of Its Motion to Dismiss the First Amended Complaint; the Declaration of

Shukry Bishara in Support of Defendant's Motion to Dismiss (annexed hereto); and the

Declaration of Hamzeh Ahmed Haddad (annexed hereto); the undersigned will move this Court

before the Honorable Nina Gershon, United States District Judge, in the United States

Courthouse, 225 Cadman Plaza East, Courtroom 4, 4th Floor, Brooklyn, New York 11201, on

such date and at such time as the Court sets, for an order dismissing the First Amended

Complaint on the grounds, *inter alia*, of (1) failure to state a claim pursuant to Federal Rules of

Civil Procedure 12(b)(6), and (2) *forum non conveniens,* and granting Defendants such other and

further relief as the Court may deem just and proper.

Dated: New York, New York
          November 18, 2004

                              WINSTON & STRAWN

                              By:_____
                                   Michael D. Burrows (MB 2863)

                                   200 Park Avenue
                                   New York, New York 10166
                                   Tel.: (212) 294-6700

                                   *Attorneys for Defendant*

TO:    Andrew D. Friedman, Esq.
Wechsler Harwood LLP
488 Madison Avenue
New York, New York  10022
(212) 935-7400

David H. Wollmuth, Esq.
Wollmuth Maher & Deutsch LLP
500 Fifth Avenue
New York, New York  10110
(212) 382-3300

Gary M. Osen, Esq.
Osen & Associate, LLC
700 Kinderkamack Road
Oradell, New Jersey  07649
(201) 265-6400

Mark S. Werbner, Esq.
Sayles Werbner
4400 Renaissance Tower
1201 Elm Street
Dallas, Texas  75270
(214) 939-8700

*Counsel for Plaintiffs*

- 2 -

# Bishara Decl.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
COURTNEY LINDE, et al.,                           :

                    Plaintiffs,        :        04 CV 2799 (NG)(ASC)

          - against -                :        **DECLARATION OF
SHUKRY BISHARA IN SUPPORT
OF DEFENDANT'S MOTION TO
DISMISS**
ARAB BANK plc                                     :

                Defendant.         :

-----------------------------------------------------X

        Shukry Bishara declares under penalty of perjury:

        1.     I am the Chief Banking Officer of Arab Bank plc (the "Bank"), the

defendant in the above-captioned action, and am resident at the Bank's headquarters in Amman,

Jordan. I submit this declaration in support of the Bank's motion to dismiss the First Amended

Complaint on the grounds of *forum non conveniens* and on other grounds. The sections of this

declaration are as follows:

| Section | Page |
|---|---|
| Preface | 2 |
| Personal Background | 2 |
| History of Arab Bank | 4 |
| The New York Branch | 5 |
| Operating in Gaza and West Bank | 5 |
| Role of the Arab League and the Saudi Committee | 8 |
| Payments By Other Banks and Organizations | 10 |
| The Beirut Account | 10 |
| Policies and Systems | 11 |
| Documents and Witnesses | 12 |

*Forum Non Conveniens* Consents                              13

Conclusion                                                   13

## Preface

2.      I am told by our New York lawyers that this motion to dismiss must be made under certain rules which apply in United States Federal Courts. I understand that these rules require that the allegations in the Amended Complaint be accepted as true for purposes of the motion and that factual information, documents, explanations and other evidence are not appropriate at this stage of the proceedings.

3.      However, for personal reasons of my own and as the person who re-opened Arab Bank's branches in Palestine, developed its business in the areas, implemented its policies and set out its strategy, I cannot allow the first submission from the Bank to be put into this Court without addressing the terrible and untrue allegations leveled against the Bank in this case.

4.      I understand that the Court is likely to not consider my comments for purposes of deciding the Bank's motion to dismiss. Nevertheless, I have insisted with our lawyers and I feel that I must, at least briefly, address these issues. I respectfully ask the Court's indulgence in this respect.

## My Personal Background

5.      I was born in Jerusalem in 1947. I attended high school and graduated from the Christian Brothers in Jerusalem. Thereafter, in 1972 I received a Bachelor of Arts Degree in Economics from the American University in Beirut. I received a Master's Degree in Economics from University College London in 1973.

6.      I began my professional career at Midland Bank (U.K.). I then moved to Fidelity Bank (now part of the Wachovia Banking Group) in Philadelphia, Pennsylvania. In 1974, I was transferred to New York and later to London, still with Fidelity, until 1979 when I moved to Paris to establish Arab Bank's operations there.

2

7.     I was the General Manager of Arab Bank's operations in France from 1979 - 1994. In addition, I was the Regional Manager for Southern and Central Europe, as well as North Africa. During this period, I was responsible for the opening of our offices in New York (1982) and Singapore (1983).

8.     In 1993, upon hearing of the potential breakthrough in peace initiatives and progress of settlement of Israeli-Arab issues set out in the Oslo Accords, I offered to take charge of the Bank's reopening of branches in Gaza and the West Bank ("GWB"). I was well aware of the complications and challenges of setting up the branches operating in Palestine during those transitional years, but I could imagine no more exhilarating a challenge in my career. In the midst of the peace process between the Israelis and the Palestinians, I welcomed the opportunity to personally participate in the development process of the economic infrastructure in Gaza and the West Bank, and to take part in the transfer of best practices and know-how to the region.

9.     I moved from Paris to Ramallah to oversee the resumption of Arab Bank's operations in GWB where we presently enjoy a leading market share in excess of 50% of the banking activities carried out there by approximately 22 branches. I held that position from 1994-2002.

10.     One of the most exciting moments of my tenure in this position was the licensing ceremony of our first branch in Nablus in November 1994. At the ceremony, the Israeli commanding officer in the Palestinian territories at that time welcomed Arab Bank back into GWB and expressed his sincere wishes for success in our endeavors there.

11.     In February 2002, I was called to headquarters in Amman and was promoted to the position of Chief Banking Officer, which I still presently hold. In this capacity, I am in charge of and responsible for Arab Bank's global banking activities, including commercial lending, as well as corporate and institutional operations.

3

### History of Arab Bank

12.    Arab Bank was founded in Jerusalem on July 14, 1930 by Abdul Hameed Shoman. Arab Bank's development and growth are inevitably tied to the political and social context of the history of the Middle East for the last century.

13.    From 1960 forward, the Bank began to develop its services to other parts of the world beyond the Middle East. We were the first Arab financial institution to establish a presence in Switzerland and we opened branches in many parts of the world, including London, Paris, Italy, Singapore and Greece.

14.    During its history, Arab Bank faced many challenges. As a result of political and unforeseen events, such as the Israeli-Palestinian conflicts and the nationalization of branches in countries such as Egypt, Syria, Libya, Iraq and Sudan, the Bank lost its presence in various countries. However, the Bank has continued to meet such challenges and move forward in spite of all the difficulties.

15.    Indeed in spite of the fact of not being legally responsible to its customers for the deposits lost as a result of the above referred events, the Bank always, truthful to its tradition and high level of ethics, made up and honored its customers' trust and confidence by reimbursing out of its headquarters and its own funds for all deposits lost by its customers without having any recourse towards third parties for indemnification. This approach to banking practices helped the Bank earn the trust and respect not only of its customers by also of the entire banking community.

16.    The Bank has consolidated assets of US$32 billion. Its stock is publicly traded on the Amman Stock Exchange. Today we have a presence in 30 countries on five continents and we employ 7300 people worldwide. Arab Bank is as much an international institution as it is a regional one.

4

### The New York Branch

17.     Arab Bank's New York branch was established in 1982. It has 51 employees, offers a full range of commercial banking services and is an active participant in the capital and money markets. It enjoys an excellent reputation in the United States especially for Middle East and North Africa related trade business. Deposits at Arab Bank are insured by the Federal Deposit Insurance Corporation (FDIC) and Arab Bank is regulated and supervised by the Board of Governors of the Federal Reserve System, the FDIC and the Office of the Comptroller of the Currency.

18.     I am aware that the plaintiffs have attempted to cause damage to the New York branch by reporting to our regulators the untrue claims and unfounded accusations contained in the Amended Complaint. I am also aware that we ourselves, in line with our general policy of keeping our regulators always aware of any event concerning our branch, informed the Office of the Comptroller of the Currency of this lawsuit and have kept them apprised of all developments.

19.     As a general policy, our Bank has always applied a very conservative and traditional approach to banking and has strived to apply the highest standards of compliance. As a result, we have consistently enjoyed high ratings in general of all the banking regulatory agencies in the jurisdictions in which we operate, including those which are known to be among the leading agencies, such as those of the U.S., UK, France, Italy and Austria.

### Operating in Gaza and the West Bank

20.     Arab Bank's operations in GWB are subject to the supervision and control of the Palestinian Monetary Authority and the Central Bank of Jordan. Pursuant to the Basel Accords, a financial institution operating in multiple jurisdictions will be subject to the supervisory authority of the other countries in which it operates, as well as its home country.

21.    In the initial period of our activities in GWB, we were also subject to the supervision of the Israeli Central Bank until the handing over of economic and banking activity in 1996 to the Palestinian Authority pursuant to the Economic Protocol under the Oslo Accords of 1993. The Oslo Accords provided for Israeli-Palestinian cooperation in economic and development programs, specifically:

> cooperation in the field of finance, including a <u>financial</u> <u>development</u> and action programme for the encouragement of <u>international investment</u> in the West Bank and the Gaza Strip, and in Israel, as well as the establishment of a Palestinian Development Bank. (Oslo Accords, Annex III) (emphasis added).[1]

22.    The Oslo Accords recognized the importance of investment in Palestine to the peace process. The Bank committed to help with that investment. Among other projects, we partnered with the International Financial Corporation (of the World Bank) and the German government to establish a long-term development bank known as the Arab Palestine Investment Bank. We worked with several U.S. entities to develop a major power project in the Gaza Strip and we participated in long-term projects in telecommunications and manufacturing. Also, the Bank became a founding shareholder in the US$172 million Palestine Development Investment Company (PADICO), which was established to help revitalize the Palestinian economy.

23.    From the very beginning, Arab Bank strategically identified the potential bottom-up growth for the local economy. For this reason, Arab Bank partnered with a number of specialized non-governmental organizations (NGO's ) including USAID, IFC, OXFAM, ANERA, CARITAS, Save the Children Fund, Catholic Relief Services, CHF and DEG that all support the development of micro, small and medium-sized businesses. The dedicated services of Arab Bank and success in the delivery of these programmes are recognized by all of the above agencies.

---

[1]    Attached hereto as Ex. 1.

24.     Owing to its reputation for ethical standards and reliability, Arab Bank has emerged as the main vehicle for the payments by the international donor community, especially the European Union, World Bank and mainstream Arab governments.  Although the Bank is a non-political entity, it has a vested interest that the peace process should succeed and contrary to the implicit allegations in the Amended Complaint, Arab Bank has absolutely no motive to see the peace process derailed.

25.     Since 1996, the Israeli Central Banking Authority supervisory role in GWB was officially transferred to the Palestinian Monetary Authority.  Nevertheless, the Israeli authorities maintain indirect monitoring of the Arab Bank's activities through the flow of physical (cash bank notes) transfers of funds in and out of GWB, which are subject to the pre-approval and clearance by the Israeli security authorities.

26.     In addition, and given Israel's strategic and close interest in fighting terrorism and its right to pursue such activities in GWB, as also expressed in the Oslo Accords, I am confident that had the Israeli authorities found any activities of the Bank to be engagement in aiding and abetting terrorism, as alleged in the Amended Complaint, they would have acted to prevent such activities, as they have done in many other cases.  The fact that we have and continue to have business relations and transactions with Israeli banks reflects, in my opinion, the Arab Bank's professional and unstained goodwill in Israel.

27.     Arab Bank enjoys a highly professional relationship with its Israeli counterparts, which is one of full cooperation and mutual respect.  As the official currencies in effect in GWB are Israeli Shekels, Jordanian Dinars and U.S. dollars, Arab Bank is regularly engaged in transactional and corresponding relationship with its Israeli counterparts.  In addition, Arab Bank maintains a professional relationships with the Israeli authorities as it handles many of the payments made by the Israeli authorities to the Palestinian Authority.

7

### Role of the Arab League and the Saudi Committee

28.     Since the Oslo Accords, there were several attempts to finalize a true and lasting peace between Palestinians and Israelis. Amongst the key milestones was the Wye River Memorandum in October of 1998, entered into by President Clinton, Yaser Arafat and Benjamin Netanyahu, which provided, *inter alia*, that "the Israeli and Palestinian sides reaffirm their commitment to enhancing their relationship and agree on the need to actively promote economic development in the West Bank and Gaza." The Memorandum also provided that:

> the two sides agree on the importance of continued international
> donor assistance to facilitate implementation by both sides of
> agreements reached. They also recognized the need for enhanced
> donor support for economic development in the West Bank and
> Gaza. They agree to jointly approach the donor community to
> organize a Ministerial Conference ... to seek pledges for enhanced
> levels of assistance. (Wye River Memorandum, Section III)
> (emphasis added).[2]

29.     In addition, in 2002-03, representatives from the United States, the European Union, the United Nations and Russia ("the Quartet") proposed a "Roadmap" for peace, which re-emphasized the vital importance of improving:

> the humanitarian situation and prospects for economic development
> in the West Bank and Gaza and [initiating] a major donor assistance
> effort. (Roadmap, Phase I) (emphasis added).[3]

30.     By 2000, the process contemplated by the Oslo Accords had not been completed. Ariel Sharon visited the Al-Aqsa Mosque in September of 2000 and as a result, a second Intifada began causing economic deterioration in GWB. Unemployment was rising, foreign investments diminished considerably and violence between the two parties was on the rise and many innocent people were killed or injured. The Intifada continues to this day.[4]

---

[2]     Attached hereto as Ex. 2.
[3]     Attached hereto as Ex. 3.
[4]     The word Intifada did not originally mean insurrection or rioting with violence. Technically, it means an uprising, a movement toward some rational goal. It has, unfortunately, come to mean an armed uprising of Palestinians against Israeli occupation of the West Bank and Gaza Strip.

8

31. At a meeting in Cairo in October of 2000, the Arab League recognized, as had the peace negotiators before it, that economic and humanitarian circumstances prevailing in GWB were worsening as a result of the hardships and difficult circumstances suffered by the civilian population.[5] It agreed to "put in place an operating mechanism" to support and alleviate the civilian population's hardships.

32. As a result, the Arab League resolved to create two funds to support humanitarian efforts and economic developments in Palestine.

33. It also called upon the member states to find new and flexible mechanisms that would ensure the availability of funds, in response to which a committee was created in Saudi Arabia (later on to be called the Saudi Committee Relief for the Palestinian People).[6] Payments were made to thousands of unemployed Palestinians, persons in hospitals, Palestinians that were wounded or injured during the violence, persons whose houses were destroyed, as well as payments to Palestinian schools, hospitals and infrastructure in general.

34. Plaintiffs characterize the work of this Committee as designed to encourage terrorism. Nothing could be further from the truth. The Arab League's goals and the Committee's goals were to counter unemployment and generally alleviate the suffering of the civilian population.

35. Obviously all this aid from the Saudi Committee had be channeled to the GWB through banking networks.

36. Beginning in December of 2000, the Saudi Committee made approximately 200,000 payments into Palestine through Arab Bank branches totaling over US$90,000,000. The payments were made to institutions and individuals alike.

37. The allegations in the Amended Complaint regarding our conspiracy with the Saudi Committee to encourage suicide bombers and reward their families for their deaths are

---

[5] Attending the Cairo Summit were representatives from Kuwait, Lebanon, Libya, Egypt, Saudi Arabia, Mauritania and

9

completely false and untrue. I cannot imagine more horrible accusations to tarnish our reputation.

