UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------X
COURTNEY LINDE, et al.,                    :

              Plaintiffs,            :        04 CV 2799 (NG)(ASC)

      -against-                     :

ARAB BANK plc,                              :

           Defendant.             :

----------------------------------------------------X


## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT


**WINSTON & STRAWN LLP**
200 Park Avenue
New York, New York 10166
Tel.:  (212) 294-6700

Attorneys for Defendant Arab Bank plc

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................................1

THE DEFENDANT......................................................................................................................4

HISTORY OF THE BANK ..........................................................................................................6

ARGUMENT ............................................................................................................................10

I.  THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO
    STATE A CLAIM ..........................................................................................................10

    A.  The Legal Standard Applicable To A Rule 12(b)(6) Motion ............................10

    B.  The Claims Arising Out Of Four Of The Incidents Alleged In The Amended
        Complaint Should Be Dismissed For Failure To Allege Any Connection To
        Arab Bank ........................................................................................................12

    C.  Claims One Through Seven Should Be Dismissed As To All Plaintiffs Because
        The Amended Complaint Does Not Allege That They Were Injured By Reason
        Of Arab Bank's Alleged Wrongdoing In Connection With The "Insurance
        Scheme" ...........................................................................................................17

    D.  Claims One Through Seven Should Be Dismissed As To All Plaintiffs Because
        The Amended Complaint Does Not Allege That Arab Bank Knowingly and
        Intentionally Maintained Bank Accounts For Purported "Charity Fronts
        Controlled By HAMAS" Or Directly For HAMAS ...........................................22

    E.  Claims One Through Seven Should Also Be Dismissed Because Plaintiffs Have
        Not Alleged That Any Upper-Level Management Of Arab Bank Participated In
        The Purported Unlawful Activity .....................................................................30

    F.  The Fifth Claim Should Also Be Dismissed For Failure to Allege A Violation
        Of Criminal Law As Required By 18 U.S.C. § 2331(1)(A) ...............................33

    G.  The Sixth Claim Should Also Be Dismissed For Failure to Allege That Arab
        Bank "Collected Funds" In Violation Of 18 U.S.C. § 2339(1)(A)....................34

    H.  The Eighth Claim Should Be Dismissed For Failure To State A Claim For
        International Infliction Of Emotional Distress ..................................................37

II.  Boim v. Quranic Literary Institute does not bar dismissal .............................................42

    A.  The Stark Contrast Between The Direct Claims At Issue In Boim And The
        Vague Claims At Issue Here.............................................................................42

    B.  Section 2333 Does Not Provide A Civil Cause Of Action For Aiding And
        Abetting Or Conspiracy To Commit International Terrorism ............................48

III. The Amended Complaint Should Be Dismissed on Forum Non Conveniens Grounds ..50

    A.  The Standard For A Forum Non Conveniens Motion -- Three Stages..............50

    B.  Plaintiffs' Choice Of Forum Is Entitled To Diminished Deference ..................55

i

      C.    An Adequate Alternative Forum Exists ............................................................... 58

      D.    The Private Interest Factors Strongly Favor Dismissal ..................................... 63

      E.    The Public Interest Factors Also Strongly Favor Dismissal .............................. 65

CONCLUSION .............................................................................................................................. 68

## TABLE OF AUTHORITIES

### CASES

*Aguinda et al. v. Texaco, Inc.*, 303 F.3d 470 (2d Cir. 2002) .........................................59, 60

*Alcoa S.S. Co., Inc.*, 654 F.2d 147 (2d Cir. 1980) ..............................................................56

*Alfadda v. Fenn*, 159 F.3d 41 (2d Cir. 1998) .....................................................................65

*Archer v. Farmer Bros. Co.*, 70 P.3d 495 (Colo. App. 2002) .............................................38

*Bank of Credit Commerce International (Overseas) Ltd. v. State Bank of
Pakistan*, 273 F.3d 241 (2d Cir. 2001) ..........................................................................58

*Banque Worms v. Luis A. Duque E Hijos, Ltda.*, 652 F.Supp. 770 (S.D.N.Y.
1986) ..........................................................................................................................31, 32

*Base Metal Trading et al. v. Russian Aluminum et al.*, 253 F.Supp.2d 681
(S.D.N.Y. 2003) ...........................................................................................................51, 65

*Billy Baxter Inc., v. The Coca-Cola Co.*, 431 F.2d 183 (2d Cir. 1970) ..............................18

*Blanco v. Banco Industrial De Venezuela*, 997 F.2d 974 (2d Cir. 1993) ....................55, 64

*Boim v. Quaranic Literacy Institute*,  291 F.3d 1000 (7th Cir. 2002) .............19, 24, 34, 45

*Boim v. Quranic Literacy Institute*, 127 F.Supp.2d 1002 (N.D. Ill. 2001) ............42, 43, 45

*Bonsignore v. The City of New York*, 683 F.2d 635 (2d Cir. 1982) ..................................19

*Burnett v. Al Baraka Investment & Development Corp.*, 274 F.Supp.2d 86
(D.D.C. 2003) ................................................................................................................3, 12, 67

*Calgarth Investments, Ltd. v. Bank Saderat Iran*, No. 95 Civ. 5332, 1996
U.S.Dist. LEXIS 5562 (S.D.N.Y. Apr. 26, 1996), *aff'd, 108 F.3d 329* (2d Cir.
1997) ............................................................................................................................67

*Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994) ...........48

*Clearfield Trust Co. v. United States*, 318 U.S. 363 (1943) ..............................................19

*Cohen v. Standard Bank Inv., Ltd.,* No. 97 Civ. 3802 (SAS), 1998 WL 782024
(S.D.N.Y. Nov. 6, 1998) ................................................................................................46

*Concesionaria DHM, S.A. v. International Finance Corp.*, 307 F.Supp.2d 553
(S.D.N.Y. 2004) ............................................................................................................55

*Connolly v. Havens*, 763 F.Supp. 6 (S.D.N.Y. 1991) ........................................................11

*Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690 (1962)............19

*Estate of Cowart v. Nickolas Drilling Co.,* 505 U.S. 469 (1992) .......................................34

*Department of Economics Dev. v. Arthur Anderson & Co.*, 924 F.Supp. 449
   (S.D.N.Y. 1996)..........................................................................................................49

*District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077 (D.C. Cir. 1984).......................11

*Dowling v. United States*, 473 U.S. 207 (1985)................................................................35

*El-Fadl v. Central Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996)....................................63

*El-Fadl v. Petra Bank et al.*, 93-Civ.-1895 (D.D.C. 1997)................................................62

*Estates of Ungar v. Palestinian Authority*, 153 F.Supp.2d 76 (D.R.I. 2001) ....................51

*First Nation Bank v. Gelt Funding*, 27 F.3d 763 (2d Cir. 1994) .......................................18

*Forbes v. Merrill Lynch, Fenner & Smith, Inc.*, 957 F.Supp. 450 (S.D.N.Y. 1997) .........39

*Fort Wayne Telsat v. Entertainment and Sports Programming Network*, 753
   F.Supp. 109 (S.D.N.Y. 1990).....................................................................................11

*Franceskin v. Credit Suisse*, 214 F.3d 253 (2d Cir. 2000)................................................41

*Francis v. Chemical Bank*, 62 F.Supp.2d 948 (E.D.N.Y. 1999) [Gershon, J.]..................41

*In re Gas Reclamation, Inc. Securities Litigation*, 663 F.Supp. 1123 (S.D.N.Y.
   1987) ...........................................................................................................................22

*Geisler v. Petrocelli*, 616 F.2d 636 (2d Cir. 1980) ..........................................................11

*Green v. Liebowitz*, 118 A.D.2d 756, 500 N.Y.S.2d 146 (2d Dep't 1986) ........................38

*Griffen v. Topps Appliance City, Inc.*, 337 N.J.Super. 15 (N.J. Super. Ct. App.
   Div. 2001) ...................................................................................................................38

*Gruber v. Prudential-Bache Securities, Inc.*, 679 F.Supp.°165 (D.Conn. 1987).........31, 32

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)...................................................51, 64, 66

*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) ......................................................24

*Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, No. 88 Civ. 8048 (JES),
   1997 WL 76674 (S.D.N.Y. Feb. 20, 1997)................................................................49

*Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21 (2d Cir. 1990) .....................18, 24

*Holmes v. Securities Investor Protection Corp. et al.*, 503 U.S. 258 (1992)...............18, 19

*Iragorri v. United Technologies Corp.*, 274 F.3d 65 (2d Cir. 2001) ...........................55, 56

*K Mart Corp v. Cartier, Inc.*, 486 U.S. 281 (1987) .............................................................35

*Koehler v. Bank of Bermuda*, No. 96 Civ. 7885, 1998 WL 67652 (S.D.N.Y. Feb. 19, 1998) ......................................................................................................................11

*Koster v. Lumberman's Mutual Casualty Co.*, 330 U.S. 518 (1947) .................................55

*Lan Associates XVII, L.P. v. Bank of Nova Scotia*, No. 96 Civ. 1022 (JFK), 1997 WL 458753 (S.D.N.Y. Aug. 11, 1997)...................................................................66, 67

*Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003) ...........................................21, 22

*Mack v. Altmans Stage Lighting Co.*, 98 A.D.2d 468, 470 N.Y.S.2d 664 (2d Dep't 1984) .........................................................................................................................20

*Martin v. Citibank, N.A.*, 762 F.2d 212 (2d Cir. 1985).......................................................39

*Metropolitan Furniture Rental v. Alessi*, 770 F.Supp. 198 (S.D.N.Y. 1990)....................24

*Moore v. City of New York*, 219 F.Supp.2d 335 (E.D.N.Y. 2002) .....................................38

*Murray v. British Broadcasting Corp.*, 81 F.3d 287 (2d Cir. 1996)...........................55, 56

*Oki Semi Conductor Co. v. Wells Fargo*, 298 F.3d 768 (9th Cir. 2002) ...........................22

*P.T. United Can Co. v. Crown Cork & Seal*, 138 F.3d 65 (2d Cir. 1998).........................58

*Parnes v. Heinold Commodities, Inc.*, 548 F.Supp. 20 (N.D. Ill. 1982)...........................31

*Pelman v. McDonald's Corp.*, 237 F.Supp.2d 512 (S.D.N.Y. 2003).................................19

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).....................................53, 55, 58, 64, 66

*Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64 (2d Cir. 2003).........................................................................……....50, 51, 52, 56, 57

*R.E. Davis Chemical Corp. v. Nalco Chemical Co.*, 757 F.Supp. 1499 (N.D. Ill. 1990) ..........................................................................................................................32

*R. Maganlal & Co. v. M.G. Chemical Co.*, 942 F.2d 164 (2d Cir. 1991)....................52, 58

*Realmuto v. Yellow Freight System, Inc.*, 712 F.Supp. 287 (E.D.N.Y. 1989) ...................39

*Reers v. Deutsche Bahn AG*, 320 F.Supp.2d 140 (S.D.N.Y. 2004)....................................66

*Renner v. Chase Manhattan Bank*, No. 98 Civ. 926 (CSH), 1999 WL 47239
(S.D.N.Y. Feb. 3, 1999) ............................................................................................... 46

*Republic of Panama v. BCCI Holdings*, 119 F.3d 935 (11th Cir. 1997) ........................... 23

*Ridder v. Hibsch*, 94 S.W.3d 470 (Mo. Ct. App. 2003) ...................................................... 39

*Riske v. King Soopers*, 366 F.3d 1085 (10th Cir. 2004) ..................................................... 38

*Rolo v. City Investing*, 155 F.3d 644 (3d Cir. 1998) ........................................................... 49

*Rooney v. Witco Corp.*, 722 F.Supp. 1040 (S.D.N.Y. 1989) .............................................. 39

*Rosenheck v. Rieber*, 932 F.Supp. 626 (S.D.N.Y. 1996) .................................................... 49

*Rush v. Oppenheimer & Co., Inc.*, 628 F.Supp. 1188 (S.D.N.Y. 1985) ............................ 32

*Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d
774 (2d Cir. 1984) ....................................................................................................... 11

*Stuto v. Fleishman*, 164 F.3d 820 (2d Cir. 1999) ............................................................... 38

*Sussman v. Bank of Israel*, 801 F.Supp. 1068 (S.D.N.Y. 1992) ............................. 56, 57, 58

*Suzik v. Sea-Land Corp.*, 89 F.3d 345 (7th Cir. 1996) ....................................................... 19

*Transamerica Ins. Fin. Corp. v. Fireman's Fund Ins. Co.*, 1992 U.S.Dist. LEXIS
17633, 89 Civ. 8625, 1992 WL 350800 (S.D.N.Y. Nov. 19, 1992) ............................ 20

*Transunion Corp. v. Pepsico, Inc.*, 811 F.2d 127 (2d Cir. 1987) ....................................... 58

*Twyman v. Twyman*, 855 S.W.2d 619 (TX 1993) ................................................................ 38

*United States v. Al Arian*, 329 F.Supp.2d 1294 (M.D. Fl. 2004) ....................................... 25

*United States v. Salameh*, 152 F.3d 88 (2d Cir. 1998) ....................................................... 24

*United States v. Sattar*, 272 F.Supp.2d 348 (S.D.N.Y. 2003) ........................................... 25

*United States v. Standard Oil Co. of California*, 332 U.S. 301 (1947) ............................. 19

*United States v. Wiley*, 846 F.2d 150 (2d Cir. 1988) ......................................................... 24

*Universal Licensing Corp. v. Paola Del Lungo*, 293 F.3d 579 (2d Cir. 2002) ................. 41

*Varnelo v. Eastwind Trading Co.*, No. 02 Civ. 2084 (KMW), 2003 WL 230741
(S.D.N.Y. Feb. 3, 2003) ............................................................................................... 56

*Williams v. United States*, 458 U.S. 279 (1982) ................................................................35

## FEDERAL STATUTES

8 U.S.C. § 219..........................................................................................................................27

8 U.S.C. § 1182........................................................................................................................27

8 U.S.C. § 1189..................................................................................................................26, 27

15 U.S.C. § 15 ...................................................................................................................17, 18

18 U.S.C. § 2 ...........................................................................................................................48

18 U.S.C. § 1964.................................................................................................................17, 18

18 U.S.C. § 2332....................................................................3, 4, 21, 23, 24, 27, 48, 49

18 U.S.C. § 2331...............................................................................................................23, 33

18 U.S.C. § 2333................................................................................................... *passim*

18 U.S.C. § 2339A.................................................................3, 21, 23, 24, 27, 36, 48, 50

18 U.S.C. § 2339B .............................................................21, 23, 25, 34, 35, 36, 37, 48, 50

18 U.S.C. § 2339C ...............................................................21, 3, 25, 34, 36, 37, 48, 50

22 U.S.C. § 2371......................................................................................................................27

22 U.S.C. § 2781......................................................................................................................27

28 U.S.C. § 1367......................................................................................................................41

31 C.F.R. § 103.20...................................................................................................................28

31 C.F.R. § 103.22...................................................................................................................28

31 C.F.R. §§ 103.100-110........................................................................................................27

31 C.F.R. § 120 *et seq*............................................................................................................28

31 C.F.R. §§ 501.601-501.606.................................................................................................27

31 C.F.R. § 594-97...................................................................................................................27

31 U.S.C. § 5311 *et seq*..........................................................................................................27

50 U.S.C. § 2405 ..............................................................................................27

50 U.S.C. §§ 1701-1706 ...................................................................................27

Fed. R. Civ. P. 12(b) ..........................................................................................2

## STATE STATUTES

Tex. Civ. Prac. & Rem. Code Ann. § 1 6.003 ..................................................39

New York C.P.L.R. § 215....................................................................................39

F.S.A. § 95.11(3)................................................................................................39

## MISCELLANEOUS

Executive Order No. 13224 (66 Fed. Reg. 49079 (Sept. 23, 2001)) ..........................26, 27

Exec. Order No. 12947 (60 Fed. Reg. 5079 (Jan. 23, 1995)) ....................................26, 27

Audrey Kurth Cronin, *"The 'FTO List' and Congress: Sanctioning Designated*
*Foreign Organizations,"* Congressional Research Service of the Library of
Congress, Oct. 21, 2003 ................................................................................27

*A Bill To Provide a New Civil Cause of Action In Federal Law for International*
*Terrorism that Provides Extraterritorial Jurisdiction Over Terrorist Acts*
*Abroad Against United States Nationals*: *Hearing on S:2465 before the*
*Subcommittee On Courts and Administrative Practice of the Committee on*
*the Judiciary United States Senate*, 101st Cong. 4-5 ................................................53

*Hearing on the Implementation Legislation for the International Convention for*
*the Suppression of Terrorist Bombings and the International Convention for*
*the Suppression of the Financing of Terrorism Before the Subcomm. on Crime*
*of the House Comm. on the Judiciary,* 107th Cong. (2001) ......................................37

147 Cong.Rec. E2397-01 (statement of Rep. Sheila Jackson-Lee) ..................................36

W. Prosser & W. Keeton, *The Law of Torts* § 41 (5th ed. 1984). .....................................18

*Restatement (Second) of Torts* § 433 ..............................................................20

Defendant Arab Bank plc ("Arab Bank" or "the Bank") respectfully submits this memorandum of law in support of its motion to dismiss the First Amended Complaint (the "Amended Complaint") for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and on *forum non conveniens* grounds.

## PRELIMINARY STATEMENT

Plaintiffs are represented by four (or five) law firms located in Dallas, New Jersey, New York (and Pennsylvania).[1]   The lawyers have a website, which they call *terrorvictims.us* (the "Website"); it solicits additional plaintiffs to join in this action.   The Website states that persons wishing to participate in the lawsuit should complete a questionnaire, which is provided on the Website, and send it to the law firm of Sayles Lidji & Werbner in Dallas. The Website states that "The National Law Journal rates the firm among the 'winningest' law firms in America."  Name partner, Mark Werbner, is described as lead counsel for the case. The Website states that the case is being handled on a contingency fee basis and that "if the lawsuit is not successful and no funds are recovered, then the clients will not be charged any legal fees or any costs for expenses."  Finally, the Website states that counsel  "...anticipate adding additional defendants or filing additional lawsuits in the near future."  *See* Website at FAQs 7.[2]

---

[1]      The original lead counsel for plaintiffs, Wollmuth Maher & Deutsch LLP, have announced their intention to withdraw but have not yet done so.  In addition, it appears that a new firm has been added for plaintiffs, Kohn, Swift & Graf, P.C. of Philadelphia, although no appearance has yet been noted.

