UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
COURTNEY LINDE, et al.,

      Plaintiff,  **MEMORANDUM AND ORDER**

 - v -  CV-04-2799 (NG)(VVP)

ARAB BANK, PLC, et al.,

      Defendants.
----------------------------------------------------------x
PHILIP LITLE, et al.,

      Plaintiffs,

 - v -  CV-04-5449 (NG)(VVP)

ARAB BANK, PLC,

  Defendant/Third Party Plaintiff.

 - v -

BANK HAPOALIM, et al.,

    Third Party Defendants.
----------------------------------------------------------x
ORAN ALMOG, et al.,

      Plaintiffs,

 - v -  CV-04-5564 (NG)(VVP)

ARAB BANK, PLC,

  Defendant/Third Party Plaintiff,

 - v -

BANK HAPOALIM, et al.,

    Third Party Defendants.
----------------------------------------------------------x
ROBERT L. COULTER, SR., et al.,

      Plaintiffs,

 - v -  CV-05-365 (NG)(VVP)

ARAB BANK, PLC,

      Defendant.
----------------------------------------------------------x
GILA AFRIAT-KURTZER, et al.,

      Plaintiffs,

 - v -  CV-05-388 (NG)(VVP)

ARAB BANK, PLC,

  Defendant/Third Party Plaintiff,

 - v -

BANK HAPOALIM, et al.,

    Third Party Defendants.
----------------------------------------------------------x
MICHAEL BENNETT et al.,

      Plaintiffs,

 - v -  CV-05-3183 (NG)(VVP)

ARAB BANK, PLC,
          Defendant/Third Party Plaintiff,
   - v -
BANK HAPOALIM, et al.,
           Third Party Defendants.
-----------------------------------------------------------x
ARNOLD ROTH, et al.,
           Plaintiffs,
   - v -                            CV-05-3738 (NG)(VVP)
ARAB BANK, PLC,
          Defendant/Third Party Plaintiff,
   - v -
BANK HAPOALIM, et al.,
           Third Party Defendants.
-----------------------------------------------------------x
STUART WEISS AND SUSAN WEISS, et al.,
           Plaintiffs,
   - v -                            CV-06-1623 (NG)(VVP)
ARAB BANK, PLC,
          Defendant/Third Party Plaintiff,
   - v -
BANK HAPOALIM, et al.,
           Third Party Defendants.
-----------------------------------------------------------x
JOSEPH JESNER, et al.,
           Plaintiffs,
   - v -                            CV-06-3869 (NG)(VVP)
ARAB BANK, PLC,
          Defendant/Third Party Plaintiff,
   - v -
BANK HAPOALIM, et al.,
           Third Party Defendants.
-----------------------------------------------------------x
POHORELSKY, Magistrate Judge:

      The above-captioned related actions involve tort claims arising from injuries and deaths caused by suicide bombings and other attacks in Israel, the West Bank, and Gaza primarily since the onset of the second *intifada* in late 2000. The plaintiffs[1] allege that the defendant Arab Bank

---

[1] This motion was filed by the *Linde* and *Almog* plaintiffs; its arguments and requests for relief were then adopted by the *Litle*, *Bennett*, *Roth*, *Weiss*, and *Jesner* plaintiffs. (*See*, *e.g.*, Dec. 21, 2007 Letter to United States Magistrate Judge Viktor V. Pohorelsky, 06-CV-3869, Dkt. Entry 257.)

PLC, a Jordanian banking institution, is responsible for their losses because it knowingly disbursed monies to terrorists, the families of terrorists, and terrorist organizations, as part of a plan to foster terrorism. Among the allegations made in the *Linde v. Arab Bank plc* complaint, the first of these actions to be filed, is that Arab Bank supported terrorism by providing banking services, through an account held at its Al-Mazra branch in Beirut, to Hamas, an organization that has claimed responsibility for terrorist attacks throughout Israel, the West Bank and Gaza. In connection with a motion to dismiss the amended *Linde* complaint, Arab Bank's chief banking officer submitted a declaration stating that Arab Bank had closed the account, which it described as "dormant," had frozen its funds, and had notified the authorities. In the course of discovery, however, Arab Bank produced documents which revealed that, contrary to the declaration, there had been activity in the "dormant" account, and that after the declaration was submitted the balance in the account had been turned over to Osama Hamdan, the account holder and a Hamas leader, pursuant to Lebanese banking regulations.

