UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------x
COURTNEY LINDE, et al.,

                              Plaintiffs,          **REPORT AND RECOMMENDATION**

        - v -                                      CV-04-2799 (NG)(VVP)

ARAB BANK, PLC.,                                   **AND ALL RELATED CASES**[1]

                              Defendant.
---------------------------------------------------------x

        The plaintiffs have moved for sanctions pursuant to Rule 37(b)(2) of the Federal Rules of

Civil Procedure because of the failure by the defendant to provide court-ordered discovery.  The

unproduced discovery consists of financial records and other information located in various

foreign jurisdictions.  In prior proceedings in these related actions, familiarity with which is

presumed, the court found that, although the bank secrecy laws of those foreign jurisdictions bar

disclosure of the unproduced discovery, the privacy interests served by those laws had to yield to

the interests served by the disclosure of the information in these actions.  *Linde v. Arab Bank,*

*PLC*, 463 F. Supp. 2d 310, 315-16 (E.D.N.Y. 2006).  Notwithstanding that ruling, the defendant

has continued to decline, on foreign bank secrecy law grounds, to produce the information.  The

plaintiffs therefore seek an order with a variety of measures to remedy the defendant's refusal to

produce the information, as well as an award of attorney's fees and costs for the defendant's

failure to comply with discovery orders.

_____

        [1]The following related cases have been consolidated with the instant case for purposes of
discovery and other pretrial proceedings: *Philip Litle, et al. v. Arab Bank, PLC*, CV-04-5449 (NG)(VVP),
*Oran Almog, et al. v. Arab Bank, PLC*, CV-04-5564 (NG)(VVP), *Robert L. Coulter Sr., et al. v. Arab Bank,*
*PLC*, CV-05-365 (NG)(VVP), *Gila Afriat-Kurtzer, et al. v. Arab Bank, PLC*, CV-05-388 (NG)(VVP),
*Michael Bennett et al. v. Arab Bank, PLC*, CV-05-3183 (NG)(VVP), *Arnold Roth, et al. v. Arab Bank, PLC,*
CV-05-3738 (NG)(VVP), *Stewart Weiss, et al. v. Arab Bank, PLC*, CV-06-1623 (NG)(VVP), and *Joseph*
*Jesner, et al. v. Arab Bank, PLC*, CV-06-3869 (NG)(VVP).

# I. LEGAL AND JURISPRUDENTIAL CONSIDERATIONS

Rule 37 of course authorizes the court to impose sanctions for a party's failure to produce discovery. *See* Fed. R. Civ. P. 37(b). Although the degree of culpability of the offending party is a consideration in determining an appropriate sanction, sanctions may be imposed even if a party has not acted wilfully or in bad faith, because sanctions serve not only a punitive function but the remedial function of restoring the prejudiced party to the same position he would have been in absent the non-production of evidence by the opposing party. *Residential Funding Corp. v. Degeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (*quoting Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 75 (S.D.N.Y. 1991). The *Restatement (Third) of the Foreign Relations Law of the United States* (hereinafter "*Restatement*"), to which the Supreme Court and courts in the Second Circuit look to resolve issues involving the production of evidence in violation of the laws of foreign jurisdictions, *see, e.g., Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court*, 482 U.S. 522, 541-46 (1987); *United States v. Davis*, 767 F.2d 1025, 1033-34 (2d Cir. 1985); *Minpeco, S.A. v. Conticommodity Serv., Inc.*, 116 F.R.D. 517, 529-30 (S.D.N.Y. 1987), likewise recognizes the propriety of sanctions even in the absence of fault or bad faith. Section 442 of the *Restatement* thus provides that

> a court may, in appropriate cases, make findings of fact adverse to a party that has failed to comply with the order for production, even if that party has made a good faith effort to secure permission from the foreign authorities to make the information available and that effort has been unsuccessful.

*Restatement (Third)* § 442 (2)(c). In this litigation, the court has already determined that the withheld evidence is essential to the proof of the plaintiffs' case. *Linde*, 463 F. Supp. 2d at 311-12. Accordingly, some sanction must be imposed if for no other reason than to restore the

"evidentiary balance" that has been disturbed by the non-production of important evidence. *Turner*, 142 F.R.D. at 75.

