UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------
                             :

COURTNEY LINDE, et al.,          :

                  Plaintiffs,   :

     - against -          :

ARAB BANK, PLC,           :

                  Defendant.   :

--------------------------------------------------------------

CV-04-2799 (BMC)(VVP)
and all related cases[*]

# MEMORANDUM OF LAW OF DEFENDANT ARAB BANK PLC IN SUPPORT OF ITS MOTION FOR JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(a)

---

[*]     *Philip Litle, et al. v. Arab Bank, PLC*, 04-CV-5449 (BMC)(VVP)*; Oran Almog, et al. v. Arab Bank, PLC,* 04-CV-5564 (BMC)(VVP)*; Robert L. Coulter, Sr., et al. v. Arab Bank, PLC,* 05-CV-365 *(BMC)(VVP) Gila Afriat-Kurtzer, et al. v. Arab Bank, PLC,* 05-CV-388 (BMC)(VVP)*; Michael Bennett, et al. v. Arab Bank, PLC,* 05-CV-3183 (BMC)(VVP)*; Arnold Roth, et al. v. Arab Bank, PLC,* 05-CV-03738 (BMC)(VVP)*; Stewart Weiss, et al. v. Arab Bank, PLC,* 06-CV-1623 (BMC)(VVP).

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ..................................................................................................... 2

    A.    No Reasonable Juror Has A Legally Sufficient Basis To Find That The Bank's Financial Services Were A "But For" And Proximate Cause Of Each Of The 24 Attacks. ........................................................................ 2

        1.    Proof Of "But For" Causation Requires Plaintiffs To Establish That Each Of Their Injuries Would Have Been Avoided Absent The Bank's Services. ................................................................... 2

        2.    Proof Of Proximate Causation Requires Plaintiffs To Establish That The Bank's Services Directly Aided In The Commission Of Each Of The 24 Attacks. .............................................................. 4

        3.    Arab Bank's Processing Of Saudi Committee Transfers Was Not A "But For" And Direct Cause Of Any Of The 24 Attacks. ......................... 5

        4.    Arab Bank's Provision Of Financial Services To Palestinian Charities Was Not A "But For" And Direct Cause Of Any Of The 24 Attacks. ....................................................................................... 7

        5.    Arab Bank's Provision Of Financial Services To Alleged Hamas "Leaders And Operatives" Was Not A "But For" And Direct Cause Of Any Of The 24 Attacks. ...................................................... 8

        6.    Plaintiffs Failed To Adduce Any Probative Evidence Suggesting That Hamas Was Responsible For The Bus No. 19 And Neve Dekalim Attacks. ................................................................. 10

    B.    No Reasonable Juror Has A Legally Sufficient Evidentiary Basis To Find That Arab Bank Acted With "An Intent To Harm Someone" In Providing The Financial Services At Issue. ........................................................ 11

        1.    In Implementing OFAC Screening, The Bank Employed A Powerful Tool Designed To Counter The Financing Of Terrorism. ....... 11

        2.    Many Of The Palestinian Charities At Issue Received USAID Funding, And None Were Listed As Terrorist Organizations By The United States, The European Union Or The United Nations........... 13

        3.    Saudi Arabia Delivered Aid To The West Bank And Gaza Through The Saudi Committee, Which Has Never Been Listed As A Terrorist Organization By The United States, The European Union Or The United Nations. .......................................................... 14

        4.    With Few Exceptions, None Of The Accounts Or Transactions At Issue Involves Parties Who Have Ever Been Designated As Terrorists By The United States. ............................................. 15

5.    The Adverse Inference Sanction Does Not Relieve Plaintiffs Of Their Burden Of Proof. ........................................................................... 17

C.    No Reasonable Juror Has A Legally Sufficient Evidentiary Basis To Find That Arab Bank Knowingly Provided Financial Services To Hamas. ................ 17

1.    Arab Bank's Provision Of Financial Services For The Benefit Of Palestinian Charities Was Not Knowing Support For Hamas. ................ 17

2.    Arab Bank's Processing Of Transfers Initiated By The Saudi Committee Was Not Knowing Support For Hamas. ............................... 20

3.    Arab Bank's Processing Of Transfers For Alleged Hamas "Leaders And Operatives" Was Not Knowing Support For Hamas. ..................... 21

D.    The Financial Services At Issue Did Not Involve Acts Dangerous To Human Life Or Appear To Be Intended To Intimidate Or Coerce Civilians. ........................................................................................................... 23

CONCLUSION ........................................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*3M v. Pribyl*,
    259 F.3d 587 (7th Cir. 2001) ...................................................17

*Abecassis v. Wyatt*,
    No. 09-CV-3884, 2014 WL 9888846 (S.D. Tex. Mar. 12, 2014)............................................24

*Am. Protein Corp. v. AB Volvo*,
    844 F.2d 56 (2d Cir. 1988)...................................................19

*Bank of Montreal v. Mitsui Mfrs. Bank*,
    No. 85-CV-1519, 1987 WL 5829 (S.D.N.Y. Jan. 21, 1987) ..................................................19

*Bernstein v. Kerry*,
    962 F. Supp. 2d 122 (D.D.C. 2013) ...................................................13-14

*Blinzler v. Marriott Intern.*,
    81 F.3d 1148 (1st Cir. 1996)...................................................17

*Boim v. Holy Land Found. for Relief & Dev.*,
    549 F.3d 685 (7th Cir. 2008) ...................................................1

*Burnett v. Al Baraka Inv. & Dev. Corp.*,
    274 F. Supp. 2d 86 (D.D.C. 2003) ...................................................23

*Burrage v. United States*,
    134 S. Ct. 881 (2014)...................................................passim

*Fahey v. Mallonee*,
    332 U.S. 245 (1946)...................................................24

*F. Hoffman-LaRoche v. Empagran S.A.*,
    542 U.S. 155 (2004)...................................................24

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 542 (E.D.N.Y. 2012) ...................................................passim

*Hahn v. Sargent*,
    523 F.2d 461 (1st Cir. 1975)...................................................17

*Hemi Grp., LLC v. City of New York*,
    130 S. Ct. 983 (2010)...................................................4

*Holder v. Humanitarian Law Project*,
    130 S. Ct. 2705 (2010) ........................................................................................7, 24

*Holmes v. Sec. Investor Prot. Corp.*,
    503 U.S. 258 (1992) ............................................................................................ 2-3

*In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi Bank)*,
    714 F.3d 3d 118 (2d Cir. 2013) *cert. denied* 134 S. Ct. 2870 ........................ passim

*JHP & Associates, LLC v. N.L.R.B.*,
    360 F.3d 904 (8th Cir. 2004) ...............................................................................17

*Kaplan v. Al Jazeera*,
    No. 10-CV-5298, 2011 WL 2314783 (S.D.N.Y. June 7, 2011) ...............................1

*Kronisch v. United States*,
    150 F.3d 112 (2d Cir. 1998) ................................................................................17

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) ...............................................................................................23

*Letscher v. Swiss Bank Corp.*,
    No. 94-CV-8277, 1997 WL 304895 (S.D.N.Y. June 5, 1997) ...............................17

*Linde v. Arab Bank, PLC*,
    262 F.R.D. 136 (E.D.N.Y. 2009) .........................................................................11

*MAG Portfolio Consult, GBMh v. Merlin Biomed GRP., LLC*,
    268 F.3d 58 (2d Cir. 2001) ........................................................................... 18-19

*Morrison v. National Australia Bank Ltd.*,
    130 S. Ct. 2869 (2010) .......................................................................................24

*Nguyen v. Holder*,
    --- F.3d ---, 2014 WL 3953758 (9th Cir. Aug. 14, 2014) ......................................1

*Paroline v. United States*,
    134 S. Ct. 1710 (2014) .........................................................................................3

