# Exhibit C

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              EASTERN DISTRICT OF NEW YORK

 3    _____
                                      :
 4    COURTNEY LINDE, et al.,         :
                                      :
 5            Plaintiffs,             :
                                      :
 6    -against-                       : Case No.:
                                      : CV 04 2799(NG)(VVP)
 7    ARAB BANK, PLC,                 :
                                      :
 8            Defendant/Third-Party   :
              Plaintiff,              :
 9                                    :
      -against-                       :
10                                    :
      BANK HAPOALIM, et al.,          :
11                                    :
              Third-Party Defendants.:
12    _____
                                      :
13    PHILIP LITLE, et al.,           :
                                      :
14            Plaintiffs,             :
                                      :
15    -against-                       : Case No.:
                                      : CV 04 5449(NG)(VVP)
16    ARAB BANK, PLC,                 :
                                      :
17            Defendant/Third-Party   :
              Plaintiff,              :
18                                    :
      -against-                       :
19                                    :
      BANK HAPOALIM, et al.,          :
20                                    :
              Third-Party Defendants.:
21    _____:

22            DEPOSITION OF CAROLINE NAJAR
                    Tel Aviv, Israel
23                 July 20, 2008

24

25    Reported by:  BRENDA MATZOV, CA CSR 9243
```

```
 1                        C. NAJAR

 2   ORAN ALMOG, et al.,                :
                                        :
 3          Plaintiffs,                 :
                                        :
 4   -against-                          : Case No.:
                                        : CV 04 5564(NG)(VVP)
 5   ARAB BANK, PLC,                    :
                                        :
 6          Defendant/Third-Party       :
            Plaintiff,                  :
 7                                      :
     -against-                          :
 8                                      :
     BANK HAPOALIM, et al.,             :
 9                                      :
            Third-Party Defendants.     :
10   _____:
                                        :
11   ROBERT L. COULTER, SR., FOR        :
     THE ESTATE OF JANIS RUTH           :
12   COULTER, et al.,                   :
                                        :
13          Plaintiffs,                 :
                                        :
14   -against-                          : Case No.:
                                        : CV 05 365(NG)(VVP)
15   ARAB BANK, PLC,                    :
                                        :
16          Defendant/Third-Party       :
            Plaintiff,                  :
17                                      :
     -against-                          :
18                                      :
     BANK HAPOALIM, et al.,             :
19                                      :
            Third-Party Defendants.     :
20   _____:

21

22

23

24

25
```

1                    C. NAJAR

2    GILA AFRIAT-KURTZER, et al.,     :
                                      :
3          Plaintiffs,               :
                                      :
4    -against-                        :  Case No.:
                                      :  CV 05 388(NG)(VVP)
5    ARAB BANK, PLC,                  :
                                      :
6          Defendant/Third-Party     :
           Plaintiff,                 :
7                                      :
     -against-                        :
8                                      :
     BANK HAPOALIM, et al.,           :
9                                      :
           Third-Party Defendants.:
10   _____:
                                      :
11   MICHAEL BENNETT, et al.,         :
                                      :
12         Plaintiffs,               :
                                      :
13   -against-                        :  Case No.:
                                      :  CV 05 3183(NG)(VVP)
14   ARAB BANK, PLC,                  :
                                      :
15         Defendant/Third-Party     :
           Plaintiff,                 :
16                                     :
     -against-                        :
17                                     :
     BANK HAPOALIM, et al.,           :
18                                     :
           Third-Party Defendants.:
19   _____:

20

21

22

23

24

25

```
 1                    C. NAJAR

 2  ARNOLD ROTH, et al.,            :
                                    :
 3           Plaintiffs,            :
                                    :
 4  -against-                       : Case No.:
                                    : CV 05 3738(NG)(VVP)
 5  ARAB BANK, PLC,                 :
                                    :
 6           Defendant/Third-Party  :
             Plaintiff,             :
 7                                  :
    -against-                       :
 8                                  :
    BANK HAPOALIM, et al.,          :
 9                                  :
             Third-Party Defendants.:
10  _____:
                                    :
11  STEWART WEISS AND SUSAN WEISS,  :
    et al.,                         :
12                                  :
             Plaintiffs,            :
13                                  :
    -against-                       : Case No.:
14                                  : CV 06 1623(NG)(VVP)
    ARAB BANK, PLC,                 :
15                                  :
             Defendant/Third-Party  :
16           Plaintiff,             :
                                    :
17  -against-                       :
                                    :
18  BANK HAPOALIM, et al.,          :
                                    :
19           Third-Party Defendants.:
    _____:

