# Exhibit E

Page 1

1                       Esther Avraham

2

3    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK

4
     _____

5    COURTNEY LINDE, et al.                    :
                                               :
6                       Plaintiffs,            :
                                               :
7                                              :
     -against-                                 :Case No.
8                                              :CV 04 2799(NG)(VVP)
                                               :
9    ARAB BANK, PLC                            :
                                               :
10         Defendant/Third-Party Plaintiff,:
                                               :
11                                             :
     -against-                                 :
12                                             :
                                               :
13   BANK HAPOALIM, et al.                     :
14   ---------------------------------------:
15

16                   Deposition of:

17                   Esther Avraham

18

19                    taken at:

20              Dan Tel Aviv Hotel
                     Tel Aviv
21                    Israel

22

23            on October 24th 2007
            commencing at 9:00 a.m.

24

25

```
 1                    Esther Avraham
 2  --------------------------------------:
                                          :
 3  PHILIP LITLE, et al.                  :
                                          :
 4                    Plaintiffs,         :
                                          :
 5                                        :
    -against-                            :Case No.
 6                                        :CV 04 5449(NG)(VVP)
                                          :
 7  ARAB BANK, PLC                        :
                                          :
 8       Defendant/Third-Party Plaintiff,:
                                          :
 9  -against-                             :
10                                        :
                                          :
11  BANK HAPOALIM, et al.                 :
    --------------------------------------:
12  ORAN ALMOG, et al.                    :
                                          :
13                    Plaintiffs,         :
                                          :
14  -against-                            :
    -against-                            :Case No.
15                                        :CV 04 5564(NG)(VVP)
                                          :
16  ARAB BANK, PLC                        :
                                          :
17       Defendant/Third-Party Plaintiff,:
                                          :
18  -against-                             :
19                                        :
                                          :
20  BANK HAPOALIM, et al.                 :
                                          :
21          Third-Party Defendants.       :
22
23
24
25
```

```
 1                    Esther Avraham
 2   --------------------------------------:
     ROBERT L. COULTER, SR.,              :
 3   FOR THE ESTATE OF JANIS RUTH         :
     COULTER, et al.                      :
 4                    Plaintiffs,         :
                                          :
 5                                        :
     -against-                           :Case No.
 6                                        :CV 05 365(NG)(VVP)
                                          :
 7   ARAB BANK, PLC                       :
                                          :
 8        Defendant/Third-Party Plaintiff,:
                                          :
 9   -against-                           :
                                          :
10                                        :
11   BANK HAPOALIM, et al.                :
                                          :
12   --------------------------------------:
     GILA AFRIAT-KURTZER, et al.          :
13                    Plaintiffs,         :
14                                        :
15   -against-                           :Case No.
                                          :CV 05 388(NG)(VVP)
16                                        :
     ARAB BANK, PLC                       :
17        Defendant/Third-Party Plaintiff,:
18                                        :
                                          :
19   -against-                           :
                                          :
20                                        :
     BANK HAPOALIM, et al.                :
21                                        :
               Third-Party Defendants.    :
22   _____:
23
24
25
```

1                          Esther Avraham
2                                                    :
    MICHAEL BENNETT, et al.                          :
3                                                    :
                       Plaintiffs,                   :
4                                                    :
5    -against-                                       :Case No.
                                                     :CV 05 3183(NG)(VVP)
6                                                    :
    ARAB BANK, PLC                                   :
7                                                    :
            Defendant/Third-Party Plaintiff,:
8                                                    :
                                                     :
9    -against-                                       :
                                                     :
10
    BANK HAPOALIM, et al.                            :
11                                                   :
    _____     :
12                                                   :
    ARNOLD ROTH,                                     :
13                     Plaintiffs,                   :
                                                     :
14                                                   :
    -against-                                        :Case No.
15                                                   :CV 05 3738(NG)(VVP)
                                                     :
16   ARAB BANK, PLC                                  :
                                                     :
17          Defendant/Third-Party Plaintiff,:
                                                     :
18   -against-                                       :
19                                                   :
                                                     :
20   BANK HAPOALIM, et al.                           :
                                                     :
21            Third-Party Defendants.               :
    _____:
22
23
24
25

```
 1                    Esther Avraham
 2                                          :
     STEWART WEISS AND SUSAN WEISS, et al.  :
 3                                          :
                    Plaintiffs,            :
 4                                          :
                                            :
 5   -against-                 :Case No.
                                :CV 06 1623(NG)(VVP)
 6                                          :
     ARAB BANK, PLC                         :
 7                                          :
             Defendant/Third-Party Plaintiff,:
 8                                          :
                                            :
 9   -against-                              :
                                            :
10                                          :
     BANK HAPOALIM, et al.                  :
11                                          :
                 Third-Party Defendants.   :
12   _____   :
                                            :
13   JOSEPH JESNER, et al.                  :
                                            :
14                    Plaintiffs,          :
                                            :
15                                          :
     -against-                 :Case No.
16                              :CV 06 3869(NG)(VVP)
                                            :
17   ARAB BANK, PLC                         :
                                            :
18           Defendant/Third-Party Plaintiff,:
                                            :
19   -against-                              :
20                                          :
     BANK HAPOALIM, et al.                  :
21                                          :
                                            :
22               Third-Party Defendants.   :
     _____:
23
24
25
```

1              Esther Avraham
2            A T T E N D A N C E S
3

4      Appearing on behalf of the Plaintiffs:
5              Mr. John Eubanks
               MOTLEY RICE LLC
6              28 Bridgeside Boulevard
               P.O. Box 1792
7              Mt. Pleasant, SC 29465
               Telephone: 843 216 9214
8              E-mail: jeubanks@motleyrice.com
9

10     Appearing on behalf of Arab Bank:
11             Mr. James Reardon
               DEWEY & LEBOEUF LLP
12             125 West 55th Street
               New York, NY 10019-5389
13             Telephone: 212 424 8569
               E-mail  jreardon dl.com
14

15

16     Also Present:
17

18             RANAE BUTLER
19             RUCHI AVITAL - INTERPRETER
20             VARDA YAARI - INTERPRETER
21             KAY HENDRICK - COURT REPORTER
22

23

24

25

Page 7

1                     Esther Avraham

2

3

    ESTHER AVRAHAM                                    8
4

    Examined by Mr Reardon                            8
5

    Cross-examination by Mr Eubanks.                  74
6

    Re-examined by Mr Reardon                         82
7

        Avraham Exhibit 1  ... ... ... ... ... ..    62
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       Esther Avraham

2                          Wednesday, 24th October 2007

3    Interpreters sworn.

4                    ESTHER AVRAHAM

5              having been duly affirmed,

6              testified as follows:

7    Examined by Mr Reardon

8         Q.   Good morning, Miss Avraham.

9         A.   Good morning.

10        Q.   Do you speak any English?

11        A.   A little.

12        Q.   So we have the Court Reporter here and

13   obviously I will speak in English and the Court Reporter

14   will translate to Hebrew.

15        We are here in the case of Almog versus Arab Bank

16   pending in the Eastern District Court in Brooklyn, New York

17   before Judge Gershone.  My name is Jim Reardon and I am with

18   the firm of Dewey & LeBoeff and I would ask that the other

19   Counsel and assistant to counsel make their appearances now?

20        MR KAPLAN:  John Eubanks from the law firm Motley

21   Rice on behalf of the plaintiff.

22        MS BUTLER:  Ranae Butler, Mann & Mairone.

23        MR REARDON:  Miss Avraham, as you can see the

24   Court Reporter is taking down my questions.  She will be

25   also taking down your answers so the answers need to be

1                    Esther Avraham

2     verbal, not nods of the head as we might do in regular

3     conversation.  If you need to take a break at any point in

4     time let me know and you can take a break as long as there

5     is not a question pending.

6           A.    Okay.

7           Q.    And if you don't hear a question or don't

8     understand a question just ask me to repeat it or rephrase

9     it otherwise we will presume that you understand the

10    question.  Can you please state your full name please?

11          A.    Esther Avraham.

12          Q.    When were you born and hold are you?

13          A.    I was born on March 6th 1977 and I am 30 and

14    a half years old.

15          Q.    And where were you born?

16          A.    In Israel.

17          Q.    Where in Israel?

18          A.    In Bat Yam.

19          Q.    Where is that in relation to?

20          A.    Twenty minutes south of Tel Aviv.

21          Q.    What citizenships, if any, do you have

22    besides Israel?

23          A.    I have none.

24          Q.    Where did you go to school in Israel?

25          A.    In Bat Yam.

1              Esther Avraham

2          Q.   Did you finish high school in Bat Yam?

3          A.   Yes, I did.

4          Q.   And did you continue your education beyond

5    high school?

6          A.   No.

7          Q.   Where do you live now?

8          A.   In Rehovot.

9          Q.   Where did you live in March 2004?

10         A.   Ashdod.

11         Q.   Do you have any other homes or residences in

12   Israel besides Rehovot today?

13         A.   I have a home in Ashdod.

14         Q.   Sorry.  What year did you complete high

15   school?

16         A.   In 1996.

17         Q.   Did you begin working after high school?

18         A.   No.

19         Q.   What did you do after high school?

20         A.   I waited to be enlisted in the army.

21         Q.   Were you ultimately enlisted in the army?

22         A.   Yes.

23         Q.   What was your length of service in the army?

24         A.   A year and seven months.

25         Q.   What timeframe was that year and seven

1                     Esther Avraham

2    months?

3              A.   I didn't understand the question.

4              Q.   What were the years, what year did you start

5    in the military and when did it end?

6              A.   From 1996 to 1998.

7              Q.   Are you in the Reserves today?

8              A.   No.

9              Q.   A year and seven months, is that a regular

10   length for someone who enlists?

11             A.   Yes.

12             Q.   What was your rank in the military?

13             A.   I was a sergeant.

14             Q.   What generally were your duties in the

15   military?

16             A.   I was a technical clerk.

17             Q.   Where did you complete your service?

18             A.   I don't understand.

19             Q.   What location, what city or town?

20             A.   Zrifin.

21             Q.   How do you spell that?

22             A.   Z-R-I-F-I-N.

23             Q.   Where is Zrifin?

24             A.   Ramle.

25             Q.   What did you do after your service -- let me

Page 12

1                        Esther Avraham

2      go back and ask a follow-up question.  Was your service in

3      the Army or Air Force, or what branch of the military were

4      you in?

