**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
                                       :

**COURTNEY LINDE,** *et al.***,**         :

                                       :     **MEMORANDUM OF UNION OF ARAB**

            *Plaintiffs,*        :     **BANKS AS AMICUS CURIAE IN**

                                         :     **SUPPORT OF ARAB BANK, PLC**

    -against-               :

                                         :     **04-CV-2799 (BMC)(VVP)**

**ARAB BANK, PLC,**            :     **and related cases**[1]

                                         :

            *Defendant.*      :

                                         :
-------------------------------------------------------x

---

[1] *Philip Litle, et al. v. Arab Bank, PLC*, 04-CV-5449 (BMC)(VVP); *Oran Almog, et al. v. Arab Bank, PLC*, 04-CV-5564 (BMC)(VVP); *Robert L. Coulter, Sr., et al. v. Arab Bank, PLC*, 05-CV-365 (BMC)(VVP); *Gila Afriat-Kurtzer, et al. v. Arab Bank, PLC*, 05-CV-388 (BMC)(VVP); *Michael Bennett, et al. v. Arab Bank, PLC*, 05-CV-3183 (BMC)(VVP); *Arnold Roth, et al. v. Arab Bank, PLC*, 05-CV-03738 (BMC)(VVP); *Stewart Weiss, et al. v. Arab Bank, PLC*, 06-CV-1623 (BMC)(VVP).

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE*.............................................................................................1

ARGUMENT ...........................................................................................................................2

I.   The District Court's Rulings Are Controlling Questions of Law..............................5

II.  There Are Substantial Grounds for Disagreement with the District Court's Sanctions Order..........................................................................................................................6

III. There Are Substantial Grounds for Disagreement with the Court's Causation and § 2339B Liability Decisions.......................................................................................8

IV. An Appeal at This Juncture Would Significantly Assist in Ultimately Terminating This Litigation and Would Avoid Potentially Grave Injury Arab Bank Might Suffer If Review Is Delayed................................................................................................11

CONCLUSION.....................................................................................................................14

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Aspen Ford, Inc. v. Ford Motor Co.*,
    Nos. CV-01-4677, CV-99-5978, 2008 WL 163695 (E.D.N.Y. Jan. 15, 2008) ........................5

*Balintulo v. Daimler AG*,
    727 F.3d 174 (2d Cir. 2013) ..................................................................................................11

*Cal. Pub. Employees' Retirement Sys. v. WorldCom, Inc.*,
    368 F.3d 86 (2d Cir. 2004) ......................................................................................................8

*EM Ltd. v. Republic of Arg.*,
    473 F.3d 463 (2d Cir. 2007) ..................................................................................................11

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
    542 U.S. 155 (2004) ................................................................................................................4

*In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi Bank)*,
    714 F.3d 118 (2d Cir. 2013) ................................................................................................8, 9

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*,
    313 F.3d 70 (2d Cir. 2002) ....................................................................................................10

*Katz v. Carte Blanche Corp.*,
    496 F.2d 747 (3d Cir. 1974) ..................................................................................................14

*Kiobel v. Royal Dutch Petroleum Co.*,
    133 S. Ct. 1659 (2013) .......................................................................................................4, 10

*Kiobel v. Royal Dutch Petroleum Co.*,
    621 F.3d 111 (2d Cir. 2010) ..................................................................................................11

*Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave*,
    921 F.2d 21 (2d Cir. 1990) .................................................................................................5, 11

*Koehler v. Bank of Bermuda Ltd.*,
    101 F.3d 863 (2d Cir. 1996) ..................................................................................................11

*Mohawk Indus., Inc. v. Carpenter*,
    558 U.S. 100 (2009) ............................................................................................................5, 8

*Morris v. Khadr*,
    415 F. Supp. 2d 1323 (D. Utah 2006) ..................................................................................13

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) ......................................................................................................8

*Rubin v. Hamas Islamic Resistance Movement,*
   No. 02-cv-0975, slip op. (D.D.C. Sept. 27, 2004) .................................................13

*Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers,*
   357 U.S. 197 (1958) ....................................................................................................3, 6

*Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa,*
   482 U.S. 522 (1987) ....................................................................................................3, 6

*United Healthcare Ins. Co. v. AdvancePCS,*
   316 F.3d 737 (8th Cir. 2002) .........................................................................................12

*United States v. Cities Serv. Co.,*
   410 F.2d 662 (1st Cir. 1969) ..........................................................................................14

*University of Texas Southwestern Med. Ctr. v. Nassar,*
   133 S. Ct. 2517 (2013) .....................................................................................................8

*Weber v. United States Trustee,*
   484 F.3d 154 (2d Cir. 2007) ..........................................................................................11

**REGULATIONS AND STATUTES**

31 C.F.R. pt. 501, app. A ....................................................................................................10

31 C.F.R. § 594.201(a)(i) ...................................................................................................10

31 C.F.R. § 594.201(a) .........................................................................................................3

31 C.F.R. § 594.304 ............................................................................................................10

31 C.F.R. § 594.308 ............................................................................................................10

31 C.F.R. § 597.201(a) .........................................................................................................3

