UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

COURTNEY LINDE, et al.                    :
                                          :    Case No. CV 04 2799 (NG)(VVP) *and all*
                                          :    *related cases**
                      Plaintiffs,         :
                                          :
         -against-                        :
                                          :
ARAB BANK, PLC,                           :
                                          :
                      Defendant.          :
                                          :

---

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT ARAB BANK, PLC'S MOTIONS FOR: (1) JUDGMENT AS A MATTER OF LAW PURSUANT TO FED. R. CIV. P. 50(B); (2) A NEW TRIAL PURSUANT TO RULE 59; AND (3) CERTIFICATION OF AN INTERLOCUTORY APPEAL UNDER 28 U.S.C. §1292(B)**

---

* *Litle, et al. v. Arab Bank, PLC,* No. CV-04-5449 (E.D.N.Y. 2004) (BMC)(VVP); *Almog, et al. v. Arab Bank, PLC,* No. CV-04-5564 (E.D.N.Y. 2004) (BMC)(VVP); *Coulter, et al. v. Arab Bank, PLC,* No. CV-05-365 (E.D.N.Y. 2005) (BMC)(VVP); *Bennett, et al. v. Arab Bank, PLC,* No. CV-05-3183 (E.D.N.Y. 2005) (BMC)(VVP); *Roth, et al. v. Arab Bank, PLC,* No. CV-05-3738 (E.D.N.Y. 2005) (BMC)(VVP); and *Weiss, et al. v. Arab Bank, PLC,* No. CV-06-1623 (E.D.N.Y. 2006) (BMC)(VVP).

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   STANDARDS FOR RELIEF GOVERNING DEFENDANT'S MOTIONS......................... 4

   A.   Rule 50(b)................................................................................................ 4

   B.   Rule 59 .................................................................................................... 5

   C.   28 U.S.C. § 1292(b) ................................................................................ 6

      1.   Controlling Question of Law........................................................ 6

      2.   Substantial Ground for Difference of Opinion ............................ 7

      3.   May Materially Advance the Ultimate Termination of the Litigation ........................ 8

III.  THERE IS AMPLE EVIDENCE TO SUPPORT THE VERDICT.................................... 8

   A.   Arab Bank knowingly provided financial services to Hamas ......................... 8

   B.   Knowing payments for "Martyr Operations" are not "Routine Banking" .................... 10

   C.   The self-destruction of Dr. Milton-Edwards, the Bank's expert witness on Hamas...... 11

      1.   "Islamic Resistance Movement – Hamas" – Four Words Dr. Milton-Edwards Can't Read In Arabic.................... 13

      2.   Dr. Milton-Edwards claimed she could not identify the founder of Hamas's terror apparatus because he had a big beard........................ 13

      3.   Dr. Milton-Edwards is contradicted by her own book ................ 16

4.   Dr. Milton-Edwards claims that all Hamas leaders try to keep their identities secret 17

IV.  THE COURT PROPERLY AND FAIRLY APPLIED THE RULE 37(b) REMEDIAL ORDER ........................................................................................................................ 18

A.   The production order is not at issue ............................................................. 19

B.   Remedies were indisputably necessary, and the Court applied the correct legal standard in issuing them ........................................................................................... 20

C.   The Solicitor General's erroneous *dicta* do not warrant post-trial relief ...................... 22

D.   The court did not commit clear error in implementing a permissive adverse inference instruction and that remedy did not deprive Defendant of a fair defense ...................... 25

1.   The Court's permissive adverse inference instruction reflects no clear error. ........... 25

2.   The Court did not commit clear error in excluding evidence on Rule 37(b) preclusion grounds. ...................................................................................... 27

E.   The court's application of the remedial order does not warrant certification of any issue to the court of appeals. ................................................................................. 34

V.   THE COURT APPLIED THE CORRECT CAUSATION STANDARDS ......................... 36

VI.  THERE IS NO DISPUTE IN THIS CIRCUIT THAT KNOWING VIOLATIONS OF § 2339B CONSTITUTE ACTS OF INTERNATIONAL TERRORISM UNDER THE ATA ........................................................................................................................... 42

VII. NONE OF THE BANK'S OTHER CLAIMS OF ERRORS ARE VALID ......................... 47

A.   Plaintiffs Are Not Required To Prove "Evil Intent" ...................................... 47

B.   The Court Did Not Commit Error in Refusing To Permit Defendant to Introduce Testimony Regarding Foreign Laws .............................................................. 48

C. Foreign Law Testimony Was Properly Precluded by the Court's Rule 37(b) Order..... 52

D. Evidence and Jury Instructions Concerning Foreign Bank Secrecy Laws Were Properly Rejected............................................................................................................... 54

E. The Court Did Not Err In Excluding Defendant's "Experts" On The Saudi Committee In Support Of The Intifada Al Quds ............................................................. 58

 1. Robert Lacey............................................................................................ 58

 2. David Rundell........................................................................................... 63

F. The Court Did Not Err In Admitting The Israeli Unlawful Associations List............... 65

G. The Court Did Not Err In Issuing Its *Respondeat Superior* Instruction........................ 68

H. The Court Did Not Err In Admitting Limited Statements Against Interest By Hamas . 69

I. The Court Did Not Abuse Its Discretion When It Allowed Plaintiffs To Impeach A Witness With Factual Findings From The FinCEN Assessment .................................. 73

J. The Trial Structure Approved By The Court Does Not Warrant A New Trial.............. 77

VIII. CONCLUSION.................................................................................................... 81

## TABLE OF AUTHORITIES

**Cases**

*Aaron v. Kroger Ltd. P'ship I,*
    2012 WL 78392 (E.D. Va. Jan. 6, 2012)……………………………………………...56

*Abecassis v. Wyatt,*
    7 F. Supp. 3d 668 (S.D. Tex. 2014).…………………………………………………46, 68

*Abecassis v. Wyatt,*
    2014 WL 5483724 (S.D. Tex. Oct. 29, 2014).……………………….…………...36

*Abecassis v. Wyatt,*
    785 F. Supp. 2d 614 (S.D. Tex. 2011).……………………………………………..68

*Adams v. Szczerbinski,*
    329 Fed. Appx. 19 (7th Cir. 2009)……………………………………………….80

*Ahrenholz v. Board of Tr. of Univ. of Ill.,*
    219 F.3d 674 (7th Cir. 2000).……………………………………………………..6

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas,*
    426 F. Supp. 2d 125 (S.D.N.Y. 2005)……………………………………………7

*Bank of China, New York Branch v. NBM LLC,*
    359 F.2d 171 (2d Cir. 2004).………………………………………………………58-59

*Boim v. Holy Foundation for Relief & Dev. ("Boim III"),*
    549 F.3d 685 (7th Cir. 2008).……………………………………………...44, 48, 72, 78

*Brady v. Wal-Mart Stores, Inc.,*
    455 F. Supp. 2d 157 (E.D.N.Y. 2006).……………………………………………..76

*Burnett v. Al Baraka Inv. & Dev. Corp.,*
    274 F. Supp. 2d 86 (D.D.C. 2003).………………………………………………44

*Camreta v. Greene,*
    131 S.Ct. 2020 (2011).………………………………………………………...60

*Caronia v. Hustedt Chevrolet,*
    2009 WL 5216940 (E.D.N.Y. Dec. 29, 2009)………………………………...80

*Cash v. Cnty. of Erie,*
    654 F.3d 324 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1741 (2012)…………..…………4-5

*Chin v. Port Authority of N.J.*,
    685 F.2d 135 (2d Cir. 2012)……………………………………………………...60

*Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*,
    602 F.2d 1062 (2d Cir. 1979)……………………………………………………21

*Compton v. Luckenbach Overseas Corp.*,
    425 F.2d 1130 (2d Cir. 1970), *cert. denied*, 400 U.S. 916 (1970)………………………6

*Estate of Parsons v. Palestinian Authority*,
    651 F.3d 118 (D.C. Cir. 2011)……………………………………………………...68

*Estevez-Yalcin v. Children's Vill.*,
    2006 WL 3420833 (S.D.N.Y. Nov. 27, 2006)………………………………………8

*Farr Man Coffee, Inc. v. Chester*,
    1993 WL 328854 (S.D.N.Y. Aug. 26, 1993), *aff'd*, 19 F.3d 9 (2d Cir. 1994)…………..5

*Garg v. Winterthur Life*,
    573 F. Supp. 2d 763 (E.D.N.Y. 2008)……………………………………………6-7

*Genentech, Inc. v. Novo Nordisk A/S*,
    907 F. Supp. 97 (S.D.N.Y. 1995)…………………………………………………7

*German by German v. Federal Home Loan Mtge. Corp*,
    896 F. Supp. 1385 (S.D.N.Y. 1995)………………………………………………6

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 542 (E.D.N.Y. 2012)……………………………………*passim*

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 523 (E.D.N.Y 2012)……………………………………………59

*Gilmore v. Palestinian Interim Self-Gov't Auth.*,
    2014 WL 3719160 (D.D.C. July 28, 2014)………………………………………70

*Goldberg v UBS AG*,
    690 F. Supp. 2d 92 (E.D.N.Y. 2010)……………………………………………46-47

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009)……………………………………………39-40

*Highland Capital Mgmt., L.P. v. Schneider*,
    551 F. Supp. 2d 173 (S.D.N.Y. 2008)……………………………………………...76

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)………………………………………………………...38

*Holmes v. Securities Investor Protection Corp.*,
    503 U.S. 258 (1992)………………………………………………………...41

*Horizon Asset Management Inc. v. H & R Block, Inc.*,
    580 F.3d 755 (8th Cir. 2009)……………………………………………80

*In re City of New York*,
    607 F.3d 923 (2d Cir. 2010)………………………………..……………………35

*In re Duplan Corp.*,
    591 F.2d 139 (2d Cir. 1978)………………………………………………7

*In re Facebook Inc., IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 524 (S.D.N.Y. 2014)…………………………………………7

*In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi Bank)*,
    714 F.3d 118 (2d Cir. 2013)……………………………………...40, 43-44

*Isra Fruit Ltd. v. Agrexco Agricultural Export Co., Ltd.*,
    804 F.2d 24 (2d Cir.1986)………………………………………………8

*Kaplan v. Al Jazera*,
    2011 WL 2314783 (S.D.N.Y. June 7, 2011)………………………………47-48

*Koehler v. Bank of Bermuda Ltd.*,
    101 F.3d 863 (2d Cir. 1996)………………………………………………8

*Kronisch v. United States*,
    150 F.3d 112 (2d Cir. 1998)………………………………………21, 35

*Laborers Local 17 v. Phillip Morris, Inc.*,
    191 F. 3d 229 (2d Cir. 1999)……………………………………41-42

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)………………………………………...42

*Linde v. Arab Bank, PLC*,
    706 F.3d 92 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 2869 (2013)…………………*passim*

*Linde v. Arab Bank*, PLC,
    944 F. Supp. 2d 217 (E.D.N.Y. 2013)………………………………...51, 52, 56

*Linde v. Arab Bank, PLC*,
    922 F. Supp. 2d 292 (E.D.N.Y. 2011)……………………………………………………..58

*Linde v. Arab Bank*,
    920 F. Supp. 2d 282 (E.D.N.Y. 2011)……………………………………………60-61, 63

*Linde v. Arab Bank Plc*,
    269 F.R.D. 186 (E.D.N.Y. 2010)……………………………………………………*passim*

*Linde v. Arab Bank, PLC*,
    262 F.R.D. 136 (E.D.N.Y. 2009)…………………………………………………….....48

*Linde v. Arab Bank, PLC*,
    2009 WL 8691096 (E.D.N.Y. June 1, 2009)…………………………………………….20

*Linde v. Arab Bank Plc*,
    463 F. Supp. 2d 310 (E.D.N.Y. 2006)…………………………………………….*passim*

*Meiselman v. Byrom*,
    207 F. Supp. 2d 40 (E.D.N.Y. 2002), *aff'd*, 144 F. App'x 164 (2d Cir. 2005)……………5

*Minpeco S.A. v. Conticommodity Servs., Inc.*,
    116 F.R.D. 517 (S.D.N.Y. 1987)……………………………………………………...20

*Morris v. Flaig*,
    511 F. Supp. 2d 282 (E.D.N.Y. 2007)……………………………………………...34

*Option Res. Grp. v. Chambers Dev. Co.*,
    967 F. Supp. 846 (W.D. Pa. 1996)……………………………………………...76-77

*Owens v. Republic of Sudan*,
    412 F. Supp. 2d 99 (D.D.C. 2006)……………………………………………...39, 78

*Parker v. Reda*,
    327 F.3d 211 (2d Cir. 2003)………………………………………………………...59

*Paroline v. United States*,
    134 S. Ct. 1710 (2014)……………………………………………………..37, 38, 39-40

*Patsy's Italian Rest, Inc. v. Banas*,
    575 F. Supp. 2d 427 (E.D.N.Y. 2008), *aff'd*, 658 F.3d 254 (2d Cir. 2011)……………5-6

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000)………………………………………………………………5

*Renner v. Chase Manhattan Bank*,
    2000 WL 781081 (S.D.N.Y. 2000)……………………………………………………69

*Residential Funding Corp. v. DeGeorge Finan. Corp.*,
    306 F.3d 99 (2d Cir. 2002)…………………………………………………...21, 24

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013)……………………………………………………40

*S.E.C. v. Pentagon Capital Mgmt. PLC*,
    2010 WL 985205 (S.D.N.Y. March 17, 2010)………………………………..77

*Société Internationalle Pour Participations Industrielles Et Commerciales. S.A. v. Rogers*,
    357 U.S. 197 (1958)…………………………………………………………..20

*Société Nationale Industrielle Aérospatiale v. United States District Court*,
    482 U.S. 522 (1987)…………………………………………………………...20

*Sokolow v. Palestine Liberation Organization*,
    2014 WL 6601023 (S.D.N.Y. Nov. 19, 2014)…………………………….38-39, 68

*Stansell v. BGP, Inc.*,
    2011 WL 1296881 (M.D. Fla. March 31, 2011)……………………………36, 43

*Stevenson v. Union Pacific Railroad Co.*,
    354 F.3d 739 (8th Cir. 2004)……………………………………………………55

*Stutts v. De Dietrich Group*,
    2006 WL 1867060 (E.D.N.Y. June 30, 2006)………………………………...44

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991)……………………………………………………50

*United States v. Burrage*,
    134 S. Ct. 881 (2014)……………………………………………………………37

*University of Texas Southwestern Medical Center v. Nassar*,
    135 S. Ct. 2517 (2013)…………………………………………………………...37

*Weiss v. National Westminster Bank*,
    768 F.3d 202 (2d Cir. 2014) ……………………………………………….*passim*

*Weiss v. Nat'l Westminster Bank PLC*,
    453 F. Supp. 2d 609 (E.D.N.Y. 2006)……………………………………...52

viii

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010)…………………………………………………...39

*Zaremba v. General Motors Corp.*,
    360 F.3d 355 (2d. Cir. 2004)……………………………………………………..60

## **Statutes**

Fed. R. Civ. P. 50(a) ………………………………………………………………...4

18 U.S.C. §2331(1) ………………………………………………………………...43

18 U.S.C. §2339B………………………………………………………………….46

18 U.S.C. §2339B(a)(1) ……………………………………………………………43

28 U.S.C. § 1292(b) ………………………………………………………………..6

## **Other Authority**

*Restatement (Third) of the Foreign Relations Law of the United States* §442…………..19, 55-56

*Restatement (Third) of Torts* §27 rep. note for cmt. a……………………………………...39

S. Rep. No. 102–342, at 22 (1992) …………………………………………………...39

## I.      INTRODUCTION

This memorandum is submitted in opposition to the motions of Defendant Arab Bank, PLC ("Defendant, "Arab Bank" or the "Bank") for: (1) judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b); (2) a new trial pursuant to Rule 59; and (3) certification of an interlocutory appeal under 28 U.S.C. §1292(b).[1] Each motion must be denied entirely.

The jury verdict in this case was not the result of judicial error but the inexorable result of overwhelming evidence that Arab Bank knowingly transferred more than $36 million to Hamas's most senior leaders, operatives and institutions and knowingly and actively facilitated payments to the families of 24 Hamas suicide bombers and more than 150 Hamas operatives, more than 10 of whom were directly implicated in the specific acts of terrorism that killed and injured Plaintiffs.

Cognizant of this overwhelming evidence of its complicity in dozens of terror attacks that maimed and murdered more than a thousand people, Arab Bank adopted a two-pronged approach to this litigation.  First, the Bank stonewalled nearly all discovery "essential to the proof of the plaintiffs' case"[2] while simultaneously contending that plaintiffs had insufficient evidence to reach the jury.  Second, having withheld the vast majority of the relevant evidence, the Bank insisted that it should face no consequences for its brazen disregard of its discovery obligations and this Court's orders and loudly complained that *the Bank* was the victim of an unjust "show trial."  The Bank's decade of scorched earth litigation tactics included:

---

[1]      References to the Bank's Rule 50 motion are cited herein as "JML Mem.".  References to the Bank's Rule 50 motion are cited herein as "NT Mem.".  References to its §1292(b) motion are cited herein as "§1292(b) Mem.".  References to the Hashemite Kingdom of Jordan's, and the Union of Arab Banks' amici submissions in support of Defendant's §1292(b) application are referred to herein as "Jordan Mem." and "UAB Mem.," respectively.  Unless otherwise noted, all Electronic Case Filing (ECF) docket references relate to docket numbers in the *Linde* action.  Citations to the trial record are cited forth herein as "TT____.".

[2]      *Linde v. Arab Bank, PLC,* 463 F. Supp. 2d 310, 315 (E.D.N.Y. 2006).

- Submitting a false and misleading sworn declaration by its then-Chief Banking Officer, Shukry Bishara, in support of its motion to dismiss the *Linde* complaint. (PX4721) ¶41 of the declaration falsely stated that "it is inconceivable that we would open an account for Hamas whether in Beirut or in any of our branches" but failed to advise the Court that the account belonged to a designated Hamas leader or that multiple transactions paid into the account were in the name of "Hamas".)

- Obfuscating the scope of the responsive documents physically in possession of the Bank in the United States.[3]

- Harassing terror victims during depositions by asking insulting and irrelevant questions that resulted in a reprimand by the Court.[4]

- Seeking removal of the district judge based on wholly baseless assertions of bias.[5]

- Proposing a flagrantly impractical trial plan (339 separate trials). *Linde* ECF No. 327. *See* Declaration of Aaron Schlanger ("Schlanger Decl.") Exhibit 1.

- Filing a frivolous mandamus petition that was summarily denied without briefing. *See* Petition for Writ of Mandamus in *In re Arab Bank, PLC*, 13-3253, ECF. No. 1 (2d Cir. August 29, 2013) and Order Denying Petition for Writ of Mandamus, ECF No. 35 (2d Cir. January 7, 2014).

- Vexatiously rearguing issues previously decided by the Court.[6]

---

[3]     "It was 'simply not acceptable' for the Bank to 'withhold the documents showing the funds transfers through New York which plaintiffs seek to make their case.'" *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 193 (E.D.N.Y. 2010) (quoting Dec. 13, 2006 Order, *Linde* Docket ECF #272).

[4]     *See* June 3, 2009 Conference Transcript at 15-20.

[5]     *See* June 6, 2011 Reply Br. of Def.-Appellant in support of Appeal and Pet. for Mandamus (2d Cir. No. 10-4519-cv(L)).

[6]     *See, e.g.*, Defendant's argument with respect to the applicable scienter standard: *Linde* ECF 53 (arguing that Section 2333(a) requires a showing of upper level management's participation in the unlawful activity) (rejected by district court – *Linde* ECF 96); *Linde* ECF 824 (again arguing that Plaintiffs must show upper level management knew and intended to commit the tortious conduct); *Linde* ECF 887 (same); *Linde* ECF 942 (motion for reconsideration arguing that common law respondeat superior principles do not apply to ATA claims following April 24, 2013 ruling that respondeat superior does apply to this case) (motion for reconsideration denied by June 18, 2013 Order, *Linde* ECF 963); *Linde* ECF 1019 (Defendant's proposed jury instruction again arguing that respondeat superior principles do not apply to ATA claims). *See also* Defendant's argument with respect to applicable causation standard: *Linde* ECF 927 (arguing "but for" causation); *Linde* ECF 930 (same); *Linde* ECF 935 (same) (motion for reconsideration denied, *Linde* ECF 963, rearguing "but for" causation following April 24, 2013 ruling that held "but for" causation not required); August 29, 2013 Writ of Mandamus to the Second Circuit, Docket No. 13-3253 (arguing "but for" causation) (Mandamus summarily denied January 7, 2014); *Linde* ECF 1019 (rearguing "but for" causation); *Linde* ECF 1020 (same); *Linde* ECF 1135 (same). *See also* Defendant's argument with respect to statements against interest under Fed. R. Evid. 804(b)(3): *Linde* ECF 1033 (arguing that Hamas claims of responsibility are not statements against interest); July 31, 2014 Order (*Linde* ECF 1049) (holding that Hamas claims of responsibility qualify as statements against interest); *Linde* ECF 1096 (rearguing same issue).

The Bank did all these things while willfully withholding critical evidence, portraying itself to the public as a victim of the proceedings[7] and exhibiting not one scintilla of remorse either for its litigation tactics or its responsibility for the death and injury of more than a thousand people.

The Bank's present motions continue that ten year strategy, which now lays in ruins because of: (1) the overwhelming evidence presented at trial that Arab Bank knowingly provided financial services to Hamas; (2) the devastating testimony of David Blackmore, the Bank's former compliance officer in London (3) the self-destruction of Dr. Milton-Edwards, the Bank's sole expert witness on Hamas; and (4) the Bank's absurd claim that Hamas leaders "all try to maintain their identities as secret." Few litigants' credibility could survive such an onslaught of (often self-inflicted) blows, but it bears noting that this parade of blunders was first preceded by the Bank's decision to spend more than a week of trial contesting Hamas's responsibility for the 24 attacks even though the Bank's own expert witnesses later confirmed that Hamas perpetrated at least eight of the attacks.  TT2253-2258.  The Bank offered no evidence to the contrary and no expert witness to rebut Plaintiffs' two experts on this subject.  Instead, the jury was presented with a mountain of evidence that Hamas perpetrated the attacks and even saw video of the Bank's customer, Osama Hamdan, appearing on CNN in March 2002 taking credit for and justifying the Park Hotel suicide bombing.  *Any* jury presented with multiple examples of Hamas suicide bombers speaking on camera about their imminent intention to commit act of violence as

---

See also Defendant's argument with respect to relevance of foreign law: *Linde* ECF 785 (arguing that experts previously excluded by the December 6, 2011 Order could testify as *fact witnesses* and offer specific testimony pursuant to future notice consistent with Rule 44.1); *Linde* ECF 803 (arguing that foreign law was essential to defense and specifically to scienter); *Linde* ECF 908 (same); *Linde* ECF 930 (same); May 14, 2013 Order (*Linde* ECF 945) (denying Rule 44.1 Motion); *Linde* ECF 972 (Supplemental Pretrial Order submission seeking to reinstate same foreign law experts previously excluded in December 6, 2011 and May 14, 2013 Orders).