## Payments by Other Banks and Organizations

38.     The Arab League is not the only entity that gives money to the Palestinians in order to relieve suffering, unemployment and support a devastated economy. The donor community is made up of many contributors, such as the United Nations Development Program, European Union, Arab Monetary Fund, French Development Agency, Italian government, World Bank and USAID. A substantial amount has been paid into GWB through various banks, including Arab Bank, as well as various Israeli banks.

39.     While the Intifada continues and while there is conflict and violence between the Israelis and the Palestinians, humanitarian organizations contribute and will continue to contribute funds. Palestine cannot survive during these times without donor support.

40.     There are numerous other examples of humanitarian aid, charitable contributions and other assistance to countries going through violent conflict. For instance, non-partisan world humanitarian organizations have supported victims of violence in Afghanistan, Darfur, Sudan, Cambodia, Bosnia and Ivory Coast.

## The Beirut Account

41.     The Amended Complaint falsely claims: "Arab Bank knowingly provides banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut." Am. Compl. Para. 345. This is not true. It is inconceivable that we would open an account for HAMAS whether in Beirut or in any of our branches.

42.     The Amended Complaint refers to account number 3-810-622-473-0330 in Arab Bank El-Mazra branch, Lebanon as a main account used to fund terrorism. We have

---

Yemen.
6       Royal Decree No. (8636), dated 18-7-1421 A-H.

investigated this account and our findings were that this account, which had a balance of US$ 8000, had been opened by an individual and has been dormant for the past three years.

43.    We also discovered that unknown to the Bank, as plaintiffs claim, that this account number was used on a website that plaintiffs allege is a HAMAS website. Upon confirming that this account was at some time available on a website alleged to belong to HAMAS, a fact that the Bank was unaware of, the Bank closed this account, froze the balance of its funds and reported it to the appropriate authorities.

### Policies and Systems To Prevent Money Laundering and Terrorism

44.    The Bank is at the forefront of preventing money-laundering and terrorist financing. It employs complex, sophisticated and state of the art software programs, commonly known as "filters," which are designed to identify terrorists and terrorist organizations and to detect suspicious patterns of financial activity.

45.    Arab Bank's supervisory authority is the Central Bank of Jordan. In addition, Arab Bank is supervised by the regulatory authorities in all the countries where it operates. Among the main regulatory authorities with oversight over the operations in Arab Bank branches are: Office of the Comptroller of the Currency in the U.S., the Financial Services in the United Kingdom, and the Commission Bancaire in France. As a matter of general policy, the Bank deliberately applies the strictest of the rules as set out by the various regulators. Arab Bank is in good standing and highly regarded by the various regulatory bodies in question.

46.    Our headquarters office in Amman maintains state of the art systems to prevent any money-laundering or terrorist activity and coordinates with the Central Bank of Jordan in that regard. Jordan has severe penalties for money laundering, pursuant to Anti-Money Laundering Regulations in Jordan No. 10 for the year 2001 issued by the Central Bank of Jordan under Section 99/B of the Banking Law.

11

47.    In order to counter terrorist financing transactions, Arab Bank applies the Office of Foreign Assets Control's list (the "OFAC list"), as well as local lists developed by the jurisdictions in which the Bank operates.

48.    The Bank's compliance is of the highest technical quality.

49.    The Bank enjoys an excellent rating from independent and internationally recognized agencies, such as Moody's Investors Service. Moody's has described Arab Bank as "one of the most prominent and well-known banking institutions in the banking world."[7] Moody's says that its rating is based, among other things, on the Bank's "preparedness to deal with catastrophic events and its long-standing track record of surviving wars, nationalizations, and economic crises."[8] Moody's adds, "in a region with a history of political and economic uncertainties ... Arab Bank is recognized as the flight-to-quality bank in the Middle East."[9]

50.    Independently of any regulatory requirements, the Bank has been at the forefront of creating and implementing strict standards on its own.

## Documents and Witnesses

51.    Arab Bank's documents that may be relevant to this case are located in four places: Amman, Ramallah, New York and Beirut.[10] I would say that more than 95% of the documents are in Amman; about one-half of them are in Arabic.

52.    With regard to witnesses, I would estimate now that Arab Bank has approximately 12 employees, in addition to myself, who have knowledge of the subject matter in this case. Most of the witnesses are in the Bank's headquarters in Amman with only one or perhaps two witnesses in New York and one in Ramallah.

---

[7]    Moody's Analysis, December 2003, pg. 1, attached hereto as Ex. 4.
[8]    Moody's Credit Opinion, February 2004, pgs. 1-2, attached hereto as Ex. 5.
[9]    See Ex. 4 at pg. 2.
[10]   Ramallah is the headquarters center for GWB and is located in the West Bank, about 40 miles from Amman.

12

53.     As appears below, even though most of the documents and witnesses are in Amman, to remove any doubt, the Bank will agree to produce any relevant documents and witnesses in an action in Jordan if this case is dismissed for *forum non conveniens*.

### *Forum Non Conveniens* Consents

54.     I am informed that certain conditions must be fulfilled in order for an action to be dismissed on the grounds of *forum non conveniens*. I have set forth below certain consents that I understand are necessary to satisfy those requirements. I am the person authorized to give such consents on behalf of the Bank.

55.     In connection with the motion to dismiss on the grounds of *forum non conveniens*, Arab Bank hereby agrees to consent to:

(a)  the jurisdiction of the Jordanian courts in any action filed by plaintiffs alleging the same or similar claims asserted in the Amended Complaint;

(b)  the application of U.S. law in such action, including, without limitation, the statute known as the Anti-Terrorism Act, 18 U.S.C. Section 2331, *et seq.*;

(c)  produce any relevant documents and witnesses in such action;

(d)  waive any statute of limitations or other time limit defense for bringing suit in such action; and

(e)  pay plaintiffs three times the amount of damages and reasonable attorney's fees in such action.

### Conclusion

56.     This lawsuit is made up of false claims. Arab Bank is an honorable and reputable commercial enterprise that has served its customers in the Middle East and throughout the world for 75 years. It has always been conscious of its obligations to conduct safe, sound and prudent banking in all jurisdictions in which it operates.

57.     For myself personally and on behalf of the Bank, I wish to state unequivocally that I reject violence for any purpose, political or otherwise. Plaintiffs allegations are unfair and untrue; they seek to exploit the current worldwide fear of terrorism.

13

58.     It seems ironic, but apropos, that I sign this document in this city, just across the Jordan River from Ramallah, on this day -- a day that will surely be on every timeline of the history of the Middle East. I respectfully ask this court to look hard at these most serious allegations and to judge us fairly.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at Amman, Jordan, on the ___11 th___ day of November 2004.

_Shukry Bishara_

14

# Exhibit 1

# MEMRI

## THE MIDDLE EAST MEDIA RESEARCH INSTITUTE

### Oslo I
### Declaration of Principles on Interim Self-Government Arrangements
### September 13, 1993

The Government of the State of Israel and the P.L.O. team (in the Jordanian-Palestinian delegation to the Middle East Peace Conference) (the "Palestinian Delegation"), representing the Palestinian people, agree that it is time to put an end to decades of confrontation and conflict, recognize their mutual legitimate and political rights, and strive to live in peaceful coexistence and mutual dignity and security and achieve a just, lasting and comprehensive peace settlement and historic reconciliation through the agreed political process. Accordingly, the, two sides agree to the following principles:

## ARTICLE I: AIM OF THE NEGOTIATIONS

The aim of the Israeli-Palestinian negotiations within the current Middle East peace process is, among other things, to establish a Palestinian Interim Self-Government Authority, the elected Council (the "Council"), for the Palestinian people in the West Bank and the Gaza Strip, for a transitional period not exceeding five years, leading to a permanent settlement based on Security Council Resolutions 242 and 338.

It is understood that the interim arrangements are an integral part of the whole peace process and that the negotiations on the permanent status will lead to the implementation of Security Council Resolutions 242 and 338.

## ARTICLE II: FRAMEWORK FOR THE INTERIM PERIOD

**The agreed framework for the interim period is set forth in this Declaration of Principles.**

## ARTICLE III: ELECTIONS

1. **In order that the Palestinian people in the West Bank and Gaza Strip may govern themselves according to democratic principles, direct, free and general political elections will be held for the Council under agreed supervision and international observation, while the Palestinian police will ensure public order.**

2. **An agreement will be concluded on the exact mode and conditions of the elections in accordance with the protocol attached as Annex I, with the goal of holding the elections not later than nine months after the entry into force of this Declaration of Principles.**

3. **These elections will constitute a significant interim preparatory step toward the realization of the legitimate rights of the Palestinian people and their just requirements.**

## ARTICLE IV: JURISDICTION

**Jurisdiction of the Council will cover West Bank and Gaza Strip territory, except for issues that will be negotiated in the permanent status negotiations. The two sides view the West Bank and the Gaza Strip as a single territorial unit, whose integrity will be preserved during the interim period.**

## ARTICLE V: TRANSITIONAL PERIOD AND PERMANENT STATUS NEGOTIATIONS

1. **The five-year transitional period will begin upon the withdrawal from the Gaza Strip and Jericho area.**

2. Permanent status negotiations will commence as soon as possible, but not later than the beginning of the third year of the interim period, between the Government of Israel and the Palestinian people representatives.

3. It is understood that these negotiations shall cover remaining issues, including: Jerusalem, refugees, settlements, security arrangements, borders, relations and cooperation with other neighbors, and other issues of common interest.

4. The two parties agree that the outcome of the permanent status negotiations should not be prejudiced or preempted by agreements reached for the interim period.

### ARTICLE VI: PREPARATORY TRANSFER OF POWERS AND RESPONSIBILITIES

1. Upon the entry into force of this Declaration of Principles and the withdrawal from the Gaza Strip and the Jericho area, a transfer of authority from the Israeli military government and its Civil Administration to the authorised Palestinians for this task, as detailed herein, will commence. This transfer of authority will be of a preparatory nature until the inauguration of the Council.

2. Immediately after the entry into force of this Declaration of Principles and the withdrawal from the Gaza Strip and Jericho area, with the view to promoting economic development in the West Bank and Gaza Strip, authority will be transferred to the Palestinians on the following spheres: education and culture, health, social welfare, direct taxation, and tourism. The Palestinian side will commence in building the Palestinian police force, as agreed upon. Pending the inauguration of the Council, the two parties may negotiate the transfer of additional powers and responsibilities, as agreed upon.

### ARTICLE VII: INTERIM AGREEMENT

1. The Israeli and Palestinian delegations will negotiate an agreement on the interim period (the "Interim Agreement")

2. The Interim Agreement shall specify, among other things, the structure of the Council, the number of its members, and the transfer of powers and responsibilities from the Israeli military government and its Civil Administration to the Council. The Interim Agreement shall also specify the Council's executive authority, legislative authority in accordance with Article IX below, and the independent Palestinian judicial organs.

3. The Interim Agreement shall include arrangements, to be implemented upon the inauguration of the Council, for the assumption by the Council of all of the powers and responsibilities transferred previously in accordance with Article VI above.

4. In order to enable the Council to promote economic growth, upon its inauguration, the Council will establish, among other things, a Palestinian Electricity Authority, a Gaza Sea Port Authority, a Palestinian Development Bank, a Palestinian Export Promotion Board, a Palestinian Environmental Authority, a Palestinian Land Authority and a Palestinian Water Administration Authority, and any other Authorities agreed upon, in accordance with the Interim Agreement that will specify their powers and responsibilities.

5. After the inauguration of the Council, the Civil Administration will be dissolved, and the Israeli military government will be withdrawn.

### ARTICLE VIII: PUBLIC ORDER AND SECURITY

In order to guarantee public order and internal security for the Palestinians of the West Bank and the Gaza Strip, the Council will establish a strong police force, while Israel will continue to carry the responsibility for defending against external threats, as well as the responsibility for overall security of Israelis for the purpose of safeguarding their

internal security and public order.

### ARTICLE IX: LAWS AND MILITARY ORDERS

1. The Council will be empowered to legislate, in accordance with the Interim Agreement, within all authorities transferred to it.

2. Both parties will review jointly laws and military orders presently in force in remaining spheres.

### ARTICLE X: JOINT ISRAELI-PALESTINIAN LIAISON COMMITTEE

In order to provide for a smooth implementation of this Declaration of Principles and any subsequent agreements pertaining to the interim period, upon the entry into force of this Declaration of Principles, a Joint Israeli-Palestinian Liaison Committee will be established in order to deal with issues requiring coordination, other issues of common interest, and disputes.

### ARTICLE XI: ISRAELI-PALESTINIAN COOPERATION IN ECONOMIC FIELDS

Recognizing the mutual benefit of cooperation in promoting the development of the West Bank, the Gaza Strip and Israel, upon the entry into force of this Declaration of Principles, an Israeli-Palestinian Economic Cooperation Committee will be established in order to develop and implement in a cooperative manner the programs identified in the protocols attached as Annex III and Annex IV.

### ARTICLE XII: LIAISON AND COOPERATION WITH JORDAN AND EGYPT

The two parties will invite the Governments of Jordan and Egypt to participate in establishing further liaison and cooperation arrangements between the Government of Israel and the Palestinian representatives, on the one hand, and the Governments of Jordan and Egypt, on the other hand, to promote cooperation between them. These arrangements will include the constitution of a Continuing Committee that will decide by agreement on the modalities of admission of persons displaced from the West Bank and Gaza Strip in 1967, together with necessary measures to prevent disruption and disorder. Other matters of common concern will be dealt with by this Committee.

### ARTICLE XIII: REDEPLOYMENT OF ISRAELI FORCES

1. After the entry into force of this Declaration of Principles, and not later than the eve of elections for the Council, a redeployment of Israeli military forces in the West Bank and the Gaza Strip will take place, in addition to withdrawal of Israeli forces carried out in accordance with Article XIV.

2. In redeploying its military forces, Israel will be guided by the principle that its military forces should be redeployed outside populated areas.

3. Further redeployments to specified locations will be gradually implemented commensurate with the assumption of responsibility for public order and internal security by the Palestinian police force pursuant to Article VIII above.

### ARTICLE XIV: ISRAELI WITHDRAWAL FROM THE GAZA STRIP AND JERICHO AREA

Israel will withdraw from the Gaza Strip and Jericho area, as detailed in the protocol attached as Annex II.

### ARTICLE XV: RESOLUTION OF DISPUTES

1. Disputes arising out of the application or interpretation of this Declaration of Principles. or any subsequent agreements pertaining to the interim period, shall be resolved by negotiations through the Joint Liaison Committee to be established

pursuant to Article X above.

2. Disputes which cannot be settled by negotiations may be resolved by a mechanism of conciliation to be agreed upon by the parties.

3. The parties may agree to submit to arbitration disputes relating to the interim period, which cannot be settled through conciliation. To this end, upon the agreement of both parties, the parties will establish an Arbitration Committee.

**ARTICLE XVI: ISRAELI-PALESTINIAN COOPERATION CONCERNING REGIONAL PROGRAMS**

Both parties view the multilateral working groups as an appropriate instrument for promoting a "Marshall Plan", the regional programs and other programs, including special programs for the West Bank and Gaza Strip, as indicated in the protocol attached as Annex IV.

**ARTICLE XVII: MISCELLANEOUS PROVISIONS**

1. This Declaration of Principles will enter into force one month after its signing.

2. All protocols annexed to this Declaration of Principles and Agreed Minutes pertaining thereto shall be regarded as an integral part hereof.

Done at Washington, D.C., this thirteenth day of September, 1993.

For the Government of Israel
For the P.L.O.

Witnessed By:

The United States of America
The Russian Federation

**ANNEX I: PROTOCOL ON THE MODE AND CONDITIONS OF ELECTIONS**

1. Palestinians of Jerusalem who live there will have the right to participate in the election process, according to an agreement between the two sides.