[2]      Plaintiffs' attorneys are advertising using print and media, including the popular web search engine Google. Depending on the news topics and search terms used, individuals searching at *http://www.google.com* are directed to plaintiffs' attorneys' Website, *http://www.terrorvictims.us*, located under the "Sponsored Links" column on the search results page. Companies or individuals wishing to advertise with Google pay an opening fee, and then pay on what is termed a "cost-per-click" approach, *i.e.*, the number of times potentially interested parties "click" on the advertisement in question.  Google works with advertisers to negotiate a rate per click based on the extent and number of search terms Google will use to match a particular search to a particular advertiser's needs.  The greater in scope the search, the more expensive the cost per click would be.

The Amended Complaint alleges that Arab Bank has aided and abetted international terrorism by providing financial services to Palestinian terrorists, the families and beneficiaries of terrorists and to foreign terrorist organizations. Relying largely on newspaper reports, internet sources, websites and other mass media, the Amended Complaint portrays a scenario of money transfers from allegedly anti-Israeli interests in Saudi Arabia through Arab Bank to Palestinian terrorists operating in Israel. The Amended Complaint concludes that Arab Bank knew, should have known or recklessly disregarded or ignored that it was processing funds destined for terrorist purposes.

This action was brought pursuant to certain sections of the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2332, 2333 and 2339A-C. Plaintiffs allege that Arab Bank "conspired to commit acts of international terrorism, resulting in the killing, attempted killing and maiming of scores of American citizens in Israel since September 2000...." Am. Compl. ¶ 1. As stated by the District Court for the District of Columbia in its consideration of claims brought against various defendants by September 11 victims and their families and representatives:

> [I]t is difficult to imagine uglier or more serious charges than those the plaintiffs have leveled at these defendants. *The use of the privileged medium of a lawsuit to publicly label someone an accomplice of terrorists can cause incalculable reputational damage.* . . . It is worth recalling that one of the reasons for Rule 9(b)'s heightened pleading standard in fraud cases was "the desire to protect defendants from the harm that comes to their reputations or to their goodwill when they are charged with serious wrongdoing. . . .

*Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d. 86, 103-04 (D.D.C. 2003) (citations omitted).

It is essential that the inflammatory rhetoric[3] of the Amended Complaint, portraying the horrors of a terrorist reality, not be permitted to obscure the infirmities of the Amended Complaint. That the Amended Complaint comprises 67 pages is of little consequence, if the claims have no legal basis.

Glaringly absent from the Amended Complaint are any facts to support the allegations that Arab Bank had the requisite knowledge and intent. In addition, although replete with references to alleged terrorists organizations and schemes to finance acts of terrorism, the Amended Complaint is devoid of allegations of causation linking the plaintiffs' injuries to any action or inaction on the part of the Bank. *See* Sections I.C-F, *infra* at pp. 17-33.

In addition, the doctrine of *forum non conveniens* is applicable here. Most of the plaintiffs reside in Israel and the alleged actions of the Bank took place, primarily, at its headquarters in Amman, Jordan. Jordan is an adequate alternative forum for plaintiffs' claims, and a balancing of the public and private interests relevant in a *forum non conveniens* motion favors dismissal. Most of the witnesses are Jordanian citizens residing in Amman and most of the documents are in Jordan and written in Arabic. Moreover, plaintiffs' claims arise out of acts committed in Israel and allegedly furthered by monetary funding in the Middle East. This case simply does not belong in a New York court. *See* Section III, *infra* at p. 51.

## THE DEFENDANT

Arab Bank plc, is a Jordanian bank with headquarters in Amman, Jordan. *See* Declaration of Shukry Bishara, dated November 11, 2004 ("Bishara Decl.") ¶ 1. It was established almost 75 years ago and today has a network of branches spanning 30 countries in five continents. It employs 7,300 people worldwide and is one of the largest banks in the Middle

---

[3]     Plaintiffs' Second Claim for Relief is entitled: "Conspiracy to Commit Murder and Attempted Murder of United States Citizens In Violation Of 18 U.S.C. §§ 2332(b) and 2333." Am. Compl. p. 56.

East. Arab Bank provides a wide variety of financial services, which include corporate and retail banking, trade financing, commercial real estate lending and other traditional banking services. *Id.* ¶¶ 11-16.

The Bank enjoys an excellent reputation throughout the financial world. Moody's Investors Service has described Arab Bank as "one of the most prominent and well-known banking institutions in the banking world." *Id.* ¶ 49. Moody's rating is based, among other things, on the Bank's "preparedness to deal with catastrophic events and its long-standing track record of surviving wars, nationalizations, and economic crises. …[I]n a region with a history of political and economic uncertainties … Arab Bank is recognized as the flight-to-quality bank in the Middle East." *Id.*

The Bank is at the forefront of preventing money-laundering and terrorist financing. It employs complex, sophisticated and state of the art software programs, commonly known as "filters," which are designed to identify terrorists and terrorist organizations and to detect suspicious patterns of financial activity. Arab Bank is supervised by the Central Bank of Jordan and by the regulatory authorities in all of the countries where it operates. As a matter of policy, the Bank applies the strictest rules as set out by the various regulators. Most importantly, in order to counter terrorist financing transactions, Arab Bank applies the Office of Foreign Assets Control's list (commonly known as the "OFAC list"), as well as other lists, including local lists developed by the jurisdictions in which the Bank operates. *Id.* ¶¶ 44-50.

Arab Bank has operated its federally chartered branch in New York since 1983. It has 50 employees and offers complete commercial banking services and is an active participant in the capital and money markets. Deposits at Arab Bank's New York branch are insured by the Federal Deposit Insurance Corporation ("FDIC") and Arab Bank is regulated and supervised by

the Board of Governors of the Federal Reserve System, the FDIC and the Office of the Comptroller of the Currency.  It enjoys an excellent reputation in the United States especially for Middle East and North Africa related trade business.  The Bank has consistently enjoyed high ratings from all the banking regulatory agencies in the jurisdictions in which it operates, including those in the U.S., UK, France, Italy and Austria.  *Id.* ¶¶ 17-19.

**HISTORY OF THE BANK**

Arab Bank's history and growth are inevitably tied to the political and social turmoil of the Middle East for the last century.  The Bank was founded in Jerusalem in 1930, a time when Palestine was under British mandate.  *Id.* ¶ 12.  In 1948, the United Nations divided Palestine into two states and violence embroiled the region almost immediately.  As a result, the Bank reincorporated and moved its headquarters to Jordan.  The Bank continued to operate in Gaza and the West Bank until June of 1967 at which time all branches were closed.  In 1994, in the context of the Oslo Accords (discussed *infra*) and as a result of the bilateral arrangements and peace treaty signed between Jordan and Israel, Arab Bank resumed operations in Gaza and the West bank.  *Id.* ¶ 8.

Arab Bank currently operates 22 branches in Palestine and its operations there are subject to the supervision and control of the Palestinian Monetary Authority and the Central Bank of Jordan.  *Id.* ¶ 20.  Initially, the Bank's operations there were also subject to the supervision of the Israeli Central Bank until the handing over of economic and banking activity in 1996 to the Palestinian Authority pursuant to the Economic Protocol of the Oslo Accords. The Oslo Accords, signed in 1993, provided for Israeli-Palestinian cooperation in economic and development programs.  The Accords recognized how important investment in Palestine was to the peace process:

6

cooperation in the field of finance, including a <u>financial development</u> and action programme for the encouragement of <u>international investment</u> in the West Bank and the Gaza Strip, and in Israel, as well as the establishment of a Palestinian Development Bank. (Oslo Accords, Annex III) (emphasis added).

*Id.* ¶ 21.

The Bank committed to help with that investment. Among other projects, it partnered with the International Financial Corporation (of the World Bank) and the German government to establish a long-term development bank known as the Arab Palestine Investment Bank. The Bank worked with several U.S. entities to develop a major power project in the Gaza Strip and participated in long-term projects in telecommunications and manufacturing. Also, the Bank became a founding shareholder in the US$172 million Palestine Development Investment Company (PADICO), which was established to help revitalize the Palestinian economy. *Id.* ¶ 22.

As stated above, since 1996, the supervisory role of the Israeli Central Banking Authority in Gaza and the West Bank was officially transferred to the Palestinian Monetary Authority. Nevertheless, the Israeli authorities maintain indirect monitoring of Arab Bank's activities in the area. *Id.* ¶ 25. As the three official currencies in effect in Gaza and the West Bank are Israeli shekels, Jordanian dinars and U.S. dollars, Arab Bank is regularly engaged in transactions with its Israeli counterparts. The Bank handles many of the payments made by the Israeli authorities to the Palestinian Authority. *Id.* ¶ 27.

Since the Oslo Accords, there have been many attempts to reach final agreements between the Palestinians and the Israelis. All of these attempts acknowledged that a lasting peace required a stable economy in Gaza and the West Bank. In 1998, the Wye River Memorandum was entered into by President Clinton, Yaser Arafat and Benjamin Netanyahu. It provided, *inter alia*, that "the Israeli and Palestinian sides reaffirm their commitment to

7

enhancing their relationship and agree on <u>the need to actively promote economic development in the West Bank and Gaza</u>." The Memorandum also provided that:

> the two sides agree on the importance of continued international <u>donor assistance</u> to facilitate implementation by both sides of agreements reached. They also recognized the need for enhanced <u>donor support</u> for economic development in the West Bank and Gaza. They agree to jointly approach the <u>donor community</u> to organize a Ministerial Conference ... to seek pledges for enhanced levels of assistance. (Wye River Memorandum, Section III) (emphasis added).

*Id.* ¶ 28. In 2002-03, representatives from the United States, the European Union, the United Nations and Russia ("the Quartet") proposed a "Roadmap" for peace, which, once again, emphasized the importance of improving:

> the humanitarian situation and prospects for *economic development* in the West Bank and Gaza and [initiating] a major donor assistance effort. (Roadmap, Phase I) (emphasis added).

*Id.* ¶ 29.

Despite these (and many other) efforts, peace has been very difficult to achieve. By 2000, the process long-contemplated by the Oslo Accords had not been completed. When Ariel Sharon visited the Al-Aqsa Mosque in September of 2000, events turned worse and a Second Intifada began.[4] Since the start of the Intifada, unemployment has risen in Gaza and the West Bank, foreign investments have diminished and violence between the two sides has become commonplace and has resulted in thousands of civilian deaths and injuries. The Intifada continues to this day. *Id.* ¶ 30.

Soon after the beginning of the Second Intifada, representatives of the governments of Kuwait, Lebanon, Libya, Egypt, Saudi Arabia, Mauritania, and Yemen -- all

---

[4]    The word Intifada did not originally mean insurrection or rioting. Originally, it was an uprising, a "shaking off," a movement toward some rational goal. It has, unfortunately, come to mean an uprising of Palestinians against Israeli occupation of the West Bank and Gaza Strip.

members of the Arab League -- met in Cairo at the Arab Summit Conference and recognized, as had the peace negotiators before them, that economic and humanitarian circumstances in Gaza and the West Bank were worsening and would continue to deteriorate as long as the violence continued.  The Arab League members agreed to "put in place an operating mechanism" to support and alleviate the civilian population's hardships.  *Id.* ¶ 31.

As a result, the League resolved to create two funds to support humanitarian efforts and economic developments in Palestine.  *Id.* ¶ 32.  It also called upon the member states to find methods that would ensure the availability of funds.  For its part in this process, the government of Saudi Arabia created a department or committee called the Saudi Committee-Relief for the Palestinian People.  Payments were made through the Committee to thousands of unemployed Palestinians, persons in hospitals, Palestinians that were wounded or injured during the violence, persons whose houses were destroyed, as well as payments to Palestinian schools, hospitals and infrastructure in general.  *Id.* ¶ 33.

This aid from the Saudi Committee was channeled to Gaza and the West Bank through banking networks.  Beginning in December of 2000, the Saudi Committee made approximately 200,000 payments into Palestine through Arab Bank branches totaling over US$90,000,000.  The payments were made to institutions and individuals alike.  *Id.* ¶ 35-36.  In addition to the contributions from the Saudi Committee and from other members of the Arab League, many other contributors, such as the United Nations Development Program, European Union, Arab Monetary Fund, French Development Agency, Italian government, World Bank and USAID provided aid to the Palestinian people.  Funds from many sources have been paid into Gaza and the West Bank through various banks, including Arab Bank, as well as various Israeli banks.  *Id.* ¶ 38.

Arab Bank has a long history.  It has operated continuously through wars and nationalizations and it is now a cornerstone in the rebuilding of the Palestinian economy. Plaintiffs' lawyers use inflammatory rhetoric and explicit descriptions of violence in the Amended complaint, and yet, in a case where the subject matter is so tragic, they accuse carelessly, unconcerned with accuracy or explanation.  When dealing with accusations so harsh, it would seem that their pleading obligation would be heightened – to pay particular attention and to examine their accusations and inferences before they are publicly made.  However, there is no sign of the extra care that should be taken here, not only as a matter of pleading under Rule 8, but as a matter of sound judgment and plain fairness.  The Amended Complaint simply does not, because it cannot, set forth the requisite allegations of causation or knowledge on the part of the Bank, and, for that reason, it cannot survive this motion.

## ARGUMENT

## I.   THE AMENDED COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

As more fully discussed below, plaintiffs' allegations, under the Anti-Terrorism Act, are subject to dismissal for failure to plead any causal connection to Arab Bank and for failure to aver the requisite knowledge or criminal intent.  Accordingly, all claims against Arab Bank should be dismissed, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for failure to state a claim upon which relief can be granted.

### A.   The Legal Standard Applicable To A Rule 12(b)(6) Motion

As a matter of both judicial economy and essential fairness to those who face allegations of wrongdoing, this court has repeatedly recognized that the pleading requirement of Rule 8, while liberally construed, does not provide safe harbor to those who file allegations that fail to meet minimal standards of sufficiency.  Pursuant to Rule 12(b)(6), the function of a

10

motion to dismiss "'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'" *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir. 1980)).  While a court must of course accept the plaintiffs' allegations as true for the limited purposes of a Rule 12(b)(6) motion to dismiss, it is equally true that the complaint "'must set forth enough information to suggest that relief would be based on some recognized legal theory,'" and the court "'has no obligation to create, unaided by plaintiff, new legal theories to support a complaint.'"  *Connolly v. Havens,* 763 F. Supp. 6, 9 (S.D.N.Y. 1991) (quoting *Fort Wayne Telsat v. Entertainment and Sports Programming Network,* 753 F. Supp. 109, 111 (S.D.N.Y. 1990) and *District of Columbia v. Air Florida, Inc.,* 750 F.2d 1077, 1081-82 (D.C. Cir. 1984)).

Similarly, while the court must view a complaint's allegations in the light most favorable to the pleader, it is equally well established that "the complaint must contain allegations concerning each of the material elements necessary to sustain recovery . . . ."  *Koehler v. Bank of Bermuda,* No. 96 Civ. 7885, 1998 WL 67652, at *5 (S.D.N.Y. Feb. 19, 1998) (citation omitted).

It is essential that the rhetoric of, and the graphic description of terrorist acts in, the Amended Complaint, not be permitted to cloud the fundamental infirmities of the Amended Complaint.  In view of the fact that the allegations here comprise not a simple contract or tort claim, but rather a purported conspiracy to commit acts of terrorism and murder, the court must provide thorough scrutiny in assessing the legal sufficiency of plaintiffs' allegations.  Judge Robertson's note of caution is again on point:

> No heightened standard of pleading will be applied in this case, but, given the extreme nature of the charge of terrorism,

11

> fairness requires extra-careful scrutiny of plaintiffs' allegations as
> to any particular defendant, to ensure that he--or it--does indeed
> have fair notice of what the plaintiffs' claim is and the grounds
> upon which it rests, and that no inferences are accepted that are
> unsupported by the facts set out in the [complaint].

*Burnett*, 274 F. Supp. 2d at 103-04 (citations omitted).

The Website used by the plaintiffs' lawyers, under a page entitled FAQs, poses the question "Who is eligible to participate in the lawsuit?" The overbroad answer to that question confirms the lack of proximate cause which underlies the entire Amended Complaint: "United States citizens killed or injured in terrorist attacks between September 2000 and the present." *See* Website at FAQs 1. In the face of such boundless, but plainly intended, reach, threatening the gravest reputational harm to a bank which enjoys an excellent reputation in 30 countries worldwide (*see generally*, Bishara Decl. at ¶¶ 16, 19, 27, 49 and 56), the "extra-careful scrutiny of plaintiffs' allegations" urged by the District of Columbia court is appropriate and warranted here.

**B.     The Claims Arising Out Of Four Of The Incidents Alleged In The Amended Complaint Should Be Dismissed For Failure To Allege Any Connection To Arab Bank**

In essence, the Amended Complaint alleges that Arab Bank supported terrorism in two ways. <u>First</u>, plaintiffs allege the maintenance by Arab Bank of bank accounts for "The Islamic Resistance Movement" (known as "HAMAS"), Am. Compl. ¶¶ 43, 345-47, *et seq.*, and for numerous so-called "charitable front organizations" allegedly controlled by HAMAS. Am. Compl. ¶¶ 343-45, 347-54. <u>Second</u>, the Amended Complaint alleges that Arab Bank maintains and administers an "insurance scheme" designed to compensate the families of suicide bombers. Am. Compl. ¶¶ 302-342. These allegations are stated and repeated in various forms but the Amended Complaint does not connect either of these allegations any of the specific terrorist incidents alleged.

As noted above, the true tenor of the Amended Complaint can best be appreciated by reference to the plaintiffs' lawyers' Website. The open invitation by counsel to all "United States citizens killed or injured in terrorist attacks between September 2000 and the present" to join in the suit plainly captures any citizen who is the unfortunate victim of terror -- presumably anywhere in the world and by any cause, known or unknown -- and amply demonstrates why the Amended Complaint is rife with alleged acts of violence that are not even remotely linked to any action by Arab Bank. *See* Website at FAQs 1.