Relying on the crime-fraud exception to the attorney-client privilege, the plaintiffs now move to compel discovery of various otherwise privileged documents related to the declaration and the payment. They argue that the declaration and the payment to Hamdan provide probable cause that Arab Bank intended to provide banking services to Hamas in violation of United States perjury and anti-terrorism laws. In the alternative, they seek *in camera* review by the court and a log of the privileged documents. The plaintiffs' evidentiary submissions are insufficient to support their theory of a concerted plan by Arab Bank to disburse the money to Hamdan while misleading the court about it. Although not convinced that the plaintiffs' submissions support it, the court in its discretion will nevertheless conduct an *in camera* review

and require preparation of a privilege log. Thus, for the reasons set forth below, the plaintiffs' application is DENIED in part and GRANTED in part.

## FACTS

Osama Hamdan Abdelatief Hamdan opened the account in question at the Al-Mazra branch of Arab Bank in Beirut, Lebanon in 1998 (the "Hamdan Account"). (Ex. E to the Alan Howard Decl.) In the ensuing years, a number of deposits into the account explicitly referred to "Harakat al-Mukuwama al-Islamiya" – The Islamic Resistance Movement – better known as Hamas, as well as the Palestine Information Center, a donation-solicitation website set up by Hamas. (Pls. Mem in Supp. of Their Mtn. to Compel Prod. of Docs. Based on the Crime-Fraud Exception to the Att'y-Client Privilege and Att'y Work-Product, ("Pls. Mem in Supp.") 5.) It does not appear that these references triggered any sort of review by Arab Bank,[2] although Hamas had been designated a Foreign Terrorist Organization by the United States government on October 8, 1997 pursuant to Section 219 of the Immigration and Nationality Act and the Antiterrorism and Effective Death Penalty Act. (*Id.* 4-5.)

On August 22, 2003, the United States Department of Treasury designated Osama Hamdan and five other individuals and five charities as Specially Designated Global Terrorists ("SDGTs") due to their involvement in or financial support for Hamas. (Pls. Mem. 6; Press Release, United States Treasury, U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as Terrorist Entities (*available at* http://www.treas.gov/press/releases

---

[2] Arab Bank's 30(b)(6) deponent confirmed that the stamp on an incoming wire transfer with an explicit reference to Hamas indicated it had been reviewed by an Arab Bank official upon receipt. (Ex. D. to Unger Decl. at 158-160.)

/js672.htm).) On September 8, 2003, Arab Bank's Al-Mazra branch received a letter from the Lebanese Special Investigation Committee of the Lebanese Central Bank (the "SIC"). (Ex. E. to the Unger Decl.) The letter, which listed the names of the individuals and entities who had just been designated SDGTs by the United States, requested that Arab Bank report back to the SIC within a week about whether the Al-Mazra branch held an account for a listed name. (*Id.*) The SIC's request does not explicitly mention that the names on the list are linked to terrorism, however, and it is unclear whether the suspected connections were common knowledge in Lebanon at the time. (*But cf.* Pls. Mem. in Supp. at 5-6.) Arab Bank's letter in response stated that it required more information, such as three-part names and other identifying information about the organizations, before it could provide an affirmative or negative answer to the SIC. (Ex. F. to the Ari Unger Decl.) Arab Bank's letter, sent within a week of receipt of the SIC request, appears to be its last correspondence with the SIC before the first complaint in the above-captioned related actions was filed.

That complaint, in *Linde et al. v. Arab Bank plc,* was filed on July 2, 2004. It specifically alleges that Arab Bank "knowingly provides banking services to Hamas directly through its El-Mazra[3] Branch Account # 3-810-622473-0220," *i.e.*, the Hamdan Account, that Hamas solicited funds for this account through the Palestine Information Center, and that transactions into the account referenced both Hamas and the website. (First *Linde* Compl. ¶¶ 205-06.)[4] Slightly less than two months later, on August 30, 2004, the Bank drafted a Payment Memorandum

---

[3]The plaintiffs spell the name of the Arab Bank Lebanon branch "El-Mazra"; Arab Bank refers to the same branch as "Al-Mazra." The court adopts Arab Bank's spelling herein.