Rule 37(b)(2) provides broad discretion to a district court in fashioning an appropriate sanction when a party withholds evidence in breach of discovery obligations. *Residential Funding*, 306 F.3d at 107. Severe sanctions such as entry of default or dismissal of claims may be imposed in extreme circumstances. *See, e.g., Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007) (*citing John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc.*, 845 F.2d 1172, 1176 (2d Cir. 1988). Ordinarily, however, severe sanctions require a determination that a party's failure to comply with discovery obligations is due to wilfulness or bad faith, *e.g., Daval Steel Prods. v. M/V Fakredine*, 951 F.3d 1357, 1367 (2d Cir. 1991), and before imposing severe sanctions the court must consider whether lesser sanctions will provide an effective remedy. *See, e.g., Shcherbakovskiy*, 490 F.3d at 139-40; *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999); *Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir. 1988). Lesser available sanctions include orders directing that "designated facts be taken as established for purposes of the action," or precluding the offending party from offering evidence concerning designated matters. Fed. R. Civ. P. 37(b)(2)(A)(i) and (ii). Adverse inference instructions are also an option. *See, e.g., Société Internationale Pour Participations Industrielles et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 212-13(1958); *Residential Funding*, 306 F.3d at 107 (*citing Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 267 (2d Cir. 1999)).

The court's broad discretion in fashioning sanctions must be guided by several important considerations. The sanction must be "just," *see* Fed. R. Civ. P. 37(b)(2)(A), and "the severity of the sanction must be commensurate with the non-compliance." *Shcherbakovskiy*, 490 F.3d at

140; *accord, Daval Steel Prods.*, 951 F.3d at 1368.  As noted above, sanctions serve both a punitive and a remedial purpose.  Whether a sanction serves those purposes and is "commensurate with the non-compliance" requires the weighing of two objective factors: (1) the intent of the party withholding evidence – that is, whether the party is motivated by a bad faith desire to deprive the court of evidence that would be damaging to it; and (2) the likely content of the withheld evidence – that is, what would the evidence likely prove.  *See Turner*, 142 F.R.D. at 74; *accord, Kronisch v. United States*, 150 F.3d 112, 127 (2d Cir. 1998) ("Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence.").  The first factor informs the punitive function of sanctions, while the second informs the remedial function.

## II.  <u>THE SANCTIONS TO IMPOSE</u>

Determining what sanctions to impose begins with an analysis of the two factors identified above – the defendant's intent in withholding evidence and the content and significance of that evidence.

### A.    INTENT

The facts on this question are decidedly mixed.  As explained in more detail in the discussion below regarding their content, the withheld bank records bear directly on a central element of the plaintiffs' proof here – whether the defendant provided financial services to terrorists.  Without that evidence the plaintiffs face a difficult, and perhaps insurmountable, hurdle in establishing their case.  The defendant, of course, has argued that the evidence would actually establish that they have not knowingly provided financial services to terrorists.

Nevertheless, the fact that the withheld records may disclose a large volume of payments and other transactions made to or for the benefit of terrorists, as well as other information linking the defendant's accountholders to terrorist organizations, furnishes a powerful incentive to withhold them.

On the other hand, there is no question that the Bank faces a difficult choice in deciding whether to produce the information at issue here. The court previously determined, and the plaintiffs do not dispute, that disclosure of the information would violate the laws of foreign jurisdictions and expose not only the Bank, but its employees, to criminal sanctions in those jurisdictions. *Linde*, 463 F. Supp. 2d at 313. As the Supreme Court noted in a similar context, "fear of criminal prosecution constitutes a weighty excuse for nonproduction." *Société Internationale*, 357 U.S. at 211. It is difficult to assess how real that threat actually is, as the defendant has not brought to the court's attention any prosecutions or other penalties that the Bank, or any bank in those jurisdictions for that matter, has ever faced for violations of the laws in question. Nevertheless, compliance with the disclosures ordered by the court would expose large volumes of protected information relating to the defendant's accountholders in derogation of specific warnings already given to the defendant by foreign authorities in response to the Bank's requests for authorization to make the disclosures ordered by this court. Clearly, compliance with the court's order carries some risk for the defendant.