*Rothstein v. UBS AG*,
    647 F. Supp. 2d 292 (S.D.N.Y. 2009) ("*Rothstein I*") .............................................4

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ("*Rothstein IV*") ................................................ passim

*Rothstein v. UBS AG*,
    772 F. Supp. 2d 511 (S.D.N.Y. 2011) ("*Rothstein III*") .........................................7

*SEC v. Colello*,
    139 F.3d 674 (9th Cir. 1998) ...............................................................................17

*Stansell v. BGP, Inc.*,
    No. 09-CV-2501, 2011 WL 1296881 (M.D. Fl. Mar. 31, 2011) ..............................................24

*Strauss v. Credit Lyonnais, S.A.*,
    No. 06-CV-0702, 2006 WL 2862704 (E.D.N.Y. Oct. 5, 2006)........................................ 17-19

*Stutts v. De Dietrich Group*,
    No. 03-CV-4058, 2006 WL 1867060 (E.D.N.Y. June 30, 2006) ...........................................23

*United States v. Bestfoods*,
    524 U.S. 51 (1998)...............................................................................19

*United States v. Miller*,
    No. 13-3177, 2014 WL 4211198 (6th Cir. Aug. 27, 2014) .....................................................3

*United States v. Thompson/Center Arms Co.*,
    504 U.S. 505 (1992)...............................................................................23

*University of Texas Southwestern Med. Ctr. v. Nassar*,
    133 S. Ct. 2517 (2013)........................................................................... passim

*Weiss v. National Westminster Bank, PLC*,
    936 F. Supp. 2d 100 (E.D.N.Y. 2013) ..........................................................11, 19

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) .................................................................2

STATUTES

Anti-Terrorism Act, 18 U.S.C. § 2331, et seq. ("ATA").................................................. passim

OTHER AUTHORITIES

Federal Rule of Civil Procedure 50(a) ...................................................................1, 25

Arab Bank plc ("Arab Bank" or the "Bank") respectfully moves for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a).

## PRELIMINARY STATEMENT

Plaintiffs seek to hold the Bank liable under the Anti-Terrorism Act, 18 U.S.C. § 2333 ("ATA"), alleging that its provision of funds transfers, involving the participation of more than 50 other prominent global banks, and account services constituted "act[s] of international terrorism" within the meaning of the statute. The ATA requires proof that the financial services provided by the Bank were the "but for" and proximate cause of each of the 24 attacks at issue.[1] It also requires proof that the Bank's services:

- were performed with "an intent to harm someone,"[2] "malice," "evil motive," or such a "conscious and deliberate disregard of the interests of others that the conduct may be called willful or wanton";[3]

- were knowingly provided to Hamas, with knowledge of the fact that it was a designated Foreign Terrorist Organization ("FTO") or that it "engaged or engages in terrorist activity" or "terrorism" [18 U.S.C. § 2339B(a)(1)];

- "involve[d] violent acts or acts dangerous to human life" [18 U.S.C. § 2331(1)(A)]; and

- appeared to be intended—from an objective perspective—to "intimidate or coerce a civilian population[,]" "influence the policy of a government by intimidation or coercion[,]" or "affect the conduct of a government by mass destruction, assassination, or kidnapping[.]" 18 U.S.C. § 2331(1)(B).

Each of the banking services that Plaintiffs have placed at issue must be evaluated separately to determine if it provides an evidentiary basis for the elements of proof required by the ATA. The state of mind of each Bank employee, officer or director involved in providing

---

[1] *In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi Bank)*, 714 F.3d 118, 123 (2d Cir. 2013) *cert. denied* 134 S. Ct. 2870; *see also infra* Point A.

[2] *Nguyen v. Holder*, --- F.3d ---, 2014 WL 3953758, at *5 (9th Cir. Aug. 14, 2014).

[3] *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 692 (7th Cir. 2008) (2333(a) requires "proof of intentional misconduct"); *Kaplan v. Al Jazeera*, No. 10-CV-5298, 2011 WL 2314783, at *4 (S.D.N.Y. June 7, 2011) (2333(a) requires a showing of "deliberate wrongdoing").

these services must also be separately evaluated.  A review of the Bank's services, as set forth below, demonstrates that neither the Bank nor any of its employees or agents acted with an improper state of mind, nor did they cause the acts of violence that injured these Plaintiffs. While courts are sometimes reluctant to grant a motion at the close of a plaintiff's case, it is clear that compelling reasons exist under controlling Supreme Court and Second Circuit precedent for this Court to do so now.

## ARGUMENT

A.     **No Reasonable Juror Has A Legally Sufficient Basis To Find That The Bank's Financial Services Were A "But For" And Proximate Cause Of Each Of The 24 Attacks.**

Each Plaintiff is required to prove that his or her injuries were caused "*by reason of* an act of international terrorism" committed by the Bank.  18 U.S.C. § 2333(a) (emphasis supplied).[4]  The Supreme Court and Second Circuit have consistently held that the phrase "by reason of," when used in federal tort statutes like the ATA, has a "well understood meaning" which "'require[s] a showing that the defendant's violation not only was a "but for" cause of [plaintiff's] injury, but was the proximate cause as well.'" *Al Rajhi Bank*, 714 F.3d at 123 (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013) ("*Rothstein IV*") and *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)) (other citations omitted).[5]

1.    Proof Of "But For" Causation Requires Plaintiffs To Establish That Each Of Their Injuries Would Have Been Avoided Absent The Bank's Services.

The Supreme Court recently reaffirmed its "*insistence* on but-for causality" in

---

[4]      *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 43 (D.D.C. 2010) (defendant's conduct must satisfy ATA definition of an "act of international terrorism"); Hr'g Tr. at 4:25-5:2; 67:3-8, Apr. 24, 2013 (dismissing Plaintiff's ATA aiding and abetting claims) (*Linde* ECF No. 943) (the "Apr. 24th Tr."); Order, at 3, dated May 10, 2013 (dismissing Plaintiffs' ATA conspiracy claims) (*Linde* ECF No. 944).

[5]      The *Al Rajhi Bank* petition for *certiorari* (2013 WL 4855973, at *16-17) acknowledges that "but for" and "strict proximate caus[ation]" are required in this Circuit to plead and prove an ATA claim.

unambiguous terms:  "the phrase 'by reason of' requires *at least a showing of 'but for' causation*[.]"  *Burrage v. United* States, 134 S. Ct. 881, 889 (2014) (citations omitted) (emphasis supplied).  The Court rejected policy arguments advanced to support less demanding causation standards, such as "substantial" or "contributing factor" tests:  "[t]he role of this Court is to apply the statute as it is written—even if we think some other approach might 'accord with good policy[.]'"  *Burrage*, 134 S. Ct. at 890-92 (noting that Congress could have used the phrase "contributes to," but chose to use the phrase "by reason of") (citations omitted); *University of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2525 (2013) (holding that "but for" causation must be applied "absent an indication to the contrary in the statute itself").[6]

Proof of "but for" causation requires a "plaintiff to show 'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct."  *Nassar*, 133 S. Ct. at 2525, 2533; *Burrage*, 134 S. Ct. at 892 (a "nonessential contributing factor" is not a "but for" cause).  This strict causation requirement is consistent with "[t]he general tendency of the law, in regard to damages at least, . . . not to go beyond the first step" in assigning liability.  *Holmes*, 503 U.S. at 271-72.[7]  Failing to require proof of "but for" causation is reversible error.  *See United States v. Miller*, No. 13-3177, 2014 WL 4211198, at *3-4 (6th Cir. Aug. 27, 2014) (concluding that the Court's "insistence" on but-for causality applies "in criminal and civil cases alike").