20

21

22

23

24

25
```

1                          C. NAJAR

2  JOSEPH JESNER, et al.,              :
                                       :
3           Plaintiffs,                :
                                       :
4  -against-                           :  Case No.:
                                       :  CV 06 3869(NG)(VVP)
5  ARAB BANK, PLC,                     :
                                       :
6           Defendant/Third-Party      :
            Plaintiff,                 :
7                                      :
   -against-                           :
8                                      :
   BANK HAPOALIM, et al.,              :
9                                      :
            Third-Party Defendants.:
10  _____:

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                          C. NAJAR

2              Deposition of CAROLINE NAJAR, taken in the

3    above-entitled cause pending in the United States

4    District Court, Eastern District of New York,

5    pursuant to notice, before BRENDA MATZOV, CA

6    CSR 9243, at the Dan Tel Aviv Hotel, 99 Hayarkon

7    Street, Crown Room, Tel Aviv, Israel, on Sunday,

8    the 20th day of July, 2008, at 2:23 p.m.

9

10

11   APPEARANCE OF COUNSEL:

12   FOR PLAINTIFF:

13              MOTLEY RICE, LLC
                By:  VINCENT I. PARRETT, ESQ.
14              28 Bridgeside Boulevard, P.O. Box 1792
                Mount Pleasant, South Carolina 29465
15              843.216.9000
                vparrett@motleyrice.com
16

17   FOR DEFENDANT:

18              DEWEY & LeBOEUF, LLP
                By:  JAMES J. REARDON, ESQ.
19              125 West 55th Street
                New York, New York 10019
20              212.424.8000
                jreardon@dl.com
21

22   ALSO PRESENT:

23              AKIVA BREST, Hebrew Interpreter

24

25

1                          C. NAJAR

2                       I N D E X

3    WITNESS

4    Caroline Najar

5

6    EXAMINATION                                 PAGE

7    By Mr. Reardon                             8, 81

8    By Mr. Parrett                               63

9

10

11                  E X H I B I T S

12   NO.              DESCRIPTION               PAGE

13   Exhibit 1      Printouts of Photos, Bates

14                  MR-AB-422417-000149 to

15                  MR-AB-422417-000151           78

16

17

18       Q U E S T I O N S   I N S T R U C T E D

19            N O T   T O   A N S W E R

20                    (None.)

21

22

23     R E Q U E S T E D   I N F O R M A T I O N

24                    (None.)

25

Page 8

1                              C. NAJAR

2                          P R O C E E D I N G S

3

4                             AKIVA BREST,

5              the interpreter, was duly affirmed

6              to translate from English to Hebrew

7              and from Hebrew to English.

8

9                             CAROLINE NAJAR,

10             called as a witness, being first duly

11             affirmed, was examined and testified

12             as hereinafter set forth:

13

14              (The proceedings were conducted through

15         the Hebrew interpreter, unless otherwise

16         indicated.)

17

18                           EXAMINATION

19    BY MR. REARDON:

20        Q.   Good morning.  My name is Jim Reardon,

21    and I'm with the law firm of Dewey & LeBoeuf.  We

22    represent the defendant.

23             As you can see, the court reporter is

24    taking down my questions, and she'll be taking down

25    your answers.  So we need you to answer verbally

Page 9

1                          C. NAJAR

2     as opposed to nods of the head as you might do in

3     normal conversation.

4          A.    Okay.

5          Q.    In some cases, your lawyers may object.

6     But, generally, you may answer the question.

7               If you need a break at any time, let us

8     know, and we can take a break as long as there's no

9     question pending.

10         A.    Okay.

11         Q.    Could you please state your name for the

12    record?

13         A.    Caroline Najar Bahous.

14         Q.    Is Hebrew your first language?

15         A.    No.

16         Q.    What is your first language?

17         A.    Arabic.

18         Q.    Do you speak both languages equally well

19    or one better than the other?

20         A.    Equally.  I speak equally in both

21    languages.

22         Q.    Okay.  Where do you live?

23         A.    In Haifa.

24         Q.    Are you a plaintiff in a lawsuit?

25         A.    Yes.

1                          C. NAJAR

2        Q.   Where did you graduate -- have you

3   graduated high school?

4        A.   Yes.

5        Q.   When?

6        A.   In '95.

7        Q.   Was that in Haifa?

8        A.   Yes.

9        Q.   Where did you live in 2003?

10       A.   In Haifa.

11       Q.   Okay.  Have you lived in Haifa all of your

12   life?

13       A.   Yes.

14       Q.   Has your family lived in Haifa -- come

15   from Haifa?

16       A.   Yes.

17       Q.   How far back does your family go living

18   in Haifa?

19       A.   For as long a time as I know.

20       Q.   Okay.  Your Complaint alleges that your

21   husband Osama Najar was killed on October 4, 2003,

22   in Haifa; is that correct?

23       A.   Yes.

24       Q.   Was this at the Maxim restaurant?

25       A.   Yes.

1                          C. NAJAR

2        Q.    Have you remarried?

3        A.    Yes.

4        Q.    When?

5        A.    Three months ago.

6        Q.    What's the name of your husband?

7        A.    Maron.

8        Q.    Is that his first name?

9        A.    Yes.

10       Q.    Have you taken his last name?

11       A.    No.  Not yet.

12       Q.    Okay.  Do you plan to?

13       A.    Not for the time being.

14       Q.    Okay.  What is your husband's last name?

15       A.    Diav.

16       Q.    Are you of the Jewish faith?

17       A.    No.

18       Q.    Are you Catholic?

19       A.    Yes.

20       Q.    Earlier I asked you about whether you

21   understood Arabic and Hebrew.

22             Do you also understand some English?

23       A.    Yes.

24       Q.    Do you understand it as well as Hebrew and

25   Arabic?

1                           C. NAJAR

2          A.    More or less.

3          Q.    (Not translated.)  So you're understanding

4     my questions as I'm asking them for the most part?

5          A.    (In English.)  A little bit.

6          Q.    What is the location where the Maxim

7     restaurant was located?

8          A.    It's close to the Haifa beach.

9          Q.    Is it on Hahagana Boulevard?

10         A.    The street?

11         Q.    (Counsel nods head.)

12         A.    It's known as the Maxim Junction.  I don't

13    know the exact address.

14         Q.    Okay.  Have you ever heard of it being

15    located on Hahagana Ave.?

16         A.    I know that there is a Hahagana Boulevard.

17         Q.    Is that right near the Maxim restaurant?

18         A.    Yes.

19         Q.    Ms. Najar, in your Complaint, at

20    paragraph 106, it alleges that:

21              "Almost since the formation of the State

22    of Israel in 1948, Palestinian paramilitary and

23    terrorist organizations have sought to destroy it."

24              Having lived in Haifa all of your life and

25    your family with its roots in Haifa, have you heard

1                         C. NAJAR

2    of the history of Haifa?

3              MR. PARRETT:  Objection to form.

4              THE WITNESS:  No.

5         Q.   BY MR. REARDON:  Have you ever heard that

6    Haifa, prior to 1948, was a city with approximately

7    75,000 Palestinians?

8              MR. PARRETT:  Objection.  Foundation.

9              THE WITNESS:  No.

10        Q.   BY MR. REARDON:  Has anyone ever told you

11   that?

12        A.   No.

13        Q.   Have you ever read that anywhere?

14        A.   No.

15        Q.   Have you ever read or heard that the

16   Jewish settlers in the area of Haifa began to shell

17   and snipe at the Palestinians who lived in Haifa

18   beginning in December 1947?

19             MR. PARRETT:  Objection.  Foundation.

20             THE WITNESS:  No.

21        Q.   BY MR. REARDON:  Have you ever read or

22   heard that the Jewish troops in 1948, quote:

23             "Rolled barrels full of explosives and

24   huge steel balls down the roads, which they then

25   ignited."

1                         C. NAJAR

2              MR. PARRETT:  Objection.  Foundation.

3              THE WITNESS:  No.

4       Q.   BY MR. REARDON:  Referring back to the

5  previous question, have you heard that, when the

6  Jewish troops would do that, that:

7              "The moment panic-stricken Palestinian

8  residents came running out of their homes to try to

9  extinguish these rivers of fire, they were sprayed

10 by machine-gun fire."

11             Have you ever heard of this occurring in

12 1948?

13             MR. PARRETT:  Object to form.

14             THE WITNESS:  No.

15      Q.   BY MR. REARDON:  And had you ever heard

16 that, in the areas of Haifa, where both the Jewish

17 communities and the Arab communities interacted,

18 that the, quote, unquote:

19             "Haganah brought cars to Palestinian

20 garages to be repaired, loaded with explosives and

21 detonating devices," unquote.

22             MR. PARRETT:  Object to form.

23             THE WITNESS:  No.

24      Q.   BY MR. REARDON:  Have you ever heard of

25 the Irgon in 1948 throwing a bomb into a large group

1                     C. NAJAR

2    of Palestinians who were waiting to enter the Iraqi

3    Petroleum Company in Haifa?

4         A.   No.

5         Q.   Have you heard of the Iraqi Petroleum

6    Company in Haifa?

7         A.   No.

8         Q.   Are there any other petroleum companies

9    in Haifa?

10        A.   I don't know.

11        Q.   Is Haifa a port city?

12        A.   Yes.

13        Q.   Have you ever heard that the Haganah's

14   actions caused people to run to the port.  And

15   when the Palestinians reached the port, the

16   Haganah shelled these people --

17             MR. PARRETT:  Objection.  Form.

18   Foundation.

19        Q.   BY MR. REARDON:  -- in 1948?

20        A.   No.

21        Q.   Have you ever heard of an area in Haifa

22   called Wadi Rush Miyya?

23        A.   I've heard of it.

24        Q.   What is it?

25        A.   I have no idea.

1                          C. NAJAR

2        Q.    Have you ever heard that, in 1948, the

3   people who lived there were expelled and that the

4   Haganah blew up the houses of the people who lived

5   there?

6             MR. PARRETT:  Objection.  Form.

7   Foundation.

8             THE WITNESS:  No.

9        Q.    BY MR. REARDON:  How about Hawassa, do you

10  know what Hawassa is?

11       A.    No.

12       Q.    Have you ever heard of Operation Scissors

13  or Operation Cleansing the Leven?

14             And I will give the Hebrew words.

15  "Misparayim" and "Bi'ur Hametz."

16       A.    No.

17       Q.    Have you ever heard that, in or around

18  1948, that after the Palestinians had been expelled

19  from the villages in Haifa, that their houses were

20  looted and then detonated?

21             MR. PARRETT:  Objection.  Form.

22  Foundation.

23             THE WITNESS:  No.

24       Q.    BY MR. REARDON:  Had you ever heard, just

25  in growing up in Haifa, anything about what happened

1                          C. NAJAR

2   to the Palestinians who lived in Haifa in 1948?

3        A.   I had heard that there were residents

4   there and that they left.  But apart from that,

5   nothing.

6        Q.   You had just heard that they just decided

7   to leave?

8        A.   I know that there was a war and they left.

9   I don't know the reasons for their leaving.

10       Q.   Did you ever talk to your parents or

11  grandparents about the history of Haifa and what

12  happened in 1948 -- 1947, 1948?

13       A.   No.

14       Q.   Your Complaint states that there have been

15  attempts to destroy Israel since the formation of

16  Israel in 1948.

17            You haven't heard of anything that

18  occurred in Haifa in that time frame, any sort

19  of conflict between Israel and the Palestinians?

20            MR. PARRETT:  Objection to form.

21            THE WITNESS:  No.

22       Q.   BY MR. REARDON:  Okay.  Do you have an

23  understanding of how your family was able to stay

24  in Haifa?

25       A.   No.

1                       C. NAJAR

2          Q.    Are your grandparents still alive?

3          A.    No.

4          Q.    Did you ever know them while they were

5    alive?

6          A.    A little.  I was very small.

7          Q.    The high school that you went to in Haifa,

8    was that a mixed school with Catholics and Jewish

9    students?

10         A.    No.

11         Q.    Was it only Catholic students?

12         A.    No.

13         Q.    Was it only Jewish students?

14         A.    No.

15         Q.    What was the nature of the school, then?

16         A.    There were Catholics and Muslims.

17         Q.    What was the name of that school?

18         A.    The Italian Nuns' School.

19         Q.    Did they teach anything about the history

20   of Haifa at the Italian Nuns' School?

21         A.    Specifically about the Haifa history, no.

22         Q.    Did they teach generally about the Haifa

23   history?

24         A.    A little.  Not much.

25         Q.    Is it mostly Catholic Arabs who live in

1                          C. NAJAR

2    Haifa or Muslim Arabs, or is it about equal?

3         A.   I think there are equal amounts.

4         Q.   You ever hear of any Palestinians outside

5    of Haifa who still have the keys to houses where

6    they lived in Haifa before they were driven out

7    in 1948?

8              MR. PARRETT:  Objection.  Foundation.

9              THE WITNESS:  No.

10        Q.   BY MR. REARDON:  And do you live in a

11   particular neighborhood of Haifa?

12        A.   What do you mean?

13        Q.   Well, are there different areas of Haifa

14   that are known by different names?

15        A.   Every neighborhood has its name.

16        Q.   Does your area where you live, your

17   neighborhood have a name?

18        A.   Yes.

19        Q.   What's the name of it?

20        A.   Stella Maris.

21        Q.   Have you ever heard of Wadi Nisnas?

22        A.   Yes.

23        Q.   What is that?

24        A.   Now it's an area of markets.

25        Q.   And was it something prior to that?

Page 20

1                           C. NAJAR

2       A.    Not that I know of.

3       Q.    Had you ever heard that, once the Haganah

4  drove most of the Palestinians out of Haifa, they

5  attempted to push most of them into one location

6  within Haifa?

7             MR. PARRETT:  Objection.  Foundation.

8             THE WITNESS:  No.

9       Q.    BY MR. REARDON:  Have you ever heard that

10  the 70,000 or so Palestinians that were driven out

11  of Haifa in 1947 or 1948, when they attempted to

12  come back, the Haganah either arrested them or

13  deported them?

14            MR. PARRETT:  Objection.  Foundation.

15            THE WITNESS:  No.

16      Q.    BY MR. REARDON:  Have you ever heard in

17  general that there are Palestinians who came from

18  Haifa who would like to come back to Palestine?

19      A.    Not that I know of.

20      Q.    Have you ever heard of something called --

21  what some people call the right of return?

22            MR. PARRETT:  Objection to form.

23            THE WITNESS:  No.

24      Q.    BY MR. REARDON:  Have you ever heard of

25  Palestinians, who live anywhere within Palestine or

1                      C. NAJAR

2      Israel or the Territories, who were driven out in

3      1947 or '48 and desire to come back to where they

4      were living at the time of the war?

5          A.   No.

6          Q.   Okay.  Now, your Complaint alleges that

7      there is a conflict between the Israelis and the

8      Palestinians.

9               Do you have any understanding of what the

10     source of that conflict is?

11         A.   No.

12         Q.   And do you consider yourself to be a

13     Palestinian?

14         A.   In this country, I don't know how to

15     regard myself.

16         Q.   Well, I'm confused by the answer.

17               Could you explain what you mean by "in

18     this country, I don't know how to regard myself"?

19         A.   As a Catholic, I'm not considered to be a

20     Palestinian as the Muslims are.  And regarding the

21     Jews, I'm not accepted by them.  So I find myself

22     caught in the middle.

23         Q.   Being caught in the middle, does that

24     affect how you're treated here in Israel?

25         A.   Not always.

1                      C. NAJAR

2        Q.    Are there sometimes when you're treated

3   differently being caught in the middle?

4        A.    Sometimes.

5        Q.    Under what circumstances?

6        A.    There's all kinds of circumstances.

7   Socially.  At work.

8        Q.    What sort of circumstances are you treated

9   differently at work?

10        A.    Not in my particular job.  But certainly

11   in other cases, when you're looking for a job,

12   conditions for acceptance.

13        Q.    Are some of the conditions for acceptance

14   job service in the Israeli Army?

15        A.    Yes.

16        Q.    Is that one of the conditions you were

17   referring to?

18        A.    Part of it.

19        Q.    What's the other part?

20        A.    The fact that I'm Arabic, Christian.

21        Q.    Is it the fact that you're Arabic or the

22   fact that you're Christian or both?

23             MR. PARRETT:  Form.

24             THE WITNESS:  When they hear that I'm

25   Christian, that alleviates a little the issue than

1                    C. NAJAR

2    being Arabic.

3        Q.   BY MR. REARDON:   Okay.   So it alleviates,

4    what, employers that you're Christian as opposed to

5    Muslim?

6        A.   It seems to be.   It seems to.

7        Q.   Do employers ask you those questions in

8    Israel?

9        A.   It depends.

10       Q.   Well, for you in particular, in your

11   experience being Arabic and Catholic, has an

12   employer ever asked you whether you are a Catholic

13   Arab or a Muslim Arab?

14            MR. PARRETT:   Objection.   Form.

15            THE WITNESS:   So far I've worked with my

16   father.   He's a Christian.   So it's had no effect.

17       Q.   BY MR. REARDON:   Have your friends who

18   have sought employment with Israel faced those

19   questions?

20       A.   Yes.   My brothers, friends.

21       Q.   But people are alleviated when you say:

22   "I'm Catholic and not Muslim."

23       A.   Yes.   There is a differentiation.

24       Q.   And you said earlier, I think, you were

25   caught in the middle.

Page 24