5                  A.    Munitions, Ordinance.

6                  Q.    Is Ordinance different from the Army or Air

7      Force, I don't understand?

8                  A.    It is a different area.

9                  Q.    It has its own branch separate from the Army

10     or Air Force?

11                 A.    No, it is not a separate branch.

12                 Q.    Okay.  Is it part of the Army then, is

13     Munitions part of the Army?

14                 A.    Yes.

15                 Q.    What did you do after completing your service

16     in Munitions?

17                 A.    I began to work.

18                 Q.    Where did you begin to work?

19                 A.    In an insurance company.

20                 Q.    What was the insurance company?

21                 A.    REA Israeli Insurance Company.

22                 Q.    Is that a private company or a government

23     insurance company?

24                 A.    Private company.

25                 Q.    How long did you work at REA?

Page 13

1                    Esther Avraham

2           A.    Five years.

3           Q.    So did you work from approximately 1998 to

4     2003?

5           A.    Exactly.

6           Q.    Did you take any employment after 2003?

7           A.    Yes.

8           Q.    What was your next job?

9           A.    An insurance agency in Ashdod.

10          Q.    What is the name of that insurance agency?

11          A.    I can't recall.

12          Q.    How long did you work there?

13          A.    A half year.

14          Q.    Did you work there up until the time of your

15    husband's death?

16          A.    No.

17          Q.    When did you stop working at the insurance

18    agency?

19          A.    About a year before he was killed.

20          Q.    Did you take another job after this insurance

21    agency?

22          A.    No.

23          Q.    What were you doing in the approximately one

24    year between your work at this insurance agency and the time

25    of your husband's death?

                    Esther Avraham

1

2          A.    We were getting ready to marry, more or less.

3    That was most of our occupation.

4          Q.    What date were you married?

5          A.    November 4th 2003.

6          Q.    What is your husband's name?

7          A.    Avi Avraham.

8          Q.    Have you remarried?

9          A.    No.

10         Q.    Have you resumed dating or seeing other

11   people?

12         A.    Yes.

13         Q.    Do you live by yourself or do you live with

14   someone else?

15         A.    I live alone.

16         Q.    Are you working today?

17         A.    Yes.

18         Q.    Where do you work?

19         A.    A machining company.

20         Q.    Do you know the name of that company?

21         A.    R Mechanics.

22         Q.    Where is that?

23         A.    In Rehovot.

24         Q.    Was that your first job since you left the

25   insurance agency in 2004?

Page 15

Esther Avraham

1    A.    No.

2    Q.    What was the first job after you left the

3  insurance agency in 2004?

4    A.    A different insurance agency in Ashdod.

5    Q.    Do you remember the name of that agency?

6    A.    No, it was just for a brief time.

7    Q.    Then was R Mechanics the very next job after

8  this insurance agency that you worked for for a brief time?

9    A.    No, I worked in another place.

10    Q.    Okay.  What was this other place?

11    A.    An importer of toys in Ashdod.

12    Q.    Was this job at the importer of toys the job

13  that immediately preceded your job at R Mechanics?

14    A.    Yes.

15    Q.    What date approximately did you return to

16  work at the insurance agency that you worked for for a brief

17  time?

18    A.    Excuse me?

19    Q.    Would you like me to repeat the question?

20  I~guess I am trying to figure out when you started work at

21  this insurance agency after the time period in which you

22  weren't working for a while?

23    A.    Two months after my husband was killed.

24    Q.    What is your income today?

Page 16

1              Esther Avraham

2         A.    4,000 Sheckels a month.

3         Q.    What was your income in 2003 approximately?

4         A.    I can't recall.

5         Q.    Are you making any claim for lost income in

6   this case?

7         A.    Yes.

8         Q.    How much income do you claim you lost for

9   yourself?

10        A.    I can't assess it.

11        Q.    Do you have any documents or records that

12  would help us determine any claim that you might have for

13  lost income?

14        A.    Yes.

15        Q.    What are those documents?

16        A.    My husband's pay slips.

17        Q.    How about your own records?

18        A.    Like what?

19        Q.    Well, your own pay slips?

20        A.    I have them.

21        Q.    Let me go back.  Based upon your answer that

22  you can provide your husband's pay slips -- I am not sure we

23  were communicating correctly on the last question.  What

24  I~meant is are you making a claim for lost income,

25  I actually meant you personally as opposed to any claim you

Page 17

1                    Esther Avraham

2    might be separately making on behalf of your husband?

3            A.   No.  I would like a break, please?

4            MR REARDON:  Sure.

5

6                    (Short adjournment)

7            A.   I would like to amend my answer before.

8            Q.   Sure?

9            A.   To the question of whether I am claiming loss

10   of income, yes I am claiming loss of my own income.

11           Q.   For the record, that amendment came in

12   between a break where you met with your counsel, correct?

13           A.   I did meet with my lawyer but it wasn't based

14   on that meeting that I made this change.

15           Q.   What is the amount that you claim in lost

16   income?

17           A.   I can't assess it.

18           Q.   I want to go through some biographical

19   questions about your husband Avi Avraham?

20           A.   Okay.

21           Q.   How long did you know him before you were

22   married?

23           A.   Two years.

24           Q.   What was his educational background?

25           A.   He was a junior engineer.

1          Esther Avraham

2          Q.   Do you know where he attended high school?

3          A.   Yes.

4          Q.   Where?

5          A.   Eshel Hanassi Dormitory.

6          Q.   Do you know where that is?

7          A.   Near Bersheb.

8          Q.   Did he attend college?

9          A.   Yes.

10         Q.   Where did he attend college?

11         A.   It is a college for junior engineers, I can't

12  recall the name.

13         Q.   Did he obtain a degree?

14         A.   Yes.

15         Q.   What was the degree?

16         A.   Electrical engineer.

17         Q.   Did he have any other degrees besides the

18  electrical engineering?

19         A.   No.

20         Q.   Do you know if he had any specialised

21  training other than his education as an electrical engineer?

22         A.   He had in-service training as part of his

23  work.

24         Q.   Do you know the nature of what that

25  in-service training was?

1                    Esther Avraham

2          A.   No.

3          Q.   What was your husband's work history from the

4    two years that you knew him before you were married up until

5    the time of his death?

6          A.   From the day that I knew him he worked in the

7    Port -- the day that I met him actually.

8          Q.   Did he work for the same company for the

9    entire time?

10         A.   Yes.

11         Q.   What was the name of the company?

12         A.   The Ashdod Port.

13         Q.   What was his income in 2003?

14         A.   Between seven and 8,000 Sheckels.

15         Q.   Is that per month?

16         A.   Yes.

17         Q.   Did your husband serve in the military?

18         A.   Yes.

19         Q.   When?

20         A.   Between 1988 and 1991.

21         Q.   Was he in the Army?

22         A.   Yes.

23         Q.   Do you know his rank?

24         A.   Sergeant.

25         Q.   Was he in the Reserves in 2004?

Page 20

1                    Esther Avraham

2            A.   Yes.

3            Q.   Do you know where he performed his military

4    service while in the Reserves in 2004?

5            A.   More in the territories, I can't recall the

6    exact place.

7            Q.   By the territories do you mean West Bank or

8    Gaza?

9            MR KAPLAN:   Object to the form.

10           MR REARDON:   What do you mean by the territories?

11           A.   Jenine.

12           Q.   Do you understand the West Bank to be part of

13   the territories?

14           A.   Yes.

15           Q.   Do you understand Gaza to be part of the

16   territories?

17           A.   Yes.

18           Q.   Was your husband in uniform on the day of his

19   death?

20           A.   No.

21           Q.   What were his duties at the Ashdod Port?

22           A.   He was a crane engineer.

23           Q.   Have you been to the Ashdod Port before?

24           A.   Yes.

25           Q.   Have you observed the Israeli military

1                         Esther Avraham

2    presence there?

3              A.   No.

4              Q.   Does the Israeli military guard the Ashdod

5    Port?

6              A.   No.

7              Q.   Do you know who guards the Ashdod Port?

8              A.   A private guarding company, security company.

9              Q.   Do you know the name of the company?

10             A.   No.

11             Q.   Have you sued that company?

12             A.   The security company?

13             Q.   Yes?

14             A.   No.

15             Q.   Do you place any responsibility on the

16   security company for the incident that occurred in March

17   2004 in which your husband was killed?

18             A.   No.

19             Q.   Why not?

20             A.   Because it was the responsibility of the

21   police and the Ashdod Port company.

22             Q.   Have you sued the Ashdod Port company?

23             A.   Not exactly.

24             Q.   What do you mean "not exactly"?

25             A.   There is a claim on behalf of all the

Page 22

                    Esther Avraham

1    families that were harmed in the incident.  They are suing

2    all those that were involved in the incident.  I don't know

3    if the Port is involved.

4         Q.   Are you a part of this claim?

5         A.   Yes.

6         Q.   What is the name of this claim?

7         A.   I don't know.

8         Q.   Do you have any legal papers relating to this

9    claim?

10        A.   Yes.

11        MR REARDON:  We would call for the production of

12   those papers and we will follow it up with a letter.

13        Miss Avraham, who are your lawyers in this claim?

14        A.   Markman and Tumashin.

15        Q.   When did you retain Markman and Tumashin?

16        A.   About a year after the terror attack.

17        Q.   Are there any parties you can identify as

18   defendants in this case?

19        A.   Not that I recall.

20        Q.   Do you know how much money you are demanding

21   in that case?

22        A.   I haven't been told.

23        Q.   Do you know how many other people or

24   Plaintiffs in that case?

1                   Esther Avraham

2          A.    Seven others.

3          Q.    Do you know any of these people personally?

4          A.    Yes.

5          Q.    What are their names?

6          A.    Eti Dahan, Simol Tubol, Kinerget Abutbul,

7   Adar Damari.

8          Q.    Who else?

9          A.    Mervav Hendler.

10          Q.    Anyone else?

11          A.    Oren Marciano.

12          Q.    Anyone else?

13          A.    No.

14          Q.    You named six individuals, are there other

15   people in that lawsuit but you can't remember their names?

16          A.    Yes.

17          Q.    Did you file that lawsuit before you became

18   involved in this lawsuit?

19          A.    They were done at the same time I think.

20          Q.    Are your lawyers in that case against the

21   Ashdod Port company the same lawyers in this case or are

22   they different?

23          A.    Different lawyers.

24          Q.    How did you become involved in this case

25   against the Ashdod Port company?