18 U.S.C. § 2331(1) ..............................................................................................................9

18 U.S.C. § 2333(a) ............................................................................................................13

18 U.S.C. § 2339B ..................................................................................................... *passim*

28 U.S.C. § 1292(b) ................................................................................................... *passim*

**OTHER AUTHORITIES**

ABA Model Rule 1.6 .............................................................................................................6

ABA, *Proposed Resolution & Report No. 103* (Feb. 6, 2012) .........................................7

iii

*Background on Anti-Money Laundering*, World Bank,
http://web.worldbank.org/WBSITE/EXTERNAL/WBI/WBIPROGRAMS/PSGLP/0,,
contentMDK:20292990~menuPK:461615~pagePK:64156158~piPK:64152884~theSi
tePK:461606,00.html (last visited Nov. 7, 2014) ...................................................................12

Fed. Reserve Sys., *2013 Federal Reserve Payments Study, Recent and Long-Term
Payment Trends in the United States: 2003–2012* (Dec. 19, 2013)............................................9

Jan Barton, *Who Cares About Auditor Reputation?*, 22 Contemp. Acct. Res. 549 (2005) ...........13

Kurt Mueller, *The Swiss Banking Secret: From a Legal View*, 18 Int'l & Comp. L.Q. 360
(1969).................................................................................................................................6

Press Release, Dep't of the Treasury, *Treasury Reaches Largest Ever Sanctions-Related
Settlement with BNP Paribas SA for $963 Million* (July 30, 2014)........................................12

Stephanie Clifford, *The Cost for Arab Bank Is a Complex Calculation*, N.Y. Times, Sept.
24, 2014...........................................................................................................................6

World Bank, *Reference Guide to Anti-Money Laundering and Combating the Financing
of Terrorism*, at II-3 (2d ed. 2006), *available at*
http://siteresources.worldbank.org/EXTAML/Resources/396511-1146581427871/
Reference_Guide_AMLCFT_2ndSupplement.pdf ..................................................................12

The Union of Arab Banks ("UAB") submits this brief as *amicus curiae* in support of Arab Bank, PLC ("Arab Bank" or "Bank")'s Motion for Certification for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b).[2]

## INTEREST OF *AMICUS CURIAE*

The UAB is an independent consortium of over 330 members that include the largest and most prominent Arab banking, financial, and investment institutions, including defendant Arab Bank. As the preeminent banking and financial industry group in the Middle East, the UAB is a true representative of the Arab banking community and a leading authority on the legal and regulatory issues that its members face.

The UAB is uniquely qualified to comment on Arab Bank's motion for appellate certification. The UAB seeks to ensure its members have the tools to detect, report, and eliminate terrorist financing. The UAB publishes prominent treatises and periodicals on Islamic banking and develops good governance and best banking practices to help them be vigilant against terrorist financing. The UAB periodically partners with the U.S. Department of the Treasury and the Association of Certified Anti-Money Laundering Specialists to hold conferences on the prevention of terrorist financing. The UAB is also well versed in the stringent privacy laws that many Middle Eastern and European jurisdictions impose on banks.

The UAB has a critical interest in this litigation because its members are vulnerable to the same impossible legal dilemma that Arab Bank experienced when it was sanctioned because foreign customer privacy laws foreclosed its compliance with plaintiffs' discovery requests. As this is the first civil case where claims have gone to trial against a bank under the Anti-Terrorism

---

[2] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution to fund the preparation or submission of this brief. No person other than *amicus curiae* or its counsel made a monetary contribution to the brief's preparation or submission.

Act ("ATA"), 18 U.S.C. § 2333, the UAB is highly concerned that this case provides a playbook for private plaintiffs to manufacture discovery sanctions against foreign banks and exploit lax causal standards to secure potentially catastrophic jury verdicts based on speculation and innuendo.  Equally alarming is the possibility that Arab Bank may have no recourse to challenge the judgment on appeal as a result of the potential collateral consequences of any damages award.

If this Court were to confirm the finding of liability, there is a serious risk that, in the absence of immediate appellate review, Arab Bank could suffer dire injury far beyond any specific damages award.  By labeling defendant a supporter of terrorism, subject to potentially enormous liability, the Court's order would cause corresponding banks and depositors alike to consider ceasing their business with the Bank.  If even a few major banks cease interacting with Arab Bank, there is a dangerous possibility of a cascade of similar decisions that could threaten the Bank's very survival.  Because there is an urgent need for immediate review and little, if any, benefit in postponing appeal until after a series of costly and time-consuming damages trials, the UAB submits this brief to urge the Court to grant Arab Bank's Motion for Certification for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292(b).