[7]      *See, e.g.*, http://www.arabbankfacts.com/2014/09/arab-bank-statement-on-jury-verdict-in-linde-v-arab-bank-plc/.

"warriors" of Hamas would be entitled to develop significant questions regarding the credibility of a defendant that nevertheless urged the jury to conclude that Hamas was not responsible for those attacks.[8]

In sum, while the narrowly tailored remedies imposed by the Court as a result of Defendant's sweeping withholding of evidence were necessary to prevent the Bank from entirely subverting the judicial process, the jury's verdict was not dependent on the permissive adverse inference instruction. The evidence of the Bank's complicity in financing and supporting Hamas was unrefuted, the Bank's own litigation strategy eviscerated its credibility before the jury and the liability verdict was not simply supported by – it was the only conceivable result of – the evidence presented.

## II.    STANDARDS FOR RELIEF GOVERNING DEFENDANT'S MOTIONS

The exacting standards of each of the Bank's motions impose heavy burdens on Defendant.  Because of their interlocutory nature, and because the Court is intimately familiar with the record, it has broad discretion to deny them without the need for extended discussion or analysis, and the Court of Appeals will not disturb those decisions absent a clear showing that the Court abused that discretion.

### A.    Rule 50(b)

Rule 50 provides for entry of judgment as a matter of law where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on the issue or issues that are the subject of the motion.  Fed. R. Civ. P. 50(a).[9]  This exacting standard,

---

[8]        The jury was presented with video "wills" of: Assem Rihan, perpetrator of the December 12, 2001 Bombing and Shooting Attack, Emmanuel Settlement, PX3398; Asef Hanif and Omar Sharif, perpetrators of the April 30, 2003 Mike's Place Bombing, PX3826; Basem Takruri, perpetrator of the May 18, 2003 Bus 6 Bombing, PX3863; and Raed Misk, perpetrator of the August 19, 2003 Bus 2 Bombing, PX 3912.

[9]        Defendant's motion, made pursuant to Fed. R. Civ. P. 50(b), is merely a renewal of the Rule 50(a) motion it made at the conclusion of Plaintiffs' case-in-chief.

similar to summary judgment, "imposes a heavy burden on a movant," *Cash v. Cnty. of Erie*, 654 F.3d 324, 332-33 (2d Cir. 2011), because "in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record[,] ... draw all reasonable inferences in favor of the nonmoving party, and [refrain from] mak[ing] credibility determinations or weigh[ing] the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000) (citations omitted).

A movant's "burden is 'particularly heavy' where, as here, 'the jury has deliberated in the case and actually returned its verdict' in favor of the non-movant." *Cash*, 654 F.3d at 333 (*quoting Cross v. N.Y.C. Transit Auth.,* 417 F.3d 241, 248 (2d Cir. 2005)).  In the Second Circuit:

> [A] court may set aside [a jury] verdict only if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it.  In short, a Rule 50 motion may be granted only if the court, viewing the evidence in the light most favorable to the non-movant, concludes that a reasonable juror would have been *compelled* to accept the view of the moving party.

*Cash*, 654 F.3d at 333 (citations and internal quotations omitted; emphasis in original).

**B.     Rule 59**

Although vested with somewhat greater discretion under Rule 59, "a trial court generally should not be inclined to disturb a jury's verdict." *Meiselman v. Byrom*, 207 F. Supp. 2d 40, 42 (E.D.N.Y. 2002), *aff'd*, 144 F. App'x 164 (2d Cir. 2005).  A Rule 59 motion may not be used to re-litigate matters already decided by the Court.  *Farr Man Coffee, Inc. v. Chester*, No. 88 CIV 1692 (DNE), 1993 WL 328854, at *1 (S.D.N.Y. Aug. 26, 1993), *aff'd*, 19 F.3d 9 (2d Cir. 1994).  Therefore, "if the moving party's argument is simply a disagreement with the court's decisions or conclusions, that party is not entitled to relief under Rule 59." *Patsy's Italian Rest, Inc. v. Banas*, 575 F. Supp. 2d 427, 445 (E.D.N.Y. 2008), *aff'd*, 658 F.3d 254 (2d Cir. 2011) (*citing*

*Meiselman*, 207 F. Supp. 2d at 42) (further citations omitted).

As the Second Circuit has long taught:

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.

*Compton v. Luckenbach Overseas Corp.*, 425 F.2d 1130, 1133 (2d Cir. 1970), *cert. denied*, 400 U.S. 916 (1970).

### C.   28 U.S.C. § 1292(b)

Section 1292(b) provides that a district court may certify for appeal an ordinarily non-appealable interlocutory order if it determines that (1) the order "involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) an immediate appeal "may materially advance the ultimate termination of the litigation."  28 U.S.C. § 1292(b).  Interlocutory appeals are strongly disfavored in federal practice, and are not intended "as a vehicle to provide early review of difficult rulings in hard cases."  *German by German v. Federal Home Loan Mtge. Corp*, 896 F. Supp. 1385, 1398 (S.D.N.Y. 1995).  Furthermore, as the Seventh Circuit explains, the purpose of § 1292(b) is "that if a case turn[s] on a pure question of law, something *the court of appeals could decide quickly and cleanly without having to study the record*, the court should be enabled to do so without having to wait till the end of the case."  *Ahrenholz v. Board of Tr. of Univ. of Ill.*, 219 F.3d 674, 677 (7th Cir. 2000) (emphasis added).

### 1.   Controlling Question of Law

Under the first prong of § 1292(b), "[t]o establish that the interlocutory decision contains a controlling question of law, the defendant must show that": (i) "reversal of the court's order

would terminate the action," or (ii) "determination of the issue on appeal would materially affect the outcome of the litigation."  *Garg v. Winterthur Life*, 573 F. Supp. 2d 763, 767-768 (E.D.N.Y. 2008) (citation omitted).  "'[T]he critical requirement is that it (an interlocutory appeal) have the potential for substantially accelerating the disposition of the litigation.'"[10] *Cf. Genentech, Inc. v. Novo Nordisk A/S*, 907 F. Supp. 97, 99 (S.D.N.Y. 1995) (rejecting § 1292 motion because, even if appeals court reverses district court's order, "this action would plainly not terminate").

Furthermore, this element requires "a 'pure' question of law that the reviewing court 'could decide quickly and cleanly without having to study the record.'"  *In re Facebook Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 524, 536 (S.D.N.Y. 2014) (quoting *Freeman v. National Broadcasting Co., Inc.*, 1993 WL 524858 (S.D.N.Y. Dec. 15, 1993)).  Questions regarding applying the appropriate law to the relevant facts are generally not suitable for § 1292 certification.  *Id.*

### 2.      Substantial Ground for Difference of Opinion

Under § 1292(b)'s second prong, a substantial ground for difference of opinion exists when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." *Facebook*, 986 F. Supp. at 540, *citing Capitol Records, LLC v. Vimeo, LLC*, 972 F Supp. 2d 537, 551 (S.D.N.Y. 2013). "A mere claim that a district court's decision was incorrect does not suffice to establish substantial ground for a difference of opinion." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 426 F. Supp. 2d 125, 129 (S.D.N.Y. 2005).  "Rather, to satisfy this prerequisite, there must be 'substantial doubt' that the district court's order was correct." *Id.*

---

[10]      *In re Duplan Corp.*, 591 F.2d 139, 148 n.11 (2d Cir. 1978) (Friendly, C.J.) (quoting 9 Moore's Fed. Practice § 110.22(2) (1975) [rev. without alteration in 19 *Moore's Fed. Practice* § 203.31[3] (2006) (George C. Pratt, ed.)]).

### 3.      May Materially Advance the Ultimate Termination of the Litigation

Under § 1292(b)'s third prong, "[a]n immediate appeal is considered to advance the ultimate termination of the litigation if that appeal promises to advance the time for trial or shorten the time required for trial." *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863 (2d Cir. 1996).  "However, it is not enough that certification will not slow down this litigation; it must materially advance it."  *Estevez-Yalcin v. Children's Vill.*, 2006 WL 3420833, at *4 (S.D.N.Y. Nov. 27, 2006); *see also, e.g., Isra Fruit Ltd. v. Agrexco Agricultural Export Co., Ltd.*, 804 F.2d 24, 26 (2d Cir. 1986) (denying certification where determination on appeal would result in no "appreciable saving of time").

## III.      THERE IS AMPLE EVIDENCE TO SUPPORT THE VERDICT

### A.      Arab Bank knowingly provided financial services to Hamas

The evidence presented at trial established that Arab Bank knowingly provided financial services to:

> a.      Osama Hamdan, a senior Hamas leader who the jury saw appear on CNN in March 2002 (PX3580) in his role as a Hamas spokesman.  Hamdan took credit for and justified the Park Hotel suicide bombing during his appearance. Multiple credits made to his' account were made payable to "Hamas," (PX106, PX136 and PX140) and Arab Bank paid him $8,677 by cashier's check in 2005 (PX180) knowing that he was both a Specially Designated Global Terrorist and senior Hamas leader (after the Bank submitted its misleading declaration to the Court).[11]
>
> b.      Sheikh Ahmad Yassin, a Hamas founder and its spiritual leader.  Yassin

---

[11]      With regard to the Bank's withholding of records for all other accounts, it is worth noting that despite the Hamdan account number being specifically identified in the *Linde* Complaint, Defendant initially refused to produce the account records on *relevance* grounds, stating: "This request asks for information concerning an account that is not alleged to be related to a specific incident in which any of the more than 2000 plaintiffs claim to have been injured. This request therefore contravenes the Court's directive that plaintiffs' Phase I requests must be linked to the specific incidents: 'it is an animating principle of my thinking anyway that the accounts that are going to be looked at are accounts that have some link.' *See* Transcript of June 22, 2005 Hearing before Magistrate Judge Pohorelsky at 72; *see also id*. at 64-67."  Schlanger Decl. <u>Exhibit 2</u>.  Moreover, although Arab Bank had *already* produced those documents in another litigation, the Bank "further object[ed] to this request on the ground that it would require production that would subject the Bank or its employees to criminal sanctions under the bank secrecy laws of the Lebanon." *Id.*

was designated a Specially Designated Terrorist by the United States in 1995, but remained an Arab Bank accountholder in 2001. The Bank's own witnesses (Tayseer Sadeq and Muhammad al-Tahan) acknowledged knowing that Mr. Yassin was a Hamas leader during the relevant time period. Excerpt 9, PX4793.

c.  Ismail Haniyeh, a Hamas leader and chief of staff to Sheikh Yassin who: (1) was an accountholder at the Bank in the Palestinian Territories; and (2) received payments via Arab Bank-New York totaling more than $420,000. Again, the Bank's own witness (Muhammad al-Tahan) acknowledged that he knew Haniyeh was a Hamas leader during the relevant time period. Excerpt 9, PX4793.

d.  Eleven (11) account holders who the Bank admits were U.S.-designated terrorists. Excerpt 4, PX4783.

e.  Numerous U.S.-designated terrorists *after* they were designated by means of funds transfers totaling over $2.5 million. PX12.

f.  Families of 24 Hamas suicide bombers, 145 other Hamas "martyrs" and direct payments to 11 Hamas operatives. TT1626-27.

g.  12 entities controlled by Hamas that, based largely on records from the Bank's New York branch, received more than $32 million in documented payments to their accounts at Arab Bank between January 1, 1999 and December 31, 2004. PX4752.

In addition, after the Bank opened the door to its admission, the jury was able to read and consider the FBI's 2001 Watson Memorandum (admitted without objection) that identified five Arab Bank customers as "controlled by HAMAS" and noted "GOI [government of Israel] analysis, as well as open source reporting, has identified that the civilian population is aware that the services being provided by the zakat committees, whether it's the distribution of food, medical services or other social services, are being provided by HAMAS."[12] PX1297, pp. 27-28.

---

[12]  It did not help Defendant's case that Dr. Beverley Milton-Edwards testified that the Watson Memorandum was secret during the 2000-2004 time period and did not "reach the light of day in the U.S. public domain until the HLF trial in 2007." She was asked if she had ever typed "Watson memorandum" into Google and replied "probably." (TT2313) On rebuttal, the jury was presented with two newspaper articles from December 6, 2001, one from the *Los Angeles Times* and the other *from The New York Times* discussing the Watson Memorandum and its contents (TT3063-65). It also did not help Defendant's case that Dr. Milton-Edwards disclaimed familiarity with the evidence presented in the *Holy Land Foundation* criminal trial by stating that "I don't live in America, I've never lived in America, and therefore, in Europe, it's not been of as much interest as it has been here." TT2304.

The jury also heard not only that Israeli and German government intelligence assessments matched those of the FBI, but also that the defendants in the criminal prosecution of the Holy Land Foundation in Texas were found guilty of providing material support to Hamas by sending money to many of the *same* Arab Bank customers at issue. PX4340 and PX4442.

This evidence not only established that the Bank knowingly provided material support to Hamas and Hamas-controlled entities and agents, but that the dollar amounts implicated and their temporal connection to the attacks on the Plaintiffs clearly made such attacks reasonably foreseeable, if not inevitable.  None of this evidence was disputed or contradicted.  The only evidence of the Bank's material support to Hamas that the Bank even *challenged* was the evidence that certain entities were part of Hamas's network of social organizations.  That defense collapsed with the self-destruction of the Bank's wholly-discredited expert (discussed more fully *infra*).

**B.      Knowing payments for "Martyr Operations" are not "Routine Banking"**

David Blackmore, former compliance officer for Arab Bank's London branch, provided devastating testimony that undercut the Bank's already implausible claim that the payments processed by Arab Bank on behalf of the Saudi Committee were "routine" and "consistent with international standards."  Mr. Blackmore's testimony confirmed the obvious – that wire transfers listing the beneficiary as the "family of the martyr Ibrahim Abdul Karim Bani Awdah" or spreadsheets of beneficiaries listing the cause of death for payments as "martyr operation" do not reflect routine banking transactions.

With respect to the Saudi Committee wire transfer made payable to "[t]he family of the martyr Ibrahim Abdul Karim Bani Awdah," Blackmore testified:

> There would have been a number of reasons why this would not have been applied, firstly, because as you rightly say, the account of – the beneficiary name

is not specific, there's no account number, the payment for the original transaction I notice is in cash. **We would never in a million years have dealt with a payment order such as this.** Excerpt 7, PX4791 (emphasis added).

He further testified that the factors that would have precluded the execution of the transaction included: (1) the failure of the transfer documents to identify a beneficiary or any beneficiary account number[13]; and (2) the payment directed to the family of a "martyr." Excerpt 7, PX4791.

With respect to the Bank's Saudi Committee spreadsheets of beneficiaries listing the cause of death for payments (PX327), Blackmore testified:

> If this had arrived in London, which one never did in my experience, **we would have immediately commissioned probably a multiple suspicious activity report,** because this is just something which we were most unused to dealing with. We never dealt with something like this to my best of my knowledge and belief. Excerpt 7, PX4791 (emphasis added).

In light of Mr. Blackmore's testimony, the jury was entirely justified in concluding that Saudi Committee cash payments made to non-customers identified only with the title "family of the martyr" were anything but routine banking transactions. That testimony further undercut Arab Bank's contention that the Saudi Committee payments were "consistent with international standards" (TT3185) and nothing more than "a humanitarian effort." TT3187.

### C. The self-destruction of Dr. Milton-Edwards, the Bank's expert witness on Hamas

Plaintiffs presented evidence that the Bank maintained accounts for much of Hamas's senior leadership,[14] many of its senior terror cell commanders and operatives and more than $32

---

[13] Defense counsel argued at closing arguments that "many of the Saudi Committee payments that were sent from the Arab National Bank to Arab Bank for distribution to the beneficiaries were paid in cash. And that's consistent with international standards. You don't have to have an account at a bank in order to receive a payment from another bank." TT3185.

[14] *See, e.g.* (evidence of accounts for Sheikh Yassin, Salah Shehadeh, Ismail Haniyeh, Ismail Abu Shanab and Abbas al-Sayd) PX2080, PX1920, PX1938, PX1939, PX1940, PX1941, PX2145, PX2163, PX2188, PX2199, PX1916, PX1917, PX1924, PX1928, PX1929, PX1930, PX1931, PX1933, PX1934, PX1935, PX2039, PX2074,

million dollars to various Hamas-controlled organizations. Both of Plaintiffs' experts on Hamas financing (Dr. Levitt and Mr. Spitzen) provided detailed testimony, supported by voluminous evidence about various Hamas leaders and organizations over several days.[15] The vast majority of this evidence was not contested and the task of casting doubt on both Plaintiffs' experts and evidence therefore rested on the shoulders of Defendant's sole expert witness on Hamas, Dr. Beverley Milton-Edwards.

A trial transcript can never fully capture how a jury experiences the presentation of trial testimony, nor does it note the jurors' reactions to that testimony. Thus, while the transcript in this case reflects the fact that Dr. Milton-Edwards' testimony was not credible, it does not record the *laughter* her testimony at times provoked from the jury. The core of Dr. Milton-Edwards' testimony was that: (1) unlike Plaintiffs' experts on Hamas, she conducted extensive field work in the Palestinian Territories; (2) the specific entities in question in the Palestinian Territories were not controlled by Hamas between 2000 and 2004; and (3) the entities were not perceived by the Palestinian public to be controlled by or affiliated with Hamas in that time frame.

On direct examination, Dr. Milton-Edwards claimed to have reached her conclusions based on a long list of factors ("I tried to be thorough") that she used to determine whether the organizations at issue were controlled by Hamas. The supposed criteria included "financial records and … the annual accounts of the Zakat committee[s]" (TT2135), "beneficiary files" (TT2136), "beneficiary lists" (TT2154, 2167), "audited accounts of the [Islamic Charitable] society" (TT2155) and "audited annual reports [for the Jenin Zakat Committee]" (TT2168).

---

PX2170, PX2174, PX2185, PX2203, PX2204, PX1912, PX1919, PX1936, PX1937, PX2060, PX2111, PX2146, PX2168, PX2187 PX1990, PX1991, PX1992, PX1993, PX1994, PX1995, PX1996, PX1997, PX1998.

[15] The evidence ranged from U.S. government designations (PX1415 Designation of the Union of Good, PX1293 Al Salah) and foreign government investigative findings (PX1284 and 1356 – German Intelligence Service assessments) to Israeli military court convictions (PX3476 – conviction of Falah Nada) to videotaped statements of Hamas leaders (PX106 Sheikh Bitawi and PX1244 Video of Khaled Mash'al and Sheik Yousef Al-Qaradawi).

1.      **"Islamic Resistance Movement – Hamas" – Four Words Dr. Milton-Edwards Can't Read In Arabic**

On direct examination, Dr. Milton-Edwards claimed to speak Arabic (TT2022; 2171) and to have reviewed the various organizations' literature (TT2164-65)[16] for any signs of Hamas affiliation or radicalism.   On cross-examination, however, Dr. Milton-Edwards was asked whether she could read and translate the words "Islamic Resistance Movement – Hamas" on a billboard that appeared in the promotional video for her book.  She replied "No, I can't. It's in Arabic."  TT2338.  That testimony established both the falsity of Dr. Milton-Edwards' claim that she was bilingual and demonstrated that she could not have performed the supposed vetting of "financial records," "beneficiary files and lists," "audited annual reports" and other "literature" published by the Palestinian organizations in question that was supposedly central to the opinions she expressed.  After all, an expert who cannot even recognize the word "HAMAS" in Arabic would be hard pressed to discern anything concerning that terrorist organization in Arabic-language documents or within the walls of the various charitable organizations that Plaintiffs alleged were affiliated with Hamas in the West Bank and Gaza Strip.

2.      **Dr. Milton-Edwards claimed she could not identify the founder of Hamas's terror apparatus because he had a big beard**

At trial, extensive evidence was presented that Arab Bank maintained an account for Salah Shehadeh, the founder of Hamas's terror apparatus (referred to herein as the "al-Qassam Brigades").   *See, e.g.*, PX1920 and Spitzen Slide 21.   Dr. Milton-Edwards identified a photograph of Shehadeh that appeared on a billboard in the promotional video for her book, yet still testified that he maintained a highly secretive existence and was not known to the

---

[16]      *See, e.g.* "The literature that you would see in the sort of lobby or reception area of the Zakat Committee were just the usual announcements about, you know, religious festivals, prayer times and the activities of the Zakat Committee." TT2164:22-TT2165:1.

Palestinian public.[17]

She was then shown a video of Shehadeh addressing an enormous crowd, but claimed not to be able to clearly identify him.  TT2383 ("**It could be. It could be somebody else. I mean, I'm sorry, but it's the whole big beard phenomenon and lots of people looking like that.**"). Dr. Milton-Edwards refused even to acknowledge that the speaker in the video was addressing a large crowd. TT2385 ("I'm considering that most of the video is just blurred. Blurred crowd scenes, and then we see a partially blurred and then partially clear individual of several seconds long.").

When a still image of Shehadeh from the video was later shown to the jury juxtaposed with a photograph of him that Dr. Milton-Edwards had previously identified, the jury *laughed* at the preposterous and self-evidently false claim that she still could not identify him.

18 19

Dr. Milton-Edwards and the jury were then shown the still image of the "blurred crowd scene."

---

[17]     "[H]e was alleged to be and was believed to be – I think there's consensus on that – the head or one of the heads of the Izz al-Din al-Qassam Brigades. As I already explained in my direct testimony, the Izz al-Din al-Qassam Brigade, their leaders, operatives, their planners and organizers, maintained a highly secret existence. They didn't take on much of a public persona. They wouldn't have been known as public figures by Palestinians, because of their fear of persecution by Israel and by the Palestinian Authority." TT2378:22-2379:6.

[18]     Identified by Dr. Milton-Edwards as Salah Shehadeh.

[19]     Dr. Milton-Edwards claimed she could not confirm that this still image from the video was of Salah Shehadeh.



The colloquy continued:

> Q Do you have any doubt that Mr. Shehada was speaking in front of a very large crowd?
> MR. INGERMAN: Objection.
> THE COURT: Overruled.
> THE WITNESS: It could have been, I don't know where this clip is coming from. I don't know what this clip is about.
> THE COURT: What he's asking you is, in the clip, do you agree that this is a picture of Shehadeh speaking to a large crowd in the clip?
> THE WITNESS: Oh, I see.
> THE COURT: In the clip.
> THE WITNESS: In the clip.
> THE COURT: Yes.
> THE WITNESS: Yes.
> Q And you testified a few minutes ago that Salah Shehadeh was killed by Israel in 2002; correct?
> THE WITNESS: That's correct, yes.
> Q And Mr. Shehada was in prison in Israel until 2000; isn't that correct?
> THE WITNESS: I believe so, yes.
> Q So, considering he spent ten years in prison before that, this event had to take place sometime between 2000 and 2002, after he was out of prison and before he died; is that fair?
> MR. INGERMAN: Objection.
> THE COURT: Sustained.
> Q I'll ask a new question. Do you still maintain that Salah Shehadeh was a secret, shadowy individual who was unknown to the Palestinian public during the relevant time period?
> THE WITNESS: Yes, I still maintain that as a publicly recognized figure across the Palestinian territories, Mr. Shehadeh was maintaining a secret existence. In my own experience he maintained a secret existence. According to those I worked with he maintained a secret existence.