2. In addition, the election agreement should cover, among other things, the following issues:

   a. the system of elections;
   b. the mode of the agreed supervision and international observation and their personal composition; and
   c. rules and regulations regarding election campaign, including agreed arrangements for the organizing of mass media, and the possibility of licensing a broadcasting and TV station.

3. The future status of displaced Palestinians who were registered on 4th June 1967 will not be prejudiced because they are unable to participate in the election process due to practical reasons.

**ANNEX II: PROTOCOL ON WITHDRAWAL OF ISRAELI FORCES FROM THE GAZA STRIP AND JERICHO AREA**

1. The two sides will conclude and sign within two months from the date of entry into force of this Declaration of Principles, an agreement on the withdrawal of Israeli military forces from the Gaza Strip and Jericho area. This agreement will include comprehensive arrangements to apply in the Gaza Strip and the Jericho area subsequent to the Israeli withdrawal.

2. Israel will implement an accelerated and scheduled withdrawal of Israeli military forces from the Gaza Strip and Jericho area, beginning immediately with the signing of the agreement on the Gaza Strip and Jericho area and to be completed within a period not exceeding four months after the signing of this agreement.

3. The above agreement will include, among other things:

   a. Arrangements for a smooth and peaceful transfer of authority from the Israeli military government and its Civil Administration to the Palestinian representatives.
   b. Structure, powers and responsibilities of the Palestinian authority in these areas, except: external security, settlements, Israelis, foreign relations, and other mutually agreed matters.
   c. Arrangements for the assumption of internal security and public order by the Palestinian police force consisting of police officers recruited locally and from abroad holding Jordanian passports and Palestinian documents issued by Egypt). Those who will participate in the Palestinian police force coming from abroad should be trained as police and police officers.
   d. A temporary international or foreign presence, as agreed upon.
   e. Establishment of a joint Palestinian-Israeli Coordination and Cooperation Committee for mutual security purposes.
   f. An economic development and stabilization program, including the establishment of an Emergency Fund, to encourage foreign investment, and financial and economic support. Both sides will coordinate and cooperate jointly and unilaterally with regional and international parties to support these aims.
   g. Arrangements for a safe passage for persons and transportation between the Gaza Strip and Jericho area.

4. The above agreement will include arrangements for coordination between both parties regarding passages:

   a. Gaza - Egypt; and

   b. Jericho - Jordan.

5. The offices responsible for carrying out the powers and responsibilities of the Palestinian authority under this Annex II and Article VI of the Declaration of Principles will be located in the Gaza Strip and in the Jericho area pending the inauguration of the Council.

6. Other than these agreed arrangements, the status of the Gaza Strip and Jericho area will continue to be an integral part of the West Bank and Gaza Strip, and will not be changed in the interim period.


ANNEX III: PROTOCOL ON ISRAELI-PALESTINIAN COOPERATION IN ECONOMIC AND DEVELOPMENT PROGRAMS

The two sides agree to establish an Israeli-Palestinian continuing Committee for Economic Cooperation, focusing, among other things, on the following:

1. Cooperation in the field of water, including a Water Development Program prepared by experts from both sides, which will also specify the mode of cooperation in the management of water resources in the West Bank and Gaza

Strip, and will include proposals for studies and plans on water rights of each party, as well as on the equitable utilization of joint water resources for implementation in and beyond the interim period.

2. Cooperation in the field of electricity, including an Electricity Development Program, which will also specify the mode of cooperation for the production, maintenance, purchase and sale of electricity resources.

3. Cooperation in the field of energy, including an Energy Development Program, which will provide for the exploitation of oil and gas for industrial purposes, particularly in the Gaza Strip and in the Negev, and will encourage further joint exploitation of other energy resources. This Program may also provide for the construction of a Petrochemical industrial complex in the Gaza Strip and the construction of oil and gas pipelines.

4. Cooperation in the field of finance, including a Financial Development and Action Program for the encouragement of international investment in the West Bank and the Gaza Strip, and in Israel, as well as the establishment of a Palestinian Development Bank.

5. Cooperation in the field of transport and communications, including a Program, which will define guidelines for the establishment of a Gaza Sea Port Area, and will provide for the establishing of transport and communications lines to and from the West Bank and the Gaza Strip to Israel and to other countries. In addition, this Program will provide for carrying out the necessary construction of roads, railways, communications lines, etc.

6. Cooperation in the field of trade, including studies, and Trade Promotion Programs, which will encourage local, regional and inter-regional trade, as well as a feasibility study of creating free trade zones in the Gaza Strip and in Israel, mutual access to these zones, and cooperation in other areas related to trade and commerce.

7. Cooperation in the field of industry, including Industrial Development Programs, which will provide for the establishment of joint Israeli- Palestinian Industrial Research and Development Centers, will promote Palestinian-Israeli joint ventures, and provide guidelines for cooperation in the textile, food, pharmaceutical, electronics, diamonds, computer and science-based industries.

8. A program for cooperation in, and regulation of, labor relations and cooperation in social welfare issues.

9. A Human Resources Development and Cooperation Plan, providing for joint Israeli-Palestinian workshops and seminars, and for the establishment of joint vocational training centers, research institutes and data banks.

10. An Environmental Protection Plan, providing for joint and/or coordinated measures in this sphere.

11. A program for developing coordination and cooperation in the field of communication and media.

12. Any other programs of mutual interest.

### ANNEX IV: PROTOCOL ON ISRAELI-PALESTINIAN COOPERATION CONCERNING REGIONAL DEVELOPMENT PROGRAMS

1. The two sides will cooperate in the context of the multilateral peace efforts in promoting a Development Program for the region, including the West Bank and the Gaza Strip, to be initiated by the G-7. The parties will request the G-7 to seek the participation in this program of other interested states, such as members of the

Organisation for Economic Cooperation and Development, regional Arab states and institutions, as well as members of the private sector.

2. The Development Program will consist of two elements:

    a. an Economic Development Program for the 'West Bank and the Gaza Strip.
    b. a Regional Economic Development Program.

    A. The Economic Development Program for the West Bank and the Gaza strip will consist of the following elements:

        1. A Social Rehabilitation Program, including a Housing and Construction Program.
        2. A Small and Medium Business Development Plan.
        3. An Infrastructure Development Program (water, electricity, transportation and communications, etc.)
        4. A Human Resources Plan.
        5. Other programs.

    B. The Regional Economic Development Program may consist of the following elements:

        1. The establishment of a Middle East Development Fund, as a first step, and a Middle East Development Bank, as a second step.
        2. The development of a joint Israeli-Palestinian-Jordanian Plan for coordinated exploitation of the Dead Sea area.
        3. The Mediterranean Sea (Gaza) - Dead Sea Canal.
        4. Regional Desalinization and other water development projects.
        5. A regional plan for agricultural development, including a coordinated regional effort for the prevention of desertification.
        6. Interconnection of electricity grids.
        7. Regional cooperation for the transfer, distribution and industrial exploitation of gas, oil and other energy resources.
        8. A Regional Tourism, Transportation and Telecommunications Development Plan.
        9. Regional cooperation in other spheres.

3. The two sides will encourage the multilateral working groups, and will coordinate towards their success. The two parties will encourage intersessional activities, as well as pre-feasibility and feasibility studies, within the various multilateral working groups.

**AGREED MINUTES TO THE DECLARATION OF PRINCIPLES ON INTERIM SELF-GOVERNMENT ARRANGEMENTS**

# A. GENERAL UNDERSTANDINGS AND AGREEMENTS

Any powers and responsibilities transferred to the Palestinians pursuant to the Declaration of Principles prior to the inauguration of the Council will be subject to the same principles pertaining to Article IV, as set out in these Agreed Minutes below.

## B. SPECIFIC UNDERSTANDINGS AND AGREEMENTS

Article IV

It is understood that:

1. Jurisdiction of the Council will cover West Bank and Gaza Strip territory, except for issues that will be negotiated in the permanent status negotiations: Jerusalem, settlements, military locations, and Israelis.

2. The Council's jurisdiction will apply with regard to the agreed powers, responsibilities, spheres and authorities transferred to it.

Article VI (2)

It is agreed that the transfer of authority will be as follows:

1. The Palestinian side will inform the Israeli side of the names of the authorised Palestinians who will assume the powers, authorities and responsibilities that will be transferred to the Palestinians according to the Declaration of Principles in the following fields: education and culture, health, social welfare, direct taxation, tourism, and any other authorities agreed upon.

2. It is understood that the rights and obligations of these offices will not be affected.

3. Each of the spheres described above will continue to enjoy existing budgetary allocations in accordance with arrangements to be mutually agreed upon. These arrangements also will provide for the necessary adjustments required in order to take into account the taxes collected by the direct taxation office.

4. Upon the execution of the Declaration of Principles, the Israeli and Palestinian delegations will immediately commence negotiations on a detailed plan for the transfer of authority on the above offices in accordance with the above understandings.

Article VII (2)

The Interim Agreement will also include arrangements for coordination and cooperation.

Article VII (5)

The withdrawal of the military government will not prevent Israel from exercising the powers and responsibilities not transferred to the Council.

Article VIII

It is understood that the Interim Agreement will include arrangements for cooperation and coordination between the two parties in this regard. It is also agreed that the transfer of powers and responsibilities to the Palestinian police will be accomplished in a phased manner, as agreed in the Interim Agreement.

Article X

It is agreed that, upon the entry into force of the Declaration of Principles, the Israeli and Palestinian delegations will exchange the names of the individuals designated by them as members of the Joint Israeli-Palestinian Liaison Committee.

It is further agreed that each side will have an equal number of members in the Joint Committee. The Joint Committee will reach decisions by agreement. The Joint Committee may add other technicians and experts, as necessary. The Joint Committee will decide on the frequency and place or places of its meetings.

Annex II

It is understood that, subsequent to the Israeli withdrawal, Israel will continue to be responsible for external security, and for internal security and public order of settlements and Israelis. Israeli military forces and civilians may continue to use roads freely within the Gaza Strip and the Jericho area.

Done at Washington, D.C., this thirteenth day of September, 1993.

For the Government of Israel
For the P.L.O.

Witnessed By:

The United States of America

## The Russian Federation

**BRIDGING THE LANGUAGE GAP BETWEEN THE MIDDLE EAST AND THE WEST**

MEMRI holds copyrights on all translations. Materials may ONLY be cited with proper attribution.
For Copyright Information, click here.

Developed and maintained by; WEBstationONE. Hosted By: SecureHosts. Copyright © 2001, 2002, 2003 All Rights Reserved.

# Exhibit 2

**PLO/Palestine**                                                                      **23 October 1998**
**Israel**

# THE WYE RIVER MEMORANDUM

The following are steps to facilitate implementation of the Interim Agreement on the West Bank and Gaza Strip of September 28, 1995 (the "Interim Agreement") and other related agreements including the Note for the Record of January 17, 1997 (hereinafter referred to as "the prior agreements") so that the Israeli and Palestinian sides can more effectively carry out their reciprocal responsibilities, including those relating to further redeployments and security respectively. These steps are to be carried out in a parallel phased approach in accordance with this Memorandum and the attached time line. They are subject to the relevant terms and conditions of the prior agreements and do not supercede their other requirements.

## I. FURTHER REDEPLOYMENTS

A. Phase One and Two Further Redeployments
1. Pursuant to the Interim Agreement and subsequent agreements, the Israeli side's implementation of the first and second F.R.D. will consist of the transfer to the Palestinian side of 13% from Area C as follows:

> 1% to Area (A)
> 12% to Area (B)

The Palestinian side has informed that it will allocate an area/areas amounting to 3% from the above Area (B) to be designated as Green Areas and/or Nature Reserves. The Palestinian side has further informed that they will act according to the established scientific standards, and that therefore there will be no changes in the status of these areas, without prejudice to the rights of the existing inhabitants in these areas including Bedouins; while these standards do not allow new construction in these areas, existing roads and buildings will be maintained. The Israeli side will retain in these Green Areas/Nature Reserves the overriding security responsibility for the purpose of protecting Israelis and confronting the threat of terrorism. Activities and movements of the Palestinian Police forces may be carried out after coordination and confirmation; the Israeli side will respond to such requests expeditiously.
2. As part of the foregoing implementation of the first and second F.R.D., 14.2% from Area (B) will become Area (A).

B. Third Phase of Further Redeployments
With regard to the terms of the Interim Agreement and of Secretary Christopher's letters to the two sides of January 17, 1997 relating to the further redeployment process, there will be a committee to address this question. The United States will be briefed regularly.

## II. SECURITY

In the provisions on security arrangements of the Interim Agreement, the Palestinian side agreed to take all measures necessary in order to prevent acts of terrorism, crime and hostilities directed against the Israeli side, against individuals falling under the Israeli side's authority and against their property, just as the Israeli side agreed to take all measures necessary in order to prevent acts of terrorism, crime and hostilities directed against the Palestinian side, against individuals falling under the Palestinians side's authority and against their property. The two sides also agreed to take legal measures against offenders within their jurisdiction and to prevent incitement against each other by any organizations, groups or individuals within their jurisdiction.
Both sides recognize that it is in their vital interests to combat terrorism and fight violence in accordance with Annex I of the Interim Agreement and the Note for the Record. They also recognize that the struggle against terror and violence must be comprehensive in that it deals with terrorists, the terror support structure, and the environment conducive to the support of terror. It must be continuous and constant over a long-term, in that there can be no pauses in the work against terrorists and their structure. It must be cooperative in that no effort

can be fully effective without Israeli-Palestinian cooperation and the continuous exchange of information, concepts, and actions.

Pursuant to the prior agreements, the Palestinian side's implementation of its responsibilities for security, security cooperation, and other issues will be as detailed below during the time periods specified in the attached time line:

A. Security Actions

1. Outlawing and Combating Terrorist Organizations

(a) The Palestinian side will make known its policy of zero tolerance for terror and violence against both sides.

(b) A work plan developed by the Palestinian side will be shared with the U.S. and thereafter implementation will begin immediately to ensure the systematic and effective combat of terrorist organizations and their infrastructure.

(c) In addition to the bilateral Israeli-Palestinian security cooperation, a U.S.-Palestinian committee will meet biweekly to review the steps being taken to eliminate terrorist cells and the support structure that plans, finances, supplies and abets terror. In these meetings, the Palestinian side will inform the U.S. fully of the actions it has taken to outlaw all organizations (or wings of organizations, as appropriate) of a military, terrorist or violent character and their support structure and to prevent them from operating in areas under its jurisdiction.

(d) The Palestinian side will apprehend the specific individuals suspected of perpetrating acts of violence and terror for the purpose of further investigation, and prosecution and punishment of all persons involved in acts of violence and terror.

(e) A U.S.-Palestinian committee will meet to review and evaluate information pertinent to the decisions on prosecution, punishment or other legal measures which affect the status of individuals suspected of abetting or perpetrating acts of violence and terror.

2. Prohibiting Illegal Weapons

(a) The Palestinian side will ensure an effective legal framework is in place to criminalize, in conformity with the prior agreements, any importation, manufacturing or unlicensed sale, acquisition or possession of firearms, ammunition or weapons in areas under Palestinian jurisdiction.

(b) In addition, the Palestinian side will establish and vigorously and continuously implement a systematic program for the collection and appropriate handling of all such illegal items in accordance with the prior agreements. The U.S. has agreed to assist in carrying out this program.

(c) A U.S.-Palestinian-Israeli committee will be established to assist and enhance cooperation in preventing the smuggling or other unauthorized introduction of weapons or explosive materials into areas under Palestinian jurisdiction.

3. Preventing Incitement

(a) Drawing on relevant international practice and pursuant to Article XXII (1) of the Interim Agreement and the Note for the Record, the Palestinian side will issue a decree prohibiting all forms of incitement to violence or terror, and establishing mechanisms for acting systematically against all expressions or threats of violence or terror. This decree will be comparable to the existing Israeli legislation which deals with the same subject.