### The Linde Claims

Perhaps the clearest examples in this regard are the claims asserted on the behalf of name plaintiff John Linde, Jr. ("Linde"). The claims pertaining to Linde's death in northern Gaza in October 2003 are asserted by his widow, individually, and as representative of his estate, and by four additional plaintiffs, as family members alleging related emotional injury (collectively, the "Linde plaintiffs"). Am. Compl. ¶¶ 5-32. The Linde plaintiffs state one, and only one, allegation regarding the circumstances of Linde's death, as follows:

> John Linde, Jr. and two other DynCorp employees were part of a security detail escorting U.S. diplomats on their way to interview Palestinian applicants for Fulbright scholarships when the car he was in was blown up by a remote-controlled bomb near the Beit Hanoun junction in northern Gaza on October 15, 2003.

Am. Compl. ¶ 13 (emphasis added).

Nowhere is there any allegation regarding the person or persons alleged to be responsible for the act which is pled, nor even any allegation regarding any terrorist group, or groups, broadly claimed to bear some sort of responsibility for the act which is pled. While the incident alleged by the Linde plaintiffs is tragic in all respects, there is simply no allegation, nor even any inference to be drawn, suggesting any connection to Arab Bank. Plaintiffs have stated no allegation regarding the person or group that caused Linde's death, and thus have not alleged -

13

- indeed, cannot allege -- any conceivable link to Arab Bank.  These claims cannot possibly withstand even the lightest scrutiny.

### The Parsons Claims

The plaintiffs also allege that "two other DynCorp employees were part of [the] security detail" in which Linde was killed.  Am. Compl. ¶ 13.  With regard to that incident, only the above-referenced claim pertaining to Linde was asserted in the initial complaint.  In the Amended Complaint, however, related claims were then added, with respect to Mark Parsons ("Parsons"), who is alleged to have been killed in the same incident.  Am. Compl.  ¶ 34.  Yet, in the underlined amended pleading, no further allegations have been stated with regard to the cause of the incident or the identification of any person or group purportedly responsible, or any purported connection to Arab Bank.  Rather, the insufficiency of the claims originally stated by the Linde plaintiffs is reflected again in the Amended Complaint with respect to Parsons.[5]

The allegations of the Linde and Parsons plaintiffs are not alone in their failure to plead any connection to Arab Bank, or even to any known person or group alleged to bear direct responsibly -- an obviously necessary predicate.  Similar insufficiencies, although in relation to different circumstances, are as just as apparent with regard to the allegations pertaining to the murder of Jacob Mandell ("Mandell"), near his home in Israel.

### The Mandell Claims

The claims, brought by Mandell's parents individually and as representatives of the decedent's estate, are based upon what are perhaps the most reprehensible events in the Amended Complaint.  Plaintiffs assert that Mandell, an eighth grade student, had skipped school and, with an unnamed friend who does not appear as a plaintiff in this suit, then went hiking near

---

[5]   There is no claim stated by any person on behalf of Parsons, but rather only a claim for emotional injury stated by Parsons' brother, Matthew.  Am. Compl. ¶ 35 & Caption.

a series of caves, where both boys were murdered. Am. Compl. ¶¶ 184-89. Although the Mandell plaintiffs initially allege that Mandell and his friend were "murdered by Palestinian terrorists," Am. Compl. ¶ 186, they subsequently concede, by their own additional allegations, that the identity of the assailants -- and even the affiliation of the assailants, if any such affiliation exists -- is unknown:

> A splinter Palestinian terrorist group calling itself "Palestinian Hezbullah" claimed responsibility for the murders, but the murders have been widely credited to the "Popular Resistance Committees." The killers have not yet been apprehended.

Am. Compl. ¶ 189. Thus, as pled, this terrible murder may have been the work of agents of "Palestinian Hezbullah," or it may instead have been the work of agents of the "Popular Resistance Committees" (and it may have been the heinous act of one or two neighboring thugs, or of an entire mob with no tie whatsoever to organized terrorism). More importantly, however, for the instant purposes, there is no specific allegation in the Amended Complaint linking either of these groups to Arab Bank in any way.

A sad fact of the Middle East is that it has been and continues to be fraught with violence -- both by the acts of organized terrorists and by those of ordinary residents as well. No matter how horrific the surrounding circumstances, and this incident is perhaps the most appalling of all, to suggest that Arab Bank is liable for these unexplained deaths -- in the absence of even the identity of an assailant, let alone any potential, alleged connection to Arab Bank -- is an utterly unsustainable claim.

The claims of the Linde, Parsons and Mandell plaintiffs all suffer from these same pleading deficiencies.

## The Kushner Claims

The claim of plaintiff Gloria Kusher ("Kusher"), alleging injury in connection with a suicide bombing in an Israeli outdoor market, Am. Compl. ¶¶ 209-17, suffers from similar pleading deficiencies. Here, however, the Kusher plaintiffs do not allege that one group claimed responsibility, rather, they allege that *two different* groups -- HAMAS and the Popular Front for the Liberation of Palestine -- *both* claimed credit for the very same attack. Am. Compl. ¶ 211. While plaintiffs may be expected to counter that such matters are irrelevant, because some group or person was ultimately responsible, such argument should not be taken seriously. To allege that a fully accredited and regulated bank, operating in 30 countries, has knowingly aided and abetted acts of violence and murder, could not be more grave. To contend that only *someone* committed these acts could not provide a sufficient nexus even for a commercial case, let alone a case containing allegations as serious as here, under the legal principles discussed further below.

Even if the bombing were in fact the act of the Popular Front for the Liberation of Palestine, for example, it is notable that here too, as with Palestinian Hezbullah and the Popular Resistance Committees, the Amended Complaint is devoid of any allegation concerning any tie between Arab Bank and the Popular Front for the Liberation of Palestine and, again, there is not even a single further reference to the Popular Front for the Liberation of Palestine anywhere in the Amended Complaint. Under all the circumstances, such allegations are more than unsustainable, more than careless, more than frivolous – they are irresponsible.

## The Fenichel and Nevies Claims

Just as no connection is alleged between any activity of Arab Bank and the Popular Front for the Liberation of Palestine, it is also evident from the face of the Amended Complaint, as noted above, that a similar lack of connection warrants dismissal of the claims pertaining to acts for which AAMB purportedly claimed responsibility. There are no allegations

16

linking Arab Bank to AAMB in any way. The claims asserted by the four Fenichel plaintiffs, Am. Compl. ¶¶ 242-61, and by the two Nevies plaintiffs, Am. Compl. ¶¶ 262-68, fall within this category of claims related to AAMB.

On its face, the Amended Complaint clearly fails to state claims for relief on behalf of the Linde, Parsons, Mandell, Kushner, Fenichel and Nevies plaintiffs because they do not contain any allegations that link defendant Arab Bank to any of the alleged wrongful acts. All claims asserted by these plaintiffs, therefore, should be dismissed.

C.   **Claims One Through Seven Should Be Dismissed As To All Plaintiffs Because The Amended Complaint Does Not Allege That They Were Injured By Reason Of Arab Bank's Alleged Wrongdoing In Connection With The "Insurance Scheme"**

Claims One through Seven should be dismissed because plaintiffs have failed to allege that Arab Bank caused the harm for which they seek compensation. Plaintiffs are required to allege that they have been injured "by reason of" Arab Bank's purported wrongdoing in connection with "insurance payments." Because plaintiffs' Section 2333 claims fail to allege causation, they should be dismissed.

No court in this Circuit has addressed the meaning of the phrase "by reason of" in Section 2333 of the ATA. However, courts in this Circuit and elsewhere have interpreted identical language in the private right of action provisions of RICO and the Clayton Act. These interpretations are highly persuasive regarding the meaning of the phrase "by reason of" in Section 2333(a) because Section 2333(a) is analogous to the private rights of action provided for in RICO and the Clayton Act.[6]

---

[6]   The private right of action under the ATA is analogous to a RICO private right of action because each must be premised on a violation of criminal law, each must allege and prove injury "by reason of" criminal violations, and the unusual remedies of treble damages and cost of suit, including attorney's fees, are available in each case. *See* 18 U.S.C. § 2333(a) and 18 U.S.C. § 1964(c). A private right of action pursuant to the Clayton Act shares the same characteristics except that it is not premised exclusively on violations of criminal law. *See* 15 U.S.C. § 15.

In order to allege they have been injured "by reason of" Arab Bank's alleged acts, plaintiffs should be required to allege both cause in fact and proximate causation. *See Holmes v. Securities Investor Protection Corp. et al.*, 503 U.S. 258, 267 (1992) (interpreting the phrase "by reason of" in civil RICO to require causation in fact and proximate causation). The test for causation in fact is easy to state: "An act or omission is not regarded as a cause of an event if the particular event would have occurred without it." W. Prosser & W. Keeton, *The Law of Torts* § 41 at 265 (5th ed. 1984). As to proximate cause, this Court should apply the same test that this Circuit employs for civil claims under RICO and the Clayton Act. Under this test, a defendant's conduct must be a "substantial factor" in the sequence of responsible causation, the plaintiff's injury must be "reasonably foreseeable or anticipated as a natural consequence," and there must be some direct relation between the injury asserted and the injurious conduct alleged. *See, e.g., First Nation Bank v. Gelt Funding*, 27 F.3d 763, 769 (2d Cir. 1994) (private civil RICO claim); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 23-27 (2d Cir. 1990) (private civil RICO claim); *cf. Billy Baxter Inc., v. The Coca-Cola Co.*, 431 F.2d 183, 187 (2d Cir. 1970) (quoting

---

Set forth below are the provisions granting a private right of action in the ATA, RICO and the Clayton Act. Section 2333(a) of the ATA provides:

> Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

18 U.S.C. 2333(a). Section 1964(c) of RICO provides in relevant part:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee, except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962.

18 U.S.C. 1964 (c). And Section 4 of the Clayton Act provides in relevant part:

> . . . [A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a).

18

*Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 702 (1962) (private

civil Clayton Act claim).  As in the case of RICO and the Clayton Act, the "by reason of"

requirement in Section 2333(a) of the ATA mandates that at least some limitation be employed

to ensure that liability is imposed only on those causes which are sufficiently connected with the

result and of sufficient significance that the law is justified in imposing liability.  Otherwise,

Section 2333(a) would have essentially unlimited reach and any act which turns out to facilitate

terrorism, regardless of how remote that act may be from the terrorist attack itself, could result in

joint and several liability for treble damages and cost of suit.[7]

---

[7]   In discussing proximate cause under Section 2333(a), the Seventh Circuit in *Boim* refers only to a foreseeability test.  *Boim v. Quaranic Literacy Institute*, 291 F.3d 1000, 1011-12 (7th Cir. 2002).  The *Boim* court relied upon a Seventh Circuit decision, *Suzik v. Sea-Land Corp.*, 89 F.3d 345, 348 (7th Cir. 1996), in which a federal court in a diversity matter applied Illinois state law of proximate cause.  The *Boim* court also cited sections of the *Restatement (Second) of Torts* -- a restatement of the state common law of torts – which address intervening and superceding causes.

As an initial matter, the *Boim* court incorrectly looked to state law as the sole source for interpreting the "by reason of" phrase in Section 2333(a).  In interpreting a federal statute, federal courts engage in interstitial lawmaking.  Because of federal separation of powers and due process concerns, a federal court should seek to reach conclusions that are clearly suggested by federal enactments – constitutional or congressional.  *See, e.g., Clearfield Trust Co. v. United States*, 318 U.S. 363, 366 (1943) (After observing that the authority of United States to issue a check for services rendered under the Federal Emergency Relief Act of 1935 "had its origin in the Constitution and statutes of the United States," the Court asserted that "[t]he duties imposed upon the United States and the rights acquired by it as a result of the issuance find their roots in the same federal sources.") (footnote omitted); *cf. United States v. Standard Oil Co. of California*, 332 U.S. 301, 313 (1947) ("But in the federal scheme our part in that work, and the part of the other federal courts, outside the constitutional area is more modest than that of state courts, particularly in the freedom to create new common-law liabilities, as *Erie R. Co. v. Tompkins* itself witnesses.") (citation omitted).

Moreover, the Congress that enacted Section 2333(a) should be deemed to have intended that the phrase "by reason of" have the same meaning that courts had already given to it in connection with civil RICO and the Clayton Act.  *See, e.g., Holmes*, 503 U.S. at 267-68 ("We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in section 7 of the Sherman Act, and later in the Clayton Act's section 4 [by reason of].  It used the same words [in RICO], and we can only assume it intended them to have the same meaning that courts had already given them.") (citations omitted).

In any event, were this Court to look to the common law of New York regarding proximate cause for purposes of interpreting the "by reason of" language in Section 2333(a), it would arrive at the same result required by this Circuit's RICO and Clayton Act cases.  Courts in New York look to both the foreseeability of harm and whether a defendant's activities were a substantial cause in creating the harm in order to determine whether proximate cause exists.  For example, in *Bonsignore v. The City of New York*, 683 F.2d 635, 638 (2d Cir. 1982), the Second Circuit, applying New York common law, limited a defendant's liability for negligence to those foreseeable consequences that the defendant's negligence was a substantial fact in providing.  Similarly, in *Pelman v. McDonald's Corp.*, 237 F.Supp. 2d 512, 538 (S.D.N.Y. 2003), the court, in applying New York common law, held that "[i]n order to show proximate cause, a plaintiff must establish that the defendant's conduct was a substantial

Plaintiffs' Section 2333 claims are deficient because they fail to allege that Arab Bank's alleged conduct with respect to the purported "insurance payments" was a cause in fact of their harm. Specifically, plaintiffs do not allege who the individual terrorists are who directly injured them. Plaintiffs do not allege that the terrorists who directly injured them were aware of the "insurance scheme." Plaintiffs do not allege that the terrorists who directly injured them were motivated in any respect by any "insurance payments" or any other financial inducement. Plaintiffs also do not allege that any relative of any terrorist who directly injured them ever elected to collect any "insurance payment" from Arab Bank or any other organization.[8] Plaintiffs are unable to make these allegations even though they claim that an internet website, newspaper advertisements and annual reports of the Saudi Committee (the organization that allegedly finances the entire "insurance scheme") list "the names of Palestinian prisoners to whom it provided terrorism benefits as well as the names of the Palestinian martyrs (including the names of those killed in suicide bombings) whose families received terrorism death benefits," and "numerous 'martyrs' whose cause of death was listed as 'suicide attack.'" Am Compl. ¶¶ 331, 332, 338. Plaintiffs are also unable to make these allegations even though the Al-Ansar Charity allegedly maintains a similar website. Am. Compl. ¶¶ 351-53.

Plaintiffs' Section 2333 claims are also deficient because they fail to allege that Arab Bank's alleged conduct with respect to the purported "insurance payments" was a

---

whether an act constitutes a substantial cause of the alleged harm, including "the aggregate number of actors involved which contribute towards the harm and the effect which each has in producing it" and "whether the situation was acted upon by other forces for which the defendant is not responsible." *See, e.g., Transamerica Ins. Fin. Corp. v. Fireman's Fund Ins. Co.,* 1992 U.S. Dist. LEXIS 17633, at *26, No. 89 Civ. 8625 (PNL), 1992 WL 350800, at *9 (S.D.N.Y. Nov. 19, 1992) (quoting *Mack v. Altmans Stage Lighting Co.,* 98 A.D.2d 468, 470-71, 470 N.Y.S.2d 664, 667 (2d Dep't 1984) (citing *Restatement (Second) of Torts* § 433)).

[8]     The alleged terrorists specifically identified in paragraphs 315 and 333 of the Complaint are not alleged to have any connection to any of the attacks on any of the plaintiffs described in paragraphs 5 through 268 of the Complaint. The purported terrorist identified in paragraph 352 of the Complaint is alleged to have caused harm only to the sister (also a plaintiff) of plaintiff Chaya Ben-Zaken Zilberstein. Am. Compl. ¶¶ 202-207.

proximate cause of their harm. Because they are unable to connect the terrorists who allegedly harmed them to Arab Bank, plaintiffs allege generally that Arab Bank is responsible for <u>all</u> Palestinian terrorist acts since October 2000 and therefore must be responsible for the attacks on Plaintiffs. Thus, the Amended Complaint alleges "[b]y knowingly and actively participating in this process, Arab Bank and its co-conspirators, the Saudi Committee and others, have <u>knowingly aided and abetted each and every terrorist act committed by Palestinian terrorists</u> <u>since the formation of the Saudi Committee's universal insurance coverage scheme in October</u> <u>2000</u> in violation of 18 U.S.C. § 2332, 18 U.S.C. § 2339A, 18 U.S.C. § 2339B and 18 U.S.C. § 2339C." Am. Compl. ¶ 342 (emphasis added). Thus, according to plaintiffs, even if the terrorists who attacked them and their relatives were not motivated by the "insurance scheme," Arab Bank is somehow responsible for plaintiffs' harm because it has somehow provided an incentive to <u>all</u> terrorists through its alleged actions.

If proximate cause imposes any limit on liability for claims made pursuant to Section 2333(a) of the ATA, then plaintiffs' allegations here regarding Arab Bank's alleged wrongdoing in connection with the "insurance scheme" are deficient. In considering similar claims under civil RICO, courts have refused to extend liability on the basis of such a remote and disconnected act.

For example, in *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113 (2d Cir. 2003), this Circuit upheld the dismissal of a civil RICO claim because the alleged racketeering activities by the banks there were not a substantial factor in the alleged harm. In *Lerner*, the plaintiffs, who had been defrauded by an attorney, brought a civil RICO suit against banks in which their funds had been placed in escrow, claiming that the banks had engaged in fraud by providing the wrong reason for the return of bounced checks and by failing to report the overdrafts to the state

disciplinary committee. Plaintiffs' theory was that if the banks had put the proper designation on the checks and reported the overdrafts to the state disciplinary committee, the fraud would have been uncovered. The court in *Lerner* found that the banks' alleged activity could not be a substantial cause of the plaintiffs' injury. *Id.* at 122-24.

Similarly, in *In re Gas* Reclamation, *Inc. Securities Litigation*, 663 F. Supp. 1123 (S.D.N.Y. 1987), the court dismissed a civil RICO claim against an accounting firm which was based on the accounting firm's allegedly providing engagement letters to an investment company that defrauded investors. The court found that the alleged acts were not substantial and were too attenuated to give rise to the inference of proximate cause under RICO. *Id.* at 1125-26. *See also Oki Semi Conductor Co. v. Wells Fargo*, 298 F.3d 768, 774, (9th Cir. 2002) (dismissing plaintiff's claims against a bank that allegedly laundered the proceeds of a theft on the grounds that the direct and proximate cause of plaintiff's loss was the theft and not the money laundering).