[4]These allegations are also asserted by the *Almog* plaintiffs (04-CV-5564, Dkt. Entry 1, ¶¶ 38-39) and reasserted in the amended *Linde* complaint, filed on Aug. 8, 2004. (04-CV-2799, Dkt. Entry 4, ¶¶ 345-47).

concerning the Hamdan Account with the subject line, "Transfer Per Request of Manager of Lebanon Region $8,677.72." A handwritten note on the document stated, "For the transfer of the amount to a temporary credit account until the amount is paid, and after inviting him personally to the branch." (Ex. H to Unger Decl.) The next day, the Lebanon Region Manager for Arab Bank sent a letter to the Special Investigation Committee, referring to their correspondence of August and September 2003, and informed the Committee that the account under the name "Osama Abdelatif Hamdan" had been closed on August 30, 2004. (Ex. I to Unger Decl.)

On March 11, 2005, Arab Bank moved to dismiss the *Linde* action on several grounds, including failure to state a claim and *forum non conveniens*. Accompanying the motion was a declaration by Shukry Bishara, then-Chief Banking Officer of Arab Bank, that had been drafted in November of 2004 ("Bishara Declaration" or "the Declaration"). In the preface, the writer acknowledged that the court would likely not consider the substance of his declaration at the motion to dismiss stage, but expressed that he felt compelled to address the allegations against Arab Bank due to his long-standing personal involvement in opening Arab Bank's branches in Palestine, developing its business, implementing its policies, and setting its strategies. (Bishara Decl. ¶ 4.) The Declaration focuses primarily on Bishara's personal background and his knowledge of the operations of Arab Bank branches in New York, the Gaza Strip, and the West Bank; payments by the Arab League, the Saudi Committee, and other entities to Palestinians; and policies in place to combat money laundering. In addition, the Declaration seeks to refute the allegation that Arab Bank knowingly provided banking services to Hamas through the Hamdan Account. It states that Arab Bank investigated the account and found that it had been opened by an individual, not an organization, and that the account had been "dormant" for the

past three years.  (*Id.* ¶ 42.)  The Bishara Declaration also states that after Arab Bank had confirmed that the account had been advertised on a website alleged to be controlled by Hamas, it "closed this account, froze the balance of its funds and reported it to the appropriate authorities."  (*Id.* ¶ 43).  On March 30, 2005, approximately three weeks after the Declaration was filed, Mr. Hamdan collected his account balance from Arab Bank.  (Ex. A to Unger Decl.)

Sometime after January 22, 2007, after Arab Bank's motion to dismiss had been denied, and the payment had been made, Arab Bank produced to the plaintiffs a number of new documents related to the Hamdan Account, including the Payment Memorandum, the cancelled check to Hamdan, and the correspondence between the SIC and Arab Bank.  (Pls. Mem. 13.) Some of these documents revealed that during the time the Bishara Declaration had asserted the Hamdan account to be "dormant," it had in fact received a number of deposits.  (Ex. O to the Unger Decl.)

Based on these documents and their belated disclosure,[5] plaintiffs now assert that there is probable cause to find that Arab Bank planned to supply Hamdan with funds in violation of 18 U.S.C. §2339B(a)(1), while lying to the court about its plan, as evidenced by the Payment Memorandum, the Bishara Declaration, and the eventual March 2005 payment.  They invoke the crime-fraud exception to gain access to all privileged documents and work product relating to the Bishara Declaration, the Payment Memorandum, and the execution of the March 30, 2005 payment. The plaintiffs also request, should the court decline to invoke the crime-fraud exception, that Arab Bank be ordered to compile a privilege log of the above documents and to

---

[5] The plaintiffs find significant that these documents were belatedly produced, but admit they have no basis to assert that either Arab Bank or its counsel purposefully withheld them.  (Pls. Mem. in Supp. 13.)

produce the documents to the court for *in camera* review. Arab Bank submits that the plaintiffs' motion should be denied because the plaintiffs' evidentiary submissions are insufficient to trigger the crime-fraud exception, and that Arab Bank should be awarded costs and attorney's fees related to this motion.