The plaintiffs cast doubt on the extent to which the defendant actually fears any risk of adverse consequences for violating foreign bank secrecy laws by pointing out that the defendant has previously produced documents in violation of those laws – including documents relevant to the claims here – to federal regulatory authorities and pursuant to a grand jury subpoena during a

federal criminal investigation. They argue that the defendant's decision to produce some protected documents to federal authorities, while refusing to produce other protected documents here, is evidence of bad faith because it demonstrates that the defendant has chosen whether or not to make disclosures based, not on whether disclosure will violate bank secrecy laws, but on whether disclosure will help them or hurt them in a given situation. The plaintiffs point to *Remington Prods., Inc. v. North Am. Philips Corp.*, 107 F.R.D. 642 (D. Conn. 1985), where the court found the defendant to be acting in bad faith when it refused to produce documents on grounds that to do so violated a Dutch blocking statute.[2] Among other reasons supporting that finding, the court there pointed out that the defendant had chosen to ignore the same blocking statute in an earlier case when disclosure of the same types of information served their interests. *Id.* at 654-55. The situation here is somewhat different, however, because the defendant's prior disclosure was made to governmental authorities, whose requests are typically viewed as exemplifying strong national interests particularly in criminal proceedings. *See, e.g., In re Grand Jury Subpoena dated August 9, 2000*, 218 F. Supp. 2d 544, 562-63 (S.D.N.Y. 2002); *see also Restatement* § 442 rep. note 9 (1987). Arguably the defendant would be less fearful that foreign governments would pursue sanctions against it for disclosures made to governmental authorities than for disclosures made in private civil litigation. It is also noteworthy that the Bank's

_____

[2]The "blocking statute" at issue in *Remington Products* differs significantly from the bank secrecy laws involved here. The Dutch law prevented the disclosure of broad ranges of information only in antitrust cases, and was enacted for the specific purpose of frustrating enforcement of United States antitrust law. *See Remington Prods.*, 107 F.R.D. at 651-52. In contrast, the bank secrecy laws here prevent disclosure of specific types of information to anyone, whether for purposes of litigation or any other purpose.

disclosures to United States governmental authorities is not public information, and the fact that those disclosures were made apparently remains unknown to foreign authorities.

Moreover, the defendant points out that, in contrast to the situation in *Remington Products*, the defendant has made various good faith efforts, some of which have been quite successful, to obtain permission to produce substantial quantities of documents otherwise prohibited from disclosure. The bank secrecy laws involved here permit disclosure of protected information with the consent of those to whom the information pertains. The defendant thus has obtained the permission of the Saudi Committee for the Support of the Intifada Al Quds ("Saudi Committee") to disclose all documents relating to transactions handled by the defendant on the Saudi Committee's behalf, resulting in the production of some 180,000 transactional documents. The defendant also sought and obtained the permission of the Lebanese Special Investigation Commission ("SIC") to produce documents relating to an account at a Lebanese branch which was held in the name of an individual who has been identified as a high-ranking member of HAMAS. In addition, the defendant made a number of unsuccessful efforts, first through its own petitions to governmental authorities and then through letters rogatory signed by the court, to obtain permission from authorities in Lebanon, Jordan, and at the Palestinian Monetary Authority to disclose documents within those jurisdictions. Except for the one request granted by the SIC above, those requests were denied.[3] Finally, the defendant has disclosed to the plaintiffs the records that were previously disclosed to federal authorities as mentioned above.

---

[3]Early on in the discovery process, before sending the letters rogatory, the defendant had succeeded in petitioning a lower court in Jordan for permission to disclose records subject to that country's bank secrecy law. The lower court ruling was overturned upon the appeal of one of the affected accountholders.

Overall, the defendant's efforts have resulted in the disclosure of over 200,000 documents that are subject to bank secrecy laws.

The plaintiffs challenge the good faith of the defendant on several additional grounds. They argue that the defendant's second request to the Lebanese SIC for authorization to disclose records relating to several accounts in Lebanon is not evidence of good faith because it was made in a manner calculated to fail. The request was made by letter dated September 25, 2006, prior to this court's determination that the defendant was required to produce documents notwithstanding the prohibitions of foreign bank secrecy laws. The plaintiffs find fault with the letter because it advised the SIC that the claims in these cases were baseless and that a decision by this court had "provided for respecting confidentiality laws in the countries of these accounts." Arab Bank Letter to SIC, Sept. 25, 2006, at p. 2 (found at Ungar Decl. Ex. 40). The plaintiffs argue these assertions were false because the court's decision denying the defendant's motion to dismiss the claims had already demonstrated that the claims were not baseless and because the question whether foreign "confidentiality laws" would be "respected" had not yet been decided. The false assertions, in the plaintiffs' view, tended to encourage denial of the request, similar to unsuccessful requests that were made in *Remington Products* which the court there found to be evidence of bad faith.