---

[6]    Judge Gershon acknowledged that, in light of *Rothstein IV* and *Al Rajhi Bank*, Section 2333(a)'s silence as to aiding and abetting and conspiracy liability required her to reverse her prior decision denying the Bank's motion to dismiss those claims (*supra* n.4).  So too is Section 2333(a) silent as to any form of causation other than "by reason of," *i.e.*, "but for," causation.  Judge Gershon's rejection of "but for" causation, Apr. 24th Tr. at 74, is in conflict with the recent and controlling decisions discussed above.

[7]    Plaintiffs cite *Paroline v. United States*, 134 S. Ct. 1710 (2014), a case involving a *mandatory restitution* statute, in arguing that they need not prove "but for" causation.  Pls.' Ltr., at 8, July 8, 2014 (*Linde* ECF No. 1017).  But *Paroline* itself notes that when proof of "but for" causation is not required, it is improper to impose liability for the victim's losses on a single defendant beyond the "amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses."  *Id*.  Here, the ATA imposes liability on a single defendant for *three times the amount* of a plaintiff's total damages, 18 U.S.C. § 2333(a).

2. Proof Of Proximate Causation Requires Plaintiffs To Establish That The Bank's Services Directly Aided In The Commission Of Each Of The 24 Attacks.

In evaluating whether a plaintiff has satisfied his burden of proving proximate causation, "the focus is on the directness of the relationship between the conduct and the harm[,]" not whether injuries were foreseeable, as the Plaintiffs contend. *Hemi Grp., LLC v. City of New York*, 130 S. Ct. 983, 991 (2010) (noting that its proximate causation decisions "never even mention the concept of foreseeability"); *Rothstein v. UBS AG*, 647 F. Supp. 2d 292, 295 (S.D.N.Y. 2009) ("*Rothstein I*") (proximate causation under the ATA is "narrowly defined").

The Second Circuit has recently applied this direct causation standard in affirming the dismissal of analogous ATA claims after noting the following deficiencies:

- Plaintiffs failed to allege "*that the money allegedly donated by the . . . defendants* to the purported charities actually was transferred to Al Qaeda and *aided in the September 11, 2001 attacks*." *Al Rajhi Bank*, 714 F.3d at 124 (emphasis supplied).

- Plaintiffs did "not allege that if UBS had not transferred U.S. currency to Iran, *Iran . . . would not have funded the attacks in which plaintiffs were injured*." *Rothstein IV*, 708 F.3d at 97 (emphasis supplied).

- Plaintiffs did not allege "that Iran *would have been unable to fund the attacks* by Hizbollah and Hamas without the cash provided by UBS." *Id.* (emphasis supplied).

- Plaintiffs did not allege a direct connection "between *the cash transferred by UBS to Iran and the terrorist attacks by Hizbollah and Hamas that injured plaintiffs*." *Id.* (emphasis supplied).

Plaintiffs are therefore required to prove a direct relationship between specific financial services provided by the Bank and specific acts of terrorism that caused their injuries.[8]

---

[8]      For the reasons stated herein and in <u>App. A</u>, Plaintiffs have also failed to prove that the Bank's financial services were a substantial factor in causing each of the 24 attacks and that their injuries were the foreseeable result of those financial services.

3. Arab Bank's Processing Of Saudi Committee Transfers Was Not A "But For" And Direct Cause Of Any Of The 24 Attacks.

Plaintiffs have proffered the following evidence in an effort to establish a causal link between the Bank's processing of Saudi Committee transfer instructions and the 24 attacks:

- seven transactions that involve payments of $5,316.06 or $5,311.16 to the survivors of alleged terrorists (*see* App. A);

- seven transactions that involve payments of $2,655.78 to relatives of prisoners (*id.*);

- two transactions that involve payments of $1,325.64 to those who sustained injuries during the relevant time period (*id.*); and

- the testimony of Mathew Levitt and Ari Dan Spitzen, who opined that the Saudi Committee program incentivized terrorism (*e.g.,* Tr. 779-80).

There is no evidence that any Saudi Committee payment was made to anyone allegedly involved, or the relatives of anyone allegedly involved, in 12 of the 24 attacks.[9] Plaintiffs have obviously failed to prove that the Bank's processing of Saudi Committee transfers was a "but for" and proximate cause of these attacks.

Nor is the evidence that Plaintiffs adduced with respect to the remaining 12 attacks remotely sufficient to satisfy the "but for" and proximate causation elements of their claims.[10] There is no evidence that the bombers or gunmen responsible for perpetrating these attacks were aware of the Saudi Committee, received any payment from the Saudi Committee, or received any financial service from the Bank. App. A; Tr. 420-21 (Bus No. 2 bombing carried out to "avenge" death); 424-25 (Mike's Place attack carried out to "avenge" death). On this record, there is no basis to conclude that these attacks would not have occurred absent the Bank's

---

[9]     The deficiencies of Plaintiffs' proof with regard to these 12 attacks are separately analyzed in App. A, VI-VII, IX, XI-XII, XIV, XVI, XVII, XXI-XXIV.

[10]     The deficiencies of Plaintiffs' proof with regard to these 12 attacks are separately analyzed in App. A, I-V, VIII, X, XIII, XV, XVIII-XX.

processing of Saudi Committee transfers, *Nassar*, 133 S. Ct. at 2525, 2533-34, that the Bank's processing of Saudi Committee transfer instructions aided these 12 attacks, *Al Rajhi Bank*, 714 F.3d at 124, or was required for their success, *Rothstein IV*, 708 F.3d at 97.

Of the 62 alleged accomplices to these 12 attacks, Plaintiffs have identified only *three* who they claim to have received Saudi Committee payments.  App. A, XVIII (payment *two and a half years before* bombing);[11] VIII (payments *more than ten months before* bombing). There is no evidence that the four attacks in which these individuals were allegedly involved would not have occurred absent the Bank's processing of these Saudi Committee transfers many months, or years, earlier, *Nassar*, 133 S. Ct. at 2525, 2533-34; or that these three transfers, which were remote in time and tangential in relationship to these four attacks, were used to aid the commission of these attacks, *Al Rajhi Bank*, 714 F.3d at 124, or were otherwise required to finance these attacks, *Rothstein IV*, 708 F.3d at 97.

The remaining Saudi Committee transfers at issue pre-date, or post-date, these 12 attacks by many months or years and were made to the *relatives* of perpetrators or accomplices.[12] App. A.  There is no evidence that these payments were ever transferred to the perpetrators or accomplices themselves, much less evidence that these transfers were used in any way to facilitate any of the 12 attacks or were required for their commission.  *Nassar*, 133 S. Ct. at 2525, 2533-34; *Al Rajhi Bank*, 714 F.3d at 124; *Rothstein IV*, 708 F.3d at 97.

---

[11]    Plaintiffs identify this payment of $2,655.73 in connection with two other attacks that occurred between *two and three years after* the payment date.  App. A, XV, XX.

[12]    *E.g.*, App. A, I (payment to *father seven months after bombing*); II (payment to *wife eight months after bombing*); VIII (payment to *mother more than six months before bombing*); X (payment to *mother more than nine months prior to bombing*).

None of this evidence, including the video wills and claims of responsibility that have been admitted over the Bank's continuing objections, is sufficient to establish "but for" and proximate cause.

### 4. Arab Bank's Provision Of Financial Services To Palestinian Charities Was Not A "But For" And Direct Cause Of Any Of The 24 Attacks.

Plaintiffs have not adduced any evidence suggesting that the Palestinian charities that received financial services from the Bank were involved in any of the 24 attacks at issue. Their experts expressly disclaim having any opinion as to whether "any of the . . . Zakat charities was the cause of any one of these 24 attacks" or was involved in any way with providing logistical support or recruiting. Tr. 688; App. B. Nor have Plaintiffs adduced any evidence suggesting that any of the international charitable associations that they allege to be part of Hamas' "worldwide fundraising network" had any involvement in the 24 attacks (see App. C).