```
 1                        C. NAJAR
 2            Where does that place the Muslim Arabs in
 3   terms of --
 4            MR. PARRETT:  Objection.  Form.
 5            THE WITNESS:  I have no response.
 6       Q.   BY MR. REARDON:  Have any of your friends
 7   or brothers ever been denied employment because they
 8   were Arab and not Jewish that you're aware of?
 9       A.   No.
10       Q.   Because they were Catholic, it was no
11   problem?
12            MR. PARRETT:  Objection.  Foundation.
13            THE WITNESS:  As far as I know, yes.
14       Q.   BY MR. REARDON:  A few questions ago, I
15   had asked you:  Are there circumstances when you're
16   treated differently in Israel as a Catholic Arab?
17            And you said socially and, I think, for
18   work.
19            How have you felt caught in the middle
20   socially aside from employment opportunities?
21       A.   Could you repeat the question?
22       Q.   Yes.  How have you felt you have been
23   treated differently in Israel socially as opposed
24   to in an employment setting?
25       A.   So far I've been treated okay socially,
```

Page 25

1                          C. NAJAR

2    but -- me personally.  But there are those who are

3    in my surroundings.

4          Q.   Anybody in your immediate family when you

5    mention your immediate surroundings?

6          A.   No.

7          Q.   Does most of your immediate family work

8    for your father?

9          A.   No.

10         Q.   Do you have any brothers and sisters?

11         A.   Two brothers.

12         Q.   Have they served in the Israeli Army?

13         A.   No.

14         Q.   If your brothers served in the Israeli

15   Army, what sort of positions would they be put in?

16              MR. PARRETT:  Objection.  Foundation.

17              THE WITNESS:  I don't know.

18         Q.   BY MR. REARDON:  Do you know any of your

19   friends or relatives who have served in the Israeli

20   Army?

21         A.   No.

22         Q.   To your understanding, are Jewish Israelis

23   required by law to serve in the Army?

24         A.   Yes.

25         Q.   And if either of your brothers wanted to

1                         C. NAJAR

2    serve in the Army so they could get the benefits of

3    satisfying those preconditions for jobs of having

4    served in the Army, could they?

5              MR. PARRETT:  Objection.  Form.

6              THE WITNESS:  I don't know.

7         Q.   BY MR. REARDON:  Have you ever heard that

8    a Palestinian or what Israel considers to be an Arab

9    person would be put into very low-level positions in

10   the Army if they were to be in the Army?

11        A.   Not that I know of.

12        Q.   Have you ever heard one way or the other?

13             MR. PARRETT:  Objection.  Asked and

14   answered.

15             THE WITNESS:  No.

16        Q.   BY MR. REARDON:  And is your husband's

17   background also Catholic?

18             MR. PARRETT:  Objection to form.

19             THE WITNESS:  Yes.

20        Q.   BY MR. REARDON:  On your identity papers,

21   what is your nationality listed as?

22             Is it listed as Israeli?

23        A.   Yes.

24        Q.   Did you ever have papers that just said

25   Arab versus Jewish?

```
 1                          C. NAJAR

 2        A.   It's not written in my I.D.  My I.D., it's

 3   written Israeli.

 4        Q.   Has it always been that way?

 5        A.   I don't think so.

 6        Q.   What did it used to say?

 7        A.   I think it used to be written Arabic or

 8   Israeli.

 9        Q.   Do you know when that changed in terms of

10   your identity papers?

11        A.   No.

12        Q.   (Not translated.)  And you have Israeli

13   citizenship; correct?

14        A.   (In English.)  Yes.

15        Q.   Do you ever travel?

16        A.   Yes.

17        Q.   Which airport do you travel out of?

18        A.   Ben Gurion.

19        Q.   How are you treated there?

20        A.   So far, okay.

21        Q.   Have you ever heard of Arab people being

22   treated poorly at Ben Gurion?