Page 24

1                     Esther Avraham

2          A.    I heard about it from friends -- I heard

3    about it from other people who were affected by the terror

4    attack and I joined in the suit.

5          Q.    Who told you about it?

6          A.    I can't recall.

7          Q.    How did you find out about this suit?

8          A.    The same way, through friends.

9          Q.    Do you remember what friends told you about

10   this lawsuit?

11         A.    Negba Asulin.

12         Q.    Was there anyone else.

13         A.    No.

14         Q.    Who is Negba Asulin?

15         A.    One of the widows in the terror attack.

16         Q.    How did she tell you about this lawsuit?

17         A.    By telephone.

18         Q.    And did she call you?

19         A.    Yes.

20         Q.    What did she tell you about the lawsuit?

21         A.    That a group was getting organised among all

22   the families that were injured by the terror attack and that

23   I was invited to a meeting.

24         Q.    And did you attend a meeting?

25         A.    Yes.

Page 25

Esther Avraham

1  Q.   How long after the phone call did you attend
this meeting?

3  A.   About a week.

5  Q.   Where was the meeting?

6  A.   In Negba's home.

7  Q.   Who else was present at the meeting?

8  A.   Representatives of all the families that were
injured.

10  Q.   Who were those representatives of families
who were injured?

12  A.   Negba's brother, Eti Dahan, Kinerget Abutbul,
Simol Tubol and his mother.  I can't recall.

14  Q.   Were there others but you can't remember
their names?

16  A.   Yes.

17  Q.   Were any of these people lawyers?

18  A.   No.

19  Q.   What was discussed at this meeting?

20  A.   The possibility of filing a lawsuit.

21  Q.   Did you say anything at this meeting?

22  A.   I asked questions that pertained to the
matter.

24  Q.   Who did you ask questions to?

25  A.   I asked the lawyer present at the meeting.

Page 26

Esther Avraham

1    Q.  Let me follow-up because I think earlier

2 I~had asked if there were any -- well, I asked whether any

3 of the people you named were lawyers and you said no, and

4 now you have indicated that there was a lawyer present.  Who

5 was the lawyer present, if you recall?

6    A.   What I meant is none of the representatives

7 was a lawyer but we did meet with a lawyer, she came from

8 the Mairone company and her name was Hila.

9    MR EUBANKS:  I interject an objection so that we

10 don't stray towards attorney/client privileged information.

11    MR REARDON:  Do you know whether Hila is an

12 attorney?

13    A.   Yes.

14    MR REARDON:  What questions did you ask at that

15 meeting?

16    MR EUBANKS:  Objection.  I will let her answer but

17 I believe this may be attorney/client privileged

18 information.

19    A.   I asked questions that pertained to the

20 lawsuit, who were we suing, what were the chance, what would

21 be the time period of that lawsuit, what would be the

22 procedures involved.

23    MR EUBANKS:  Before that there was another

24 question I want to object to, that nothing that may

1                    Esther Avraham

2   constitute attorney/client privilege here constitutes a

3   waiver at all for the attorney/client privilege in the

4   future.

5           MR REARDON:  Do you remember who they said they

6   were planning on suing?

7           A.   The Arab Bank.

8           MR REARDON:  Had you ever heard the name Arab Bank

9   before that meeting?

10          A.   No.

11          MR REARDON:  Had you ever banked at Arab Bank?

12          A.   No.

13          MR REARDON:  What was said about your chances with

14  Arab Bank?

15          MR EUBANKS:  Objection, based on attorney/client

16  privilege.  I am going to instruct her not to answer that

17  question.

18          MR REARDON:  What was said about the procedures of

19  the lawsuit?

20          A.   I just remember I understood that it would be

21  a very lengthy procedure.  This is it more or less,

22  generally speaking.

23          Q.   And are any of those people who attended that

24  meeting not Plaintiffs in this lawsuit?

25          A.   That didn't join in the lawsuit?

1          Esther Avraham

2          Q.   Yes?

3          A.   I'm not sure.

4          Q.   Is there anyone you know who attended that

5     meeting who didn't join the lawsuit?

6          A.   I can't recall.

7          Q.   Did you bring anyone yourself, with yourself

8     to the meeting?

9          A.   Yes, my sister.

10         Q.   Has she joined the lawsuit?

11         A.   No.

12         Q.   Was she present when these questions were

13    posed to Hila?

14         A.   Yes.

15         Q.   I will ask the question again:  What did you

16    ask about Arab Bank's -- about your chances of prevailing

17    against Arab Bank?

18         THE INTERPRETER:  What did she ask?

19         MR REARDON:  What did you ask Arab Bank.  Let's

20    strike that, I think there is too much confusion in that.

21    What did you ask about Arab Bank?

22         A.   I wanted to know more details about them.  It

23    was the first time I heard about them.

24         Q.   What did Hila say in response to your

25    questions?

Page 29

Esther Avraham

1       A.   She explained to me that the Bank resides in
2  New York.  Who the owners of the bank is, is also what she
3  explained to me.  What ownership it has and the monies that
4  it transfers from where to where.

5       Q.   Who did Hila say the owners were of the Bank?

6       A.    I know that she said that it was owned by a
7  Jordanian entity.  I don't remember the names, I'm not sure
8  she mentioned the names.

9       Q.   Did it matter to you who owned the Bank?

10       A.   No.

11       Q.   Would you have sued an Israeli bank as well
12  as a Jordanian bank?

13       A.    If there was a need to, yes.

14       Q.    What newspapers do you read?

15       A.    Yedioth, it is a daily newspaper.

16       Q.    Do you read the Jerusalem Post?

17       A.   No.

18       Q.    Do you read Haaretz?

19       A.   No.

20       Q.    Do you read anything else beside Yedioth?

21       A.   No.

22       Q.    Have you read in Yedioth there is an Israeli
23  bank that has transferred funds into Gaza recently?

24       A.    No.

                    Esther Avraham

1

2          Q.   If that's true would you sue those banks?

3          A.   Of course.

4          Q.   So far you haven't sued those banks, correct?

5          A.   No.

6          Q.   The only bank being sued is a Jordanian bank?

7          A.   Yes.

8          Q.   What other questions did you ask at this

9   meeting that we are talking about a few questions ago?

10         A.   I don't remember, it was a long time ago.

11         Q.   When was this a long time ago?

12         A.   Almost three years.

13         Q.   It's October 2007, so sometime in 2004?

14         A.   Approximately.

15         Q.   I apologise, I can't make this scroll, whose

16   house was this meeting at?

17         A.   Negba Asulin.

18         Q.   Do you know if she joined this lawsuit?

19         A.   I don't know.

20         Q.   Do you have contact information for

21   Miss Asulin?

22         A.   Yes.

23         Q.   What is that contact information?

24         A.   I don't remember them by heart but I have it

25   written somewhere.

Esther Avraham

1

2    Q.   Do you have contact information for the other

3    people who attended that meeting at Negba's house?

4    A.   Not with me at the moment but I have them

5    written somewhere.

6    MR EUBANKS:  Can we go off the record for a

7    second?

8    MR REARDON:  Sure.

9                    (off-the-record)

10    MR REARDON:  Miss Avraham, we have been discussing

11    this meeting that you attended at Negba's house and I have a

12    couple more, we skipped a couple of bibliographical

13    questions.  What was your husband's birthday?

14    A.   It was July 22nd 1970.

15    Q.   What is your national origin?

16    A.   I was born in Israel.  My parents were born

17    in Turkey.

18    Q.   What was your husband's national origin?

19    A.   His parents came from Egypt.

20    Q.   Are you of the Jewish faith?

21    A.   Yes.

22    Q.   Was your husband as well?

23    A.   Yes.

24    Q.   Have you told me all the questions that you

25    asked at this meeting at Negba's house?

Page 32

1                    Esther Avraham

2          A.   All that I remember.

3          Q.   Do you remember questions that other people

4     asked at Negba's house about this lawsuit?

5          A.   They were more or less similar to my

6     questions.

7          Q.   How long did the meeting last?

8          A.   Between 90 minutes to two hours.

9          Q.   Who else asked questions that you recall

10    besides yourself?

11         A.   All those present.

12         Q.   And can you remember any of their questions?

13         A.   Very vaguely, not really.

14         Q.   Aside from people asking questions did Hila

15    make a presentation at the beginning of the meeting?

16         THE INTERPRETER:  You didn't mean a power point

17    presentation?

18         MR REARDON:  No.

19         A.   Yes.

20         Q.   What was the nature of this presentation?

21         A.   It was very relaxed and calm.  She explained

22    things in a very matter of fact manner about the nature of

23    her firm.  Who they were, various technical comments, and

24    details about where they were residing.  Then she moved on

25    and talked about the details of the lawsuit, if indeed we

Page 33

Esther Avraham

1  decide to file a lawsuit.

2          Q.  What did she say about her firm?

3          A.  She said, you know, that in this firm there

4  were a number of lawyers.  Some of them were in Israel

5  others were in different places in the world.  This is it,

6  and that they have decided to file this lawsuit against the

7  Arab Bank, or that they were ready to represent us in our

8  lawsuit.

9          Q.  Had they already filed a lawsuit at the time

10  that they were asking you to join this lawsuit?

11          A.  I think so.  I'm not sure.

12          Q.  And you indicated that Hila indicated where

13  the firm resides, what did she say about that?

14          A.  She gave us the address of the firm, who

15  headed that firm and also contacts details, info.  And in

16  case we wanted to continue to maintain contact with them.

17          Q.  Were any papers circulated at the meeting?

18          A.  Yes.

19          Q.  What were those papers?

20          A.  It was a detailed explanation of what this

21  lawsuit was all about, against who.  It was filed.  This is

22  it more or less as far as I can recall.

23          Q.  Did you keep a copy of these papers?

24          A.  I'm supposed to have a copy.

1            Esther Avraham

2          MR REARDON:  We call for the production of those

3     papers and will follow it with a written request?

4          MR EUBANKS:  I will object to the extent that it

5     may be a client intake form or something of that nature to

6     initiate the lawsuit.

7          MR REARDON:  Just for the record I think we have

8     already established non clients and people who had no chance

9     of becoming Plaintiffs in this suit were present at this

10    meeting and if there was a waiver to any privilege evidence.

11         My next question is were there any power points or

12    electronic presentations made to you?