## ARGUMENT

A series of rulings by this Court had the practical effect of significantly lowering plaintiffs' burden to prevail against Arab Bank.  The sanctions order allowed the jury to infer from Arab Bank's compliance with foreign customer privacy laws not only that the Bank had in fact "provided financial services" to terrorist groups or affiliates, but even more consequentially, that it did so with a culpable state of mind.  *See* Jury Charges 13, ECF No. 1162.  At trial, the Bank was prevented from explaining how foreign law had prohibited it from producing the

2

requested documents, or even from offering highly probative exculpatory evidence going to state of mind.  Opinion and Order 28–29, July 12, 2010, ECF No. 625.  In addition, the Court effectively lowered the standard for causation and liability by (1) excusing plaintiffs from proving that Arab Bank's conduct was either the "but for" or direct proximate cause of their injuries, and (2) holding that a violation of 18 U.S.C. § 2339B—which criminalizes material support to terrorists—was *in and of itself* an act of terrorism that could form the basis for ATA liability.  *See* Jury Charges 15–18, ECF No. 1162.  These rulings had the effect of depriving the Bank of critical defenses while relieving plaintiffs of the need to prove causation and intent, which are the critical elements of an ATA violation.

The precedent set by these rulings will have adverse consequences for foreign banks subject to U.S. jurisdiction and for U.S. banks operating abroad.  Middle Eastern and European countries often impose on banks stringent customer privacy laws that may interfere with document production in U.S. litigation.  Unless U.S. courts take into account the unique burdens for banks and other litigants in this position, *see Société Nationale Industrielle Aérospatiale v. U.S. Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 546 (1987), and recognize that "fear of criminal prosecution" under customer privacy laws "constitutes a weighty excuse for nonproduction," *Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 211 (1958), banks operating abroad will face insurmountable disadvantages in defending against ATA suits.

Compounding this problem, lessening the causation and liability standards under the ATA threatens to turn banks into guarantors for the wrongful actions of their clients.  International banks are stringently regulated under multiple overlapping know-your-customer and trade sanctions regimes administered by foreign, international, and U.S. authorities,

including the U.S. Office of Foreign Assets Control (OFAC) sanctions program.  *See* 31 C.F.R. §§ 594.201(a), 597.201(a).  By effectively lowering the standard for ATA liability, the Court makes private plaintiffs the primary regulators of banks' efforts to combat terrorist financing. Such vast regulatory power should not be vested in private plaintiffs, who typically do not "exercise the degree of self-restraint and consideration of foreign governmental sensibilities generally exercised by the U.S. Government."  *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 171 (2004) (quotation marks omitted).   The intrusion into matters of foreign concern could not be more clear in this case, where the United States government has criticized the sanctions order for failing to give due respect to foreign secrecy laws and undermining the United States' close cooperative relationships with key regional partners in the fight against terrorism.  Br. for the United States as *Amicus Curiae* ("U.S. Br.") at 8, 19, *Arab Bank, PLC v. Linde*, 134 S. Ct. 2869 (2014) (No. 12-1485); c*f. Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (warning against "unintended clashes between our laws and those of other nations which could result in international discord" and interfere with U.S. foreign policy (quotation marks omitted)).

Under § 1292(b), a district court may certify "an order not otherwise appealable" that "[1] involves a controlling question of law [2] as to which there is substantial ground for difference of opinion and [3] that an immediate appeal from the order may materially advance the ultimate termination of the litigation."  The disputed rulings at issue are strenuously contested and highly consequential—not only for the litigants in this case, but also for banks across the globe that may curtail their actions in the United States as a consequence of the jury verdict.  Were the Court of Appeals to reverse on this Court's sanctions, causation, and § 2339B liability rulings, Arab Bank would be entitled to a new liability trial or dismissal of the claims in

their entirety.  On the other hand, in the absence of immediate appeal, the Bank faces not only

the certainty of extensive damages litigation that may prove pointless, but also the prospect of

serious adverse collateral consequences merely from having been labeled by this Court as a

sponsor of terrorism.

**I.      The District Court's Rulings Are Controlling Questions of Law**

The sanctions order, causation rulings, § 2339B liability ruling, and expected orders

resolving Arab Bank's motion for judgment as a matter of law or new trial under Rules 50 and

59, to the extent they address those issues, unquestionably involve "controlling question[s] of

law" that satisfy the first element of § 1292(b).  Were the Second Circuit to reverse on any of

these issues, Arab Bank would be entitled to either a new trial or dismissal of the claims against

it.  These are prototypical "controlling question[s] of law."  *Aspen Ford, Inc. v. Ford Motor Co.*,

Nos. CV-01-4677, CV-99-5978, 2008 WL 163695, at *2 (E.D.N.Y. Jan. 15, 2008) ("A question

of law is controlling if reversal of the order would significantly affect the conduct of the action."

(quotation marks omitted)); *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave*,

921 F.2d 21, 24 (2d Cir. 1990) ("Although the resolution of an issue need not necessarily

terminate an action in order to be 'controlling,' it is clear that a question of law is 'controlling' if

reversal of the district court's order would terminate the action." (citations omitted)).  Though

the sanctions order relates to a discovery dispute, this fact does not disqualify it from § 1292(b)

certification.  Indeed, the Supreme Court has instructed that district courts facing thorny

discovery questions "should not hesitate to certify an interlocutory appeal," particularly when the

ruling "involves a new legal question or is of special consequence."  *Mohawk Indus., Inc. v.