TT2392-94.   Dr. Milton-Edwards' steadfast refusal to concede the obvious destroyed her credibility and left the jury with the straightforward choice of whether to credit her' testimony *or their own eyes.*

15

### 3.      Dr. Milton-Edwards is contradicted by her own book

Moments later, Dr. Milton-Edwards was shown Spitzen Slide 50 (Schlanger Decl.

Exhibit 3), which depicted several individuals that Plaintiffs' expert asserted were the leaders of

the Hamas-controlled Al-Nur Prisoner Society.  The slide included a photograph of Mushir Al-

Masri, and Dr. Milton-Edwards adamantly confirmed her earlier testimony that Al-Masri had no

connection with the Al-Nur Prisoner Society, which Plaintiffs' expert asserted was controlled by

Hamas.  TT2395 ("I was never informed of him having any connection with the Al-Nur Prisoner

Society. When I had met officers at the Al-Nur Prisoner Society during the period in question

and subsequently, Mr. Al-Masri, there was never any – nobody ever told me that he was on that

committee or had been a founder of that committee.")  Dr. Milton-Edwards was then directed to

page 240 of her book, Hamas: The Islamic Resistance Movement, where she states that Al-Masri

was "a Board member of the Gaza based charity Al-Nur."  Dr. Milton-Edwards then conceded,

"I had forgotten that." TT: 2394:20-2397:10.

Dr. Milton-Edwards also testified on direct examination regarding the Islamic Society of

Gaza:

> Q Did you apply your research criteria to determine whether or not Al Jamiya Al
> Islamiya or the Islamic society was controlled or perceived to be controlled by Hamas
> during the 2000-2004 time period?
> A Yes, I did.
> Q And what conclusion did you reach?
> A I reached the conclusion that they weren't controlled by Hamas, nor did the
> Palestinians perceive them as being controlled by Hamas.

TT2222.

On cross-examination, however, she was confronted with an excerpt from page 176 of

her book (Schlanger Decl. Exhibit 4), which states:

> But the work of **the Islamic Society and the rest of Hamas's network in the
> decades up to, during and after the second intifada**, when families needed it

most, represented not so much a donation as an investment by Hamas, one that reached a lucrative political dividend in the 2006 election.

TT2407 (emphasis added).  Once again the jury was left to consider the stark contrast between Dr. Milton-Edwards' testimony on direct examination and the analysis in her book, the latter of which was supported by two of Plaintiffs' experts, various government investigations and videotaped evidence.  *See* PX1275 and 1284 (BND Reports); PX1078 (Israeli Blacklist); and PX1132 (Islamic Society kindergarten video).

### 4.      Dr. Milton-Edwards claims that all Hamas leaders try to keep their identities secret

Dr. Milton-Edwards' difficulties stemmed in part from the Bank's untenable trial strategy of suggesting that all Hamas leaders and operatives were clandestine (and hence unknown to and unrecognized by the Bank.)  In his opening statement, defense counsel asserted:

> What [Hamas] does have, rather than somebody you can identify is operatives, senior operatives, activists, supporters, sympathizers, but **they all try to maintain their identities as secret.** And why do they do that? It's pretty easy to figure out, because they are criminals, if they identify themselves as associated with Hamas, they're either arrested or, in many cases, assassinated. So the whole thing is not you can go somewhere and figure out who is part and parcel of Hamas. What you have to do is go take a look at the OFAC list to figure out who these terrorists are. TT266 (emphasis added).

The assertion that "all" Hamas operatives "try to maintain their identities as secret" and Dr. Milton-Edwards' testimony that "[t]hey didn't have much of a public persona" (TT2378:22-2379:6), further destroyed not just her own credibility, but also the Bank's.  The jury was presented with *overwhelming* evidence that many Hamas leaders were well known and operated openly.  The evidence included:

> a.      Video of Osama Hamdan on CNN in March 2002 (PX3580), as noted above.
> b.      Video of Hamed Bitawi, who was the Chairman of the al-Tadamun Charitable Society and Vice-Chairman of the Nablus Zakat Committee (both Arab Bank customers) addressing a massive rally in Nablus in 2001 in honor of three fallen Hamas leaders. PX1061

c.    Confession of Abbas al-Sayed, mastermind of the Park Hotel suicide bombing, describing himself as a HAMAS spokesman and acknowledging that his responsibilities in HAMAS included "participating in activities related to the Intifada, such as demonstrations on various occasions, delivering speeches at festivals, participating in seminars, lecturing, conducting phone interviews with various satellite channels, and representing Hamas Movement in front of popular and official parties." PX3524

d.    The military court conviction of Jamal Tawil, the Hamas mayor of al-Bireh, notes that he was a member of Hamas since 1997, served as a Hamas spokesman from mid-2001 onward, and had pled guilty to being a member of Hamas.  PX1224.

e.    Video of Hamas leader Khalid Mish'al speaking in a public forum on the Al Jazeera television network about the support Hamas received from the Union of Good, an Arab Bank customer that was later designated an SDGT.  PX1244.

f.    Video of a kindergarten ceremony at the Islamic Society of Gaza, another Arab Bank customer, where a child dressed in a small wheelchair portrays Hamas founder and spiritual leader Sheikh Ahmad Yassin. PX1132.

g.    Video of Arab Bank's Chief Compliance Officer in the Palestinian Territories, Tayseer Sadeq, in which he testified: "Sheikh Ahmed Yassin is known throughout the world through the mass media, that he is the – that he is the head of the Hamas organization in the Palestinian Territories, and this is no secret." Excerpt 9, PX4793.

h.    Still images from the aforementioned video of Salah Shehadeh addressing an enormous crowd.

Thus, the Plaintiffs' evidence abundantly proved that the Bank knew or was deliberately indifferent to the fact that its account holders and customers were agents of Hamas, and that showing was not predicated upon any adverse inference (which instead primarily protected Plaintiffs from the Bank's efforts to exploit the evidentiary gaps that it had created).

## IV.    THE COURT PROPERLY AND FAIRLY APPLIED THE RULE 37(b) REMEDIAL ORDER

Neither a new trial nor § 1292(b) certification is warranted with respect to the Court's implementation of application of its Fed. R. Civ. P. 37(b)(2)(A) order ("the Remedial Order," reported at *Linde v. Arab Bank, PLC*, 269 F.R.D. 186 (E.D.N.Y. 2010)).  The underlying production orders, including their factual findings, were properly entered.[20]  The selected Rule 37(b) remedies were necessary to address the glaring evidentiary imbalances resulting from the

---

[20]    *Linde*, 463 F. Supp. 2d 310.

Bank's withholding of evidence, were within the Court's discretion, and were properly applied at trial.  Defendant's attacks rest primarily upon *dicta* contained in the Office of the Solicitor General ("OSG") *amicus* brief to the U.S. Supreme Court[21] prior to the trial's commencement (a brief that recommended *against* granting the Bank's *certiorari* petition).  These *dicta* have been mooted by the overwhelming evidence introduced at trial supporting the jury's verdict for Plaintiffs. In any event, the OSG's brief made three basic errors (discussed *infra*) in construing the voluminous pretrial record.  The Remedial Order was issued after careful application of *Restatement (Third) of the Foreign Relation Laws of the United States* § 442's standard balancing test, as adapted by the Second Circuit.  Its impact on the jury's verdict is not a pure question of law, but a classic fact-bound inquiry that would not materially advance the lawsuit's resolution.

### A.    The production order is not at issue

The evidence Defendant withheld was indisputably "essential to the proof of the plaintiffs' case," "highly specific," and "[r]easonable alternative means for obtaining the discovery sought from the defendant [were] not available."  *See Linde*, 463 F. Supp. 2d at 315. The Bank sought no interlocutory appeal from the production order and, after the Court entered the Remedial Order, the Bank directed a motion for reconsideration, two mandamus petitions, a collateral order appeal, *and* a *certiorari* petition at the Remedial Order.   In response to Defendant's first mandamus petition/collateral order appeal, the Second Circuit reaffirmed that:

> Records concerning accounts held at the Bank and documents related to the Saudi Committee are directly relevant to whether Arab Bank knowingly provided banking services in support of terrorist operations and are thus essential to plaintiffs' case. Arab Bank has unique access to the records and only Arab Bank can make a complete production.

*Linde v. Arab Bank, PLC*, 706 F.3d 92, 115 (2d Cir. 2013) *cert. denied,* 134 S. Ct. 2869 (2014).

---

[21]    Cited herein as the "OSG Br."

**B.     Remedies were indisputably necessary, and the Court applied the correct legal standard in issuing them**

Even now, the Bank does not truly challenge the production order itself, but instead argues that it should have been excused from any adverse *consequences* for defying it.  But when it fashioned the Remedial Order, the Court indisputably applied the correct test set forth in *Restatement* § 442, and *Société Nationale Industrielle Aérospatiale v. United States District Court*, 482 U.S. 522, 544 n.28 (1987), and *also* considered all of that test's relevant factors, *including* hardship and good faith under *Minpeco S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y.1987).  The Second Circuit agreed, *see Linde*, 706 F.3d at 110-14, and recognized that Rule 37(b) permits even *harsher* sanctions than any the Order embodied.  *Id.* at 116.[22]  Hence, the Court applied the appropriate legal standard, considered all relevant factors, *including* foreign bank secrecy interests and U.S. interests, and carefully fashioned a Remedial Order in the middle range of available relief.

The Second Circuit never suggested granting *no remedy* under these circumstances.  The Supreme Court, and the OSG in this case (OSG Br. at 11), both recognized the propriety of sanctions even for *good faith* non-production because of the requirements of foreign law.[23]  Considering the fact that, though not even necessary for the selected remedies,[24] this Court and the Second Circuit *each* rejected the Bank's claims of good faith,[25] remedies that attempted to

---

[22]     Such remedies include deeming orders requested here by Plaintiffs, initially ordered (and then converted to an adverse inference instruction) by the Magistrate Judge, and finally (over Plaintiffs' objection) rejected by Judge Gershon in favor of the adverse inference instructions that were given here.

[23]     *Société Internationalle Pour Participations Industrielles Et Commerciales. S.A. v. Rogers*, 357 U.S. 197 (1958) (foreign defendant had produced 190,000 documents and was expressly found to have acted in good faith).

[24]     *See Rogers*, 357 U.S. at 213 (even when a party's non-production is based in complete good faith on the prohibitions of foreign bank secrecy law, "the District Court would be justified in drawing inferences unfavorable to petitioner as to particular events."); *Linde*, 269 F.R.D. at 197 (court need not make findings of bad faith or willful conduct to issue deemed adverse factual findings as Rule 37(b) remedy).

[25]     *See Linde v. Arab Bank, Plc*, 2009 WL 8691096, at *5 (E.D.N.Y. June 1, 2009); *Linde*, 269 F.R.D. at 199;

redress the severe evidentiary imbalance created by the Bank's non-production were essential. There can be no genuine dispute that the Remedial Order was curative, not punitive.[26]   The Bank has *never* cited any case, nor are Plaintiffs aware of any, where a court refused to issue a remedial order on similar facts.[27]

Nevertheless, the Bank has never proposed any order other than one precluding it from offering the documents it withholds – a "remedy" or "sanction" that simply cements the status quo of non-production.[28]  In fact, even the Bank's false  "remedy" of being precluded from using the documents it withheld would be meaningless inasmuch as the Bank *still* insists on its right to proffer testimony to the jury about what the withheld documents would have shown (*e.g.*, "We closed the designated terrorists' accounts"), despite withholding documents and testimony that would reveal the accountholder's identities; demonstrate when the accounts were closed; delineate the accounts' balances; and illuminate whether the Bank knowingly paid those account

*Linde*, 706 F.2d at 113.

[26]      *See Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979) (Rule 37(b) remedies should be crafted as means of ensuring  "… that a party will not be able to profit from its own failure to comply"); *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (Rule 37(b)'s remedial function aimed at "insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the [withholding of evidence]); *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir. 2002) (court should implement a remedy that will "'restor[e] the evidentiary balance'") (internal citation omitted).

[27]      *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542 (E.D.N.Y. 2012), offered by the Bank, held only that "any adverse inference based on a party's failure to produce documents (or spoliation) does not alone satisfy a party's burden to produce facts necessary *to defeat a motion for summary judgment*."  *Id.*, 893 F. Supp. 2d at 553.  *Gill* did not repudiate *Kronisch*'s directive to district courts "to attempt to place the innocent party in the same position he would have been in had the evidence not been destroyed by the offending party." *Kronisch*, 150 F.3d at 127-28. Moreover, as noted *infra*, Judge Weinstein's analysis was expressly limited to *Gill*'s facts, which involved a shooting that occurred in 2008, and he recognized a different result might be warranted in this case.  *See id.* at 562 *See also id.* at 551 (concurring with holding in *Wultz v. Bank of China*, 910 F. Supp. 2d 948, 959 (S.D.N.Y. 2012) (Scheindlin, J.) that "[t]he interest of the United States in depriving international terrorist organizations of funding that could be used to kill American citizens strongly outweighs the interest of a foreign nation in bank secrecy laws and the abstract or general assertion of sovereignty.").

[28]      As Judge Gershon explained when she denied the Bank's motion for reconsideration of the Rule 37 remedies, "[t]he Bank, in its submissions to this court on sanctions … did not suggest that comity would be affected differently by one sanction rather than another. *And it seems clear that the Bank is simply attempting to avoid meaningful sanctions altogether, despite this court's decision to give greater weight to the United States' interest in preventing the financing of terrorism than to other jurisdictions' enforcement of their bank secrecy laws*."  *Linde*, 269 F.R.D. at 208 (emphasis added).

21

balances to persons or entities it knew to be terrorists.  This Court unambiguously recognized that the Remedy Order was designed to address *precisely* this scenario.  *See* Jul. 30, 2013 Conf. Tr. at 22:18-28:5.  Thus, contrary to the Bank's baseless insistence on a new trial "in which the sanctions play[] *no* or a lesser part," § 1292(b) Mem. at 5 (emphasis added), the Remedy Order was irrefutably necessary under Rule 37(b).

### C.    The Solicitor General's erroneous *dicta* do not warrant post-trial relief

Failing to establish that the Remedial Order's *actual* application deprived it of "a fair opportunity to defend itself," the Bank retreats to the OSG's brief's *dicta* criticizing the Order. NT Mem. at 7-8.  The OSG agreed that the lower courts applied the appropriate legal standard in deciding whether to issue and how to frame the Remedial Order, agreed that the lower courts "were required to, *and did*, consider whether its orders were consistent with international comity," never argued that, under the standard, any foreign interest was *by itself* dispositive, and did not state that any of the selected remedies were improper.  OSG Br. at 9-10 (emphasis added).  The OSG's concern was instead whether the lower courts granted sufficient weight to foreign and U.S. interests in considering *what* remedy to implement (which the OSG failed to describe).  *Id.* at 9.  But the OSG's *dicta* reflected basic, material <u>factual</u> errors on its part in assessing the pretrial record.

*First*, the OSG said that the Bank withheld records from ten accounts "*allegedly* maintained by petitioner for certain terrorist organizations," quoting the Bank's characterization of the record.  OSG Br. at 4 (emphasis added).  But the Bank *admitted* that these account holders were persons or entities that the United States government had designated.[29]  The difference is

---

[29]    *See Linde*, 269 F.R.D. at 197-98 ("The Beirut Account is only one of eleven accounts that defendant **admits** it maintained for FTOs, SDGTs, or SDTs."); *id*. at 198-99 ("The record establishes that defendant has withheld materials falling into the following categories: (1) account records for ten of eleven accounts **defendant admits it maintained** for FTOs, Specially Designated Global Terrorists ("SDGTs"), or Specially Designated Terrorists.")

more than semantic.  It means that the privacy interests the Bank, the UAB, and the Jordanian Government so assiduously protect belong to U.S.-designated *terrorists.*

*Second,* the OSG erroneously stated that the lower courts rejected the Bank's claims of good faith "simply because petitioner previously produced some of the documents to the Departments of Treasury and Justice."  OSG Br. at 12.  The Bank invited that error and now repeats it in its brief.  NT Mem. at 1, 8.  However, Judge Gershon explained the Bank's lack of good faith differently:

> [D]efendant claims credit for its production of Arab Bank New York documents. Defendant forgets that *it produced documents touching its New York branch only after I ordered it to do so*, noting that defendant's actions thus far had not inspired "confidence that reliance on other [production] requests [would] be effective," given that the Bank had "failed to produce New York documentation ... admittedly called for by plaintiffs' requests." Dec. 13, 2006 Order. The Bank had refused to produce *despite its earlier production of many of the very same documents to the OCC, FinCen, and the DOJ.*

269 F.R.D. at 199-200 (emphasis added).  The Court rejected the Bank's claim of good faith not "simply because [the Bank] previously produced some of the documents to the Departments of Treasury and Justice," but in substantial part because the Court had to *order* the "obfuscating" and delaying Bank to produce those same records that were "admittedly called for by plaintiffs' requests," and were in the United States and therefore not subject even to bank secrecy objections.[30]

Judge Gershon thus correctly observed that "Defendant gets little credit for its grudging production of the ABNY documents, which were produced only after this court rejected the Bank's attempt to obfuscate the production obligations of its local branch, or for its production of

---

(Emphasis added.)

[30]    In a December 16, 2006 Order (*Linde* ECF No. 272) Judge Gershon admonished the Bank that "… a party requesting documents should not be required to police its adversary's responses to its requests," and that "it is simply not acceptable *at this late date* for Arab Bank to withhold the documents showing the funds transfers through New York which plaintiffs seek to make their case." *Id.*, *slip op.* at *5, 6 (emphasis added).

records for HAMAS-affiliated charities, which were already physically located in the United States, and regarding which the Bank's witnesses have refused to answer substantive deposition questions." 269 F.R.D. at 199.  In sum, both Judge Gershon and the Second Circuit rejected the Bank's claims that it acted in complete good faith, and Judge Gershon did not rest her finding "simply" on the Bank's prior disclosures to the U.S. government, contrary to the OSG's mistake.[31]

*Third*, the OSG worried that the Remedial Order penalized the Bank for disclosing documents to the U.S. government and thus might deter "cooperation by both foreign sovereigns and private entities *under their auspices*" pursuant to "exceptions in the laws, applicable treaty provisions, or approval by foreign governmental authorities."  OSG at 13-14, 19 (emphasis added).[32]  But the OSG's brief erred in representing that Defendant's prior disclosures to the U.S. government followed its foreign regulators' approval under exceptions to their bank secrecy laws.[33]  Unmentioned in the OSG's brief is the fact that the Magistrate Judge entered an order making a presumptive *factual finding* under Fed. R. Evid. 104 "that Defendant has previously produced documents relevant to this case in the United States *without obtaining the prior formal*

---

[31]    These instances of Defendant's discovery misconduct – unmentioned in the OSG's brief – contributed to the "years of delay" that the Court also properly noted and the Circuit confirmed, (*Linde*, 706 F.3d at 113), and neither was the result of the Bank's disclosures to the U.S. government. This Court thus properly considered the Bank's "purposeful sluggishness" in eventually shaping its Remedial Order.  *See Residential Funding*, 306 F.3d at 110 (asserting that, in fashioning a remedial order, the District Court erred by failing to consider the non-producing party's "purposeful sluggishness").

[32]    The OSG criticized the lower courts for allegedly "*equating the status of government and private-party document requests*."  OSG Br. at 15.  In fact, Judge Gershon expressly noted that "prior disclosures ... made to governmental authorities" are different because "they are thought to embody a 'strong' national interest, especially in the context of criminal prosecutions."  *Linde*, 269 F.R.D. at 199.  The Second Circuit also observed that "foreign states may face different considerations when deciding whether to prosecute banks for disclosing sensitive materials to foreign governments than when deciding whether to prosecute banks for the disclosure of such materials to private civil litigants."  *Linde*, 706 F.3d at 114.

[33]    The Lebanese bank secrecy laws that the Bank argued to the lower courts contain *no exceptions.  See* Defendant's Apr. 3, 2006 memorandum of law opposing a production order (*Linde* ECF No. 170) (citing (at p.16) its Fed. R. Civ. P. 44.1 expert's representation that under Lebanon's "clear and unambiguous" bank secrecy law, its employees "…are bound to *absolute secrecy* in favor of the bank's clients and may not disclose to *anyone whatsoever*….").

*consent* of the applicable governmental authorities in Jordan, Lebanon, or the PA providing Defendant with immunity from criminal prosecution for violations of any applicable banking secrecy laws prior to Defendant's production of these documents in the United States." *See* Schlanger Decl. Exhibit 5, at *2 (emphasis added). This Order invited Defendant to "*rebut this finding with competent evidence*" (*id.*), but the Bank spurned that invitation, and the finding remains standing to date.

*Only* when Defendant filed its Reply Brief *in 2013* in support of its *certiorari* petition (when it was too late for Plaintiffs to respond) did the Bank first claim that it had "previously provided records to U.S. officials with permission" and "the consent of its regulators (as plaintiffs well know)." Reply Br. for Pet. at 2, No. 12-1485. The OSG apparently credited Defendant's misrepresentation in assuming that the disclosures at issue before the Court were made "with consent of petitioner's regulators." OSG Br. at 15. Yet the Bank's counsel had, on July 20, 2006, represented to the Court that "quite frankly… those regulatory authorities don't know about the disclosures to date in Texas [to the grand jury]." Jul. 20, 2006 Conf. Tr. at 120:6-7, Schlanger Decl. Exhibit 6. In short, the OSG's concern that the Remedial Order punished foreign cooperation with the U.S. government turned on invalid hypotheticals at odds with the actual record. Such errors would have deprived the OSG's *dicta*'s criticisms of any force had the trial not mooted them.

    **D.**    **The court did not commit clear error in implementing a permissive adverse inference instruction and that remedy did not deprive Defendant of a fair defense**

        **1.**    **The Court's permissive adverse inference instruction reflects no clear error.**

Before the trial, the Bank (having advised the Court that it did not oppose providing the

instruction before it commenced its direct case[34]) *specifically requested* that the jury be instructed:

> The mere existence of an inference against the defendant does not relieve the plaintiffs of the burden of establishing their case by a preponderance of the evidence. If the plaintiffs are to obtain a verdict, *you must still find from the credible evidence that they have sustained the burden cast upon them.*[35]

Toward the close the Plaintiffs' direct case, the Court then gave this instruction:

> Nevertheless, the defendant in this case refused to provide certain documents that the plaintiffs requested and refused to permit their witnesses to answer certain questions during depositions. Accordingly, based on this refusal, *if you find the plaintiffs have come forward with credible evidence to support the following statements*, you may, but are not required to infer ….

TT1726:16-23 (emphasis added). The Court also expressly cautioned the jury "[a]gain, ladies and gentlemen, that's permissive for you to infer, *you are not required to infer that*. You have to consider the case *based on all of the evidence that's presented to you* when it comes time to deliberate." TT1727:5-8 (emphasis added). Later, in the jury charge, and using the *very* instruction Defendant requested, the Court further instructed:

> Now, the mere existence of an inference against the defendant, does not by itself relief the plaintiffs of the burden of establishing their case by a preponderance of the evidence. If the plaintiffs are to obtain a verdict, *you must still find from the credible evidence that they have sustained the burden cast upon them.*

TT3330:25-3331:3 (emphasis supplied).[36]

---

[34]    *See* Sept. 3, 2014 Letter from Shand S. Stevens to Hon. Brian M. Cogan, at 1 (*Linde* ECF No. 1124).