(b) A U.S.-Palestinian-Israeli committee will meet on a regular basis to monitor cases of possible incitement to violence or terror and to make recommendations and reports on how to prevent such incitement. The Israeli, Palestinian and U.S. sides will each appoint a media specialist, a law enforcement representative, an educational specialist and a current or former elected official to the committee.

B. Security Cooperation

The two sides agree that their security cooperation will be based on a spirit of partnership and will include, among other things, the following steps:

1. Bilateral Cooperation
There will be full bilateral security cooperation between the two sides which will be continuous, intensive and comprehensive.
2. Forensic Cooperation
There will be an exchange of forensic expertise, training, and other assistance.
3. Trilateral Committee
In addition to the bilateral Israeli-Palestinian security cooperation, a high-ranking U.S.-Palestinian-Israeli committee will meet as required and not less than biweekly to assess current threats, deal with any impediments to effective security cooperation and coordination and address the steps being taken to combat terror and terrorist organizations. The committee will also serve as a forum to address the issue of external support for terror. In these meetings, the Palestinian side will fully inform the members of the committee of the results of its investigations concerning terrorist suspects already in custody and the participants will exchange additional relevant information. The committee will report regularly to the leaders of the two sides in the status of cooperation, the results of the meetings and its recommendations.
C. Other Issues
1. Palestinian Police Force

    (a) The Palestinian side will provide a list of its policemen to the Israeli side in conformity with the prior agreements.
    (b) Should the Palestinian side request technical assistance, the U.S. has indicated its willingness to help meet these needs in cooperation with other donors.
    (c) The Monitoring and Steering Committee will, as part of its functions, monitor the implementation of this provision and brief the U.S.

2. PLO Charter
The Executive Committee of the Palestine Liberation Organization and the Palestinian Central Council will reaffirm the letter of 22 January 1998 from PLO Chairman Yasir Arafat to President Clinton concerning the nullification of the Palestinian National Charter provisions that are inconsistent with the letters exchanged between the PLO and the Government of Israel on 9/10 September 1993. PLO Chairman Arafat, the Speaker of the Palestine National Council, and the Speaker of the Palestinian Council will invite the members of the PNC, as well as the members of the Central Council, the Council, and the Palestinian Heads of Ministries to a meeting to be addressed by President Clinton to reaffirm their support for the peace process and the aforementioned decisions of the Executive Committee and the Central Council.
3. Legal Assistance in Criminal Matters
Among other forms of legal assistance in criminal matters, the requests for arrest and transfer of suspects and defendants pursuant to Article II (7) of Annex IV of the Interim Agreement will be submitted (or resubmitted) through the mechanism of the Joint Israeli-Palestinian Legal Committee and will be responded to in conformity with Article II (7) (f) of Annex IV of the Interim Agreement within the twelve week period. Requests submitted after the eighth week will be responded to in conformity with Article II (7) (f) within four weeks of their submission. The U.S. has been requested by the sides to report on a regular basis on the steps being taken to respond to the above requests.
4. Human Rights and the Rule of Law
Pursuant to Article XI (1) of Annex I of the Interim Agreement, without derogating from the above, the Palestinian Police will exercise powers and responsibilities to implement this Memorandum with due regard to internationally accepted norms of human rights and the rule of law, and will be guided by the need to protect the public, respect human dignity, and avoid harassment.

## III. INTERIM COMMITTEES AND ECONOMIC ISSUES
1. The Israeli and Palestinian sides reaffirm their commitment to enhancing their relationship and agree on the need actively to promote economic development in the West Bank and Gaza. In this regard, the parties agree to continue or to reactivate all standing committees established by the Interim Agreement, including the Monitoring and Steering Committee, the Joint Economic Committee (JEC), the Civil Affairs Committee (CAC), the Legal Committee, and the Standing Cooperation Committee.
2. The Israeli and Palestinian sides have agreed on arrangements which will permit the timely opening of the

Gaza Industrial Estate. They also have concluded a "Protocol Regarding the Establishment and Operation of the International Airport in the Gaza Strip During the Interim Period."

3. Both sides will renew negotiations on Safe Passage immediately. As regards to the southern route, the sides will make best efforts to conclude the agreement within a week of the entry into force of this Memorandum. Operation of the southern route will start as soon as possible thereafter. As regards the northern route, negotiations will continue with the goal of reaching agreement as soon as possible. Implementation will take place expeditiously thereafter.

4. The Israeli and Palestinian sides acknowledge the great importance of the Port of Gaza for the development of the Palestinian economy, and the expansion of Palestinian trade. They commit themselves to proceeding without delay to conclude an agreement to allow the construction and operation of the port in accordance with the prior agreements. The Israeli-Palestinian Committee will reactivate its work immediately with a goal of concluding the protocol within sixty days, which will allow commencement of the construction of the port.

5. The two sides recognize that unresolved legal issues adversely affect the relationship between the two peoples. They therefore will accelerate efforts through the Legal Committee to address outstanding legal issues and to implement solutions to these issues in the shortest possible period. The Palestinian side will provide to the Israeli side copies of all its laws in effect.

6. The Israeli and Palestinian sides also will launch a strategic economic dialogue to enhance their economic relationship. They will establish within the framework of the JEC an Ad Hoc Committee for this purpose. The committee will review the following four issues: (1) Israeli purchase taxes; (2) cooperation in combating vehicle theft; (3) dealing with unpaid Palestinian debts; and (4) the impact of Israeli standards as barriers to trade and the expansion of the A1 and A2 lists. The committee will submit an interim report within three weeks of the entry into force of this Memorandum, and within six weeks will submit its conclusions and recommendations to be implemented.

7. The two sides agree on the importance of continued international donor assistance to facilitate implementation by both sides of the agreements reached. They also recognize the need for enhanced donor support for economic development in the West Bank and Gaza. They agree to jointly approach the donor community to organize a Ministerial Conference before the end of 1998 to seek pledges for enhanced levels of assistance.

## IV. PERMANENT STATUS NEGOTIATIONS
The two sides will immediately resume permanent status negotiations on an accelerated basis and will make a determined effort to achieve the mutual goal of reaching an agreement by May 4, 1999. The negotiations will be continuous and without interruption. The U.S. has expressed its willingness to facilitate these negotiations.

## V. UNILATERAL ACTIONS
Recognizing the necessity to create a positive environment for the negotiations, neither side shall initiate or take any step that will change the status of the West Bank and the Gaza Strip in accordance with the Interim Agreement.

**ATTACHMENT**: Time Line
This Memorandum will enter into force ten days from the date of signature.
Done at Washington, D.C. this 23rd day of October 1998.
B. Netanyahu (signed) For the Government of the State of Israel
Y. Arafat (signed) For the PLO
Witnessed by: William B. Clinton (signed) The United States of America

## TIME LINE
Note: Parenthetical references below are to paragraphs in "The Wye River Memorandum" to which this time line is an integral attachment. Topics not included in the time line follow the schedule provided for in the text of the Memorandum.
1. Upon Entry into Force of the Memorandum:

- Third further redeployment committee starts (I (B))
- Palestinian security work plan shared with the U.S. (II (A) (1) (b))

•Full bilateral security cooperation (II (B) (1))
•Trilateral security cooperation committee starts (II (B) (3))
•Interim committees resume and continue; Ad Hoc Economic Committee starts (III)
•Accelerated permanent status negotiations start (IV)

<u>2. Entry into Force - Week 2</u>:

•Security work plan implementation begins (II (A) (1) (b)); (II (A) (1) (c)) committee starts
•Illegal weapons framework in place (II (A) (2) (a)); Palestinian implementation report (II (A) (2) (b))
•Anti-incitement committee starts (II (A) (3) (b)); decree issued (II (A) (3) (a))
•PLO Executive Committee reaffirms Charter letter (II (C) (2))
•Stage 1 of F.R.D. implementation: 2% C to B, 7.1% B to A. Israeli officials acquaint their Palestinian counterparts as required with areas; F.R.D. carried out; report on F.R.D. implementation (I (A))

<u>3. Week 2-6</u>:

•Palestinian Central Council reaffirms Charter letter (weeks two to four) (II (C) (2))
•PNC and other PLO organizations reaffirm Charter letter (weeks four to six) (II (C) (2))
•Establishment of weapons collection program (II (A) (2) (b)) and collection stage (II (A) (2) (c)); committee starts and reports on activities.
•Anti-incitement committee report (II (A) (3) (b))
•Ad Hoc Economic Committee: interim report at week three; final report at week six (III)
•Policemen list (II (C) (1) (a)); Monitoring and Steering Committee review starts (II (C) (1) (c)
•Stage 2 of F.R.D. implementation: 5% C to B. Israeli officials acquaint their Palestinian counterparts as required with areas; F.R.D. carried out; report on F.R.D. implementation (I (A))

<u>4. Week 6-12</u>:

•Weapons collection stage II (A) (2) (b); II (A) (2) (c) committee report on its activities.
•Anti-incitement committee report (II (A) (3) (b))
•Monitoring and Steering Committee briefs U.S. on policemen list (II (C) (1) (c))
•Stage 3 of F.R.D. implementation: 5% C to B, 1% C to A, 7.1% B to A. Israeli officials acquaint Palestinian counterparts as required with areas; F.R.D. carried out; report on F.R.D. implementation (I (A))

<u>5. After Week 12</u>:
Activities described in the Memorandum continue as appropriate and if necessary, including:

•Trilateral security cooperation committee (II (B) (3))
•(II (A) (1) (c)) committee
•(II (A) (1) (e)) committee
•Anti-incitement committee (II (A) (3) (b))
•Third Phase F.R.D. Committee (I (B))
•Interim Committees (III)
•Accelerated permanent status negotiations (IV)

# Exhibit 3

A PERFORMANCE-BASED ROADMAP
TO A PERMANENT TWO-STATE SOLUTION TO THE ISRAELI-PALESTINIAN CONFLICT

The following is a performance-based and goal-driven roadmap, with clear phases, timelines, target dates, and benchmarks aiming at progress through reciprocal steps by the two parties in the political, security, economic, humanitarian, and institution-building fields, under the auspices of the Quartet. The destination is a final and comprehensive settlement of the Israel-Palestinian conflict by 2005, as presented in President Bush's speech of 24 June, and welcomed by the EU, Russia and the UN in the 16 July and 17 September Quartet Ministerial statements.

A two state solution to the Israeli-Palestinian conflict will only be achieved through an end to violence and terrorism, when the Palestinian people have a leadership acting decisively against terror and willing and able to build a practicing democracy based on tolerance and liberty, and through Israel's readiness to do what is necessary for a democratic Palestinian state to be established, and a clear, unambiguous acceptance by both parties of the goal of a negotiated settlement as described below. The Quartet will assist and facilitate implementation of the plan, starting in Phase I, including direct discussions between the parties as required. The plan establishes a realistic timeline for implementation. However, as a performance-based plan, progress will require and depend upon the good faith efforts of the parties, and their compliance with each of the obligations outlined below. Should the parties perform their obligations rapidly, progress within and through the phases may come sooner than indicated in the plan. Non-compliance with obligations will impede progress.

A settlement, negotiated between the parties, will result in the emergence of an independent, democratic, and viable Palestinian state living side by side in peace and security with Israel and its other neighbors. The settlement will resolve the Israel-Palestinian conflict, and end the occupation that began in 1967, based on the foundations of the Madrid Conference, the principle of land for peace, UNSCRs 242, 338 and 1397, agreements previously reached by the parties, and the initiative of Saudi Crown Prince Abdullah – endorsed by the Beirut Arab League Summit – calling for acceptance of Israel as a neighbor living in peace and security, in the context of a comprehensive settlement. This initiative is a vital element of international efforts to promote a comprehensive peace on all tracks, including the Syrian-Israeli and Lebanese-Israeli tracks.

The Quartet will meet regularly at senior levels to evaluate the parties' performance on implementation of the plan. In each phase, the parties are expected to perform their obligations in parallel, unless otherwise indicated.

On the United Nations website at
http://www.un.org/News/dh/mideast/roadmap122002.pdf.

> **PHASE I:**
> **ENDING TERROR AND VIOLENCE, NORMALIZING PALESTINIAN LIFE,**
> **AND BUILDING PALESTINIAN INSTITUTIONS**
> **PRESENT TO MAY 2003**

In Phase I, the Palestinians immediately undertake an unconditional cessation of violence according to the steps outlined below; such action should be accompanied by supportive measures undertaken by Israel. Palestinians and Israelis resume security cooperation based on the Tenet work plan to end violence, terrorism, and incitement through restructured and effective Palestinian security services. Palestinians undertake comprehensive political reform in preparation for statehood, including drafting a Palestinian constitution, and free, fair and open elections upon the basis of those measures. Israel takes all necessary steps to help normalize Palestinian life. Israel withdraws from Palestinian areas occupied from September 28, 2000 and the two sides restore the status quo that existed at that time, as security performance and cooperation progress. Israel also freezes all settlement activity, consistent with the Mitchell report.

At the outset of Phase I:

- Palestinian leadership issues unequivocal statement reiterating Israel's right to exist in peace and security and calling for an immediate and unconditional ceasefire to end armed activity and all acts of violence against Israelis anywhere. All official Palestinian institutions end incitement against Israel.

- Israeli leadership issues unequivocal statement affirming its commitment to the two-state vision of an independent, viable, sovereign Palestinian state living in peace and security alongside Israel, as expressed by President Bush, and calling for an immediate end to violence against Palestinians everywhere. All official Israeli institutions end incitement against Palestinians.

**SECURITY**

- Palestinians declare an unequivocal end to violence and terrorism and undertake visible efforts on the ground to arrest, disrupt, and restrain individuals and groups conducting and planning violent attacks on Israelis anywhere.

- Rebuilt and refocused Palestinian Authority security apparatus begins sustained, targeted, and effective operations aimed at confronting all those engaged in terror and dismantlement of terrorist capabilities and infrastructure. This includes commencing confiscation of illegal weapons and consolidation of security authority, free of association with terror and corruption.

- GOI takes no actions undermining trust, including deportations, attacks on civilians; confiscation and/or demolition of Palestinian homes and property, as a punitive

measure or to facilitate Israeli construction; destruction of Palestinian institutions and infrastructure; and other measures specified in the Tenet work plan.

- Relying on existing mechanisms and on-the-ground resources, Quartet representatives begin informal monitoring and consult with the parties on establishment of a formal monitoring mechanism and its implementation.

- Implementation, as previously agreed, of U.S. rebuilding, training and resumed security cooperation plan in collaboration with outside oversight board (U.S.–Egypt–Jordan). Quartet support for efforts to achieve a lasting, comprehensive cease-fire.

    ➢ All Palestinian security organizations are consolidated into three services reporting to an empowered Interior Minister.

    ➢ Restructured/retrained Palestinian security forces and IDF counterparts progressively resume security cooperation and other undertakings in implementation of the Tenet work plan, including regular senior-level meetings, with the participation of U.S. security officials.

- Arab states cut off public and private funding and all other forms of support for groups supporting and engaging in violence and terror.

- All donors providing budgetary support for the Palestinians channel these funds through the Palestinian Ministry of Finance's Single Treasury Account.

- As comprehensive security performance moves forward, IDF withdraws progressively from areas occupied since September 28, 2000 and the two sides restore the status quo that existed prior to September 28, 2000. Palestinian security forces redeploy to areas vacated by IDF.

### PALESTINIAN INSTITUTION-BUILDING

- Immediate action on credible process to produce draft constitution for Palestinian statehood. As rapidly as possible, constitutional committee circulates draft Palestinian constitution, based on strong parliamentary democracy and cabinet with empowered prime minister, for public comment/debate. Constitutional committee proposes draft document for submission after elections for approval by appropriate Palestinian institutions.