Even taking plaintiffs' claims as true, plaintiffs have failed to allege that Arab Bank caused the harm to them for which they seek compensation, and have failed to allege that Arab Bank acted knowingly and intentionally. Accordingly, the Section 2333 claims should be dismissed for failure to state a claim.

**D. Claims One Through Seven Should Be Dismissed As To All Plaintiffs Because The Amended Complaint Does Not Allege That Arab Bank Knowingly and Intentionally Maintained Bank Accounts For Purported "Charity Fronts Controlled By HAMAS" Or Directly For HAMAS**

Section 2333(a) of Title 18, upon which plaintiffs base their Section 2333 claims, provides:

§ 2333. Civil remedies

> (a)      Action and jurisdiction. –Any national of the United
> States injured in his or her person, property, or business by reason
> of an act of international terrorism, or his or her estate, survivors,
> or heirs, may sue therefore in any appropriate district court of the
> United States and shall recover threefold the damages he or she
> sustains and the cost of the suit, including attorney's fees.

(emphasis added).   The term "international terrorism," which is referred to in Section 2333, is

defined at 18 U.S.C. § 2331(1).  Section 2331(1) provides in part:

> § 2331. Definitions
> As used in this chapter—
> (1) the term "international terrorism" means activities that—
>      (A)      involve violent acts or acts dangerous to human life
> that are a violation of the criminal laws of the United States or of
> any State, or that would be a criminal violation if committed within
> the jurisdiction of the United States or of any State;

Thus, a private litigant's civil claims under Section 2333 must be based on acts which, among

other things, are violations of criminal law (or would be violations but for jurisdictional issues).

*Cf. Republic of Panama v. BCCI Holdings*, 119 F.3d 935, 948-49 (11th Cir. 1997) ("Section

1961 requires that a RICO plaintiff establish that a defendant could be convicted for violating

any of its predicate statutes . . . .   Therefore, in order to survive a motion to dismiss, a plaintiff

must allege facts sufficient to support each of the statutory elements for at least two of the

pleaded predicate acts.") (citations omitted).

Here, the Section 2333 claims are premised on violations of 18 U.S.C. §§ 2332,

2339A, 2339B(a)(1)(2) and 2339C, which are also part of the ATA.[9]  The Section 2333 claims

allege aiding and abetting and conspiracy (first and second claims for relief) as well as direct

substantive violations (third through seventh claims for relief).

_____

[9]      Sections 2332, 2339A, 2339B(a)(1) and 2339C of Title 18 proscribe criminal conduct.   Section
2339B(a)(2) does not.   As is discussed more fully below, plaintiffs' fifth claim for relief, which is expressly
premised on a violation of Section 2339B(a)(2), should also be dismissed on the additional ground that Section
2339B(a)(2), which does not in any manner proscribe criminal conduct, cannot provide a basis for a private litigant's
civil claims under Section 2333.

In order to allege that Arab Bank has aided and abetted violations of, and conspired to violate Section 2332 (which deals with criminal penalties for homicide and other physical violence), plaintiffs must assert, among other things, that Arab Bank acted knowingly and intentionally. *See, e.g., Boim v. Quaranic Literacy Institute,* 291 F.3d 1000, 1011, 1019-21 (7th Cir. 2002) (imposing civil liability only on aiders and abettors who "knowingly and intentionally" funded acts of terrorism); *see also United States v. Salameh,* 152 F.3d 88, 145-46 (2d Cir. 1998) (essential elements of crime of conspiracy include that defendant "knowingly participated in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy"); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 26 n.4 (2d Cir. 1990) (civil RICO complaint "must allege some factual basis for a finding of a conscious agreement among the defendants"); *United States v. Wiley,* 846 F.2d 150, 154-55 (2d Cir. 1988) (reversing aiding and abetting conviction because insufficient evidence defendant knew of wire fraud or intended to contribute to its success); *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C. Cir. 1983) (aider and abettor must be "generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance" and "knowingly and substantially" assist the principal violation); *Metro Furniture Rental v. Alessi,* 770 F. Supp. 198, 201 (S.D.N.Y. 1990) (dismissing a civil RICO conspiracy claim against bank and accounting firm which alleged they had facilitated the embezzlement of monies by a corporate officer where plaintiff failed to allege facts demonstrating a knowing agreement among co-conspirators to commit predicate acts).

Similarly, the third through the seventh claims for relief, which assert direct substantive violations of the ATA, must also allege that Arab Bank acted knowingly and intentionally. 18 U.S.C. §§ 2339A(a) ("knowing or intending"), 2339B(a)(1) ("knowingly"),

24

2339C(a)(1) ("unlawfully and willfully"); *United States v. Sattar*, 272 F. Supp. 2d 348, 356 (S.D.N.Y. 2003); *United States v. Al Arian*, 329 F. Supp. 2d 1294, 1298-99 (M.D. Fl. 2004).

Because plaintiffs' Section 2333 claims allege only that Arab Bank "knew or recklessly disregarded" knowledge of the alleged wrongdoing. Am. Compl. ¶¶ 379, 382, 388, 398, 401, 418, these claims should be dismissed. Plaintiffs' failure to allege the requisite *mens rea*, without more, warrants the dismissal of their Section 2333 claims.

However, the Section 2333 claims are also deficient because they fail to provide factual allegations that support the assertion that Arab Bank knowingly and intentionally provided banking accounts to purported HAMAS agents. This is true of both the account allegedly maintained for the purported "official" internet website of HAMAS (Am. Compl. ¶¶ 345-47) as well as the accounts allegedly maintained for purported "charitable front organizations controlled by HAMAS." Am. Compl. ¶¶ 343-73.

### So-Called Charitable Organizations

Plaintiffs' allegations relating to Arab Bank's knowledge and intent concerning the charitable organizations are deficient for several reasons. First, plaintiffs do not allege that any Arab Bank officer, director or employee had direct involvement with any of the charitable organizations. Plaintiffs' allegations are based only on information which they assert is publicly available through internet websites, newspaper articles and other media. These allegations are deficient because they do not assert that any Arab Bank employee has actual knowledge of the internet websites and other media that supposedly demonstrate that the charitable organizations are HAMAS agents. Plaintiffs also concede that "[e]ach of these front organizations officially holds itself out to the public as a charitable organization with a purely humanitarian and benign purpose." Am. Compl. ¶ 370.

25

Second, plaintiffs' allegations are also deficient because offices of the European Union and U.S. governmental agencies (such as the Office of Foreign Assets Control or OFAC), which identify terrorist organizations on published lists to enable financial institutions to block these terrorist organizations' monetary transactions, have not identified any of the charitable organizations referred to in the Amended Complaint (with the exception of the Holy Land Foundation For Relief and Development, which is discussed more fully below). If these governmental organizations, which have access to public and non-public information regarding terrorist organizations, have not determined that these charities are controlled by HAMAS, then the "public" information referred to in the Amended Complaint cannot provide an adequate basis for alleging that Arab Bank knew the charities are HAMAS agents. Allegations that such information "should be known" to Arab Bank (*see, e.g.*, Am. Compl. ¶ 338) are insufficient to state a claim under Section 2333(a). A copy of the OFAC List, dated as of November 10, 2004, which is published by the Office of Foreign Assets Control of the U.S. Department of the Treasury pursuant to Executive Order No. 12947 (60 Fed. Reg. 5079 (Jan. 23, 1995)), and Executive Order No. 13224 (66 Fed. Reg. 49079 (Sept. 23, 2001)). *See* http://www.treas.gov/offices/enforcement/ofac/sdn/t11sdn.pdf. As is discussed more fully below, the OFAC list includes organizations and individuals identified by OFAC as well as organizations and individuals included on all other lists of terrorist and criminal organizations maintained by the U.S. government.[10]

---

[10]     In the United States, the Department of the Treasury, the Secretary of State, the Department of Homeland Security, the Department of Justice and the Office of the President are involved in identifying terrorist organizations in order to deter terrorist financing and money laundering.

     The Secretary of State formally designates terrorist organizations to the Foreign Terrorist Organization list (the "FTO list") pursuant to section 219 of the Immigration and Nationality Act, codified at 8 U.S.C. § 1189. Organizations placed on the FTO list are subject to financial and immigration sanctions, including the blocking of assets. Several federal agencies contribute to an administrative process that results in an organization being designated as a "foreign terrorist organization." *See* 8 U.S.C. § 1189; Exec. Order No. 13224, Section 2(b) (66 Fed. Reg. 49079 (Sept. 25, 2001)). The intelligence community gathers non-classified as well as classified information

regarding an organization. The Department of Justice then reviews that information to determine the weight of the legal evidence against the organization, and consults with the Department of Homeland Security. After the Secretary of State designates an organization as a foreign terrorist organization, the Treasury Department determines whether to block assets held by the organization. *See* Audrey Kurth Cronin, *"The 'FTO List' and Congress: Sanctioning Designated Foreign Organizations,"* Congressional Research Service of the Library of Congress, Oct. 21, 2003 (published on the U.S. State Dep't website at http://fpc.state.gov/documents/Organization/25996.pdf) (hereinafter, the *"Cronin Report"*). *See* http://europe.eu.int/comm/externa_relations/cfsp/sanctions/list/version4/global/e_ctlview.html.

The Secretary of State also determines the members of the "state sponsors of terrorism" list -- a list including Cuba, Iran, Iraq, Libya, North Korea, Sudan and Syria -- pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405 (j)), section 40A of the Arms Export Control Act (22 U.S.C. § 2781), and section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. § 2371). *Cronin Report*, at CRS-3. Additionally, the State Department maintains the "Terrorist Exclusion List," pursuant to section 411 of the USA PATRIOT Act (8 U.S.C. § 1182), by which the Secretary of State, in consultation with the Department of Justice, prevents terrorist organizations from entering the United States. *Cronin Report*, at CRS-5.

President William J. Clinton invoked the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*, in creating the "Specially Designated Terrorists" list (the "SDT" list) in 1995 under Presidential Executive Order 12947. *Cronin Report*, at CRS-4. This list specifically identified individuals and entities which threatened the Middle East peace process at the time. President George W. Bush, invoking the same powers, created the "Specially Designated Global Terrorists" list (the "SDGT" list) after September 11, 2001, under Presidential Executive Order 13224. *Id.* The SDGT list was designed to block "all property and interests in property" of the various SDGTs. *Id.* The Treasury Department is empowered to freeze the assets of individuals and entities appearing on the SDT list and the SDGT list.

Within the Department of the Treasury, there are three offices involved in monitoring terrorist money laundering: the Office of Foreign Asset Control ("OFAC"); the Office of the Comptroller of the Currency ("OCC"); and, the Financial Crimes Enforcement Network ("FinCEN").

OFAC maintains the "Specially Designated Nationals and Blocked Persons" list (the "OFAC list"), which is a comprehensive list designed to aid financial and governmental organizations in the anti-money laundering and anti-terrorism financing programs. Exec. Order No. 12947 (60 Fed. Reg. 5079 (Jan. 23, 1995)); Exec. Order No. 13224 (66 Fed. Reg. 49079 (Sept. 23, 2001)); 31 C.F.R. §§ 594-97. OFAC works with financial institutions to freeze assets of organizations and individuals included on the OFAC list. The OFAC list includes individuals and organizations identified by OFAC as well as individuals and organizations included on all other lists of terrorist and criminal organizations maintained by the U.S. government, such as the FTO list, the SDT list and the SDGT list. *Id.* The OFAC list is publicly available, and financial organizations are required to block the assets of the individuals and organizations appearing on the list, and to report those actions to OFAC. 31 C.F.R. §§ 501.601-501.606. OFAC has subpoena power to require financial institutions to report all details regarding assets held in the U.S. by foreign governments or individuals. 31 C.F.R. 501.602. OFAC additionally utilizes its investigative powers to identify foreign organizations for placement on the OFAC list, with input from the Office of the President, the Department of Homeland Security, the Department of Justice, the OCC and FinCEN. *See, e.g.,* the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706, 31 C.F.R. Parts 537-39, 592, 595-97, and the Antiterrorism and Effective Death Penalty Act, enacting 8 U.S.C. § 219, 18 U.S.C. § 2332(d) and 18 U.S.C. §§ 2339A and B. The current OFAC list is over 160 pages long and identifies over 4100 organizations and individuals.

The OCC regulates national banks and branches of foreign banks and oversees their compliance with U.S. banking laws, including the Bank Secrecy Act (31 U.S.C. § 5311 *et seq.*) and the USA PATRIOT Act (8 U.S.C. § 1182).

FinCEN is a network designed to assist U.S. and international law enforcement agencies in investigating money-laundering and terrorism financing pursuant to the Bank Secrecy Act ("BSA") and the USA PATRIOT Act, 31 U.S.C. §§ 5311-5330, and Pub. L. 107-56. FinCEN functions as the central clearinghouse for federal law enforcement agency inquiries into financial organizations, particularly regarding terrorism financing operations and money laundering schemes. *See* Section 314(a) of the USA PATRIOT Act, 31 C.F.R. §§ 103.100-110. FinCEN also requires financial institutions to keep various records and to file reports, such as Suspicious Activity Reports ("SARs") and Currency Transaction Reports ("CTRs"), and may levy civil penalties for failure to comply with the

Third, plaintiffs' allegation that certain of the charitable organizations referred to in the Amended Complaint "have all been identified by United States Department of Justice as HAMAS front organizations," Am. Compl. ¶ 348, does not support a claim that Arab Bank acted knowingly and intentionally in any manner related to plaintiffs' alleged harm here. The same is true for plaintiffs' allegation that "[Holy Land Foundation For Relief and Development (HLF)] and its officers have been criminally indicted in the United States District Court for the Northern District of Texas for providing material support to a designated Foreign Terrorist Organization (HAMAS) -- including for specific transactions involving payments made by HLF to [certain charities listed in the Amended Complaint]." Am. Compl. ¶ 356. Plaintiffs' allegations are misleading and deficient because they omit critical information from the document they purport to summarize. Plaintiffs' allegations are based on an indictment that does not mention Arab Bank and that was returned on January 26, 2004, many months and in some cases years after the terrorist attacks that are the subject of the Amended Complaint. The indictment cannot, as a matter of simple logic, provide any basis for alleging here that Arab Bank intentionally maintained bank accounts for charitable organizations that it knew were controlled by HAMAS

---

BSA. 31 C.F.R. §§ 103.20, 103.22. FinCEN also maintains centralized databases containing this information and makes it available for use by law enforcement agencies in tracking terrorism financing as well as other financial crimes. 31 C.F.R. § 120 *et seq.*

The international community has also taken measures to combat money laundering and terrorism financing. The European Union provides financial institutions and governmental authorities with a publicly available list, which is similar to the OFAC list, known as the "Electronic List of Persons and Entities Subject to Financial Sanctions" (the "European Union list"). The European Union list identifies individuals and organizations whose assets are required to be blocked, frozen or otherwise prohibited, pursuant to the European Union Common Foreign & Security Policy ("CFSP") and Article 11 of the Treaty on European Union. The European Union obligates financial organizations to freeze all funds belonging to foreign terrorist organizations identified on the European Union list through regulations binding on all member nations and their financial institutions therein. *See, e.g.,* Common Position 2002/402/CFSP, O.J. (L 139), May 25, 2002, p. 4; Council Regulation (EC) No. 881/2002, O.J. (L 139), May 29, 2002, p. 9; Common Position 2001/931/CFSP, O.J. (L 344), Dec. 28, 2001, p. 93; Council Decision 2004/306/EC, O.J. (L 99), Apr. 3, 2004, p. 28; and Council Decision 2003/48/JHA, O.J. (L 16), Jan. 1, 2003, p. 68. European Union regulations regarding individuals or organizations designated as foreign terrorists are binding on European Union member nations pursuant to Articles 60, 301 and 308 of the treaty establishing the European Community.

on or prior to the terrorist attacks alleged here. In other words, Arab Bank cannot be charged with awareness of the allegations set forth in the indictment at the time of the events at issue here. Equally important, the Amended Complaint does not allege that Arab Bank provided any banking services to Holy Land Foundation For Relief and Development at any time _after_ it was included on the OFAC list or the EU list. _See_ Exhibits A and B hereto.

### HAMAS Account

The Amended Complaint's allegation that Arab Bank allegedly intentionally and knowingly maintains a bank account for HAMAS is also insufficient. Am. Compl. ¶¶ 345-47. According to the Amended Complaint, there is an advertisement on a website which solicits funds to support the website (called The Palestinian Information Center) and directs that the funds be sent (mentioning only the account number) to Al-Mazra Branch Account # 3-810-622473-0330 at the Arab Bank in Beirut. Am. Compl. ¶ 346. The Amended Complaint also asserts that the U.S. Department of Justice has "identified the website: www.palestine-info.com as the 'official' website of HAMAS." _Id._ Based on these "premises," the Amended Complaint concludes that Arab Bank "knowingly provides banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut which collects funds directly in the name of HAMAS." Am. Compl. ¶ 345. Because this conclusory allegation does not follow from the premises asserted, it does not provide a basis for asserting the Section 2333 claims against Arab Bank.

First, the Amended Complaint does not provide the most basic information about the Department's purported identification of the website as the official website of HAMAS – the Amended Complaint neither specifies the date when the Department made the purported statement, nor does it indicate where and in what form (_i.e._, official publication, speech of a Department employee, internal Department document) the Department supposedly made the

29

statement.  If the statement was made after the terrorist attacks at issue here, it can have no bearing on whether Arab Bank acted knowingly and intentionally.  If the statement was made in a forum which Arab Bank could not be expected to have knowledge of, the statement cannot provide a legal basis for alleging that Arab Bank knowingly provides banking services to HAMAS.

Second, the Amended Complaint does not allege that Arab Bank knew of the advertisement.  In any event, the Amended Complaint also does not allege that if Arab Bank knew of the advertisement that it also knew, based on the advertisement, that it was maintaining an account "on behalf of HAMAS and which HAMAS controls and maintains directly."  Nothing in the Amended Complaint's description of the website and the advertisement indicates that HAMAS sponsors them.