**DISCUSSION**

I. STANDARD

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The privilege "encourage[s] full and frank communication between attorneys and their clients," *id.* at 389, freeing clients to reveal past wrongdoings to their attorneys, *Fisher v. United States*, 425 U.S. 391, 403 (1976) and obtain "the aid of persons having knowledge of the law and skilled in its practice," *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888). The protection afforded to attorney work product serves a related purpose, giving lawyers the freedom to work for their clients without fear of intrusions by opposing parties. *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). When clients seek advice from counsel about *future* wrongdoing, however, protection for attorney-client communications and related attorney work product "cea[ses] to operate." *United States v. Zolin,* 491 U.S. 554, 562 (1989) (*quoting* 8 WIGMORE § 2298 at 573, internal quotes omitted). The crime-fraud exception to attorney client privilege and attorney work product ensures that clients do not benefit from the protective cloak of these doctrines when seeking counsel's assistance in committing future offenses. *Id.* at 561.

In the Second Circuit, application of the crime-fraud exception requires a party to "demonstrate that there is probable cause to believe a crime or fraud has been attempted or

committed and that the communications were in furtherance thereof." *United States v. Richard Roe, Inc.* ("*Roe I*"), 68 F.3d 38, 40 (2d Cir. 1995). "The crime-fraud exception does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud." *Id.* "Probable cause" means "a reasonable basis for believing that the objective was fraudulent." *Id.* It is the client's intent to engage in criminal activity, not counsel's, that is relevant; counsel need not even be aware that their assistance was sought for criminal purposes. *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,* 731 F.2d 1032, 1038 (2d Cir. 1984) ("*Marc Rich Case*"). Once probable cause has been established, the court in its discretion may examine the evidence *in camera*. *United States v. Jacobs*, 117 F.3d 82, 87 (2d Cir. 1997). "[I]f and when there has been an *in camera* review, the district court exercises its discretion again to determine whether the facts are such that the exception applies." *Id.*

The quantum of proof necessary to establish the applicability of the crime-fraud exception, however, is unsettled. In the criminal arrest context, probable cause has been a "fluid concept," notably "incapable of precise definition or quantification." *Maryland v. Pringle*, 540 U.S. 366, 370-71 (2003); *see also Brinegar v. United States*, 338 U.S. 160, 173 (the "quanta . . . of proof" appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant.) This ambiguity has carried over into the crime-fraud exception context where, although the Supreme Court suggested that there is a specific "quantum of proof" necessary for the application of the crime-fraud exception, it refrained from clarifying exactly what that is. *Zolin*, 491 U.S. at 563. Similarly, the "circuit courts have not addressed in meaningful detail the actual burden that the movant carries in seeking to pierce the privilege on the basis of the crime-fraud exception, and . . . the degree of discretion available to the trial court in assessing such an

argument by the movant." *In re Omnicom Group Inc., Secs. Litig.*, 233 F.R.D. 400, 406 (S.D.N.Y. 2006). As a result, there is some confusion as to what parties must establish, and what courts may require, to pierce the attorney-client privilege.

In evaluating the plaintiffs' bid to discover Arab Bank's privileged materials, the court takes into account a number of considerations. Caselaw suggests that courts have leeway to decide whether probable cause, a low standard, necessarily pierces the privilege. "[I]t is not all clear that the court lacks discretion, in appropriate circumstances, to require more then [] literal compliance with . . . minimum standards." *Id.* at 406 (citing *Jacobs*, 117 F.3d at 87). Courts have exercised their discretion to decline to apply the exception, particularly where it appears that it would unduly invade the attorney-client privilege or "tilt the playing field at an early stage of litigation." *United States v. Richard Roe, Inc.*, 168 F.3d 69, 71 (2d Cir. 1999) ("*Roe II*"). Indeed, given the "critical role" that "the attorney-client privilege and work product immunity play. . . in our judicial system, the limited exceptions to them should not be framed so broadly as to vitiate much of the protection they afford." *Id.* (citations omitted).

II. ANALYSIS

Determining whether "there is probable cause to believe a crime or fraud has been attempted or committed" and that "[attorney-client] communications were in furtherance thereof," *Roe I*, 68 F.3d at 40, begins with an examination of the two factual bases for plaintiffs' motion: the Payment Memorandum and eventual payment to Hamdan, and the Bishara Declaration. The court will then evaluate whether *in camera* review of privileged materials is warranted.