Although the letter could have been more forceful in its effort to convince the SIC to permit disclosure, the court does not find as much fault in it as the plaintiffs. One can hardly expect a litigant applying to a governmental agency such as the SIC, which is charged with investigating terrorism, not to deny, in strong terms, any complicity in terrorist conduct that is alleged against it by others. As to the statement that this court had "provided for respecting

confidentiality laws," that statement was a reference to this court's statement in an early order concerning foreign discovery which asserted that the order did not constitute "a ruling concerning the laws, rules and regulations applicable in other countries that limit the disclosure of documents (hereinafter "bank secrecy laws"), or the appropriate remedies, if any, for the failure or refusal by the defendant to produce documents because of bank secrecy laws." Doc. Prod. Order, Mar. 3, 2006 ¶ 12. That statement obviously recognized the potential applicability of foreign bank secrecy laws, and the possibility that such laws might interfere with production of documents here. The Bank's characterization of that statement as one that "provided for respecting confidentiality laws" is not inaccurate and does not constitute evidence of bad faith.

Finally, the plaintiffs point to two discovery disputes where the defendant's opposition to discovery demands on relevance grounds was overruled by the court as further evidence of the defendant's general lack of good faith in conducting discovery. Neither dispute involved foreign bank secrecy laws. It is of course common for parties to resist discovery based on arguments that the discovery is irrelevant, and also common that such arguments are rejected. In the circumstances, the court is not prepared to find that the overruled assertions of lack of relevance here constitute any evidence of bad faith.

On balance, although the court is not convinced that the defendant has acted in the utmost good faith in withholding evidence subject to foreign bank secrecy laws, the court cannot find that it is acting in bad faith. As the Second Circuit observed in *Reilly v. Natwest Markets Group Inc.*, "failures [to produce relevant evidence] occur 'along a continuum of fault – ranging from innocence through the degrees of negligence to intentionality.' " 181 F.3d 253, 267-68 (2d Cir. 1999) (*quoting Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988)). The court is

unable to determine precisely where on that continuum the defendant's refusal to produce discovery lies, but doubts about the defendant's motivations must be tempered with the acknowledgment that the defendant has undertaken a number of steps contemplated to permit disclosure of documents prohibited by foreign bank secrecy laws, and by virtue of those steps has been able to produce a substantial quantity of documents sought by the plaintiffs.

B.    CONTENT

The withheld evidence consists of a variety of bank records as well as incomplete responses to requests for admissions.  The unproduced documents were the subject of various discovery orders entered by the court, but were ultimately narrowed and set forth in a production order entered by the court on May 7, 2007 (hereinafter the "Document Production Order") after the court had overruled the defendant's objections to discovery based on foreign bank secrecy laws.  Briefly described, the unproduced documents fall into the following categories:

(1)    account documents and transaction records for all individuals who received payments from the Saudi Committee;
(2)    account documents and transaction records for a listed group of 36 entities which purport to be charitable organizations but which the plaintiffs allege act as fronts for HAMAS;
(3)    account documents and transaction records for 8 organizations (including HAMAS) designated as either terrorist organizations or their affiliates and 56 individuals alleged to be agents of those organizations; and
(4)    records, including wire transfer records, for 8 organizations that have been listed by the United States government as Specially Designated Global Terrorists.

The requests for admissions the defendant declined to answer were made in the Plaintiffs' First Set of Requests for Admissions and Related Interrogatories and asked the defendant to authenticate various documents that appeared to be business records of the defendant but which had been seized from third parties.

Understanding the significance of the withheld evidence requires consideration of the theories of proof the plaintiffs will pursue to establish their claims. The plaintiffs will seek to prove two factual theories. First, they will seek to prove that the defendant helped to administer a so-called "death and dismemberment benefit plan" under which the Saudi Committee made cash payments to terrorists and to their family members or other representatives which served as an incentive for suicide bombers and others who killed or caused injuries to the plaintiffs. The defendant's role, according to the plaintiffs, included distributing the payments through its branches in the West Bank and Gaza in accordance with instructions provided by the Saudi Committee. Second, apart from the death and dismemberment plan, the plaintiffs will seek to prove that the defendant provided financial services – such as the opening of accounts, wire transfers, and other activities to facilitate the transmission of funds – to various organizations and individuals who were acting as fronts for HAMAS, a designated foreign terrorist organization, and to several other designated foreign terrorist organizations.