Rather than attempt to establish a "but for" or direct causal connection between these charities (much less the Bank's financial services) and their injuries, Plaintiffs theorize that these charities furthered Hamas' fundraising and recruiting goals by, *inter alia*, providing needed services to the local community that helped "attract the masses to Jihad." *E.g.,* Tr. 603-04; 2006. But such opinions fall far short of proof that any of the charities played an essential or direct role in the commission of any of the 24 attacks.[13]

---

[13]     Judge Gershon previously relied on *dicta* of the Supreme Court in *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2725 (2010) ("*HLP*") that "money is fungible" as a basis for concluding that Plaintiffs were not required to prove a direct causal link between the financial services provided by the Bank and the 24 attacks. Apr. 24th Tr. at 74:8-10. But as Judge Rakoff explained in the opinion affirmed by *Rothstein IV*, *HLP* is irrelevant to the causation analysis under Section 2333(a). *Rothstein v. UBS AG*, 772 F. Supp. 2d 511, 518 (S.D.N.Y. 2011) ("*Rothstein III*") ("[A]pplying the ['money is fungible'] *dicta* of [*HLP*] outside its criminal context would be like applying the rules of hockey to a game of lacrosse, on the theory that they both involve big sticks."). *HLP* cannot be used to override the direct causation requirements articulated in *Rothstein IV* and *Al-Rajhi Bank*, in which the Second Circuit held that transfers of fungible money to a state sponsor of terrorism and alleged terrorist fronts were not a direct cause of the plaintiffs' injuries.

These charities, identified in <u>Appendices B and C</u>, also maintained accounts at other banks (Tr. 1868; *infra* n.27); therefore, even if there was some evidence of their involvement in these 24 attacks—and there is not—there is no basis to conclude that the Bank's financial services were essential to their activities, *Burrage*, 134 S. Ct. at 892. There is no evidence that the Bank's financial services to these charities aided in any of these attacks, *Al Rajhi Bank*, 714 F.3d at 124; nor is there evidence that the 100 operatives allegedly involved in these 24 attacks (*see* <u>App. A</u>) received or required any assistance from these charities in perpetrating their crimes (Tr. 786 (noting Hamas' $70 million budget)). *Rothstein IV*, 708 F.3d at 97.

No reasonable juror could find that the financial services provided by the Bank to these charities were a "but for" and direct cause of Plaintiffs' injuries.

> 5.   Arab Bank's Provision Of Financial Services To Alleged Hamas "Leaders And Operatives" Was Not A "But For" And Direct Cause Of Any Of The 24 Attacks.

Plaintiffs have also failed to adduce evidence of any significant probative force suggesting that financial services provided to alleged Hamas "leaders and operatives" was a "but for" or direct cause of any of the 24 attacks at issue. While their experts have identified financial services provided by the Bank to 19 such individuals (*see* Tr. 1437-75), Plaintiffs have adduced no evidence to suggest any of these individuals was involved in perpetrating or funding any of the 24 attacks. Tr. 1437-75; <u>App. A & D</u>.

One of these alleged "leaders and operatives," Salah Shehada, is alleged to have had some tangential connection to one of the attacks at issue, the March 7, 2002 shooting committed by Muhammad Farhat in Atzoma. <u>App. A</u>, VI (Shehada granted permission for the underage shooter to commit an attack). There is no evidence that "but for" the financial services provided by the Bank to Shehada, which pre-dated the attack at issue by *more than a year*,

Shehada would not have permitted Farhat to shoot his gun; nor is there a *scintilla* of evidence suggesting that Shehada used the financial services of the Bank to aid that shooting.  *Nassar*, 133 S. Ct. at 2525; *Al Rajhi Bank*, 714 F.3d at 124.

Plaintiffs have introduced only one exhibit that attempts to connect a financial service provided to an alleged Hamas leader or operative with *any* of the 24 attacks.  That exhibit contains the purported notes of the interrogation of Abbas al-Sayed (PX3524), who allegedly planned and supervised the Park Hotel bombing (*see* App. A, VII).[14]  According to these interrogation notes, al-Sayed purchased guns and ammunition from February 2001 to July 2001—*more than eight months prior* to the Park Hotel bombing—with money from his "private bank account in Arab Bank in Tulkarem."  (PX3524 at 11.)

There is no evidence in al-Sayed's "confession," however, that he was involved in providing weapons or funds for the Park Hotel *bombing*.  (*Id*.)  Nor is there any evidentiary basis to conclude that Odeh's bombing would not have occurred absent the alleged financial services provided by the Bank to al-Sayed, *Nassar*, 133 S. Ct. at 2525,[15] or that the Bank's financial services to al-Sayed aided in that attack, *Al Rajhi Bank*, 714 F.3d at 124.

The evidence adduced concerning other accounts that Plaintiffs allege were maintained for alleged Hamas "leaders and operatives" is similarly deficient.  App. D.  For example, Plaintiffs have not proven that any funds transfers from the account of Osama Hamdan, an alleged Hamas spokesperson, were directed to anyone outside of Lebanon.[16]  Nor have they

---

[14]    The Bank respectfully maintains that these highly prejudicial interrogation notes, which are not probative of any of the essential elements of Plaintiffs' claims, should be stricken from the record.  Ltr. From S. Stephens, Esq. to Hon. Brian M. Cogan, dated Aug. 31, 2014 (*Linde* ECF No. 1114).

[15]    In fact, the evidence adduced at trial reflects the fact that al-Sayed maintained accounts at other banks, into which greater sums of money were deposited.  (*See* PX1990-91, PX1993, PX1995-98.)

[16]    Plaintiffs' expert Spitzen opined that Hamdan sent $10,000 *within Lebanon* to Yousef al-Hayek on December 18, 2000, and that several months later (from February 12, 2001 to May 11, 2001), al-

adduced any evidence suggesting that Hamdan had any role in the commission of any of the 24 attacks; it follows *a fortiori* that the account services provided by the Bank to Hamdan were not a "but for" or direct cause of the Plaintiffs' injuries.

No reasonable juror could find that the financial services provided by the Bank to these alleged "leaders and operatives" were a "but for" and direct cause of Plaintiffs' injuries.

> 6. Plaintiffs Failed To Adduce Any Probative Evidence Suggesting That Hamas Was Responsible For The Bus No. 19 And Neve Dekalim Attacks.

Even though the Bank believes that the Plaintiffs have failed to prove Hamas' responsibility for perpetrating all 24 attacks, the record is particularly threadbare with respect to two:  the bombing of Bus No. 19 on January 29, 2004 and the mortar strike at Neve Dekalim on September 24, 2004.  App. A, XXIII, XXIV.

With respect to the Bus No. 19 attack, Plaintiffs' expert conceded that while the bomber, Ali Ja'ara, planned an initial attack with an alleged Hamas operative, that attack never took place; instead, Ja'ara carried out this bombing with the Al Aqsa Martyrs Brigades ("AAMB").  Tr. 1283-96.  Neither Hamas nor its operative, who consulted with Ja'ara about a different attack, was involved in the Bus No. 19 attack (*id*); AAMB, on the other hand, built the bomb and drove Ja'ara to the bomb site (*id*. 1293).

With regard to the Neve Dekalim attack, Plaintiffs' expert acknowledged that the perpetrators of this attack have never been identified (by authorities or Hamas).  *Id*. 1321. Plaintiffs' proof with regard to Hamas' involvement in this attack consists of two alleged claims of responsibility.  (PX4073, PX4074.)  However, these claims fail to identify the names of the

---

Hayek sent money to al-Sayed—*more than a year before* the Park Hotel bombing.  (Tr. 1649:14-24). Any suggestion that al-Hayek transferred Hamdan's $10,000 to al-Sayed is nothing but rank conjecture; moreover, as noted *supra* Point A.5, al-Sayed is not alleged to have had a role in providing weapons or funds in support of the Park Hotel bombing.

alleged perpetrators and thus do not implicate anyone's penal interests.  Therefore, even under the disputed rulings in this case regarding such evidence, these claims should be stricken.