23        A.   Not that I know of.

24        Q.   Have you ever traveled to the United

25   States?
```

1                          C. NAJAR

2        A.    No.

3        Q.    Where have you traveled?

4        A.    Spain, Paris, Greece.

5        Q.    When was the last time that you traveled?

6        A.    Two weeks ago.

7        Q.    Was that in connection with the honeymoon

8   or vacation?

9        A.    (In English.)  No, no.  A vacation.

10        Q.    Did you go anywhere on a honeymoon?

11        A.    Yes.

12        Q.    Where?

13        A.    To Paris.

14        Q.    For how long?

15        A.    A week.

16        Q.    (Not translated.)  Do you have any

17   children?

18        A.    (In English.)  Yes.  One daughter.

19        Q.    When was she born?

20        A.    2000.

21        Q.    That was with your first husband Osama;

22   right?

23        A.    Yes, Osama.

24        Q.    Having been recently married, have you

25   become familiar with any rules that a Palestinian

Page 29

1                        C. NAJAR

2    who marries a Jewish person cannot gain Israeli

3    citizenship?

4          A.   No.

5          Q.   Have you ever heard that?

6          A.   No.  It's of no interest to me.

7          Q.   After you graduated high school, what sort

8    of work did you take up, if any?

9          A.   I studied accounting.  And I work in

10   accounting.

11         Q.   Is that with your father's company?

12         A.   In his office.  Yes.

13         Q.   In your father's accounting office?

14         A.   Tax consultancy.

15         Q.   Is it located in Haifa?

16         A.   Yes.

17         Q.   What's the name of the tax consultancy

18   located in Haifa?

19         A.   John Bahous.

20         Q.   Is that your father's name, John Bahous?

21         A.   Yes.

22         Q.   And did you go to a school beyond high

23   school, that you graduated in 1995, for accounting

24   training?

25         A.   Accountancy.  Yes.

1                          C. NAJAR

2        Q.    And to what institution did you go for

3   accountancy training?

4        A.    College for Administration.

5        Q.    Where is that located?

6        A.    It was in Hagefen Street.

7        Q.    (Not translated.)  Is that in Haifa?

8        A.    (In English.)  Yes.

9        Q.    We have three languages going on at once.

10             How long was that program?

11       A.    One and a half years.

12       Q.    And did you obtain a degree?

13       A.    Yes.  A certificate.

14       Q.    Okay.  Is it a certificate in accountancy?

15       A.    Yes.

16       Q.    And have you undertaken any other formal

17   training beyond that certificate training?

18       A.    I studied taxation, but I didn't pass the

19   exam.

20       Q.    When did you study taxation?

21       A.    '97, '98.

22       Q.    And this would be following -- sorry.

23             This would be prior to 2003, then?

24       A.    (Witness nods head.)

25       Q.    Did you ever undertake that exam again,

1                    C. NAJAR

2  the taxation exam?

3       A.   No.

4       Q.   Did you need that to work at your father's

5  business?

6       A.   No.

7       Q.   Was that taxation test, was that -- was

8  there a course that went with that?

9       A.   Yes.  And you have to go through the tax

10  commissioner's office to take the test.

11       Q.   So did you start working at your father's

12  firm right after you completed your certificate

13  program for a year and a half?

14       A.   I was working also while I was studying.

15       Q.   Okay.  So I take it, the year and a half

16  after you graduated high school, you were working

17  and studying at the same time?

18       A.   Yes.

19       Q.   Were you full-time at work at that point?

20       A.   No.

21       Q.   How many hours a week were you working

22  then?

23       A.   I don't recall.  But it was dependent on

24  my study program.

25       Q.   And did there come a point in time when

Page 32

1                          C. NAJAR

2    you started working full time for your father's

3    business?

4         A.    Yes.

5         Q.    Approximately what year was that?

6         A.    '98.

7         Q.    Did you work any jobs in between 1998

8    and today that are different than your father's

9    business?

10        A.    In 2003, I worked in another position.  It

11   was a full-time position.

12        Q.    Was that before or after October of 2003?

13        A.    Before.

14        Q.    Okay.  What was the name of that company?

15        A.    It was as an accountant in the Food Depot.

16        Q.    In approximately what month did you start

17   working as an accountant in the Food Depot?

18        A.    In 2002.

19        Q.    Do you recall what month in 2002?

20        A.    If I'm not mistaken, it was September.

21        Q.    Were you working at the Food Depot in or

22   about October 2003?

23        A.    Yes.

24        Q.    Did you stay with the Food Depot after

25   October 2003?

Page 33

1                          C. NAJAR

2        A.    No.

3        Q.    After October 2003, when was the first

4   time that you went back to work?

5        A.    February, March of 2004.

6        Q.    That was back with your father's company?

7        A.    Yes.

8        Q.    Did you leave the Food Depot?

9        A.    Yes.

10       Q.    Did you ask to go back there?

11       A.    No.

12       Q.    Did the Food Depot give you any time off

13  after the incident in October 2003?

14       A.    Yes.

15       Q.    How much?

16       A.    I don't remember.

17       Q.    At what point did you decide not to go

18  back to the Food Depot after October 2003?

19       A.    I remember -- I don't remember exactly

20  when.  But I do recall that there were too many

21  hours that I had to work.  And I decided to reduce

22  the number of hours that I worked.

23       Q.    Did you go back to the Food Depot at some

24  point in time before you eventually left?

25             MR. PARRETT:  Objection.  Asked and

Page 34

1                          C. NAJAR

2    answered.

3              THE WITNESS:  No.

4         Q.   BY MR. REARDON:  Okay.  When you were

5    working at the Food Depot prior to October 4, 2003,

6    how many hours were you working a week?

7         A.   Eight hours a day.

8         Q.   Was it a salary position?

9         A.   Yes.

10        Q.   Did you go back to an eight-hour-a-day

11   position with your father in February, March 2004?

12        A.   No.

13        Q.   How many hours a day did you go back with

14   your father?

15        A.   Five hours.

16        Q.   Did there come a point in time when you

17   went back to eight hours a day with your father's

18   company?

19        A.   No.

20        Q.   Does that position require eight hours a

21   day, or is that just a position that can be done in

22   five hours a day?

23             MR. PARRETT:  Objection to form.

24             THE WITNESS:  It was an eight-hour-a-day

25   position.  But I wasn't able to work more than five

1                          C. NAJAR

2    hours.

3        Q.   BY MR. REARDON:   So your father's company

4    has adjusted it so you can work five hours a day?

5        A.   Yes.

6        Q.   Is that a salaried position?

7        A.   Yes.

8        Q.   How much is your salary per month today?

9        A.   Between 2,500 and 3,000.

10       Q.   Is that shekels?

11       A.   Yes.

12       Q.   And what was your salary, for example, in

13   2002?

14       A.   It was dependent on the number of hours

15   I worked.  It was between three and a half thousand

16   and 4,000.

17       Q.   Were you paid depending upon how many

18   hours you worked, or was it always the same per

19   month?

20       A.   I was paid per hour, but there was also

21   overtime.

22       Q.   So in order to get paid, you would have to

23   keep track of how many hours you would work per week

24   at your prior job at the Food Depot?

25       A.   Yes.

1                       C. NAJAR

2        Q.   Do you keep track of your hours in your

3   current job?

4        A.   No.

5        Q.   What schedule do you work now?

6             Is it fixed?

7        A.   Yes.

8        Q.   When do you go in and when do you leave?

9        A.   I begin at 8:00 o'clock, and I finish at

10   1:00, 1:30.

11        Q.   Do you take care of your daughter after

12   that time?

13        A.   Yes.

14        Q.   What's your daughter's name?

15        A.   Nataly.

16        Q.   Okay.  Are you considering having more

17   children?

18        A.   Yes.

19        Q.   Do you live in your own home with your

20   husband and your daughter today?

21        A.   Yes.

22        Q.   (Not translated.)  Does anyone else live

23   in that home?

24        A.   (In English.)  No.

25        Q.   In connection with your husband Osama

1                          C. NAJAR

2    Najar's death in 2003, did you receive any benefits

3    from the Bituach Leumi?

4              MR. PARRETT:  Objection.  Form.

5              THE WITNESS:  Yes.

6        Q.   BY MR. REARDON:  Did you receive money

7    from the Bituach Leumi?

8              MR. PARRETT:  Objection.  Form.

9              THE WITNESS:  Yes.

10       Q.   BY MR. REARDON:  How much money did you

11   receive per month from the Bituach Leumi?

12             MR. PARRETT:  Objection.  Form.

13             THE WITNESS:  I have no answer.

14             MR. PARRETT:  She should answer.

15             THE WITNESS:  7,500.

16             MR. PARRETT:  Noting my objection for the

17   record.

18             MR. REARDON:  Yes.

19             MR. PARRETT:  Fair enough.

20       Q.   BY MR. REARDON:  Has your marriage -- has

21   your second marriage caused you to lose that monthly

22   payment from Bituach Leumi?

23       A.   They are supposed to stop payment.

24       Q.   Are they going to stop it entirely, or

25   will it be reduced to some amount?

Page 38

1                          C. NAJAR

2              MR. PARRETT:  Objection.  Foundation.

3              THE WITNESS:  They will reduce the amount

4      because they are paying for my daughter as well.

5         Q.   BY MR. REARDON:  (Not translated.)  So

6      there will still be some payment because of your

7      daughter?

8         A.   (In English.)  Yes.

9         Q.   And do you have an approximate amount how

10     much you'll still get, or you just don't know one

11     way or the other?

12             MR. PARRETT:  Objection.  Form.

13             THE WITNESS:  I don't know.

14        Q.   BY MR. REARDON:  What are your duties as

15     employed with your father?

16        A.   As an office clerk and as an accountant.

17        Q.   And as an office clerk and an accountant,

18     what are you required to do?

19        A.   What do I do as an accountant, or what do

20     I do as an office clerk?

21        Q.   Let's split it up.

22             What do you do as an office clerk?

23        A.   Banks, run errands.

24        Q.   You do the banking?

25        A.   Yes.

1                          C. NAJAR

2        Q.    What does that entail?

3        A.    Bank adjustments, errands, deposits.

4        Q.    So you would take the payments that the

5   firm receives and deposit the payments?

6              Is that one of the banking duties?

7        A.    Yes.

8        Q.    And you would write checks for payments,

9   for accounts payable?

10       A.    If necessary, yes.

11       Q.    Is there also an accounts payable clerk?

12             Is there a separate clerk for that?

13       A.    No.

14       Q.    Is there anything else that you do in

15   connection with banking aside from sort of making

16   the deposits?

17       A.    No.

18       Q.    In terms of the clerk aspect, does that

19   involve filing and doing the paperwork and things

20   of that nature?

21       A.    Yes.  Everything connected with being a

22   clerk.

23       Q.    Beyond your clerk duties, in terms of the

24   accounting duties, does that involve basically doing

25   the books of your father's firm?

1                          C. NAJAR

2        A.    Yes.

3        Q.    So you're the accountant for an accounting

4   firm; is that right?

5        A.    No.  I don't keep those books.

6        Q.    (Not translated.)  Okay.  All right.  Do

7   you do books for clients of your father?

8        A.    (In English.)  Yes, of course.

9        Q.    Okay.  Has your father's company ever done

10  banking with the defendant in this case that you're

11  aware of?

12       A.    No.

13       Q.    And how about banks like Israeli Discount

14  Bank, does his accounting firm do business with

15  them?

16       A.    No.

17       Q.    How about the Israeli Postal Bank?

18       A.    Not specifically with the Postal Bank.

19  With the postal service we have business.

20       Q.    Okay.  Is there a bank that your father's

21  business uses?

22       A.    Yes.

23       Q.    Which bank?

24       A.    The International Bank.

25       Q.    Is it Bank Leumi?

Page 41

                              C. NAJAR

1

2        A.    The Ben Leumi.  The International Bank.

3    The bank HaBen Leumi.

4        Q.    (Not translated.)  Are you translating the

5    formal name?

6              Is there a formal name for the bank?

7        A.    (In English.)  It's like National Bank.

8    The National Bank.

9        Q.    (Not translated.)  Like the Israeli Bank?

10       A.    (In English.)  No.

11       Q.    What's the formal name?

12       A.    The First International Bank.

13       Q.    (Not translated.)  Okay.

14       A.    (In English.)  That's the name of the

15   bank.

16       Q.    Okay.  Okay.  It's not Bank Leumi, though;

17   right?

18       A.    (In English.)  No, no, no.

19       Q.    All right.  Were you aware that there were

20   other banks in this case that allegedly transferred

21   money to reach, for example, Hamas?

22              MR. PARRETT:  Objection.  Form.

23   Foundation.  Argumentative.

24              THE WITNESS:  No.

25       Q.    BY MR. REARDON:  Have you ever heard of

Page 42

1                          C. NAJAR

2    anybody talking about the Postal Bank or the Israeli

3    Discount Bank or Bank Leumi transferring money

4    allegedly to terrorist prisoners?

5                MR. PARRETT:  Objection.  Form.

6                THE WITNESS:  Not that I know of.

7         Q.   BY MR. REARDON:  Have you ever read that

8    anywhere?

9         A.   No.

10        Q.   Had you ever heard about Arab Bank prior

11   to this lawsuit?

12        A.   Before this?

13        Q.   Yes, before the lawsuit.

14        A.   (In English.)  I heard something.  I don't

15   know.

16        Q.   In English, you said, "I heard something."

17             And had you just heard that it was a bank?

18             Had you heard anything beyond that?

19             MR. PARRETT:  Objection.  Form.

20             THE WITNESS:  I don't know.  Not that I

21   know of.

22        Q.   BY MR. REARDON:  Okay.  And when did you

23   first hear about Arab Bank in connection with this

24   lawsuit?

25        A.   At that time when I submitted my claim.

Page 43

1                        C. NAJAR

2       Q.    How did you hear about the lawsuit?

3       A.    What do you mean?

4       Q.    Well, did somebody contact you and tell

5   you there's a lawsuit, you can join?

6       A.    (In English.)  No.  I heard about it from

7   David Mena.

8       Q.    Okay.  Are you friends with David Mena?

9       A.    He's my attorney.

10      Q.    He's your personal attorney?

11      A.    For this lawsuit.

12      Q.    Okay.  But prior to hearing from David

13  Mena about this lawsuit, did David Mena ever handle

14  any other cases for you?

15      A.    No.

16      Q.    And have you sued anyone else besides the

17  defendant in this case?

18      A.    No.

19      Q.    Okay.  Did David Mena contact you first?

20      A.    Yes.

21      Q.    Was that by phone?

22      A.    Yes.

23      Q.    What did he say to you?

24      A.    I don't remember.

25            MR. PARRETT:  Objection.  Form.

1                         C. NAJAR

2        Q.    BY MR. REARDON:  Well, did you agree to

3    join a lawsuit on the phone, or did you meet with

4    him at some point later?

5        A.    After I met with him.

6        Q.    Okay.  And you don't remember what he

7    said on the phone about the lawsuit when he first

8    contacted you?

9             MR. PARRETT:  Objection.  Asked and

10   answered.

11            THE WITNESS:  No.

12       Q.    BY MR. REARDON:  What facts have your --

13   well, what is your claim against Arab Bank?

14       A.    I'm suing them for the damages that have

15   been caused to me.

16       Q.    Do you have any facts yourself that

17   connect them to the suicide bombing at the Maxim

18   restaurant in October 2003?

19            (Brief discussion in Hebrew between the

20         interpreter and the witness.)

21            THE INTERPRETER:  She asked me to repeat

22   it.

23            MR. REARDON:  Sure.

24            (Pending question retranslated.)

25            THE WITNESS:  I know that they're funding

1                          C. NAJAR

2    the terrorists.

3         Q.    BY MR. REARDON:  But do you have any facts

4    that connect Arab Bank in particular to the incident

5    in October of 2003?

6              MR. PARRETT:  Objection.  Asked and

7    answered.

8              THE WITNESS:  I have no response.

9         Q.    BY MR. REARDON:  I take it, then, your

10   answer is "no"?

11             MR. PARRETT:  Objection.  Asked and

12   answered.

13             THE WITNESS:  I'm not answering.

14             MR. PARRETT:  Well, instruct the witness

15   she should answer to the best of her ability, with

16   the objection noted that she's already answered it.

17   But she should answer.

18             THE WITNESS:  I think they are connected.

19        Q.    BY MR. REARDON:  Okay.  But do you have

20   any basis, other than your own thought, that the

21   bank is connected to this incident in October 2003?

22             MR. PARRETT:  Objection.  Asked and

23   answered.

24             THE WITNESS:  No.

25        Q.    BY MR. REARDON:  Have you told me all you

Page 46

1                          C. NAJAR

2   know about Arab Bank today?

3       A.   That's what I know.  Everything I know,

4   I've told you.

5       Q.   Okay.  Do you have any knowledge or

6   information about the Saudi Committee?

7       A.   I know nothing of that.

8       Q.   Are you able to identify any Palestinian

9   charities by name?

10      A.   No.

11      Q.   Other than the money received from Bituach

12  Leumi, have you received any charity in connection

13  with your husband's death in October 2003?

14           MR. PARRETT:  Objection.  Form.

15           THE WITNESS:  No.

16      Q.   BY MR. REARDON:  Okay.  Do you have any

17  out-of-pocket expenses which have not been paid by

18  the Bituach Leumi?

19           MR. PARRETT:  Objection.  Form.

20      Q.   BY MR. REARDON:  And by this, I mean

21  things for which you paid money which you haven't

22  been reimbursed.

23           MR. PARRETT:  Same objection.

24           THE WITNESS:  No.

25      Q.   BY MR. REARDON:  Have you seen a

1                     C. NAJAR

2    psychiatrist or psychologist following your

3    husband's death?

4         A.    Yes.   A psychologist.

5         Q.    What was his or her name?

6         A.    Nagla.

7         Q.    (Not translated.)   Is that a man or a

8    woman?

9         A.    (In English.)   A woman.

10        Q.    When did you first start seeing Nagla?

11        A.    Immediately following the attack.

12        Q.    About how many -- do you still see Nagla?

13        A.    I'm now with someone else.

14        Q.    When did you stop seeing Nagla?

15        A.    Some months ago.

16        Q.    About how frequently between October 22

17   (sic), 2003, and the time at which you stopped

18   seeing Nagla did you see her?

19        A.    It was once a week.

20        Q.    Was it always once a week?   Or did it go

21   up and down or always once a week?

22        A.    Once a week.

23        Q.    What's Nagla's last name?

24        A.    Kawah.

25        Q.    Do you see a psychologist since Nagla

Page 48