13         A.   No.

14         Q.   Do you recall anything else Hila said

15    about -- do you recall anything else that Hila said in this

16    presentation to this group?

17         A.   No.

18         Q.   After Hila made her presentation did the

19    people who attended the meeting remain to discuss the

20    lawsuit?

21         MR EUBANKS:  Object to form.  But you can answer.

22         A.   I personally left the meeting after it was

23    finished.  I went back home with my sister.

24         MR REARDON:  You left immediately after Hila made

25    her presentation and didn't stay to discuss the meeting with

Page 35

1                    Esther Avraham

2    anyone else?

3              A.   I left immediately.

4              Q.   Did you discuss the meeting with your sister

5    on the way home?

6              A.   Yes.

7              Q.   What did you discuss with your sister?

8              A.   We discussed the possibility of joining this

9    lawsuit.  We read the material that was handed to us and the

10   presentation that Hila gave us.  This is it, generally

11   speaking.

12             Q.   You and your sister read these materials?

13             A.   Yes.

14             Q.   And what is your sister's name?

15             A.   Dalia Weis.

16             Q.   Where does she live?

17             A.   Yavne.

18             Q.   I am from the United States so I have not

19   mastered all the cities in Israel.  Is that someplace

20   located in Israel?

21             A.   Yes.

22             Q.   It is not for lack of trying.  Did you follow

23   it up with Hila and contact her or did she contact you?

24             A.   I contacted her.

25             Q.   Did you tell her you wanted to join the suit

Esther Avraham

1  or did you still have questions about whether to join the

2

3  suit?

4          A.   I still have questions but I don't remember

5  what they were.

6          Q.   What were these questions that you had?

7          MR EUBANKS:  Objection, asked and answered.

8          A.   I don't remember.

9          MR REARDON:  How long after the meeting did you

10  contact Hila?

11          A.   About a week.

12          Q.   After you asked these questions did you

13  immediately join the lawsuit or did you wait to think about

14  it more?

15          A.   Immediately, I joined immediately.

16          Q.   In between the meeting and the time that you

17  called Hila did you do any of your own investigation into

18  the potential for a lawsuit against the defendant in this

19  case?

20          A.   Yes.

21          Q.   And what did you do?

22          A.   I spoke with a number of other families who

23  were involved, who they worked with other law firms and they

24  filed the same lawsuit, and I ultimately chose Mann &

25  Mairone who are representing me in this lawsuit.  They are

Esther Avraham

1  my lawyers.

2        Q.  You said at the moment they are your lawyers,

3  are you considering changing to some other lawyers?

4        A.  No.

5        Q.  You said you spoke with other families in

6  between that week, what other families did you speak with?

7        A.  I spoke with family Dahan, family Asulin,

8  family Damari and family Abutbul.

9        Q.  Do you know if they all joined this lawsuit?

10       A.  I'm not sure which of them.

11       Q.  Did any of the families who attended that

12  meeting tell you that they were not joining the lawsuit?

13       A.  Not that I can recall.

14       Q.  What other lawyers did you speak with in

15  between the time of the meeting and the time you called

16  Hila?

17       A.  I didn't speak to any lawyers, only the

18  families.

19       Q.  Did you do any reading or anything else or

20  did you simply speak to other families?

21       MR EUBANKS:  Object to form.  You can answer.

22       A.  I read the page that Hila gave me and other

23  wordings of similar lawsuits then I decided to join the

24  lawsuit.

Page 38

1              Esther Avraham

2           MR REARDON:  What were the other similar lawsuits

3    that you read about?

4           A.   Similar lawsuits from other law firms.

5           Q.   Did you look at the papers in these other

6    lawsuits?

7           A.   Yes.

8           Q.   Do you recall the names of the papers you saw

9    in these other lawsuits?

10          A.   Of what, the names of what?

11          Q.   The papers?

12          A.   Various papers that provide details of the

13   lawsuit.

14          Q.   Who provided these papers about these other

15   lawsuits to you?

16          A.   Additional families that were present at the

17   meeting.

18          Q.   Do you remember which ones provided you these

19   other papers?

20          A.   Abutbul and Asulin families.

21          Q.   Do you remember the names of these other

22   lawsuits?

23          A.   No.

24          Q.   Do you remember whether -- do you remember

25   whether there were defendants other than Arab Bank?

1                    Esther Avraham

2          A.   No, only the Arab Bank was the defendant in

3    those lawsuits.

4          Q.   Did anybody at this meeting ask why there

5    were any other defendants or other banks to sue besides Arab

6    Bank?

7          A.   No.

8          Q.   Did Hila say why they were only suing Arab

9    Bank and not any other banks?

10         A.   She said that a good reason had been found to

11   show that they had transferred money to terrorist

12   organisations.

13         Q.   Did she tell you an amount of money that had

14   been allegedly transferred to terrorist organisations?

15         A.   Not that I can recall.

16         Q.   Did she identify any particular alleged

17   terrorist organisations that money had been transferred to

18   allegedly?

19         A.   She didn't mention names.

20         Q.   Did she provide any documents identifying how

21   they were to establish their case against Arab Bank?

22         A.   She didn't show us any written document but

23   she gave us good reason to believe that there was justify --

24   that they had actually transferred money but she didn't show

25   us anything in writing.

Page 40

Esther Avraham

1

2      Q.   Did Hila identify any connection between the

3  incident in which your husband was killed and Arab Bank at

4  this meeting?

5      A.   Not at that meeting but at a later meeting

6  held at a later date.

7      Q.   Do you have some knowledge or information

8  about a connection between Arab Bank and your husband's

9  death?

10      MR EUBANKS:  Objection to the extent it calls for

11  communications between attorney/client.

12      MR REARDON:  I am simply asking for a yes or no

13  answer at this point?

14      A.   May I answer the question?

15      MR EUBANKS:  Yes.

16      A.   I know that a sum of $5,000 was transferred

17  to the family, the son of the family, the man that killed my

18  husband in the explosion in the Port.

19      MR REARDON:  How do you know that?

20      A.   My lawyer told me.

21      MR REARDON:  What is the name?

22      MR EUBANKS:  Hold on a second.  I want to put on

23  the record that any disclosure of attorney/client privilege

24  does not constitute a waiver of attorney/client privilege

25  for the future.

Esther Avraham

1    MR REARDON:   What is the name of the son?

2    A.   I can't recall.

3    Q.   Do you know the name of the family members?

4    A.   No, and I don't care.

5    Q.   Do you know what motivated these people to

6    carry out this incident in March 2004 in the Ashdod Port?

7    A.   There's no human reason that can motivate

8    someone to do something like that.

9    Q.   Do you believe someone would kill themselves

10   for $5,000?

11   A.   Yes, human animals.

12   Q.   Human animals?

13   A.   Only they are capable of doing such things.

14   Q.   When you say they, who are they?

15   A.   Terror organisations, Hamas, Jihad, Fatah.

16   Q.   They are the human animals?

17   A.   Certainly.

18   Q.   And you believe they would kill themselves

19   for $5,000?

20   A.   For even less than that.

21   Q.   Are things that bad in Palestine that people

22   would kill themselves for $5,000?

23   MR EUBANKS:   Object to form but you can answer.

24   A.   Apparently yes, but that doesn't justify the

Page 42

1                   Esther Avraham

2    action.

3              MR REARDON:  Are there any Israelis that would

4    kill themselves for $5,000?

5              A.   I don't think so.

6              Q.   Do you know if anybody in the family of the

7    individuals who carried out this incident was aware it would

8    happen beforehand?

9              A.   Certainly.

10             Q.   How do you know that?

11             A.   I have seen it in the media, the support and

12   the appreciation that they receive.  They are turned into

13   martyrs.  It is a well known fact.

14             Q.   I guess my question was do you have any

15   knowledge or information that the people who were related to

16   these people who carried out this act had actual knowledge

17   that someone they were related to was going to carry out

18   this incident in March 2004?

19             A.   No, I don't know in this specific case.

20             Q.   Do you know what the Saudi Committee is?

21             A.   No.

22             Q.   Is it your understanding that payments

23   allegedly made through Arab Bank only went to what they call

24   suicide bombers?

25                   (Off-the-record)

Page 43

1                    Esther Avraham

2          A.    Not only but also.

3          Q.    What else do you understand payments were

4    made for allegedly?

5          A.    Do you mean beside terror?

6          Q.    My question is do you have any -- let me

7    rephrase the question.  Do you have any understanding of

8    whether payments were made to people who need charity?

9          A.    I have heard that that is the case.  I don't

10   know if that is true but I have heard it.

11         Q.    Where have you heard that?

12         A.    From my firm of attorneys -- in my firm of

13   attorneys.

14         Q.    Do you have any objection to charity to

15   Palestinians in need?

16         A.    Certainly not.  Not at all.

17         Q.    And if the family members of the people who

18   carried out this incident in March 2002 were unaware of that

19   in advance would you object to providing them charity?

20         MR EUBANKS:  Object to form but she can answer.

21         A.    Can I not answer that question?

22         MR REARDON:  No, you need to answer the question.

23         A.    If they didn't know then I have no problem

24   with that.

25         MR REARDON:  Your complaint mentions the words

1              Esther Avraham

2  targeted killings or targeted assassinations, do you know

3  what that means?

4         A.  Yes.

5         MR REARDON:  What does that mean to you?

6         A.  Not to carry out the specific action about

7  which knowledge is known in advance.

8         MS BUTLER:  I am not sure about the translation.

9         MR REARDON:  I am asking follow-up questions.

10 Based on the answer, even if it was translated I am not sure

11 it was translated from English to Hebrew in the right way so

12 let me see -- not that you didn't translate it correctly.

13        THE INTERPRETER:  No, I think she may not know

14 what the term is.

15        MR REARDON:  That may be the case as well.  Let

16 me, I will withdraw that question.  Your complaint mentions

17 the terms targeted assassination and targeted killing, are

18 you familiar with the policy of the government of Israel of

19 assassinating Palestinians who they believe are terrorists?

20        THE INTERPRETER:  Off the record I will explain

21 the term because she may be familiar with it.

22                (Off-the-record)

23        MR EUBANKS:  Object to form.

24        A.  Yes.

25        MR REARDON:  Okay.  Do you agree with that policy?

Page 45

1              Esther Avraham

2         A.   No.

3         MR REARDON:  Why don't you agree with that policy?

4         A.   I don't think that is the right way.

5         MR REARDON:  What do you think would be the right

6    way?