Carpenter*, 558 U.S. 100, 110–11 (2009).  And even if the sanctions order were not eligible for

immediate review pre-trial, the jury's verdict and Rule 50 order addressing the effect of the

sanctions order unquestionably do qualify.  Given the central importance of the sanctions order

to the verdict in the first case against a bank defendant to go to trial for ATA violations,

certification is clearly appropriate.  *See* Stephanie Clifford, *The Cost for Arab Bank Is a Complex Calculation*, N.Y. Times, Sept. 24, 2014, at A28.

## II.    There Are Substantial Grounds for Disagreement with the District Court's Sanctions Order

Banking privacy laws have been enacted across the globe in recognition of the highly

sensitive information found in bank records.  These records reveal not only a depositor's

financial position, but also his or her social and political affiliations and intimate personal details.

Banking privacy laws therefore regulate banks for the benefit of the depositor, just as the duty of

confidentiality imposes on attorneys a near-absolute obligation to maintain client secrets—for

the client's benefit—even where an evidentiary privilege does not apply.  *See* ABA Model Rule

1.6.  As the U.S. government has noted, the privacy laws at issue in this case are "laws of general

applicability that reflect legitimate sovereign interest in protecting foreign citizens' privacy and

confidence in the nations' financial institutions."   U.S. Br. at 16.   Indeed, banking privacy laws

were first enacted in Switzerland in 1934, thwarting attempts by Nazi authorities to investigate

the assets of Jews and other "enemies of the state."  Kurt Mueller, *The Swiss Banking Secret:*

*From a Legal View*, 18 Int'l & Comp. L.Q. 360, 361–62 (1969).  Since then, banking privacy

laws and other data privacy laws have spread throughout the world, and are prevalent in Europe

and the Middle East.

Principles of comity demand that courts "demonstrate due respect for any special

problem confronted by the foreign litigant on account of its nationality or the location of its

operations, and for any sovereign interest expressed by a foreign state." *Société Nationale*, 482

U.S. at 546.  When foreign banks are prohibited from producing documents under threat of

criminal prosecution, they have "a weighty excuse for nonproduction, and this excuse is not

weakened because the laws preventing compliance are those of a foreign sovereign." *Rogers*, 357 U.S. at 211.  Yet despite clear Supreme Court precedent, the American Bar Association has noted that "U.S. courts have often misapplied the standard and ruled that the needs of the proceeding before them inevitably must take precedence over the privacy and data protection concerns of other nations." ABA, *Proposed Resolution & Report No. 103*, at 3–4 (Feb. 6, 2012). This approach places foreign litigants on the horns of a precarious dilemma, forced to "choose between inconsistent legal requirements and perhaps to incur sanctions under one legal system or the other."  *Id.* at 15.

      While the UAB recognizes that the Court has already considered the issue and reached a contrary view, the fact that the United States government disagrees with this Court's assessment demonstrates that reasonable minds may differ on the question and that it is quite possible the Second Circuit will disagree with this Court's conclusion.  In response to a request by the Supreme Court for its views, the United States explained that this Court's comity analysis did not give sufficient weight to the prerogative of foreign governments to enforce legitimate privacy laws within their own jurisdictions.  U.S. Br. at 8–9, 16.  The Hashemite Kingdom of Jordan has similarly objected to the sanctions order as an interference with its sovereign authority over banks within its jurisdiction.  Br. of Jordan as *Amicus Curiae* at 16, *Arab Bank, PLC v. Linde*, 134 S. Ct. 2869 (2014) (No. 12-1485).  The United States underscored that the Court's sanctions order also seriously undermined American national security interests in the Middle East.  U.S. Br. at 12, 19–20.  Notably, the magistrate judge who considered the request for sanctions in the first instance, and who conducted numerous discovery hearings in this case, did not recommend such sweeping sanctions as this Court ultimately imposed.  *See* Report and Recommendation 22, ECF No. 560.  As a result of the difficulty of these issues, and the reasonable grounds for

disputing the Court's ruling, the Second Circuit's guidance would be useful before undertaking the burdens and expense associated with damages trials for more than 297 plaintiffs.[3]

## III.    There Are Substantial Grounds for Disagreement With The Court's Causation and § 2339B Liability Decisions

There are likewise reasonable grounds for disagreement with the Court's causation and § 2339B liability determinations.  As the Supreme Court has noted, "but for" causation is a "standard requirement of any tort claim" that must be applied unless the statute provides otherwise.  *University of Texas Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2524–25 (2013).  The Second Circuit has suggested that the ATA in particular requires a showing of both "but for" and proximate causation.  *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013) (citing *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 265–68 (1992)); *In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi Bank)*, 714 F.3d 118, 123–24 (2d Cir. 2013) (citing *Holmes*, 503 U.S. at 266–68).  As a part of this proximate causation standard, plaintiffs must show a *direct* relationship between the allegedly wrongful conduct by the Bank and the harm to plaintiffs.  *See Rothstein*, 708 F.3d at 97; *Al Rajhi Bank*, 714 F.3d at 124.  Yet the Court required only that Arab Bank's acts be a "substantial factor in the sequence of events responsible for causing plaintiffs' injuries," omitting "but for" and "direct" proximate cause instructions from the jury charges.  *See* Jury Charges 18, ECF No. 1162.