[35]    *Id.* at 3. Although Plaintiffs unsuccessfully requested that the Court say "some credible evidence," mirroring *Kronisch*, they otherwise agreed to this phrasing because the inference reflected what the missing withheld evidence would have demonstrated, rather than the withholding act itself. *See* TT1724:1-5.

[36]    The Court prefaced this instruction by cautioning that for *any* inference, "[a]n inference is not a suspicion or guess. It is a reasoned, logical decision to conclude that a fact exists on the basis of another fact that you know exists." TT3329:14-16. The Court further explained "[t]he process of drawing inferences from facts in evidence is not a matter of guesswork or speculation. An inference is a deduction or conclusion that you, the jury, are permitted, but not required to draw, from the facts that have been established by direct or circumstantial evidence." TT3329:23-3330:2.

Thus, the inference instructions, as a whole, powerfully guarded against the risk of "verdict by sanction." They ensured that the jury would not rely *solely* (if at all) on any adverse inferences, but would *also* consider whether Plaintiffs proffered credible evidence to support the inferences and whether the evidence in the whole record met the Plaintiffs' burden of proof.[37] No more was required.

### 2. The Court did not commit clear error in excluding evidence on Rule 37(b) preclusion grounds.

According to Defendant the Remedial Order precluded it: "from introducing *any* evidence or testimony to establish its innocent state of mind in providing any of the financial services at issue, other than those pertaining to one Lebanese account"; from demonstrating its efforts to counter terror financing at its foreign branches; from proving that it was better at such efforts than its peers; or from responding "…to plaintiffs' use of the Bank's interrogatory response that it held 11 accounts for designated parties worldwide (in particular admitting into evidence Defendant's interrogatory response representing to have "closed those 11 accounts pursuant to the designations)." *See* NT Mem. at 9. Apart from the fact that certain of these categories were inadmissible because they were not relevant under Fed. R. Evid. 401, the Bank's complaints actually highlight the acute need for a preclusion remedy. Telling the jury that "we closed these accounts" makes a claim that would find "proof or refutation" (*Linde,* 269 F.R.D. at 205) within the withheld account records of admitted terrorists. Such testimony would have

---

[37]    The Bank in passing argues, however, that Plaintiffs' closing arguments improperly invited the jury to rest any adverse inferences it might draw on the Bank's misconduct in withholding evidence, and not just on extrapolations from Plaintiffs' credible evidence and the record as a whole. NT Mem. at 9 n.5. That is not the case. Plaintiffs' counsel permissibly directed the jury's attention to the *types* of information the withheld evidence would contain. *See* TT3253:11-6 ("These are the kinds of things they didn't want you to see. They didn't want you to know first-hand the four names for each of those individuals. They didn't want you to know what their addresses were. They didn't want you to know the phone numbers. They didn't want you to see the passport, the identification of these people.").

served as a proxy for the records themselves, giving the Bank an enormous and unfair tactical advantage.[38]

The Bank's attack on this part of the Remedial Order fails for two reasons. *First*, the preclusion did *not* prevent the Bank from asserting any defense or even from offering "evidence to establish its innocent state of mind," so long as that evidence could be fairly tested by discovery it had provided. The Bank was therefore able to: mount its "OFAC-only"[39] defense; provide testimony concerning transactions in New York; offer testimony of practices and customs there and abroad; and offer as evidence the Hamdan account and the spreadsheet of martyrs' payments the Bank had produced. Its defenses failed not as a result of the partial preclusion, but because the jury rightly rejected the absurd proposition that absent inclusion on a blacklist, the Bank had no idea who Sheikh Yassin or Osama Hamdan were. *Second*, the Bank precluded *itself* by reneging on its prior promises to the jury, instead strategically choosing not to call to the stand its employees with the most direct knowledge of documents it had produced and could testify about.

### a. The Court Permitted the Bank To Present a Full Defense, Often Despite Plaintiffs' Objections.

Often over Plaintiffs' objections, Defendant presented significant evidence (including much counter-designated deposition testimony during Plaintiffs' direct case) that the jury *could* have credited had it so desired. Thus, based on rationales set forth in prior Court orders,[40] the Bank was permitted to present evidence concerning banking practices and international standard setters through both expert and fact witnesses, including (despite Plaintiffs' further objection) its

---

[38]     Nevertheless, although the Court thereafter struck the answer, the Bank's witness *did* manage to tell the jury that the Bank closed the accounts. *See* TT2770:5-13.

[39]     "OFAC only" is shorthand for the argument that banks can, do and are justified in solely relying on government blacklists to determine the identity of terrorists.

[40]     *See* May 28, 2013 Order (*Linde* ECF No. 954) at 6-7.

"banking standards" expert Anne Vitale.[41]   Defendant also (again over Plaintiffs' overruled objections) introduced evidence of these standards and generally described its alleged Middle East compliance program.   *See* Aug. 26, 2014 Order (*Linde* ECF No. 1103) at 1-2. Consequently, Ms. Vitale testified at trial (*without* the Court reiterating its limiting instruction that evidence of compliance activities could only be considered in respect to Osama Hamdan's account) that:

- Wire transfers can be processed by a recipient bank even without the beneficiary's name or with a mismatching name.  TT2987:24 – 2988:21.

- A three or four-bank correspondent banking relationship for a wire transfer is "very common" and, in that instance, each bank checks the transfer against its blacklist. TT2988:22 – 2990:14.

- It is "consistent with international banking standards" for banks to process wire transfers to a beneficiary, even if the beneficiary does not have an account at the recipient bank, so long as the beneficiary presents identification.  TT2991:7 – 2993:9.

- From 2000-2004, banks applied OFAC lists electronically, but it was not "a common industry practice or industry standard" for foreign banks outside of the U.S. to apply the OFAC list to their transactions.  Instead, banks applied the blacklist of the country in which they were located.  TT2995:7-19.

- False positives were common with OFAC filters from 2000-2004.  TT2995:22 – 2996:19.

- From 2000-2004, there was no international banking standard, and thus no violation of such standards, obligating banks to look backwards after a designation to see if the bank had done transactions for a designated entity or person.  TT2997:21 – 2998:10.

- From 2000-2004, there also was no international banking standard requiring banks to do their own research about transacting parties or do anything more than screen against blacklists.  TT3011:20 – 3012:3.  Ms. Vitale, in fact, even explained to the jury DX645, a Wolfsberg Group Statement stating that the most effective means by which to identify terrorist funds within a financial institution is

---

[41]      *See* May 28, 2013 Order at 6; Sept. 16, 2014 Order (*Linde* ECF No. 1156) at 3-4.

for "governments to identify those connected to terrorist activities and provide that information to financial institutions in a timely manner." TT3012:17 – 3014:8.

- Clearing transactions from Jordan to the Palestinian Territories through the U.S. was not unusual, and in fact such transfers were "very routine" banking and would be checked by blacklists in each country. TT3000:24 – 3001:16.

Similarly, the Bank's Senior Vice President and Director of Compliance, Mohammed Dabbour, testified that he was familiar with international banking standards, and over Plaintiffs' objection, told the jury these standards were important to the Bank and "key pillars for the regulatory compliance." TT2729:12-20.[42]   Despite the fact that the Court generally instructed the jury that Bank witness testimony concerning compliance procedures was only relevant to assessing the Bank's conduct with respect to Osama Hamdan's account, as a practical matter, Mr. Dabbour's testimony permitted the Bank to articulate its alleged (but unverifiable) conduct and practices *globally*.  For example:

- Dabbour testified about PX1, an April 20, 2000 Bank circular addressing money laundering and terror financing, and incorporating international standards such as Basil and FATF.  TT2744:17 – 2748:19.  In fact, notwithstanding the limiting instruction, he nevertheless testified about policies concerning terror financing and their applicability "*across the board*" in all Arab countries.  2750:2 – 2751:16 (emphasis added).

- Dabbour testified about the role of the 150-200 money laundering reporting officers the Bank had *globally* in preventing terror financing. TT2763:19 – 2766:16.

---

[42]     Dabbour thus proceeded to describe the Basel Committee as the primary standard setter for banking regulation (TT2729:21–2731:6), and after a sidebar, was allowed (*again* over Plaintiffs' objection) to also describe FATF and its 40 recommendations, plus eight, designed to combat terror financing.  He testified that these practices were "the main source for building policy and procedures" and were incorporated "into Arab Bank policies, procedures, processes and practices."  TT2736:3 – 2737:18.  Later, the Court reversed a prior ruling in favor of Plaintiffs, and permitted Mr. Dabbour to testify about "home and host" standards and the regulatory bodies that govern each Arab Bank branch, allowing him to explain that this was consistent with the international standard other global banks use, and to describe his "very frequent" interaction with the Bank's money laundering reporting officers around the world in his role as regulatory compliance manager.  TT2741:3 – 2742:25.

- Dabbour testified that, with respect to documents indicating transfers made to Sheikh Yassin and Ismail Haniyeh, the transactions all passed through Defendant's OFAC filter, even though the Bank refused to produce these Hamas leaders' account records or any internal Bank communications concerning their accounts. TT2803:21 – 2806:18.[43] This testimony, of course, was foundational to Defendant's "OFAC-only" defense.

Furthermore, in its deposition counter-designations to Plaintiffs' excerpts of Gaza branch manager Ghalib Hantoly's testimony, the Bank inserted testimony claiming that the Bank checked wire transfers against its OFAC system, and that, "[i]f there had been any reason to block it because the name is listed in OFAC's lists, then the wire transfer would not have been sent through, and the relevant procedure would have been taken against it."  See PX4793, Excerpt 9; Hantoly Depo Tr. at 169:8 – 170:11.  Defendant also counter-designated analogous testimony for Mr. Dabbour. *See* PX4793, Excerpt 9; Dabbour Dep. Tr. at 247:24 – 248:12 (with regard to transfer to Hamas leader Ismail Haniyeh, "the OFAC check indicates there was no match.  So this person was not listed, or the system did not catch the name, because it -- it did not match.  It was not the same name.").  Plaintiffs' objections to both of these counter-designations were overruled.

Defendant was also permitted to present evidence that its employees' personal experiences with terrorism refuted the Plaintiffs' claim that the Bank knowingly provided financial services for terrorism.[44]  Furthermore, over Plaintiffs' objections, and with no limiting instruction, the Court permitted its expert witness, Dr. Milton-Edwards, to testify that non-

---

[43]    Other Bank witnesses, such as Shukry Bishara, testified at length over Plaintiffs' objections about the Bank's anti-money-laundering and terror financing policies.  Though a limiting instruction to the Hamdan account was issued, the jury nevertheless *heard* Mr. Bishara testify that the Bank's AML policy "emphasizes the importance of applying these instructions *across the institution*." TT2449:20 – 2463:10 (emphasis added).

[44]    *See, e.g.*, TT2059:6 – 2062:9 (Sabih Al-Masri); 2444:16 – 2445:24, 2448:25 – 2449:19 (Shukry Bishara); 2549:21 – 2553:14, 2554:12 – 2555:4 (Jamal Hurani).  Defendant's Chairman Sabih Al-Masri was also permitted to testify about the assassination of his brother by a terrorist, and the suicide bombing of his living compound in Saudi Arabia.  TT2062:10 – 2063:25.  Bishara was permitted to testify, over Plaintiffs' objection at sidebar, about the Sbarro Pizzeria bombing's close proximity to his children's school and the impact it had on his family.  TT2446:3 – 2448:2.

governmental organizations such as USAID and ANERA worked with various Arab Bank account holders, and that the Palestinian public (and thus, by extension, Defendant) perceived these Bank customers to be legitimate.[45] In sum, the Court conservatively applied the Remedial Order, and generously allowed Defendant to present a great deal of evidence supporting its "OFAC-only" and "routine banking practice" defenses.

### b. The Bank' tactical decision not to offer key witnesses served as a form of self-imposed preclusion.

The Bank made a tactical decision unforced by the Remedial Order to not call its own witnesses after telling the jury that they possessed direct knowledge of the Hamadan account records and the martyrs' payment spreadsheet Defendant *had* produced. Specifically, in Opening, Plaintiffs' counsel informed the jury they would receive deposition testimony of high-ranking employees, Mohammed Al-Tahan, Tayseer Sadeq, and Assad Saleh concerning certain key documents. TT246:17 – 248:8. Because some of the documents with which Plaintiffs had questioned the witnesses had been produced by the Bank, Defendant was not precluded from

---

[45] Perhaps to provoke a mistrial, Defendant repeatedly placed evidence before the jury that it doubtlessly knew was barred under the Remedy Order. For example, Defendant's Chairman and CEO, Sabih al-Masri, testified that Defendant's Board of Director's audit committee would "check the, the branches, the adherence to the, if they adhere to the requirements, the audits people, any misbehavior and wrongdoing" (TT2042:11-13), testimony that clearly had to be precluded given the withholding. Similarly, during testimony of Arab Bank's regional manager in Palestine, Mazen Abu Hamdan, defense counsel asked "[a]fter you joined Arab Bank in 2002, did there come a time where you became involved in a Saudi Committee program to provide unemployment benefits to families in Palestine?" (TT2836:23-25) which again resulted in a sustained objection (TT2837:1-2840:14) because the Bank had not produced all records that would permit testing of whether unemployment benefits were, in fact, paid. Defendant also tried to introduce evidence suggesting that it screened Needy Family Payments against an internal blacklist, and the Court correctly recognized (and sustained Plaintiffs' objection) that permitting the exhibit's introduction would have resulted in giving the jury the misleading impression that the Bank screened against blacklists uniformly. TT2843:11-2847:1.

The Bank's counsel paralleled these tactics in its arguments. In his opening statement, Defendant's counsel told the jury that when the U.S. designated the Al-Salah Society an SDGT in 2007, the Bank was no longer conducting transactions for that entity (TT279:21-280:1), a transparent proxy for Defendant's precluded interrogatory response. After the Court sustained an objection and struck the comment, defense counsel then told the jury "*[t]here is not any evidence, by the way, that you will see in this case that not a single penny that went through these charities was spent on terrorism*" (TT280:8-10). These blatant violations of the preclusion order elicited a blunt warning from the Court: "Mr. Stephens, the matter I struck *you just ran roughshod over the preclusion order* and you can't do that. You are hereby warned not do that again, all right?" TT298:3-5 (emphasis added).

offering testimony about these records.  Defendant's counsel therefore expressly promised the jury that the three officers, and other Bank employees, would testify in person.  Counsel even showed the jury a chart containing pictures of each witness (TT260:14 – 262:7; *see* Schlanger Decl. Exhibit 7), saying:

> This is Mohammed Al-Tahan, he was mentioned in the opening statement. He was an operations officer at the bank, and *he will testify live, and you can decide for yourself whether he actually read the letters, or the letter*, that was pointed out in the opening statement just a few minutes ago.

TT260:24 – 261:4.

Plaintiffs provided the jury the three officers' designated videotaped deposition testimony where they were questioned about specific documents.  For example, Mr. Al-Tahan, an Operations Manager for the Bank, was shown an April 11, 2001, letter he received from Arab National Bank, which attached charts (among the few items coming directly from the Bank's files) showing payment beneficiaries whose cause of death was listed as "*amaliya istishadiya*" or "martyrdom operation."  Excerpt 7; Tahan 80:15 – 82:6; PX 327.  Mr. Al-Tahan, however, testified at his deposition that he did not review the charts, did not send them to the Bank's compliance department, and instead passed them on to Mr. Saleh by handwriting a notation to Mr. Saleh to contact him.  *Id.* at 82:7 – 83:19; 88:1-8.[46]  In other designated deposition testimony Mr. Saleh, who handled wire transfers in the Palestinian Territories, denied any knowledge of the charts or any obligation to do anything other than automatically process Saudi Committee transfers, passing the buck back to Mr. Sadeq because Sadeq was in charge of compliance.  Excerpt 7; Saleh 65:7-14; 76:22 – 77:20; 93:3-15; 93:24 – 94:17.  Saleh similarly avoided giving direct answers to questions about letter requests that the Bank received and directed to him

---

[46]        At his deposition, Mr. Al-Tahan was shown an additional letter addressed to him from Arab National Bank with a martyr chart attached identifying certain martyrs' cause of death as "*amaliya istishadiya*."  Mr. Al-Tahan claimed he had not seen that letter either.  Al-Tahan Dep. Tr. 97:24 – 98:25; PX 306.

concerning Saudi Committee beneficiaries from the Al Salah Islamic Association and the Al-Islah Society, two of the Hamas organizations that worked with the Saudi Committee.  Excerpt 8; Saleh 236:5 – 242:20; PX 362.  The witnesses' denials constituted strong circumstantial, if not direct, evidence of the Bank's knowledge that it was providing death benefits for suicide bombings.

But even though these witnesses *were present in the courtroom,* the Bank never called them to the stand.  This inevitably, and fairly, elicited comment in Plaintiffs' closing argument:

> Mr. Stephens promised to us in opening, that he was going to bring Mohammed Tahan here to testify. He was right halfway. He brought him. He is over there. But he is sitting in the wrong chair. That is the chair where you explain what you saw, and what you did, not that chair.

TT3305:19-23.[47]

Hence, the Bank's own deliberate tactical choices, not the Remedial Order, "precluded" these witnesses' live trial testimony.

### E.    The court's application of the remedial order does not warrant certification of any issue to the court of appeals.

The Bank's self-preclusion is but one example of why the Court's application of the Remedial Order does not present "a 'pure' question of law that the reviewing court 'could decide quickly and cleanly without having to study the record,'" as required for § 1292(b) certification. *In re Facebook*, 986 F. Supp. 2d at 536 (citation omitted; collecting cases); *Morris v. Flaig*, 511 F. Supp. 2d 282, 315 (E.D.N.Y. 2007) (issue certified for interlocutory appeal must be a pure question of law, not a mixed question of law and fact). The Court's calibrated application of the preclusion remedy cannot be realistically disentangled from the effect of the affirmative evidence

---

[47]    *See also* TT3306:10-13 ("It would have been nice for you to hear [Assad Saleh] here so he could explain what he meant, what he did. They brought him here. He is over there. But he is not in the right chair.  Can't ask him any questions back there.").

the Bank did offer (together with its self-preclusion and independent bases to exclude evidence) "without having to study the record" in detail.

Thus, the Second Circuit would be saddled at an interlocutory phase with: (1) assessing the volume and quality of affirmative independent evidence presented by Plaintiffs; (2) evaluating whether discrete pieces of evidence were properly excluded, as well as precluded, in the exercise of the Court's broad discretion on basic Rule 401 and 403 grounds, and the degree to which any specific exclusion or preclusion was erroneous and whether it amounted to material as opposed to harmless error; and (3) reviewing the voluminous trial record to determine whether the credible evidence presented in fact supported the inferences.[48]

Not only does the application of the Remedial Order thus unmistakably present mixed questions of fact and law unsuitable for § 1292(b) certification, but its immediate review would not materially advance the lawsuit either.[49]   The question, after all, is *not* whether the Court lacked the authority to enter its Remedial Order; *no* court has so held.   It is instead whether, despite overwhelming evidence to support the jury verdict, the Bank's affirmative evidence, *and* its self-preclusion, the Remedial Order so impacted the outcome as to exceed the Court's discretion.   But even if the Second Circuit accepted the certified question and remanded the Order for modification, *this* Court will then *still* have to apply any modified Remedial Order, prolonging an already decade-long litigation rather than advancing it.

---

[48]      That is, whether the withheld evidence was likely of a similar nature to the evidence Plaintiffs presented (for example, whether account records from the ten admitted SDGT accounts for which the Bank withheld all records would contain evidence similar to the eleventh (Hamdan) account records showing "Hamas" as the beneficial customer next to the Bank officer's initials and showing a payout to SDGT Hamdan *after* the Bank admits knowing that he was an SDGT).  *See Kronisch*, 150 F.3d at 127.

[49]      *See In re City of New York*, 607 F.3d 923, 933 (2d Cir. 2010):

> [T]he discovery order at issue here would not have qualified for § 1292(b) certification because prompt appellate review of this order would not speed the District Court's consideration of the merits of the parties' claims or defenses—*for no matter how the discovery dispute is resolved, the District Court must then proceed to resolve the merits of plaintiffs' claims, whether by trial or by dispositive motion.*

## V.     THE COURT APPLIED THE CORRECT CAUSATION STANDARDS

Arab Bank once again argues that 18 U.S.C §2333(a)'s causation element requires a plaintiff to prove that it provided funds to "the bombers or gunmen responsible for perpetrating these attacks…." JML Mem. at 5.  But even that may not be enough for the Bank.  It asserts, for example, that Plaintiffs' proof of direct payments from the Bank to Abbas al-Sayed, mastermind of the Park Hotel bombing, was insufficient because al-Sayed said he withdrew money from his Arab Bank account eight months before the attack, purchased guns instead of bombs, and could have drawn money from accounts with other banks.  *Id.* at 9 & n. 15.  By this theory, nothing short of finding freshly marked bills from the Bank on the suicide bomber would meet the standard.

As noted above, this Court has already rejected the Bank's strict but-for causation test on numerous occasions.  *See* note 6, *supra*.  Those rulings are entirely consistent with the existing precedent concerning §2333(a)'s causation standard.  Indeed, no court has ever ruled that the strict but-for causality Arab Bank advocates is required under the ATA.  *See Stansell v. BGP, Inc.*, 2011 WL 1296881, at *9 n. 5 (M.D. Fla. March 31, 2011) ("[T]he Court is unaware of … any ATA case in which such strict causation is required.  In fact, many courts considering the ATA have definitively held that but for causation is not required.").  Moreover, at least one other federal court has rejected the argument that supposed uncertainty regarding the causation standard applicable under §2333(a) could justify a §1292(b) certification.[50]

---

[50]     In *Abecassis v. Wyatt*, 2014 WL 5483724 (S.D. Tex. Oct. 29, 2014), the court denied the defendants' application for certification of, *inter alia*, § 2333(a)'s causation standard, concluding that the defendant had failed to satisfy any of § 1292(b)'s elements.  The Court held that: (1) the causation issue as well as the question of whether the defendant had committed an act of international terrorism were not "controlling issues of law" because they were inherently fact-bound (*id.* at *2-3); (2) the same decisions Arab Bank cites as support for its contention that § 2333(a) requires strict "but for causation" did not establish substantial grounds for a difference of opinion (*id.* at *3-4); (3) the fact that the Fifth Circuit had not yet addressed § 2333(a)'s parameters did not warrant a § 1292(b) appeal; and (4) certifying the issues would not materially advance the litigation (*id.* at *5).