- Appointment of interim prime minister or cabinet with empowered executive authority/decision-making body.

- GOI fully facilitates travel of Palestinian officials for PLC and Cabinet sessions, internationally supervised security retraining, electoral and other reform activity, and other supportive measures related to the reform efforts.

Page 4

- Continued appointment of Palestinian ministers empowered to undertake fundamental reform. Completion of further steps to achieve genuine separation of powers, including any necessary Palestinian legal reforms for this purpose.

- Establishment of independent Palestinian election commission. PLC reviews and revises election law.

- Palestinian performance on judicial, administrative, and economic benchmarks, as established by the International Task Force on Palestinian Reform.

- As early as possible, and based upon the above measures and in the context of open debate and transparent candidate selection/electoral campaign based on a free, multi-party process, Palestinians hold free, open, and fair elections.

- GOI facilitates Task Force election assistance, registration of voters, movement of candidates and voting officials. Support for NGOs involved in the election process.

- GOI reopens Palestinian Chamber of Commerce and other closed Palestinian institutions in East Jerusalem based on a commitment that these institutions operate strictly in accordance with prior agreements between the parties.

HUMANITARIAN RESPONSE

- Israel takes measures to improve the humanitarian situation. Israel and Palestinians implement in full all recommendations of the Bertini report to improve humanitarian conditions, lifting curfews and easing restrictions on movement of persons and goods, and allowing full, safe, and unfettered access of international and humanitarian personnel.

- AHLC reviews the humanitarian situation and prospects for economic development in the West Bank and Gaza and launches a major donor assistance effort, including to the reform effort.

- GOI and PA continue revenue clearance process and transfer of funds, including arrears, in accordance with agreed, transparent monitoring mechanism.

CIVIL SOCIETY

- Continued donor support, including increased funding through PVOs/NGOs, for people to people programs, private sector development and civil society initiatives.

SETTLEMENTS

- GOI immediately dismantles settlement outposts erected since March 2001.

- Consistent with the Mitchell Report, GOI freezes all settlement activity (including natural growth of settlements).

<div style="border:1px solid black; text-align:center;">

### PHASE II:    TRANSITION
### JUNE 2003-DECEMBER 2003

</div>

In the second phase, efforts are focused on the option of creating an independent Palestinian state with provisional borders and attributes of sovereignty, based on the new constitution, as a way station to a permanent status settlement. As has been noted, this goal can be achieved when the Palestinian people have a leadership acting decisively against terror, willing and able to build a practicing democracy based on tolerance and liberty. With such a leadership, reformed civil institutions and security structures, the Palestinians will have the active support of the Quartet and the broader international community in establishing an independent, viable, state.

Progress into Phase II will be based upon the consensus judgment of the Quartet of whether conditions are appropriate to proceed, taking into account performance of both parties. Furthering and sustaining efforts to normalize Palestinian lives and build Palestinian institutions, Phase II starts after Palestinian elections and ends with possible creation of an independent Palestinian state with provisional borders in 2003. Its primary goals are continued comprehensive security performance and effective security cooperation, continued normalization of Palestinian life and institution-building, further building on and sustaining of the goals outlined in Phase I, ratification of a democratic Palestinian constitution, formal establishment of office of prime minister, consolidation of political reform, and the creation of a Palestinian state with provisional borders.

- INTERNATIONAL CONFERENCE: Convened by the Quartet, in consultation with the parties, immediately after the successful conclusion of Palestinian elections, to support Palestinian economic recovery and launch a process, leading to establishment of an independent Palestinian state with provisional borders.

  - ➢ Such a meeting would be inclusive, based on the goal of a comprehensive Middle East peace (including between Israel and Syria, and Israel and Lebanon), and based on the principles described in the preamble to this document.

  - ➢ Arab states restore pre-intifada links to Israel (trade offices, etc.).

  - ➢ Revival of multilateral engagement on issues including regional water resources, environment, economic development, refugees, and arms control issues.

- New constitution for democratic, independent Palestinian state is finalized and approved by appropriate Palestinian institutions. Further elections, if required, should follow approval of the new constitution.

Page 6

- Empowered reform cabinet with office of prime minister formally established, consistent with draft constitution.

- Continued comprehensive security performance, including effective security cooperation on the bases laid out in Phase I.

- Creation of an independent Palestinian state with provisional borders through a process of Israeli-Palestinian engagement, launched by the international conference. As part of this process, implementation of prior agreements, to enhance maximum territorial contiguity, including further action on settlements in conjunction with establishment of a Palestinian state with provisional borders.

- Enhanced international role in monitoring transition, with the active, sustained, and operational support of the Quartet.

- Quartet members promote international recognition of Palestinian state, including possible UN membership.

---

| PHASE III: |
| PERMANENT STATUS AGREEMENT |
| AND END OF THE ISRAELI-PALESTINIAN CONFLICT |
| 2004 – 2005 |

---

Progress into Phase III, based on consensus judgment of Quartet, and taking into account actions of both parties and Quartet monitoring. Phase III objectives are consolidation of reform and stabilization of Palestinian institutions, sustained, effective Palestinian security performance, and Israeli-Palestinian negotiations aimed at a permanent status agreement in 2005.

- SECOND INTERNATIONAL CONFERENCE: Convened by Quartet, in consultation with the parties, at beginning of 2004 to endorse agreement reached on an independent Palestinian state with provisional borders and formally to launch a process with the active, sustained, and operational support of the Quartet, leading to a final, permanent status resolution in 2005, including on borders, Jerusalem, refugees, settlements; and, to support progress toward a comprehensive Middle East settlement between Israel and Lebanon and Israel and Syria, to be achieved as soon as possible.

- Continued comprehensive, effective progress on the reform agenda laid out by the Task Force in preparation for final status agreement.

- Continued sustained and effective security performance, and sustained, effective security cooperation on the bases laid out in Phase I.

- International efforts to facilitate reform and stabilize Palestinian institutions and the Palestinian economy, in preparation for final status agreement.

Page 7

- Parties reach final and comprehensive permanent status agreement that ends the Israel-Palestinian conflict in 2005, through a settlement negotiated between the parties based on UNSCR 242, 338, and 1397, that ends the occupation that began in 1967, and includes an agreed, just, fair, and realistic solution to the refugee issue, and a negotiated resolution on the status of Jerusalem that takes into account the political and religious concerns of both sides, and protects the religious interests of Jews, Christians, and Muslims worldwide, and fulfills the vision of two states, Israel and sovereign, independent, democratic and viable Palestine, living side-by-side in peace and security.

- Arab state acceptance of full normal relations with Israel and security for all the states of the region in the context of a comprehensive Arab-Israeli peace.

# Exhibit 4

*This Analysis provides a discussion of the factors underpinning the credit rating/s and should be read in conjunction with our Credit Opinion. The most recent ratings, opinion, and other research specific to this issuer are provided on Moodys.com. Click here to link.*

# Analysis
## December 2003

| Contact | Phone |
|---|---|
| **Limassol** | |
| Hank Calenti, CFA | 357.25.586.586 |
| Jiri Kasek, CFA | |
| Elisabeth Jackson-Moore | |

# Arab Bank PLC

## Franchise Strength Exceeds Sovereign Ceiling

Arab Bank Plc. ("Arab Bank") is one of the most prominent and well-known banking institutions in the Arab world, with operations spanning the Middle East. Arab Bank's brand leadership enables it to maintain strong relationships with leading regional businesses, leverage scale and scope opportunities as a leader in major project financing and assimilate itself into the economies of many Middle Eastern countries.

A solid Middle Eastern franchise is the foundation from which Arab Bank's deposit and financial strength ratings are built. The bank also has a presence in most Western European countries as well as offices in Asia and the United States, helping to make Arab Bank a preferred counterparty for foreign banks conducting business within the Middle East.

### Global operations diminish Middle Eastern portfolio risks

A well-diversified portfolio lowers Middle Eastern credit, market and event risks within the bank. Approximately 34% of Arab Bank's assets and revenue are derived from outside the Middle East/North African ("MENA") region, while 26% of customer deposits are collected in non-MENA countries, demonstrating the presence of real equity outside the Middle East. At the bank level, assets and revenue beyond the Middle East is shown in the table below.

| Diversification of Equity and Revenue | | | | |
|---|---|---|---|---|
| | 2002 | 2001 | 2000 | 1999 |
| Assets beyond the Middle East | 33.7 | 37.5 | 39.4 | 38.8 |
| Revenue beyond the Middle East | 35.1 | 37.6 | 37.7 | 37.8 |

The scope of the non-MENA operations also strengthens the bank's ability to withstand event-shocks within the MENA area. However, as the non-MENA operations comprise a number of small niche offices, enhanced organic growth within these operations will not create positive rating pressures.

**Moody's Investors Service**
*Global Credit Research*

### Low Jordanian exposure

The existence of real equity outside Jordan is a major rating driver. Jordanian customer deposits account for 29% of Arab Bank's group assets, while Jordanian assets comprise less than 24% of group assets. The non-Jordanian assets are booked within branches and subsidiaries located outside Jordan. Taken together, this demonstrates the existence of real equity outside Jordan. Moody's believes that Jordanian regulators would have difficulty attaching the equity that resides beyond Jordan, enabling non-Jordanian branch ratings in excess of the Jordan sovereign ceiling.

## Regional Flight-to-Quality Bank in Times of Stress

### A bank that has weathered economic and political storms

In a region with a history of political and economic uncertainties, Arab Bank is a constant. Arab Bank is recognised as the flight-to-quality bank in the Middle East. The bank has rightfully earned this reputation by fulfilling its obligations during times of stress and by surviving, as an entity, through political and economic upheavals over the past 70 years. According to the bank's management, it has never faced any outflows of customer deposits during a time of crisis. In fact, according to the management, it is more common for Arab Bank to experience inflows of new funds in time of regional crisis, such as evidenced during the recent unrest in the West Bank and Gaza. Arab Bank's stellar repayment record also drives its ratings.

### Contingency operations are available for worst-case scenarios

Arab Bank has a functional infrastructure, which enables senior management to manage/operate the bank from Arab Bank's subsidiaries outside Jordan in case of any serious crisis. The bank also has data storage facilities in Switzerland, which are connected on-line to individual branches. This contingency planning provides comfort to the ratings.

## Franchise and Strategy

Arab Bank is the dominant bank in Jordan and Palestine. A strong franchise of branches, subsidiaries and affiliates around the world complements the Jordanian operations. However, rather than aim to become a global market player, Arab Bank intends to leverage its brand within the Middle East. The bank aims to capture a larger share of financial flows to and from the Middle East, and intends to selectively deepen its market share within the region. Non-MENA operations are being restructured to better support this initiative, and results are already apparent. MENA countries represented 66.3% of total bank assets at year-end 2001, compared to 55.2% at year-end 1996.

### Operations are being overhauled to support credit expansion and improve risk assessment

Following Board acceptance of an internal task force's recommendations on strategic planning, Arab Bank is in the process of undertaking a substantial tune-up of its operations to support its aspiration to be the leading financial institution of the Arab World. Strategic initiatives include enhancing and centralising critical risk management functions within the head office, upgrading the human resource support function, expanding the consumer lending and retail businesses, rationalising and streamlining the operations and IT functions of the bank, as well as developing and exploiting new financial business opportunities. These initiatives, if fully and properly executed, are likely to result in upward pressure on the financial strength rating.

### Leading Moody's to assign a positive outlook on the non-Jordanian branch deposit rating ceiling of Arab Bank

In August 2003, Moody's assigned a positive outlook on the non-Jordanian branch deposit ratings of Arab Bank Plc. The positive outlook reflects both improvements in the head office regional operating environment, and recent steps taken by the bank to improve treasury IT systems and enhance risk management. Moody's anticipates that these IT system and personnel enhancements will improve treasury oversight and enable better liquidity, interest rate and foreign exchange rate risk management and disclosure. The ratings of branches of Arab Bank Plc. in countries where the foreign currency bank deposit ceiling is lower than Baa1 (positive outlook) is constrained by the deposit ceiling of that country. Consequently, branches of Arab Bank Plc. in Jordan are rated at Jordan's ceiling for foreign currency deposits, which is set at Ba3/Not-Prime, while the ratings of Arab Bank Plc. branch in New York are set at Baa1 (positive outlook) /Prime-2.

### Under-leverage in retail creates opportunities for additional income streams

Till recently, Arab Bank has basically ignored the demand for retail banking products among the masses in the Arab markets that it serves. This is expected to change in a major way. Arab Bank began to more assertively market its abilities in retail lending products in Jordan during 2002. We expect that it will expand its retail product offerings to the mass affluent throughout the Arab World.

### Competitive threats on the horizon

Arab Bank's franchise must compete with major international banks, including HSBC, Standard Chartered and Citibank and other regional giants, such as the National Bank of Kuwait. These institutions may challenge Arab Bank's increased regional emphasis, as some offer a wider variety of more complex products and services and have the advantage of strong financial backgrounds. Therefore, any franchise strengthening will depend on the extent and nature of the competition that Arab Bank will face from these banks.

As the region eventually stabilises, political uncertainties decline and WTO obligations are fulfilled, the major international banks currently in the region are likely to commit further resources to their Middle Eastern franchises, while others will be drawn into the region. At the same time, the rapidly growing younger generation of Arab customers already has more banks from which to choose than their ageing forefathers had. In order to continue to attract and retain customers, Arab Bank must continue the process of transformation in order to become a more dynamic institution that is able to identify, meet and create the needs of current and potential customers. Although the bank's management has recognised this threat and has begun to take steps to remain competitive, Moody's believes that transformation to a more offensive strategy in preparation for heightened regional competition is the major challenge facing the bank.

## Evolving Oversight Limits Upward Pressure on the Ratings

### Independent oversight

Taken together, independent oversight issues constrain upward pressures on the credit rating. Arab Bank's diversification is not risk-free. It maintains operations in 25 countries spanning the globe. An institution of this magnitude requires diligent oversight. While Moody's has always imputed an evaluation of independent oversight and corporate governance in the ratings, given recent international events in this arena, we are now focussing more closely on these issues.

Regulatory oversight is an important part of an independent review process. While Jordanian banking authorities may have the resources to supervise local and regional operations, the ability of these authorities to apply globally comprehensive consolidated oversight to Arab Bank is still evolving. This may challenge the franchise's growth beyond the Middle East.

External auditor oversight is also an important part of an independent review process. Moody's understand that the bank's external auditor starts the annual audit in October in order to complete the assignment within the first few weeks of January. The auditor, Saba and Company, is headquartered in Amman, Jordan, and is a member firm of Deloitte Touche Tohmatsu International.

Audit committee oversight is another important part of an independent oversight process. To its merit, Arab Bank was one of the first banks in the region to establish a board level audit committee. Many banks in the region remain without such an oversight mechanism. The majority of Arab Bank's audit committee is composed of senior executives of the bank. Two non-executive directors that run many major businesses in the region also sit on this committee. Arab Bank is a lender to, and shareholder in, some of these businesses.

### Moderate transparency in financial reports:

The disclosure within Arab Bank's financial statements is sufficient to gain a minimal understanding of the risk exposure of the institution. Fortunately, the risk exposures are also minimal. However, no information on interest rate or foreign currency exposure is provided in the annual report. In addition, the composition of the various, and important, Board committees is also absent from the report.

Extremely condensed quarterly financial statements complement the year-end financial statements. Although the frequency and depth of publicly available information may exceed that of most of its Arab counterparts, for an institution as diverse, large and important among its Arab peers, the frequency and depth of publicly available information is disappointing.

*Corporate governance model protects assets but limits opportunities.*

Arab Bank's corporate governance model is welcome in a period of volatility, but insufficient for meeting the challenges that lie ahead. Like most family-controlled enterprises in the Arab world, Arab Bank is challenged to transform to an institutionalised model of corporate governance. That said, however, Arab Bank's corporate governance model is a benefit towards the protection of the bank in times of regional distress.