Third, the Amended Complaint does not allege that the bank account was opened in the name of HAMAS or that an individual affiliated with HAMAS opened it.  Given these deficiencies, the Amended Complaint fails to allege facts which support its claim that Arab Bank knowingly and intentionally maintains account # 3-810-622473-0330 for HAMAS.

Thus, the Section 2333 claims are deficient because they fail to provide factual allegations that support a claim that Arab Bank knowingly and intentionally provided banking accounts to purported HAMAS agents.

E.   **Claims One Through Seven Should Also Be Dismissed Because Plaintiffs Have Not Alleged That Any Upper-Level Management Of Arab Bank Participated In The Purported Unlawful Activity**

The Section 2333 claims do not allege that any officer or director of Arab Bank was involved in, approved or had knowledge of the purported "insurance scheme" or the alleged maintenance of accounts for HAMAS agents.  The Section 2333 claims simply refer to "Arab Bank," without specifying who allegedly took actions on Arab Bank's behalf.  Because the

Section 2333 claims fail to allege that Arab Bank's upper-level management participated in unlawful activity, these claims should be dismissed for failing to state a claim.

A corporation can only act through its officers and employees. Accordingly, each Section 2333 claim is based on the "imputed" or vicarious liability of Arab Bank. When interpreting the limits of imputed liability to a private litigant under RICO, District Courts in this Circuit have required plaintiffs to meet a "heightened standard" by pleading and demonstrating, *inter alia,* that "an officer or director had knowledge of, or was recklessly indifferent toward, the unlawful activity" before vicarious liability will be imposed on a corporate defendant. *See, e.g., Gruber v. Prudential-Bache Secs., Inc.,* 679 F. Supp. 165, 181 (D.Conn. 1987). Because as is discussed above civil claims under the ATA and RICO are analogous, the same limitations applicable to vicarious liability under RICO should apply to the instant case. Under this standard, plaintiffs' Section 2333 claims, as pleaded, must be dismissed.

District Courts in this Circuit have refused to impose traditional rules of "respondeat superior" on corporations in the civil RICO context. *See Id. at 180-81.* Though courts have articulated various rationales for this limitation, many courts have recognized that the strict application of vicarious liability principles would lead to anomalous results. *See, e.g., Id.* at 180 (noting that under the common-law doctrine of respondeat superior, innocent corporations would be liable for the actions of low-level employees). As one court aptly stated:

> [t]hat sort of respondeat superior application, perhaps permissible to establish ordinary civil liability, would be bizarre indeed as a means to warp the facts alleged in this case into the RICO mold. Under that theory, malefactors at a low corporate level could thrust treble damage liability on a wholly unwitting corporate management and shareholders.

*Parnes v. Heinold Commodities, Inc.,* 548 F. Supp. 20, 24 n.9 (N.D. Ill. 1982); *see also Banque Worms v. Luis A. Duque E Hijos, Ltda.,* 652 F. Supp. 770, 773-74 (S.D.N.Y. 1986) (rejecting

attempt to have corporation held liable for actions of an employee under RICO); *see generally, Rush v. Oppenheimer & Co., Inc.*, 628 F. Supp. 1188, 1194-95 (S.D.N.Y. 1985) (plaintiff cannot use "the theories of respondeat superior to accomplish an end-run around [RICO]).

In this Circuit, District Courts have held that "respondeat superior" liability is only permitted in a RICO claim when the defendant corporation can be fairly characterized as the "central" or "controlling" figure in the RICO enterprise. *See, e.g., Gruber*, 679 F. Supp. at 181-82; *see also Banque Worms*, 652 F. Supp. at 773 (analyzing cases involving "passive" corporations). Whether an entity may be characterized as a "central figure" is contingent on the complicity of high-level officers; only corruption that reaches the upper levels of the corporation assumes the status of corporate policy. *See id.; see also R.E. Davis Chem. Corp. v. Nalco Chem. Co.*, 757 F. Supp. 1499, 1522 (N.D.Ill. 1990) (dismissing section 1962(a) claim under RICO because plaintiff failed to allege that upper-level management participated in, or countenanced, the misconduct). As Judge Cabranes stated in *Gruber*:

> What constitutes a 'central figure' will vary with the factual circumstances of each case. In order to establish corporate liability under section 1962(c) . . . it is necessary to show that an officer or director had knowledge of, or was recklessly indifferent toward, the unlawful activity. Once knowledge or reckless indifference at this high corporate level has been determined, the court may then consider other factors, among them . . . whether the corporation directly and substantially benefited from the racketeering activity.

679 F. Supp. at 181.

The Amended Complaint is replete with claims that Arab Bank took various actions, but these vague references fall well short of establishing that a high-level Arab Bank employee knew about, or was complicit in, the alleged illegal activity. Without allegations sufficient to establish Arab Bank as a "central figure" in the unlawful activity alleged in the Amended Complaint, the Section 2333 claims against Arab Bank should be dismissed.

32

F.   **The Fifth Claim Should Also Be Dismissed For Failure to Allege A Violation Of Criminal Law As Required By 18 U.S.C. § 2331(1)(A)**

The Fifth Claim for Relief is brought pursuant to Section 2333(a), which provides for an express right of action in certain circumstances, and is premised on a violation of 2339B(a)(2).  Am. Compl. ¶¶ 399-402.  This Court should deny plaintiffs' motion because plaintiffs cannot bring a civil claim based on a violation of 18 U.S.C. § 2339B(a)(2).

Section 2333(a) provides:

§ 2333.  Civil remedies

(a)  Action and jurisdiction. –Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

(emphasis added).  The term "international terrorism," which is referred to in Section 2333, is defined at 18 U.S.C. § 2331(1).  Section 2331(1) provides in part:

§ 2331.  Definitions

As used in this chapter—

(1)  the term "international terrorism" means activities that—

(A)  involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(emphasis added).  Thus, a private litigant's civil claims under Section 2333 must be based on acts which, among other things, are violations of criminal law (or would be violations but for jurisdictional issues).

Plaintiffs' Fifth Claim for Relief is expressly premised on a violation of 18 U.S.C. § 2339B(a)(2).  Am. Compl. ¶¶ 399-402.  However, a violation of Section 2339B(a)(2) cannot provide grounds for a private litigant's civil claims under Section 2333 because Section

33

2339B(a)(2) does not in any manner proscribe criminal conduct.  Accordingly, the Fifth Claim

for Relief should be dismissed for failure to state a claim.  *See also* Defendant's Memorandum of

Law In Opposition to Plaintiffs' Motion for a Preliminary Injunction, dated November 1, 2004.

**G.**   **The Sixth Claim Should Also Be Dismissed For Failure to Allege That**
**Arab Bank "Collected Funds" In Violation Of 18 U.S.C. § 2339(1)(A)**

Plaintiffs' sixth claim for relief should be dismissed for the additional reason that

Arab Bank, as alleged, did not engage in conduct in violation of Section 2339C(a)(1).

The Amended Complaint alleges that Arab Bank, by providing financial services,

"collect[ed]" funds for terrorists in violation of Section 2339 and thus is liable under Section

2333. Am. Compl. ¶ 404.  The financial services Arab Bank allegedly provided were the

maintenance of bank accounts for HAMAS, certain so called "charitable front groups" for

HAMAS, PIJ and AAMB and unspecified family members of unnamed suicide bombers.

Importantly, the Amended Complaint does not allege that Arab Bank collected funds by

engaging in fundraising activities as many charities have been alleged to have done in other

cases. *See Boim*, 291 F.3d at 1003-04.

The core issue raised here is whether Arab Bank, by engaging in banking activity

has "collect[ed]" funds for terrorists as that term is used in Section 2339C(a)(1).  The Court

should answer this question in the negative because it is clear from the plain meaning of the text,

structure and legislative history of Section 2339C that the statute prohibits conduct associated

with the financing of and fundraising for terrorism, (*i.e.*, collecting, raising or receiving

donations or providing, donating or giving funds to terrorists), not the provision of banking

services, such as accepting deposits.

In determining the meaning of a statute, the court must first look to the text and

structure of the statute. *See, e.g.*, *Estate of Cowart v. Nickolas Drilling Company*, 505 U.S. 469,

475 (1992); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1987). Section 2339C(a)(1) entitled "[p]rohibitions against the <u>financing</u> of terrorism" provides, in relevant part, that it is a crime for one who:

> directly or indirectly, unlawfully and willfully <u>provides</u> or <u>collects</u> funds with the intention ....

18 U.S.C. § 2339C(a)(1) (emphasis added).

The title of the statute specifically states that Section 2339C prohibits the "financing" of terrorism. The Merriam-Webster dictionary defines financing to mean "to raise or provide funds or capital for." Merriam-Webster OnLine (last accessed Nov. 17, 2004) <http://www.m-w.com>. Consistent with its title, the *actus reus* under the statute is to "provide"[11] or "collect" funds for the purpose of being used by terrorists. The term "collect" is defined in the statute as to include "raising and receiving" of funds.

The terms "financing," "collect," "provide,"[12] "raising" and "receiving"[13] funds taken together in the context make clear that the statute is designed to prohibit the financing of terrorism, not to prohibit banks from providing financial services. Indeed, financiers and

---

[11]   The Amended Complaint does not allege that Arab Bank "provide[d] funds" to terrorists.

[12]   The term "provide" is defined by the statute to include "donating" and "giving" funds to terrorists. These verbs clearly connate that the law prohibits activities associated with the financing of terrorism.

[13]   The term "receiving" is admittedly a broad term that can encompass many things. However, a broad interpretation of that term to include providing financial services is inconsistent with the text of the statute and will frustrate the legislative intent. Moreover, the canon of statutory construction *noscitur a sociis ejusdem generis* instructs against such abroad reading. *Noscitur a sociis ejusdem generis* instructs that the term "receiving" should be interpreted consistently with it companion term "raising." As such, the reasonable interpretation of the term receiving is the receipt of funds that were raised in connection with the financing of terrorism. The term "receiving" should also be narrowly construed because of the rule of lenity so requires. The Supreme Court has repeatedly admonished that when deciding whether particular conduct is encompassed under a criminal statutes, courts should be guided by the principle of narrow interpretation, demanding that Congress' intention be set forth in clear and definite language so that a person of ordinary intelligence be given fair notice that his conduct is proscribed. *Dowling v. United States*, 473 U.S. 207, 213 (1985); *Williams v. United States* 458 U.S. 279, 290 (1982). Here, to hold that the term "receiving" funds -- under a statute designed to prohibit the "financing" of terrorism -- includes the acceptance of deposits by banks, would place banks in the cross hairs of prosecutors without sufficient warning.

fundraisers engage in the activities or conduct prohibited by the statute (*i.e.*, raising, receiving or collecting donations and providing, giving or donating funds to their causes.).

Arab Bank is not alleged to have engaged in these activities.   Unlike the defendants in *Boim*, Arab Bank is not alleged to have collected or raised money for terrorists. Instead, the Amended Complaint alleges simply that Arab Bank provided financial services to groups that allegedly collected funds.  But the provision of financial services is not prohibited by Section 2339C.  Had Congress intended to outlaw the provision of financial services to terrorists under Section 2339C(a)(1), it could have easily said so.  Indeed, Congress had already done so under Sections 2339A and 2339B of the same statute.  Tellingly, Congress did not include in Section 2339C(a)(1) the term "material support," which it defined in Sections 2339A and 2339B to include the provision of financial services.  Even more telling is that while Congress did not use the term material support in Section 2339C(a)(1), it did use it in another subsection of Section 2339C.  Congress' inclusion of the term in one part, but its exclusion in the other leads to the inescapable conclusion that Congress specifically intended that Section 2339C(a)(1) not prohibit the provision of banking services, such as accepting deposits.

This conclusion is also supported by the legislative history.  The legislative history establishes that the intent of Section 2339C was to criminalize fundraising for terrorism. *See, e.g.,* 147 CONG. REC. E2397-01 (daily ed. Dec. 19, 2001) (statement of Rep. Sheila Jackson-Lee) ("H.R. 3275 implements the International Convention for the Suppression of the Financing of Terrorism, which requires signatories to prosecute or extradite people who contribute to, or collect money for, terrorist groups."); *Hearing on the Implementation Legislation for the International Convention for the Suppression of Terrorist Bombings and the International Convention for the Suppression of the Financing of Terrorism Before the Subcomm. on Crime of*

36

*the House Comm. on the Judiciary,* 107th Cong. (2001), *available at* 2001 WL 1431760

(statement of Samuel M. Witten, Acting Deputy Legal Advisor, Dep't of State) ("The Terrorism

Financing Convention is aimed specifically at cutting off the resources that fuel international

terrorism….[T]he convention will obligate states to criminalize conduct related to the raising of

money and other assets to support terrorist activities.").

Because the financial services allegedly provided by Arab Bank do not fall under

the ambit of "collect[ing]" funds for terrorists as set forth in Section 2339C(a)(1), plaintiffs' sixth

claim for relief, must be dismissed.

**H.**     **The Eighth Claim Should Be Dismissed For Failure To State A Claim
        For International Infliction Of Emotional Distress**

As a final collection of six conclusory allegations in the Amended Complaint,

every plaintiff attempts to allege a common law tort claim for intentional infliction of emotional

distress ("IIED") against Arab Bank.  Am. Compl. ¶¶ 421-426.  The attempted IIED claim, on its

face, fails for the following reasons: (1) the Amended Complaint does not, as a factual matter,

allege the necessary elements of intent and causation against Arab Bank; and (2) with respect to

at least ten (10) of the plaintiffs who are allegedly apparently citizens of the State of New York,

the statute of limitations bars the attempted IIED claim.  Additionally, and where this Court

grants this motion with respect to the plaintiffs' claims arising under 18 U.S.C. § 2333, this Court

should decline to exercise supplemental jurisdiction over the plaintiffs' attempted state law tort

claim.

**1.**     **The Amended Complaint Fails To State An IIED Claim**

New York Law defines the basic elements of IIED as follows: "'a claim for

intentional infliction of emotional distress requires a showing of (1) extreme and outrageous

conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe

emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.'" *Moore v. City of New York*, 219 F. Supp. 2d 335 (E.D.N.Y. 2002) (quoting *Stuto v. Fleishman*, 164. F.3d 820, 827 (2d Cir. 1999)).[14]

**2.    The Amended Complaint Fails To Plead The Requisite Intent
And Causation Against Arab Bank, Because It Cannot**

Nothing in the Amended Complaint suggests or otherwise permits the rational inference that Arab Bank, through its banking business, intended to act (or for that matter, acted or caused any action) against the plaintiffs in any respect.   Under New York law, "[t]he gravamen of a cause of action for [IIED] is that the conduct complained of 'is especially calculated to cause, and does cause, mental distress of a very serious kind.'" *Green v. Liebowitz*, 118 A.D.2d 756, 500 N.Y.S.2d 146, 148 (2d Dep't 1986) (citing Prosser & Keaton, *Torts* §12 at 60 (5th Ed. 1984)).

The inquiry, however, does not end at this point.   Nothing in the Amended Complaint indicates that the acts about which the non-decedent plaintiffs complain were intentionally directed personally toward them.   The conduct about which a plaintiff complains in

---

[14]    The law of the states in which a number of other plaintiffs apparently reside -- Colorado, Florida, Missouri, New Jersey and Texas -- require the satisfaction of the same elements to state a claim for IIED.   *See Riske v. King Soopers*, 366 F.3d 1085, 1089 (10th Cir. 2004) (the elements under Colorado law are: "(1) the defendant(s) engaged in extreme and outrageous conduct; (2) recklessly or with intent of causing plaintiffs severe emotional distress; and (3) causing plaintiffs severe emotional distress." (citations omitted)); *Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2002).   (elements of IIED claim are : (1) the defendant(s) engaged in extreme and outrageous conduct, (2) recklessly or with intent of causing plaintiffs severe emotional distress, and (3) causing plaintiffs severe emotional distress." (citation omitted)); *Dependable Life Ins. Co. v. Harris*, 510 So.2d 985, 986 (Fl. Ct. App. 1987) (to establish cause of action for IIED under Federal Florida law, four elements must be proven: (1) deliberate and reckless infliction of mental suffering; (2) outrageous conduct; and (3) the conduct must have caused the emotional distress; and (4) the distress must be severe.); *St. Anthony's Med. Ctr. v. H.S.H.*, 974 S.W.2d 606, 612 (Mo. Ct. App. 1998) (elements of a claim under Missouri law are: (1) defendants conduct was extreme and outrageous; (2) the defendants acted in an intentional and reckless manner; and (3) defendants acts caused plaintiff severe emotional distress); *Taylor v. Metzger* 152 N.J. 490, 509 (N.J. 1998) (in order to state cause of action "plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe."); *Griffen v. Topps Appliance City, Inc.*, 337 N.J. Super. 15, 22 (N.J. Super. Ct. App. Div. Jan. 25, 2001) (under New Jersey law, the "plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe.   Initially, plaintiff must prove the defendant acted intentionally or recklessly."); *Twyman v. Twyman*, 855 S.W.2d 619, 621 (TX 1993) (under Texas law, plaintiff must establish four essential claims: (1) the defendants acted intentionally or recklessly; (2) the defendants' conduct was extreme and outrageous; (3) the actions of the defendants caused the plaintiffs emotional distress; and (4) the emotional distress suffered by plaintiff was severe).

support of an IIED claim must have been directed intentionally at him or her, and lack any reasonable justification. *See, e.g., Realmuto v. Yellow Freight System, Inc.,* 712 F. Supp. 287, 289 (E.D.N.Y. 1989) ("conduct must 'be intentionally directed at the plaintiff and lack any reasonable justification.'" (quoting *Martin v. Citibank, N.A.,* 762 F.2d 212, 220 (2d Cir. 1985))).[15]

The 39 non-decedent plaintiffs simply cannot allege that the violent acts about which each of them complains -- without regard to the fact that Arab Bank did not commit any of them -- were directed intentionally toward any of them. Stated differently, no act of Arab Bank caused the 39 non-decedent plaintiffs any injury for purposes of the claim for IIED. Absent the requisite intent and causation, the attempted IIED claim fails, and it must be dismissed.