    A. <u>The Payment to Hamdan</u>

Arab Bank's decision to close Hamdan's account after learning it was possibly involved in money laundering implicated Lebanese banking regulations as well as internal Arab Bank protocol. Under Lebanese law, if a bank suspects an account is involved in money-laundering, it must immediately notify the SIC. (Lebanese Law 318 Art. 7 ¶ 1, Ex. A to Howard Decl.) Upon learning of suspected money-laundering, the SIC "shall, within a period of three working days, take a temporary decision to freeze the suspected account[ ] for a one-time renewable five day period . . . ." (*Id.*; 30(b)(6) Tr. 222:10-12, Ex. B to Howard Decl.) If the bank wishes to close the account it suspects of money laundering, it must still notify the SIC and await a decision. "If at the end of the period stipulated . . . the [SIC] does not render any decision, the said account[] shall be automatically deemed free." (Lebanese Law 318 Art. 8 ¶ 3; 30(b)(6) Tr. 222:19-23). Under Arab Bank's internal operating procedures, while the bank awaits a decision, the balance is held in a suspense account. (30(b)(6) Tr. 223:5-9.) If none is ultimately rendered, the bank must disburse the balance of the closed account to the account holder upon his or her request. (*Id.* 175:7-24.)

After the *Linde* complaint was filed, the Bank investigated its allegations and found that, although the Hamdan account had been opened by an individual, not Hamas, the account number had been advertised on a website controlled by Hamas. (*See* 30(b)(6) Tr. 220:18-21.) Arab Bank therefore decided to close the account. (*Id.*) A Payment Memorandum was drafted containing somewhat cryptic instructions, including a hand-written Arabic note, which translated reads, "For the transfer of the amount to a temporary credit account until the amount is paid, and after inviting him personally to the branch." (Ex H. to the Unger Decl.) Contrary to the plaintiffs' assertion that the note is evidence of Arab Bank's plan to financially support

terrorism, the note reflects that Lebanese law requires Arab Bank to return the funds of a closed account to the account holder, and that Arab Bank required a personal visit to the branch by the account holder to release the funds. It further reflects that Arab Bank placed Hamdan's balance in a "temporary credit account," or a suspense account, where the money would be held pending SIC action. Pursuant to Lebanese law, Arab Bank then reported to the SIC that it had closed an account held in the name of an individual about whom the SIC had inquired a year earlier. (Ex. I to the Unger Decl.; 30(b)(6) Tr. 222:4-9, Ex. B to the Howard Declaration.) The SIC, however, did not render a decision regarding the account. Thus, when Mr. Hamdan appeared at the branch and requested his funds in March 2005 (Arab Bank Mem. 17), he was entitled under Lebanese law to retrieve the funds from his closed account.

These facts do not give the court reason to believe that, by releasing funds to Hamdan in accordance with its obligations under Lebanese law, Arab Bank had a plan to support terrorism. If there had been such a plan, it would not have made sense for Arab Bank to close the account, thereby cutting Hamdan off from their financial services. Furthermore, it would not have been consistent with such a plan for Arab Bank to report the suspected money-laundering to the SIC, thereby risking SIC seizure of the funds, and alerting the SIC to its own involvement.

Moreover, this court may ultimately find that releasing the funds to Hamdan may not give rise to criminal liability for Arab Bank. To find probable cause, the court needs to decide, at least preliminarily, whether a crime was committed – whether the Bank's actions, even if compliant with Lebanese law, nonetheless constituted a violation of the Anti-Terrorism Act. The issue of competing obligations under Lebanese banking law and United States anti-terrorism law, and which law takes precedence, is in dispute. Granting plaintiffs' motion would have

implications for any later decision by this court regarding Arab Bank's civil liability for injuries caused by Hamas. It would be precipitous for this court to weigh in one way or another on the matter until it is properly presented. "[C]ourt findings that would deprive the client of that protection [of the attorney-client privilege] should be based on an adequate record and bear some assurance of reliability." *In re Omnicom Group Inc. Secs. Litig.,* 233 F.R.D. at 405. Indeed, "any findings by the court that would suggest a strong enough basis to infer the perpetration of a fraud [or crime] when such a fraud [or crime] is an essential element of the plaintiffs' underlying claims in this case would, at the very least, potentially tilt the playing field of this lawsuit at a relatively early stage in the litigation." *Id.*, at 405-06.