Given those two theories of liability, the importance of the withheld documents is readily apparent. The transaction records constitute direct evidence of financial services. Account records and other information would serve to identify the accountholders and others for whom those financial services were provided, and would thus provide direct evidence about whether any of those financial services were provided to terrorist organizations and individual terrorists or their relatives either as part of the death and dismemberment benefit plan or to fund other activities. It would also permit the plaintiffs to follow money trails, to see whether funds and other financial services provided to ostensibly legitimate entities ended up in the hands of terrorists and terrorist organizations, or were used for terrorist activities. There is little doubt

that the withheld information would yield at least some information about financial services that were provided by the Bank to terrorists. The Saudi Committee records produced by the defendant disclose that payments distributed by the defendant on behalf of the Saudi Committee were made to persons who were identified as having committed terrorist attacks. Other records produced by the defendant and other evidence obtained by the plaintiffs establish that the defendant provided financial services to some of the entities alleged by the plaintiffs to be "fronts" for HAMAS. It would require a suspension of disbelief to conclude that the only financial services the Bank ever provided to those alleged by the plaintiffs to be terrorists or their affiliates are reflected in the documents that have been produced. The full extent of any such financial services can thus only be proven through an examination of the withheld evidence.

C. SANCTIONS PROPOSED BY THE PLAINTIFFS

The court turns now to an examination of the specific sanctions requested by the plaintiffs. The plaintiffs have submitted a proposed order that would impose essentially three kinds of sanctions. The proposed order (1) deems various facts central to the plaintiffs' claims to be established, (2) deems certain documents to be authentic business records of the defendant, and (3) precludes the defendant from offering evidence withheld on grounds of foreign bank secrecy as well as testimony that could be cross-examined through the use of such evidence.

1. *Facts To Be Deemed Established*

The facts the plaintiffs ask to be deemed established are found in the first eight numbered paragraphs of the proposed order they have submitted on this motion. Five of the paragraphs concern factual findings with respect to the death and dismemberment benefit plan; the other

three concern findings with respect to the providing of financial services to HAMAS and other terrorist organizations either directly, or through fronts or agents.

a.       Findings Concerning the Death
and Dismemberment Plan

The five proposed findings concerning the death and dismemberment plan are various iterations on the same theme.  Thus, the first reads:

> At all relevant times between 2000 and 2004, Arab Bank provided financial services on behalf of the Saudi Committee in Support of the Intifada Al Quds to more than one thousand terrorists or to the relatives or representatives of terrorists (including the relatives or representatives listed as account holders in paragraphs 2-10 of the Plaintiffs' Joint Modified Phase I Request for the Production of Documents to Defendant Arab Bank, PLC (June 27, 2005), incorporated in Decision and Order (July 27, 2005)), affiliated with Hamas, PIJ, PFLP or the Al Aqsa Martyrs Brigade, knowing or intending that the financial services were to be used, in full or in part, in preparation for, or in carrying out, terrorist acts.[4]

Pl. Proposed Order ¶ 1.  The second proposed finding is virtually identical except that it does not specify any particular number of terrorists and applies to terrorists not affiliated with a foreign terrorist organization like those identified in the first proposed finding.   The third proposed finding is different from the second in two respects: it states that Arab Bank "*knowingly* provided financial services" rather than simply "provided financial services," and it applies both to terrorists affiliated with the foreign terrorist organizations identified in the first proposed finding and to terrorists unaffiliated with any foreign terrorist organization.  The fourth proposed finding asserts that Arab Bank agreed with the Saudi Committee to provide financial services to terrorists whether or not they were affiliated with a terrorist group, and the fifth asserts that the

---

[4]"PIJ" refers to the Palestinian Islamic Jihad and "PFLP" refers to the Popular Front for the Liberation of Palestine.

Bank agreed with the Saudi Committee to provide financial services to the terrorists affiliated with the foreign terrorist organizations identified in the first proposed finding "knowing that the financial services provided material support within the meaning of 18 U.S.C § 2339A(b)(1) to these foreign terrorist organizations."

Each of the five paragraphs seek essentially two kinds of findings: one concerning the actual provision of financial services to various categories of individuals and another concerning the knowledge or state of mind of the defendant with respect to those financial services. To the extent that these proposed findings seek to deem established the fact that Arab Bank provided financial services on behalf of the Saudi Committee to terrorists, including terrorists affiliated with specified foreign terrorist organizations and terrorists unaffiliated with terrorist groups, they are reasonably commensurate with the Bank's non-compliance with the court's discovery orders. The documents withheld by the Bank includes information about the identities of the accountholders and other recipients of payments distributed by the Bank on behalf of the Saudi Committee, as well as transaction records reflecting the amounts and timing of those payments. The withheld documents would also reflect other transactions conducted by, and financial services provided to, those who received payments from the Saudi Committee. By withholding all records relating to those who received payments, the Bank has deprived the plaintiffs of the opportunity to prove the identities of all the terrorists to whom financial services were provided and the full scope of the financial services that were provided. And, because the plaintiffs are unable to learn the identities of the terrorists to whom financial services were provided, they are unable to establish whether or not they were affiliated with foreign terrorist organizations such as HAMAS and the others listed in their proposed findings.