On this record, no reasonable juror could conclude that Plaintiffs have met their burden of proof with regard to establishing Hamas' responsibility for committing the Bus No. 19 and Neve Dekalim attacks.  Judgment should be entered for the Bank with respect to these claims for this reason alone.

**B.**  **No Reasonable Juror Has A Legally Sufficient Evidentiary Basis To Find That Arab Bank Acted With "An Intent To Harm Someone" In Providing The Financial Services At Issue.**

Plaintiffs must identify specific individuals within the Bank who acted with an "intent to harm someone" or with knowledge of providing services to Hamas.  *Supra* n.3; *see also Weiss v. National Westminster Bank, PLC*, 936 F. Supp. 2d 100, 115 (E.D.N.Y. 2013) (dismissing *these Plaintiffs'* claims against NatWest because "none of the NatWest employees involved with [its] Interpal [accounts] actually suspected Interpal of supporting terrorism," despite knowing that it was an SDGT); *Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 150 (E.D.N.Y. 2009) ("[E]vidence of what Arab Bank 'should have known' will be insufficient to establish the claims against it.").  For the reasons set forth below, Plaintiffs have failed to meet their burden of proof on the *scienter* elements of their claims.

1.  In Implementing OFAC Screening, The Bank Employed A Powerful Tool Designed To Counter The Financing Of Terrorism.

There is no dispute that the automated, electronic funds transfers placed in issue by the Plaintiffs that were processed through New York were screened against the OFAC list, which includes names of "Foreign Terrorist Organizations" ("FTOs"), "Specially Designated Global Terrorists" ("SDGTs") and "Specially Designated Nations" ("SDNs").  Levitt described this list as "one tool in the toolkit" that is used in combatting the financing of terrorism ("CFT").

Tr. 620.   Levitt has also testified that when this "tool" is used, "it can and should be used electronically[,] since [the list is] so long," (*id*. 693), although he acknowledged that "there are flaws in the software even today" (*id*.).[17]

Levitt described the OFAC designation process as "very robust" and "very, very good."  *Id*. 693-95.   He acknowledged that it involves many government inputs, including "[i]ntelligence consensus, policy discussions, legal review, [and] litigation review that have to be done to justify the government actually pulling the trigger" to add a party to the OFAC list.  *Id*. 630.   He testified that "far, far, far more entities that are considered for designation are never designated because they don't make it through all the[se] great many hoops."  *Id*.   He did not, and could not, state that the U.S. Government took any steps whatsoever to inform the financial community of those entities that did not clear the "great many hoops" to merit designation.  (*Id*.)

Plaintiffs' forensic accountant, Wayne Geisser, opined about approximately 3,500 transactions that were electronically processed by Arab Bank-New York (*id*. 886), many of which were initiated by prominent European banks (*id*. 841).   The transfer records he examined contained a field indicating that they had been screened against the OFAC list.  *E.g., id*. 888-89; DX1541.   His testimony also confirmed that the Bank ceased processing funds transfers for parties once they were added to the OFAC list.  Tr. 890-97; *see also* <u>App. C</u>.   This is evidence of the behavior of a compliant institution, not one operating with an "intent to harm someone."

---

[17]     Levitt testified, for example, that other tools available for combatting terrorism financing include: "run[ning] an intelligence investigation[;] . . . insert[ing] a source[;] . . . listen[ing] on their telephones with the Court approved wiretapping[;] . . . ask[ing] [the] FBI to initiate a law enforcement investigation hopefully leading towards a prosecution[;] [and] . . . hav[ing] the State Department engage with the local government to get the local government to do more . . . ."  (*Id*. 620-21.)   It is self-evident that banks are not in the business of running clandestine agents or intelligence investigations.

      2.   Many Of The Palestinian Charities At Issue Received USAID Funding, And None Were Listed As Terrorist Organizations By The United States, The European Union Or The United Nations.

None of the Palestinian charities that Plaintiffs allege to be "fronts" for Hamas was designated as an FTO, SDGT, or SDT by the United States during the relevant time period. Tr. 706.[18] Nor did the European Union (comprised of 29 countries) (*id*. 705), which publishes its own list of designated terrorists, or the United Nations (comprised of 193 member states) (*id*. 704), designate any of these charities ( *id*. 706-07).

Additionally, many of the Palestinian charities at issue also received U.S. taxpayer funding through USAID.  *Id*. 770-71; 1899-00.  When the Israel Law Center—which represents some Plaintiffs here—sued USAID seeking to enjoin its foreign assistance to institutions and charities in the West Bank and Gaza, the Government argued that this financial assistance "*combat[s] terrorism*" and "contribut[es] to the overall *stability and security* of the region."  *Bernstein v. Kerry*, 12-CV-01906 (ESH) (D.D.C. 2012), Defs.' Mot., at 2, Apr. 1, 2013 (ECF No. 15-1) ("Kerry Br.") (emphasis supplied).  In granting the Government's motion to dismiss, the court observed that "Plaintiffs' disagreement with this policy and their belief that a change in policy would reduce the threat of terrorism is, at best, mere speculation."  *Bernstein v. Kerry*, 962 F. Supp. 2d 122, 129-30 (D.D.C. 2013).

The Bank had every reason to believe that these were legitimate charities, and Plaintiffs can point to no evidence that any of the Bank's employees considered any of them to be "fronts" for, or affiliated with, Hamas during the relevant time period.  (*E.g.*, Excerpt 1,

---

[18]      The Palestinian charities at issue are:  Al-Mujama al-Islami – Gaza; Al-Jam'iya al-Islamiya – Gaza; Al-Salah Islamic Association – Gaza; Al-Islah Charitable Society – Ramallah & Al-Bireh; Islamic Charitable Society – Hebron; Jenin Zakat Committee; Islamic Solidarity (Al-Tadhamun) Charitable Society – Nablus; Ramallah – Al-Bireh Zakat Committee; Tulkarem Zakat Committee; Nablus Zakat Committee; and the Al Nur Prisoner Society.  Al-Salah is the only one of these charities to be designated, and that did not occur until *three years after* the last attack.  *Id*. 696-97.

Shukri, 318:5-9 (Bank did not believe that Hamas had control "over entities using some other name than itself"); Tr. 1896 (Sptizen agreed that these charities were "providing the social services that they said they were providing"); *see also* App. B.

Plaintiffs have adduced no evidence that any employee of the Bank harbored an "intent to harm someone" in providing services to these lawful entities. *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 561 (E.D.N.Y. 2012) ("There is no proof that anything but routine financial services to the charities alleged to be front organizations were provided, and none of the charities were designated by the United States as front groups when the charities received services from the Bank.").

> 3. Saudi Arabia Delivered Aid To The West Bank And Gaza Through The Saudi Committee, Which Has Never Been Listed As A Terrorist Organization By The United States, The European Union Or The United Nations.

The Saudi Committee has also never appeared on the OFAC list. Tr. 780. Levitt acknowledged that the U.S. Government was aware that the Saudi Committee provided financial support to families who lost a breadwinner; he also acknowledged that, in his opinion, there was nothing improper in making payments to families that had lost their source of financial support. *Id*. 779-80; 784. There is not a *scintilla* of evidence that any Arab Bank employee possessed an "evil" motive in processing transfer instructions originating from the Saudi Committee's bank for a lawful charity administered by the Kingdom of Saudi Arabia, and overseen by its chief counter-terrorism official (*id.* 1579), merely because seven of 180,000 payments were made to family members of dead terrorists. App. A.