```
 1                        C. NAJAR
 2  Kawah?
 3        A.    Yes.  A new one.
 4        Q.    What's the name?
 5        A.    Caesar.
 6        Q.    What is Caesar's last name?
 7        A.    Hakim.
 8        Q.    Was there any break in time between seeing
 9  Nagla and Caesar Hakim?
10        A.    Yes.
11        Q.    Okay.  How long?
12        A.    A number of months.  Maybe almost a year.
13        Q.    How frequently are you seeing -- have you
14  started seeing Caesar Hakim?
15        A.    Yes.
16        Q.    And how frequently do you see him?
17        A.    I've been to one session with him.  I have
18  another session.  Once a week.
19        Q.    So have you just started this up in the
20  past week or so?
21        A.    Yes.
22        Q.    Where is Caesar Hakim's office located?
23        A.    In Hameginim Street in Haifa.
24        Q.    Where was Nagla's office located?
25        A.    "Rehov" -- Hagefen Street in Haifa.
```

1                        C. NAJAR

2        Q.   Have you ever been prescribed medications

3   by a psychiatrist or psychologist?

4        A.   No.

5        Q.   How about by your general -- do you have a

6   regular doctor?

7        A.   Yes.

8        Q.   And have you ever been prescribed any

9   medications like sleeping medicine or anything like

10  that?

11       A.   No.

12       Q.   Okay.  Have you ever been prescribed any

13  antidepressants or drugs affecting your emotional

14  condition or mood?

15       A.   No.

16       Q.   Have you ever been outside of -- aside

17  from the traveling that you've done, have you ever

18  been to any of the Territories?

19            MR. PARRETT:  Objection.  Form.

20            THE WITNESS:  No.

21       Q.   BY MR. REARDON:  Well, do you have any

22  understanding of the conditions in Gaza or the

23  West Bank?

24       A.   Apart from what I hear and see on the

25  news, no.

Page 50

1                        C. NAJAR

2        Q.    What is it that you see or hear on the

3   news about Gaza or the West Bank?

4        A.    Everything that they show.  I don't engage

5   myself in this.

6        Q.    Is there a truce presently between Israel

7   and Hamas in Gaza?

8        A.    I think it's just a very temporary thing.

9        Q.    Is it like a cease-fire?

10            MR. PARRETT:  Objection.  Foundation.

11            THE WITNESS:  Yes.

12        Q.   BY MR. REARDON:  Why do you think it's a

13   temporary thing?

14        A.    I don't want to answer that.

15        Q.   Are you able to answer it and you just

16   don't want to answer it?

17        A.    I don't want to get into politics.  It

18   doesn't interest me.

19            MR. PARRETT:  Tell her, to the best of her

20   ability, she should answer what she knows.

21            Could you repeat it for her?

22        Q.   BY MR. REARDON:  Yeah.  Ms. Najar, I was

23   just following up on a question where you answered

24   you think that the truce is a very temporary thing.

25            And I was just wondering why you thought

1                    C. NAJAR

2    it was a temporary thing.

3         A.    Because that's what usually happens.

4         Q.    Is there a cycle of violence between

5    Israel and the Palestinians?

6              MR. PARRETT:  Objection.  Foundation.

7              THE WITNESS:  I think so.

8         Q.  BY MR. REARDON:  Were you present at the

9    Maxim restaurant at the time of the explosion?

10        A.    At the time of the explosion itself, no.

11   I arrived a few minutes later.

12        Q.    And did someone notify you to come to the

13   Maxim restaurant?

14        A.    Yes.

15        Q.    What was your husband's duty at the Maxim

16   restaurant?

17        A.    He was the chef of the restaurant.

18        Q.    How long had he been working there?

19        A.    Since the year 2000 -- '99, 2000.  He had

20   worked there.  There was a break.  And then he went

21   back to work there.

22        Q.    What did he do during the break?

23        A.    He studied.

24        Q.    Where did he study?

25        A.    At the College of Administration.

1                        C. NAJAR

2        Q.    Did he have any degree or certificate from

3    the College of Administration?

4        A.    He had a certificate.

5        Q.    In what?

6        A.    In accounting.

7        Q.    What was his salary -- well, let me ask

8    you this:  Was he working in the Maxim restaurant

9    in 2002, for that year?

10       A.    Yes.

11       Q.    Approximately what was his salary for

12   2002?

13       A.    It was somewhere between 8- and 9,000.

14       Q.    Is that shekels per month?

15       A.    Yes.

16       Q.    Has anyone been appointed to represent the

17   estate of Osama Najar?

18       A.    He had no estate.  He had nothing.

19       Q.    Well, have any legal papers been filed

20   anywhere regarding any rights that he may have in

21   connection with his death?

22            MR. PARRETT:  Objection.  Calls for a

23   legal conclusion.

24            She can answer.

25            THE WITNESS:  I don't know.

Page 53

1                          C. NAJAR

2        Q.    BY MR. REARDON:  Did you keep the records

3    that would reflect your husband's income in or about

4    2002?

5        A.    No.

6        Q.    Was part of his salary a base salary and

7    part of it tips, or was it all one salary?

8        A.    No.  He didn't have tips.

9        Q.    Okay.  Did you ever have possession of the

10   records that reflect your husband's salary for 2002?

11       A.    No.

12       Q.    How about the year 2003, did you have any

13   records of his monthly income for any of the months

14   in 2003?

15       A.    I didn't have.

16       Q.    Did someone else have them?

17       A.    No.

18       Q.    Did you ever have to --

19       A.    I don't know.

20       Q.    Did you ever have to file taxes with the

21   State of Israel regarding yours and your husband's

22   income earned in 2002 or 2003?

23       A.    No.  We're salaried workers.

24       Q.    (Not translated.)  So you don't have to

25   file an income tax --

Page 54

1                          C. NAJAR

2       A.    (In English.)  No.

3       Q.    Your taxes are taken directly out of your

4    paychecks?

5       A.    Yes.

6       Q.    Do you have any of those paychecks from

7    the 2002, 2003 time period for your husband?

8       A.    No.

9       Q.    How about any bank records, do you have

10   any bank records of deposits of paychecks or

11   something like that for the years 2002, 2003?

12      A.    No.

13            MR. PARRETT:  Could I get a brief break

14   whenever convenient?

15            MR. REARDON:  Sure.  Let's take a break

16   now.

17            (Recess from 3:57 p.m. to 4:07 p.m.)

18      Q.    BY MR. REARDON:  Ms. Najar, when were you

19   born?

20      A.    1977.

21      Q.    What was the date of your husband Osama

22   Najar's birth?

23      A.    25th of January, '75.

24      Q.    Living in Haifa, have you heard of these

25   settlements out in the West Bank?

Page 55

1                           C. NAJAR

2          A.    I've heard of them.

3          Q.    What have you heard about the settlements

4     in the West Bank?

5          A.    I don't get into this deeply.   Only what

6     I've heard about on the news.

7          Q.    What is it that you've heard?

8          A.    Not that I take any real interest in it.

9     I don't know.

10          Q.    Have you ever heard whether or not Arabs

11     or Palestinians can live in the Jewish settlements

12     in the West Bank?

13          A.    I don't know.

14          Q.    Have you ever heard of settler violence

15     against Palestinians in the West Bank?

16          A.    I've heard of that.

17          Q.    What have you heard of that?

18          A.    Just what I've heard on the news.

19          Q.    Have you ever heard of Jenin?

20          A.    I've heard of a place called that.

21          Q.    What is your understanding of where Jenin

22     is located?

23          A.    I don't know where it is exactly.

24          Q.    Is it in the West Bank?

25          A.    I think so.

Page 56

1                          C. NAJAR

2        Q.   Have you ever been in the West Bank at

3   all?

4        A.   No.

5        Q.   And have you ever been to any of the

6   Palestinian Territories outside of Israel proper?

7        A.   No.

8        Q.   Is there any reason you wouldn't go to any

9   of the Palestinian Territories outside of Israel?

10       A.   No.  But I've never visited Tel Aviv

11   either.

12       Q.   Are the Palestinian Territories dangerous

13   places?

14            MR. PARRETT:  Objection.  Foundation.

15            THE WITNESS:  Everywhere is dangerous.

16       Q.   BY MR. REARDON:  Tel Aviv is dangerous?

17       A.   Also, yes.

18       Q.   Is that the same as in the Palestinian

19   Territories?

20       A.   I don't know.

21       Q.   Okay.  Had you ever heard of a period

22   in 2002 when the State of Israel had killed 497

23   Palestinians in the West Bank in two months?

24            MR. PARRETT:  Objection.  Foundation.

25            THE WITNESS:  No.

Page 57

1                          C. NAJAR

2        Q.   BY MR. REARDON:  Have you ever heard of

3   Operation Defensive Shield?

4        A.   No.

5        Q.   Do you have any relatives that live in the

6   Territories?

7        A.   No.

8        Q.   Do you have any relatives that live in

9   Lebanon or Syria or some other country who left

10  Palestine in or about 1947 or 1948?

11       A.   No.

12       Q.   Do you have any friends who have ever

13  discussed with you having relatives who are refugees

14  outside of Palestine?

15            MR. PARRETT:  Objection.  Form.

16            THE WITNESS:  No.

17       Q.   BY MR. REARDON:  Have you ever heard of

18  refugee camps?

19       A.   I've heard of them.

20       Q.   What is your understanding of what a

21  refugee camp is?

22       A.   I've only heard of them by name.  I don't

23  know what they are exactly.

24       Q.   Okay.  Have you ever heard that there are

25  people who have been living in refugee camps and

Page 58

1                          C. NAJAR

2      their relatives since 1947 or 1948?

3            A.    Not that I know of.

4            Q.    Do you know the identity of the person who

5      detonated the bomb in the Maxim restaurant?

6            A.    I know her name.  She's from the

7      Territories.

8            Q.    What's her name?

9            A.    Hanadi Jaradat.

10           Q.    Do you know where in the Territories she

11     was from?

12           A.    No.

13           Q.    Do you know what her profession was?

14           A.    She was a lawyer.

15           Q.    Do you know what motivated her to do what

16     she did in the Maxim restaurant?

17                 MR. PARRETT:  Objection.  Foundation.

18                 THE WITNESS:  No.