7         A.   I think we should speak with the relevant

8    parties and see how we can stop the cycle of bloodshed on

9    both sides.

10        MR REARDON:  Do you believe the Israeli policy of

11   targeted assassinations increases friction between Israel

12   and Palestinians rather than reduce it?

13        MR EUBANKS:  Object to form.  She can answer.  Can

14   we go off-the-record for a second?

15        MR REARDON:  Sure.

16                   (off-the-record)

17        MR REARDON:  There was a question pending which

18   was:  Do you believe the Israeli policy of targeted

19   assassinations increases conflict between Israel and

20   Palestinians?

21        MR EUBANKS:  Object to form but she can answer.

22        A.   I don't think this policy is the right way

23   but, however, I must add in light of the situation with the

24   Palestinians that as of now we don't appear to have any

25   other option unless we find partners for dialogue on the

Page 46

1                      Esther Avraham

2    other side and another way of doing things, because this is

3    a fight for our lives.

4              Q.   Do you know how many Palestinians have been

5    killed in what's called the Second Intifada?

6              A.   No.

7              MR EUBANKS:   Object to form.

8              A.   No.

9              MR REARDON:   Have you ever heard it is around

10   4,000 people.

11             A.   No, now I am hearing it.

12             Q.   Do you know how many Israelis have been

13   killed in the Second Intifada?

14             MR EUBANKS:   Object to form but she can answer.

15             A.    I cannot mention a specific number.

16             MR REARDON:   Are you familiar with the Israeli

17   policy of demolishing the homes of Palestinians who are

18   allegedly related to terrorists?

19             A.   Yes, I think it is justified.

20             Q.   Why do you think that is justified?

21             A.    Yes, because I think that if people murder

22   innocent people deliberately this is the proper thing to do,

23   and even more than that.

24             Q.   What would you do even more than that?

25             A.    I would make sure that they would be

1        Esther Avraham

2   imprisoned for a long period of time.

3        Q.   So you believe that the people who are

4   related to someone who carried out an unlawful act should be

5   imprisoned just based upon their family relation to the

6   person who carried out that act?

7        A.   In this case yes, if only to set an example.

8        Q.   How many Palestinian homes do you think

9   Israel would need to destroy to set an example to these

10  Palestinians?

11       MR EUBANKS:  Object to form.

12       A.   There is no rational way I can answer that

13  question and give you a number -- it is not rational to ask

14  that question.

15       MR REARDON:  Do you think $5,000 would be enough

16  to replace a Palestinian home?

17       A.   I don't know.

18       Q.   How much does a home cost in Israel?

19       A.   On average about $150,000.

20       Q.   Are you familiar recently that the State of

21  Israel has considered cutting off electricity and water to

22  Gaza?

23       A.   Yes, and I also note it is as a direct result

24  of the Palestinians continuing their attack on Sderot and

25  other places and as a result water and electricity would be

1            Esther Avraham

2   cut off.

3            Q.   Do you know how many people live in Gaza?

4            A.   No.

5            Q.   Do you believe everyone in Gaza is a

6   terrorist?

7            A.   No.

8            MR EUBANKS:  Object to form.

9            MR REARDON:  Do you think everyone in Gaza is a

10  member of Hamas?

11           MR EUBANKS:  Object to form.  She can answer.

12           A.   No.

13           MR REARDON:  Not being from Israel is this policy

14  of cutting off water and electricity to the residents of

15  Gaza something that the people of Israel support?

16           MR EUBANKS:  Object to form but she can answer.

17           A.   No, only in extreme cases when there is

18  incessant attacks coming from the Palestinian side.

19           MR REARDON:  So the people of Israel do not

20  support cutting off the water and electricity to Gaza?

21           A.   I can't speak on behalf of other people.

22  I~can speak for myself that I do support it.

23           Q.   And you would support it even though people

24  who live in Gaza aren't all terrorists and aren't all

25  members of Hamas?

1                           Esther Avraham

2          A.    Because the Hamas are assimilated among the

3    general public in Gaza and because the Hamas and various

4    other terrorist organisations, whose names I cannot

5    pronounce, and that they belong to terrorist organisations,

6    unfortunately innocents who are the minority will have to

7    suffer.

8          Q.    Do you believe the minority of people who

9    live in Gaza are innocent based upon your prior statement?

10         A.    A very small minority.

11         Q.    Is it possible to send any aid to

12   Palestinians who live in Gaza without supporting terrorism

13   in your mind?

14         A.    I don't know how to answer this question.

15         Q.    Okay.  Are you aware that the state of Israel

16   has declared Gaza to be a hostile entity?

17         A.    Yes.

18         Q.    How are you aware of that?

19         A.    Through the media.

20         Q.    Have you read that Israeli banks are now

21   leaving Gaza because the state of Israel has declared Gaza a

22   hostile entity?

23         A.    No.

24         Q.    Were you aware that there were Israeli banks

25   doing business in Gaza prior to that designation of Gaza as

Page 50

1                        Esther Avraham

2       a hostile entity?

3              A.    Yes.

4              Q.    Have you been aware that there were Israeli

5       banks doing business in Gaza as far back as your meeting

6       with Hila?

7              A.    No, even before that.

8              Q.    Though you were aware that Israeli banks were

9       doing business in Gaza, even before that meeting you

10      yourself didn't ask Hila whether you would be suing Israeli

11      banks in this case, did you?

12             A.    Because I know for sure that no Israeli bank

13      would transfer money for terror purposes.

14             Q.    Do you believe that any money that somehow

15      one way or another reaches Hamas is for terror purposes?

16             THE INTERPRETER:  Can you repeat?

17             MR REARDON:  Do you believe that any money that

18      somehow one way or another reaches Hamas is for terror

19      purposes?

20             MR EUBANKS:  Object to form.  She can answer.

21             A.    Most of the money is directed to terror

22      activity.

23             MR REARDON:  Have you received any police reports

24      or investigative reports from any governmental agency or the

25      military in Israel regarding the March 2004 incident at the

Page 51

1                              Esther Avraham

2    Ashdod Port in which your husband was killed?

3              A.   No, I went to the Ashdod police station and

4    I asked for the report myself.

5              MR REARDON:  Do you have a copy of that report as

6    a result of your asking for it?

7              A.   I did not take it out of the station.  It was

8    for reading purposes only.

9              MR REARDON:  Where did you go to deal with this

10   report?

11             MS BUTLER:  It wasn't translated well.  She said

12   I read it in the station and couldn't take it out of the

13   station.

14             MR REARDON:  Let's just ask, did you view this

15   report at the Ashdod police station?

16             A.   Yes.

17             MR REARDON:  What do you recall the report said?

18             A.   It mainly described the situation of the

19   fatalities, the way things went, the scenario, how many

20   explosions took place.  Basically technical details.

21             MR REARDON:  Did that report mention Arab Bank?

22             A.   No.

23             MR REARDON:  Do you have any knowledge or

24   information about charitable fronts in Israel or the

25   territories?

Page 52

1                    Esther Avraham

2          MR EUBANKS:  Object to form but she can answer.

3          A.   Can you repeat the question?

4          MR REARDON:  Sure.  Do you have any knowledge or

5    information about charitable fronts in Israel?

6          MR EUBANKS:  Object to form but she can answer.

7          A.   Yes.

8          MR REARDON:  What is your knowledge about

9    charitable fronts in Israel?

10         A.   I know there are a number of charity

11   organisations who help in various social spheres for various

12   social purposes.

13         Q.   What are these charities?

14         A.   The names?

15         Q.   Yes?

16         A.   Wizo, Naamat, Mishpaha Ahat.

17         MR EUBANKS:  Can we go offer the record for just a

18   second?

19                    (off-the-record

20         MR REARDON:  Miss Avraham, do you understand what

21   a front is?

22         A.   If I understand it correctly then it is an

23   organisation that directly helps in social matters.

24         MS BUTLER:  And voluntarily she said.

25         A.   Voluntarily.

Page 53

Esther Avraham

MR REARDON:  Are you aware of any charitable fronts in the territories?

MR EUBANKS:  Object to form but she can answer.

A.   I don't know of any particular fronts. I assume there are some.

MR REARDON:  Miss Avraham, have you ever visited the territories aside from any -- have you visited any of the territories?

A.   No.

Q.   Do you have any relatives who live in any of the territories?

A.   No.

Q.   Why have you never visited any of the territories?

A.   It is very dangerous there.

Q.   Why is it very dangerous?

A.   They don't really like us very much, we Israelis are considered persona non-grata there.

Q.   Who is it that you said "they don't like us very much", who do you mean when you say "they"?

A.   The residents of the territories.

Q.   Why is it very dangerous?

A.   Because in the territories those who had the territories are the terrorist organisations and they incite

Page 54

Esther Avraham

1    the minority and also the weak populations, and there is

2    also on-going incitements against us the Israelis.

3

4          Q.   Who are the weak populations in the

5    territories?

6          A.   Those who live there despite their will,

7    those who were forced to live there and they are subject to

8    all those organisations, all the heads of those

9    organisations.  All those in the authorities there.

10         Q.   When you said "they incite the minority", and

11   I want to clarify that, who is inciting the minority?

12         A.   The vast majority that lives there and

13   supports terror and is engaged in terror daily on a regular

14   basis.

15         Q.   Who are the minority?

16         A.   As I said those who have no economic or

17   social possibility of mobility, of leaving the place, and

18   they are forced to be there and remain subject to all those

19   heads of organisations who enforce this way of life upon

20   them.

21         Q.   And these are Palestinian people?

22         A.   Yes.

23         Q.   I have deposed a number of people in this

24   case and asked them about whether it is safe or dangerous to

25   travel or live in the West Bank and they told me it was not

                      Esther Avraham

1

2   dangerous.  I take it you would disagree with people who say

3   it is not dangerous to live in the West Bank or the

4   territories?

5            A.   Of course.

6            Q.   And, Miss Avraham, you are from Ashdod in

7   Israel proper.  Again, not being from here and being from

8   the United States, do people in Israel proper think

9   differently about life in the territories?  Object to the

10  form and also object based on relevancy, but she can answer.

11  It is very dangerous to live here because of the

12  territories.  I don't need to live in the territories to

13  know it is dangerous to live there.  The territories are

14  very close to Ashdod, Gaza, for example, and we are close,

15  and we are getting it.  It is not us that are getting the

16  Kassam.  It isn't Ashdod, but it is Ashkelon and Sderot, and

17  they are only a very few kilometers away from here.  It is

18  dangerous here because Gaza is a hostile area.