The Court also reduced the requisite showing for a substantive ATA violation.  ATA liability requires the defendant to commit an act of "international terrorism," yet the Court permitted a finding of liability based solely on a violation of the *material support* provision in

---

[3] The Second Circuit's and Supreme Court's denials of mandamus do not foreclose, and in fact support, the propriety of interlocutory appeal pursuant to 28 U.S.C. § 1292(b). *See Cal. Pub. Employees' Retirement Sys. v. WorldCom, Inc.*, 368 F.3d 86, 93–94 (2d Cir. 2004) (allowing § 1292(b) appeal after denying petition for a writ of mandamus).  Mandamus requires a showing of clear and indisputable right to relief and no other means to attain relief, requirements that do not apply to certification under § 1292(b).  Indeed, the Supreme Court, in curtailing the scope of mandamus review for discovery orders, relied on the availability of § 1292(b) as a means for interlocutory review of important discovery orders. *See Mohawk*, 558 U.S. at 110–11.

§ 2339B, which criminalizes not acts of "international terrorism" but provision of material support to terrorists.  The ATA defines acts of international terrorism to be activities that "involve violent acts or acts dangerous to human life," and which are intended "to intimidate or coerce a civilian population"; "to influence the policy of a government by intimidation or coercion"; or "to affect the conduct of a government by mass destruction, assassination, or kidnapping."  18 U.S.C. § 2331(1).  Though Congress has made the provision of "material support" to terrorists criminally actionable, such support does not itself qualify as an independent act of "international terrorism" sufficient to support liability under the ATA.  *Cf. Al Rajhi Bank*, 714 F.3d at 123 ("[A] defendant cannot be liable under the ATA on an aiding-and-abetting theory of liability.")

The combined effect of these rulings is to turn banks into guarantors for the wrongdoing of their clients, whom the banks have limited ability to monitor and even less ability to control. Banks deal with millions of nearly instantaneous transactions every day.  In 2012 alone, there were a total of 122.8 billion noncash payments (excluding wire transfers) processed by banks in the United States, including 82.3 billion card payments, 22.1 billion automated clearinghouse payments, 18.3 billion checks paid, and 5.8 billion ATM cash withdrawals.  *See* Fed. Reserve Sys., *2013 Federal Reserve Payments Study, Recent and Long-Term Payment Trends in the United States: 2003–2012*, at 41 (Dec. 19, 2013).  Large banks rely on sophisticated automated systems to identify and block transactions and close accounts associated with entities or individuals designated as terrorists.  Banks cannot perform in-depth diligence on each transaction, nor can they absolutely guarantee that services will never inadvertently be provided to would-be wrongdoers.  Nor should banks be subject to potentially catastrophic liability determinations and damages awards for isolated or innocent lapses.

A lax liability standard threatens to make private litigation under the ATA the primary vehicle for regulating foreign banks in an area of great sensitivity for our foreign affairs.  Most foreign banks are already subject to a comprehensive system of foreign laws and international regulation that prohibits terrorist financing.  Many foreign banks must comply with OFAC's trade sanctions regime, either directly by virtue of their U.S. operations, 31 C.F.R. §§ 594.304, 594.308, or indirectly by virtue of the fact that they must participate in the global economy and cannot risk being designated by OFAC as terrorist financiers themselves, *see* 31 C.F.R. § 594.201(a)(i).  Government regulators have authority to mete out significant punishments if a bank provides services to a terrorist.  These sanctions can take the form of either monetary penalties or even trade sanctions imposed against the bank.  But unlike in private ATA litigation, government regulators are charged with exercising prosecutorial discretion to ensure that punishments for terrorist financing violations are proportionate and appropriate.  *See* 31 C.F.R. pt. 501, app. A (providing that OFAC, in its discretion, may take any of the following actions as a result of an investigation: no action, request additional information, issue a cautionary letter, make a finding of violation, impose a civil monetary penalty, make a criminal referral, or take other administrative actions).  By contrast, the ATA, as construed by this Court, imposes severe punishments based on an unachievable standard of conduct in an area already highly regulated by multiple jurisdictions.  *Cf. Kiobel*, 133 S. Ct. at 1664 (warning of the "danger of unwarranted judicial interference in the conduct of foreign policy" in the context of the Alien Tort Statute).

The Second Circuit has not hesitated to grant § 1292(b) review when faced with complex legal questions at the intersection of U.S. and foreign law.  *See Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70, 81 (2d Cir. 2002) ("[T]he interaction of federal, New York, and Indonesian law poses 'substantial ground for difference of

opinion.'").  The Second Circuit, likewise, has recognized that greater appellate oversight is warranted in cases where there are "particular risks of adverse foreign policy consequences obliging courts to be particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs."  *Balintulo v. Daimler AG*, 727 F.3d 174, 187 (2d Cir. 2013) (citation and quotation marks omitted).  Accordingly, the Second Circuit has found substantial grounds for difference of opinion in a number of claims that implicate United States foreign policy.  *See, e.g.*, *Klinghoffer*, 921 F.2d at 24; *EM Ltd. v. Republic of Arg.*, 473 F.3d 463 (2d Cir. 2007).  Indeed, the Second Circuit used § 1292(b) to review the Alien Tort Statute claims alleged in *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010), leading to the Supreme Court's seminal extraterritoriality ruling in that case.  Here too, § 1292(b) review is an appropriate mechanism for addressing the "knotty legal problems" presented in the sanctions order, causation rulings, and § 2339B liability ruling.  *Weber v. United States Trustee*, 484 F.3d 154, 159 (2d Cir. 2007).