Consistent with its past assertions, the Bank's arguments in connection with the pending motions rest on: selective quotation from the supposedly "unbroken line of controlling Supreme Court precedent and Second Circuit decisions" (NT Mem. at 4); disregard of the background multiple causality principle those decisions endorse; and misapplication of RICO cases to the ATA's statutory context.  The Bank buries the latest Supreme Court causation decision from its "unbroken line," *Paroline v. United States*, 134 S. Ct. 1710 (2014), in a confused footnote.  JML Mem. at 2 n.7.[51]  *Paroline* held that "the availability of alternative causal standards where circumstances warrant is, no less than the but-for test itself as a default, part of the background legal tradition against which Congress has legislated…."  *Paroline*, 134 S. Ct. at 1727 (*citing United States v. Burrage*, 134 S. Ct. 881 (2014)).  Both Supreme Court cases the Bank cites discuss both but-for causation *and* (in language Defendant entirely ignores) the alternative standard for multiple causality.  *See Burrage*, 134 S. Ct. at 890 (recognizing alternative to but-for causality "when multiple sufficient causes independently, but concurrently, produce a result"); *University of Texas Southwestern Medical Center v. Nassar*, 135 S. Ct. 2517, 2525 (2013) (recognizing alternative to but-for causality "where an injured party can prove the existence of multiple causes….").

As *Paroline* reminds, "[c]ourts have departed from the but-for standard where circumstances warrant, especially where the combined conduct of multiple wrongdoers produces a bad outcome." 134 S. Ct. at 1723.[52]  The Court quoted a prominent tort treatise in support of

---

[51]     Though the Bank dismisses *Paroline* as an inapposite criminal case, the Supreme Court's discussion there of the "background legal tradition" in tort law was generic.  The Court stated: "The concept of proximate causation is applicable in both criminal and tort law, and the analysis is parallel in many instances. Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct. A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." 134 S. Ct. at 1719 (citations omitted).

[52]     In an *amicus curae* brief (Schlanger Decl. Exhibit 8) filed in connection with a then-pending petition for

this conclusion: "'When the conduct of two or more actors is so related to an event that their combined conduct, viewed as a whole, is a but-for cause of the event, and the application of the but-for rule to them individually would absolve all of them, the conduct of each is a cause of the event.'" *Id.* (quoting *Prosser & Keeton on Law of Torts*, § 41 (5th ed. 1984) at 268). *Paroline* also provides the attendant reasoning:

> [T]ort law teaches that alternative and less demanding causal standards are necessary in certain circumstances to vindicate the law's purposes. It would be *anomalous to turn away a person harmed by the combined acts of many wrongdoers* simply because none of those wrongdoers alone caused the harm. And it would be *nonsensical to adopt a rule whereby individuals hurt by the combined wrongful acts of many (and thus in many instances hurt more badly than otherwise) would have no redress*, whereas individuals hurt by the acts of one person alone would have a remedy.

*Id*. at 12 (emphasis added).

Here, too, it would be anomalous to turn away Plaintiffs because the Bank "only" provided Hamas tens of millions of dollars, JML Mem. at 8, because Hamas-controlled charities "also maintained accounts at other banks," *id*., or because al-Sayed could also have withdrawn funds from other banks to finance the Park Hotel bombing. *Id*. at 9 n. 15. Traditional tort principles do not confer immunity on the Bank merely because other supporters also provided Hamas funds or other material support. Given the Supreme Court's observation in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 30 (2010), that terrorists maintain no financial firewalls, conduct no outside audits, and leave no audit trails, unsurprisingly, other courts have consistently rejected the causation standards Defendant has urged.[53]

---

*certiorari* in *O'Neill v. Al Rajhi Bank et al.*, 13-318, the Office of the U.S. Solicitor General ("OSG") agreed that *Paroline*'s analysis extends to claims brought under the ATA. *See* Ex.8 at 13 n.5 (citing *Paroline* and *Boim* for principle that in civil ATA cases alternative standards for factual causation may be appropriate).

[53]    Most recently, in *Sokolow v. Palestinian Authority*, 2014 WL6601023 (S.D.N.Y. Nov. 19, 2014), the court rejected the Bank's misguided causation argument in connection with a decision denying in large measure the defendant's summary judgment motion. The court observed:

Furthermore, the Bank wrongly cites *Burrage* for the proposition that Plaintiffs had to prove that its services "were *essential* to the [charities'] activities."  JML Mem. at 8 (emphasis added).  In fact, *Burrage* repeatedly stresses that one of multiple causes of an injury qualifies as a proximate cause if it played a "*sufficient*," not necessary or essential, role in bringing about the harm.  134 S. Ct. at 890, 892.  "There is near-universal recognition of the inappropriateness of the but-for standard for factual causation when multiple *sufficient* causes exist."  *Restatement (Third) of Torts* § 27 Rep. note for cmt. a (emphasis added).[54]

"Text may not be divorced from context," *Paroline* teaches. 134 S. Ct. at 2530.  Congress "intended to incorporate common principles of tort law" into the ATA civil remedy (*Wultz v. Islamic Republic of Iran,* 755 F. Supp. 2d 1, 55 (D.D.C. 2010)), in order to "interrupt, or at least imperil, the flow of money."[55]  As courts have readily recognized, it would be completely inconsistent with this statutory context to adopt the Bank's unduly narrow theory of causation and reject the alternative multiple causality standard.[56]  In short, this is the quintessential case in

---

Defendants still argue that a reasonable jury would be unable to find that the provision of weapons proximately caused Plaintiffs' injuries. *However, a direct connection between providing material support to the terrorist organization and injury to Plaintiffs is not required.  Cf. Gill,* 893 F. Supp. 2d at 556 ("[T]he money alleged to have changed hands need not be shown to have been used to purchase the bullet that struck the plaintiff.") (citations and quotations omitted).  Instead, the question is whether the resulting harm to Plaintiffs was foreseeable.

*Id.* at *9.

[54]   *Accord Owens v. Republic of Sudan*, 412 F. Supp. 2d 99, 112 (D.D.C. 2006) ("…[F]actual causation will not be defeated so long as the earlier conduct, more probably than not, would have led to the same harm – either on its own (because it was independently *sufficient*) or in combination with other conduct or events that would foreseeably follow from the earlier conduct."). (Emphasis added.)

[55]   S. Rep. No. 102–342, at 22 (1992) (explaining that § 2333(a) is designed to "allow the law to *catch up with contemporary reality*" and is intended to impose "liability at *any point along the causal chain* of terrorism" in order to "*interrupt, or at least imperil, the flow of money*."). (Emphasis added.) The Bank's unduly narrow proposed but-for causation standard would – *by definition* – prevent the imposition of liability "at any point along the causal chain of terrorism."

[56]   *See, e.g., Goldberg v. UBS AG*, 660 F. Supp. 2d 410, 429 (E.D.N.Y. 2009) ("Common sense requires a conclusion that Congress did not intend to limit recovery to those plaintiffs who could show that the *very dollars* sent to a terrorist organization were used to purchase the implements of violence that caused harm to the plaintiff.

which "alternative and less demanding causal standards are necessary … to vindicate the law's purposes." *Paroline*, 134 S. Ct. at 1724. Fully consistent with this fundamental tort principle was the Court's causation instruction that instructed the jury that Plaintiffs were not required to prove that the Defendant's acts "were the sole cause of their injuries; nor do plaintiffs need to eliminate all other possible causes of injury," and that "it is enough if plaintiffs have proved that the defendant's acts substantially contributed to their injury, even though other factors may also have significantly contributed as well." TT338.[57]

The Bank also misconstrues the Second Circuit precedent and RICO case law. *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013), merely rejected a proposed standard that "causation be presumed" under the ATA. *Id.* at 96. The court explained that proximate causation requires a showing that defendant's "acts were a substantial factor in the sequence of responsible causation and [that the plaintiff's injury] was a reasonably foreseeable or anticipated as a natural consequence." *Id.* at 91. The instruction given by the Court tracked this language almost verbatim. Both *Rothstein* and *In re Terrorist Attacks on Sept. 11, 2001 (Al Rajhi Bank)*, 714 F.3d 118 (2d Cir. 2013), also identified a non-inclusive list of the types of allegations that would satisfy this standard. The Bank purports to list these examples at JML Mem. 4, but **omits** the two most pertinent items namely*:*

---

Such a burden would render the statute powerless to stop the flow of money to international terrorists, and would be incompatible with the legislative history of the ATA.").

[57]     At the same time, the Court cautioned the jury "the unlawful activity at issue must be a substantial and identifiable cause of the injury that plaintiffs' claim. Activities that are too remote, too indirect, or too attenuated are insufficient." TT3337:21-23. This instruction satisfied the limiting principles proximate causation embodies. Here, the timing and volume of the material support that the Bank provided to Hamas, combined with the foreseeability of injuries that resulted from that extensive support, preclude any finding that the Bank's conduct was too remote, indirect, or attenuated to support the jury's verdict. This is not an instance of *e.g.* a bank providing "routine" banking services to a single Hamas-connected charity many years before an attack. Instead, the evidence establishes that the Bank knowingly provided massive cash infusions to a Foreign Terrorist Organization in the midst of an increasingly violent and deadly intifada.

- "that the moneys UBS transferred to Iran were in fact sent to Hizbollah or Hamas." *Rothstein*, 708 F.3d at 97.

- "that [defendant bank] provided money directly to al Qaeda." *Al Rajhi*, 714 F.3d at 124.

Here, unlike the *pleadings* in *Rothstein* or *Al Rajhi*, the record demonstrates that Defendant provided funds and financial services directly to a full roster of Hamas leaders, operatives and entities, as well as to individual Hamas operatives' families. *Rothstein* and *Al Rajhi* therefore preclude the relief the Bank seeks.

Finally, the Bank's reliance on RICO cases is misguided because civil RICO actions only address economic, and not personal, injuries. Thus, courts addressing the RICO causation standard have focused on limiting the availability of RICO remedies to those most directly injured by defendants' conduct because a more permissive standard could enable plaintiffs with remote and indirect economic injuries, including even injuries derivative of harm to a third party, to invoke the statute. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) and its progeny therefore imposed a directness inquiry, "since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id*. at 269-270. In all the RICO cases cited by the Bank, the courts found that the plaintiffs were too indirectly injured to recover under RICO.

In *Laborers Local 17 v. Phillip Morris, Inc.*, 191 F. 3d 229, 237 (2d Cir. 1999), however, the Second Circuit emphasized the Supreme Court's recognition of "the impossibility of articulating a black-letter rule capable of dictating a result in every case." As a result, the court focused on the factors uniquely germane to applying the directness principle *to RICO* plaintiffs, especially whether "there are directly injured parties who can remedy the harm…." *Id.* at 237.

"[A] direct injury has been found," the court held, "when the plaintiff's injuries are not derivative of damage to a third party." *Id.* Subsequently, in *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) (*Lerner II*), the Second Circuit phrased the same principle as a limit on plaintiffs' standing under RICO: a requirement that the plaintiff show both that he "is within the class the statute sought to protect and that the harm done was one the statute was meant to prevent." *Id.* at 284.

Here, the Plaintiffs were directly injured by acts of international terrorism under 18 U.S.C. § 2331(1), acts which include violations of § 2339B.  As this Court acknowledged when it denied the Bank's summary judgment motion, its motion for reconsideration, and its objections to the jury charge, there are *no* persons more directly injured; the injuries alleged are precisely those the statute is intended to address; and there is no one more likely to vindicate the purposes of the ATA.

In sum, the Court's causation instructions were fully consonant with unanimous case law rejecting but-for causation in ATA cases. Accordingly, neither Rule 50, Rule 59, nor § 1292(b) relief is appropriate.  There was no material error of law, and no miscarriage of justice. Nor are there substantial grounds to disagree with the instruction, and the Bank's complaints do not genuinely concern controlling questions of law, but instead – as the court recognized in *Abecassis* – fact-bound disputes regarding the law's application to the facts. *Abecassis*, 2014 WL 5483724, at *2.

## VI.    THERE IS NO DISPUTE IN THIS CIRCUIT THAT KNOWING VIOLATIONS OF § 2339B CONSTITUTE ACTS OF INTERNATIONAL TERRORISM UNDER THE ATA

The Bank argues that: (a) "comity" requires a narrow reading of "acts dangerous to human life," *id.*; and (b) knowingly providing "routine banking services" to an organization the

Bank knows to be an FTO or an organization it knows engages in terrorist activities does not by itself "appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping" within the meaning of § 2331(1)(B) (hereinafter the "appear to be intended" provision).  *Id.* at 23-24; NT Mem. at 6-7.  *See also* § 1292(b) Mem. at 18-21.

The Bank's contention that acts of international terrorism under § 2333(a), as defined in § 2331(1), "are limited to 'violent acts or acts dangerous to human life'" (JML Mem. at 22, NT Mem. at 6-7; *see also* § 1292(b) Mem. at 18-21) misleadingly truncates the definitional language.  The ATA does *not* say that acts of international terrorism are "limited to 'violent acts or acts dangerous to human life' …"   Rather, it says that "the term 'international terrorism' means activities that *involve* violent acts or acts dangerous to human life…." 18 U.S.C. § 2331(1) (emphasis added).  The Bank elides over the word "involve" in the statute.  Providing funds to a customer at the bank counter is not by itself a violent act or an act directly dangerous to human life.  Neither is selling gasoline to a customer at the gas pump.  But where one *knows* that the customer is throwing Molotov cocktails at a crowd next door, the sale of gasoline would "involve" violent acts or acts dangerous to human life.  So, surely, would providing funds and banking services to a customer *known* to be an FTO or agent of an FTO, or *known* to engage in terrorist activities. *See* 18 U.S.C. § 2339B(a)(1).[58]

Neither authority cited by the Bank for the proposition that banking cannot constitute an act of international terrorism supports its arguments.  In *Al Rajhi*, 714 F.3d at 124, the Second Circuit was not persuaded that "routine banking services to organizations and individuals said to

---

[58]        *See also Stansell v. BGP, Inc.*, 2011 WL 1296881, at * 7 ("This Court agrees with the holding in *Boim III* [549 F.3d 685] that although the provision of money to a terrorist organization … may not be violent, it would be dangerous to human life.").

be affiliated with al Qaeda—as alleged by the plaintiffs – proximately caused [the 9/11 attacks]." Importantly, however, the court also expressly found that the plaintiffs' operative complaint had no plausible, non-conclusory allegations that the defendant-bank "provided money directly to al Qaeda" or that the bank had engaged in any of the other types of conduct the court deemed sufficient to allege causation.  *Id*. at 124.

The Bank's other case, *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86 (D.D.C. 2003), which *Al Rajhi* cited, found that allegations that the defendant provided *routine* banking services could not support ATA liability. That court nevertheless found the allegation "that Al Rajhi is one of a number of banks that 'have acted as instruments of terror in raising, facilitating, and transferring money to terrorist organizations'" sufficient – even standing alone – to satisfy the statute's causation standard.  *Id*. at 109 (emphasis added.)  In *Stutts v. De Dietrich Group*, 03-CV-4058 (ILG), 2006 WL 1867060 (E.D.N.Y. June 30, 2006), the court similarly found that the bank defendant's commercial banking activity (issuing a letter of credit in favor of supplier defendants in a case involving injuries radically more attenuated from the challenged conduct than the injuries Plaintiffs suffered) did not constitute international terrorism because "plaintiffs fail to sufficiently allege facts showing the Bank Defendants' knowledge and intent." *Id*. at *3.[59]

In each of these cases, the courts agreed that bank activities do not create civil ATA liability absent plausible, non-conclusory allegations that a bank *knowingly* (or with deliberate indifference) provided such services to an FTO or its agents (or their families).  In short, it is a bank's knowledge (or deliberate indifference) that takes its services out of the realm of the "routine" or "ordinary."  As shown above, the trial record was replete with evidence establishing

---

[59]       *Stutts* cited *Boim v. Quaranic Literary Inst. & Holy Foundation for Relief & Dev. (Boim II)*, 291 F.3d 1000 (7th Cir. 2002), for this articulation of the scienter standard.  The later *en banc* decision in *Boim v. Holy Foundation for Relief & Dev.* ("*Boim III*"), 549 F.3d 685 (7th Cir. 2008) (en banc), does not require proof of intent.

that the Bank knowingly or with deliberate indifference provided services and funds directly to Hamas and its agents, *and* that Hamas committed the attacks that injured Plaintiffs.   That evidence is more than sufficient to support the jury's verdict.

Nor, contrary to Defendant's insistence, would primary liability "be highly offensive to foreign nations," involve "second-guessing the regulators here and abroad," or constitute prohibited "'legal imperialism.'" JML Mem. at 23-24 & n. 26. Defendant's arguments are completely at odds with *Weiss v. National Westminster Bank*, 768 F.3d 202, 207 (2d Cir. 2014). *Weiss* explained that "Congress clearly expressed its intention for § 2333(a) to apply extraterritorially by focusing on 'international terrorism' and defining it to include exclusively activities that 'occur primarily outside the territorial jurisdiction of the United States.'" *Id*. at 207 n. 5 (citations omitted).  The fact that U.S. law regarding terrorist conduct conflicts with the law of an entity's home jurisdiction provides no basis for subordinating the U.S. standard.  *Id.* at 211 ("When Congress has manifested clear intent that a statute apply extraterritorially, it will generally apply extraterritorially regardless of whether there is a risk of conflict with foreign law…. Congress clearly expressed its intention for § 2333(a) to apply to extraterritorial activities when the statute's standards are met, regardless of the views and laws of other nations.") (citation and footnote omitted).

Finally, the Bank's argument that it was error or substantial ground for difference of opinion to instruct the jury that a violation of § 2339B is itself an act of international terrorism is contrary to the ATA's statutory scheme and the overwhelming, uniform case law in this Circuit. All courts that have considered the issue agree that § 2339B's "appear to be intended" provision "does not depend on the actor's beliefs, but imposes on the actor an objective standard to recognize the apparent intentions of actions."  *Weiss*, 768 F.3d at 207 n.6, citing *Boim III*, 549

F.3d at 693-94.[60]  This objective standard was included in the original 1992 ATA "in order to distinguish between acts of terrorism and ordinary acts of crime."  *Abecassis*, 7 F. Supp. 3d at 676; *accord Boim III*, 549 F.3d at 694.   Four years later, Congress enacted Chapter 113B, "Terrorism," of Title 18.  18 U.S.C. § 2339B.  This crime does not require a *separate* showing that the defendant's actions "appear to be intended" to advance prohibited objectives.  Rather, the appearance of the intent to advance those objectives is *inherent* in knowingly providing support to an FTO.

A defendant violates § 2339B by providing material support to an FTO only if it knows (or is deliberately indifferent to the fact) that the organization has been designated as an FTO or that the organization has engaged or is engaged in terrorist activity or terrorism.  18 U.S.C. § 2339B.  The FTO's own terrorist acts both are, and appear to be intended, to intimidate or coerce a civilian population and to influence government policy.  Thus, knowingly providing material support for the FTO also satisfies the "appears to be intended" requirement "when [the supporter] knows the terroristic aims and activities of its recipient and when it is foreseeable that the support will advance such terroristic aims."  *Abecassis*, 7 F. Supp. 3d at 676.  Therefore, "a violation of §2339B(a)(1) qualifies as an act of international terrorism for the purposes of §2333(a)."

For that reason, other courts in this District have found § 1292(b) certification inappropriate when faced with arguments nearly identical to the one Arab Bank proffers here. For example, in *Goldberg v UBS AG*, 690 F. Supp. 2d 92 (E.D.N.Y. 2010), Judge Trager rejected

---

[60]     Contrary to the Bank's contention, *Weiss* did not "expressly hold that a violation of §2339B could not by itself be an act of international terrorism." Bank NT Mem. at 7.  It expressly stated that "we review *only whether there is a triable issue of fact* as to whether NatWest fulfilled §§ 2333(a) and 2339B's scienter requirement; we do not address whether NatWest fulfilled this definitional requirement or the other requirements of the statute." *Id.* at *4 n.6 (emphasis added).  In other words, the Circuit recognized that a jury first had to determine whether NatWest had violated § 2339B; it did not suggest covertly that near-uniform precedent holding that § 2339B violations satisfy all elements of § 2331(1)'s definition were incorrect.

the defendant-bank's claim that this issue warranted certification. Adopting *Boim III*'s analysis of the issue, *Goldberg* held "sections 2339A and 2339B make clear Congress' intent that the intentional (or reckless) provision of material support to a terrorist organization *fulfills each prong of Section 2331(1)'s definition of 'international terrorism,' and therefore suffice to establish liability under Section 2333(a)."  *Id.* at 113 (emphasis added); *see also id.* at 114-15 (collecting and citing "numerous authorities [that] have similarly interpreted section 2331(1)"). Defendant never cited nor attempted to distinguish *Goldberg* even though it arose specifically in connection with a financial institution's § 1292(b) application, and the decision was specifically cited by this Court during the jury charging conference in support of the instruction at issue.

## VII.   NONE OF THE BANK'S OTHER CLAIMS OF ERRORS ARE VALID

### A.   Plaintiffs Are Not Required To Prove "Evil Intent"

Defendant persists in arguing that ATA plaintiffs must prove "intent to harm," "malice," and evil motive."  JML Mem. at 1, 11, 14, 15; NT Mem. at 10.  This contention is squarely at odds with the Second Circuit's recent holding in *Weiss* and also misconstrues *Boim III* (upon which, strangely, Defendant purports to rely).  *See* NT Mem. at 10.  *Weiss* holds:

> [I]n order to establish entitlement to a civil remedy under 18 U.S.C. §2333(a) predicated on a violation of § 2339B(a)(1), Plaintiffs were obliged to show that NatWest had actual knowledge that, or exhibited deliberate indifference to whether, [defendant's customer] provided material support to a *terrorist organization*, irrespective of whether the support aided terrorist activities.

*Id*. at 206 (italics supplied in original).  Actual knowledge or deliberate indifference is the governing standard, notwithstanding the Bank's citation to pre-*Weiss* district court cases.  JML Mem. at 10.[61]

---

[61]     Moreover, that earlier case authority itself contradicts the Bank's argument.  In *Kaplan v. Al Jazera*, 2011 WL 2314783 (S.D.N.Y. June 7, 2011), cited in JML Mem. at 10, although the court dismissed the complaint for plaintiffs' failure to plead that broadcasting news of Hezbollah rocket attacks on Israel was "intended" to help Hezbollah, the court *expressly* distinguished a claim of knowing material support. *See id.* at *6 (distinguishing *Boim*

Furthermore, insofar as the Bank's argument relies on *Boim III*'s analysis of the ATA civil remedy, the argument misconstrues *Boim III*.   The Seventh Circuit reasoned that § 2333(a)'s treble damages provision requires proving some deliberate wrongdoing or "wantonness" beyond negligence.  *Boim III*, 549 F.3d at 692-93.  Plaintiffs do not dispute that "evidence of what Arab Bank 'should have known' will be insufficient to establish the claims against it." *Linde v. Arab Bank, PLC*, 262 F.R.D. 136, 150 (E.D.N.Y. 2009)).  Proof of the defendant's evil motive sufficed.  But so did proof of its actual knowledge or its deliberate indifference to the fact that it was providing material support to a terrorist organization.[62]  As *Boim III* explains:

> To give money to an organization that commits terrorist acts is not intentional misconduct unless one either knows that the organization engages in such acts or is deliberately indifferent to whether it does or not, meaning that there is a substantial probability that the organization engages in terrorism but one does not care.