Fortunately, recent changes in share ownership and at the Board level are essentially no change. The Shoman family remains the dominant force within the institution and this adds a measure of stability. The newly created Corporate Governance Committee at the Board level is led by the Vice-Chairman and CEO of the bank, and is composed of Board members that are close to the controlling-shareholder family. This committee serves to strengthen the controlling-shareholder's position. Arab Bank's corporate governance model is welcome in a period of volatility, but insufficient for meeting the challenges that lie ahead.

Nonetheless, the bank's management culture not only endures, but also provides a mixed blessing. On the one hand, a defensive management posture has helped Arab Bank to survive and perhaps thrive from regional uncertainties. On the other hand, this approach may prove to be a constraining factor going forward.

## Financial Fundamentals

### *Liquidity is King*

Arab Bank is always flush with liquidity - at the bank and group level. Liquid assets comprise 50% of total assets at the bank and the group level. Arab Bank plc could repay all inter-bank borrowing without needing to liquidate its own inter-bank assets.

A well-diversified and liquid asset structure enables Arab Bank to meet obligations that others might find difficult. This high level of liquidity results in lower returns relative to other banks. Moody's believes that an enhanced treasury operation could improve returns, while maintaining sufficient liquidity. Lowering liquidity levels could also boost earnings. However, offsetting balance sheet inflexibility could damage the bank's repayment reputation.

### *Comfortable cushion against loan portfolio deterioration*

Gross non-performing loans (NPLs) decreased to 5.61% of gross loans (including interest-in-suspense) at year-end 2001, down from 6.0% at year-end 2000. However, this level is still above that of several years ago. This is due to a change in NPL classification standards that was part of an effort by the Central Bank of Jordan to gradually bring its classification requirements into line with the international standard of 90 days past due. NPL classification requirements migrated from 150 days past due at year-end 1999 to 90 days past due by year-end 2001, in 30-day increments each year. It is Moody's understanding that Arab Bank had historically applied a 90-day standard when assessing the adequacy of its provisions, but disclosed NPLs on the basis of what was required by the Central Bank of Jordan. Therefore, as expected, loan loss reserve coverage declined slightly as Arab Bank adopted the improved Central Bank of Jordan NPL disclosure requirement. However, the bank remains comfortably over-provisioned.

### *Ample equity to cover risks*

Arab Bank also reports ample pre-provision income to net loans, and maintains moderate levels of shareholders' equity relative to assets. Given the relatively low level of assets comprised by loans, Moody's believes that Arab Bank's income and capital levels are more than sufficient to absorb shocks to the bank.

## Related Research

**Banking Statistical Supplement**

Jordan, December 2003 (80668)

**Banking System Outlook**

Banking System Outlook: Jordan, November 2003 (80195)

*To access any of these reports, click on the entry above. Note that these references are current as of the date of publication of this report and that more recent reports may be available. All research may not be available to all clients.*

## Arab Bank PLC

| | 12/31/02 | 12/31/01 | 12/31/00 | 12/31/99 | 12/31/98 |
|---|---|---|---|---|---|
| **Summary Balance Sheet (Jordan Dinars million)** | | | | | |
| Cash & Central Bank | 2,061 | 1,937 | 1,619 | 1,451 | 1,218 |
| Due from Banks | 4,015 | 3,946 | 3,985 | 3,537 | 3,270 |
| Government Securities | 1,066 | 1,056 | 956 | 991 | 784 |
| Trading Securities | 1,471 | 1,019 | 110 | 4 | 3 |
| Investment Securities | 335 | 794 | 1,455 | 960 | 1,000 |
| Other Liquid Assets | — | — | — | — | — |
| Gross Loans | 5,587 | 5,618 | 5,482 | 5,416 | 5,264 |
| Loan Loss Reserves (LLR) | -398 | -382 | -372 | -360 | -329 |
| Net Loans | 5,189 | 5,236 | 5,110 | 5,056 | 4,936 |
| Equity in Affiliates | 182 | 163 | 179 | 169 | 175 |
| Fixed Assets | 140 | 130 | 126 | 99 | 86 |
| Other Assets | 254 | 267 | 303 | 348 | 272 |
| Total Assets | 14,714 | 14,549 | 13,845 | 12,615 | 11,743 |
| Total Assets (US$ million) | 20,747 | 20,672 | 19,555 | 17,768 | 16,563 |
| Customer Deposits | 10,745 | 9,871 | 9,505 | 8,662 | 7,918 |
| Due to Banks | 2,114 | 3,073 | 2,672 | 2,427 | 2,454 |
| Borrowings | 111 | 30 | 166 | 98 | 40 |
| Other Liabilities | 457 | 406 | 442 | 514 | 511 |
| Total Liabilities | 13,428 | 13,381 | 12,785 | 11,701 | 10,923 |
| Subordinated Loan Capital | — | — | — | — | — |
| Minority Interest | — | — | — | — | — |
| Supplementary Capital | -23 | -8 | — | — | — |
| Shareholders' Equity | 1,309 | 1,176 | 1,060 | 914 | 820 |
| Total Capital Funds | 1,286 | 1,168 | 1,060 | 914 | 820 |
| Total Liabilities & Capital Funds | 14,714 | 14,549 | 13,845 | 12,615 | 11,743 |
| Derivatives - Notional Amount | 4,470 | 2,414 | 3,402 | 6,318 | 5,757 |
| Derivatives - Replacement Value | — | — | — | — | — |
| Risk Weighted Assets (RWA) | — | — | — | — | — |
| Contingent Liabilities | 4,554 | 4,382 | 4,652 | 3,998 | 3,713 |
| **Summary Income Statement (Jordan Dinars million)** | | | | | |
| Interest Income | 586 | 775 | 894 | 784 | 806 |
| Interest Expense | -325 | -507 | -633 | -532 | -533 |
| Net Interest Income | 260 | 268 | 261 | 253 | 273 |
| FX Income | 22 | 14 | 10 | 13 | 24 |
| Trading Income | 5 | 13 | 3 | 2 | 2 |
| Fees & Commissions | 73 | 70 | 79 | 78 | 73 |
| Other Operating Income | 48 | 47 | 37 | 13 | 15 |
| Total Non Interest Income | 148 | 144 | 129 | 106 | 114 |
| Operating Income | 408 | 412 | 391 | 358 | 388 |
| Personnel Expenses | -128 | -115 | -108 | -101 | -99 |
| Other Operating Expenses | -79 | -82 | -74 | -76 | -76 |
| Operating Funds Flow | 201 | 215 | 209 | 181 | 213 |
| Amortisation / Depreciation | -16 | -14 | -13 | -14 | -14 |
| Total Non Interest Expense | -223 | -212 | -195 | -191 | -189 |
| Preprovision Income (PPI) | 185 | 201 | 195 | 167 | 199 |
| Loan Loss Provisions Expenses (LLPE) | -31 | -42 | -34 | -17 | -33 |
| Non Operating Income | 1 | 6 | — | — | — |
| Pretax Income | 155 | 165 | 161 | 150 | 166 |
| Taxes | -25 | -26 | -31 | -29 | -40 |
| Net Income | 130 | 139 | 130 | 120 | 126 |
| Minority Interests | — | — | — | — | — |
| Net Income | 130 | 139 | 130 | 120 | 126 |
| Dividends | -35 | -35 | -35 | -26 | -26 |
| Transfers to Capital Reserves | -95 | -104 | -95 | -94 | -100 |
| Other Adjustments | — | — | — | 0 | 0 |

# Arab Bank PLC

| | 12/31/02 | 12/31/01 | 12/31/00 | 12/31/99 | 12/31/98 |
|---|---|---|---|---|---|
| **Summary Balance Sheet - Growth (%)** | | | | | |
| Cash & Central Bank | 6.41 | 19.63 | 11.62 | 19.08 | -12.41 |
| Due from Banks | 1.75 | -1.00 | 12.67 | 8.16 | 23.53 |
| Government Securities | 0.89 | 10.52 | -3.50 | 26.41 | 8.96 |
| Trading Securities | 44.39 | 822.98 | 2499.13 | 44.54 | -89.46 |
| Investment Securities | -57.84 | -45.43 | 51.63 | -4.01 | 28.32 |
| Other Liquid Assets | — | — | — | — | — |
| Gross Loans | -0.55 | 2.48 | 1.22 | 2.88 | 5.36 |
| Loan Loss Reserves (LLR) | 4.14 | 2.88 | 3.36 | 9.35 | 1.51 |
| Net Loans | -0.89 | 2.45 | 1.07 | 2.45 | 5.63 |
| Equity in Affiliates | 11.57 | -8.69 | 5.87 | -3.30 | 17.87 |
| Fixed Assets | 7.97 | 3.16 | 27.74 | 15.33 | 15.10 |
| Other Assets | -4.97 | -11.99 | -12.92 | 27.87 | -9.62 |
| Total Assets | 1.14 | 5.08 | 9.75 | 7.42 | 9.13 |
| Total Assets (US$) | 0.36 | 5.71 | 10.06 | 7.27 | 9.13 |
| | | | | | |
| Customer Deposits | 8.86 | 3.85 | 9.73 | 9.40 | 9.34 |
| Due to Banks | -31.21 | 15.03 | 10.08 | -1.10 | 3.06 |
| Borrowings | 266.08 | -81.68 | 69.43 | 145.10 | 427.33 |
| Other Liabilities | 12.63 | -8.23 | -13.88 | 0.45 | 24.43 |
| Total Liabilities | 0.35 | 4.66 | 9.26 | 7.12 | 8.79 |
| Subordinated Loan Capital | — | — | — | — | — |
| Minority Interest | — | — | — | — | — |
| Supplementary Capital | 171.11 | — | — | — | — |
| Shareholders' Equity | 11.26 | 10.96 | 15.99 | 11.46 | 13.89 |
| Total Capital Funds | 10.11 | 10.17 | 15.99 | 11.46 | 13.89 |
| Total Liabilities & Capital Funds | 1.14 | 5.08 | 9.75 | 7.42 | 9.13 |
| | | | | | |
| Derivatives - Notional Amount | 85.19 | -29.05 | -46.15 | 9.74 | 94.83 |
| Derivatives - Replacement Value | — | — | — | — | — |
| Risk Weighted Assets (RWA) | — | — | — | — | — |
| Contingent Liabilities | 3.93 | -5.81 | 16.36 | 7.66 | 2.34 |
| **Summary Income Statement - Growth (%)** | | | | | |
| Interest Income | -24.45 | -13.32 | 14.02 | -2.72 | 9.95 |
| Interest Expense | -35.77 | -19.92 | 19.01 | -0.20 | 5.30 |
| Net Interest Income | -3.06 | 2.65 | 3.52 | -7.62 | 20.32 |
| FX Income | 56.64 | 36.11 | -21.56 | -44.92 | 123.63 |
| Trading Income | -63.76 | 360.24 | 48.67 | -16.27 | -88.68 |
| Fees & Commissions | 3.55 | -11.08 | 1.59 | 6.94 | 7.59 |
| Other Operating Income | 3.18 | 25.62 | 190.33 | -16.88 | 44.91 |
| Total Non Interest Income | 2.64 | 11.25 | 22.32 | -7.61 | 5.18 |
| Operating Income | -1.07 | 5.50 | 9.07 | -7.62 | 15.41 |
| Personnel Expenses | 11.36 | 6.22 | 7.13 | 1.81 | 11.01 |
| Other Operating Expenses | -4.26 | 11.74 | -3.54 | 0.85 | 16.98 |
| Operating Funds Flow | -6.50 | 2.92 | 15.49 | -15.04 | 17.02 |
| Amortisation / Depreciation | 10.33 | 7.34 | -2.98 | 0.43 | 24.94 |
| Total Non Interest Expense | 5.21 | 8.38 | 2.14 | 1.32 | 14.27 |
| Preprovision Income (PPI) | -7.70 | 2.62 | 17.00 | -16.10 | 16.52 |
| Loan Loss Provisions Expenses (LLPE) | -24.27 | 20.62 | 97.82 | -47.08 | 30.10 |
| Non Operating Income | -76.18 | — | — | — | — |
| Pretax Income | -6.01 | 2.48 | 7.60 | -9.97 | 14.16 |
| Taxes | -3.56 | -16.19 | 5.59 | -26.58 | 4.80 |
| Net Income | -6.47 | 6.91 | 8.09 | -4.74 | 17.46 |
| Minority Interests | — | — | — | — | — |
| Net Income (Group share) | -6.47 | 6.91 | 8.09 | -4.74 | 17.46 |