### 3.   Under New York Law, The Statute Of Limitations Bars The Attempted IIED Claims Of At Least Ten Plaintiffs

New York law applies exclusively to at least ten (10) of the plaintiffs, each of whom is alleged to be a citizen of New York, and each of whom was in New York when she or he purportedly suffered IIED through the alleged acts of Arab Bank (the "New York Plaintiffs"). Am. Compl. ¶¶ 96, 104, 116, 122, 218, 226, 228, 230, 233, 236. Under New York law, a one-year statute of limitations is applied to an alleged IIED claim. New York C.P.L.R. §215(3); *see, e.g., Forbes v. Merrill Lynch, Fenner & Smith, Inc.,* 957 F. Supp. 450, 455 (S.D.N.Y. 1997).[16]

---

[15]    As explained, *infra,* stripping away the emotive but disconnected allegations of the Amended Complaint leaves the plaintiffs with one collection of allegations. Arab Bank is a bank, and engaged and engages in activities connected with a bank's business. This reality, in turn, raises the justification issue in the context of IIED. If "defendant's primary purpose was to advance its own business interests, and any conduct that harmed plaintiff was incidental, defendant has not committed the New York tort of intentional infliction of emotional distress." *Rooney v. Witco Corp.,* 722 F. Supp. 1040, 1045 (S.D.N.Y. 1989), *citing O'Rourke v. Pawling Savings Bank,* 80 A.D.2d 847, 444 N.Y.S.2d 471, 472 (2d Dep't 1981) (add'l citations omitted).

[16]    The statute of limitations for IIED in Texas, Colorado and New Jersey are two years. *See* Tex. Civ. Prac. & Rem. Code Ann. § 1 6.003 (Vernon 2004); C.R.S. § 13-80-102(1)(a)(1987 Repl. Vol. 6A); N.J.S.A 2A:14-2(a). The statute of limitations in Florida is four years, F.S.A. § 95.11(3)(p) (West 2004), and in Missouri where the IIED claim is made in connection with a battery claim, as is the case here, it is two years. *Ridder v. Hibsch,* 94 S.w.3d 470, 471 n. 2, (Mo. Ct. App. 2003).

The first Complaint in this action was filed on behalf of the plaintiffs on July 2, 2004. Each of the following ten (10) New York plaintiffs -- whose purported IIED claims arise solely from the violence suffered by their relatives in Israel -- attempt through the Amended Complaint to allege an IIED claim which arose before July 3, 2003:

| Alleged Date Of Incident | Plaintiffs |
|---|---|
| December 1, 2002 | Jason Kirschenbaun<br>Isabelle Kirshenbaum<br>Martin Kirshenbaum<br>Joshua Kirshenbaum<br>Shoshanna Burgette<br>David Kirshenbaum |
| June 20, 2003 | Eugene Goldstein<br>Lorraine Goldstein<br>Barbara Goldstein<br>Michael Goldstein |

Given the Amended Complaint's admission that the violent incidents from which the New York plaintiffs derive their purported IIED claim occurred outside the one-year statute of limitations, the New York plaintiffs' attempted IIED claims are time-barred, and must be dismissed.[17]

**4.      Where The Purported Claims Arising Under 18 U.S.C. §2333 Are Dismissed, This Court Should Decline To Exercise Supplemental Jurisdiction Over The Alleged IIED Claim**

If plaintiffs' first through seventh claims for relief are dismissed as sought herein, the sole remaining alleged claim, *i.e.*, the IIED claim founded upon state law, also should be dismissed because the Court should decline to exercise supplemental jurisdiction. As a threshold

---

[17]      Seventeen (17) plaintiffs who are asserting IIED claims based on an incident that occurred before June 2, 2003 have failed to allege any State in the United States in which they are citizens. Amended Complaint ¶¶ 39, 59, 62, 64, 67, 88, 125, 184, 191, 192, 194, 202, 242, 249, 255, 258. To the extent that they are New York plaintiffs, these plaintiffs' IIED claims also must be dismissed because they are time-barred. Eleven (11) of these seventeen (17) plaintiffs allege IIED claims based on incidents that occurred on May 8, 2001, August 9, 2001 and March 31, 2002. To the extent that any of these eleven (11) plaintiffs are residents of New Jersey, Colorado, Texas or Missouri, these plaintiffs IIED claims also must be dismissed because they are time-barred.

matter, this Court must examine the misplaced allegation in the Amended Complaint that this Court possesses diversity jurisdiction in this action. *See, e.g., Franceskin v. Credit Suisse*, 214 F.3d 253, 257 (2d Cir. 2000) (on appeal in purported diversity case, "[n]either the parties nor the district court addressed the court's subject matter jurisdiction..." (citation omitted); Court of Appeals raises the issue *sua sponte*).

The Amended Complaint admits that at least four (4) plaintiffs are aliens, *i.e.*, non-United States Citizens or legal residents.[18]   It is a matter of well-established law that diversity jurisdiction is absent where, on one side of an action (here, the plaintiffs' side) there are citizens and aliens, and on the opposite side (here, Arab Bank's side) there are only aliens. *Universal Licensing Corp. v. Paola Del Lungo*, 293 F.3d 579, 581 (2d Cir. 2002).  This Court therefore should find that diversity jurisdiction is absent.

Absent diversity, the plaintiffs' sole jurisdictional basis is this Court's original jurisdiction.  Thus, the only basis upon which the plaintiffs can obtain jurisdiction in this Court with respect to their purported state common law IIED claim is through the Court's discretionary exercise of its supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) and (c).  Where this Court grants Arab Bank's motion to dismiss the first through seventh claims for relief alleged in the Amended Complaint which are based on federal question jurisdiction under the ATA, this Court should dismiss the common law IIED claim alleged in the eighth claim for relief.  28 U.S.C. §1367(c)(3).  *See, e.g., Francis v. Chemical Bank*, 62 F. Supp. 2d 948, 963 (E.D.N.Y. 1999) [Gershon, J.] (dismissing state law claims after dismissal of federal claims pursuant to 28 U.S.C. §1367(a)).

---

[18]      *See* Am. Compl. ¶ 56 ("Plaintiff Julie Averbach is a citizen of the State of Israel."); ¶ 138 ("Plaintiff Matanya Nathansen...is a citizen of the State of Israel."); and ¶195 [sic] ("Plaintiff Ran Zilberstein is a citizen of the State of Israel."); ¶ 267 (Plaintiff Naphtali Nevies is a citizen of Great Britain and a citizen of the State of Israel.).

II.   **BOIM V. QURANIC LITERARY INSTITUTE DOES NOT BAR DISMISSAL**

A.   **The Stark Contrast Between The Direct Claims At Issue In *Boim* And The Vague Claims At Issue Here**

In *Boim*, the Seventh Circuit upheld a private cause of action under Section 2333. However, the allegations here are markedly different and offer compelling evidence that the allegations are insufficient as a matter of law.

1.   **The Plaintiffs**

The two *Boim* plaintiffs were Stanley and Joyce Boim, the parents of decedent David Boim ("Boim"), a Brooklyn resident who was killed by two terrorists while studying in Israel. *Boim v. Quranic Literacy Inst.*, 127 F. Supp. 2d 1002, 1004 (N.D. Ill. 2001).

In this case, the plaintiffs, some of whom are not U.S. citizens, are alleged to be persons injured in Israel, the representative of estates of those killed in Israel and family members including parents, children, grandparents, brothers, sisters, aunts and uncles alleging emotional injury. The persons killed in Israel include those whose deaths are alleged to have been caused by suicide attacks, as well as those whose deaths were at the hands of unknown assailants.

2.   **The Defendants Identified To Be The Perpetrators Of The Acts Alleged**

The principal defendants in *Boim* were the two gunmen who "were apprehended and temporarily imprisoned by the Palestinian Authority." *Boim*, 127 F. Supp. 2d at 1004. Both "were known members of the military wing of Hamas"; one apparently was released from custody and subsequently died during a suicide bombing and the second "was convicted of participating in David Boim's murder" and remains in prison. *Id.* As the court noted, one

42

"[d]efendant . . . confessed to participating in the shooting of David Boim . . . [and] his confession was read in open court." *Id.*

Here, of course, no plaintiff has named as a defendant any of the identified perpetrators of the acts alleged to have caused the deaths and injuries complained of, because -- unlike the *Boim* plaintiffs -- they do not know and therefore cannot allege the identification of any assailant. The plaintiffs here allege only that a particular terrorist group "claimed" responsibility, *e.g.*, Averbach plaintiffs, Am. Compl. ¶¶ 39-87, or that one terrorist group "claimed" responsibility, although a *different* terrorist group was "widely credited" to have been responsible, *e.g.*, Mandell plaintiffs, Am. Compl. ¶ 189, or that two *different* groups *both* asserted claims of responsibility, *e.g.*, plaintiff Kusher, Am. Compl. ¶ 211, or that *no* person or group claimed responsibility nor was any person or group identified as bearing responsibility, *e.g.*, Linde plaintiffs, Am. Compl. ¶¶ 5-32. *See supra*, Section I.B.

### 3.    The Non-Direct Defendants

In addition to the two identified perpetrators, the Boims additionally brought suit against Mohammed Abdul Hamid Khalil Salah ("Salah") and Mousa Mohammed Abu Marzook ("Marzook"), the former alleged to be the "admitted U.S.-based leader of the military branch of HAMAS . . . prosecuted for channeling money to HAMAS and recruiting, organizing, and training terrorist operatives in Israel," and the latter alleged to be another admitted HAMAS leader arrested by the United States Immigration and Naturalization Service and whose extradition to Israel had been ordered by a United States District Court "to stand trial for offenses connected to Hamas-sponsored terrorism, including murder, attempted murder, and conspiracy." *Boim*, 127 F. Supp. 2d at 1006.

Along with Salah and Marzook, the Boims also sued several entities -- Quranic Literacy Institute ("QLI"), Holy Land Foundation For Relief and Development ("HLF"), Islamic

43

Association for Palestine, American Muslim Society, American Middle Eastern League for Palestine and United Association for Studies and Research -- all alleged to be front vehicles knowingly used by Salah and Marzook to raise money for their terrorist aims. *Id.* at 1006-08. Specifically, the Boims alleged that these entities were linked to each other and to Salah and Marzook by "interlocking directorates" and by Salah and Marzook's own participation in the entitles, including as directors and officers. *Id.* at 1008-09. The Boims further alleged "that money raised by HLF and QLI was transferred to HAMAS terrorists using ... methods to finance terrorist activities. HAMAS used the money raised in this way to purchase weapons to carry out terrorist attacks, including the attack on David Boims." *Id.* at 1004.

Most significantly, the Boims plaintiffs did not assert claims against any banks or financial institutions which the funds raised by QLI and HLF passed through.[19]

Here, of course, there are no claims against the alleged perpetrators and/or charitable organizations that were alleged to have directly funded the terrorist acts committed against the plaintiffs. Instead, plaintiffs have pursued claims against a bank without the necessary allegations that the bank directly funded the terrorist acts identified in the Amended Complaint. While it may be an attractive deep pocket, it is a completely different defendant than those sued by the Boims and mandates the dismissal of the ATA claims for the reasons set forth below.[20]

---

[19]    We note also that the plaintiffs' attorney in *Boim* did not have a website soliciting plaintiffs.

[20]    Not only is Arab Bank  a convenient deep pocket for this action coordinated by four U.S. law firms, it is a sad reality of our times that it may also be a more convenient political target than a financial institution which has no evident connection with the Middle East.

4.   **Arab Bank's Alleged Connection To The Acts At Issue Is**
     **Legally Insufficient**

As illustrated above, even were this Court to follow the reasoning adopted by the Seventh Circuit in expanding the reach of the ATA to the allegations at issue there, which the court conceded to be a "case of first impression," *Boim*, 291 F.3d at 1001, any such application to the allegations at issue here would require a stretch far beyond that found by any court.

With respect to the non-direct defendants sued by the Boims, it had been alleged that the monies raised by Salah, Marzook and the entities controlled by them were directly used to purchase the weapons used by Hinawi and Al-Sharif to kill David Boim:

> [u]pon information and belief, among the expenditures *paid for* by this pool of money were the vehicle, machine guns, and ammunition used to kill David Boim, and the training of Hinawi, Al-Sharif and other Hamas operatives involved in this attack.

*Boim*, 127 F. Supp. 2d at 1010 (emphasis added).

Here, plaintiffs do not allege that Arab Bank raised monies to enable the terrorist acts complained of, but rather that Arab Bank knew or should have known that it was used as a *conduit*, for the distribution of funds raised by others, to support activities that may or may not have had any link to the injuries alleged here by the plaintiffs. Apart from the lack of causal connection here, with the identified perpetrators of the acts at issue, the additional distinction between the raising of monies and the use of those monies to fund the specific terrorist act at issue in *Boim*, and the alleged transfer of monies by a bank here is not semantic, but real and crucial. It is likely that every transfer of monies used for wrongful purposes, including with respect to virtually every act of terrorism, both in the United States and abroad, has in one way or another involved the services of some banking institution, whether Citigroup, J.P. Morgan Chase, Arab Bank or any other such financial institution. Nonetheless, the use of the world's

banks as conduits for such wrongful acts does not make those financial conduits international terrorists or responsible for the conduct of such terrorists.

It is notable that even plaintiffs concede that each of the front organizations which allegedly maintains an account at Arab Bank "officially holds itself out to the public as a charitable organization with a purely humanitarian and benign purpose."  Am. Compl. ¶ 370. Not surprisingly, then, it is well-settled that banks owe no duty to non-customers concerning the wrongful acts of a bank customer.  *See, e.g., Renner v. Chase Manhattan Bank*, No. 98 Civ. 926 (CSH), 1999 WL 47239, at *13 (S.D.N.Y. Feb. 3, 1999) ("[Plaintiff argues] that Chase owed him a duty to prevent Chase's customer, Townsend, from defrauding Renner.  But it is well settled that a bank owes no such duty to a non-customer third-party."); *Cohen v. Standard Bank Inv., Ltd.,* No. 97 Civ. 3802 (SAS), 1998 WL 782024, at *7 (S.D.N.Y. Nov. 6, 1998) (no duty of care owed by bank to investor in allegedly fraudulent scheme perpetrated by bank borrower). Similarly, the Financial Action Task Force on Money Laundering, which acknowledges the problem inherent in detecting the techniques and mechanisms used in the financing of terrorism, observed that:

> [when] terrorists obtain their financial support from legal sources, there are certain      factors that make detecting and tracing these funds more difficult.  For example, charities and non-profit organizations and other legal entities have been cited as playing an important role in the financing of some terrorist groups.  The apparent legal source of this funding may mean that there are few, if any, indicators that would make an individual financial transaction or series of transactions stand out as linked to terrorist activities.

FATF - GAFI, April 24, 2002 ("Guidance for Financial Institutions in Detecting Terrorist Financing").

The ATA itself evidences that Congress recognized that banks, as likely conduits of terrorist financing, occupy a legally different position than individuals and non-financial

institutions.  Section 2339B, entitled "Providing material support or resources to designated foreign terrorist organizations," expressly sets forth the duty expected of banks and other financial institutions:

> Except as otherwise authorized by the Secretary, any financial institution that becomes aware that it has possession of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, shall--
>
> > (A)    retain possession of, or maintain control over, such funds; and
> >
> > (B)    report to the Secretary the existence of such funds in accordance with regulations issued by the secretary.

Section 2339(B)(a)(2).  The ATA further provides that:

> any financial institution that knowingly fails to comply with subsection (a)(2) shall be subject to a civil penalty in an amount which is the greater of--
>
> > (A)    $50,000 per violation; or
> >
> > (B)    twice the amount of which the financial institution was required under subsection (a)(2) to retain possession or control.

Section 2339(B)(b).  Thus, if a bank "becomes aware", *i.e.*, gains knowledge, that it is has become a conduit for terrorist funds, and fails to report the existence of and to stop the transfer of those funds, it may be held liable -- for a maximum civil penalty of up to $50,000.  If Congress had intended a remedy beyond that cited above, surely it would have expressly provided one -- obviously, it cannot be said that Congress had simply failed to consider the likely role of financial institutions as channels for the movement of monies used to commit terrorist acts, as it expressly and narrowly addressed that very circumstance.

**B.     Section 2333 Does Not Provide A Civil Cause Of Action For Aiding And Abetting Or Conspiracy To Commit International Terrorism**

Plaintiffs allege that Arab Bank, by providing financial services to terrorists and their families, aided and abetted and conspired to commit murder, attempted murder, and serious bodily injuries to U.S. citizens in violation of Sections 2332a, 2332b, 2332c, and 2333. The civil provision (Section 2333) does not by its own terms, create a cause of action for aiding and abetting or conspiring. In fact, none of the criminal sections in the statute expressly provide for aiding and abetting liability.[21]   Plaintiffs' attempt to expand Section 2333 to create an implied civil remedy for aiding and abetting and conspiracy when the statute does not even provide for criminal aiding and abetting must fail.

Any claims that aiding and abetting or conspiracy liability are implied in the ATA is foreclosed by Supreme Court precedent. In *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), the Supreme Court refused to imply a private right of action for aiding and abetting liability for violations of Section 10(b) of the Securities Exchange Act of 1934. The Court stated that "Congress knew how to impose aiding and abetting liability when it chose to do so. . . . If Congress intended to impose aiding and abetting liability, we presume it would have used the words 'aid' and 'abet' in the statutory text." *Central Bank*, 511 U.S. at 176-77 (citations omitted). Indeed, the Court found that, "when Congress enacts a statute under which a person may sue and recover damages from a private defendant for the defendant's violation of some statutory norm, there is no general presumption that the plaintiff may also sue aiders and abettors." *Id.* at 182 (citing *Electronic Laboratory Supply Co. v. Cullen*, 977 F.2d 798, 805-06 (3d Cir. 1992)).

---

[21]      With respect to the conspiracy claim, conspiracy is addressed in the criminal liability provisions of Sections 2339A, 2339B and 2339C for the purpose of distinguishing the criminal penalties to be imposed for conspiracy as opposed to the commission of the underlying offense.