B. The Bishara Declaration

The Bishara Declaration, the other piece of evidence on which plaintiffs' motion rests, appears to have only the slightest connection to the payment made to Hamdan. In essence, the plaintiffs assert that the Declaration is perjurious because two words in the declaration are inaccurate: the term "dormant" describing the state of Mr. Hamdan's account at the time of the filing of the *Linde* complaint, and the term "froze," in the assertion that, "the Bank ... froze the balance of [Hamdan's] . . . funds . . ." (Bishara Decl. ¶ 11.)[6] The plaintiffs argue that the

---

[6]The three paragraphs relating to the Hamdan Account contained in the fifty-eight paragraph Bishara Declaration are excerpted below.

> 41. The Amended Complaint falsely claims: "Arab Bank knowingly provides banking services to HAMAS directly through its Al-Mazra Branch Account # 3-810-622473-0330 in Beirut." Am. Compl. Para. 345. This is not true. It is inconceivable that we would open an account for HAMAS whether in Beirut or in any of our branches.

> 42. The Amended Complaint refers to account number 3-8 10-622-473-0330 in Arab Bank El-Mazra branch, Lebanon as a main account used to fund terrorism. We have investigated this account and our findings were that this account, which had a balance of USS 8000, had been opened by an individual and has been dormant for the past three years.

perjury is both an independent crime and further evidence of Arab Bank's plan to support terrorism.

The court first examines the Declaration's depiction of the Hamdan account as three-years "dormant" when there had been a number of deposits into the account during that time.[7] Clearly, this usage of "dormant" is at odds with how the word is used and understood in the United States, where a reader would properly interpret it to mean that the account had no activity – credits or debits – for the stated time period. "Dormant" has a different meaning, however, within Arab Bank Lebanon: in Arab Bank Lebanon parlance, "dormant" describes a checking account from which there had been no withdrawals for more than a year. (Arab Bank Mem. 14; 30(b)(6) Tr. at 157:21-158:4, Ex. B. to the Howard Decl.) Considered in this context, the Declaration's usage of the term "dormant" is accurate, as the term is used in Arab Bank, and not indicative of ill intent. While it may have been misleading to a United States court, the use of the term may plausibly be attributed to regional practice rather than subterfuge.

The plaintiffs also find perjurious the Declaration's statement that the Bank "froze" Hamdan's account (Bishara Decl. ¶ 43), because it is contradicted by the Rule 30(b)(6) deponent's testimony that the Bank does not have the power to freeze funds (Pls. Mem. in Supp. 22.) Tr. 177:17-23, Ex. A to the Smith Decl.) Furthermore, plaintiffs argue that the statement

---

43. We also discovered that unknown to the Bank, as plaintiffs claim, that this account number was used on a website that plaintiffs allege is a HAMAS website. Upon confirming that this account was at some time available on a website alleged to belong to HAMAS, a fact that the Bank was unaware of, the Bank closed this account, froze the balance of its funds and reported it to the appropriate authorities.

[7]In the three years preceding the submission of the Declaration, the account received seven deposits, in the amounts of $300.00, $408.00, $814.23, $995.00, $2,957.00, £1000 (British) and €450. (Ex. O. to Unger Declaration.)

that the balance was "frozen" is false because the Payment Memorandum indicates Arab Bank placed the funds in a suspense account with an intent to pay Hamdan the balance. (Ex. H to the Unger Decl.) The plaintiffs' argument, which focuses on semantic distinctions, falls short of suggesting that perjury was committed. While the Declaration's statement that the Bank froze the account is in dispute, it remains unquestioned that the account was in fact frozen for some time: SIC rules require that funds in accounts referred for suspected money laundering be temporarily frozen, and placing funds in a suspense account where they are unavailable to the account holder except upon an in person appearance is entirely consistent with that requirement.

The plaintiffs are further troubled by the Declaration's omission of the fact that Hamdan was free to collect his funds at any time, and that the Bank did not alert the court that Hamdan had indeed received the funds in March of 2005. The Declaration was drafted in November of 2004, and submitted in conjunction with Arab Bank's motion to dismiss on March 11, 2005. Hamdan visited the Al-Mazra branch and collected his funds on March 30, 2005. Thus, at the time the Declaration was submitted, no disbursements had yet been made. The court agrees that the Declaration could have been more complete with respect to Arab Bank Lebanon's possible obligation, under Lebanese law, to return the funds to Hamdan. It appears to the court, however, that many details concerning the Hamdan Account were left out of the Bishara Declaration simply because the Bishara Declaration was not focused on the Hamdan Account. Their absence does not provide probable cause that Arab Bank drafted the Declaration *in order* to deceive the court about the Hamdan account. The plaintiffs' assertions to the contrary notwithstanding, there is no indication here that Arab Bank solicited counsel's assistance in order to disguise criminal, fraudulent, or tortious conduct. For that reason, the cases they cite relying on these