Given the importance of the withheld evidence as demonstrated above, an order that deems established that Arab Bank provided financial services to terrorists affiliated with the foreign terrorist organizations identified by the plaintiffs, as well as to terrorists unaffiliated with terrorist groups will serve the remedial function of placing the plaintiffs in substantially the position they would have been in had the defendant complied with the court's discovery orders and prevents the defendant from gaining an advantage from non-compliance.

On the other hand, as to the defendant's knowledge or state of mind in the plaintiffs' proposed findings – i.e., those deeming established the knowledge and intent of the defendant in providing financial services and that the defendant had an agreement with the Saudi Committee to provide financial services with certain knowledge and intent – the findings go beyond that remedial function. There has been no showing that the withheld evidence would be likely to provide direct evidence of the knowledge and intent of the Bank in providing the financial services at the heart of this case or in entering an agreement, if any, with the Saudi Committee.

For much the same reason, an adverse inference instruction concerning the defendant's state of mind is also unwarranted. Such an instruction requires, among other things, a sufficient showing that unproduced material is "relevant," that is, that it would be of such a nature that it would tend to prove the opposing party's claim. *See, e.g., Residential Funding*, 306 F.3d at 107-09; *Kronisch*, 150 F.3d at 127 ("before we permit the drawing of an adverse inference, we require some showing indicating that the destroyed evidence would have been relevant to the contested issue"). Here, although the unproduced material is clearly "relevant" to the claim that the Bank provided financial services to terrorists, a sufficient showing that it would tend to prove the claim

that the Bank did so knowingly or intentionally has not been made.[5]  The plaintiffs should of

course be permitted to bring to the jury's attention that numerous records were not produced,

and to make arguments about how those missing records could have shed light on the Bank's

knowledge and intent.  But without a clearer showing that the unproduced material could

provide direct evidence of the Bank's state of mind, an instruction by the court about the

inferences to be drawn from the absent records is not warranted.

>    b.    Findings Concerning Financial Services To
>          HAMAS and Other Foreign Terrorist Organizations

As noted earlier, separate from the death and dismemberment benefit plan, the plaintiffs

will seek to establish that the defendant provided financial services to entities that have been

designated as foreign terrorist organizations ("FTOs") by the federal government.  The facts that

the plaintiffs seek to deem established with respect to this theory are contained in three

paragraphs in their proposed order, each of which deals with a separate group of entities or

individuals.  The first of the three relates to the charitable organizations which allegedly serve as

fronts for FTOs, and contains the following factual findings:

>    At all relevant times between 1994 and 2004, Arab Bank provided
>    financial services to the entities listed in Document Production Order, Appendix

---

[5]An adverse inference instruction also requires a showing that the withholding party acted "with a culpable state of mind."  *See, e.g., Residential Funding*, 306 F.3d at 107-08.  In spoliation cases, where the standards for adverse inference instructions have been primarily developed, that inquiry is satisfied if evidence has been destroyed "knowingly, even if without intent to [breach a duty to preserve it], or negligently."  *Id*.  No Second Circuit decision has yet discussed what constitutes a "culpable state of mind" in a situation like the one here where the withholding of evidence is intentional, but arguably justified by concerns about the consequences of violating foreign laws.  Nevertheless, the defendant's decision not to comply with the court's order likely suffices to establish the necessary "culpable state of mind." Justifiable or not, that decision prevents the plaintiffs from obtaining necessary evidence, and thus is not unlike the destruction of evidence because of simple negligence, which constitutes a sufficiently "culpable state of mind" for an adverse inference instruction.  *See id*.

A (May 7, 2007, and June 26, 2007), knowing that each entity was operated and controlled by an organization that is a foreign terrorist organization, or knowing that the entity was operated and controlled by an organization that has engaged in or engages in terrorist activity or terrorism within the meaning of 18 U.S.C. § 2339B(a)(1), including any activity that was the basis for the designation.