While Plaintiffs may disagree with Saudi Arabia's policy of providing aid through the Saudi Committee to the population of the West Bank and Gaza during the Second Intifada, *Bernstein*, 962 F. Supp. 2d at 130, they have not pointed to any evidence that the Bank's

employees understood the Saudi Committee to be anything other than a humanitarian program that was addressing a dire crisis (*e.g.,* Excerpt 7, Bishara, 198:18-199:17; *id.*, Shukri, 75:7-16, 193:16-22, 257:17-258:1; *see also* Excerpt 1, Hamdan, 48:25-49:22).[19]   No reasonable juror could find that the Bank's processing of Saudi Committee transfer instructions reflected an evil state of mind to support Hamas.  *Infra* <u>Point C.2</u>; *Gill*, 893 F. Supp. 2d at 560 (finding an absence of evidence "that the Bank's provision of banking services to the Saudi Committee was a willful attempt to aid the [Hamas] terrorist . . . who injured plaintiff").

> 4.  With Few Exceptions, None Of The Accounts Or Transactions At Issue Involves Parties Who Have Ever Been Designated As Terrorists By The United States.

Levitt has also acknowledged that only three of the 19 individuals that he describes as Hamas leaders or operatives that allegedly received financial services from the Bank have ever been added to the OFAC list (*id.* 695); none has ever been added to the European Union or United Nations lists (*id.* 704-05).  Plaintiffs have adduced no evidence to suggest that the Bank's processing of two funds transfers involving two of these three designated individuals, each of which was screened against the OFAC list and was cleared because the names on the transfer forms did not match those on the OFAC list (*e.g., id*. 273-75), reflects the knowing provision of material support to Hamas by any Bank employee, officer or director.

In the absence of evidence of "evil" intent in processing these transfers, Plaintiffs have focused on a checking account containing $8,677.92 at the time of its closure for Osama Hamdan, the third individual designated by OFAC who received services from the Bank (*e.g.,*

---

[19]     Levitt acknowledged that the fact that governments had not blacklisted the Saudi Committee and other charities may be attributable to the "legitimate" conclusions that the value of their charitable activities outweighed any potential security risk.  Tr. 777.  Indeed, Levitt agreed that there is an "acute" need for humanitarian assistance in the West Bank and Gaza (*id.* 778), and further acknowledged that governments evaluating whether to add charities to their blacklists "are for good reason very concerned about the extent of need within the Palestinian territories."  *Id*. 769.

PX104, PX106, PX136, PX140; Tr. 1406-08).  But Plaintiffs have identified no fund transfer to or from the Hamdan account after he was added to the OFAC list on August 22, 2003.  *See* App. D.  The evidence establishes that the Hamdan account was opened in 1998 after the Bank followed appropriate know-your-customer measures to verify customer identity, address and other personal details.  (Excerpt 4, Saffiedine, 79:2-80:10; 376:5-377:25; 455:16-21.)

The Bank closed this account after investigating Plaintiffs' allegations (*e.g., id.* 153:23-154:8; Excerpt 4, Bishara, 202:2-7; 203:7-13; 204:8-12), and it reported this action to its regulator in Lebanon (Excerpt 4, Dabbour, 290:8-23).  There is no evidence that any Bank employee involved in providing account services to Hamdan did so with an evil intent.  *See infra* Point C.3.[20]

On this record, the Plaintiffs cannot point to any evidence suggesting that any employee, officer or director of the Bank acted with "an intent to harm someone" in providing the financial services that they have chosen to place in issue.[21]  The record reflects the Bank's application of the OFAC list, its consistent repudiation of Hamas, and its objective not to do business with Hamas.  (*See* Excerpt 4, Dabbour, 268:3-5; 271:21-272:7; Excerpt 1, Bishara, 210:20-25; 438:23-439:3; Excerpt 3, Shoman, 241:22-242:22.)

---

[20]     The Bank was denied the opportunity to submit evidence that it followed Lebanese laws and regulations in returning this account balance.  Order, Dec. 6, 2011 (*Linde* ECF No. 773); Order, May 14, 2013 (*Linde* ECF No. 945).  Nevertheless, its closure of this account and return of funds reflects *its refusal to provide financial services to Hamdan*—not an "intent to harm someone" or to bank for Hamas.

[21]     Plaintiffs relied upon two Arab Bank calendars (PX7, PX8), admitted over the Bank's objection, that depicted "destroyed villages of Palestine" and identified "selected events in history," as well as two annual reports (PX61, PX62), also admitted over objection, that referenced the Israeli occupation as a factor contributing to the Bank's negative economic performance.  No reasonable juror could find that such evidence reflected an intent to harm someone or to Bank for Hamas through the provision of the financial services that are at issue.  (*E.g.,* Excerpt 3, Shoman, 51:16-52:17; Excerpt 2, Bishara, 341:4-9; *see also* Tr. 988 (Plaintiffs' expert Shaked referred to the West Bank and Gaza as "enemy territory").)

     5.   The Adverse Inference Sanction Does Not Relieve Plaintiffs Of Their Burden Of Proof.

The fact that this Court plans to instruct the jury that it may infer that the Bank possessed an improper state of mind does not defeat this motion.  "As a matter of law, a party that bears the burden of proof at trial must demonstrate the truth of a disputed material fact with something more than an inference that opposing witnesses are lying or evidence is not what it seems." *Gill*, 893 F. Supp. 2d at 552 (citing *Hahn v. Sargent*, 523 F.2d 461, 467 (1st Cir. 1975); *Letscher v. Swiss Bank Corp.*, No. 94-CV-8277, 1997 WL 304895, at \*4 (S.D.N.Y. June 5, 1997)).  That is because an adverse inference is permissive, not mandatory, and is alone insufficient to establish entitlement to relief.  *See Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998).[22]  The inference here can have no force or effect because Plaintiffs have produced no evidence that any employee of the Bank acted with an "intent to harm someone."

**C.**    **No Reasonable Juror Has A Legally Sufficient Evidentiary Basis To Find That Arab Bank Knowingly Provided Financial Services To Hamas.**

    1.   Arab Bank's Provision Of Financial Services For The Benefit Of Palestinian Charities Was Not Knowing Support For Hamas.

None of the Palestinian charities at issue was designated by OFAC during the period in which the Bank provided financial services to them.  Instead, Plaintiffs have relied on the opinions of Levitt and Spitzen to attempt to establish that these organizations were "fronts" for Hamas.  But their testimony has fallen far short of establishing that each of these charities was "dominate[d] and control[led]" by Hamas.  *Gill*, 893 F. Supp. 2d at 555; *Strauss v. Credit*

---

[22]    *See also JHP & Associates, LLC v. N.L.R.B.*, 360 F.3d 904, 910 (8th Cir. 2004) (adverse inference rule is permissive); *3M v. Pribyl*, 259 F.3d 587, 606 n.5 (7th Cir. 2001) (adverse inference which the jury could permissibly have drawn did not relieve the plaintiff of the burden of proving the elements of its claims); *SEC v. Colello*, 139 F.3d 674, 677–78 (9th Cir. 1998) (adverse inference alone insufficient to support a motion for summary judgment); *Blinzler v. Marriott Int'l*, 81 F.3d 1148, 1158–59 (1st Cir. 1996) (adverse inferences are permissive, not mandatory).

*Lyonnais, S.A.*, No. 06-CV-0702, 2006 WL 2862704, at *10 (E.D.N.Y. Oct. 5, 2006); *MAG Portfolio Consult, GBMh v. Merlin Biomed GRP., LLC*, 268 F.3d 58, 63 (2d Cir. 2001).