19           Q.    BY MR. REARDON:  Had you ever heard

20     that the Israeli Army killed the fiance of Hanadi

21     Jaradat?

22           A.    I heard about it on the news.

23           Q.    Had you also heard that the Israeli Army

24     had killed her brother?

25           A.    Yes.

1                        C. NAJAR

2        Q.    Had you heard that the Israeli Army had

3   denied her entry into Israel so that her father

4   could seek treatment for a liver ailment?

5        A.    I've heard of that.

6        Q.    Do you have any knowledge or information

7   about any particular group that Hanadi Jaradat was

8   affiliated with?

9        A.    No.   Not that I'm aware of.

10       Q.    Do you have any knowledge or information

11  about whether the parents of Hanadi Jaradat knew

12  what she was going to do before she did it?

13             MR. PARRETT:   Objection.   Foundation.

14             THE WITNESS:   No, I don't know.

15       Q.    BY MR. REARDON:   Have you ever heard of

16  that one way or the other?

17       A.    I don't know.

18       Q.    Do you have any knowledge or information

19  about whether the Israeli Army destroyed the family

20  home of Hanadi Jaradat following the explosion at

21  the Maxim restaurant?

22       A.    Not that I'm aware of.

23       Q.    Have you ever heard of that policy of

24  the State of Israel of demolishing the home of the

25  family who is related to someone who is alleged to

1                          C. NAJAR

2    have committed a terrorist act?

3         A.    I've heard of it.

4         Q.    Do you own your home?

5         A.    Yes.

6         Q.    How much did you pay for a home in Haifa

7    approximately?

8         A.    $140,000.

9         Q.    Would $5,000 be enough to buy a home in

10   Haifa?

11        A.    $5,000?

12        Q.    Yes.

13        A.    No.

14        Q.    What is the minimum amount of money that

15   you would need to buy a home in Haifa?

16        A.    Depends on the apartment.

17        Q.    What's the least expensive home that you

18   saw when you were looking for a home?

19        A.    Between 110-, 120,000 to infinity.

20        Q.    Okay.  Are you aware of whether innocent

21   Palestinians in the Territories are permitted to

22   recover for their injuries from the State of Israel?

23        A.    I don't know.

24        Q.    Have you heard about the large number

25   of Palestinians that the State of Israel has

Page 61

C. NAJAR

1

2    imprisoned?

3         A.    I've heard of that.

4         Q.    What have you heard about that?

5         A.    I've heard on the news that there are

6    prisoners.

7         Q.    Have you heard of people being held in

8    what they call administrative detention?

9         A.    No.

10        Q.    Prior to the cease-fire in Gaza, was the

11   Gaza Strip under siege by the State of Israel?

12        A.    Not that I'm aware of.

13        Q.    Notwithstanding not understanding the

14   motivation of the person who detonated the bomb at

15   the Maxim restaurant, do you have any opinion on why

16   some Palestinians have committed suicide bombings?

17        A.    I have no idea why they wish to do this.

18   Why a person in a state of desperation should strap

19   on an explosive charge and detonate himself, killing

20   innocent people, there is no excuse.

21        Q.    Well, I'm not asking about an excuse,

22   Ms. Najar.

23             I'm just asking whether you had an opinion

24   of why they do it.  I'm not asking you whether you

25   think that they have any cause to do it.

Page 62

1                          C. NAJAR

2            MR. PARRETT:  Objection.  Asked and

3       answered.

4       Q.   BY MR. REARDON:  And if your answer is

5       the same, that's fine.  I want to make sure that you

6       fully understood the question.

7            MR. PARRETT:  Same objection.

8            THE WITNESS:  Yes.

9       Q.   BY MR. REARDON:  Your answer is the same;

10      is that correct?

11      A.   I don't know.

12      Q.   Do you have an opinion one way or the

13      other as to whether demolishing the homes of

14      families of suicide bombers decreases or increases

15      terrorism?

16      A.   I don't know.

17      Q.   Is it fair to punish someone who isn't

18      connected to a criminal act other than their

19      familial relation?

20      A.   I don't think so.

21           MR. REARDON:  Thank you, Ms. Najar.

22           MR. PARRETT:  I have some questions.

23           (Recess from 4:33 p.m. to 4:35 p.m.)

24      //

25      //

Page 63

1                          C. NAJAR

2                        EXAMINATION

3   BY MR. PARRETT:

4        Q.    Was your late husband Osama an Arab?

5        A.    He was a Christian Arab.

6        Q.    Did Osama persecute any Arabs?

7        A.    No.

8        Q.    Did Osama discriminate against any Arabs?

9        A.    No.

10       Q.    Did Osama wage war against any Arabs?

11       A.    No.

12       Q.    Did Osama threaten any Arabs?

13       A.    No.

14       Q.    Did Osama bulldoze houses of any Arabs?

15       A.    No.

16       Q.    Did Osama drive any Arabs out of the State

17  of Israel?

18       A.    No.

19       Q.    Osama was a cook; is that correct?

20       A.    Yes.

21       Q.    He cooked at the Maxim restaurant that

22  often served Arabs; is that correct?

23       A.    Yes.

24       Q.    And what kind of folks ate at the Maxim

25  restaurant?

Page 64

1                            C. NAJAR

2         A.    It was mixed Arabs and Jews.

3         Q.    How do you know that?

4         A.    I went there.

5         Q.    What types of folks did you see at the

6    Maxim restaurant?

7         A.    All sorts of people.

8         Q.    What happened to your late husband Osama

9    on October 4th, 2003, at the Maxim restaurant?

10        A.    He was killed there on the spot.

11        Q.    How do you know what happened to him?

12        A.    People told me.

13        Q.    What did they tell you?

14             MR. REARDON:   Objection to form.

15             THE WITNESS:   They told me what happened

16   at the moments just before the attack and following

17   that.

18        Q.    BY MR. PARRETT:   What happened in the

19   moments just before the attack at the Maxim

20   restaurant on October 4th?

21        A.    People were eating there.  There were

22   children, babies, entire families there.  They were

23   eating there.  He was taking a break.

24        Q.    Who was?

25        A.    Osama and some other people from the work,

1                              C. NAJAR

2    from the staff.

3         Q.   Where were they taking a break?

4         A.   Inside the restaurant itself at the

5    workers' table.

6         Q.   And what was the suicide bomber doing

7    immediately before the explosion?

8              MR. REARDON:  Objection.

9              THE WITNESS:  She was eating.

10        Q.   BY MR. PARRETT:  And then what happened?

11        A.   She and the driver who brought her to

12   the restaurant got up.  She finished eating, and

13   she went, as it were, to pay the bill.  The driver

14   was already outside.  She turned around inside the

15   restaurant, and in the center of the restaurant,

16   in the middle there, she detonated herself.

17        Q.   What happened to the people immediately

18   around her when she detonated the bomb?

19        A.   Most of the people surrounding her were

20   killed on the spot.  Some of them were seriously

21   injured.  Some of them were slightly wounded.

22        Q.   And when was the first time after the

23   explosion that you heard there had been an explosion

24   at the Maxim on October 4th?

25        A.   A few minutes afterwards.

1                          C. NAJAR

2        Q.   How did you hear that there had been an

3   explosion?

4        A.   From a friend of mine who said that

5   there was shooting from the direction of the Maxim

6   restaurant.

7        Q.   And when you heard that there had been

8   shooting from the direction of the Maxim restaurant,

9   what did you do?

10       A.   I tried calling my husband.

11       Q.   Did you reach him?

12       A.   No.

13       Q.   What did you do next?

14       A.   I traveled in the direction of the

15   restaurant with my brother.  And on the way, I

16   switched on the news to try and hear if something

17   had happened.

18       Q.   What did you hear?

19       A.   I didn't hear anything.  I had already

20   arrived.

21       Q.   What did you see when you arrived at the

22   Maxim restaurant?

23            MR. REARDON:  Objection.

24            THE WITNESS:  Destruction.  People covered

25   in blood.  People shouting.  Ambulances.

1                      C. NAJAR

2        Q.   BY MR. PARRETT:  And what did you feel

3    like when you saw people covered in blood at the

4    restaurant where you knew your husband worked and

5    was working that day?

6              MR. REARDON:  Objection.

7              THE WITNESS:  It's something that's

8    indescribable.

9        Q.   BY MR. PARRETT:  What did it feel like?

10             MR. REARDON:  Objection.

11             THE WITNESS:  Trembling all over.  I

12   didn't understand what was going on.  I didn't

13   know to whom I should turn.  I didn't know what

14   to do.  I ran directly towards the entrance to the

15   restaurant.  They didn't let me in.

16       Q.   BY MR. PARRETT:  What did you do next?

17       A.   I started looking amongst the people who

18   were being removed from the restaurant to see if I

19   could find my husband.

20       Q.   And did you find him?

21       A.   No.

22       Q.   What did you do next when you didn't find

23   him?

24       A.   I went to the hospitals because they

25   said there were already evacuated injured people

1                          C. NAJAR

2    to hospitals.

3        Q.    And did you find him among the injured

4    evacuated people at the hospitals?

5        A.    No, I didn't.

6        Q.    What did you do next when you didn't find

7    him among the injured evacuated people that had been

8    brought to the hospitals?

9        A.    They had begun issuing lists of the

10   injured and to which hospitals they'd been referred.

11       Q.    Was Osama on any of those lists?

12       A.    No.

13       Q.    And so when you didn't find Osama at the

14   restaurant, when you didn't find him at the hospital

15   among the folks that had been injured and evacuated

16   there, when you didn't find him on the lists of

17   folks who were at other hospitals, what did you

18   feel at that moment?

19            MR. REARDON:   Objection.

20            THE WITNESS:   I just saw black before my

21   eyes, darkness.

22       Q.    BY MR. PARRETT:   How old was your daughter

23   that day?

24       A.    Two years and ten months old.

25       Q.    What did you do next after you didn't find

Page 69