19           Q.   Do you believe that -- you served in the

20  Israeli military and in your service in the Israeli military

21  and in your education did you learn about the Six Day War

22  and the history of the Six Day War?

23           MR EUBANKS:  Object to form and object to

24  relevancy.  She can answer.

25           A.   Yes, I did.

Page 56

Esther Avraham

1  MR REARDON:  You are familiar with the concept

3  that the Israeli military controls the West Bank?

4  A.  I know this concept of occupation which

5  I disagree with, by the way.

6  MR REARDON:  That was my next question, as to

7  whether you agree that Israel continues to occupy

8  territories such as the West Bank since 1967?

9  A.  Yes.

10  MR REARDON:  And do you believe that the

11  settlement of the territories is part of the conflict

12  between Israel and the Palestinians?

13  MR EUBANKS:  Object to form and object to

14  relevancy.  She can answer.

15  A.  I would like to hear the question again.

16  MR REARDON:  Sure.  Let me ask, let me start a bit

17  more generally.  Is Israel's occupation of the territories

18  in whole or in part a source of the conflict between Israel

19  and the Palestinians?

20  MR EUBANKS:  Object to form.  She can answer.

21  A.  It is a part of it but it started, in my

22  view, a lot earlier.  I don't think it is the main part

23  because its affect, if you listen to the media, two years

24  ago there was disengagement and the terror hasn't stopped,

25  it only exacerbated.

Page 57

Esther Avraham

1    MR REARDON:  When you say it started earlier, what

2    started earlier?

3         A.    The conflict.

4         MR REARDON:  When do you believe it started in

5    your mind?

6         MR EUBANKS:  Object to form.  She can answer.

7         A.    I can't say accurately.  I don't have an

8    answer right now.

9         Q.    Okay.  Do you believe this is something that

10   started two years ago or is it something that started 2,000

11   years ago?

12        A.    A lot more than 2,000 years.  It is an

13   antique conflict between us.  It is not a new conflict

14   between us.  It is an ancient conflict.

15        Q.    When you use the word "occupation" what did

16   you understand the word occupation to mean?

17        A.    It is the Palestinian parties interpretation

18   of a right to settle where we were supposed to settle.

19        Q.    I think I know what you mean but I want to

20   see if I can clarify the answer.  I don't want to put words

21   in your mouth so let me break up the questions.  You said

22   there is a place where we are supposed to settle.  What did

23   you mean when you said there is a place where we are

24   supposed to settle?

Esther Avraham

1    A.   I meant those territories that we retrieved

2    in that war in which we received what we deserved, what was

3    rightfully ours.

4    Q.   Originally I thought you were going to say

5    that the Jewish people should settle in the land of Israel

6    but I take it that you are making a distinction then that

7    Israel has a right to be there as a result of the Six Day

8    War, am I correct?

9    A.   Shall I repeat it, shall I repeat it once

10   again?

11   BY MR REARDON

12   Q.   Let's repeat the question and see where we

13   go.

14   THE INTERPRETER:  Shall I repeat the question?

15   MR REARDON:  Yes.

16   A.   I don't think there is any contradiction

17   here.

18   Q.   No, I wasn't suggesting, I am just trying to

19   distinguish when you said earlier that there's a place that

20   you are supposed to be, what that basis was, whether you

21   were basing that upon a religious belief of the right to

22   settle the land of Israel or some other right that may

23   somehow flow from the result of the Six Day War?

24   A.   Both.

Page 59

Esther Avraham

1    Q.    Okay.   Why is it that you disagree with this

2  occupation?

3         A.    I beg your pardon?

4         Q.    Earlier you said you disagree with the

5  occupation, why is it that you disagree with the occupation?

6         A.    I'm saying there are parts in Israel, there

7  are certain settlements, areas that we have to settle for

8  religious, social reasons and also the rights that we

9  deserve.   There are places, however, that may be for a

10  particular compromise, a certain concession that we would

11  make to the Palestinians.   Maybe we should leave, disengage

12  from and we have, but it did not contribute to the process

13  that we aspire to reach with the Palestinians.

14         Q.    Are there any other reasons that you disagree

15  with the occupation?

16         A.    No.

17         Q.    Are there people in Israel who have attempted

18  to impede the Oslo process or is it only Palestinians who

19  have attempted to impede the Oslo process?

20         MR EUBANKS:   Object to form and relevancy.   She

21  can answer.

22         A.    I believe that also in Israel there were

23  people or sides who tried not to reach the agreement, the

24  fanatics amongst them, I believe radical people.

Page 60

Esther Avraham

1    Q.   Do you identify certain groups as being

2    fanatics in Israel?

3    A.   The extreme right.

4    Q.   Who is the extreme right?

5    A.   Fanatics groups, I can't remember their name,

6    a few of them.  A very small minority within this group.

7    Q.   Is the Likud party among the extreme right

8    that you describe?

9    MR EUBANKS:  Objection to form.

10   A.   No, they are not extreme right.  They are a

11   right wing party.

12   MR REARDON:  How about the people who live in

13   Kiryat Arba, are they extreme right?

14   MR EUBANKS:  Objection to form.

15   A.   Yes.

16   MR REARDON:  Are there any places besides Kiryat

17   Arba that you can describe as being part of the extreme

18   right?

19   MR EUBANKS:  Objection to form.  She can answer.

20   A.   The Gush Katif area.

21   MR REARDON:  Anywhere else apart from Kiryat Arba

22   and Gush Katif that is part of the extreme right?

23   MR EUBANKS:  Objection to form, also object to

24   relevancy.

Page 61

Esther Avraham

1    MR REARDON:  Do the actions of the extreme right

2    in Israel contribute to the conflict between Israel and

3    Palestinians?

4         A.   I don't think in any significant way.

5         MR REARDON:  Do you in your own mind have any

6    views as to what contributes to the conflict between Israel

7    and the Palestinians?

8         MR EUBANKS:  Objection to form and relevancy.  She

9    can answer.

10        A.   I think that it is factors like those that

11   I~mentioned, radical factors that impedes the process.  The

12   achieving of a joint goal, the basic understanding between

13   the two nations.

14        MR EUBANKS:  Can we go off the record for a

15   moment, I need to have a conversation with you outside?

16                  (off-the-record)

17        MR REARDON:  Miss Avraham, have you provided any

18   documents to your lawyers in this case?

19        A.   Yes.

20        Q.   What documents do you remember that you

21   provided?

22        A.   Documents attesting to the fact that I am in

23   the care of a social worker since the incident.  Letters

24   regarding expenses related to a memorial book I published in

Page 62

Esther Avraham

1  memory of my husband.  The memorial book itself, a disk of

2  the memorial book.  Pension payment slips from the Betuah

3  Leumi and from my husband's pension fund.

4       MR REARDON:  John, is it okay to use these

5  documents?

6       MR EUBANKS:  Yes, that's fine.

7       MR REARDON:  Miss Avraham, I am going to mark as a

8  group this Exhibit~1.

9       (Exhibit Avraham 1 marked for identification)

10       Miss Avraham, when did you provide these documents

11       that you mentioned, the book on a disk, the pension

12       payment slips, your husband's pension fund?

13       A.   I completed handing over the documents on

14  Sunday but there are still a few documents.

15       Q.   The Sunday, today is Wednesday the 24th, so

16  Sunday the 21st?

17       A.   Yes.

18       Q.   There were approximately eight pages that

19  were provided, I believe, in advance of Sunday.  Could you

20  tell me what was provided before that date, what is it in

21  Exhibit~1 which was provided earlier than the 21st?

22       THE INTERPRETER:  You want to know what the

23  documents are?

24       MS BUTLER:  You didn't say eight of them were

Page 63

Esther Avraham

1  provided before Sunday.  You are just asking which of those

2  were provided before Sunday.

3

4          MR EUBANKS:  It doesn't matter.

5          THE INTERPRETER:  Is that what you asked?

6          MR REARDON:  I assume these were all provided

7  before Sunday?

8          MR EUBANKS:  That is correct.

9          MR REARDON:  I don't know exactly what day but

10  some time before Sunday.

11          MR EUBANKS:  I think I can represent that they

12  were provided on the 12th.

13          A.    These were all provided before Sunday.

14          MR REARDON:  But what are these documents, they

15  are all in Hebrew?

16          A.    A birth certificate.  An order of probate.  A

17  photocopy of my own ID card.  An authorisation from the

18  Ashdod Port attesting to my husband Avi's period of

19  employment.  His last payment slips.  My husband's death

20  certificate.  That's it I think.

21          Q.    So in that group you have the documents you

22  just listed.  What is it that was provided recently that is

23  not in that group of documents?

24          A.    A memorial book on a disk that I published in

25  memory of my husband.  A booklet published by the Ashdod

Page 64

Esther Avraham

1  Port in which the life stories of the victims of the terror

2  attack can be found.

3          Q.   Anything else?

4          A.   National Insurance slips and pension slips.

5          Q.   Is that it?

6          A.   There are some additional documents that

7  I~would like to give to my attorneys in the future.

8          Q.   What are those documents?

9          A.   A professional opinion by my psychologist

10  under whose care I am currently.  Alternative treatments

11  that I was forced to undergo as a result of the incident.

12          Q.   What else?

13          A.    Invoices and receipts for the medications

14  that I took in the first month --

15          THE INTERPRETER:  Sorry, I am correcting myself

16  said the witness.  Not in the first month but for an

17  extended period after the incident.

18          MR REARDON:  At the break your lawyer asked that

19  I~move along to damages which was my plan at that point

20  anyway.  Unfortunately we don't have any of these documents

21  but now that I know what they are I will ask the questions

22  to the best I can without having the documents in front of

23  me in advance of this deposition.  We will reserve the right

24  to hold the deposition open.

Page 65

                    Esther Avraham

1
2          You indicated that you had seen a psychologist

3   since your husband's death.  When did you first start seeing

4   a psychologist?

5          A.   I started the first treatment four months

6   after my husband's death with a certain woman psychologist.

7   Then I left that psychologist for a few months and went to

8   another woman psychologist under whose treatment I have been

9   since the incident.  That is eight months after my husband's

10  death until today.

11         Q.   And you continue to see a psychologist today,

12  right?

13         A.   Yes.

14         Q.   Had you ever seen a psychologist before your

15  husband's death?