**IV.  An Appeal at This Juncture Would Significantly Assist in Ultimately Terminating This Litigation and Would Avoid Potentially Grave Injury Arab Bank Might Suffer If Review Is Delayed**

Now that the Court has conducted a trial on liability, the impact of the sanctions order and other causation and liability rulings has become abundantly clear.  Yet if the Court of Appeals disagrees with these rulings, the result will be either dismissal of the complaints or at the very least a new liability trial.  In that event, a series of protracted trials assessing damages for 297 plaintiffs—and the attendant effort and expense to plaintiffs, Arab Bank, and the Court— would have been entirely wasted.  This is precisely the kind of potentially unnecessary and "protracted litigation" that § 1292(b) was enacted to avoid.  *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865–66 (2d Cir. 1996).

Though there is little, if any, benefit to delaying appellate review of these issues, there is a great deal of risk to Arab Bank if review of these issues is delayed until damages awards have been entered.  Even an order denying Arab Bank's motions for judgment or a new trial will give judicial imprimatur on the jury verdict branding Arab Bank a terrorist financier.  As the World Bank has observed, "[a] financial institution's reputation and integrity can be irrevocably harmed if involved in money laundering or financing terrorism."  *Background on Anti-Money Laundering*, World Bank, http://web.worldbank.org/WBSITE/EXTERNAL/WBI/ WBIPROGRAMS/PSGLP/0,,contentMDK:20292990~menuPK:461615~pagePK:64156158~piP K:64152884~theSitePK:461606,00.html (last visited Nov. 7, 2014).  It is well established that attacks on an institution's "intangible assets such as reputation and goodwill can constitute irreparable injury."  *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002).  And that is especially so in the case of a bank that is labeled by a court as having engaged in acts of terrorism.  Such a label could have immediate, dramatic, adverse consequences, including termination of financial relationships by other banks and financial institutions and "reduced access to world markets or access at a higher cost due to extra scrutiny of their ownership, organization and control systems."  World Bank, *Reference Guide to Anti-Money Laundering and Combating the Financing of Terrorism*, at II-3 (2d ed. 2006), *available at* http://siteresources.worldbank.org/EXTAML/Resources/396511-1146581427871/ Reference_Guide_AMLCFT_2ndSupplement.pdf.[4]

---

[4]  We note that when BNP Paribas entered into a highly publicized $963 million settlement with OFAC and state regulators resolving allegations that it transacted with or on behalf of banks controlled by Cuba, Sudan, Iran, and Burma, neither the information nor statement of facts to which BNP Paribas pleaded guilty accused BNP Paribas of having itself engaged in acts of terror by providing financial services to governments that were already designated as state sponsors of terrorism.  *See* Press Release, Dep't of the Treasury, *Treasury Reaches Largest Ever Sanctions-Related Settlement with BNP Paribas SA for $963 Million* (July 30, 2014); Information, *United States v. BNP Paribas, S.*A., 14 Cr. --- (S.D.N.Y. 2014), http://www.justice.gov/sites/default/files/opa/legacy/2014/06/30/ information.pdf; Statement of Facts, *United States v. BNP Paribas, S.*A., 14 Cr. --- (S.D.N.Y. July 30, 2014), http://www.justice.gov/sites/default/files/opa/legacy/2014/06/30/statement-of-facts.pdf.  It is highly unjust that, in

Beyond the reputational harm of being adjudged as having engaged in terrorist acts, the sheer magnitude of damages at stake could well exacerbate concerns among business partners and depositors about transacting business with the Bank.  The ATA provides treble damages for any United States national injured "by reason of an act of international terrorism."  18 U.S.C. § 2333(a).  Previous ATA damages awards have resulted in judgments of hundreds of millions of dollars.  *See*, *e.g.*, *Morris v. Khadr*, 415 F. Supp. 2d 1323 (D. Utah 2006) ($102.6 million); *Rubin v. Hamas Islamic Resistance Movement*, No. 02-cv-0975, slip op. (D.D.C. Sept. 27, 2004) ($214.5 million).  In this case, plaintiffs seek damages for 24 terrorist attacks affecting nearly 300 plaintiffs.  Those damages, trebled, could endanger the Bank's operations.  The threat of such massive liability may well cause the Bank's depositors and business partners to abandon the Bank in order to limit their own potential exposure.  The very real example of Arthur Andersen illustrates the serious stakes at issue.  The accounting firm fell apart shortly after it was convicted on charges relating to its auditing of Enron when most of its clients "defect[ed] before the auditor was found guilty."  *See* Jan Barton, *Who Cares About Auditor Reputation?*, 22 Contemp. Acct. Res. 549, 559 (2005).  Though the company was ultimately vindicated by the Supreme Court, it was a hollow victory because the company had long since collapsed.  Because of the serious questions presented as to several of this Court's rulings, including a key sanctions order that the United States has criticized for failing properly to weigh a close ally's sovereign interests, the Court should take care to avoid such a risk from delayed appellate review.