549 F.3d at 693.

*Weiss* is in complete harmony with this analysis, and also recognizes that "[w]hile § 2333(a) does not include a mental state requirement on its face, it incorporates the knowledge requirement from § 2339B(a)(1)...." 768 F.3d at 207.

### B.   The Court Did Not Commit Error in Refusing To Permit Defendant to Introduce Testimony Regarding Foreign Laws

Defendant does *not* object to the Court's jury instruction regarding the applicability of foreign law, but instead now argues that four previously excluded experts regarding banking

---

[62]   *III*, and explaining: "Plaintiffs have offered no facts suggesting that Defendant even *knew* that it was providing *anything* to Hezbollah.  This is a far cry from donating money to a terrorist organization.").  Here, the record demonstrates that the Defendant knowingly provided massive, essential banking services to the Hamas hierarchy, Hamas-controlled social services organizations, Hamas militants, and families of suicide bombers.

[62]   The Bank thus got it half right when it says Plaintiffs must show acts "with an 'intent to harm someone' *or* with knowledge of providing services to Hamas," Bank JML Mem. at 11 (emphasis added), but do not have to show *both*. In addition, deliberate indifference also satisfies the scienter standard.

laws, regulations and practice in foreign jurisdictions should have been permitted to testify at trial because – according to Defendant – Plaintiffs placed such topics at issue. NT Mem. at 13-14.  Having previously failed in its efforts via Fed. R. Civ. P. 44.1 to convince the Court to instruct the jury on foreign law, the Bank now makes *precisely the opposite argument*, asserting that the foreign law experts should have been allowed to testify *directly to the jury* because Rule 44.1 does *not* apply.  *See* NT Mem. at 13 ("Rule 44.1 is properly invoked only when—unlike here—issues of foreign law control.").

Although Defendant fails to identify the four experts at issue, based on its citation to ECF No. 773 at 6 (NT Mem. at 12), they a*ppear* to be:

**George Abed** – whose excluded expert opinions, according to the Bank, addressed "*the history of the PMA, including the role played by the international community in its formation, and the nature of its regulatory oversight of banks operating within the Palestinian Territories … [and] the development by the PMA of regulations concerning anti-money laundering and other sound banking practices.*"  Def.'s Mem. Opp. Apr. 29, 2011, at 35 (*Linde* ECF 745, Filed Under Seal).

**Yair Dagan** – whose excluded expert opinions, according to the Bank, were that "*Arab Bank was required to comply with Israeli standards in order to maintain correspondent relationships with Israeli banks; Arab Bank's operations in the Palestinian Territories were also subject to the authority of the Israeli military; the compliance practices of Arab Bank during the relevant period were at least as stringent as those employed by Israeli banks; and the financial transactions at issue in this litigation were handled in a manner consistent with the practices of Israeli banks*." *Id.*  at 42.

**Dr. Marwan M. Nsouli** – whose excluded expert opinions, according to the Bank, addressed "*the regulations and supervisory oversight in Lebanon*" in order to counter Plaintiffs' assertions "*that the Bank did not comply with Lebanese regulations in maintaining the Beirut Account and that Lebanese regulations were not, in any event, adequate to deter the provision of banking services to Hamas.*"  *Id.* at 46.

**Chakib Cortbaoui** – whose excluded expert opinions, according to the Bank, were "*essential to rebut plaintiffs' false contention that the Bank's return of funds to the holder of the Beirut Account after its closure constituted 'material support' under the provisions of the ATA.*"  According to Defendant, Cortbaoui would explain that "*unless a financial institution is directed by the Special Investigation Commission to freeze the funds contained in a closed account, that institution is obligated under Lebanese law to return*

*these funds to their owners, as the Bank did in the case of the Beirut Account*."  *Id.* at 47-48

In a December 6, 2011 Order, reported at *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 292 (E.D.N.Y. 2011), the Court held that much of these experts' proposed testimony was improper "character evidence," plainly inadmissible under Fed. R. Evid. 404(a), and irrelevant to what the Bank itself knew or deliberately ignored under the ATA.  *Id.* at 284-85 (citations omitted). Judge Gershon further held that, under Rule 44.1, "questions of foreign law are not to be determined through a proffer of expert testimony given to the jury."  *Id.* at 286.  Alternatively, the Court excluded the testimony under Rule 403 because it created "an appreciable risk of prejudice, jury confusion, and misleading the jury"[63] by leading the jury far afield of the ATA and the issues of U.S. law that the ATA posed.  *Id.*  *Nothing* in the Bank's post-trial briefs even attempts to demonstrate that the Court clearly erred in exercising its broad discretion under Rule 403 to exclude such unfairly prejudicial evidence.[64]

After the Court excluded these four "foreign law" experts, the Bank tried to offer three of them (Abed, Dagan and Nsouli) as purported "fact" witnesses.[65]  Defendant again offered each as a character witness or an improper stand-in for withheld evidence. Defendant's January 13 letter also documented the Bank's intention to offer these and other fact witnesses pursuant to Rule 44.1, and advised:

- Dr. Abed would be prepared to offer testimony *to the Court* about the policies and procedures promulgated and applied by the PMA to prevent money laundering,

---

[63]     Much of the putative "foreign law evidence" was presented in a narrative that extolled the virtues of Lebanese or Palestinian regulators and AML laws.  That evidence would almost never be admissible for any purpose.

[64]     *See United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) ("With respect to the admission or exclusion of expert evidence, we defer to the trial judge's broad discretion unless his decision is clearly wrong.").

[65]     *See* Jan. 13, 2012 Letter from Kevin Walsh to Michael Elsner, at 1, Schlanger Decl. Exhibit 9.  The four were among eleven newly minted "fact witnesses" – most of whom were previously excluded as experts by the December 6, 2011 Order.

terror financing, and other illicit activity, so that *the Court can properly instruct the jury* as to these matters.

- Dr. Nsouli is prepared to offer testimony *to the Court* about the obligations imposed upon financial institutions by Lebanese law to report suspicious accounts, and the Bank's obligations thereafter with regard to the disposition of monies held in such accounts.[66]

- Mr. Dagan will offer testimony *to the Court* about Israeli AML and CFT laws and regulations, and the very recent implementation by Israeli banks of OFAC screening systems, so that *the Court can properly instruct the jury* as to the timing and content of those laws.

*Id.* (emphasis added).  At a status conference in February 2012 (*see* Schlanger Decl. Exhibit 10), defense counsel assured the Court that it did not "contemplate … elucidating the testimony of those experts by any means other than as specified in Rule 44.1."  Feb. 24, 2012 Conference Tr. 10:22-25.

Accordingly, on April 9, 2012, the Bank repackaged its previously improper, irrelevant character testimony via Rule 44.1 proffers of foreign law (adding an expert on Jordanian law).  This time, Defendant offered general summaries of the foreign law subject matter the experts would opine on as well as copies of various foreign laws and court decisions, but no legal reports or memoranda by these experts.  The Court readily saw through the Bank's machinations and again excluded the Rule 44.1 proffers in a May 14, 2013 Order.  *See Linde v. Arab Bank, PLC*, 944 F. Supp. 2d 217, 219 (E.D.N.Y. 2013) ("…the Bank, while purporting to accept that the ATA is the law applicable to this case, suggests that it can argue to the jury that the jury should simply ignore the ATA in favor of the foreign laws the Bank chose to follow.  Such an argument is an invitation to nullification.").  Judge Gershon thus correctly anticipated *Weiss*'s holding that

---

[66]     Defendant's Lebanese law expert cited Title IV of the Lebanese Commercial Code for the proposition that Arab Bank was obligated to pay Osama Hamdan the balance on his account. The expert's statement of Lebanese law was conclusory and the cited code section does not, on its face, address the scenario at issue. More importantly, no document produced and no sworn testimony in the case indicates that any Arab Bank employee considered Title IV of the Lebanese Commercial Code before issuing a cashier's check to Hamdan in 2005, demonstrating that the issue was not only legally but factually irrelevant.

§ 2333(a) applies when its standards are met "*regardless of the views and laws of other nations*." *See Linde*, 944 F. Supp. 2d at 219 ("[W]hether foreign law permitted the Bank to provide financial services to terrorists—or even required the Bank to return money to a known terrorist, as the Bank asserts was the case with Hamdan—offers no basis for the supposed inference that the Bank had an innocent mental state regarding *compliance with United States law*."). (Emphasis added.)[67]

### C.    Foreign Law Testimony Was Properly Precluded by the Court's Rule 37(b) Order.

As discussed above, the Bank's repeated efforts to interject foreign law into the case were properly rejected on multiple, independently sufficient grounds of relevancy, hearsay, and unfair prejudice.  But much of the proposed testimony was *also* properly precluded by the Court's Rule 37(b) order.  The preclusion remedy was intended to prevent the Bank from taking improper advantage of the material imbalances that resulted from its refusal to comply with Court orders compelling discovery of essential account and related records which Plaintiffs lacked alternative means of obtaining.  Thus, the Bank's effort to assert its compliance with irrelevant foreign laws was also properly precluded given that – even if relevant – the Bank's evidentiary withholdings rendered it impossible for Plaintiffs to test Defendant's probity.

The Bank *was* permitted to provide evidence about its putative compliance with U.S. legal obligations – including those associated with OFAC blacklists – for transactions in New York, because it had provided significant (if not entirely complete) discovery of its New York and U.S. conduct.[68]  Thus, as a result of the New York document production, Defendant was able

---

[67]      *Accord, e.g., Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 633 (E.D.N.Y. 2006) (no case holds that "an American Court must decline to apply the laws of this country to a defendant over which the court has jurisdiction because the laws of the defendant's own country are more lenient").

[68]      The incomplete production followed Defendant's efforts to mislead Plaintiffs and the Court regarding the

to argue that electronic OFAC filtering was the only method banks used to detect terror financing (the "OFAC-only defense") and that "spelling errors" explained why transactions for the account of Hamas founder and leader Sheikh Yassin slipped through Defendant's *New York* branch's OFAC filter (despite Yassin having been designated as early as 1995).  But the Court rightly precluded Defendant from offering testimony concerning banking laws and regulations in the Palestinian Territories and then arguing to the jury that the Bank had fulfilled all of its regulatory obligations *in Gaza* while at the same time refusing to acknowledge, let alone produce records or permit testimony concerning, e.g., Sheikh Yassin's account at its Gaza branch. Having never produced any account documentation or internal correspondence *from its Gaza branches, or any other branch in the Palestinian Territories, and having instructed* its employees not to answer any specific questions about any customers' accounts in Gaza, admitting any evidence on compliance with Palestinian banking laws and regulations would have been manifestly unjust.

In contrast, the Bank *was* permitted to offer testimony about Osama Hamdan's account because the Bank provided discovery concerning that account.  Its witness Shukry Bishara testified that after the Bank closed the Hamdan account, "[i]t reported it to the Central Bank of Lebanon, a special investigation unit, SIC."  Mr. Bishara went on to testify as follows:

> MR. BISHARA: They checked for instructions. They waited for a period of six, seven months, and they had no choice but, in order to close the account, to remit the funds –
>
> MR. WERBNER: Your Honor, Lebanese law, I am going to object.
>
> THE COURT: He hasn't said anything about Lebanese law. He was not asked anything about Lebanese law. You are not allowed to testify about Lebanese law. The objection is overruled.
>
> MR. BISHARA: They had no choice but to return the funds to the guy, in order to close the account.  TT2474.

---

Bank's ability to locate and produce documents it had made available to the Office of the Comptroller of the Currency.  *See* Dec. 13, 2006 Order at 5-6 (Dec. 13, 2006).

Thus, Mr. Bishara was permitted to tell the jury that Arab Bank "*had no choice*" when it paid Osama Hamdan $8,677 by cashier's check knowing that he was both a Specially Designated Global Terrorist and senior Hamas leader.

Nevertheless, the Bank now argues that the Court improperly rejected the Bank's request for a jury instruction that the Bank's "witnesses would have testified" that "you have to return the money under Lebanese law." NT Mem. at 14 (citing TT3360).  Of course, the Court could not instruct the jury on what a hypothetical witness or witnesses might have said had they testified.  Moreover, the Court's instruction "not to consider whether any conduct was illegal or legal under the law of any other nation" (TT3286:11) was entirely appropriate.  It is undisputed that at the time Arab Bank paid Osama Hamdan the $8,677 in 2005, it knew that: (1) he was a Hamas spokesman and leader; (2) he was a U.S.-designated terrorist and; (3) his account had been used to solicit funds for Hamas on the internet.

Had Arab Bank attempted to offer evidence that Lebanese authorities expressed doubt that Arab Bank's accountholder was the same "Usama Hamdan" identified on the U.S.'s Specially Designated National list, that *might* have been somewhat relevant to Defendant's state of mind. But Defendant made no such proffer because no such evidence exists.  Instead, it proffers now "that the opening and closing of the Hamdan account, as well as the processing of transactions in that account, were conducted *in full compliance with Lebanese law*."  NT Mem. at 13 (emphasis added).  *Weiss* makes clear that such contentions are legally irrelevant, and inadmissible.

### D.  Evidence and Jury Instructions Concerning Foreign Bank Secrecy Laws Were Properly Rejected

The Bank's proffer of evidence of foreign bank secrecy laws to rebut (and effectively nullify) the permissive adverse inference instruction was also properly excluded.  In fact, the

Bank's Director of Regulatory Compliance, Mohammad Dabbour, actually testified that he could not provide the names of the eleven United States-designated terrorists for which the Bank maintained accounts "due to the privacy," and also said, "I cannot answer that, for privacy of all the relations."  TT2769-2770.  While Dabbour's later, more detailed answer identifying the "privacy laws of Palestine and Jordan and Lebanon" was properly stricken,[69] his first answers invoking "privacy" were not.  Nevertheless, the Bank now insists not just that its witnesses could invoke "privacy," but that they should have also been permitted to tell the jury that they had disobeyed the Court's production order because they had to comply with foreign bank secrecy laws.

The Bank cites *Stevenson v. Union Pacific Railroad Co.*, 354 F.3d 739 (8th Cir. 2004), as its only support for this assertion.  In *Stevenson* and other spoliation cases, the spoliator lost or destroyed the evidence, and the inference was based on extra-judicial historical acts that caused that loss.  The spoliator was therefore permitted to testify to facts about what happened in order to rebut the adverse inference.[70]  Here, in contrast, the Bank was ordered to provide discovery after the Court overruled its claims of bank secrecy based on the careful application of the legal standard set out in *Restatement (Third) of the Foreign Relations Law of the United States* § 442

---

[69]     A question regarding Ismail Haniyeh's account at Arab Bank resulted in Mr. Dabbour testifying that he could not answer "due to the privacy laws of Palestine and Jordan and Lebanon." That response was stricken. TT2799:13-22.

[70]     *Stevenson* also permitted this factual rebuttal in part because "*there is no finding that the evidence destroyed was crucial to the case*. No doubt the evidence destroyed was relevant and its destruction prejudiced the plaintiffs' discovery efforts, but in previous cases where we have sustained a sanction of precluding evidence completely or settling a disputed matter of fact (thus permitting no rebuttal), the offending party had destroyed the one piece of crucial physical evidence in the case.  No such finding exists here." *Stevenson*, 354 F.3d at 750-51 (emphasis added). By contrast, in this case, the Bank has never disputed the Court's finding that the withheld evidence was not only relevant and "highly specific," but "essential to proof of the plaintiffs' case," as Magistrate Judge Pohorelsky found when he overruled Defendant's objections to production.  *See Linde*, 463 F. Supp. 2d at 315.

(as adapted in this Circuit).[71] When the Bank refused to comply with the resulting order to compel, the permissive adverse inference instruction was implemented as a means to at least partially restore massive evidentiary imbalances created by the Bank's violations and withholding. *See Linde*, 269 F.R.D. at 193-195 (reviewing procedural history).  The Rule 37(b) order reflected the Court's balancing of multiple factors, including foreign bank secrecy laws, in deciding a just sanction.  When presented with the identical argument Defendant now reasserts, Judge Gershon properly found:

> Weighing the factors in ordering production and later imposing sanctions was *the job of the court, not the jury*.  Granting the Bank's application [to introduce evidence of foreign bank secrecy law to rebut the adverse inference] would defeat the court's analysis, mislead and confuse the jurors, and improperly invite them to decide legal issues.

*Linde*, 944 F. Supp. 2d at 220-221.

As another district court concluded regarding a similar argument in a spoliation case, "essentially, Defendant seeks to litigate the spoliation issue anew and to allow the jury to substitute its own judgment in place of that already entered by this Court. Such a result cannot stand."  *Aaron v. Kroger Ltd. P'ship I*, 2012 WL 78392, at *2 (E.D. Va. Jan. 6, 2012).  *Aaron* reasoned:

> The Court already examined the evidence relating to Defendant's spoliation and decided that an adverse inference instruction is the most appropriate means of redress for the wrongdoing. *The fact-finding necessary to resolve the spoliation issue has thus already occurred, thereby obviating any role for the jury on this matter. Contrary to Defendant's apparent wishes, the jury's function is not to serve as an appellate tribunal for this Court's decisions*.

*Id.* at *2 (emphasis added).

Here permitting the jury to weigh "bank secrecy" rebuttal evidence would be even less

---

[71]     The Second Circuit agreed that the Court's § 442 balancing test satisfactorily weighed Plaintiffs' need for the required discovery (and their inability to obtain it through alternative means) against foreign states' interests in enforcing their bank secrecy laws and the hardships potentially faced by Defendant given conflicting legal obligations.  *Linde*, 706 F.3d at 120.

appropriate because the Court issued the Rule 37(b) order *as a matter of law* (not as an exercise in fact-finding), after weighing U.S. and foreign law, the relevance of the withheld documents, and their importance to proof of the claims, among other factors.  The proffer of foreign bank secrecy law thus inevitably would have reopened the legal analysis and balancing that the Court had thrice conducted (including its reconsideration of the Rule 37(b) decision) and thrown a debate about the legal effect of foreign bank secrecy into the jury box.  The risk of unfair prejudice and confusion arising from the approach Defendant advocates is patent, and is not remotely comparable to circumstances where spoliators provide *factual* explanations of what happened when evidence was lost or destroyed.

The Bank had a full and fair opportunity to litigate *to the Court* the impact of foreign bank secrecy laws upon its disclosure obligations *and* the appropriate remedy for the prejudice and imbalances that resulted when it defied orders compelling disclosure.  There is no legal basis for permitting it also to re-argue foreign bank secrecy law to the jury, especially given the near certainty of jury confusion. In sum, granting the Bank's request would render the Court's Restatement § 442 balancing test a dead letter.

In describing the potential means available to the Bank for rebutting the adverse inference, the Second Circuit conspicuously omitted any reference to the Bank presenting evidence or re-argument to the jury regarding foreign bank secrecy laws.  Instead, the Second Circuit agreed that "Arab Bank could rely on these disclosures [regarding the Saudi Committee and other topics about which it provided discovery], and related testimony, to *rebut* plaintiffs' assertion that Arab Bank intended to support the Saudi Committee's alleged efforts to finance terrorists, and urge the jury to extrapolate from this evidence that Arab Bank had lacked a

culpable state of mind with regard to the other transfers at issue." *Linde*, 706 F.3d at 116 (emphasis added).

The Bank was permitted to offer precisely the rebuttal evidence that Judge Gershon and the Circuit listed, telling the jury that its document production stacked up to the equivalent of a seven-story building (TT1732); "it processes millions of transactions every year" (TT3132); its former Chief Banking Officer allegedly learned that the Saudi Committee in Support of the Intifada al Quds "was an effort by Arab governments to put together a humanitarian assistance package to the Palestinian people" (TT2463:20-21); and it allegedly offered "immediate relief assistance, humanitarian assistance to those who were wounded, to the families of those who were killed during the events" and acted "to repair, quickly, damaged infrastructure" (TT2463:25-2464:3).  One of the Bank's key witnesses even managed to testify that Defendant could not produce discovery due to "privacy" concerns.  TT2463.  The jury may not have credited these arguments or testimony, but the Bank was permitted to make, and made, the very arguments the Second Circuit identified and more.  Thus, the Court committed no error in denying Defendant's demand to advise the jury regarding foreign law, including foreign bank secrecy laws.

### E.     The Court Did Not Err In Excluding Defendant's "Experts" On The Saudi Committee In Support Of The Intifada Al Quds

#### 1.     Robert Lacey

Defendant renews its claim (NT Mem. at 20) that the Court manifestly erred in excluding Robert Lacey's proposed expert testimony.  The Court first excluded that testimony in 2013 (*see Linde*, 922 F. Supp. 2d at 316), and sustained that holding after the Bank filed a motion for reconsideration.  *Linde* ECF 940.

Admission or exclusion of expert testimony is reviewed under the "harmless error"

standard.  *Bank of China, New York Branch v. NBM LLC*, 359 F.2d 171, 183 (2d Cir. 2004).  A new trial would be warranted only if the error was a clear abuse of discretion and so clearly prejudicial to the outcome of the trial that the jury reached a seriously erroneous result, or the verdict was a miscarriage of justice.  *Parker v. Reda*, 327 F.3d 211, 213 (2d Cir. 2003).  That is clearly not the case here.

The Bank offers three reasons for asserting that this Court committed manifest error: (1) precluding Mr. Lacey "because he was not proffered as a terrorism expert"; (2) ignoring the *Gill* court's decision to deny the plaintiffs' motion to exclude his testimony, *see Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 542 (E.D.N.Y 2012); and (3) applying a double standard, allowing Plaintiffs' expert Arieh Spitzen to testify about what the Bank calls "these very same matters." NT Mem. at 20.

None of the Bank's arguments have merit.  Regarding Mr. Lacey's qualifications, Judge Gershon found that the Bank did not establish that he had any expertise on the subject of the Saudi Committee, and that "he had never heard of the Saudi Committee before his assignment in this case," although that fact was not necessarily dispositive.  *Linde*, 922 F. Supp. 2d at 328-29. Given that Mr. Lacey conceded lack of expertise in the study of terrorism and no comprehension as to how Saudi Committee fund recipients were selected, Judge Gershon correctly concluded that Mr. Lacey's lack of expertise  was "far more than a mere 'quibble with ... academic training' ...; he is wholly unqualified to proffer these opinions."  *Id.* at 329 (emphasis added), *citing, McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).

Defendant argues that Judge Gershon committed gross legal error by including the words "not an expert in terrorism" in her ruling.  In fact, however, that assessment was not only accurate, it was only one basis for Judge Gershon's conclusion that Mr. Lacey was unqualified to

offer expert opinions on the Saudi Committee. As a result, his absence could not have substantially impacted the jury's assessment.[72] At his deposition, Lacey admitted:

1)   He has not studied Hamas, Lacey Dep. 99:22-23.

2)   He is not an expert on how terror organizations finance themselves, Lacey Dep. 116:7-10; 270:23-271:3.

3)   He is not an expert on Palestine, Lacey Dep. 286:11-13.

4)   He is not an expert on charitable groups, and whether those charitable groups have ever acted as a front for Hamas or been infiltrated by Hamas, Lacey Dep. 117:10-15.

5)   He had no opportunity to understand or learn exactly how it was that charitable committees in the Palestinian Territories selected the recipients of payments from the Saudi Committee because his expertise "really stops at the Saudi end of things." Lacey Dep. 119:7-13.