## Arab Bank PLC

| | 12/31/02 | 12/31/01 | 12/31/00 | 12/31/99 | 12/31/98 |
|---|---|---|---|---|---|
| **Balance Sheet – % of Total Assets** | | | | | |
| Cash & Central Bank | 14.01 | 13.32 | 11.70 | 11.50 | 10.37 |
| Due from Banks | 27.29 | 27.12 | 28.79 | 28.04 | 27.85 |
| Government Securities | 7.24 | 7.26 | 6.90 | 7.85 | 6.67 |
| Trading Securities | 10.00 | 7.00 | 0.80 | 0.03 | 0.03 |
| Investment Securities | 2.28 | 5.46 | 10.51 | 7.61 | 8.51 |
| Other Liquid Assets | | | | | |
| Gross Loans | 37.97 | 38.62 | 39.59 | 42.93 | 44.83 |
| Loan Loss Reserves (LLR) | -2.71 | -2.63 | -2.68 | -2.85 | -2.80 |
| Net Loans | 35.27 | 35.99 | 36.91 | 40.08 | 42.03 |
| Equity in Affiliates | 1.24 | 1.12 | 1.29 | 1.34 | 1.49 |
| Fixed Assets | 0.95 | 0.89 | 0.91 | 0.78 | 0.73 |
| Other Assets | 1.72 | 1.83 | 2.19 | 2.76 | 2.32 |
| Customer Deposits | 73.03 | 67.85 | 68.65 | 68.66 | 67.42 |
| Due to Banks | 14.37 | 21.12 | 19.30 | 19.24 | 20.90 |
| Borrowings | 0.76 | 0.21 | 1.20 | 0.78 | 0.34 |
| Other Liabilities | 3.11 | 2.79 | 3.20 | 4.07 | 4.36 |
| Total Liabilities | 91.26 | 91.97 | 92.34 | 92.75 | 93.02 |
| Subordinated Loan Capital | — | — | — | — | — |
| Minority Interest | — | — | — | — | — |
| Supplementary Capital | -0.16 | -0.06 | — | — | — |
| Shareholders' Equity | 8.90 | 8.09 | 7.66 | 7.25 | 6.98 |
| Total Capital Funds | 8.74 | 8.03 | 7.66 | 7.25 | 6.98 |
| **Income Statement – % of Average Assets** | | | | | |
| Interest Income | 4.00 | 5.46 | 6.76 | 6.44 | 7.16 |
| Interest Expense | -2.22 | -3.57 | -4.78 | -4.37 | -4.73 |
| Net Interest Income | 1.78 | 1.89 | 1.98 | 2.07 | 2.43 |
| FX Income | 0.15 | 0.10 | 0.08 | 0.11 | 0.21 |
| Trading Income | 0.03 | 0.09 | 0.02 | 0.02 | 0.02 |
| Fees & Commissions | 0.50 | 0.50 | 0.60 | 0.64 | 0.65 |
| Other Operating Income | 0.33 | 0.33 | 0.28 | 0.10 | 0.14 |
| Total Non Interest Income | 1.01 | 1.01 | 0.98 | 0.87 | 1.02 |
| Operating Income | 2.79 | 2.90 | 2.95 | 2.94 | 3.45 |
| Personnel Expenses | -0.88 | -0.81 | -0.82 | -0.83 | -0.88 |
| Other Operating Expenses | -0.54 | -0.58 | -0.56 | -0.63 | -0.67 |
| Operating Funds Flow | 1.37 | 1.51 | 1.58 | 1.48 | 1.89 |
| Amortisation / Depreciation | -0.11 | -0.10 | -0.10 | -0.11 | -0.12 |
| Total Non Interest Expense | -1.52 | -1.49 | -1.48 | -1.57 | -1.68 |
| Preprovision Income (PPI) | 1.27 | 1.41 | 1.48 | 1.37 | 1.77 |
| Loan Loss Provisions Expenses (LLPE) | -0.21 | -0.29 | -0.26 | -0.14 | -0.29 |
| Non Operating Income | 0.01 | 0.04 | — | — | — |
| Pretax Income | 1.06 | 1.16 | 1.22 | 1.23 | 1.48 |
| Taxes | -0.17 | -0.18 | -0.23 | -0.24 | -0.35 |
| Net Income | 0.89 | 0.98 | 0.98 | 0.99 | 1.12 |
| Minority Interests | — | — | — | — | — |
| Net Income (Group share) | 0.89 | 0.98 | 0.98 | 0.99 | 1.12 |
| **Income Statement – % of Operating Income** | | | | | |
| Interest Income | 143.57 | 187.99 | 228.80 | 218.86 | 207.82 |
| Interest Expense | -79.79 | -122.90 | -161.90 | -148.37 | -137.34 |
| Net Interest Income | 63.78 | 65.09 | 66.90 | 70.48 | 70.49 |
| FX Income | 5.44 | 3.43 | 2.66 | 3.70 | 6.21 |
| Trading Income | 1.14 | 3.12 | 0.71 | 0.52 | 0.58 |
| Fees & Commissions | 17.85 | 17.06 | 20.24 | 21.73 | 18.77 |
| Other Operating Income | 11.79 | 11.30 | 9.49 | 3.57 | 3.96 |
| Total Non Interest Income | 36.22 | 34.91 | 33.10 | 29.52 | 29.51 |
| Operating Income | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |
| Personnel Expenses | -31.42 | -27.92 | -27.73 | -28.23 | -25.62 |
| Other Operating Expenses | -19.34 | -19.99 | -18.87 | -21.34 | -19.55 |
| Operating Funds Flow | 49.23 | 52.09 | 53.40 | 50.43 | 54.84 |
| Amortisation / Depreciation | -3.84 | -3.45 | -3.39 | -3.81 | -3.50 |
| Total Non Interest Expense | -54.61 | -51.35 | -49.98 | -53.37 | -48.66 |
| Preprovision Income (PPI) | 45.39 | 48.65 | 50.02 | 46.63 | 51.34 |
| Loan Loss Provisions Expenses (LLPE) | -7.71 | -10.07 | -8.81 | -4.85 | -8.47 |
| Non Operating Income | 0.35 | 1.45 | — | — | — |
| Pretax Income | 38.03 | 40.03 | 41.21 | 41.77 | 42.86 |
| Taxes | -6.12 | -6.27 | -7.90 | -8.16 | -10.26 |
| Net Income | 31.92 | 33.76 | 33.31 | 33.61 | 32.60 |
| Minority Interests | — | — | — | — | — |
| Net Income (Group share) | 31.92 | 33.76 | 33.31 | 33.61 | 32.60 |

## Arab Bank PLC

| | 12/31/02 | 12/31/01 | 12/31/00 | 12/31/99 | 12/31/98 |
|---|---|---|---|---|---|
| **Profitability Indicators** | | | | | |
| Return on Average Assets (%) | 0.89 | 0.98 | 0.98 | 0.99 | 1.12 |
| Return on Shareholder's Equity - period end (%) | 9.95 | 11.83 | 12.28 | 13.18 | 15.42 |
| Recurring Earning Power [1] | 1.27 | 1.41 | 1.48 | 1.37 | 1.77 |
| PPI (%) Avg Total Capital Funds | 15.09 | 18.01 | 19.80 | 19.27 | 25.86 |
| Interest Expense (%) Interest Income | 55.57 | 65.37 | 70.76 | 67.79 | 66.08 |
| Interest Income (%) Avg Interest Earning Assets [2] | 4.18 | 5.70 | 7.01 | 6.61 | 7.33 |
| Interest Expense (%) Avg Interest Bearing Liabilities [3] | 2.51 | 4.00 | 5.38 | 4.92 | 5.32 |
| Net Spread (%) [4] | 1.67 | 1.69 | 1.63 | 1.69 | 2.02 |
| Net Interest Margin (%) [5] | 1.86 | 1.97 | 2.05 | 2.13 | 2.49 |
| Non-Interest Income (%) Operating income | 36.22 | 34.91 | 33.10 | 29.52 | 29.51 |
| Income Tax (%) Pre-tax Income | 16.08 | 15.67 | 19.16 | 19.53 | 23.95 |
| **Efficiency Indicators** | | | | | |
| Non Interest Expense (%) Avg  Assets | 1.52 | 1.49 | 1.48 | 1.57 | 1.68 |
| Cost to Income Ratio (%) [6] | 54.61 | 51.35 | 49.98 | 53.37 | 48.66 |
| Personnel Expenses (%) Avg Assets | 0.88 | 0.81 | 0.82 | 0.83 | 0.88 |
| Personnel Expenses (%) Operating Income | 31.42 | 27.92 | 27.73 | 28.23 | 25.62 |
| Personnel Expenses (%) Non Interest Expense | 57.54 | 54.36 | 55.47 | 52.89 | 52.64 |
| **Liquidity Indicators** | | | | | |
| Net Loans (%) Customer Deposits | 48.29 | 53.04 | 53.76 | 58.37 | 62.33 |
| Net Loans (%) Total Deposits [7] | 40.35 | 40.45 | 41.97 | 45.60 | 47.58 |
| Average Net Loans (%) Average Customer Deposits | 50.57 | 53.40 | 55.96 | 60.26 | 63.38 |
| Average Net Loans (%) Average Assets | 35.63 | 36.44 | 38.42 | 41.02 | 42.69 |
| Liquid Assets (%) Total Assets [8] | 58.54 | 54.70 | 48.18 | 47.43 | 44.92 |
| Customer Deposits (%) Total Deposits | 83.56 | 76.26 | 78.06 | 78.11 | 76.34 |
| Customer Deposits / Shareholders' Equity (Times) | 8.21 | 8.39 | 8.97 | 9.48 | 9.66 |
| Due from Banks (%) Due to Banks | 189.90 | 128.39 | 149.16 | 145.73 | 133.26 |
| **Loan Portfolio Quality Indicators** | | | | | |
| Problem Loans (%) Gross Loans | 5.61 | 5.10 | 6.03 | 6.18 | 4.36 |
| Problem Loans (%) (Shareholders' Equity + LLR) | 18.35 | 18.37 | 23.07 | 26.27 | 19.98 |
| (Problem Loans - LLR) (%) Shareholders' Equity | -6.49 | -8.16 | -3.90 | -2.73 | -12.11 |
| Loan Loss Reserve (%) Gross Loans | 7.13 | 6.81 | 6.78 | 6.64 | 6.25 |
| Loan Loss Provision Expenses (%) Preprovision Income | 16.98 | 20.69 | 17.61 | 10.41 | 16.51 |
| LLP (%)  (Loan Loss Reserve - LLP) | 8.57 | 12.18 | 10.21 | 5.08 | 11.11 |
| Loan Loss Provision Expenses (%) Gross Loans | 0.56 | 0.74 | 0.63 | 0.32 | 0.62 |
| Preprovision Income (%) Net Loans | 3.57 | 3.83 | 3.83 | 3.30 | 4.03 |
| Shareholders' Equity (%) Net Loans | 25.22 | 22.47 | 20.75 | 18.08 | 16.61 |
| Loans to Related Cos. (%) Gross Loans | — | — | — | — | — |
| **Capitalization Indicators** | | | | | |
| Tier 1 ratio (%) | — | — | — | — | — |
| Shareholders' Equity (%) Total Assets | 8.90 | 8.09 | 7.66 | 7.25 | 6.98 |
| Shareholders' Equity (%) T. Assets + Contingent Liabilities | 6.79 | 6.21 | 5.73 | 5.50 | 5.31 |
| Total Capital funds (%) Total Assets | 8.74 | 8.03 | 7.66 | 7.25 | 6.98 |
| Total Capital (%) T. Assets + Contingent Liabilities | 6.67 | 6.17 | 5.73 | 5.50 | 5.31 |
| Shareholders' Equity (%) Total Capital funds | 101.77 | 100.72 | 100.00 | 100.00 | 100.00 |
| Contingent Liabilities (%) Total  Assets | 30.95 | 30.12 | 33.60 | 31.69 | 31.62 |
| "Free" Capital (%) Shareholders' Equity [9] | 75.34 | 75.05 | 71.23 | 70.71 | 68.24 |
| Dividend Payout (%) [10] | 27.04 | 25.29 | 27.04 | 21.92 | 20.88 |
| Internal Capital Growth (%) [11] | 8.08 | 9.81 | 10.39 | 11.47 | 13.90 |

[1] Recurring Earning Power = Preprovision Income (%) Average Total Assets
[2] Interest Earning Assets = Central Bank + Due from Banks + Government Securities + Trading Securities + Investment Securities + Gross Loans
[3] Interest Bearing Liabilities = Customer Deposits + Due to Banks + Borrowings + Subordinated Debt Capital
[4] Net spread = Interest Income (%) Avg Earning Assets - Interest Expense (%) Avg Interest Bearing Liabilities
[5] Net interest margin = Net Interest Income (%) Average Earning Assets
[6] Cost to Income Ratio = Total non interest expense (%) Operating income
[7] Total deposits = Customer deposits + Due to banks
[8] Liquid Assets = Cash & Central Bank + Due from Banks + Government Securities + Trading Securities + Other Liquid Assets
[9] Free Capital = Shareholders' Equity - Fixed Assets - Equity in Affiliates
[10] Dividend Payout = Dividends (%) Net Income
[11] Internal Capital Growth = Current period's Net income - Current period's Dividends (%) Last period's Shareholders' Equity

| Description | Coupon (%) | Currency | Face Amount (mil) | Maturity | Moody's Rating |
|---|---|---|---|---|---|
| **Arab Bank PLC** | | | | | |
| Long-Term Bank Deposit Rating | — | — | — | — | Ba3 |
| Bank Financial Strength Rating | — | — | — | — | C+ |
| Short-Term Bank Deposit Rating | — | — | — | — | NP |
| **Arab Bank Australia** | | | | | |
| Issuer Rating | — | — | — | — | Baa3 |
| Issuer Rating | — | — | — | — | P-2 |
| Issuer Rating | — | — | — | — | P-2 |
| Long-Term Bank Deposit Rating | — | — | — | — | Baa2 |
| Bank Financial Strength Rating | — | — | — | — | D |
| Short-Term Bank Deposit Rating | — | — | — | — | P-2 |
| **Arab Bank Plc. (USA Branch)** | | | | | |
| Long-Term Bank Deposit Rating | — | Domestic | — | — | Baa1 |
| Short-Term Bank Deposit Rating | — | Domestic | — | — | P-2 |



**Rating History** — **Long-term Bank Deposits**

*To order reprints of this report (100 copies minimum), please call 1.212.553.1658.*
Report Number: 80813

**Author**                                    **Senior Production Associate**

*Hank Calenti, CFA*                           *Tiffany Lam*

© Copyright 2003, Moody's Investors Service, Inc. and/or its licensors including Moody's Assurance Company, Inc. (together, "MOODY'S"). All rights reserved. **ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY COPYRIGHT LAW AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.** All information contained herein is obtained by **MOODY'S** from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, such information is provided "as is" without warranty of any kind and **MOODY'S**, in particular, makes no representation or warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability or fitness for any particular purpose of any such information. Under no circumstances shall **MOODY'S** have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of **MOODY'S** or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if **MOODY'S** is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The credit ratings, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. **NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.** Each rating or other opinion must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information contained herein, and each such user must accordingly make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling. **MOODY'S** hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by **MOODY'S** have, prior to assignment of any rating, agreed to pay to **MOODY'S** for appraisal and rating services rendered by it fees ranging from $1,500 to $1,800,000.

# Exhibit 5

Case 1:04-cv-02799-NG-VVP   Document 53   Filed 03/11/05   Page 57 of 68



**Moody's Investors Service**

Global Credit Research
Credit Opinion
26 FEB 2004

**Credit Opinion:** Arab Bank PLC

## Arab Bank PLC

*Amman, Jordan*

### Ratings

| Category | Moody's Rating |
|---|---|
| Outlook | Stable(m) |
| Bank Deposits | Ba3/NP |
| Bank Financial Strength | C+ |
| **Arab Bank Australia Limited** | |
| Outlook | Positive |
| Bank Deposits | Baa2/P-2 |
| Bank Financial Strength | D |
| Issuer Rating | Baa3 |
| ST Issuer Rating | P-2 |
| **Arab Bank Plc. (USA Branch)** | |
| Outlook | Positive |
| Bank Deposits | Baa1/P-2 |

### Contacts

| Analyst | Phone |
|---|---|
| Mardig Haladjian/Limassol | 357.25.586.586 |
| Hank Calenti/Limassol | |
| Adel Satel/Limassol | |

### Key Indicators

**Arab Bank PLC**

| | [1]2002 | 2001 | 2000 | 1999 | 1998 | [2]Avg/CAGR |
|---|---|---|---|---|---|---|
| Total Assets (US$ billion) | 20.75 | 20.67 | 19.56 | 17.77 | 16.56 | 5.79 |
| Total Capital Funds (US$ billion) | 1.81 | 1.66 | 1.50 | 1.29 | 1.16 | 11.90 |
| Recurring Earning Power % [3] | 1.27 | 1.41 | 1.48 | 1.37 | 1.77 | 1.46 |
| Return on Average Assets % | 0.89 | 0.98 | 0.98 | 0.99 | 1.12 | 0.99 |
| Net Interest Margin % | 1.86 | 1.97 | 2.05 | 2.13 | 2.49 | 2.10 |
| Cost / Income Ratio % [4] | 54.61 | 51.35 | 49.98 | 53.37 | 48.66 | 51.60 |
| Problem Loans % Gross Loans | 5.61 | 5.10 | 6.03 | 6.18 | 4.36 | 5.45 |
| Equity % Assets | 8.90 | 8.09 | 7.66 | 7.25 | 6.98 | 7.77 |

[1] Results for the 12 months ended December 31 [2] Compound Annual Growth Rate [3] Preprovision Income % Average Assets. [4] Non Interest Expense % Operating Income

### Opinion

#### Rating Rationale

The bank's particular structure of geographical diversification, where approximately 80% of the bank's assets, funding and revenues lie outside Jordan in 25 different countries, is the main determinant for the New York branch to pierce the deposit ceiling for Jordan-domiciled banks. Piercing the ceiling is further supported by the bank's high conservatism, preparedness to deal with catastrophic events and its long-standing track record of surviving wars,

nationalisations and economic crises virtually unscathed.

The Baa1/Prime-2 ratings are the highest Moody's has assigned for foreign currency deposits of Arab Bank Plc. The foreign currency deposits of the USA branch are set at the Baa1/Prime-2 level. The ratings of the Jordanian branches are constrained by the foreign currency bank deposit ceilings for Jordan.

The Financial Strength Rating ("FSR") reflects the bank's stable and good management that is capable of charting clear strategies. It also reflects the bank's sound financials coupled with a strong and defensible franchise in the Arab world. The bank is among the largest in the Middle East, it commands an important position, plays a regional role and is well regarded by its peers.