The Court in *Central Bank* also rejected the argument that a private civil Section 10(b) aiding and abetting cause of action may be based on 18 U.S.C. § 2 (2004), which provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." The Court in *Central Bank* found that while it is true that an aider and abettor of a criminal violation of the 1934 Act violates Section 2, it does not follow that a private civil aiding and abetting cause of action must also exist. *Id.* at 190. In fact, the Court pointed out that it "has been quite reluctant to infer a private right of action from a criminal prohibition alone." *Id.* (citing *Cort v. Ash*, 422 U.S. 66, 80 (1975)). The Court noted that to suggest that a private right of action exists for all injuries caused by violations of criminal prohibitions, would mean "every criminal statute passed for the benefit of some particular class of persons would carry with it a concomitant civil damages cause of action." *Id.* at 190-91. As the *Central Bank* Court concluded, "there would be no logical stopping point to this line of reasoning" and the consequences are far-reaching. *Id.*

Following the Supreme Court's precedent in *Central Bank*, courts have refused to imply an aiding and abetting claim into federal statutes. For example, the Third Circuit in *Rolo v. City Investing*, 155 F3d 644 (3d Cir. 1998), held that RICO -- a federal statute analogous to the ATA -- also does not provide civil liability for aiding and abetting. Likewise, in *Department of Econ. Dev. v. Arthur Anderson & Co.*, 924 F.Supp. 449, 475 (S.D.N.Y. 1996), Judge Mukasey, in an exhaustive opinion, held that RICO does not provide a private right of action for aiding and abetting. *See also Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison*, No. 88 Civ. 8048 (JES), 1997 WL 76674, at *7-8 (S.D.N.Y. Feb. 20, 1997) ("Following the reasoning in *Central Bank*, this Court declines to create a private right of action for aiding and abetting a RICO violation."); *Rosenheck v. Rieber*, 932 F. Supp. 626, 627 n.1 (S.D.N.Y. 1996) ("[A]iding and

abetting does not suffice under civil RICO."). Contrary to this precedent, the Seventh Circuit in *Boim* concluded that aiding and abetting was actionable under Section 2333.[22] But, the Court in *Central Bank* stated that the issue "is not whether imposing private civil liability on aiders and abettors is good policy but whether aiding and abetting is covered by the statute." *Id.* at 177. Here, it is not covered by the ATA and "policy considerations cannot override a court's interpretation of the text and structure of an Act, except to the extent that they may help to show that adherence to the text and structure would lead to a result 'so bizarre' that Congress could not have intended it." *Id.* at 188 (citing *Demarest v. Manspeaker*, 498 U.S. 184, 191 (1991)).

## III.   THE AMENDED COMPLAINT SHOULD BE DISMISSED ON *FORUM NON CONVENIENS* GROUNDS

### A.   The Standard For A *Forum Non Conveniens* Motion -- Three Stages

The doctrine of *forum non conveniens* "affords a trial court discretion in a case over which it has jurisdiction to decline to exercise it, whenever it appears that such case may be more appropriately tried in another forum, either for the convenience of the parties or to serve the ends of justice." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 67 (2d Cir. 2003). The evaluation of a motion to dismiss on the grounds of *forum non conveniens* proceeds in three stages: first, determination of the degree of deference to be afforded to the plaintiffs' choice of forum; second, an analysis of whether an adequate alternative forum exists; and third, consideration of the various private and public interest factors affecting the convenience to the

---

[22]   The Court in *Boim* also found that a cause of action for violations of the criminal provisions of Sections 2339A and 2339B may form the basis for a Section 2333 claim. We respectfully suggest that the Seventh Circuit's findings in *Boim* are incorrect. Section 2333 of the ATA does not provide a private right of action for alleged violations of Sections 2339A, 2339B and 2339C. First, there is no specific indication from the text of the statute that Section 2333 incorporates the criminal provisions of Section 2339. Section 2333 makes no reference at all to the criminal provisions of Section 2339. Second, the structure of the statute does not support a finding that Section 2333 incorporates Section 2339. Sections 2339B and 2339C, each specifically provide for civil remedies. Clearly, Congress knew how to provide for civil remedies when it wanted to. The fact that it specifically provided for a civil remedy, but not a private right of action, speaks volumes. Third, the legislative history does not support a broad reading of Section 2333 to include claims for violations of Sections 2339A, 2339B and 2339C. In fact, Section 2333 was never referenced in the legislative history for Sections 2339A, 2339B and 2339C.

litigants and the Court. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947); *Pollux*, 329 F.3d at 70; *Base Metal Trading et al. v. Russian Aluminum et al.*, 253 F. Supp. 2d 681, 693 (S.D.N.Y. 2003). The Second Circuit has summarized the overall analysis as follows: "[t]he focus of any *forum non conveniens* inquiry, as the term itself suggests, is to ensure that the place where a trial is held is convenient, that is, that the forum fits the needs and is suitable to the circumstances of the case." *Pollux*, 329 F.3d at 67.

In accord with common law *forum non conveniens* doctrine, Section 2334(d) of the ATA contains a provision regarding the "convenience of the forum" which states:

> The district court shall not dismiss any action brought under section 2333 of this title on the grounds of the inconvenience of the forum or inappropriateness of the forum chosen, unless-
>
> (1)    the action may be maintained in a foreign court that has jurisdiction over the subject matter and over all the defendants;
>
> (2)    that foreign court is significantly more convenient and appropriate; and
>
> (3)    that foreign court offers a remedy which is substantially the same as the one available in the courts of the United States.

Section 2334(d). In a letter to this Court on August 27, 2004, plaintiffs' [prior] lead counsel asserted that "[t]his special venue provision preempts *Gulf Oil* and divests a court of the authority to apply the traditional *forum non conveniens* factors which Arab Bank purports to rest its possible motion." Wollmuth Letter at 3. Counsel's letter cites *Estates of Ungar v. Palestinian Authority*, 153 F. Supp. 2d 76, 100 (D.R.I. 2001) to support their view that a case under the ATA cannot be dismissed on *forum non conveniens*. In *Ungar*, the District Court stated in *dicta* that Section 2334(d) "limits the circumstances under which a court can entertain a motion to dismiss on the grounds of inconvenience of the forum," however, the Court did not rule on the motion -- and did not even conduct a *forum non conveniens* analysis -- because the defendants failed to

name a specific adequate alternative forum or to address the other relevant considerations. In fact, other than that passing statement in *Ungar*, there are no reported cases in which a *forum non conveniens* motion under Section 2334(d) has been considered. Thus, this case is one of first impression.

Far from limiting the traditional *forum non conveniens* test, Section 2334(d) confirms a court's ability to dismiss when the appropriate requirements are established. It is clear from the plain language of the statute and its legislative history that the provisions in Sections 2334(d)(1) and (d)(2) are based on the traditional *forum non conveniens* factors. The requirement in Section 2334(d)(1), that "the action may be maintained in a foreign court that has jurisdiction over the subject matter and over all the defendants," is identical to the common law *forum non conveniens* test stating that "an alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux* 329 F.3d at 75 (citations omitted). The requirement in Section 2334(d)(2), that the "foreign court is significantly more convenient and appropriate" is the same as the required common law *forum non conveniens* showing that "the balance of convenience tilts strongly in favor of trial in the foreign forum." *R. Maganlal & Co. v. M.G. Chemical Co.*, 942 F.2d 164, 167 (2d Cir. 1991) (citations omitted).

This analysis is reinforced by the legislative history of Section 2334(d). As originally drafted, Section 2334(d) (which was Section 2334(c) at that time) stated:

> the district court shall not dismiss any action brought under section 2333 on the grounds of inconvenience or inappropriateness of the forum chosen, unless the action may be maintained in a more convenient or more appropriate foreign court that has jurisdiction over the subject matter and over the defendant or defendants.

*A Bill To Provide a New Civil Cause of Action In Federal Law for International Terrorism that Provides Extraterritorial Jurisdiction Over Terrorist Acts Abroad Against United States*

52

*Nationals*: *Hearing on S:2465 before the Subcommittee On Courts and Administrative Practice of the Committee on the Judiciary United States Senate*, 101st Cong. 4-5 (1990) (text of the Bill). At a hearing to discuss the statute before the Subcommittee on Courts and Administrative Practice of the Senate Judiciary Committee, the Committee heard testimony from one Wendy Collins Perdue, a Professor at Georgetown University Law Center, regarding the *forum non conveniens* provision of the statute. Professor Perdue stated that the section appeared "to be a very brief restatement of existing law on the doctrine of forum non conveniens" but that "if its only purpose is to restate the doctrine articulated in *Gulf Oil Corp. v. Gilbert*, 33 U.S. 501, 508 (1947), it seems to add little in the way of clarity and to risk possible confusion." *Id.* at 9-10. Professor Perdue asserted that, as drafted, the statute lessened the defendant's traditional common law burden for dismissal by referring "simply to whether an alternative forum is 'more convenient or more appropriate' and thus could be read to alter that traditional burden [set forth in *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255-56 (1981)], making dismissal proper whenever the alternative forum is even a little more convenient or appropriate." *Id.* at 10. Congress therefore changed the language of Section 2334(d) in order to raise the standard to meet the burden set forth under Supreme Court *forum non conveniens* precedent existing at that time.

Professor Perdue also pointed out in her testimony that any award in a foreign forum would likely be less than a U.S. court because other countries do not award treble damages and "the *Piper Aircraft* case suggests that the fact that the alternative forum will apply a substantially less favorable law ought not to be an important factor in deciding whether to dismiss." *Id.* Therefore, she recommended, that if it was Congress' "intent to assure victims substantial compensation, [Congress] might add language which makes clear that the fact that a plaintiff will likely recover substantially less in the alternative forum is an important factor to be

weighed in deciding whether to dismiss the case." *Id.* at 10-11. Thus, Congress added the requirement in Section 2334(d)(3), that the "foreign court offers a remedy which is *substantially the same as* the one available in the courts of the United States." (emphasis added).

Therefore, in drafting Section 2334(d) Congress sought to affirm the right to dismissal of cases brought under Section 2333 on *forum non conveniens* grounds if the well-established common law factors are met and careful consideration is given to the amount of recovery available in the alternate forum. Accordingly, contrary to plaintiffs' assertions, Congress clearly envisioned circumstances in which a *forum non conveniens* dismissal would be appropriate in cases brought under the ATA.

As set forth more fully below, it is hard to imagine circumstances more suited for *forum non conveniens* dismissal than those presented by this case: (i) Plaintiffs, though U.S. citizens, are apparently dual citizens whose residency is not alleged in the complaint, but whom "all . . . reside or spend significant amounts of time in Israel" according to plaintiffs' own papers; (ii) defendant is a Jordanian bank with headquarters approximately 50 miles from Israel; (iii) the attacks described in the Amended Complaint all occurred in Israel or Gaza; (iv) the alleged martyr payments to families of suicide bombers are alleged to have been made in Gaza and the West Bank to individuals residing there; (v) the financial services that defendant allegedly provided to charities that are "HAMAS fronts" are all local institutions in cities in the West Bank and Gaza; (vi) the Jordanian courts have jurisdiction over Arab Bank and over the subject matter of this dispute; (vii) a balance of the conveniences set forth in *Gulf Oil* demonstrates that the courts in Amman are significantly more convenient and appropriate; and as set forth more fully below, (viii) the Jordanian courts can provide a remedy which is substantially the same as the one available in this Court.

54

B.     **Plaintiffs' Choice Of Forum Is Entitled To Diminished Deference**

1.     **Factors Considered In Determining Degree of Deference**

It is well-settled law that a plaintiff's choice of forum is entitled to substantial deference. *See, e.g., Koster v. Lumberman's Mut. Casualty Co.*, 330 U.S. 518, 524 (1947); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981). When reviewing a motion to dismiss for *forum non conveniens* there is an assumption that the plaintiff's choice of forum will stand unless the defendant can demonstrate that reasons exist to afford it less deference. *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 70-71 (2d Cir. 2001). Nonetheless, this "deference is not dispositive and . . . may be overcome." *Id.* at 71. As the Second Circuit sitting en banc in *Iragorri* emphasized, "dismissal should not be automatically barred when a plaintiff has filed suit in his home forum. As always, if the balance of convenience suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper." *Id.* (quoting *Piper Aircraft Co.*, 454 U.S. at 256 n.23); *see also Blanco v. Banco Indus. De Venezuela*, 997 F.2d 974, 980 (2d Cir. 1993) ("plaintiff's [forum] selection will not invariably be upheld, or there would be no forum non conveniens doctrine to consider.").

The degree of deference assigned to plaintiff's choice depends on the specific facts of the case and may be viewed as operating along a "sliding scale." *Iragorri*, 274 F.3d at 71. For example, "[w]hile plaintiffs who file suit in the district in which they reside are entitled to great deference, less deference is owed to foreign citizens suing in the United States and U.S. residents suing outside of their home forum." *Concesionaria DHM, S.A. v. International Finance Corp.*, 307 F. Supp. 2d 553 (S.D.N.Y. 2004). A choice of home forum by an American citizen is given substantial deference because it is presumed to be convenient, while a foreign plaintiff's choice of a United States forum typically is given less deference. *See, e.g., Murray v. British Broadcasting Corp.*, 81 F.3d 287, 290 (2d Cir. 1996). This is not based on a desire to

prejudice foreign plaintiffs, but "rather on a realistic prediction concerning the ultimate convenience of the forum." *Id.*; *see also Varnelo v. Eastwind Trading Co.*, No. 02 Civ. 2084 (KMW), 2003 WL 230741, at *12 (S.D.N.Y. Feb. 3, 2003).

Following that reasoning, the Second Circuit explained that the choice of forum of a U.S. "citizen" means "citizens who were also *U.S. residents*, rather than situations in which an expatriate U.S. citizen *residing permanently in a foreign country* brings suit in the United States." *Iragorri*, 274 F.3d at 73 n.5 (emphasis added). Therefore "the selection of a U.S. forum by a U.S. citizen living abroad is entitled to less deference than the choice of the same forum by a citizen residing in the forum because with respect to the expatriate U.S. citizen 'it would be less reasonable to assume the choice of forum is based on convenience.'" *Pollux*, 329 F.3d at 73 (quoting *Iragorri*, 274 F.3d at 73 n.5.); *see also Varnelo*, 2003 WL 230741, at *12 (collecting cases).

Even in instances where a suit is brought by a U.S. citizen who actually resides in the forum in which he commenced the action, a court considering a *forum non conveniens* motion does not assign "'talismanic significance to the citizenship or residence of the parties.'" *Pollux*, 329 F.3d at 73 (quoting *Alcoa S.S. Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147, 154 (2d Cir. 1980) (en banc)). There is no inflexible rule that protects U.S. citizens or resident plaintiffs from having their causes dismissed for *forum non conveniens*. As the Second Circuit held in *Iragorri*, "while [a] plaintiff's citizenship and residence can serve as a proxy for, or indication of, convenience, neither the plaintiff's citizenship nor residence . . . necessarily controls the outcome." 274 F.3d at 74; *see, e.g., Alcoa S.S. Co., Inc.*, 654 F.2d at 152 ("American citizenship is *not* an impenetrable shield against dismissal on the grounds of forum non conveniens.") (emphasis in original); *Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1073 (S.D.N.Y. 1992)

("On more than one occasion the Second Circuit has affirmed forum non conveniens dismissal requiring litigation abroad of a claim by an American citizen or a party holding that status.") (collecting cases).

>    **2.    Plaintiffs' Choice of Forum Should Be Discounted**

The Amended Complaint identifies 58 individual plaintiffs (or estates). Of those, 30 are alleged to be dual citizens of the United States and Israel, Am. Compl. ¶¶ 39, 59, 62, 64, 67, 125, 132, 136, 141, 143, 147, 159, 167, 172, 176, 179, 184, 191-95, 195 [sic], 202, 228, 242, 249, 255, 258, 262, 4 are foreign citizens, Am. Compl. ¶¶ 56, 138, 195 [sic], 267, and 24 are U.S. citizens, Am. Compl. ¶¶ 5, 7, 16, 20, 26, 30, 35, 69, 76, 81, 96, 104, 116, 122,-23, 153, 209, 218, 226, 230, 233, 236, 239. The residence of the majority of the plaintiffs is not alleged in the Amended Complaint. However, where the Amended Complaint does specifically identify a particular plaintiff's residence it is Israel, not the U.S. In fact, the Amended Complaint alleges that 19 of the plaintiffs are residents of Israel. Am. Compl. ¶¶ 40, 65, 67, 148, 154, 160, 168, 185, 191-95, 242, 249, 255, 258, 262, 267. Therefore, the choice of a U.S. forum for those plaintiffs who are alleged to be dual citizens residing in Israel, and the 4 foreign citizen plaintiffs, is entitled to diminished deference. *Pollux,* 329 F.3d at 73.

Plaintiffs have not alleged the residency of the remaining dual citizens or U.S. citizens, but plaintiffs' own submissions to this Court to date have stated: (i) "plaintiffs, <u>all</u> of whom reside, or spend significant amounts of time, in the State of Israel;" (ii) "plaintiffs' many relatives, friends and loved ones residing in the State of Israel;" (iii) "many of the plaintiffs continue to reside in Israel, or have relatives living in Israel;" and (iv) "plaintiffs, many of whom are American citizens who either reside, or spend a significant amount of time, in Israel." Plaintiffs' Supplemental Memorandum of Law in Support of Their Application For Preliminary Injunctive Relief, dated October 15, 2004 at 4, 9; Declaration of Rachel Ehrenfeld, dated October

4, 2004 at ¶ 4 (emphasis added). Based on the above, plaintiffs cannot lay claim to the deference afforded a U.S. citizen residing in the U.S. and cannot claim that trial in New York is convenient for this case.

### C.   An Adequate Alternative Forum Exists

#### 1.   The Test For An Adequate Alternative Forum Under Common Law And The Anti-Terrorism Act

Generally an alternative forum is adequate if "(1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute." *Bank of Credit Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001). *See also R. Maganlal & Co.,* 942 F.2d at 167. A forum is considered adequate and dismissal is permitted even if a plaintiff faces the possibility of an unfavorable change in the law, for example, the absence of treble damages in the alternative forum. *See, e.g., Piper* Aircraft, 454 U.S. at 249; *Transunion Corp. v. Pepsico, Inc.*, 811 F.2d 127, 129 (2d Cir. 1987) ("though appellants might not be able to claim RICO violations and RICO treble damages in the Philippines, they could assert the three underlying frauds."); *P.T. United Can Co. v. Crown Cork & Seal,* 138 F.3d 65, 74 (2d Cir. 1998) (finding that the remedy in the alternative forum must be "adequate, not identical"). The legislative history of Section 2334(d)(3) of the ATA suggests that this provision requires a district court to consider "the fact that a plaintiff will likely recover substantially less in the alternative forum." Thus, under the ATA, a foreign court will be adequate if it "offers a remedy which is substantially the same as the one available in the courts of the United States." 18 U.S.C. § 2334(d)(3).