-15-

assertions, *Antidote International Films, Inc. v. Bloomsbury Publishing*, PLC, 242 F.R.D. 248, 250 (S.D.N.Y. 2007), *In re Enron,* 349 B.R. 115 (S.D.N.Y. 2006), *Renner v. Chase Manhattan Bank*, 2001 WL 1356192 (S.D.N.Y. Nov. 2, 2001), and *Speciality Minerals Inc. v. Pleuss-Staffer AG*, 2004 WL 42280 (S.D.N.Y Jan. 7. 2004) are inapposite: in each of these cases, the judge felt sufficiently confident that an attorney's assistance was sought to perpetrate a crime or fraud. The court here does not feel similarly confident.

The plaintiffs compare the Bishara Declaration with the perjurious affidavit in *In re Grand Jury Subpoena to Carter*, Misc. Action No. 98-068 (NHJ), 1998 U.S. Dist. Lexis 19497 (D.D.C. Apr. 28, 1998), in which Monica Lewinsky falsely swore that she never had a sexual relationship with President Clinton. The court in *Carter*, however, made its decision to pierce the attorney-client privilege surrounding the drafting of that affidavit based on very strong evidence that Monica Lewinsky had consulted her attorney and used his services in order to commit perjury – evidence that included tape-recorded conversations between Monica Lewinsky and Linda Tripp in which Lewinsky discussed her relationship with President Clinton.[8] Factually, *Carter* is not at all comparable to the case at bar. Here, the evidence indicates at most a lack of precision, while in *Carter*, the court was presented with the affiant's tape-recorded conversations in which she squarely contradicted the substance of her affidavit. The issues identified by the plaintiffs here are not of " 'sufficient weight' to warrant abridging the attorney-client privilege." *Id.* at *9.

---

[8]The court in *Carter* does not explicitly describe the contents of the evidence upon which it based its decision, having examined it *in camera*, but Tripp's tape recordings of conversations she had with Lewinsky discussing Lewinsky's relationship with Bill Clinton are well-known. *See*, *e.g.*, Francis X. Clines, Panel Releases Conversations Taped by Tripp, New York Times, Oct. 3, 1998 (available permanently at http://query.nytimes.com/gst/fullpage.html?res=9D0CEFD61338F930A35753C1A96E958260&sec=&spon=&partner=permalink&exprod=permalink).

C. *In Camera* Review

Prior to engaging in *in camera* review to determine the applicability of the crime-fraud exception, courts "'require a showing of a factual basis adequate to support a good faith belief by a reasonable person,' that in camera review . . . may reveal evidence to establish the claim that the crime-fraud exception applies." *Zolin*, 109 S.Ct. 2619, 2631 (1989). This standard requires a "lesser . . . showing . . . than is required ultimately to overcome the privilege." *Id.* Ultimately, "the decision whether to engage in *in camera* review rests *in the sound discretion* of the district court." *Id.* Whether the plaintiffs have met even the lower standard required for *in camera* review is questionable. Nevertheless, the lack of clarity in the Bishara Declaration regarding the status of the Hamdan account, and Arab Bank's failure to apprise the court of the disbursement of the funds, while possibly harmless, raises some concern. Thus, in an abundance of caution, the court will require the defendant to provide a log of all privileged documents concerning the Hamdan account, including documents generated or received by Arab Bank's legal department and any of its current or former litigation counsel after the filing of these actions such as those generated in connection with the submission of the Bishara Declaration, and to produce copies of all logged materials to the court for *in camera* review.[9]

---

[9]To the extent that the court requires English translations, the court will advise counsel as the need arises.

## CONCLUSION

For the foregoing reasons, the plaintiffs' motion is denied in part and granted in part. Arab Bank is directed to provide chambers with a privilege log and copies of the documents as discussed above within 30 days. Arab Bank's request for costs and attorney's fees is denied.

**SO ORDERED:**

*Viktor V. Pohorelsky*

VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
February 25, 2009