Proposed Order ¶ 6. (The entities listed in the Appendix A referred to above are all ostensibly charitable organizations.)

The second of the three paragraphs contains similar findings but relates to 56 individuals, listed in an Appendix B to the Document Production Order, who are alleged to be agents of FTOs. The findings proposed by the plaintiff with respect to those individuals are that the defendant provided financial services to those individuals "knowing that the individual was an agent for an organization that is a foreign terrorist organization, or knowing that the individual was an agent for an organization that has engaged in or engages in terrorist activity or terrorism within the meaning of 18 U.S.C. § 2339B(a)(1), including any activity that was the basis for the designation."

The final paragraph relates to four FTOs – HAMAS, the Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, and the Al Aqsa Martyrs Brigade – and four organizations known to be their affiliates. The findings proposed by the plaintiff assert that the defendant provided financial services to those eight entities knowing that they were either FTOs or "organizations that have engaged in or engages in terrorist activity or terrorism within the meaning of 18 U.S.C. § 2339B(a)(1), including any activity that was the basis for the designation."

In analyzing the factual findings set forth in the above three paragraphs, the court again draws a distinction between findings concerning the provision of financial services and findings

concerning the defendant's knowledge about the entities and individuals to whom the financial services were rendered. As to the provision of financial services, documents produced by the defendant and other evidence obtained by the plaintiffs from other sources establish that the defendant did provide some financial services directly to several of the charitable organizations covered in the first paragraph and to several of the individuals covered in the second. As to those entities and individuals, findings that they received financial services are hardly necessary. The question for the court is whether it is appropriate to deem established that the Bank provided financial services to all of the other entities and individuals covered by the three paragraphs including HAMAS and the other FTOs.

In the absence of any evidence that the defendant actually provided financial services to those other entities covered by the factual findings proposed by the plaintiffs, the more appropriate remedy for restoring the evidentiary balance is an adverse inference instruction that permits the jury to draw the inference, based on the fact that the defendant withheld highly relevant records, that the defendant provided financial services to those individuals and entities either directly or indirectly. That the withheld records could provide such proof is hardly debatable. Any documents concerning accounts held by any of those entities and individuals and transactions conducted on their behalf would provide direct evidence that the defendant provided them with financial services. More importantly, the withheld documents would also provide information concerning the sources and beneficiaries of funds flowing through their accounts. To the extent that those sources and beneficiaries of funds could be connected to the four FTOs, the withheld documents would serve to establish that the defendant provided financial services, indirectly, to the FTOs. Account opening documents, which would provide

the names and other identifying information about those with signature authority on the accounts, could conceivably also provide information linking the charitable organizations and individuals to the FTOs. By declining to produce complete information concerning the charitable organizations and individuals alleged to be acting on behalf of the FTOs, the defendant has deprived the plaintiffs of a clear opportunity to obtain evidence proving that the defendant also provided financial services, at least indirectly, to the FTOs.

Although the withheld documents are of a nature that they would clearly establish whether financial services were provided to the entities and individuals named by the plaintiffs, the likelihood that they would provide evidence concerning the knowledge of the defendant about the connection between those financial services and terrorist organizations and activities is decidedly less clear. It is certainly conceivable that withheld documents concerning the charitable organizations and the individuals referred to in the proposed findings would provide some information disclosing an affiliation with the FTOs. At least one document produced relating to one individual for whom the Bank provided financial services contains a notation referring to "Hamas." But any documents disclosing such connections between charitable organizations or individuals, on the one hand, and the FTOs, on the other, would serve only as circumstantial evidence that the Bank knew they were either controlled by or acting as agents of those FTOs, as the plaintiffs have asked the court to find. Indeed, absent a confession, knowledge and intent are always matters of circumstantial evidence. Accordingly, as with the factual findings proposed concerning the defendant's knowledge with respect to the Saudi Committee payments, the factual findings proposed by the plaintiffs concerning the defendant's knowledge with respect to the financial services that the defendant provided, or may have

-19-

provided, to charitable organizations and individuals are not adequately supported by the record developed thus far. Neither the proposed factual findings nor an adverse inference instruction are warranted with respect to the defendant's knowledge or state of mind.