Levitt acknowledged that nine out of the ten charities on which he opined were formed years prior to the founding of Hamas (Tr. 749; *see also id.* 1882), and were initially licensed by the Israeli Government (*id*. 750).  Spitzen testified that it was "hard to point to the particular point in time" when charities become "Hamas societies" (*id.* 1884).  Levitt also testified that "discriminating between legit and nefarious charities is extremely difficult" (*id*. 746), except "on the ground in the West Bank, and the Gaza Strip" (*id.* 747), where he believes that it was easier to make such determinations.  Yet he never visited any of these charities or interviewed anyone who works at them, claiming that such visits were of little value.  *Id*. 740 (Minutes later, however, Levitt sought to discredit Britain's investigation of Interpal because it didn't "send a single investigator to the West Bank in [sic] the Gaza Strip" (*id*. 764)).[23]

Levitt conceded that he tried to "cover the waterfront" by describing these charities as "departments, agents, alter egos, precursors, or otherwise controlled or dominated by Hamas."  *Id.* 734-35.  "Waterfront" conclusions of this type—such as whether an organization was a "precursor" to Hamas—do not meet the test of 2339B because they fall entirely short of proving that these charities were so controlled by Hamas as to be their "alter egos."  *Strauss*, 2006 WL 2862704, at *10; *MAG Portfolio Consult, GBMh*, 268 F.3d at 63.

Levitt's testimony establishes little more than the absence of any consensus as to whether these charities were controlled by Hamas.  While the U.S. designated Interpal, a British charity, in August 2003 because of its alleged ties to the Palestinian charities at issue (Tr. 754),

---

[23]     In evaluating Levitt's opinions, Judge Weinstein stated that their "probative force and reliability is borderline," and, with regard to Spitzen, that "he's another one of these borderline experts."  *Gill v. Arab Bank, PLC*, 11-CV-03706, Hr'g Tr. at 34:25, 39:23-40:2, Oct. 3, 2012 (*Gill* ECF No. 179).

Levitt acknowledged that Britain investigated Interpal three times between 1996 and 2008 and "found insufficient evidence" to conclude that it was supporting terrorism or Hamas. *Id.* 768; 773 (apology issued to Interpal for accusing it of having Hamas ties); 778 (Interpal still operates today). He offered similar testimony about CBSP, a French charity that underwent "several administrative and judicial investigations" by the French Government that produced "no evidence" that its donations to the Palestinian charities were being used "for terrorist purposes." *Id.* 776-77; 778 (CBSP still operates today).

Spitzen and Levitt addressed only one of the control factors that must be met to establish "alter ego" and "control" under *MAG Portfolio, Strauss and Gill*—namely, whether Hamas and the charities shared leadership. Tr. 631-34; 658-60; 1519; 1522-23; 1528-30; 1554. Shared leadership, standing alone, however, is not, legally sufficient to establish control.[24]

Plaintiffs have failed to adduce any evidence to establish to the satisfaction of a reasonable juror that the Bank's employees or officers believed any of these charities to be the functional equivalents of Hamas. *Weiss*, 936 F. Supp. 2d at 115. To the contrary, the Bank's employees have testified that they were not aware of the existence of such front organizations (*e.g.,* Excerpt 1, Shukri, 318:5-9). Such conclusions are corroborated by evidence that none of these organizations had been designated in the jurisdictions where the banking services were provided. Many, moreover, were funded by the U.S. Government in an effort to "contribut[e] to the overall stability and security of the region." *See* Kerry Br., at 2.

---

[24]   *See Bank of Montreal v. Mitsui Mfrs. Bank*, No. 85-CV-1519, 1987 WL 5829, at *5 (S.D.N.Y. Jan. 21, 1987); *see also United States v. Bestfoods*, 524 U.S. 51, 69-70 (1998); *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 60 (2d Cir. 1988). While each identified a handful of individuals who, they claimed, were both board members of the charities and "leaders" of Hamas (Tr. 631-34), neither Levitt nor Spitzen specified the size of any of the charities' boards and whether the individuals whom they identified controlled any board. *Id.* 660-61; 631-32; 633-34; 1453-54; 1522-23; 1528-30; 1535; 1888.

2.   Arab Bank's Processing Of Transfers Initiated By The Saudi Committee Was Not Knowing Support For Hamas.

The Saudi Committee was formed by the Kingdom of Saudi Arabia and overseen by its Minister of the Interior (Tr. 1579).  It was never designated by the United States as an FTO, SDT or SDGT (*id.* 780; 1931-32).  It operated transparently, posting beneficiary names and payment details to its website (*id.* 1932-36); it administered aid programs for families of martyrs (those who died, regardless of cause) (approx. $5,300), those who were crippled (approx. $5,300), those who were wounded (approx. $1,300), and those who lost their homes or had a breadwinner in prison (approx. $2,600) (*id.* 1937-40; 1945).  It also provided funds to charities operating in the Territories to provide food and social services to the needy (*e.g., id.* 1956-57).

There is no dispute with regard to the Bank's limited role in the processing of Saudi Committee transactions.  It received transfer instructions initiated by Arab National Bank, the Saudi Committee's bank in Saudi Arabia, and processed those instructions either by depositing funds in bank accounts maintained in the West Bank and Gaza or distributing cash at its branches after verifying the identity of recipients.  (*See* Excerpt 7, Shukri, Fazwan, 69:13-21; 71:3-72:8; 91:10-21.)  The Bank did not choose beneficiaries, establish payment criteria, or specify benefit amounts.  Tr. 1936.  In fact, there is no evidence that the Bank exercised any form of discretion in processing the payments originated by the Committee.  *Id.*

None of the transfer records reflecting the 180,000 payments made by the Saudi Committee contains any reference to Hamas, nor does the correspondence generated and received in connection with the Saudi Committee's activities.  (*E.g.,* PX306; PX327.)  The Plaintiffs instead purport to find evidence of the Committee's ties to Hamas in the fact that it delegated the task of selecting beneficiaries to charitable organizations operating in the Palestinian Territories—themselves not blacklisted by the United States—that Plaintiffs brand as

"front organizations" for Hamas.  Tr. 785-86.  On this record, there is no basis for any reasonable juror to conclude that any Bank employee, officer or director knowingly provided material support to Hamas by processing Saudi Committee transfers.

Much of the Plaintiffs' case-in-chief has focused upon the fact that seven payments of $5,316.06 were made to the survivors of suicide bombers allegedly affiliated with the 24 attacks.  *See* App. A.  These seven payments, identical in value to all other payments made to Palestinians who lost a breadwinner or were crippled (Tr. 1939), represent a miniscule fraction of the total originated by the Saudi Committee that passed through the Bank.  Nothing in these payment instructions indicates any affiliation between the survivor and Hamas, nor have Plaintiffs established that any of these recipients was designated by the United States as a terrorist.  *Id.*  Plaintiffs have not established, as they must, that survivors of the terrorists were themselves part of Hamas and that, in processing payments to these relatives, any employee of the Bank knew that they were providing financial services to Hamas.  No reasonable juror could conclude, on this evidence, that there is any reason to conclude that in processing Saudi Committee payments to survivors of those who died, or relatives of those who were imprisoned, the Bank knew that it was providing financial services to Hamas.

3. Arab Bank's Processing Of Transfers For Alleged Hamas "Leaders And Operatives" Was Not Knowing Support For Hamas.

Levitt concedes that only three of the alleged Hamas "leaders and operatives" that he has identified as having received financial services from the Bank have ever been designated by the United States, the European Union or the United Nations as terrorists.  *Supra* Point B.4.  Two of these individuals received wire transfers that were screened by the Bank's automated systems in New York for the very purpose of blocking transactions for the benefit of designated individuals.  Because the names as spelled on these transfer instructions did not match any name

on the OFAC list at the time, the Bank's systems permitted these transactions to be processed. (*See* PX1914; PX2080; Tr. 273-75; 275.)  Plaintiffs have not adduced any evidence to suggest that these transfers were processed with knowledge of providing services to Hamas.  *Cf. Gill*, 893 F. Supp. 2d at 573 ("Insufficient evidence is adduced to tie the personal bank accounts of individuals who may be affiliated with Hamas to Hamas itself.  More is required to establish liability of the Bank.").