```
 1                        C. NAJAR

 2    your husband on the list of folks who had been taken

 3    to the hospitals?

 4        A.    I was told that there were still people

 5    being operated on who hadn't been added yet to those

 6    lists.  I tried looking for him there.  I wasn't

 7    permitted.

 8             My uncle, who's a doctor, was permitted

 9    into the operating theaters to check.  And we didn't

10    find him there.  So nothing remained except for us

11    to travel to Abu Kabir to identify his body.

12        Q.    Did you go there?

13        A.    I didn't go.

14        Q.    Where did you go?

15        A.    I was taken home.

16        Q.    Was anyone at your home?

17        A.    There were loads of people there.

18        Q.    And did they tell you anything when you

19    arrived back at your home?

20             MR. REARDON:  Objection to form.

21             THE WITNESS:  No.

22        Q.    BY MR. PARRETT:  When was the first time

23    that you learned that your husband had been killed?

24        A.    A few minutes after I had been there and

25    the kitchen crew had come outside and he wasn't
```

Page 70

```
 1                    C. NAJAR

 2   amongst them.

 3        Q.   And what did you feel at that moment when

 4   you knew your husband had been killed?

 5             MR. REARDON:  Objection to form.

 6             THE WITNESS:  I felt that my whole life

 7   had been destroyed.  I didn't know what to do, what

 8   I should tell my daughter.

 9        Q.   BY MR. PARRETT:  Did that feeling that

10   your whole life had been destroyed ever recur to you

11   after October 4, 2003?

12        A.   Nothing's been the same since then.

13        Q.   Did you feel that feeling again?

14             MR. REARDON:  Objection.

15             THE WITNESS:  Yes.

16        Q.   BY MR. PARRETT:  How often?

17             MR. REARDON:  Objection.

18             THE WITNESS:  I have no idea.

19        Q.   BY MR. PARRETT:  What emotional pain have

20   you suffered as a result of the October 4th bombing

21   that killed your husband?

22             (Pending question retranslated.)