16         A.   No.

17         Q.   And once you began your first treatment how

18  frequently did you go to the psychologist?

19         A.   Once a week.

20         Q.   And how long did that frequency continue?

21         A.   Are you talking about with the first

22  psychologist?

23         Q.   Yes, once a week -- how long did you continue

24  for once a week with the first psychologist?

25         A.   For one month.

Page 66

1                    Esther Avraham

2          Q.   What was that psychologist's name?

3          A.   I can't recall.

4          Q.   And how long did you see that psychologist

5    for?

6          A.   About four months.

7          Q.   And for the first month your frequency was

8    once a week, what was your frequency after that with the

9    first psychologist?

10          A.   Once in two or three weeks.

11          Q.   Do you recall how much you paid per session

12    for these visits to the first psychologist?

13          A.   I can't recall but I have receipts.  I have

14    no idea but I have it all written down.  I have all the

15    receipts.

16          Q.   With regard to payments you have made -- let

17    me strike that.  Have you made payments directly to the

18    psychologist or has some agency for the government of Israel

19    made these payments for you?

20          A.   I paid for the first psychologist out of my

21    own pocket and the second psychologist is paid for by Betuah

22    Leumi.  They are the ones that pay for my treatment.

23          Q.   Have you ever had the payments for your

24    treatment, for the first psychologist reimbursed by anyone?

25          A.   No.

1          Esther Avraham

2          Q.   Do you have an approximation of how much

3    money you spent on the first psychologist?

4          A.   About 800 Sheckels.

5          Q.   Did you make these payments in cash or by

6    check or by credit card?

7          A.   In cash and in checks.

8          Q.   And you indicated earlier that you have

9    documents, receipts for these payments, or could otherwise

10   get them?

11         A.   Yes.

12         Q.   And then after your treatment with the first

13   psychologist did you immediately begin treatment with the

14   second psychologist or did you take a break for a while?

15         A.   Because of my difficult state during that

16   period I took a break of four months.  After four months

17   I returned to treatment with the psychologist.

18         Q.   Do you recall the name of the doctor that you

19   saw next?

20         A.   Dr Shula Bren.

21         Q.   Where is his or her office?

22         A.   In Ashdod.

23         Q.   How frequently did you see that doctor when

24   you first began treatment?

25         A.   Once a week.

Page 68

Esther Avraham

Q.    And how long did you continue treatments for once a week?

A.    To this day.

Q.    When do you recall when you started with the second doctor?

A.    Eight months after my husband was murdered.

Q.    Do you take any medications that are prescribed by your current psychologist?

A.    No.

Q.    Did you take any medications with your first psychologist?

A.    I wasn't prescribed any medications by a psychologist or a psychiatrist.  The medication that I~mentioned earlier were sleeping pills that I received during the first year.

Q.    Where did you receive these sleeping pills from?

A.    From my general practitioner, family practitioner.

Q.    How many times did you see your general practitioner in your mind in connection with the events following your husband's death?

A.    If would say quite a lot because of my emotional situation, my physical situation deteriorated.

Page 69

Esther Avraham

I~had a lot of physical problems.  I had problems with my stomach and my muscles.  I had chronic pain and I visited him frequently.

Q.   Other than what you just described have you had any physical effects that you attribute to your husband's death?

A.   As a result of the murder of my husband I have problems of attention deficit and memory and this is the case until this day and it constantly affects my life today negatively.

Q.   Has any doctor made a diagnosis of this attention deficit in memory?

A.   My general practitioner thinks that there is a direct relation to the tragedy, and my psychologist also has diagnosed my attention deficit and problems of general focusing as being the result of the tragedy.

Q.   And you indicated that your psychologist is preparing or has prepared a letter to this effect that is going to be produced in the future?

A.   Yes.

Q.   And have you already produced that to your lawyers or are you waiting for that document from your psychologist?

A.   I am still waiting for the letter.

Page 70

Esther Avraham

1      Q.   Are there any other psychological damages

3   that you have not described here today that you claim in

4   this lawsuit?

5           THE INTERPRETER:  Damages or damage?

6           MR REARDON:  Damage, it is the same.

7           THE INTERPRETER:  Damages, compensation?  Damage

8   harm?

9           MR REARDON:  Well, my meaning is are you making a

10  claim -- strike that.  Is there any other psychological

11  damage -- and it sounds like I should say harm for the

12  purpose of terms -- that you are claiming in this lawsuit

13  that you have not already described?

14          A.   Of course.  As a result of the tragedy I have

15  difficulty getting on with my life, with rebuilding my life.

16  It is difficult for me to continue to persist in

17  relationships, to persist in things.  It caused me enormous

18  damage to this day, harm.

19          Q.   Anything else?

20          A.   No.

21          Q.   Are there any physical affects that you claim

22  beyond what we have already discussed in this deposition?

23          A.   No.

24          Q.   Has the Betuah Leumi reimbursed you for all

25  your expenses associated with the second psychologist that

1                     Esther Avraham

2   you are seeing?

3           A.   Yes.

4           Q.   How about your general practitioner, has the

5   Betuah Leumi reimbursed you for that?

6           A.   My visits to the general practitioner are not

7   covered by Betuah Leumi, that is covered by my National

8   Insurance plan like everyone else.

9           Q.   Therefore, those expenses have been

10  reimbursed by the National Insurance plan?

11          A.   That is not entirely the case.  The

12  prescriptions that I had to fill following my visits to the

13  general practitioner, for those I have not been reimbursed.

14          Q.   Is there any form of a co-payment with this

15  National Insurance plan?

16          A.   I believe that it is largely subsidized.

17          Q.   Have you received, have you been assigned a

18  disability rating from the Betuah Leumi as a result of your

19  husband's death?

20          A.   No.

21          Q.   Do you or your husband's parents receive a

22  monthly stipend from the Betuah Leumi as a result of your

23  husband's death?

24          MR EUBANKS:  Objection, based on the court's prior

25  collateral source ruling.  She can answer.

Page 72

1                    Esther Avraham

2          A.   Yes.

3          MR REARDON:   How much is that?

4          MR EUBANKS:   Objection based on the court's prior

5   collateral source rulings.   If she knows an exact amount she

6   can answer but not an approximate amount.

7          A.   I don't know the exact amount.

8          MR REARDON:   Okay.  Well, I think that is a very,

9   very narrow interpretation of what is said on that

10  transcript.  I am going to ask you if you know an

11  approximate amount of how much you receive on a monthly

12  basis from the Betuah Leumi based upon your independent

13  knowledge as you sit here today, if you can remember at all?

14         THE INTERPRETER:   What was the last part?

15         MR REARDON:   If you can remember.

16         MR EUBANKS:   I restate the objection but she can

17  answer.

18         A.   It varies very much.  It ranges around 6,000

19  Sheckels a month.

20         MR REARDON:   Do you know why it would vary?

21         A.   There is certain amounts that are subtracted

22  according to their own criteria.

23         MR REARDON:   Aside from the Betuah Leumi do you

24  receive any pension in connection with your husband's job at

25  the Ashdod Port?

Page 73

1          Esther Avraham

2          MR EUBANKS:  Objection based on the courts's prior

3    collateral source rulings but she can answer.

4          A.  Yes.

5          MR REARDON:  How much approximately?

6          MR EUBANKS:  Objection, based on the court's prior

7    collateral source rulings but she can answer.

8          A.  It also varies.  It is around 6,000 Sheckels

9    a month.

10         MR REARDON:  Do you receive money from any other

11   source besides the Betuah Leumi or your husband's pension

12   fund on a monthly basis?

13         MR EUBANKS:  Objection, based on the court's prior

14   collateral source rulings but she can answer.

15         A.  Yes, my own income.  My own salary, monthly

16   salary.

17         MR REARDON:  We discussed that earlier, it is

18   approximately $4,000 a month, your own income, is that

19   correct?

20         MR EUBANKS:  Not dollars.

21         MR REARDON:  Your counsel corrected me, I said

22   dollars.  It is 4,000 Sheckels?

23         A.  Yes.

24         MR REARDON:  Let me ask this for the record to

25   make sure it is clear.  You your own income is 4,000

Page 74

Esther Avraham

1   Sheckels a month, correct?

2         A.   That is true.

3         MR REARDON:  Did you receive any other form of

4   stipend aside from what you received from Betuah Leumi or

5   your husband's pension?

6         MR EUBANKS:  Objection based on the court's prior

7   collateral source rulings but she can answer.

8         MR REARDON:  Including life insurance?

9         A.   No, I have no further stipends.

10        MR REARDON:  Miss Avraham, thank you for your

11  time.  I have no further questions at this time, subject to

12  reopening based upon the documents that will be provided

13  after this deposition and at this time your counsel may have

14  some follow-up questions for you.

15        MR EUBANKS:  I do have some follow-up questions.

16  Cross-examination by Mr Eubanks.

17        Q.   Miss Avraham, you testified that you met your

18  husband approximately two years before he was killed; is

19  that correct?

20        A.   Yes.

21        Q.   Where did you meet him?

22        A.   We met through friends.

23        Q.   Did you start dating immediately when you

24  met?

Page 75

Esther Avraham

1    A.   Yes.

2    Q.   You testified that you were -- strike that.

3    Can you restate for the record the date of your marriage?

4

5    A.   November 4th 2003.

6    Q.   So at the time that he was killed you had

7    been married approximately four months, is that correct?

8    A.   Sadly, yes.

9    Q.   During the time preceding your -- strike

10   that.  During the time preceding your husband's death had

11   you discussed building your family?

12   A.   Yes, and far more than that, more than we

13   spoke.  I was pregnant.  I was pregnant with twins.

14   Unfortunately it didn't succeed, three months before my

15   husband died I lost the pregnancy.

16   Q.   Between the time that you lost your pregnancy

17   and the time that your husband was killed were you

18   contemplating having children?

19   A.   Yes, according to the doctors's orders and,

20   absurdly enough, we were planning to start on the day that

21   he was murdered.

22   Q.   Can you explain what you mean by according to

23   the doctor's orders?

24   A.   I went through a very difficult miscarriage

25   and I was forbidden to become pregnant again for three

Page 76

Esther Avraham

1  months.  I was under very strict bedrest under doctor's care

2

3  and the approximate date when we were permitted to try

4  again, one of the dates was the date that my husband was

5  killed.

6           Q.   You testified that your education only went

7  through high school; is that correct?