Section 1292(b) was enacted to protect against these kinds of harms.  Section 1292(b) certification is an appropriate vehicle for "avoidance of harm to a party *pendente lite* from a possibly erroneous interlocutory order and the avoidance of possibly wasted trial time and

---

contrast to BNP Paribas, Arab Bank should have its reputation stained with an adjudication that it engaged in terrorist acts, when, unlike BNP Paribas, the persons for whom Arab Bank is alleged to have provided financial services were never designated as terrorists by OFAC or similar entities.

litigation expense." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 753, 756 (3d Cir. 1974).

Section 1292(b) review was specifically intended to "prevent irreparable harm to an unsuccessful

litigant" in the district court that might result from delayed appeal. *United States v. Cities Serv.

Co.*, 410 F.2d 662, 664 (1st Cir. 1969). This Court should therefore exercise its discretion to

certify this case for appeal to prevent the risk of significant injury to Arab Bank if appellate

review were denied and to ensure that foreign banks and domestic banks operating abroad have

the benefit of the final work of the Court of Appeals on these critical issues.

<u>**CONCLUSION**</u>

For the foregoing reasons, amicus the Union of Arab Banks urges the Court to grant

defendant Arab Bank's motion for § 1292(b) certification.


November 10, 2014                                 Respectfully submitted,


                                                 /s/    *Patrick Sinclair*
                                                 Patrick Sinclair
                                                 Ropes & Gray LLP
                                                 1211 Avenue of the Americas
                                                 New York, NY 10036
                                                 (212) 596-9000
                                                 Patrick.Sinclair@ropesgray.com

                                                 Douglas Hallward-Driemeier
                                                 Ropes & Gray LLP
                                                 One Metro Center
                                                 700 12th Street, NW, Suite 900
                                                 Washington, DC 20005
                                                 (202) 508-4600
                                                 Douglas.Hallward-Driemeier@ropesgray.com

## CERTIFICATE OF SERVICE

I certify that this Memorandum of Union of Arab Banks as Amicus Curiae in Support of

Arab Bank, LLC was served on November 10, 2014, via CM/ECF to the following counsel of

record:

*Counsel for Plaintiffs:*

Mark S Werbner, Esq.,
SAYLES WERBNER
1201 Elm Street
4400 Renaissance Tower
Dallas, TX 75270
214-939-8700
Fax: 214-939-8787
Email: mwerbner@swtriallaw.com

Peter A. Binkow, Esq.,
LAW OFFICES OF LIONEL Z. GLANCY
1801 Avenue of the Stars
Suite 308
Los Angeles, CA 90067
(310) 201-9150

Steven M. Steingard, Esq.,
KOHN, SWIFT & GRAF, PC
One South Broad Street
Suite 2100
Philadelphia, PA 19107
215-238-1700
Fax: 215-238-1968
Email: ssteingard@kohnswift.com

Aaron Schlanger, Esq.,
OSEN LLC
2 University Plaza
Suite 201
Hackensack, NJ 07601
201-265-6400
Email: as@osen.us

Clyde T. Turner, Esq.,
TURNER AND ASSOCIATES
4705 Somers Ave

Suite 100
North Little Rock, AR 72116
501-791-2277
Fax: 501-791-1251
Email: tab@tturner.com

James P. Bonner, Esq.,
STONE BONNER & ROCCO LLP
260 Madison Avenue
17th Floor
New York, NY 10016
212-239-4340
Fax: 212-239-4310
Email: jbonner@lawssb.com

Naomi B. Weinberg, Esq.,
OSEN LLC
2 University Plaza
Suite 201
Hackensack, NJ 07601
201-265-6400
Fax: 201-265-0303
Email: nbw@osen.us

Neal Dublinsky, Esq.,
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue Of the Stars
Ste. 311
Los Angeles, CA 90067
310-201-9150
Fax: 310-201-9160

Peter R. Kolker, Esq.,
ZUCKERMAN SPAEDER LLP
1800 M Street, Nw
Suite 1000
Washington, DC 20036
(202)778-1800
Fax: (202)822-8106
Email: pkolker@zuckerman.com

Semra Aylin Mesulam, Esq.,
ZUCKERMAN SPAEDER LLP
1800 M Street, NW
Suite 1000
Washington, DC 20036-5807

202-778-1800
Email: semra.mesulam@gmail.com

Andrew David Friedman, Esq.,
WECHSLER, HARWOOD, HALEBIAN & FEFFER, L.L.P.
488 Madison Avenue
8th Floor
New York, NY 10022
(212) 935-7400
Fax: 212-753-3630
Email: afriedman@whesq.com