The essence of Mr. Lacey's opinion was that, based upon his observations at "the Saudi end of things," the Saudi Committee had an ostensibly charitable purpose, but he possessed no expertise that qualified him to opine about the Saudi Committee's own records. In that regard, his experience stood in sharp contrast to Mr. Spitzen's, whose in-depth research and analysis of the Saudi Committee (including the organizations it partnered with, and the individuals it paid), rendered him eminently qualified to offer testimony on the subject.

It is true that, in *Gill,* Judge Weinstein took a more liberal approach to admitting experts, but *Gill* binds neither this nor any other District Court.[73]  More importantly, *Gill* provides no basis for this Court to depart from Judge Gershon's earlier, 2011 opinion *in this matter* (*Linde v. Arab Bank,* 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011)), where the Court held that testimony

---

[72]      *See, e.g., Chin v. Port Authority of N.J.,* 685 F.2d 135, 161 (2d Cir. 2012) ("an erroneous evidentiary ruling warrants a new trial only when a substantial right of a party is affected, as when a jury's judgment would be swayed in a material fashion by the error."), *quoting Lore v. City of Syracuse,* 670 F.2d 127, 155 (2d Cir. 2012).

[73]      *See Camreta v. Greene,* 131 S. Ct. 2020, 2033, n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").  Experts are frequently admitted in one proceeding and not admitted held others.  *See, e.g., Zaremba v. General Motors Corp.*, 360 F.3d 355, 359 (2d Cir. 2004).

indistinguishable from Lacey's opinions was irrelevant and improper because it sought to communicate expert opinions regarding the Saudi Committee's intentions and motives.

Finally, Defendant's wan effort to draw analogies between Mr. Lacey's paean to Saudi Arabia's goodwill and Mr. Spitzen's trial testimony is inapt.  This Court previously rejected very similar arguments when Defendant made them at trial.  *Linde* ECF No. 1156.[74]  For example, the Court denied Defendant's request to reconsider the exclusion of Mr. Lacey (and Mr. Rundell, discussed below).  At that time, the Court made clear that, unlike Mr. Lacey and Mr. Rundell, Mr. Spitzen did not offer opinions on the subjective intent of the Saudi Committee.  Sept. 16, 2014 Order at 1.  Defendant again baselessly argues that the Court was mistaken.  According to Defendant, Mr. Spitzen's door-opening testimony covers four topics:

1) ***Mr. Spitzen was permitted to testify that the Saudi Committee worked hand-in-glove with the Union of Good to support Hamas***. NT Mem. at 20.  Defendant cites three pages from the trial transcript (TT1570; 1576; and 1586).  The only reference at TT1570 conceivably addressing this issue is at lines 18-21, where Mr. Spitzen states that the Saudi Committee is a member of the Union of Good, a simple declarative statement having nothing to do with the Saudi Committee's subjective intent.  The Saudi Committee is not even *mentioned* on TT1576; the testimony on that page concerns transfer of funds to Hamas-managed associations in the West Bank by the Union of Good.  Mr. Spitzen's prior statement, that the Saudi Committee is a member of the Union of Good, is presumably the tie-in, but again, Mr. Spitzen's statement says *nothing* about the Saudi Committee's intent.  At TT1586, Mr. Spitzen testified regarding a letter he reviewed purporting to be from *the Palestinian Authority* complaining that Saudi Committee funds were going to Hamas rather than other organizations.  Mr. Spitzen explained that the letter is consistent with the conclusions he drew concerning Saudi Committee contributions to Hamas.  His testimony presents no opinions regarding the Saudi Committee's "intentions or beliefs."

2) ***Mr. Spitzen was permitted to testify that the findings of his research were consistent with Plaintiffs' contention that the Saudi Committee was part of the Union of Good, which in turn had a "primary purpose" of "divert[ing] charitable donations to support Hamas members and the families of terrorist operatives."*** NT at 20.  Here, the Bank cites TT1577 and 1580. Again, the Saudi Committee is *not* mentioned on TT1577, but the testimony contains a reference to

---

Defendant has apparently also abandoned its previous argument that the testimony of Plaintiffs' expert Dr. Matthew Levitt also justifies resurrecting Mr. Lacey.

the "primary purpose" of the Union of Good at TT1577:20-24. However, it is *not* Mr. Spitzen's opinion, but a *quotation* being read to him from the United States' designation of the Union of Good, and Mr. Spitzen merely agrees that the statement is consistent with his findings. TT1580 contains testimony in which Mr. Spitzen state that the Saudi Committee was one of the 50 foundations under the umbrella of the Union of Good, a straightforward statement having *nothing* to do with the subjective intent of the Saudi Committee.

    3)    ***Mr. Spitzen was permitted to testify that the evidence he reviewed showed that the Saudi Committee transferred money for the purpose of supporting Hamas and that this evidence helped him reach his conclusion "regarding the relationship between the contribution made by the Saudi Committee to Hamas.*** NT Mem. at 20. The Bank cites TT1586, which merely repeats the quote cited at no. 1 above.

    4)    ***Mr. Spitzen was permitted to testify that the Saudi Committee payments were inordinately high, and that this enabled him to conclude that "the payments by the Saudi Committee to different prisoners of Hamas suicide bombers and to injured operatives of Hamas were extremely significant to them."*** NT. Mem. at 20-21. The Bank cites TT1591-92, testimony that merely states that the Saudi Committee payments to the families of Hamas prisoners and suicide bombers were significant to the recipients, based upon average per capita income in the West Bank and Gaza Strip. That testimony is based upon Mr. Spitzen's years of work and research in the Palestinian Territories, and it has nothing to do with the subjective intent of the Saudi Committee.

Despite failing to identify any conceivable analogy, Arab Bank contends that Mr. Spitzen's testimony entitles it to respond with Mr. Lacey's testimony. Specifically, the Bank claims that the Court should have admitted testimony concerning the paragraphs from Mr. Lacey's Report and Rebuttal Report cited at NT Mem. at 21. *See Linde* ECF Nos. 918 and 919. The twelve pages of text Arab Bank cites contain no mention of the Union of Good, no citation to any of the documents produced by the Saudi Committee in this litigation, and no suggestion that Mr. Lacey has reviewed the amounts received by the Saudi Committee beneficiaries, their economic significance or the identities of the beneficiaries. Rather, those twelve pages contain evidence that Judge Gershon properly precluded – irrelevant narrative about the history and charitable intentions of the Saudi Committee and the Saudi government. Presenting this

meritless argument a third time does not earn the Bank a new trial.

## 2. David Rundell

When Judge Gershon excluded Mr. Rundell's opinions in 2011, she held that "the history of international assistance efforts in the Palestinian Territories and economic development of the region, as described particularly by David Rundell ... is not relevant to whether or not certain bank transactions took place in violation of the ATA. In addition to being an inappropriate area for expert testimony, reviewed against the ATA's elements, these kinds of generalities do not go to any issues under the ATA." *Linde,* 920 F. Supp. 2d at 285. Defendant again fails to explain how testimony regarding "the legitimate humanitarian mission of the Saudi Committee," NT Mem. at 21, is relevant to "whether or not certain bank transactions took place in violation of the ATA."

Like its arguments concerning Mr. Lacey, Defendant claims manifest error based on supposedly analogous testimony Mr. Spitzen gave. NT Mem. at 21. Defendant claims TT1579-1581 reflects testimony by Mr. Spitzen regarding the Saudi Committee's purpose, thus requiring a new trial where Mr. Rundell would testify about "the legitimate humanitarian mission of the Saudi Committee." Again, the Bank falsely characterizes Mr. Spitzen's testimony; Spitzen testified as to goals the Saudi Committee *published on its own website,* not his opinions about its goals. Mr. Spitzen also opined as to the Saudi Committee membership in the Union of Good, based on documents and data he reviewed, not based on an assessment of the Saudi Committee's motives.

The Bank's claim that Mr. Rundell should be permitted to testify about "the legitimate humanitarian mission of the Saudi Committee" is particularly misguided because Mr. Rundell's opinions are all predicated on his expertise as "the former Chargé d'Affaires and Deputy Chief

of Mission at the United States Embassy in Saudi Arabia" and "the longest-serving American diplomat in Saudi Arabia."[75]  Defendant previously asserted that Mr. Rundell would testify that he is "wholly unaware of any conclusion within the U.S. government that the Kingdom of Saudi Arabia has at any time collected funds in order to provide incentives for terrorist acts" and that "[t]o the contrary, during periods when [he] worked closely with the financial, foreign affairs, and security ministries of the Saudi government, [he] encountered only a shared commitment to combating terrorism and terrorist financing." *Citing* Rundell Report at ¶ 37.

A Freedom of Information Act disclosure served on Plaintiffs' counsel by the U.S. State Department, six years after the request was made, while the jury was deliberating in this case makes clear that the United States government took a very different view of the Saudi Committee's activities than the one Mr. Rundell would purportedly express.  A heavily redacted State Department memorandum titled "Ongoing Hamas Fundraising Operations in Saudi Arabia" (*see* Schlanger Decl. Exhibit 11) notes:

> **In 2003, the United States provided evidence to Saudi authorities that the Saudi al Quds Intifadah Committee ("Committee") founded in October 2000, was forwarding millions of dollars in funds to the families of Palestinians engaged in terrorist activities, including those of suicide bombers. The funds were often transferred through integrated accounts at a number of major Saudi banks that were popularly referred to as Account 98.**

When it filed its Rule 59 Memorandum on October 10, Defendant was indisputably aware of the contents of the State Department memorandum.  Thus, the Bank knows that the Rundell testimony it proposes to introduce is undeniably false.  For this additional reason, the Rundell testimony cannot merit a new trial.

---

[75]    *See* Defendant's Apr. 29, 2011 Mem. of Law in Opp. to Pls. Mot. To Exclude 16 of the Bank's Case-in-Chief Expert Witnesses, at 72; Filed Under Seal, No ECF Docket Number.

**F.       The Court Did Not Err In Admitting The Israeli Unlawful Associations List**

Defendant also argues (NT Mem. at 21-22) that the improper admission of Israel's Unlawful Associations list (PX1078 – the "Israeli Blacklist") warrants a new trial because the document: (1) concerns foreign law and is thus irrelevant based on prior Court rulings; (2) was not properly authenticated; and (3) was irrelevant and unfairly prejudicial.  Defendant fails to describe the legal standard that would justify that ruling, but presumably believes these purported errors caused the jury to reach "a seriously erroneous result" constituting a "miscarriage of justice."  The Court committed no error, let alone anything close to a miscarriage of justice.

*First,* the Court's rulings excluding evidence or arguments concerning compliance with foreign law did not bar PX1078's admission.  The Israeli Blacklist is a non-exclusive data point supporting Mr. Spitzen's opinions that particular organizations were, in fact, part of Hamas's network.  Consistent with Fed. R. Evid. 703, Mr. Spitzen directly identified the source document he was considering and relying upon.  The issue was not whether the designated entities listed in PX1078 were part of Hamas as a matter of Israeli *law* – or for that matter *any* foreign jurisdiction's *law*.  Rather, the Israeli Blacklist, which reflects the Israeli government's investigations and analysis, was admissible as one piece of the overwhelming *factual* evidence the jury properly considered in determining whether various organizations were controlled by Hamas.

Notably, Mr. Spitzen offered no opinions regarding the Bank's knowledge of, or obligations with respect to, the Israeli Blacklist.  Nor did he offer opinions or explanations regarding whether the list was physically received by the Defendant.  He also did not opine whether the Israeli Blacklist should have been disseminated more broadly, converted to an electronically-searchable format, or which sectors of the public were expected to take affirmative

action.

Contrary to the Bank's vague attempt to draw a parallel between Mr. Spitzen's testimony and the irrelevant testimony the Bank sought to introduce, Defendant's so-called "foreign law experts" were never offered for the purpose of establishing whether any of the entities listed in PX1078 were part of Hamas.  Moreover, the Court permitted Defendant's expert, Dr. Milton-Edwards, to opine that:

> [I]t would be important in terms of the criteria to see were any of these Zakat committees coordinating with the Israeli defense forces during the period of 2000 and 2004 or other Israeli authorities to actually distribute humanitarian aid, particularly in towns like Jenin and Ramallah and Nablus. I looked at whether Hamas was claiming control of the Zakats and house members or people that I was speaking to who said that they were representing Hamas views. Again, very importantly, did the Palestinian community, did the people of these areas in these towns, in these refugee camps, in these villages, did they say, oh, yes, that's the Hamas committee.

TT2136.

Dr. Milton-Edwards was not only permitted to discuss the Palestinian Authority's ("PA") licensing of particular organizations[76] but was also allowed to testify without any supporting evidence that the government of Israel approved providing financial assistance to the Jenin Zakat Committee, an entity on the Israeli Blacklist, after the government received a list of proposed aid recipients from international aid organizations. TT2163.  Had Dr. Milton-Edwards retained a

---

[76]    *See, e.g.*, TT2116:24-2119:9 (discussing evolution of licensing); 2121:2-17 (discussing PA licensing renewal practices); 2141:20-17 (licensing of Islamic Charitable Society of Hebron); 2148:5-19 (discussing PA-licensed educational institutions run by Islamic Charitable Society of Hebron); 2159:11-23 (licensing of Jenin Zakat Committee); 2170:6-17 (licensing of Al Tadamun Islamic Charitable Society); 2187:24-2188:12 (licensing of Tulkarem Zakat Committee); 2196:8-2192(2) (licensing for Ramallah Zakat Committee); 2201:19-2202:6 (licensing for Al Islah Charitable Society); 2219:1-5 ("Again, as was the usual practice because of licensing regulations, I mean all of these societies because they were licensed, they were legally obliged to have Board of Directors in their branches and they were legally obliged to have around 11 to 12 members."); 2228:25-2229:6 ("As I've said, the licensing regime, the regulation and the laws that permit these societies to operate and be founded, first by Israel and later by the Palestinian Authority on an annual renewal basis, would have stipulated that you have to have a Board of Members, a Board of Directors for each branch and that that has to have around 12 male members."); 2237:5-11 (regulation of Al Nur Prisoners Society); DX1618 (summarizing data points informing witness's opinion that eleven zakats and charitable societies not controlled by Hamas, including fact that they were licensed and regulated by PA or Israel).

shred of credibility with the jury, this unsubstantiated testimony could have been far more impactful than the properly admitted government record at issue.  However, as discussed above, the admission of testimony regarding these *factual* issues is a universe away from the Bank's effort to introduce witnesses and evidence in order to advise the jury regarding foreign legal requirements, or how compliance with such requirements therefore demonstrated that the Bank lacked the requisite *mens rea*.  For Plaintiffs, the Israeli Blacklist merely served as one data point relevant to whether the Bank's conduct violated the ATA's material support element, whereas Defendant's effort to introduce foreign law was an attempt to *nullify* U.S. law and numerous Court rulings.

*Second*, the Israeli Blacklist was properly authenticated under Fed. R. Evid. 901, not Rule 902.  Mr. Spitzen testified that he: (a) recognized the document; (b) understood it was publicly available and that it was issued for the purpose of informing the general public that certain associations were illegal; (c) understood (based on his experience as a government official consulted on the designation process) that such publications are made publicly available in Israel; and (d) could verify that it was authentic.  TT1492:6-19.  Rule 901 (including Rule 901(b)(1) or Rule 901(b)(4)) require no more.  Although the Bank was permitted to cross-examine Mr. Spitzen to cast doubt on his opinions, his testimony regarding PX1078 was unassailable.[77]

*Third*, the Bank's claim that admitting the Israeli Blacklist was unfairly prejudicial under Rule 403 is unfounded.  As shown above, PX1078 was admissible under the Federal Rules of

---

[77]        Dr. Milton-Edwards testified regarding *her* understanding of the degree to which the Israeli Blacklist was publicly available or disseminated (TT2127:2-212:5), and Defendant was permitted to proffer testimony by its expert, Yair Dagan, on this subject but declined to do so. The accuracy of Mr. Spitzen's testimony is, moreover, further confirmed by the October 24, 2014 Declaration of Israeli Defense Forces (IDF) Colonel (ret.) Shlomo Politis (the "Politis Decl."), attached as Schlanger Decl. Exhibit 12. The Politis Decl. sets forth, in greater detail than was necessary or appropriate for the jury, the process by which the government of Israel published and disseminated its Blacklist.

Evidence.  It was one in a series of data points tending to establish that certain customers of the Bank were part of Hamas's network of organizations.  The Court afforded Defendant's expert, Dr. Milton-Edwards, considerable latitude to testify repeatedly as to purported Palestinian or Israeli licensing of various organizations or entities notwithstanding the fact that the Bank established no foundation to authenticate the licenses and supposed government actions she narrated.  Accordingly, the admission of PX1078 was not unfairly prejudicial nor was it legal error.

### G.    The Court Did Not Err In Issuing Its *Respondeat Superior* Instruction

The Bank (NT Mem. at 11-12), once again insists that ATA liability cannot be found based on Defendant's employees' and/or agents' conduct.  Defendant presents the same arguments it unsuccessfully offered at summary judgment,[78] in its 2013 motion for reconsideration,[79] and *again* in connection with its proposed jury instructions,[80] which the Court (again) considered before the final charges were delivered.  *See* TT3027:2-11.  The argument has not improved with age or repetition.  Indeed, the Bank identifies no ATA decision that supports its argument,[81] and ignores the fact that courts have explicitly noted that civil RICO's vicarious

---

[78]    See Mem. of Law of Defendant Arab Bank Plc In Support Of Its Motion For Summary Judgment at 6-7 (*Linde* ECF No. 887).

[79]    *See* Mem. of Law In Support Of Defendant Arab Bank PLC's Motion For Partial Reconsideration Of This Court's April 24, 2013 Decision To Deny, In Substantial Part, The Bank's Motion For Summary Judgment, Or, In The Alternative, For Certification Of An Interlocutory Appeal, at 18-20 (*Linde* ECF No. 942).

[80]    *See* Proposed Jury Instructions Submitted by Defendant Arab Bank PLC, Proposed Instruction No. 31, and Proposed Jury Instruction No. 31A at 54-58 (*Linde* ECF No. 1019).

[81]    *See Gill*, 893 F. Supp. 2d at 558 (Plaintiff is correct in contending that the ATA provides for corporate liability on a theory of *respondeat superior*."). *Accord Estate of Parsons v. Palestinian Authority*, 651 F.3d 118, 148-150 (D.C. Cir. 2011) (concurring opinion of Brown, C.J.); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614, 650 (S.D. Tex. 2011); *Abecassis v. Wyatt*, 7 F. Supp. 3d 668, 677 (S.D. Tex. 2014); *Sokolow v. Palestinian Authority*, 2014 WL 6601023, at *4.

liability principles are *sui generis* to that statute.[82]   In short, the Bank's argument has been repeatedly rejected by this Court and many other district courts, and the Court's jury instructions were correct.

### H.  The Court Did Not Err In Admitting Limited Statements Against Interest By Hamas

Despite the fact that the Court issued *two* separate written Orders (*Linde* ECF Nos. 1049 and 1118) that rejected Defendant's argument that Hamas's statements of responsibility were inadmissible, the Bank uses its Rule 59 motion as a vehicle to reargue the law of the case without citing any new precedent overlooked by the Court.  Instead, it cites the same cases the Court previously considered and distinguished.  NT Mem. at 16.

As the Court correctly recognized, "People usually have a motive for saying something that is against their penal interest, besides wanting to go to jail.  So they have some other purpose.  If inherently the declaration is against their penal interest, the fact that they have some other motive for making that declaration does not rob it of its probative force."  TT1022:14-20. Accordingly, as the Court explained, the fact that the jury had to decide what weight to assign to these statements did not affect the statements' admissibility.  Aug 1, 2014 Order at *6.[83]  This analysis squared with both the law and common sense.  Given that Hamas did, in fact, claim responsibility for terrorist attacks while *well aware* that its claims would spark reprisals by the Israeli government, those statements were undeniably against Hamas's interests.  *Linde* ECF

---

[82]    *See Renner v. Chase Manhattan Bank*, 2000 WL 781081, at *11 (S.D.N.Y. 2000) (explaining that civil RICO cases constitute only a "*narrow exception to the general principle of respondeat superior*" that does not extend beyond the statute).

[83]    While the above is sufficient to deny the Bank's motion, it is worth observing that Defendant ignores the Court's August 29, 2014 Order (*Linde* ECF No. 1110), which circumscribed the evidence of which the Bank complains by requiring that "[t]hose claims of responsibility that plaintiffs intend to submit to the jury must be redacted, except for the actual statements taking responsibility for the attacks, statements providing corroborative details of the attack, the Hamas seal and (where applicable) the picture of the perpetrator."  August 29, 2014 Order.

1118.   Furthermore, as noted in PX1248, an August 22, 2003 U.S. government designation admitted into evidence without objection:

> **By claiming responsibility for the despicable act of terror on August 19, Hamas has reaffirmed that it is a terrorist organization committed to violence against Israelis** and to undermining progress toward peace between Israel and the Palestinian people, President Bush stated. (Emphasis added.)

This example confirms the accuracy of the observation in the Court's August 1 Order that, "[b]y claiming responsibility for an attack, Hamas could trigger investigation by Israeli authorities, investigation which could lead to imprisonment or assassination by the IDF if the statement of responsibility is found true."  Aug. 1 Order at *6. In this particular case, Hamas's claim of responsibility precipitated the U.S. designation of several Hamas leaders and organizations. This Court's ruling is also supported by numerous decisions holding that "boastful," "bragging," and "braggadocio" statements *can* be admissible under Fed. R. Evid. 804(b)(3) if they are sufficiently self-inculpatory.[84]  While *Gill*, 893 F. Supp. 2d at 569, reached a contrary conclusion, that decision only made an opaque *cf.* reference to these indistinguishable decisions.  The Bank simply ignores this authority.[85]

At the trial, the Court carefully considered each statement against interest Plaintiffs sought to introduce on a case-by case basis, and correctly applied the reasoning documented in the Court's orders.  To wit:

(1)   Before Plaintiffs' expert Evan Kohlmann testified, Plaintiffs' counsel sought rulings on three categories of evidence to be proffered through Mr. Kohlmann: (1) "three communiqués from Hamas of statements of responsibility for the particular attacks" (TT309:10-11); (2) "a collection of some video clips with respect to certain suicide bombers prior to their attacks in sort of a last will and testament"

---

[84]   *See id.* (citing *United States v. Mills*, 704 F.2d 1553, 1562 (11th Cir. 1983)); *United States v. Mussare, III*, 405 F.3d 161, 168 (3d Cir. 2005); *United States v. Berrios*, 676 F.3d 118, 129 (3d Cir. 2012).

[85]   Defendant also relies upon the inapposite decision in *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 2014 WL 3719160, *9-10 (D.D.C. July 28, 2014).  There, the court made the *factual* conclusion that the particular declaration at issue "was a publicity-seeking effort that was not contrary to his perceived interests." *Id.*

(TT309:20-22); and (3) "a page from the Palestine info website which, too, calls for donations to a specific account, an Arab Bank account."  TT309:25-310:2. Defendant only questioned whether the last category of documents, specifically PX289, qualified as an actual statement against interest.  After listening to the parties' arguments, the Court reframed the issue as "is it against the third-party's interest" to make the statement admissible based on sufficient indicia of trustworthiness (TT312:9-11) and held "I don't know if I'm going [to] allow every single website, but I will allow this one."  TT312:19-20; *see also* TT376-77. There is no manifest error in this determination.