**Credit Strengths**

Arab Bank Plc.'s credit strengths include:

· Abundant liquidity;

· Ample capitalisation;

· Comfortable cushion against loan portfolio deterioration;

· A good Middle Eastern franchise with low Jordanian exposure;

· Global operations that diminish Middle Eastern portfolio risks;

· The image of being a regional flight-to-quality bank in times of stress;

· Under-leverage in retail that creates opportunities for additional income streams; and

· An operations overhaul currently underway to support credit expansion and improve risk assessment.

**Credit Challenges**

Arab Banks Plc.'s credit challenges include:

· Evolving oversight that limits upward pressure on the ratings;

· A moderate transparency in financial reports;

· A corporate governance model that protects assets but limits opportunities; and

· The challenge to effect a corporate cultural revolution in operations and governance in evolutionary steps.

**What Could Change the Rating - UP**

A minor improvement in disclosure and IT systems in support of treasury operations would place the New York branch rating under positive pressure. These enhancements, together with an enhancement of group independent oversight and an improvement in the Jordanian and larger Middle Eastern operating environment as Arab Bank penetrates retail space in these markets could result in an upgrade in the FSR. The deposit rating in Jordan will move with changes in the deposit ceiling for Jordan.

**What Could Change the Rating - DOWN**

A material reduction in overall liquidity combined with an increase in illiquid Middle Eastern assets would result in a decrease in the New York branch rating. These changes, together with a significant reduction in asset quality or earnings power would result in a downgrade in the FSR. The deposit rating in Jordan will move with changes in the deposit ceiling for Jordan.

**Rating Outlook**

The FSR and deposit ratings are stable. Likely changes depend on the success of recent management initiatives to enhance the franchise and hinge on changes in the Middle East operating environment, an area that is the

bank's focus for further expansion.

© Copyright 2004, Moody's Investors Service, Inc. and/or its licensors including Moody's Assurance Company, Inc. (together, "MOODY'S"). All rights reserved.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY COPYRIGHT LAW AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT. All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, such information is provided "as is" without warranty of any kind and MOODY'S, in particular, makes no representation or warranty, express or implied, as to the accuracy, timeliness, completeness, merchantability or fitness for any particular purpose of any such information. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The credit ratings and financial reporting analysis observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER. Each rating or other opinion must be weighed solely as one factor in any investment decision made by or on behalf of any user of the information contained herein, and each such user must accordingly make its own study and evaluation of each security and of each issuer and guarantor of, and each provider of credit support for, each security that it may consider purchasing, holding or selling.

MOODY'S hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MOODY'S have, prior to assignment of any rating, agreed to pay to MOODY'S for appraisal and rating services rendered by it fees ranging from $1,500 to $2,300,000. Moody's Corporation (MCO) and its wholly-owned credit rating agency subsidiary, Moody's Investors Service (MIS), also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually on Moody's website at www.moodys.com under the heading "Shareholder Relations - Corporate Governance - Director and Shareholder Affiliation Policy."

# Haddad Decl.

**COURTNEY LINDE, el al.,**
**Plaintiffs**
-Against-
**ARAB BANK plc,**
**Defendant.**

**04 CV 2799 (NG) (ASC)**

**DECLARATION OF**
**HAMZEH AHMAD   HADDAD**

Hamzeh Ahmad Haddad declares:

1-   I am an attorney at law practicing in Jordan and was admitted to the Jordan Bar in 1985. I hold an LL.B. from Damascus University (1971), an LL.M and Ph.D from Cairo University (1976), and another Ph.D from University of Bristol in the U.K. Between 1977 and 1985, I taught different subjects of private law at the University of Jordan, school of law. During that period and since then also, I used to teach law as a part time lecturer at different academic institutions in Jordan such as the Judicial Institute, Mota University and the University of Yarmouk. Also, I was many times invited by Saint Joseph University in Beirut as a visiting professor, giving lectures to the post graduate students. From February 2004 until June 2004, I was lecturer of law at the High Judicial Institute in Dubai. I have the right to appear before the First Instance Court (FIC), Appeal Court (AC) and Cassation Court (CC) in Jordan since 1985.

2-   I am making this affidavit to the best of my knowledge in support of Arab Bank's Motion in the case No. CV 04 2799 (NG) (ASC), to dismiss it on the ground of *forum non conveniens.*

3-   I have reviewed the First Amended Complaint submitted by the Plaintiffs in the above-mentioned case. I have also reviewed the Anti – Terrorism Act, 18 U.S.C., Sections 2331 et seq.  I have been asked to address the issue of whether the competent courts in Jordan are open to the plaintiffs to seek damages because of the Arab Bank's conduct and acts as alleged in the complaint filed in this case.

4-   According to the Constitution of Jordan (1952), judges are independent, and in exercising their functions they are subject to no

authority other than that of the law ( article 97). Courts are divided into three categories: ordinary, religious and special courts. Courts are open to all and shall be free from any interference in their affairs (article 101.1).

5- There are three levels of trial in Jordan as far as the ordinary courts are concerned. The FIC, which is the first degree court in Jordan, is a court of general jurisdiction in civil, commercial and criminal matters. This Court has general jurisdiction to hear claims in all civil disputes including claims brought by any party seeking damages for causes of action recognized in the law. The second level court is the AC to which the losing party may appeal the decision of the FIC. The third level court is the CC which is the highest court in Jordan before which the decision of the AC may be challenged. Generally, every judgment issued by the FIC may be subject to AC and every judgment by the latter may be subject to the CC the decision of which is final, definite and subject to no more appeal or challenge.

6- Articles 99-102 of the Constitution provide that the stages and jurisdiction of courts shall be organized by the law; courts are open to all and secured from interference in their affairs; and ordinary courts shall have jurisdiction over all persons in all criminal and civil matters including lawsuits filed by or against the government, with the exception of matters given to religious or special courts by this Constitution or any other operative law. The Law No. 17/2001 relating to the formation of ordinary courts repeats Article (102) of the Constitution in the sense that such courts exercise their jurisdiction over all persons in criminal and civil matters. Article (4) of that law provides that FIC has jurisdiction over all criminal and civil cases as long as the jurisdiction of which have not been given to another court.

7- Generally speaking, one may say that FICs have jurisdiction in all civil cases including any claim the subject-matter of which is a claim for damages. According to the Civil Code, the sources of  obligation, including a claim for damages, are the contract, unilateral will, tort, enrichment without cause and the law itself (First Chapter of the Code). As to damages based on tort, article 256 of the Code provides that every injurious act shall render the person who commits it liable for damages even if he lacks discernment. Damages include the actual loss and the loss of profit (article 266) and ,also, include moral damage

2

where article 267 provides, *inter alia*, that **1-** The right to damages shall also include moral damage, so any trespass on another's liberty, honour, reputation, social status or financial standing shall render the person commits the trespass liable for damages, **2-** Any damages may be awarded to spouses and close relatives in the family for the moral damage inflicted upon them by the death of the injured.

Tens of cases in which the courts had given compensation on the ground of moral damage do exist. New examples of this could be found in Civil Cassation No. 155/2004 (Adala Centre on the Computer); No. 853/2004, (*ibid*); No. 687/2004 (*ibid*); No. 446/2004 (*ibid*); and No. 4590/2004 (*ibid*).

**8-**    If more than one person have participated in the injurious act, every one of them shall be liable for his share and the court may rule between them equally or jointly (article 265 of the Civil Code). But practice shows that in almost, if not all cases, the courts decide joint liability against the doers.

**9-**    On the other hand, if the tortious act constitutes a crime, all persons who participated in the act shall jointly be liable for damages towards the injured party in addition, of course, to the (criminal) punishment imposed upon them (Article 42 and 46 of the Penal Code). Two examples of cases applying this principle may be cited here (Civil Cassation No. 1863/2002, Adala Centre on the Computer; and Penal Cassation no. 59/1981, Bar Association Journal, 1981, p. 1111).

**10-**   Terrorism is a crime under Jordanian Law where article 147 of the Penal Code Provides that: **1-** Terrorism denotes the use or threat of use, of violence, regardless of incentive, motive or inclination and irrespective of it being executed individually or collectively, with the aim of disturbing public order or subjecting society's safety and security to peril, if such an event causes fear and fright among people, or subjects their lives and security to danger; or causes damage to infrastructure, utilities and public or private ownership; or international utilities and diplomatic missions, or by occupying or seizing them; or subjecting national resources to danger, or obstructing the application of constitutional and legal provisions. **2-**       Crimes of terrorism include any act appertaining to any banking transaction, and specially the depositing of funds at any bank or financial institution operating in the Kingdom, or the transfer

of funds to any destination whatsoever if it was apparent that such funds are suspect and are connected to terrorist activities.  In such event, the following procedures shall apply:

a.   Sequestration (attachment) of funds by a decision issued by the Attorney General, and barring dealing with it until investigations are completed.

b.   The Attorney General shall, in coordination and cooperation with the Central Bank and any other relevant authority, whether local or international, conduct an investigation, and if it was proven that such transaction is related to a terrorist activity, the case shall be referred to the competent court.

c.   Anyone convicted of the commission of this crime shall be sentenced to temporary hard labour, and the responsible administrator at the bank or financial institution, who knowingly executed the transaction, shall be sentenced to a prison term and the funds that has hitherto been sequestered (attached) shall be confiscated.

11-  Two important points may be mentioned in this respect. Firstly, a legal entity (such as a company) may commit or participate in the commitment of a crime through its managers, representatives or employees. In such a case, the entity may be stopped (prevented) from further works provided that the crime is (of) felony (like a terrorism crime) or (of) misdemeanor (article 36 of the Penal Code), in addition to its civil liability for damages (if any). It is to be noted that article (271) of the Civil Code provides that civil liability shall not affect criminal liability when its prerequisites are fulfilled and the criminal penalty shall not affect the limitation of the extent of the civil liability and the estimation of damages

12-  Secondly, Penal law shall apply to Jordanians who commit or participate, outside the country, in the commitment of a crime of the above type (Article 10.1 of the Penal Code), which event results automatically in giving Jordanian courts  the jurisdiction to hear the Penal case in these circumstances. Two examples from the CC, Penal Division, may be cited here, *i.e.*, no. 4/1986, Bar Association Journal, 1988, P. 1778; and no. 119/1954, *ibid*, 1955, p. 877. Needless to say

that the said provision applies to natural persons and artificial ones (such as a company) as well. In this regard, it is to be mentioned that in civil cases against a corporate, jurisdiction is given to the Jordanian competent court where the headquarter of the corporate exists or, as the plaintiff chooses, where the relevant branch of a company is located (Article 38 of the Law of Civil Procedure).

13-    Based on the above, one may conclude that a crime may be committed in a country other than Jordan by a branch of a Jordanian company. In such a case, a criminal case may be brought against the headquarter of the company in Jordan. At the same time, if the crime results in injury to any person he may institute a civil suit in Jordan against the headquarter, the subject of which is a claim for damages.

14-    1:    According to article (103.1) of the Constitution, in matters of a civil or commercial nature where it is in conformity with international usage (custom) to apply the law of a foreign country, such law shall be applied in the manner provided for in the (local) law. Generally, it is acceptable by the court to apply a foreign law and there are many judicial precedents to this effect. Such application is based on articles 11-29 of the Civil Code which provide for the different manners in which the foreign law applies. For example, an injurious act and its effect is subject to the law of the country in which the act was committed (article 22 of the Civil Code). Therefore, if a crime or any other tortious act, resulted in injuries to some people, was committed by a Jordanian company or its branch in, say country (A), and a lawsuit for damages was submitted in Jordan, the competent court shall apply the law of (A) on the elements of the tortious act, the damage and the damages. The exception to this rule is that a foreign law may not be applied if it is contrary to public order or policy (article 29 of the Civil Code). In fact, even in this situation, only the provision which is against public order is to be excluded while other provisions survive and must be applied.

       2:    Section 2333 of Anti–Terrorism Act, 18 U.S.C in the USA (the ACT) provides that "Action and jurisdiction. Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or

her estate, survivors, or heirs, may sue therefore in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees". Assuming that the rules of conflict of laws in the Civil Code in Jordan would lead to the application of the US laws more specifically the ACT, I do believe that section 2333 is not against public order in Jordan since it does not infringe any basic or serious local rule affecting the social, religious, political life or the like in the country.

**3-**    Therefore, if US Law were to apply, the plaintiffs would have their remedy under the Act. If Jordanian Law were to apply, their remedy would be as described above.

**15-**    As to evidence in civil matters, the law which generally applies, is the Law of Evidence No. 30 of 1952. This Law divides the means of evidence into writing, testimony, presumption, admission (acknowledgement or confession) oath and expertise. In material facts (such as injurious acts), proving of an alleged fact may be made by all means including testimony which is in almost, if not all cases is the normal means of evidence. If that act constitutes a crime, the way and method of evidence become much more easier than when the act is qualified as a mere civil one. This is due to the fact that a public prosecutor, while having big powers and authorities, is a major or the major part of the case. He is bound and empowered as well to collect evidences in any legal way he considers appropriate. If necessary, he may use his power of temporarily arresting any person who might be a part of the crime or, in certain circumstance, even a witness on the crime.

**16-**    Anyway, in civil cases, the proof is generally vested in the parties themselves. But a court would be of much help in this matter. It has the power to call witnesses or even to oblige them to appear before the court under penalty (Article 81.6 of LCP). This may also be said in respect of experts. If a witness resides outside the country and he is a Jordanian, a court may ask the Jordanian Consular, through the Ministry of Foreign Affairs, to testify him under oath. If the witness is not Jordanian, a court may accept an affidavit given by him abroad (Article 4 of Law of Evidence). The court may also give the party concerned the chance to bring the (foreign) witness (residing abroad)

to appear before the court which much happens in practice. Generally, a foreign witness, no matter what his nationality is, may come into the country and appear before the Court provided that the official requirements for his entry, such as an entry visa, have met.

17- As per article (100) of the Law of Civil Procedure (LCP), a court may also order any party  to the lawsuit to submit any document he obtains, if the court considers it necessary for rendering its judgment. Likewise, a court may, upon the request of either party, order a bank or any businessman to present a copy of any (accounting) entry existing in the relevant (commercial) books or the computer (Article 105 of LCP). A party alleging that the other party obtains a document relative (necessary) to the case, may appeal to the court for an order obliging that party to present the said documents (Article 20 of LE).

18- As to the legal fees, FIC has to decide in its judgment that a losing party should pay to the other party legal fees but not exceeding the sum of (500) Jordanian Dinars, which is equivalent to approximately (700) US Dollars. However, the parties may agree that, regardless of fees decided by the court, the losing party shall compensate the other party for the legal fees of the latter's attorney. The amount of such fees is subject to the agreement but may not exceed, in my opinion, 25 % of the claim's value[*].

19- I have noticed Section 2333 of the ACT above providing, *inter alia*, that a victim of an act of international terrorism shall recover threefold the damages he or she sustains. Such a rule has no equivalent under the laws of Jordan. Instead article 363 of the Civil Code provides that if damages are not estimated under the law or in the contract, the court shall estimate them as those equal to the actual damage at the time it occurred. Accordingly, a  Jordanian court may not render a judgment for damages exceeding the damage, including the loss of profit, sustained by the innocent party. In my opinion, such a provision does not preclude the parties from the right to agree that after the court

---

[*] This opinion is based on the fact that a fees' agreement between a client and a lawyer may not, by the law, exceed the above mentioned percentage. By analogy, the same may be applied to an agreement between the parties providing that either of them shall compensate the other for the latter's legal fees.

renders its decision, the injured party may be compensated by the other for whatever sum is designated in the agreement, particularly when the damage is of moral . This is particularly true where the party agreeing to pay more than the judgment of the court is of equal or greater bargaining power.

**I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge, the foregoing is true and correct.**

**Executed at Amman , Jordan , on Thursday 11 November 2004.**

Hamzeh Ahmad Haddad