#### 2.   Jordan Is An Adequate Alternative Forum

As set forth in the accompanying Declaration of Hamzeh Ahmad Haddad ("Haddad Decl."), dated November 11, 2004, an attorney practicing in Amman, Jordan, and a

lecturer and former professor in Amman, the Jordanian courts are an adequate alternative forum for plaintiffs' claims in this lawsuit and offer the plaintiffs substantially the same remedy as available to them in this Court.

Article 97 of Jordan's Constitution guarantees the independence of the judicial branch, clearly stating that judges are subject to no authority but that of the law. Jordanian courts are open to all persons and shall be free from any interference in the court's affairs. The Constitution divides the courts into three categories: ordinary, religious and special courts. Haddad Decl ¶ 4.

The Jordanian ordinary courts would have jurisdiction over the subject matter of this dispute. There are three levels within the Jordanian ordinary courts: (1) the First Instance Court; (2) the Appeals Court; and (3) the Cassation Court. The First Instance Court has general jurisdiction in civil, commercial and criminal matters and may hear claims by any party seeking damages for causes of action recognized in the law. *Id.* ¶ 5. The Civil Code recognizes various sources of obligations, the breach of one or more of which gives rise to a claim for damages by the party harmed, including contract and tort. Damages include actual loss, lost profits and moral damages to an individual and his or her spouse or relatives. *Id.* ¶ 7.

In addition, Jordanian courts would have jurisdiction over all the parties to this action. Jordanian courts are vested with jurisdiction over all persons (Jordanians and non-Jordanians) in all civil and criminal matters, with the exception of matters that are assigned for trial by religious or special courts under any other law. *Id.* ¶ 6. Defendant Arab Bank is headquartered in Amman and is subject to jurisdiction in a Jordanian court, and it has nonetheless also explicitly consented to the jurisdiction of the Jordanian courts over the claims asserted against it by plaintiffs in this action. *See* Bishara Decl. ¶ 55(a); *see also Aguinda et al.*

*v. Texaco, Inc.,* 303 F.3d 470, 476-77 (2d Cir. 2002) ("the requirement of an adequate alternative forum will be satisfied when the defendant is amenable to process in the other jurisdiction [and] … [a]n agreement by the defendant to submit to the jurisdiction of the foreign forum can generally satisfy" this requirement) (internal quotations omitted) (citation omitted).

The procedural rights and remedies in Jordan are not identical to those available in the U.S., nevertheless, the Jordanian judicial system provides significant procedural safeguards to litigants. Law of Evidence No. 30 of 1952 is the law which generally applies in civil matters. *See* Haddad Decl. ¶ 15. A Jordanian court has the power to summon witnesses to give evidence that the court deems relevant and may require them to appear before the court under penalty. *Id.* ¶ 16. In addition, a Jordanian court may order any party to a lawsuit to submit any relevant documents and a party may request that its adversary produce documents, including bank records. *Id.* ¶ 17. In this case, Arab Bank has explicitly consented to making all documents and witnesses available in a Jordanian court. Bishara Decl. ¶ 55(c).

According to Professor Haddad, a Jordanian court would offer substantially the same remedy for plaintiffs' claims as a U.S court. Terrorism is a crime under Jordanian law. Article 147 of the Penal Code provides:

> **1-** Terrorism denotes the use or threat of use, of violence, regardless of incentive, motive or inclination and irrespective of it being executed individually or collectively, with the aim of disturbing public order or subjecting society's safety and security to peril, if such an event causes fear and fright among people, or subjects their lives and security to danger; or causes damage to infrastructure, utilities and public or private ownership; or international utilities and diplomatic missions, or by occupying or seizing them; or subjecting national resources to danger, or obstructing the application of constitutional and legal provisions.
>
> **2-** Crimes of terrorism include any act appertaining to any banking transaction, and specially the depositing of funds at any bank or financial institution operating in the Kingdom, or the transfer of

> funds to any destination whatsoever if it was apparent that such
> funds are suspect and are connected to terrorist activities.

Haddad Decl. ¶10.

In the case of suspected terrorist banking transactions, an investigation shall be conducted by the Attorney General in cooperation with the Central Bank of Jordan and any other relevant local or international authority and the suspected funds will be attached for the duration of the investigation. If it is proven that such transaction is related to terrorist activity, the case will be referred to the appropriate court and anyone convicted will be sentenced to prison and the funds would be attached and confiscated. *Id.* ¶ 10a-c.

A legal entity may commit or participate in the commission of a crime through its managers, representatives or employees and in such a case may be prevented from further works in addition to any civil liability for damages. In addition, the above provisions of the penal law applies to Jordanians who commit a crime outside the country and gives Jordanian courts jurisdiction to hear such a case. Based on the above, Professor Haddad concludes:

> that a crime may be committed in a country other than Jordan by a
> branch of a Jordanian company. In such a case, a criminal case
> may be brought against the headquarter of the company in Jordan.
> *At the same time, if the crime results in injury to any person he*
> *may institute a civil suit in Jordan against the headquarter, the*
> *subject of which is a claim for damages.*

*Id.* ¶ 13 (emphasis added). Article 271 of the Civil Code provides that civil liability shall not affect criminal liability and that the criminal penalty shall not affect the determination of the scope and damages of civil liability. *Id.* ¶ 11.

Jordanian courts may apply foreign law. Under the Jordanian Civil Code, if a crime or tortious act was committed by a Jordanian company or its branch in another country, and a suit for damages is brought in a Jordanian court, the court would apply the law of the foreign country where the act was committed. In such a case, the Jordanian court will apply all

provisions of the foreign law unless a provision is contrary to public policy, in which case the court would sever that provision.  Assuming a Jordanian court found that the acts were committed in the U.S., it would apply the Anti-Terrorism Act.  Accordingly, Prof. Haddad concludes that: "If U.S. law were to apply, the plaintiffs would have their remedy under the [Anti-Terrorism] Act.  If Jordanian law were to apply, their remedy would be [the criminal and civil remedies] described above."  *Id.* ¶ 14(1-3).  In addition, Defendant Arab Bank has explicitly consented to the application of U.S. law.  Bishara Decl. ¶ 55(b).

The treble damages provision of the ATA has no equivalent under Jordanian law. Typically, an injured party receives the actual damages suffered, including loss profit and moral damages.  However, Prof. Haddad concludes that the treble damages provision of the ATA:

> does not preclude the parties from the right to agree that after the court renders its decision, the injured party may be compensated by the other for whatever sum is designated in the agreement, particularly when the damage is of moral.  This is particularly true where the party agreeing to pay more than the judgment of the court is of equal or greater bargaining power.

Haddad Decl. ¶ 19.  Defendant Arab Bank has explicitly agreed to pay three times the amount of damages determined by a Jordanian court.  Bishara Decl.  ¶ 55(e).  In addition, a Jordanian court would honor an agreement between the parties as to legal fees, provided, according to Prof. Haddad, that the fees not exceed 25% of the claim's value.  Haddad Decl. ¶ 18.  Defendant has also stipulated to the payment of reasonable attorney's fees.  Bishara Decl. ¶ 55(e).

### 3.    Jordan Has Been Found To Be An Adequate Alternative Forum

In *El-Fadl v. Petra Bank et al.*, 93-Civ.-1895 (D.D.C. 1997) ("District Court Opinion") the D.C. district court held that "Jordan is an adequate forum," relying on the expert opinion of Professor Haddad, dated June 11, 1996.  In *El-Fadl*, Plaintiff, a Lebanese citizen, brought suit against various Jordanian institutions and officials -- including Petra Bank and its

Washington D.C. subsidiary, Petra International Banking Corporation ("PIBC") -- seeking to recover damages for wrongful termination of employment and other tort claims.

The district court dismissed the complaint as to all defendants and in particular, the court granted PIBC's motion to dismiss on *forum non conveniens* grounds, finding that the plaintiff had an available forum in Jordan. On appeal, the plaintiff argued, *inter alia*, that the court erred in finding that he had an adequate alternative forum in Jordan. *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 670 (D.C. Cir. 1996). The Court of Appeals remanded for consideration on this point and instructed the parties to submit additional evidence as to the adequacy of the forum. *Id.* at 677-78. Specifically, the Court cited three Jordanian laws and instructed the parties to submit additional evidence as to whether these statutes precluded a Jordanian court from adjudicating plaintiff's case. *Id.* at 678. Defendants Petra Bank and PIBC submitted an affidavit of Prof. Haddad, the expert here, in support of their renewed *forum non conveniens* motion. After reviewing the additional affidavits of both sides, the district court affirmed the dismissal, finding that Petra Bank could be sued for damages in a Jordanian court and plaintiff had adequate recourse in those courts. District Court Opinion at 11-13. The Court held that "Jordan is an adequate alternative forum for [plaintiff] to pursue his claims against Petra Bank . . . [Plaintiff's] claims should be adjudicated where he resides, where they arose, where he was allegedly injured, and where the overwhelming number of witnesses and evidence are located." Haddad Decl. ¶ 13.

## D.    The Private Interest Factors Strongly Favor Dismissal

The relevant private interest factors applicable to a *forum non conveniens* motion all favor dismissing this action. Those factors are "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to

the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Gilbert*, 330 U.S. at 508; *Piper Aircraft*, 454 U.S. at 241 n.6.

### 1. The Great Majority Of The Relevant Witnesses And Documents Are Located In Jordan Or Elsewhere In The Middle East

The convenience of witnesses tips strongly in favor of litigation in Jordan. The individuals and organizations plaintiffs identified in the Amended Complaint are likely to be witnesses and are located almost entirely in Jordan or elsewhere in the Middle East. The allegations not only regarding the defendant, but regarding non-parties located in the Middle East demonstrate that the United States is not the proper forum for this litigation. The following potential witnesses are specifically identified in the Amended Complaint: HAMAS or "Harakat Muqawama Islamiyya" or "Izz-el-Din al Qassam Brigade"; Popular Front for the Liberation of Palestine; Islamic Association (Gaza) a/k/a Al Jamaya Al-Islamiya; Nablus Charitable Committee; Ramallah Charitable Committee; Tulkarem Charitable Committee; Jenin Charitable Committee; Al-Ansar Charity (Gaza branch); Al Mujama Al-Islami; Islamic Charity of Hebron; Holy Land Foundation; Palestinian Islamic Jihad; Al-Ihsan Charitable Society; Islamic An-Naqqa Society for Women, Bethlehem; Al Aqsa Martyrs Brigade; Palestinian Hezbullah; Popular Resistance Committees; Family of Iz Aldin, Al Masri; Family of Bassem Jamil Tarkrouri. *See, e.g.,* Am. Compl. ¶¶ 46, 189, 272, 281, 289, 343-65.

Given the number of non-party witnesses located in Jordan or elsewhere in the Middle East, there will unquestionably be easier access to sources of proof in Jordan. Where the court has no ability to compel the production of documents or witnesses from the foreign country, the private interest factors point toward dismissal of the matter on *forum non conveniens* ground. *See Blanco*, 997 F.2d at 982 ("most, if not all, of the witnesses whose testimony would be required, are located in Venezuela; there is no process available to compel their appearance in

New York"); *Alfadda v. Fenn*, 159 F.3d 41, 48 (2d Cir. 1998) ("compulsory process is available in France to secure the live testimony of necessary foreign witnesses outside the reach of United States process"). As set forth in the Declaration of Prof. Haddad, a Jordanian court has the "power to call witnesses or even to oblige them to appear before the court under penalty." Haddad Decl. ¶ 16.

Not only are almost all the individuals identified in the Amended Complaint non-parties located in Jordan [or elsewhere in the Middle East], but the Defendant Arab Bank is based in Amman, Jordan and almost all of the Defendant's likely potential witnesses are located in Jordan. Bishara Decl. ¶ 51-52. In addition, according to plaintiffs' own submissions it appears that the majority of its witnesses either reside or spend significant amounts of time in Israel, approximately 50 miles from Amman, Jordan.

Finally, the great majority of the documents are located in Jordan, and many are written in Arabic. Bishara Decl. ¶ 51. *See also Base Metal Trading*, 253 F. Supp. 2d at 712 ("The need for extensive document translation supports a finding that this forum in inconvenient."); *P.T. United Can Co., Ltd. v. Crown Cork & Seal Co.*, No. 96 Civ. 3669 (JGK), 1997 WL 31194, at *8 (S.D.N.Y. Jan. 28, 1997).

### E.   The Public Interest Factors Also Strongly Favor Dismissal

The public interest factors applicable to a *forum non conveniens* motion are "[a]dministrative difficulties . . . for courts when litigation is piled up in congested centers instead of being handled at its origin;" (2) "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation;" (3) the "local interest in having localized controversies decided at home;" (4) the "appropriateness . . . in having the trial . . . in a forum that is at home with the state law that must govern the case, rather than having a

court in some other forum untangle problems in conflict of laws, and in law foreign to itself." *Gilbert*, 330 U.S. at 508-09; *Piper Aircraft*, 454 U.S. at 241 n.6.

### 1.   There Is No Reason To Burden This Court Or A New York Jury With This Litigation

There is no basis to burden a New York jury with issues raised by primarily foreign residents seeking damages for occurrences which happened in Israel and Jordan. *See Gilbert*, 330 U.S. at 508-09; *Lan Associates XVII, L.P. v. Bank of Nova Scotia*, No. 96 Civ. 1022 (JFK), 1997 WL 458753, at *6 (S.D.N.Y. Aug. 11, 1997) ("to require New York's citizens to serve as jurors merely because some wire transfers passed through BNS's New York branch would be inappropriate"). To ask a jury in the Eastern District of New York to hear a lengthy and complex trial involving parties with little or no connection to this Court who were harmed by activities which occurred entirely in the Middle East would be a significant burden. *See Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 160 (S.D.N.Y. 2004) (court dismissed on *forum non conveniens* grounds, found public interest factor of jury duty pointed toward dismissal where Connecticut residents harmed by events occurring entirely in Europe).

There is equally little basis to further crowd this Court's congested docket with litigation with so little local interest. *Lan Associates,* 1997 WL 458753, at *6; *Gilbert*, 330 U.S. at 509. Trying this case in the U.S. would require the diversion of resources from other cases with more of a connection to the U.S.

### 2.   Jordan Has A Paramount Interest In These Controversies

Unlike New York, Jordan has a very significant "local interest" in having this controversy "decided at home," based on the extensive allegations regarding a prominent Jordanian bank's conspiracy to pay families of suicide bombers and its alleged provision of financial services to HAMAS-controlled organizations operating in cities in the West Bank and

66

Gaza. *See generally* Am. Compl. ¶¶ 302-365.  The plaintiffs and their families are alleged to have been injured in Israel by a conspiracy between a Jordanian bank and "a charity registered with the Kingdom of Saudi Arabia" (Am. Compl. ¶ 302) to pay families of Palestinian suicide bombers and by a Jordanian bank's provision of banking services to local charitable entities in cities in the West Bank and Gaza.  New York has no link to this action.

In the absence of any overriding connection by the plaintiffs to the United States or this district, the Amended Complaint relies on alleging broadly, and without specificity, that "funds are primarily converted into U.S. dollars through the New York branch of Arab Bank and then routed to the local branches of Arab Bank in the West Bank;" that "[Arab Bank's] New York branch continued to wire thousands of dollars to the Ramallah Charitable Committee at HLF's request;" and that the "New York branch of the Arab Bank has facilitated the transfer of significant sums to Tulkarem Charitable Committee." Am. Compl. ¶¶ 339, 359, 362.  Such allegations are insufficient to demonstrate a significant New York interest in this dispute.  *See Lan Associates*, 1997 WL 458753, at *6 (rejecting plaintiffs' assertion that an alleged wire transfer of funds through a New York bank provided New York with a significant interest in adjudicating this dispute, reasoning that "[w]ere such a minimal contact with New York to be deemed significant, this Court, located in one of the world's largest and busiest financial centers, would be burdened with countless international financial disputes having no real, substantive link to New York.").[23]

---

[23]    *Sussman v. Bank of Israel*, 801 F. Supp. 1068 (S.D.N.Y. 1992), *aff'd*, 990 F.2d 71 (2d Cir. 1993) (per curiam), *rev'd on other grounds*, 56 F.3d 450 (2d Cir. 1995); *Calgarth Investments, Ltd. v. Bank Saderat Iran*, No. 95 Civ. 5332, 1996 U.S. Dist. LEXIS 5562, at *20, (S.D.N.Y. Apr. 26, 1996), *aff'd, 108 F.3d 329* (2d Cir. 1997) ("debits and credits at New York bank accounts, without more, do not give New York or the United States an interest in transactions that otherwise are entirely foreign); *Burnett v. Al Baraka Investment & Development Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003) ("We have found [no support] for the proposition that a bank is liable for injuries done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service.").

## CONCLUSION

Arab Bank is sued here because of its name, its headquarters location, its deep pocket and its Palestinian origins and operations in Gaza and the West Bank. The world reflexively condemns terrorism after each new outrage – in Israel, Northern Ireland, Indonesia or elsewhere – without any real exposure to it. Arab Bank, however, knows first hand what the consequences can be; it has endured terrorism and violence throughout its entire history. Just because a bunch of U.S. lawyers have gotten together and rounded up plaintiffs – plaintiffs who have admittedly been terribly aggrieved – to charge the Bank with horrible crimes in Federal court under a U.S. statute of laudatory intent, does not make those charges true. There is violence in the Middle East, but this Bank is not a part of it; it is not an aider or abettor of murder; it is not a conspirator or a "front" for terrorists and this emotionally-charged and media-oriented Complaint cannot establish that it is.

The Bank's role in Palestine and its best contribution to peace is to help stabilize and improve the economy, not to further destroy it.

_____
Michael D. Burrows (MB-2863)

WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
(212) 294-6700

OF COUNSEL:

 J.David Reich
 Jeffrey R. Burke
 Catherine B. Schumacher
 Matthew T. Rogers
 Douglas W. Mateyaschuk II

68