**2.** <u>*The Requests for Admissions*</u>

Under Rule 36, if a party fails to provide a proper response to a request for admission, "the court may order either that the matter is admitted or that an amended answer be served." Fed. R. Civ. P. 36(a)(6). As the court has specifically overruled the defendant's bank secrecy objections to the plaintiffs' First Set of Requests for Admissions, and the defendant has declined to serve an amended answer to those requests, the court must order that the matters that the defendant has refused to answer on bank secrecy grounds are deemed admitted. In addition, to the extent the requests for admissions asked that the defendant confirm the authenticity of the defendant's records obtained from other sources, those records should be deemed admissible as authentic business records of the defendants.

**3.** <u>*The Requested Preclusion Order*</u>

The plaintiffs request an order that would preclude the defendant from offering in evidence any documents that have been withheld on foreign bank secrecy law grounds. As the defendant concedes, such an order is appropriate and should be entered. The plaintiffs also seek the preclusion of any testimony that would be subject to cross-examination with evidence that has been withheld. Although the court may prohibit a party from introducing designated matters in evidence, *see* Fed. R. Civ. P. 37(b)(2)(A)(ii), the preclusion sought by the plaintiffs could be interpreted to prevent the defendant from offering a broad range of evidence, including testimony concerning their knowledge about various matters, because the plaintiffs could argue

that the withheld evidence could provide material to challenge such testimony. Thus, although

limitations on testimony the defendant can offer should be imposed to prevent the defendant

from gaining an unfair advantage from their failure to produce documents, the complete extent

to which testimony should be precluded is best left to trial, when the court can assess the nature

of testimony offered by the defendant and how the plaintiffs are prejudiced by the absence of

records in countering that testimony.

### 4. *Attorneys' Fees and Costs*

Although neither the plaintiffs nor the defendant have addressed this issue in any detail,

the plaintiffs have requested that the defendant be required to pay "their reasonable expenses,

including attorney's fees, caused by its failure to comply with the discovery orders identified in

the [Plaintiffs' Proposed] Order." Pl. Mem. at 31. Rule 37(b)(2)(C) provides that when a party

has failed to comply with a discovery order "the court must order the disobedient party . . . to pay

the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was

substantially justified or other circumstances make an award of expenses unjust." Here, given

that disclosure of the information ordered by the court would subject the defendant to criminal

liability, and the Supreme Court's own observation that "fear of criminal prosecution constitutes

a weighty excuse for nonproduction," *Société Internationale*, 357 U.S. at 211, the defendant's

failure to provide court-ordered discovery is substantially justified and an award of fees and

expenses is therefore not appropriate.

### CONCLUSION

For the reasons discussed above, I recommend that an order be entered imposing the following sanctions on the defendant for failure to comply with discovery orders:[6]

1.  A direction that the following facts be deemed established for purposes of these actions: between 2000 and 2004 the defendant provided financial services on behalf of the Saudi Committee in Support of the Intifada Al Quds to numerous terrorists or to the relatives or representatives of terrorists affiliated with HAMAS, PIJ, PFLP or the Al Aqsa Martyrs Brigade, as well as terrorists or the relatives or representatives of terrorists not affiliated with any terrorist organizations.

2.  An instruction to be given to every jury that addresses the issue of liability advising that because the defendant has refused to produce relevant documents in its possession the jury may, but are not required, to infer that the records would prove that during the period from 1994 to 2004 the defendant provided financial services, either directly or indirectly, to foreign terrorist organizations – including HAMAS, the Palestinian Islamic Jihad, the Popular Front for the Liberation of Palestine, and the Al Aqsa Martyrs Brigade – and to individuals affiliated with foreign terrorist organizations.

3.  A direction that all requests for admissions in the plaintiffs' First Set of Requests for Admissions which the defendant has declined to answer on foreign bank secrecy law grounds are deemed admitted, and that any documents referred to in those requests as to which the plaintiffs sought confirmation of their authenticity as business records of the defendant are admissible at trial as such.

4.  A direction that the defendant is precluded from offering in evidence at any trial any documents or other information withheld from discovery on bank secrecy law grounds.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;

Any objections to this Report and Recommendation must be submitted to Judge Gershon within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal any judgment or order entered by the District Court in reliance on this Report

---

[6]In view of the nature of the consequences of the court's decisions concerning sanctions, this opinion is made in the form of a recommendation, which is subject to *de novo* review under Rule 72(b), rather than an order reviewable only for clear error under Rule 72(a).

and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see, e.g., Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298 (2d Cir.), *cert. denied*, 113 S. Ct. 825 (1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam).

*Viktor V. Pohorelsky*
VIKTOR V. POHORELSKY
United States Magistrate Judge

Dated: Brooklyn, New York
        June 1, 2009