With regard to the one remaining designated individual identified by Levitt, Osama Hamdan, the record is not in dispute:  an individual checking account was opened and maintained for Hamdan in accordance with the Bank's standard policies and procedures and approved by the Central Bank of Lebanon.  (Excerpt 4, Saffiedine, 376:5-377:25; 455:16-21.) Hamdan presented the Bank with required account opening documentation and information. (*Id*.)  He was not designated until 2003 (PX1248), many years after the account was opened in 1998 (PX102).  His account was closed in 2004 (Excerpt 4, Saffiedine, 153:23-154:8), and became dormant in 2002, one year after funds were last withdrawn from the account (*id.* Bishara, 537:18-538:5).

The last transfer into this account was made in June 2003, two months before the designation of "Usama Hamdan" by the United States as an SDGT.  (PX264 (last transfer); PX1248 (designation).)  Once Bank officials became aware of derogatory information, the account was frozen and closed.  (Excerpt 4, Saffiedine, 79:2-80:10; 153:23-154:8; 455:16-21.) Upon receiving transfers, totaling less than $800, that misidentified the accountholder as Hamas, the Bank confirmed that the proper accountholder was Osama Hamdan (and *not Hamas*).  (*E.g.*, *id.* 376:5-377:25; 455:16-21; Tr. 1987:13-1988:16.)  No reasonable juror could find that the Bank provided knowing support to Hamas, sufficient to underwrite 24 acts of terror, by virtue of

this banking conduct in an account containing $8,677.92 when closed.

Plaintiffs have adduced no evidence that any Bank employee, officer or directors knew that providing automated, electronic funds transfers or account services to these individuals was equivalent to providing services to Hamas. *Gill*, 893 F. Supp. 2d at 573; <u>App. D</u>.

### D. The Financial Services At Issue Did Not Involve Acts Dangerous To Human Life Or Appear To Be Intended To Intimidate Or Coerce Civilians.

The banking services at issue are not acts of "international terrorism," which are limited to "violent acts or acts dangerous to human life" that violate U.S. criminal law and appear intended to "intimidate or coerce" a civilian population or influence government conduct or policy. 18 U.S.C. §§ 2331(1), 2333(a); *Al Rajhi Bank*, 714 F.3d at 124 (citing *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 109 (D.D.C. 2003) (banks are not liable "for injuries done with money that passes through its hands")); *Stutts v. De Dietrich Group,* No. 03-CV-4058, 2006 WL 1867060, at *2-*3 (E.D.N.Y. June 30, 2006) (banking conduct "does not constitute international terrorism" under Section 2331). As a matter of law, the evidence here is plainly insufficient to make such a showing.[25]

That the sorts of routine financial activities the Bank engaged are not acts of international terrorism under the ATA is also supported by the rule of lenity, which applies because Section 2331 requires plaintiffs to prove a criminal violation. *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *United States v. Thompson/Center Arms Co*., 504 U.S. 505, 517-18 (1992) (plurality); *id.* at 519 (Scalia & Thomas, JJ., concurring in the judgment). Under the rule of

---

[25]  The United States describes the Bank as "a constructive partner . . . in working to prevent terrorist financing." *Amicus* Br. of the United States of America, *Arab Bank, PLC v. Linde*, No. 12-1485, at 19-20 (*Linde* ECF No. 1015-1) ("U.S. Br."). Jordan closely regulates the Bank, including through its laws designed to "stanc[h] the flow of money to terrorists," and explained that it is a force for economic and political stability in the region. *Amicus* Br. of the Hashemite Kingdom of Jordan, *Arab Bank, PLC v. Linde*, No. 12-1485, 2013 WL 3830458 (U.S., July 24, 2013). Those are not descriptions of an international terrorist.

lenity, the court should not interpret the civil liability statutes to create an expansive view of what is criminalized by Section 2339B.  *See HLP*, 561 U.S. at 35.  Because none of the individuals or charities at issue were themselves designated FTOs, Plaintiffs' Section 2339B claims must fail.

The comity concerns explained by the United States and Jordan also counsel against an expansive reading of Section 2333.  Labeling the Bank a terrorist by stretching the meaning of "acts dangerous to human life" in ways that confuse primary liability with aiding and abetting concepts would be highly offensive to foreign nations and seriously interfere with U.S. foreign policy interests, actually "harm[ing] counterterrorism efforts."  U.S. Br. 19-21.[26]

Nor can a reasonable juror observe the regulated banking conduct at issue and find that it "appeared to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping[.]"  18 U.S.C. § 2331(1)(A)-(B); *see also Abecassis v. Wyatt*, No. 09-CV-3884, 2014 WL 9888846, at *7 (S.D. Tex. Mar. 12, 2014); *Stansell v. BGP, Inc.*, No. 09-CV-2501, 2011 WL 1296881, at *9 (M.D. Fl. Mar. 31, 2011).  Nothing in the Bank's provision of financial services remotely appeared to be intended to achieve any of these terroristic objectives.

Substantially all of the bank transactions at issue here were processed automatically, without human intervention (*see* Tr. 704:4-7), and with the participation of more than 50 prominent American, British, French, German, Swedish, Dutch, Danish, Italian, Spanish,

---

[26]     Plaintiffs' reading of Section 2333 would also have lay juries second guessing the regulators here and abroad, making judgments about who is a terrorist and what compliance efforts are sufficient.  *Fahey v. Mallonee*, 332 U.S. 245, 250 (1946).  Expanding the reach of Section 2333 is also an impermissible "act of legal imperialism" (*F. Hoffman-LaRoche v. Empagran S.A.*, 542 U.S. 155, 169 (2004)) at odds with the Court's warnings against expansive extraterritorial application of U.S. law.  *See Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010).

Slovakian, Australian, South African, Asian, and Middle Eastern banks.[27]   No reasonably objective observer of such banking conduct would conclude that it appeared to reflect a desire by the Bank to engage in terrorism.

## CONCLUSION

When scrutinized with care, it is clear that each of the transactions that Plaintiffs have placed in issue falls far short of satisfying the demanding requirements of the ATA. Nothing in the routine transactions at issue evidences any evil intention on the part of the Bank's employees, or any causal connection to the grave injuries at issue.   Under the circumstances, it is the proper function of this Court to prevent the jury from being inflamed or prejudiced by extraneous evidence that is certain to influence its deliberation and verdict.   This Court should grant the Bank's motion under Fed. R. Civ. P. 50(a) for judgment as a matter of law.

Dated: New York, New York
September 8, 2014

Respectfully submitted,

**DLA Piper LLP (US)**

_____/s/_____
Shand S. Stephens
Anthony P. Coles
Brett Ingerman
1251 Avenue of the Americas
New York, New York 10020
(212) 835-6000
*Attorneys for Defendant Arab Bank plc*

OF COUNSEL:
Kevin Walsh
Douglas W. Mateyaschuk, II
Joshua S. Sprague

---

[27]     *E.g.*, PX98-99; PX124-25; PX130-31; PX138; PX150; PX155-56; PX164; PX166-71; PX206-13; PX239;  PX247;  PX249-50;  PX254;  PX260;  PX265-71;  PX273-75;  PX277;  PX1512-38;  PX1548-85; PX1764-65; PX1797-00; PX1826-29; PX1831-35; PX1837-43; PX1914; PX1975-79; PX1983; PX1990-91; PX1993; PX1995-98; PX2004; PX2228; PX2298-08; PX2310; PX2390; PX2432-44; PX2449-57; PX2461; PX2463; PX2532-44; PX2553-56; PX2561-64; PX2681-13; PX2894-03.