23             THE WITNESS:  It's suffering that you have

24   to live with daily, every minute of the day, and

25   to explain to a daughter who is two years and ten
```

1                     C. NAJAR

2   months old what had happened, that her father had

3   gone to work and didn't come home again.

4        Q.   BY MR. PARRETT:  Is that suffering that

5   you still live with daily today?

6             MR. REARDON:  Objection.

7             THE WITNESS:  Yes.

8        Q.   BY MR. PARRETT:  Is that suffering that

9   you'll live with in the future?

10            MR. REARDON:  Objection.

11            THE WITNESS:  Yes.

12       Q.   BY MR. PARRETT:  Did your daughter suffer

13  emotional pain as a result of the killing of her

14  father?

15       A.   She still suffers.

16       Q.   On October 4th, 2003, did she realize that

17  her dad didn't come home?

18       A.   She understood.  She noticed, but she

19  wasn't able to express her emotions.  But she

20  did express her anger towards her father.  But

21  every year, as she grows up, she has more questions

22  concerning the matter.

23       Q.   And why was she angry at that time at her

24  father?

25       A.   She thought that she (sic) left him (sic).

1                          C. NAJAR

2        Q.   She thought that he left her?

3             Is that your testimony?

4        A.   Yes.

5        Q.   And after October 4th, 2003, did your

6   daughter come to learn that her dad had been killed?

7        A.   A couple of years later, she understood

8   that he wasn't to blame, that somebody else was to

9   blame.

10       Q.   And did she express any feelings at that

11  point?

12            MR. REARDON:  Form.

13            THE WITNESS:  Yes.

14       Q.   BY MR. PARRETT:  What feelings did she

15  express when she learned that her father had been

16  killed and he wasn't to blame?

17            MR. REARDON:  Same objection.

18            THE WITNESS:  She didn't understand to

19  begin with the meaning of a female terrorist.  She

20  only thought, as if in the fairy tales, that there

21  was a witch that had come to harm her father.

22  That's what she called her then, a witch.  That's

23  what she called her, a witch.

24       Q.   BY MR. PARRETT:  Is she in school now?

25       A.   Yes.

1                     C. NAJAR

2      Q.   Has she had any problems in school as a

3   result of the death of her father?

4      A.   Yes.

5      Q.   How so?

6           MR. REARDON:  Objection.

7           THE WITNESS:  She has a fear of

8   everything.  She's very dependent.

9      Q.   BY MR. PARRETT:  You just said she has a

10   fear of everything.

11          What sorts of things does she have a fear

12   of as a result of the death of her father?

13     A.   She has many fears.

14     Q.   What was it like for you to be -- strike

15   that.

16          What was it like for you to have your

17   husband taken away from you?

18     A.   It was very difficult.

19     Q.   Were you lonely?

20     A.   Yes.

21     Q.   Did you have any particular problems

22   within your community?

23     A.   Yes.  Because in our sector, there's these

24   customs.  It's very difficult for a divorced or a

25   widowed woman to live, to function.  Everybody is

1                           C. NAJAR

2    watching you, when you go out and whatever you're

3    doing.

4         Q.   Did you suffer any physical injuries as a

5    result of the death of your husband?

6         A.   I lost a few kilos in weight.

7         Q.   And how is that related to the death of

8    your husband?

9         A.   After what had happened, I didn't have any

10   appetite for food.  I didn't have an appetite for

11   life.

12        Q.   You testified earlier that you've been

13   treated by a psychologist?

14        A.   Yes.

15        Q.   Has that psychologist cured you of the

16   emotional pain that you've suffered as a result of

17   the death of your husband?

18        A.   It's helped a little.

19        Q.   Do you still feel emotional pain after

20   seeing your psychologist?

21        A.   It's something that carries on all the

22   time.  It's something that you live with.  It's

23   something that you cannot forget.

24        Q.   How old was Osama on October 4th, 2003?

25        A.   Twenty-eight.

1                          C. NAJAR

2        Q.    How was his health?

3        A.    He was healthy.

4        Q.    Did he ever express to you how long he

5    intended to work in his career, to what age?

6        A.    Until retirement age.

7        Q.    What is the usual retirement age in your

8    community?

9        A.    Sixty-five, 67.

10       Q.    Immediately before the October 4th, 2003,

11   bombing, how much was Osama earning per month in

12   shekels?

13             MR. REARDON:   Asked and answered.

14             THE WITNESS:   Between 8- and 9,000

15   shekels.

16       Q.    BY MR. PARRETT:   Did Osama have any plans

17   to enter into any business for himself before he

18   died?

19       A.    Yes.   He dreamed about having his own

20   restaurant.

21       Q.    And did he talk about where he would have

22   opened that restaurant?

23       A.    It would have been in Haifa for sure.

24       Q.    Was he a popular chef in Haifa?

25             MR. REARDON:   Objection.

1                    C. NAJAR

2              THE WITNESS:  Everybody that knew him knew

3    him to be an excellent cook.

4         Q.   BY MR. PARRETT:  Do you think he would

5    have been a successful owner of a restaurant in

6    Haifa?

7              MR. REARDON:  Objection.

8              THE WITNESS:  I think so.  Yes.

9         Q.   BY MR. PARRETT:  And immediately after

10   he was killed on October 4, 2003, your family lost

11   the 8- to 9,000 shekels per month that he had been

12   earning and bringing in in income; is that correct?

13        A.   Correct.

14        Q.   And before the October 4th, 2003, attack,

15   you testified earlier that you worked eight hours a

16   day.

17              Was that five days a week?

18        A.   It was sometimes six days a week.

19        Q.   Six days a week.

20              So that was a full-time job that you

21   worked as an accountant before October 4, 2003?

22        A.   Yes.

23        Q.   After October 4th, 2003, have you ever

24   worked eight hours a day, five or six days a week

25   at any full-time job?

1                    C. NAJAR

2        A.    No.

3        Q.    Why not?

4        A.    I wasn't able to.  I have a young daughter

5    that I have to take care of.

6        Q.    Have any of the emotional injuries that

7    you suffered as a result of the October 4th killing

8    of your husband inhibited your ability to work full

9    time?

10            MR. REARDON:  Objection.

11            THE WITNESS:  Yes.

12       Q.    BY MR. PARRETT:  How so?

13            MR. REARDON:  Same objection.

14            THE WITNESS:  I wasn't able to work an

15   eight-hour-a-day job, having a daughter who's been

16   through such a crisis.  She needed me beside her all

17   the time.  It was also a difficulty for me to go and

18   buy products for home.  She was always afraid that I

19   would leave her.

20       Q.    BY MR. PARRETT:  What was your life like

21   before the October 4th suicide bombing?

22       A.    Just as any other young couple wanting to

23   build a home, have a family.

24            MR. PARRETT:  I'd like to have these three

25   pages marked as Exhibit 1, please.

1                            C. NAJAR

2            And these are three documents that have

3    been Bates stamped MR-AB-422417-000149 through

4    MR-AB-422417-000151.

5            (C. Najar Exhibit 1 marked.)

6        Q.   BY MR. PARRETT:  Please take a moment to

7    look through those three pages.

8        A.   (Examining.)

9        Q.   What is page 1 of Exhibit 1?

10       A.   It's a picture of our wedding.

11       Q.   Whose wedding?

12       A.   Mine and Osama's.

13       Q.   When was that picture taken?

14       A.   On the day of the wedding in April '98.

15       Q.   And is that picture a fair and accurate

16   depiction of you and Osama on the day it was taken?

17       A.   Yes.

18       Q.   Turn to page 2, please.

19       A.   (Witness complies.)

20       Q.   What is page 2?  What appears there?

21       A.   That was a picture taken exactly a week

22   before the attack.

23       Q.   What does that picture show?

24       A.   Myself, Osama, and Nataly.  It was at my

25   brother's engagement.

1                      C. NAJAR

2        Q.    Do you recall who took that photograph?

3        A.    There was a photographer there.

4        Q.    And is that picture a fair and accurate

5   depiction of you, Osama, and Nataly on the date it

6   was taken one week before October 4, 2003?

7        A.    Yes.

8        Q.    When was the first time that you saw that

9   picture that appears on page 2 of Exhibit 1?

10        A.    After the attack.

11        Q.    When after the attack?

12        A.    I was brought these pictures to look at

13   just a few days after the attack.

14        Q.    How did you feel when you saw this picture

15   a few days after your husband had been killed?

16             MR. REARDON:   Objection.

17             THE WITNESS:   I felt bad.

18        Q.    BY MR. PARRETT:   I'd like to direct your

19   attention to Page 3 of Exhibit 1.

20             What does the top picture show?

21        A.    That was a picture taken the day

22   immediately preceding the attack.   It was a Friday

23   night.

24        Q.    What does the top picture on Page 3 of

25   Exhibit 1 show?

Page 80

1                           C. NAJAR

2        A.   It's a picture of Nataly playing with her

3    father.  She's playing doctor.

4        Q.   And is that picture a fair and accurate

5    depiction of Osama and Nataly the day before the

6    October 4, 2003, attack?

7        A.   Yes.

8        Q.   Is that one of the last pictures that you

9    have of Osama and Nataly together?

10       A.   Yes.

11       Q.   I'd like to direct your attention to the

12   bottom picture on page 3 of Exhibit 1.

13            What does that picture show?

14       A.   It was about two weeks before the attack.

15   We were in Eilat on a family vacation.  I took the

16   picture.

17       Q.   And is that picture a fair and accurate

18   depiction of Osama and Nataly approximately two

19   weeks before the October 4th, 2003, attack when you

20   took that picture?

21       A.   Yes.

22       Q.   Does Nataly ever look at these pictures?

23       A.   Yes.

24       Q.   What does she say when she looks at these

25   pictures?

Page 81

1                          C. NAJAR

2              MR. REARDON:  Objection.

3              THE WITNESS:  At first she never looked at

4       the pictures.  She didn't agree to look at them.

5          Q.  BY MR. PARRETT:  When she looks at them

6       now, what does she say?

7              MR. REARDON:  Objection.

8              THE WITNESS:  We try to recall all kinds

9       of memories from that day.  We try to tell her of

10      all of the things we did together.

11         Q.  BY MR. PARRETT:  Does she miss her dad

12      now?

13         A.   I think so.  Yes.

14             MR. PARRETT:  That's all I have.

15

16                    FURTHER EXAMINATION

17      BY MR. REARDON:

18         Q.   Ms. Najar, how long before you were

19      married were you engaged?

20             How long was the engagement?

21             MR. PARRETT:  Which marriage?  Objection.

22         Q.   BY MR. REARDON:  Fair enough.

23             Your second marriage, how long before you

24      were married were you engaged?

25         A.   A number of months.

1                          C. NAJAR

2        Q.   And how long before you were engaged had

3   you been seeing your current husband?

4        A.   I don't know.  Not a long time.

5             MR. REARDON:  Thank you, Ms. Najar.

6             (The deposition concluded at 5:11 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C. NAJAR

2                  CERTIFICATE OF REPORTER

3

4           I, BRENDA MATZOV, CA CSR 9243, do hereby

5    certify:

6           That the foregoing deposition was taken

7    before me at the time and place herein set forth,

8    at which time the aforesaid proceedings were

9    stenographically recorded by me and thereafter

10   transcribed by me;

11          That the foregoing transcript, as typed,

12   is a true record of the said proceedings;

13          And I further certify that I am not

14   interested in the action.

15

16          Dated this 31st day of July, 2008.

17

18   _____

     BRENDA MATZOV, CA CSR 9243
19

20

21

22

23

24

25

1                          C. NAJAR

2                    WITNESS ERRATA SHEET

3    NAME OF CASE:  ALMOG v. ARAB BANK, PLC

4    DATE OF DEPOSITION:  JULY 20, 2008

5    NAME OF WITNESS:  CAROLINE NAJAR

6    Reason codes:
              1.  To clarify the record.
7             2.  To conform to the facts.
              3.  To correct transcription errors.
8

9    PAGE        LINE      CHANGE                    REASON

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23

24                      _____
                        CAROLINE NAJAR, Witness
25