8           A.   Yes.

9           Q.   Prior to your husband's death had you made

10  plans to continue your education?

11          MR REARDON:  Objection.

12          A.   I wanted to continue my studies but it was

13  more important to us to build a family and after my

14  husband's death I wanted to go back.  In fact, I actually

15  tried but I failed because of my emotional state.  I found

16  it too difficult to cope with higher education.

17          MR EUBANKS:  After your husband's death were you

18  able to work immediately?

19          A.   Under no circumstances, there was one

20  attempt.  It failed very quickly after one month.  I stayed

21  at home for a long period of time and only after that did

22  I~return to work.

23          Q.   Can you tell me the date of your husband's

24  death?

25          A.   March 4th 2004.

Page 77

Esther Avraham

1    Q.   Where were you at the time of the explosion?

2    A.   At home.

3    Q.   How did you learn of the explosion?

4    A.   I started to get phone calls that people were

5    looking for Avi and he wouldn't answer his phone.

6    Q.   At what time -- strike that.  When did you

7    learn that Avi had been injured in the attack?

8    A.   I received an unofficial announcement at

9    seven, two and a half hours after the explosion from a

10   friend of ours, a friend of Avi's who had not been injured

11   and from that I concluded that he had been killed.

12   Q.   When did you learn officially that he had

13   been killed?

14   A.   I received official announcement at midnight

15   when social workers accompanied by a doctor came to the

16   house, but this was after my family, my brother-in-law and

17   friends had gone to the Abu Kabir Forensic Institute to

18   identify the body definitively, which was impossible to do.

19   MR REARDON:  Objection to the portion of that that

20   is not responsive.

21   MR EUBANKS:  Did you accompany these individuals

22   to identify your husband's body?

23   A.   I couldn't, I was unable to.

24   Q.   How did they know to go to the Abu Kabir

Page 78

Esther Avraham

1 Forensic Institute to identify him?

2 MR REARDON: Objection.

3 A. After we visited all the hospitals looking

4 for Avi and we saw that he was not injured among any of them

5 we were left with no alternative but to go to Abu Kabir.

6 There we discovered that there was one remaining

7 unidentified body and it turned out that it was Avi's.

8 THE INTERPRETER: She would like a break.

9 MR REARDON: Sure.

10 (Short adjournment)

11 MR EUBANKS: I only have a few more questions, so

12 it is only a little bit more time.

13 The attack that resulted in your husband's death,

14 that took place in Ashdod; is that correct?

15 A. That is correct.

16 MR EUBANKS: Did you believe that Ashdod was a

17 dangerous place prior to that attack?

18 MR REARDON: Objection. You can answer.

19 A. The truth is I was afraid of other things.

20 I didn't fear that anything like this would happen, I was

21 afraid of other things happening in the Port.

22 MR EUBANKS: Has the attack changed your mind

23 regarding how dangerous Ashdod is?

24 MR REARDON: Objection.

Esther Avraham

1    A.   I think that Ashdod is dangerous enough to be

2    attacked, and also any other place in Israel.  It is simply

3    proved that any place and any one can be harmed.  It can

4    happen everywhere and to everyone.

5         MR EUBANKS:  Just so the record is clear, Ashdod

6    is not in what has been referred to as the territories; is

7    that correct?

8         A.   No, definitely not.

9         MR EUBANKS:  And you currently live in Rehovot; is

10   that correct?

11        A.   Correct.

12        MR EUBANKS:  And Rehovot is not in what has been

13   referred to as the territories; is that correct?

14        A.   Correct.

15        MR EUBANKS:  You testified that you have been

16   seeing a psychologist and you see a psychologist to this

17   day; is that correct?

18        A.   That is correct, yes.

19        MR EUBANKS:  Have you received a diagnosis?

20        MR REARDON:  Objection.

21        A.   I didn't receive it in writing, I am still

22   waiting for the professional opinion so I can pass it on to

23   my lawyers.  In conversation they told me that I was

24   suffering from PTSD.  I suffered a severe loss and as a

Page 80

Esther Avraham

1    result I suffered the damages of that loss.

2         MR EUBANKS:  Other than what you have testified to

3    here today can you tell me how your life has changed since

4    the death of your husband?

5         MR REARDON:  Objection.

6         A.   So it is this way, my life has changed

7    drastically.  I went from total bliss, we were a young

8    couple at the beginning of our way.  We planned to build our

9    family and then we had this miscarriage and since the death

10   of my husband I am not the same person any more.  The right

11   to build a family was impeded.  I cannot continue with my

12   personal life, not in couplehood anyway.  This ability of

13   mine was severely hurt and harmed.  I think that the

14   greatest damage is that my life stopped at the age of 27.

15   I~don't go out and I can't rehabilitate my life.  At this

16   time, a month from now I should have celebrated my fourth

17   anniversary.  I was supposed to be a mother, which

18   I probably will never be.  My personal life was brutally and

19   blatantly taken away from me and this horror has been with

20   me for the past four years.

21        MR EUBANKS:  Please excuse me if this question has

22   been asked and answered already.  It was much earlier in the

23   deposition.  Have you dated other men since your husband was

24   killed?

Esther Avraham

1    A.   I tried but the attempt failed.  I didn't

2  actually manage to continue dating other partners.

3    MR EUBANKS:  You have testified that you have also

4  seen a social worker, is that correct?

5    MR REARDON:  Objection.

6    A.   That is correct.

7    MR EUBANKS:  What has been the nature of your

8  relationship with the social worker?

9    MR REARDON:  Objection.

10    A.   She was the one who helped me with all the

11  procedures, vis-a-vis the various authorities and entities.

12  She also supported me and provided me with the morale

13  I needed to uplift and she also recommended me and referred

14  me to the psychologist that I still see today.  She helped

15  me with all the bureaucracy and she gave me the first

16  emotional and general support that I needed after the

17  attack.

18    MR EUBANKS:  I would like to ask you a few

19  questions about the attack itself?  Do you know if there was

20  a particular organisation that claimed responsibility for

21  this attack.

22    MR REARDON:  Objection.

23    A.   From what I heard it was the Hamas.

24    MR EUBANKS:  From where did you hear this?

1              Esther Avraham

2         MR REARDON:  Objection.

3         A.   From the media and certain people in the

4    police.

5         MR EUBANKS:  Do you know where your husband was in

6    proximity to the bomber at the time of the attack?

7         MR REARDON:  Same objection.

8         A.   Probably very, very close because after the

9    attack you couldn't identify him.  The only way to identify

10   him was with his tooth X-ray and his whole body was

11   completely disformed.

12        MR REARDON:  Dental records?

13        THE INTERPRETER:  Mutilated.

14        MS BUTLER:  Dental records.

15        MR EUBANKS:  I have no further questions.

16   Re-examined by Mr Reardon

17        MR REARDON:  Miss Avraham, I have just a few

18   questions?  Have you received any medical diagnosis that you

19   are unable to conceive a child today.

20        A.   No.

21        Q.   In terms of the schools that you testified

22   you attempted to attend what schools were those?

23        A.   There's this college in Ashdod that teaches

24   graphics and I started studying graphics there and I left

25   because I couldn't study and I couldn't focus because of the

Page 83

1                        Esther Avraham

2    situation at that time.

3              Q.   What was the name of the college in Ashdod?

4              A.   Michlala Leminhal, the Administration College

5    or the College of Administration.

6              Q.   Did you submit applications to attend this

7    college?

8              A.   I went there to find out and then I applied.

9    You don't need to fill any forms.

10             Q.   What dates did you attend this college?

11             A.   I don't remember but it was a very short

12   time.  I think it was a month or even less than that.

13             Q.   Did you pay for this college or were you on

14   some form of scholarship?

15             A.   No, I paid it out of my own pocket.

16             Q.   Have you ever been to the United States?

17             A.   No.

18             Q.   If asked to testify in this trial in the

19   United States would you come to the United States for that

20   purpose?

21             A.   Of course.

22             Q.   Were you asked if you were going to be in the

23   United States prior to this deposition in the event that

24   your deposition might be taken in the United States by

25   anyone?

Page 84

1                         Esther Avraham

2          A.   My lawyer has told me that there is this

3    possibility that I might be needed or asked to testify

4    there.

5          Q.   Did anybody ask whether you would submit to

6    this deposition in the United States -- let me rephrase.

7    Did anybody ask whether you would be travelling in the

8    United States such that you might have your deposition taken

9    in the United States?  If you ask her if she understands the

10   question.

11             THE INTERPRETER:  Okay.

12        A.    My attorney asked me this question.

13             MR REARDON:  Subject to the documents being

14   produced and the potential need to continue the deposition

15   I~have no further questions at this time.  Thank you,

16   Miss Avraham.

17             MR EUBANKS:  I want to state one last thing on the

18   record.  I would ask that any request for additional

19   production be made in writing, as has been the practice in

20   these depositions.  Also to state an objection to producing

21   any documents that might contain collateral source

22   information, even those documents may have been discussed

23   during the course of this deposition.  That's it.

24

25                    --------------------

Page 85

1                            Esther Avraham

2                 CERTIFICATE    OF    COURT    REPORTER

3

4            I, Kay Hendrick, a qualified court reporter

5       contracted by TSG Reporting, hereby certify that the

6       testimony of the witness, Esther Avraham in the foregoing

7       transcript, taken on Wednesday, 24th October 2007, was

8       recorded by me in machine shorthand and was thereafter

9       transcribed by me, and that the foregoing transcript is

10      a true and accurate verbatim record of the said testimony.

11      I further certify that I am not a relative, employee or

12      counsel of any of the parties to the within cause, nor am I

13      an employee or relative of any counsel for the parties, nor

14      am I in any way interested in the outcome of the within

15      cause.

16

17

18      Signed ..................................

19

20           Ms Kay Hendrick

21

22      Dated: November 5th, 2007

23

24

25

Page 86

1          Esther Avraham

2

3          CERTIFICATE  OF  DEPONENT

4

5    I, Esther Avraham, hereby certify that I have read the

6    foregoing pages of my deposition of testimony taken in these

7    proceedings on Wednesday, 24th October 2007, and, with the

8    exception of the changes listed below and/or corrections, if

9    any, find them to be a true and accurate transcription

10   thereof.

11

12

13   Signed ......................................

14

15

16   Mrs Esther Avraham

17

18

19

20

21

22

23

24

25

1          Esther Avraham

2

3

4                    E R R A T T A

5

6    Page No                    Description

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25