Joshua D. Glatter, Esq.,
Mark S Werbner, Esq.,
Peter A. Binkow, Esq.,
Aaron Schlanger, Esq.,
OSEN LLC
2 University Plaza
Suite 201
Hackensack, NJ 07601
201-265-6400
Fax: 201-265-0303
Email: jdg@osen.us

Cindy T. Schlanger, Esq.,
OSEN LLC
2 University Plaza
Suite 201
Hackensack, NJ 07601
201-265-6400
Fax: 201-265-0303
Email: cts@osen.us

Gary M. Osen, Esq.,
James P. Bonner, Esq.,
Naomi B Weinberg, Esq.,
Neal Dublinsky, Esq.,
Peter R. Kolker, Esq.,
OSEN LLC
2 University Plaza
Suite 201
Hackensack, NJ 07601
201-265-6400
Fax: 201-265-0303
Email: gmo@osen.us

Peter Raven-Hansen, Esq.,
Semra Aylin Mesulam, Esq.,
Andrew David Friedman, Esq.,
OSEN LLC
700 Kinderkamack Rd
Oradell, NJ 07649
201-265-6400
Fax: 201-265-0303
Email: pravenhansen@gmail.com

Ari Ungar
OSEN LLC
2 University Plaza
Suite 201
Hackensack, NJ 07601
201-265-6400
Email: au@osen.us

Brian Thomas Frutig
MOTLEY RICE LLC
28 Bridgeside Boulevard
Po Box 1792
Mount Pleasant, SC 29464
843-216-9109
Fax: 843-216-9450
Email: bfrutig@motleyrice.com

John M. Eubanks
MOTLEY RICE LLC
28 Bridgeside Blvd
Po Box 1792
Mount Pleasant, SC 29465
843-216-9000
Fax: 843-216-9450
Email: jeubanks@motleyrice.com

Neil L. Glazer
KOHN SWIFT & GRAF P.C.
One South Broad Street
Suite 2100
Philadelphia, PA 19107-3304
215-238-1700
Fax: 215-238-9806
Email: nglazer@kohnswift.com

Stephen H. Schwartz
KOHN, SWIFT & GRAF, P.C.
One South Broad Street
Philadelphia, PA 19107
215-238-1700
Fax: 215-238-9806
Email: sschwartz@kohnswift.com

***Counsel for Defendant Arab Bank, PLC:***

Kevin Walsh, Esq.,
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 335-4571
Fax: 212-335-4501
Email: kevin.walsh@dlapiper.com

Anthony Paul Coles, Esq.,
DLA PIPER LLP (US)
1251 Avenue Of The Americas
New York, NY 10020
212-335-4844
Fax: 212-884-8644
Email: anthony.coles@dlapiper.com

Brett Ingerman, Esq.,
DLA PIPER LLP (US)
6225 Smith Avenue
Baltimore, MD 21209
410-580-4177
Fax: 410-580-3001
Email: brett.ingerman@dlapiper.com

Douglas Walter Mateyaschuk, Esq.,
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 335-4984

Shand Scott Stephens, Esq.,
DLA PIPER LLP
1251 Avenue Of The Americas
38th Floor
New York, NY 10020
212-335-4500

Fax: 212-335-4501
Email: shand.stephens@dlapiper.com

Steven J. Young, Esq.,
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 335-4929

***Counsel for Respondent Israel Discount Bank, Ltd.:***

Matthew E. Fishbein, Esq.,
DEBEVOISE & PLIMPTON
919 Third Avenue
New York, NY 10022
(212) 909-6077
Fax: 212-909-6836
Email: mfishbein@debevoise.com

Peter Adam Chavkin, Esq.,
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C.
666 Third Avenue
The Chrysler Center, 32nd Floor
New York, NY 10018
212-983-3000
Fax: 212-983-3115
Email: pchavkin@mintz.com

David L. Barres, Esq.,
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO, P.C.
666 Third Avenue
New York, NY 10017
(212)692-6776
Fax: (212)983-3115
Email: dbarres@mintz.com

***Counsel for Third Party Defendants:***

Jennifer R. Cowan, Esq.,
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
212-909-6000
Fax: 212-909-6836
Email: jrcowan@debevoise.com

Matthew E. Fishbein, Esq.,
DEBEVOISE & PLIMPTON
919 Third Avenue
New York, NY 10022
(212) 909-6077
Fax: 212-909-6836
Email: mfishbein@debevoise.com

Narges Maneck Kakalia, Esq.,
MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO P.C.
666 Third Avenue
New York, NY 10017
212-692-6215
Fax: 212-983-3115
Email: nmkakalia@mintz.com

***Counsel for Interested Party Bank Hapoalim:***

Jay Cohen, Esq.,
PAUL, WEISS, RIFKIND, WHARTON & GARRISON
1285 Avenue Of The Americas
New York, NY 10019
212-373-3163
Fax: 212-492-0163
Email: jaycohen@paulweiss.com

November 10, 2014                    Respectfully submitted,

                                    /s/   *Patrick Sinclair*
                                    Patrick Sinclair
                                    Ropes & Gray LLP
                                    1211 Avenue of the Americas
                                    New York, NY 10036
                                    (212) 596-9000
                                    Patrick.Sinclair@ropesgray.com