(2)     During Mr. Kohlmann's testimony, Plaintiffs' counsel sought to admit into evidence PX4767, a Hamas claim of responsibility for the Park Hotel bombing. Defense counsel argued that "the declaration against interest is not being used against the party."  TT365:11-12.  The Court overruled the objection and held that "[t]he declarant's interest is always against a nonparty, otherwise it is an admission."  TT365:14-15.  In the same line of questioning regarding another video exhibit, PX3580, defense counsel argued that claims of responsibility for terrorist attacks help "mov[e] forward some agenda" and that "is in their interest." TT370:7-11, 370:22-23.  The Court overruled the objection stating "the fact of the matter is, he might have some pause and hesitation and have to balance whether getting himself in trouble, is worth the benefit of making the statement.  He – declarant measures that, that balance in every declaration he makes.  I think it is very clear that this had potential exposure to the declarant…." TT371:2-8.  There is no manifest error in this instance.[86]

(3)     In receiving over objection PX3912 – a video will of the perpetrator of the August 19, 2003 bombing of Bus 2 in Jerusalem – the Court ruled that "if it is a declaration, if someone says I have done or I am about to commit a terrorist act, which this effectively is, then I am going to overrule the objection.  So you can just note your objections to preserve it and I will overrule it."  TT418:17-21.  The Bank was permitted to note its objections to similar documents; however, the Court overruled those objections for the entirely valid reasons previously stated on the record. *See* TT423:15-20 (admitting PX3807).

(4)     During Dr. Matthew Levitt's testimony, Plaintiffs presented PX1244 – a video showing Sheikh Yousef Qaradawi speaking on a panel with Hamas leader Khalid Mishal and stating that the Union of Good provided money to Hamas.  In addition to holding this was a statement against interest, the Court determined that it was in response to "doors that the defendant opened in its opening statement and I see no impediment to the plaintiffs addressing those points."  TT670:2-673:12.  This *separate* basis for admission clearly does not demonstrate manifest error.

---

[86]     The Court demonstrated the balanced approach it took with respect to admitting statements against interest into evidence by sustaining Defendant's objection to PX 3909 on the basis that the circumstantial proof that Hamas was taking responsibility for an attack did not suffice to meet Rule 804(b)(3)'s standard, notwithstanding the document's appearance on Hamas's website.  TT410:1-411:24.

As the Seventh Circuit noted in *Boim III*, internet website postings by terrorist groups may be independently admissible into evidence for their truth subject to proper authentication (some type of proof that the postings were actually made by the organization to which they are being attributed).  549 F.3d at 702.  The *Boim III* court noted that the plaintiffs' expert in that case:

> identifies the websites from which he quotes as ones controlled by Hamas, but it does not describe the basis for his conclusion, and consequently his declaration does not permit any independent assessment of the purported links between these sites and Hamas and the source of the postings that he recounts. Of course, the rules of evidence do not limit what type of information an expert may rely upon in reaching his opinion; even if that information would not otherwise be admissible in a court proceeding, an expert witness may rely upon it so long as it is the type of information on which others in the field reasonably rely. *Indeed, Rule 703 now expressly permits the expert to disclose such information to the jury, provided the court is satisfied that its helpfulness in evaluating the expert's opinion substantially outweighs its prejudicial effect*. Nonetheless, a judge must take care that the expert is not being used as a vehicle for circumventing the rule against hearsay. Where, as here, the expert appears to be relying to a great extent on web postings to establish a particular fact, and where as a result the factfinder would be unable to evaluate the soundness of his conclusion without hearing the evidence he relied on, we believe the expert must lay out, in greater detail than Paz did, the basis for his conclusion that these websites are in fact controlled by Hamas and that the postings he cites can reasonably and reliably be attributed to Hamas. *Id.* at 703 (emphasis added).

Here, Plaintiffs proffered two experts who offered extensive and detailed evidence that the websites containing Hamas's claims of responsibility genuinely belonged to Hamas and that the claims were authentic.[87] Mr. Kohlmann linked one of the websites at issue directly to Hamas leader and Arab Bank customer Osama Hamdan, whose account number appeared on the website and received donations in the name of "Hamas." With respect to the other website that was a source of Hamas claims of responsibility – www.alqassam.ps – Defendant's expert

---

[87]     In the exercise of the Court's discretion, as noted in *Boim III*, the claims of responsibility for various attacks could also have been disclosed to the jury under Rule 703, provided the court was satisfied that its helpfulness in evaluating the expert's opinion substantially outweighs its prejudicial effect.

acknowledged that accessing and reviewing the website was part of her regular research on Hamas. TT2258:12-22. Similarly, Ronni Shaked, whom Plaintiffs proffered as an expert regarding the attribution of the 24 attacks at issue to Hamas, also relied upon these claims of responsibility by Hamas.  The Court correctly concluded that Mr. Shaked's testimony would be sufficient to authenticate the claims of responsibility. TT 814:11-815:18.

Accordingly, the Court should – again – overrule Defendant's objections and deny its Rule 59 motion on this issue.

### I.     The Court Did Not Abuse Its Discretion When It Allowed Plaintiffs To Impeach A Witness With Factual Findings From The FinCEN Assessment

By permitting Plaintiffs' counsel to cross-examine Brian Billard, the Bank's New York branch compliance chief, regarding excerpts from the FinCEN Assessment of Civil Money Penalty (the "Assessment") the Court properly exercised its discretion under Fed. R. Evid. 403 and avoided the material prejudice Plaintiffs would have faced had they been barred from conducting that cross-examination.  The Court also properly rejected the Bank's incorrect claim that Rule 408 prohibited any reference to the Assessment, particularly in the tailored manner it was used at trial.  Even before the Bank decided to elicit trial testimony from Billard boasting of Defendant's purportedly outstanding compliance culture, the Assessment had been purged of all references to, and indicia of, both settlement and penalties. Rule 408 prohibits the admission of "conduct or a statement made during compromise negotiations about the claim."  The record makes clear that Court did not admit anything Arab Bank said, much less "a statement made during compromise negotiations about a claim."  The excerpts used during Mr. Billard's cross-examination were statements of government findings, not statements made by *Defendant* as part of a settlement.

The Court did <u>not</u> "reject[] ... the Bank's argument that the FinCEN Assessment was a

settlement ...” NT Br. at 17.[88]   Instead, the Court consistently applied heightened scrutiny to *both* the portions of the Assessment Plaintiffs proffered, and the manner in which the Assessment was used at trial.   Critically, the Assessment was *not* introduced into evidence, and it was not provided to the jury. It was instead permitted solely for the limited and proper purpose of asking Mr. Billard about specific government factual findings *after* Mr. Billard repeatedly asserted on direct examination that the New York branch strictly complied with all legal requirements and industry best practices, issues that Plaintiffs *never* raised in their direct case. For example, Mr. Billard stated:

- “[I]n order to make sure that we comply fully with the U.S. regulations – because we are being hosted by the U.S., we’re doing business in the U.S. – we follow very strictly the laws and regulations of the U.S. ...” TT2584.

- “You know, as a branch of Arab Bank, we were doing business in the USA. Okay.   They are our host country.   As such, we insure, like we do around the world, we insure that we follow to the strictest degree the local rules and regulations and laws.   That’s how we run our business.” TT2592.

- “And as a guest of the United States to do business, we strictly followed every law, rule and regulation that we were required to.”  TT2593.

- “And you know, in order to apply for a license at OFAC, you had to have good records, be very strict, and therefore we would have very good records on those items.”  TT2594.

Defendant transparently elicited this testimony to convince the jury that no bank whose network included a U.S. branch with such exemplary practices could ever knowingly do business with Hamas.   Defendant obviously knew Billard’s representations directly conflicted with

---

[88]      FinCEN’s Assessment is divided into six sections and is signed only by FinCEN’s director, not by the Bank. There is no separate stipulation and consent, as there are for the two (prior) OCC Consent Orders. Three of the Assessment’s sections, Introduction, Consent to Assessment, and Release, report that the Bank consents in the Consent Order to the concurrent $24 million fine *but* neither admits nor denies any of the factual findings and legal conclusions reflected in Sections III and IV of the Assessment (which are *not* incorporated into the Consent Order agreed to by the Bank).  Although *portions* of the Assessment thus evidence a settlement, the document *itself* is simply a publicly available document memorializing FinCEN’s investigative findings, which the agency conducted pursuant to its statutory authority. Moreover, FinCEN’s factual findings neither resulted from or reflected any negotiations or compromises, and are not attributable to the Bank or Mr. Billard. Those findings are not hearsay, pursuant to Fed. R. Evid. 803(8).

FinCEN's factual findings. The Court agreed, but, mindful of Rule 403 and Rule 408's strictures, established clear limits for Plaintiffs' cross-examination.

Plaintiffs were not permitted to mention the settlement, agreement, consent, compromise, penalty, fine, sanction, or the fact that the Bank had agreed to shut down its branch and convert it to an agency as a result of the parallel FinCEN and OCC investigations, even though the jury arguably was left with the misimpression that the branch still was open.  TT2592-93.  Moreover, instead of permitting Plaintiffs to introduce the Assessment into evidence for the purpose of impeaching Mr. Billard, the Court only permitted Plaintiffs to question Mr. Billard about select factual findings.  TT2688.  Billard was thus cross-examined about three specific FinCEN factual findings:

- Mr. Billard, are you aware that FinCEN made the following finding: "Arab Bank-New York did not file the majority of its Suspicious Activity Reports referencing terrorist financing until ... after the Office of Controller of the Currency commenced a review of its funds transfer activity in July of 2004?" TT2704.

- "Are you aware that FinCEN found that names similar to those of originators and beneficiaries of funds transfers cleared by Arab Bank-New York appeared in credible and publicly available sources of information, including Congressional testimony, indictments in the United States, and well publicized research and media reports linking the originators and beneficiaries to illicit activities?  Some originators or beneficiaries appeared in subpoenas or other legal processes that Arab Bank-New York received from law enforcement in the United States." TT2705.

- Mr. Billard, are you aware that FinCEN made the following finding: "Once a designation occurred, Arab Bank-New York failed to review recent activity occurring prior to the designation and associated with the designated activities to identify potentially suspicious activity.  Had such a review been conducted, it would have uncovered originators and beneficiaries with possible ties to the designated entities that had recently engaged in potentially suspicious activity. Arab Bank-New York failed to review information in its possession that would have shown it was clearing funds transfers for individuals and entities dealing with subsequently designated terrorists and terrorist organizations, failed to analyze this information, and failed to file Suspicious Activity Reports?" TT2705-06.

In response to each inquiry Billard testified he was aware of the findings, but with respect to the first finding he added that he disagreed with it.  The limits imposed by the Court – even on the scope of cross examination – reflected careful consideration of Rule 403 and Rule 408's precepts. ("The Court remains mindful of the potential for prejudice, and thus will not admit the FinCEN assessment as substantive evidence ..." (*Linde* ECF 1156)).[89]  Rule 408(b) expressly permits a court to admit evidence of a settlement or of statements made by a party in settlement negotiations if the purpose is to "prove[] a witness's bias or prejudice...."  Mr. Billard, still employed by the Bank, was the head of compliance of the Bank's New York branch during the relevant period, and was therefore directly responsible for some of the functions that led to the imposition of severe penalties.  His testimony was that Defendant's compliance function met the strictest U.S. banking standards.  Plaintiffs were entitled to confront him with factual findings from the Assessment that directly conflicted with his representations.  "It blinks reality to argue, as defendant[] do[es], that this extended paean to [the bank's] virtue ... did not invite a response based fairly in the evidence."  *Brady v. Wal-Mart Stores, Inc.*, 455 F. Supp. 2d 157, 181 (E.D.N.Y. 2006) (allowing use of consent decree after ordering redaction of prejudicial portions, limiting counsel's use of decree, and giving jury a limiting instruction).

Finally, the concise excerpts of the Assessment that Plaintiffs were permitted to deploy in cross-examination of Mr. Billard are in no way analogous to the communications between attorneys engaged in settlement negotiations discussed in *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 198-99 (S.D.N.Y. 2008).[90]  Notwithstanding Defendant's claim

---

[89]    The latter citation and quote also go directly to the Court's appropriate weighing of the probative versus prejudicial value of the FinCEN Assessment's passages, pursuant to Rule 403.

[90]    Defendant's citation to *Gill v. Arab Bank, PLC*, is misplaced, because, unlike here, Judge Weinstein's concern was that the OCC investigation and settlement occurred years before the 2008 events at issue in that case. *Gill,* 893 F. Supp. 2d at 566.

to the contrary, *Option Res. Grp. v. Chambers Dev. Co.*, 967 F. Supp. 846, 850 (W.D. Pa. 1996), remains good law, appropriately cited by the Court in its September 16, 2014 Order denying Defendant's motion for mistrial.  *See S.E.C. v. Pentagon Capital Mgmt. PLC*, 2010 WL 985205, *2-5 (S.D.N.Y. March 17, 2010) (discussing and endorsing *Option Res. Grp.*).[91]  Thus, the Assessment's factual findings were properly presented to the jury in accord with Rule 403 and 408; the Court's ruling is no basis for a new trial.

### J.      The Trial Structure Approved By The Court Does Not Warrant A New Trial

The Bank again protests that it was unfairly prejudiced by the trial's structure, contending that the jury was confused, because (according to the Bank) Plaintiffs were permitted to "…present evidence to the jury pertaining to 24 separate Hamas attacks, even though that evidence was irrelevant to particular incidents."  NT Mem. at 23.  This argument is particularly cynical in light of the Bank's own prior proposals regarding the trial's structure.  Following a February 1, 2007 conference before the Magistrate Judge, the parties submitted several trial proposals to the Court. *See Linde* ECF Nos. 327, 328.  In March 2007, Defendant wrote to the Court and proposed that for all 6,000 claims,[92] the Court should – post-summary judgment – conduct separate sets of trials for ATA plaintiffs and ATS plaintiffs, *Linde* ECF No. 327, at *2, and further explained that under this schematic, the Court would convene seriatim trials grouped either for each family of plaintiffs, or "groups of plaintiffs organized by attack and segregated by citizenship." *Id.* at *7.

Two years later, in November 2009, after Plaintiffs submitted (*Linde* ECF No. 586) a

---

[91]      Defendant argues that *Option Res. Grp.* is wrong, citing *Carpenters Health & Welfare Fund v. The Coca-Cola Co.*, No. 00-CV-2838, 2008 WL 9358563 (N.D. Ga. Apr. 23, 2008), but as Judge Sweet observed, the Northern District of Georgia refused to admit an S.E.C. order on the basis that doing so would have a "chilling effect" on future S.E.C. settlements.  *Pentagon Capital*, 2010 WL 985205 at *4.

[92]      At that time, the Alien Tort Statute plaintiffs' claims had not been dismissed.

collective uniform proposed trial structure (which the Court ultimately adopted), the Bank correspondingly filed its own revised proposed trial structure, this time recommending a trifurcated trial to "resolve all of the 6,580 plaintiffs' claims—arising from 389 separate alleged incidents." *Linde* ECF No. 591.  This would allegedly be accomplished by special interrogatories that "could easily facilitate the jury's consideration of the different standards of liability applicable to each of these statutes" and would have asked the jury decide "whether plaintiffs have introduced appropriate evidence of culpable conduct by the Bank independent of evidence of the incidents themselves."

To sum up, the Bank now argues that the liability trial just concluded manifested "extreme prejudice to the Bank caused by this mass proceeding and the jury's inability to evaluate the evidence on an incident-by-incident basis."  NT Mem. at 24. This, even though it previously proposed a trial: (1) to dispose of more than 6,000 claims; (2) with two different legal standards (ATA and ATS); (3) deriving from 389 attacks (4) without the jury hearing about any of those attacks.

It is hard to credit the Bank's protestations of prejudice in light of the kind of trial(s) it previously proposed. The substance of its arguments fares no better. In showing that Defendant provided material support to Hamas, Plaintiffs presented voluminous evidence exhibiting the various types of support Defendant provided.[93]  Plaintiffs established that Defendant transferred over \$3.5 million to Hamas leaders between July 2000 and February 2002, out of which over \$1.5 million was transferred to Hamas leaders *prior* to March 28, 2001, the date of the first

---

[93]     Defendant's apparent belief that ATA claims require some equivalent to LIFO or FIFO accounting is baseless, and has, in fact, been rejected. *See Boim III*, 549 F.3d at 699-700 (rejecting argument that two-year gap between material support and injury was too attenuated, and stating that even fifty year gap might not prevent the imposition of liability because "[t]errorism campaigns often last for many decades" and "[s]eed money for terrorism can sprout acts of violence long after the investment"); *Owens*, 412 F. Supp. 2d at 112-13 (rejecting argument that passage of time between provision of material support and terrorist attack defeated causation).

attack.  TT1408-12.  Some of the Hamas leaders that received wire transfers, at least based on the limited evidence the Bank produced, included: Sheikh Yassin, who received a $60,000 transfer (TT1404); Salah Shehadeh, who received $109,500 in transfers (TT1450); Ismail Haniyeh, who received $420,100 in transfers (TT1451-2); and Abbas al-Sayed, who received $123,000 in transfers.  TT1461.  The material support provided to any one of these individuals alone would have been sufficient for a jury to conclude that Defendant was liable for the 24 attacks carried out by Hamas.

Plaintiffs also produced evidence of payments made to the families of **5** suicide bombers responsible for attacks that injured Plaintiffs, which are clearly relevant to the jury's assessment of Defendant's *mens rea* and liability.  Rather than merely pointing to a single isolated aberration, Plaintiffs identified combined payments that aided Hamas in carrying out the suicide bombings, as noted above, thus providing future suicide terrorists comfort that their families would receive money after they carried out attacks.  With respect to twelve attacks, Plaintiffs presented evidence of transfers to either the families of the suicide bombers, the families of Hamas operatives involved in the attacks or the Hamas operatives who perpetrated the attacks, a particularly difficult task given the Bank's refusal to produce ordered discovery germane to these facts.

Beyond payments to terrorists, Plaintiffs also presented evidence revealing that between 1999-2004 the Bank processed over $2.5 million for the Islamic Society of Gaza (PX4756), a key Hamas-controlled entity in the Gaza Strip that Defendant's expert described as part of "Hamas's network in the decades up to, during and after the second intifada."  PX2413-14.  The jury also learned that during the same time period, Defendant processed over $15 million for the Al-Salah Islamic Association – Gaza, which the U.S. government has found to be a key Hamas

institution.  *See* PX1293.  And the jury also received evidence demonstrating that between 1999 and 2004, the Bank processed over $9.5 million in payments directed to the Islamic Charitable Society of Hebron, another Hamas-controlled entity in the West Bank. PX4758.  The jury was also able to consider the FBI's assessment that funding of that organization "is one example of the role that zakat committees play in the overall goal of building HAMAS grassroots support through charitable projects."  PX1297 p. 28.

The over **$27** million that Arab Bank processed for these three core Hamas entities in the West Bank and Gaza Strip alone would allow a jury to conclude that Defendant's material support for Hamas was a proximate cause of the injuries that Hamas inflicted in each of the 24 attacks.  The Court fairly and correctly exercised its discretion under Fed. R. Civ. P. 42.

Ultimately, courts possess broad discretion to consolidate cases under Fed. R. Civ. P. 42(a) and those decisions are reviewed for an abuse of discretion.  *See Adams v. Szczerbinski*, 329 Fed. Appx. 19, 22 (7th Cir. 2009)("A district court's decision to consolidate cases is subject to review only for an abuse of discretion." (*quoting King v. Gen. Elec. Co.*, 960 F.2d 617, 626 (7th Cir.1992)).[94]  Defendant does not even discuss Fed. R. Civ. P. 42(a)'s standards in its motion.  *See* NT Mem. at 22-24.  Here, the Court acted well within its discretion in managing these actions, and the Bank points to nothing other than conjecture in support of its argument (NT Mem at 23) that the jury ignored the Court's extensive instructions that each attack had to be considered separately.  *See* TT3338:26-3339:1.

---

[94]     *See also Horizon Asset Management Inc. v. H & R Block, Inc.*, 580 F.3d 755, 769 (8th Cir. 2009) (district court did not abuse its discretion by consolidating shareholders' nine securities and derivative actions against corporation, where the actions involved common parties, overlapping legal issues, and related factual scenarios, and no unfair prejudice resulted); *Caronia v. Hustedt Chevrolet*, 2009 WL 5216940 (E.D.N.Y. Dec. 29, 2009) (consolidating four Title VII actions alleging a hostile work environment was created by a single defendant was warranted; because actions related to workplace's nature a whole).

## VIII.   CONCLUSION

Defendant's trifecta of briefs embodies the old cliché about doing the same thing over and over and expecting a different result.  None of the Bank's arguments are new and none are any more compelling or persuasive than they were the first two, three or more times they w advanced.  Taken as a whole, the Bank's arguments are a testament to the Defendant's abject contempt for its myriad victims, the Court, the judicial process and the very idea of accountability under the law.  For all the reasons set forth in this brief and countless others submitted over the past decade, the Defendant's motions should be denied.

Dated:  November 24, 2014
       Hackensack, NJ

                                Respectfully submitted,

                                OSEN LLC

           By:    /s/ Gary M. Osen
                   Gary M. Osen, Esq.
                   Joshua D. Glatter, Esq.
                   Aaron Schlanger, Esq.
                   Peter Raven-Hansen, Esq., Of Counsel
                   Ari Ungar, Esq.
                   2 University Plaza, Suite 201
                   Hackensack, New Jersey 07601
                   (201) 265-6400

                   KOHN, SWIFT & GRAF, P.C.
                   Steven M. Steingard, Esq.
                   Stephen H. Schwartz, Esq.
                   Neil L. Glazer, Esq.
                   One South Broad Street, Suite 2100
                   Philadelphia, PA 19107
                   (215) 238-1700

                   ZUCKERMAN SPAEDER LLP
                   Shawn P. Naunton. Esq.
                   1185 Avenue of the Americas
                   New York, NY 10036
                   (646) 746-8655

TURNER & ASSOCIATES, P.A.
C. Tab Turner, Esq.
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

Attorneys for *Linde* and *Coulter* Plaintiffs

MOTLEY RICE LLC
Michael Elsner, Esq.
John M. Eubanks, Esq.
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465
(843) 216-9000

Attorneys for *Almog* Plaintiffs

SAYLES WERBNER
Mark S. Werbner, Esq.
Joel Israel, Esq.
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
(214) 939-8700

HEIDEMAN NUDELMAN & KALIK, P.C.
Richard D. Heideman, Esq.
Noel J. Nudelman, Esq.
Tracy Reichman Kalik, Esq.
1146 19th Street, NW
Fifth Floor
Washington, DC 20036
(202) 463-1818

STONE BONNER & ROCCO LLP
James P. Bonner, Esq.
145 West 45th Street,
New York, New York 10036
(212) 239-4340

Attorneys for *Litle*, *Roth*, and *Bennett* Plaintiffs