UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                         :
COURTNEY LINDE, et al.,                                  :
                                                         :
                              Plaintiffs,                :
                                                         :   04-cv-2799 (BMC) (VVP)
               - against -                               :   and related cases[1]
                                                         :
ARAB BANK, PLC,                                          :
                                                         :
                              Defendant.                 :
                                                         :
-------------------------------------------------------- X


**MEMORANDUM OPINION AND ORDER**

---

[1] The following related cases have been consolidated with this case for the purposes of this trial:  Philip Litle, et al.
v. Arab Bank, PLC, 04-cv-5449; Oran Almog, et al. v. Arab Bank, PLC, 04-cv-5564; Robert L. Coulter, Sr., et al. v.
Arab Bank, PLC, 05-cv-365; Gila Afriat-Kurtzer, et al. v. Arab Bank, PLC, 05-cv-388; Michael Bennett, et al. v.
Arab Bank, PLC, 05-cv-3183; Arnold Roth, et al. v. Arab Bank, PLC, 05-cv-03738; Stewart Weiss, et al. v. Arab
Bank, PLC, 06-cv-1623.

# Table of Contents

INTRODUCTION ................................................................................................ 1

EVIDENCE AT TRIAL ..................................................................................... 2

   I.   Plaintiffs' Case ......................................................................................... 2

   II.   Defendant's Case .................................................................................... 13

STANDARD OF REVIEW .............................................................................. 21

DISCUSSION .................................................................................................. 22

   I.   Sanctions Order ....................................................................................... 23

     A.   Background ......................................................................................... 23

     B.   The Effect of the Permissive Inference ............................................ 26

     C.   The Effect of the Preclusion Order ................................................... 31

     D.   The Solicitor General's Certiorari Brief ........................................... 35

   II.   "Act of International Terrorism" ........................................................... 42

   III.   Causation ................................................................................................ 44

     A.   Governing Law .................................................................................. 45

     B.   Jury Charge ........................................................................................ 52

     C.   Sufficiency of the Evidence .............................................................. 53

   IV.   Attribution to Hamas ............................................................................. 56

   V.   Scienter ................................................................................................... 58

   VI.   *Respondeat Superior* .......................................................................... 66

   VII.   Evidentiary Rulings ............................................................................... 69

     A.   Authentication Generally .................................................................. 69

     B.   Declarations Against Interest ............................................................ 72

     C.   Foreign Law ....................................................................................... 80

     D.   Israeli List of Unlawful Associations and Terrorist Organizations ............... 82

     E.   FinCEN Assessment .......................................................................... 83

     F.   Saudi Committee Experts .................................................................. 86

   VIII.   Trial Structure ...................................................................................... 89

   IX.   Defendant's 1292(b) Motion ................................................................ 92

CONCLUSION ................................................................................................ 94

**INTRODUCTION**

This case involves claims brought under the civil liability provisions of the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a) et seq., against defendant Arab Bank, PLC. Plaintiffs are American citizens who were the victims, or relatives of victims, of 24 terrorist attacks in Israel and the Palestinian Territories. After a lengthy trial, a jury found that those attacks were perpetrated by the Palestinian terrorist group Harakat al-Muqawama al-Islamiya ("Hamas") during the Second Intifada, a time of great violence between 2000 and 2005.[2] It also found that defendant knowingly provided financial services to Hamas by providing financial services to its operatives; to 11 charities controlled by Hamas; and to an organization called the Saudi Committee for the Support of the Intifada Al-Quds, an entity connected to the Saudi Arabian government that made payments to beneficiaries identified by Hamas-controlled organizations, including the families of Hamas suicide bombers and prisoners.

Before me is defendant's timely motion for judgment as a matter of law under Federal Rule of Civil Procedure 50. In the alternative, defendant has moved for a new trial under Rule 59 and for certification of an interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

---

[2] The 24 attacks are: the March 28, 2001 bombing at Neve Yamin; the June 1, 2001 bombing at the Dolphinarium in Tel Aviv; the August 9, 2001 bombing at Sbarro in Jerusalem; the December 1, 2001 bombings on Ben Yehuda Street; the December 12, 2001 attack on Bus No. 189 at Emmanuel; the March 7, 2002 attack at Atzmona; the March 10, 2002 bombing at Café Moment; the March 27, 2002 bombing at the Park Hotel, Netanya; the May 7, 2002 bombing at the Sheffield Club, Rishon Le-Zion; the September 19, 2002 bombing on Bus No. 4, Allenby Street; the June 18, 2002 bombing on Bus No. 32-A, Pratt Junction, Jerusalem; the July 31, 2002 bombing of the Frank Sinatra Cafeteria at Hebrew University; the January 29, 2003 shooting attack on Road 60; the March 5, 2003 bombing on Bus No. 37, Haifa; the March 7, 2003 shooting attack in Kiryat Arba; the April 30, 2003 bombing at Mike's Place, Tel Aviv; the May 18, 2003 bombing on Bus No. 6, French Hill, Jerusalem; the June 11, 2003 bombing on Bus No. 14A, Jaffa Road, Jerusalem; the June 20, 2003 shooting attack on Road 60; the August 19, 2003 bombing on Bus No. 2, Jerusalem; the September 9, 2003 bombing at Café Hillel, Jerusalem; the October 22, 2003 shooting attack in Tel Rumeida; the January 29, 2004 bombing on Bus No. 19, Jerusalem; and the September 24, 2004 mortar attack on Neve Dekalim.

**EVIDENCE AT TRIAL**

Much of the evidence that was introduced at trial had been previewed in detail in numerous pretrial rulings in this decade-old litigation. <u>See, e.g.</u>, <u>Linde v. Arab Bank, PLC</u>, 269 F.R.D. 186 (E.D.N.Y. 2010); <u>Linde v. Arab Bank, PLC</u>, 384 F. Supp. 2d 571 (E.D.N.Y. 2005). The following is a partial summary of the evidence presented over the course of the approximately six-week trial.

**I.    Plaintiffs' Case**

Plaintiffs first called Evan Kohlmann, an international terrorism consultant, principally to determine whether or not Hamas – "a terrorist organization that was founded in approximately December of 1987" – had ever issued claims of responsibility for the 24 terrorist attacks at issue in this case. Mr. Kohlmann is an expert in international terrorism specializing in terrorist communications and previously has been so qualified in domestic and foreign cases. He has given similar testimony in criminal prosecutions. <u>See</u> <u>United States v. Ali</u>, No. 10-cr-187, 2011 WL 4583826, at *6 (D. Minn. Sept. 30, 2011) ("Kohlmann will testify regarding several communiques posted to the official al-Shabaab website, and that these communiques claim responsibility for certain events. Kohlmann's testimony as to these claims of responsibility, their source and their authenticity will assist the jury in understanding the discussions between the conspirators."). Mr. Kohlmann testified that he had reviewed a list of the 24 attacks at issue and had concluded, based on his approximately twenty years researching Hamas communications, that "Hamas has indeed[] issued communiques or other claims of responsibility, in which they have indicated their involvement or at least claimed their involvement in these various attacks." Mr. Kohlmann testified that Hamas issues claims of responsibility for terrorist attacks in order

to:  (1) "announce their presence both on a local stage as well as international stage"; (2) "attract new members"; and (3) "solicit financial donations."

As part of his testimony, Mr. Kohlmann authenticated two websites as sources of Hamas communications:  Palestine-info.com and alqassam.ps.  He explained that the first website represents the political wing of Hamas, and the second is the website for Hamas' military wing. Mr. Kohlmann described the factors, which were "both extrinsic as well as intrinsic," that led him to conclude that these were Hamas websites.  He testified that those factors included:  the reliance by the United States and other governments on the webpages as authentic sources of Hamas communications; the language and facts used in postings; the posting of exclusive interviews with Hamas leaders and nonpublic details of their lives; and the fact that the websites contained official Hamas seals and watermarks.

After authenticating the websites, Mr. Kohlmann also authenticated many communiques, which he testified are official communications from a terrorist group, in which Hamas took credit for the attacks at issue in this case.  Among them were video wills of individuals who were about to commit terrorist attacks.  For instance, Mr. Kohlmann authenticated the video will of Raed Abdul Hamid Misk, which was received in evidence over defendant's objection.[3]  Mr. Kohlmann identified Misk and concluded that his video will was an authentic claim of responsibility by Hamas because, among other reasons, the video will was available in the "martyr" subsection of the alqassam.ps website and because Misk identified himself as being part of the military wing of Hamas.  Mr. Kohlmann also authenticated portions of the websites that were not claims of responsibility, but were calls for donations to Hamas at a particular Arab Bank account.  These postings were also admitted in evidence over defendant's objection.

---

[3] In August 2003, Misk blew himself up on Bus No. 2 in Jerusalem, killing approximately 23 people and wounding as many as 125 others.

Mr. Kohlmann identified Osama Hamdan as a senior Hamas spokesman and an account holder at Arab Bank in Lebanon. The latter was based on an authentication of Hamdan's passport, which was filed in connection with Hamdan's obtaining an Arab Bank account, and which was received in evidence. In connection with this testimony, Mr. Kohlmann authenticated certain bank transfer ("SWIFT") records processed through Arab Bank for Hamdan's account, and in which the beneficiary of the transfer was listed as "Harakat al Muqawamah al Islamiyah Hamas." Through Mr. Kohlmann, plaintiffs introduced a CNN interview with Hamdan, in which Hamdan claimed responsibility for the March 27, 2002 Park Hotel bombing on behalf of Hamas.

During cross-examination, Mr. Kohlmann conceded that with respect the January 29, 2004 suicide bombing on Bus No. 19 (discussed further below), another terrorist organization, the Al-Aqsa Martyrs Brigade ("AAMB"), along with Hamas, issued a claim of responsibility for the attack. In addition, defendant pointed out the lack of corroboration for some of Hamas' claims of responsibility and Mr. Kohlmann acknowledged that Hamas has motives to lie about such claims for propaganda purposes. Ultimately, however, this did not change Mr. Kohlmann's conclusion that Hamas claimed responsibility for each of the attacks at issue in this case.

Plaintiffs next called Dr. Matthew Levitt, a director at the Washington Institute for Near East Policy, who has been qualified as an expert on Hamas in federal court on numerous other occasions. Prior to his current role, Dr. Levitt did counter-terrorism work for the United States Department of Treasury, the FBI, and the United States Department of State. Initially, Dr. Levitt provided "a little bit of Hamas 101," describing the organization as an "extremist group" that was designated as a terrorist group by the United States. He explained that terrorist designations – which include the terms Foreign Terrorist Organization ("FTO"), Specially Designated Terrorist ("SDT"), and Specially Designated Global Terrorist ("SDGT") – are labels used by the

United States Departments of State and Treasury to "make it more difficult for organizations that are involved in illicit activity, in this case terrorist activity, to be able to raise, launder, move and access money." Dr. Levitt also introduced the jury to the role of designation lists, or "black list[s]," issued by the United States Office of Foreign Asset Control ("OFAC").[4]

Dr. Levitt testified about numerous Hamas leaders. One of the key individuals among those was Sheikh Ahmed Yassin, a paraplegic, who was a religious figure and one of the founders of Hamas, and who was regarded as Hamas' spiritual leader. Dr. Levitt also spoke about Salah Shehadah, the one-time leader of Hamas' military wing, which is known as the Izz al-Din al-Qassam Brigades. During this testimony, Dr. Levitt authenticated the terrorist designations of various individuals by the United States government. He also authenticated SWIFT transfers which showed funds being wired through Arab Bank to various individuals associated with Hamas. For example, Dr. Levitt testified about a wire transfer for $20,000 to Ismail Abd Al Salam Haniyeh, whom he described as "the one time Hamas prime minister, another time the head of the Hamas political branches that were in the Gaza Strip."

In addition, Dr. Levitt testified about the relationship of certain charities to Hamas.[5] He concluded that these charities were controlled by Hamas and funneled money to it via Arab Bank. This conclusion was based, in part, on evidence that many of the charities were founded by senior Hamas leaders or had Hamas operatives on their boards, as well as on findings by the United States government. One such charity, the Al Salah Islamic Society, he described as "a fairly significant Hamas-affiliated charity in the Gaza Strip." In fact, he explained that another

---

[4] As discussed below, a central element of defendant's case was that its use of the OFAC list to screen transactions was sufficient to show that it had not acted knowingly in providing financial services to Hamas.

[5] The 11 charities at issue are: the Islamic Charitable Society of Hebron; the Jenin Zakat Committee; the Al Tadamun Islamic Charitable Society; the Nablus Zakat Committee; the Tulkarem Zakat Committee; the Ramallah Al Bireh Zakat Committee; the Al Islah Charitable Society; Mujama Al Islamiya (Islamic Center, Gaza); Al Jamiya Al Islamiya (Islamic Society, Gaza); Al Salah Islamic Society; and the Al Nur Prisoner Society.

Hamas leader, Ismail Abu Shanab, called the Al Salah Islamic Society an "important early Hamas-affiliated charity." Two other charities, the Nablus Zakat and the al-Tadamun Society, were associated with Sheikh Bitawi, "a long time Hamas leader in the West Bank."

Through Dr. Levitt, plaintiffs put in evidence the terrorist designations of various charities, including the Al Salah Islamic Society and the Union of Good, an "umbrella organization" which encompasses many of the groups at issue in this case and which was created by the leadership of Hamas.

Dr. Levitt also offered testimony about the Saudi Committee, one of the charities included in the Union of Good. He stated, in concurrence with a German intelligence report, that the Saudi Committee passed donations through to the families of martyrs, which included suicide bombers. Dr. Levitt testified that, based on his investigation, he had concluded that defendant processed those payments on behalf of the Saudi Committee. Dr. Levitt also authenticated SWIFT transfers showing money being wired through Arab Bank to various charities that he identified as being associated with Hamas. As just one example, he authenticated a SWIFT transfer showing $7,800 being sent to the Islamic Society, Gaza, one of the charities at issue in this case, through Arab Bank. He also authenticated a wire transfer showing $12,000 going to the Ramallah Zakat Committee, another of the charities at issue.

Finally, through Dr. Levitt (and over defendant's objection), plaintiffs entered certain videos in evidence, including one produced by Al-Manar television – which is the television station of Hezbollah, a terrorist organization in Lebanon – depicting school children dressed up as terrorists at an event for one of the charities at issue. Dr. Levitt testified that he recognized the logo of the television station and was personally familiar with the video, as well as its use by law enforcement agencies in other countries.

Over the next three days of trial, plaintiffs presented the testimony of Mr. Ronni Shaked, a former paratrooper and intelligence analyst, now a researcher and journalist associated with Hebrew University in Jerusalem. Mr. Shaked testified that, in his assessment, the 24 attacks at issue in this case were, in fact, perpetrated by Hamas. His investigation relied on, among other things, Israeli Security Agency ("ISA") reports, local police reports, and claims of responsibility. Effectively, only two attacks are at issue in the instant motion.

With respect to the January 29, 2004 suicide bombing on Bus No. 19, Mr. Shaked explained that the suicide bomber, Ali Ja'ara, approached two individuals, Nufal Adawin and Muhammad Nashash, and indicated that he wanted to carry out a suicide attack. They prepared an explosive device and planned an attack. Adawin was later convicted of various terror-related crimes, including membership in Hamas. But the initial attack was never carried out, because Ja'ara encountered a checkpoint on the way to his target and was forced to turn back. Sometime later, Ja'ara approached operatives from the AAMB and reiterated his desire to carry out a suicide attack. Cross-examination revealed that Nashash was, in fact, convicted of membership in another Palestinian terrorist group, the AAMB.[6] Mr. Shaked acknowledged that the AAMB, not Hamas, provided Ja'ara with the bomb and drove him to his target, where he boarded a bus and detonated it. Ja'ara identified himself as an AAMB operative in his will. Four AAMB operatives were convicted for the Bus No. 19 attack. The ISA report on which plaintiffs heavily relied stated that the AAMB claimed responsibility for the Bus No. 19 attack.

Mr. Shaked also attributed the September 24, 2004 mortar attack on Neve Dekalim, in Gaza, to Hamas. He based his determination on Hamas' claim of responsibility, and on an assessment that Hamas was the only Palestinian organization commonly using certain types of

---

[6] Due to an apparent translation error, the copy of Nashash's conviction that plaintiffs originally submitted stated that Nashash was convicted of membership in Hamas. Mr. Shaked conceded, upon reviewing the document from the stand, that Nashash was actually convicted of membership in the AAMB.

mortars at that time. On cross-examination, he conceded that other terrorist organizations were, in fact, using the same mortars during this time period.

Plaintiffs next called Arieh Spitzen. Mr. Spitzen was employed by the Israeli Defense Force between 2001 and 2009, and was the head of the Palestinian Affairs Department for the Coordinator of Government Activities in the Territories. Like Dr. Levitt, Mr. Spitzen offered corroborative testimony regarding the Hamas affiliations of many individuals discussed above, such as Sheik Yassin and Salah Shehadah.[7] Similarly, Mr. Spitzen evaluated many of the charities at issue in this case from 1999 through 2005 and identified numerous prominent Hamas officials who occupied leadership roles in these charities.

Mr. Spitzen repeatedly qualified his opinions by reminding the jury that he had not been able to review the full set of defendant's customer files because defendant had refused to transfer the records to him. Nevertheless, he explained that he was able to find wire transfers for many Hamas leaders that went through Arab Bank. For instance, Mr. Spitzen was able to locate certain wire transfers to Sheikh Yassin in 2001. He testified that it was Yassin's account that was referred to in an internet posting where Abd al-Azis al-Rantisi, another Hamas leader, stated that those who wished to donate money to support Hamas and those harmed in the Second Intifada should send donations to the account of Sheikh Yassin at Arab Bank: "[H]ere is the account number: The Arab Bank – Gaza, account number 36444, the sheikh Ahmad Yassin." In fact, Mr. Spitzen testified that on May 30, 2001, this same account, number 36444, belonging to Yassin, received a $60,000 wire transfer processed through Arab Bank from an individual named Yousef El-Hayek.

Mr. Spitzen identified a transfer to El-Hayek from Osama Hamdan, who sent El-Hayek a check for $10,000 from his Arab Bank account. He also identified 223 individuals, either leaders

---

[7] Mr. Spitzen also added that Yassin was killed by the IDF in 2004, while Shehadah was killed by the IDF in 2002.

of Hamas or their family members, who received transfers of funds (including many from El-Hayek) that were processed by Arab Bank.

Based on the records that he was able to obtain, Mr. Spitzen testified that the following individuals received transfers through Arab Bank:

1. Halima Hassan Yassin, Sheikh Yassin's wife, received six Arab Bank transfers between November 2000 and May 2001 in the amount of $153,435.

2. Salah Shehadah received seven Arab Bank transfers between November 2000 and February 2001 in the amount of $109,500.

3. Ismail Haniyeh, the Bureau Chief of Sheikh Yassin's Bureau, received 19 Arab Bank transfers between July 2000 and September 2001 in the amount of $420,100.

4. Ismail Abu Shanab, another Hamas founder, received nine Arab Bank transfers between August 2000 and August 2001 in the amount of $173,172.

5. Abbas Al-Sayyed, the individual who confessed responsibility for the Park Hotel bombing in 2002, received nine Arab Bank transfers between February 2001 and May 2001 in the amount of $123,000.

Mr. Spitzen also testified extensively about the charities at issue in this case, all of which had Arab Bank accounts, and all of which he testified were controlled by Hamas. He authenticated an Israeli list of Unlawful Associations and Terrorist Organizations, which he testified was published in the Official Gazette of Israel, the Israeli equivalent of the Federal Register. The list was received in evidence over defendant's objection. Mr. Spitzen testified that various organizations on this list were controlled by Hamas, and that he was able to locate money transferred through Arab Bank for virtually all of the charities at issue in this case during the Second Intifada.

Using figures calculated by another of plaintiffs' experts, forensic accountant Wayne Geisser, Mr. Spitzen testified that $32,312,170 was transferred to the Arab Bank accounts of these charities. In particular, Mr. Spitzen testified about the Saudi Committee, which is one of

the 50 member organizations of the Union of Good.  He stated that the Union of Good is an umbrella organization that "was established with the special purpose by Hamas leaders to transfer funds to Hamas."[8]  He further testified that through Arab Bank, the Saudi Committee "transferred funds to the families of Hamas suicide bombers, to Hamas prisoners and operatives."  Of the $32,312,170 transferred to the charities, Mr. Spitzen testified that "some 15 million plus dollars" was transferred by the Saudi Committee to nine of those charities.

Mr. Spitzen also testified that many of the charities at issue handed out Hamas propaganda, and often gave funds to terrorists and their family members.  Specifically, he testified that he was familiar with "lists showing martyr payments to families of suicide bombers and other terrorists" from his time working for the Israeli government.[9]  Mr. Spitzen explained that these "martyr files" were similar to social security files in that they described the martyr, the circumstances of his death, his background, and any money transferred to him or his family.

He discussed the lists of payments to martyrs' families produced by defendant, which were admitted in evidence.  From these martyr lists, Mr. Spitzen concluded that the Saudi Committee made 24 payments to the families of suicide bombers from Hamas via Arab Bank from 2000 through 2002.  He testified that these included payments to the immediate relatives of Hamas suicide attackers who perpetrated four of the terrorist attacks at issue:  (1) the June 1, 2001 Dolphinarium bombing; (2) the August 9, 2001 Sbarro Pizzeria bombing; (3) the December 1, 2001 Ben Yehuda Street bombings; and (4) the December 12, 2001 shooting attack on Bus No. 189 in Emmanuel.

---

[8] Mr. Spitzen also read from the U.S. Department of Treasury's press release designating the Union of Good as a SDGT which said that "the Union of Good Facilitates the transfer of tens of millions of dollars a year to Hamas managed associations in the West Bank and Gaza Strip."

[9] For example, he recalled some "martyr files" that were seized by the Israeli government from one of the charities, the al-Tadamun Society in Nablus.

Plaintiffs also put into evidence two of defendant's interrogatory answers. The first interrogatory asked defendant to "[s]tate the total number of fund transfers you processed for Palestinian Foreign Terror Organizations, Specially Designated Terrorist and Specially Designated Global Terrorists from the date of designation of those individuals or entities by the United States Government through December 31, 2007." Defendant answered "Arab Bank processed 282 funds transfers in which parties identified on Exhibit A were either the originator or the beneficiary from the date of the designation of those individuals or entities by the United States Government through December 31, 2007."

The second asked defendant to "[s]tate the total dollar amount" of all such funds transfers. Defendant answered that "Arab Bank processed $2,563,275 in funds transfers in which parties identified on Exhibit A were either the originator or the beneficiary from the date of designation of those individuals or entities by the United States Government through December 31, 2007."[10]

Plaintiffs supported their case-in-chief, throughout, with the videotaped deposition testimony of numerous bank employees. For example, the jury watched the deposition testimony of Mohammad al-Tahan, one of defendant's operations managers, who acknowledged a 2001 letter from Arab National Bank (the Bank's correspondent bank in Saudi Arabia) titled "Outward Transfers As Per the Request of the Saudi Committee For Support of the Intifada Al Quds." This document appended lists of payments to the families of deceased individuals, whose cause of death was noted as *amaliya istashidaya*, which Mr. al-Tahan testified means "martyrdom operations." Mr. al-Tahan also testified that when he came into possession of these lists, he simply passed them along to the attention of another bank employee, Assad Saleh (who, for his

---

[10] The jury was not permitted to consider the names of the parties identified in Exhibit A as evidence in the case.

part, testified that in processing these transfers he had simply "carried out [his] duties" to the correspondent bank).

The videotaped deposition testimony of certain of defendant's employees also evidenced that some of its employees knew that Sheikh Yassin was a leader of Hamas. For instance, Mr. al-Tahan admitted that he knew that Sheikh Yassin was "a terrorist leader of a terrorist group." Defendant's Chief Compliance Officer in the Palestinian Territories, Tayseer Sadeq, testified that Yassin "is known throughout the world" as "the head of the Hamas organization in the Palestinian Territories, and this is no secret."

Plaintiffs also played the video deposition testimony of David Blackmore, a former compliance officer for defendant's London branch. The significance of this testimony, in terms of undermining defendant's central theory of the case – that its sole obligation was to make sure that it was not dealing with OFAC-designated entities or individuals – is hard to overstate. When Mr. Blackmore was asked to provide his view of the Saudi Committee wire transfer made payable to "[t]he family of the martyr Ibrahim Abdul Karim Bani Awdah," and processed by defendant, he testified as follows:

> Q. And the beneficiary name is not specific in the sense that it doesn't say exactly who is to receive the wire transfer, it's the family of that particular martyr. Were there policies and procedures in effect at Arab Bank in the United Kingdom that would have prevented executing a wire transfer where there is no specific account number listed and no specific beneficiary name provided?

> A. There would have been a number of reasons why this would not have been applied, firstly, because as you rightly say . . . the beneficiary name is not specific, there's no account number, the payment for the original transaction I notice is in cash. *We would never in a million years have dealt with a payment order such as this.*

(Emphasis added).

## II. Defendant's Case

Defendant opened its case by calling Sabih Al-Masri, who has been the chairman of Arab Bank for two years and has sat on its board since 1998. He testified as to the history of Arab Bank and its operations, including its expansion in the Palestinian Territories during the period after the Oslo Accords were signed in the mid-1990s. Specifically, he testified that the Second Intifada had a substantial negative impact on defendant's operations in Gaza and the West Bank during the time period of the attacks at issue in this case. Over plaintiffs' objection, he testified as to the operation of defendant's audit committee. On cross-examination, he conceded that he has limited day to day involvement with defendant's operations, and that he had never heard of the Saudi Committee until the commencement of this suit.

Defendant next called Dr. Beverly Milton-Edwards, an author and scholar who has written extensively on Hamas. She testified that she had conducted extensive field work traveling with Hamas during the Second Intifada, including with members of the al-Qassam Brigades. She was called for the purpose of giving her assessment of the 11 *zakat* (charitable) committees, specifically (1) to opine on whether they were controlled by Hamas, and (2) whether the public perceived them as being controlled by Hamas during the relevant period (2002-04). Based on her field work and research, she concluded, in short, that the answer to both questions was no.

The effect of cross-examination on Dr. Milton-Edwards' testimony, and its potential spillover effect on the credibility of defendant's entire case, is again hard to overstate. First, asked on direct examination whether she had "observe[d] any evidence at all that Hamas was controlling . . . any of these eleven Zakats and charitable organizations during the relevant time

period," she answered that she had seen none, nor had she seen Hamas "paraphernalia" during her visits to all but two of the charities in question during the relevant period.

On cross-examination, among other things, Dr. Milton-Edwards was shown a photograph (in fact, a still frame taken from a promotional video which had been released in connection with the launch of her book, Hamas: The Islamic Resistance Movement, in 2010). She identified several individuals appearing in the photo, including Sheikh Yassin, Abd al-Azis al-Rantisi, and Salah Shehadah. Other than a "symbol of Hamas" appearing on a billboard in the photo, she could not point to "anything else on it that tells you it's a Hamas image." On the billboard, however, were the words *Muka Mahal Islamiah*, which means "Islamic Resistance Movement," followed by the word "Hamas." She was asked: "Can you tell us what it says right here on the bottom?" She replied: "No, I can't. It's in Arabic."

In other respects, Dr. Milton-Edwards' testimony was contradicted by her own book. For example, she testified about the whether the Islamic Society, Gaza, a charity for which defendant processed transactions, was controlled by Hamas:

> Q: Did you apply your research criteria to determine whether or not . . . the Islamic society was controlled or perceived to be controlled by Hamas during the 2000-2004 time period?
>
> A: Yes, I did.
>
> Q: And what conclusion did you reach?
>
> A: I reached the conclusion that they weren't controlled by Hamas, nor did the Palestinians perceive them as being controlled by Hamas.

On cross-examination, she was confronted with a passage from her book, which stated:

> But the work of the Islamic Society and the rest of Hamas's network in the decades up to, during and after the second intifada, when families needed it most, represented not so much a donation as an investment by Hamas, one that reached a lucrative political dividend in the 2006 election.

Dr. Milton-Edwards also testified that when she had met Musri Al-Masri, an "emerging leader" of Hamas, in 2005 or 2006, she was "never informed" of him having any connection with the Al Nur Prisoner Society. She was confronted with an excerpt from her book in which Al-Masri is identified as someone "involved as a Board member of the Gaza based charity Al-Nour." She dismissed the inconsistency with the telling observation that "you know my book much, much better than I do," and, when pressed, acknowledged that she had "forgotten I had written this in the book with my co-author."

Defendant's next witness was Shukry Bishara, who is the head of the Palestinian Monetary Authority and a former executive of the Bank. He explained the impact of the Second Intifada – including the Sbarro Pizzaria attack on September 21, 2001 – on both his family and on defendant's operations.

Because his knowledge of defendant's policies extended beyond the Palestinian Territories, he was allowed to authenticate plaintiffs' exhibits 1 and 41, which were examples of defendant's internal guidance from the beginning of the Second Intifada concerning its anti-money-laundering policies. Despite an instruction limiting his testimony on these subjects to defendant's policies outside of the Palestinian Territories, he testified that they were in force "across the institution."[11]

Bishara testified that, to his knowledge, during 2000-01, the Saudi Committee offered three categories of "programs and benefits," specifically humanitarian aid; repair and construction; and unemployment benefits. He also testified that the account of Osama Hamdan had received five transfers after his OFAC designation, and had been closed as a result of his designation, in 2004; about $8,000 was returned to him out of escrow. In fact, as noted above,

---

[11] As discussed below, defendant was precluded from offering evidence of its policies in Lebanon and the Palestinian Territories, where account records that could show defendant's adherence to such policies had not been produced.

defendant had long since admitted in its interrogatory responses that it had returned over $2 million to account-holders whose accounts were frozen after their designation by OFAC. Bishara and others testified that defendant "had to" return frozen assets to known terrorists in such cases.[12]

On cross-examination, Bishara acknowledged a 2001 letter titled "Payment of incoming transfers for the benefit of the families of the martyrs and the injured of the Al-Aqsa Intifada," in which he wrote that defendant "strive[s] for the success" of this party's [i.e., the Saudi Committee's] project." He acknowledged defendant's possession of the payment lists for survivor benefit payments from the Saudi Committee, on which the cause of death for certain beneficiaries was listed as *amaliya istashidaya*, which, as noted above, was translated as "martyrdom operations," and which defendant's regional compliance manager acknowledged means "suicide operation."

Defendant also called Jamal Hurani, defendant's CEO for the Palestinian Territories. He testified extensively, as the others before him, about the impact of the Second Intifada on his family and on bank operations. Over plaintiffs' objections, Hurani also testified at length about defendant's policies for compliance with Palestinian Monetary Authority regulations (although he was not allowed to testify as to defendant's adherence to such policies in that area). Hurani, who rose to the executive ranks from being a programmer, also testified about the automated operation of defendant's OFAC compliance software, and the manner in which transactions are flagged by the system for review.

---

[12] Defendant attempted to justify these returns by pointing to Lebanese law requiring it, but such reliance on foreign law to explain otherwise knowing conduct had been precluded by Judge Gerson in a pre-trial ruling. As discussed in greater detail below, this ruling also prohibited defendant from explaining the non-production of account records, which gave rise to the discovery sanctions that are at issue in the instant motions, by resort to its foreign bank secrecy obligations.

Defendant then called Brian Billard, a New York-based Arab Bank executive who, from 1999 to 2004, was its comptroller and compliance officer. Billard testified that from the outset, he had been "very impressed" with defendant's compliance policies because "everybody was involved" in that function. Because defendant's department heads "had many years of knowledge" in compliance, he was "very comfortable."

Billard explained at length the role of defendant's New York branch (since converted to an agency), specifically its role in "dollar clearing" for overseas transactions in U.S. dollars and service to U.S. companies generally. Again consistent with the central theory of defendant's case, he explained the central role of the OFAC list in defendant's U.S. compliance procedures, and opined that decisions about who should be on the list are properly the role of law enforcement, not the banks that must comply with the list.

Billard recounted his pre-trial review of several hundred individual transactions that had passed through the New York branch, and cleared the OFAC list, including some initiated by Yousef El-Hayek. He also acknowledged payments to and from nine charitable organizations, for example, from the Al-Aqsa foundation of Saudi Arabia (a charity designated by OFAC in 2003) to the Ramallah Zakat Committee. Billard noted only two missed transactions from designated entities, both from Interpal, which had been missed due to "human error."

He emphasized the strength of defendant's compliance efforts generally, calling those efforts "strict," defendant's record-keeping "very good," and its approach "conservative." He also testified to certain specifics, such as that defendant was "prompt" in filing mandatory Suspicious Activity Reports.

However, on cross-examination, Billard was confronted with certain findings issued in a 2004 assessment by the Department of Treasury's Financial Crimes Enforcement Network

("FinCEN").  The assessment included findings that defendant had had not filed "the majority of

its Suspicious Activity Reports referencing terrorist financing until after the [United States]

Office of Controller of the Currency ["OCC"] commenced a review of its funds transfer activity

in June of 2004," which was also after the commencement of this lawsuit; that "names similar to

those of originators and beneficiaries of funds transfers cleared by Arab Bank-New York

appeared in credible and publicly available sources of information, including Congressional

testimony, indictments in the United States, and well publicized research and media reports

linking the originators and beneficiaries to illicit activities"; and that "[o]nce a designation

occurred, Arab Bank-New York failed to review recent activity occurring prior to the designation

and associated with the designated entities to identify potentially suspicious activity."  He

testified, however, that he had never read the FinCEN report in full, in part because "[t]hat was

being handled by counsel."

        With respect to defendant's reliance on the OFAC list to identify suspect transactions,

Billard also conceded that a number of payments that had been "straight through processed" –

i.e., without human intervention – by the branch were made by or to designated individuals.

These transactions included those made, for example, by Yousef El-Hayek to Sheik Yassin.

Billard also conceded that, beyond the OFAC list, there would be other ways to obtain personal

knowledge that a particular bank customer was a terrorist.

        Defendant then called Mohammed Dabbour, defendant's senior vice president and

director of compliance, based at defendant's Amman headquarters.  Over plaintiffs' continued

objections and requests for limiting instructions, he testified at length regarding international

banking standards, including those established by the Basel Committee and Financial Action

Task Force ("FATF").  He explained the "know your customer" rules, use of blacklists, training,

18

and the "150, [or] 200 people" whose "primary responsibility was combatting money laundering and terrorism financing" at the Bank. He also explained "home and host" standards, which apply local regulations to banks doing business anywhere other than their home jurisdictions. Finally, he explained defendant's policy of required photo identification for any non-customer who is the beneficiary of a wire transfer.

On cross-examination, Dabbour was asked whether he was aware that defendant had admitted (which it had) "that it maintained accounts for eleven United States designated terrorists on the OFAC list?" He answered that he was. When asked to name them, he refused to answer, invoking the right to privacy of defendant's account holders. He also admitted knowing that defendant had transferred over $2.5 million to former customers whose accounts had been closed as a result of OFAC designation.

Like the testimony of David Blackmore, Dabbour's cross-examination undercut the central theory of the Bank's defense, that it could not be expected to do more than check transactions against the OFAC list. He was confronted by testimony at his deposition, at which he had stated: "[I]f upon discovering an unusual transaction by – by one of our customers as part of the investigation in the account of our customer, we might look to see if there is any information available in the public domain. And that would be part of the investigative process."

Defendant called three other former employees of the Bank in the Palestinian Territories during the relevant time. They were Mazen Abu Hamdan, the regional head of compliance, Baker Mohammed Ahmad Al-Omari, a former manager of a branch in the West Bank, and George Kawwas, a retired Bank employee from Bethlehem, located close to the border between Israel and the West Bank, just south of Jerusalem. They testified as to the catastrophic impact of the Second Intifada on the Bank's operations. In addition, among other things, these Bank

employees testified to the widespread dissemination of posters bearing "pictures of martyrs" throughout the Palestinian Territories, including on the fronts of Arab Bank branches.

Defendant's final fact witness was Manny Caravanos, the Bank's vice president of operations for (i.e., the head of) the New York branch. He testified that he was responsible for ensuring defendant's compliance with OFAC. He explained the technical standard (SWIFT) by which international transfers are processed and, like Mr. Billard, opined that a person or entity's presence on the OFAC list was a matter for law enforcement, not banks. Yet on cross-examination, Mr. Caravanos acknowledged that he was not aware of the 11 accounts held by the Bank in the Palestinian Territories for designated individuals, nor the $2.5 million that had been returned to these individuals when their accounts were closed.

Defendant closed its case with the expert testimony of Anne Vitale, a former prosecutor and consultant to the financial services industry with respect to money laundering and anti-terrorism compliance. Her testimony was focused on explaining international standards, including the Basel Committee on Banking Supervision, the Financial Action Task Force, and the Wolfsberg Group. She explained in detail the mechanism by which banks can process wire transfers to non-account holders, and the know-your-customer protections that govern such transactions. She provided the jury with a detailed picture of the use of blacklists such as the OFAC list. Over plaintiffs' objection, she testified that it was not common during the relevant period for foreign banks to use this country's OFAC list, but that of the host country. She opined that defendant's OFAC-only approach to screening for transfers to terrorists or terrorist organizations was consistent with the international standards of the time.

## STANDARD OF REVIEW

Rule 50 provides for entry of judgment as a matter of law where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on the issue or issues that are the subject of the motion. Fed. R. Civ. P. 50(a). A court reviewing a Rule 50 motion "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Cross v. New York City Transit Auth., 417 F.3d 241, 247 (2d Cir. 2005) (citations omitted). The burden on the moving party is "particularly heavy where the jury has deliberated in the case and actually returned its verdict" in favor of the non-movant. Id. at 248.

Rule 59 provides a court with discretion to grant a new trial if it is persuaded that there were, among other things, errors of law in charging the jury or improper admission or exclusion of evidence. See Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992). A court "may not disturb the jury's verdict unless there was no substantial evidence to support it." Compton v. Luckenbach Overseas Corp., 425 F.2d 1130, 1133 (2d Cir. 1970). "The judge's duty is essentially to see that there is no miscarriage of justice." Id.

Under § 1292(b), a court may certify an interlocutory order for appellate review if (1) it "involves a controlling question of law," (2) "as to which there is substantial ground for difference of opinion," and (3) an immediate appeal "may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Interlocutory appeal is not a "vehicle to provide early review of difficult rulings in hard cases." German v. Fed. Home Loan Mortg. Corp., 896 F. Supp. 1385, 1398 (S.D.N.Y. 1995). Only "exceptional circumstances justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 475, 98 S. Ct. 2454, 2461 (1978).

# DISCUSSION

Defendant's Rule 59 motion assigns error to a number of the Court's charges to the jury, i.e., it argues that the verdict was reached under incorrect legal standards, including the ATA's causation and scienter standards, and as a result of the improper application of a pretrial sanctions order. It also argues that the Court made certain evidentiary rulings in error and that it was prejudiced the structure of the trial.

Defendant's Rule 50 motion, which of course challenges the sufficiency of the evidence presented in this case, is almost entirely focused on demonstrating that plaintiffs have failed to meet the legal standard that defendant argues is correct, as opposed to the one that Judge Gershon, to whom this case was previously assigned, and I have held applicable. I have therefore assessed the sufficiency of the evidence at trial under the correct legal standards.

Another problem with defendant's Rule 50 motion is that it begins with, and heavily rests upon, the unsupported assertion that "[e]ach of the banking services that Plaintiffs placed at issue must be evaluated separately to determine if it provides an evidentiary basis for the elements of proof required by the ATA." Defendant then proceeds to analyze separately the financial services it provided to senior Hamas leaders, the financial services it provided to Hamas-controlled charities, and the financial services it provided to the Saudi Committee, without ever addressing the *collective* weight of all of these forms of support as evidence of either proximate causation or scienter. As did the jury, I reject this focus on the trees over the forest.

For the following reasons, defendant's Rule 50 motion is granted in part and denied in part, and defendant's Rule 59 and § 1292(b) motions are denied.

## I. Sanctions Order

### A. Background

Before trial, Judge Gershon imposed sanctions on defendant for its failure to comply with a prior discovery order compelling production of key account records, despite the fact that its objections based on foreign bank secrecy laws had been considered and overruled.  See generally Linde, 269 F.R.D. 186 (the "Sanctions Order").  Defendant argues that I erred in applying those sanctions too broadly, and in declining to reconsider them in light of a brief filed by the United States Solicitor General in connection with defendant's unsuccessful interlocutory appeal.

The Sanctions Order sets forth the history of discovery in this action in great detail, but as is most relevant here, defendant refused to produce full account records for its customers in Lebanon and the Palestinian Territories (Gaza and the West Bank).  Defendant admitted that it maintained accounts for 11 individuals or entities that were designated as FTOs, SDTs, or SDGTs during the relevant time period, but refused to specify the identity of these account holders.

Defendant produced full account records for only one account, the Beirut account of Osama Hamdan.  Osama Hamdan is a spokesman for and leader of Hamas, designated as a SDGT by OFAC in 2003.  Several transfers into his Arab Bank account in Beirut explicitly listed "Hamas" as the beneficiary party.  See, e.g., Linde, 269 F.R.D. at 197-98.  Even assuming his account was among the 11 to which defendant admitted, there remain at least 10 of defendant's accountholders who were admittedly OFAC-designated terrorists, but whom defendant refused to identify, much less produce their full account records.[13]

---

[13] As discussed below, defendant sought to enter evidence that it closed the accounts of all OFAC-designated individuals and entities, but produced neither supporting documentation for such account closures nor any indication of what it did with the funds in those accounts.  Linde, 269 F.R.D. at 201 & n.13.  Defendant was precluded from making this argument, because it would have found proof or refutation in the withheld documents.

In imposing sanctions, Judge Gershon found that defendant had "intentionally failed to meet its production obligations." Id. at 197. She also found, with respect to defendant's claim that it would face criminal prosecution in Jordan if it complied with its discovery obligations, that "there is nothing in the record indicating that defendant faces a real risk of prosecution." Id.

There can be no question that defendant's violation of Judge Gershon's production order was intentional. Defendant may or may not have had a good faith basis for arguing that it was not obligated to produce the records in the first instance (in reliance on local bank secrecy laws), but once Judge Gershon rejected that argument and ordered the records produced, defendant made the deliberate decision to disregard that Order.

I note also that, as demonstrated below, the circumstantial evidence at trial demonstrated that defendant's reliance on local law was, in all likelihood, a convenient pretext for the non-production of documents that would have definitively answered the question as to defendant's knowledge that it was helping to finance Hamas. Judge Gershon entered the Sanctions Order in an effort to mitigate the effects of defendant's non-production of this highly probative evidence.

The Sanctions Order had two aspects. First, it provided for a permissive adverse inference instruction as follows:

> [The jury] may, but is not required to, infer: (1) that defendant provided financial services to organizations designated by the United States as Foreign Terrorist Organizations, and to individuals affiliated with the FTOs; (2) that defendant processed and distributed payments on behalf of the Saudi Committee to terrorists, including those affiliated with named terrorist organizations and those who are unaffiliated, their relatives, or representatives; and (3) that defendant did these acts knowingly and purposefully.

Linde, 269 F.R.D. at 205. This instruction was given both near the end of plaintiffs' case and as part of the final jury charge. (The Court modified the wording slightly, although not materially, because after the Sanctions Order was issued, the focus of the trial was narrowed to Hamas and alleged violations of 18 U.S.C. § 2339B, a statute that requires only knowing conduct.)

Second, the Sanctions Order restricted defendant's ability to submit evidence of, or argue, certain facts that would likely have been illuminated by the withheld documents and testimony.  It provided:

> The Bank must be precluded from making any argument about its state of mind that would find proof or refutation in the withheld documents.  Defendant is entitled to rely on the documents it did produce to make its case that it did not have the required state of mind.  In addition, defendant can argue to the jury that it had no knowledge that certain accountholders, whose records have been produced, were terrorists.  But it cannot argue that it had no knowledge a certain Bank customer was a terrorist if it did not produce that person's complete account records.

Id. at 204.  Thus, the Sanctions Order permitted defendant to make arguments about its intent as to the account for which it produced full records, the account of Osama Hamdan in Lebanon, but it precluded defendant from arguing that it did not know that other customers were terrorists.  On the other hand, it did not direct the jury to find that defendant had such knowledge; it left plaintiffs with the burden of proving defendant's knowledge.

It is clear from her decision why Judge Gershon chose these particular sanctions.  This extensive circumstantial evidence strongly suggests that the withheld records would have shown what defendant knew about the Hamas connections of its customers, which means that defendant's invocation of bank secrecy kept the most direct inculpatory evidence from the jury, as Judge Gershon predicted.  For example, the evidence at trial demonstrated that defendant's policies required customers to provide photo identification when opening an account or receiving cash over the counter and that defendant would retain a photocopy of that identification.  Thus, the withheld records would likely have removed any need to speculate about whether "Ahmad Ismail Yasine" was, in fact, Sheikh Yassin – one or more people at the Bank were looking right at this person, and made a copy of his photograph identification.  The same would be true of the account records for other alleged Hamas leaders who received transfers from Yousef El-Hayek.

In all such cases, the withheld records would have shown the volume, amount, timing, and sender and recipient information for transfers that were not routed through New York.

Moreover, as Judge Gershon noted, there were significant shortcomings in defendant's production of records related to Saudi Committee payments. See Linde, 269 F.R.D. at 198. For instance, documents that defendant withheld as the "private account information" of Saudi Committee beneficiaries may have included photo identification of individuals who plaintiffs contend were terrorists. Nothing could be more probative as to the presence, or absence, of defendant's knowledge as to with whom it was dealing. The Sanctions Order was an effort to "level the playing field" by replacing the withheld evidence with jury instructions and trial rules intended to put plaintiffs in a position comparable to that which they would have occupied had defendant complied with the Court's orders to produce, while attempting to achieve a balance that stopped short of striking defendant's answer or instructing the jury that the element of knowledge must be deemed proven. However, in hindsight, it seems to me that the Sanctions Order fell short of accomplishing even those modest goals.

B. The Effect of the Permissive Inference

In light of the evidence that was adduced at trial even without the withheld documents, both by plaintiffs and defendant, it is now apparent that the permissive inference jury instruction had far less of a detrimental effect on defendant's case than defendant contends. As a practical matter, it was effectively lost in the nearly seven weeks of trial proceedings. It took only a moment to mention in plaintiffs' lengthy case and was buried in the lengthy final charge, although plaintiffs of course referred to it in their closing.

In any event, the verdict was based on volumes of damning circumstantial evidence that defendant knew its customers were terrorists.

Consider, for example, the compelling circumstantial evidence that plaintiffs were able to adduce – despite the withheld documents – relating to an Arab Bank account held by Sheikh Ahmed Ismail Hasan Yassin, a founding member and senior leader of Hamas. He was first designated as a SDT by the United States in 1995, and was described as the "[f]ounder and chief ideological figure of HAMAS." He was designated as a SDGT in 2003. In issuing that designation, the United States government described Yassin as "the head of HAMAS in Gaza" and stated that "he maintain[ed] a direct line of communication with other HAMAS leaders on coordination of HAMAS's military activities." He was killed by Israel in 2004. The evidence showed that the wheelchair-bound Yassin, a man with a highly distinctive appearance, was well-known as a Hamas leader both internationally, and particularly in the Palestinian Territories, during the relevant time period; indeed, he could fairly be described as the face of Hamas. Sheikh Yassin was also, according to substantial circumstantial evidence, an Arab Bank customer.

That circumstantial evidence begins with the wire transfer from Yousef El-Hayek in Lebanon for $60,000 – which, because it was routed through defendant's New York branch, was produced – to a beneficiary named "Ahmad Ismail Yasine." The transfer went to an account numbered 36444 in Arab Bank's branch in Gaza. As discussed in more detail above, El-Hayek also initiated and received wire transfers, routed through New York, to and from other accounts at Arab Bank held in names of (or similar to) Hamas leaders.

This evidence of transactions that seem to have involved known Hamas leaders certainly is relevant to defendant's culpability for those transfers themselves. But its cumulative effect is even greater, in light of the possibility that any given transfer was not to a designated individual, but to someone with a similar name. In other words, for example, transfers from El-Hayek to

accounts likely held by Hamas leaders are significant circumstantial evidence that the recipient of the transfer from El-Hayek to "Ahmad Ismail Yasine" was made to *the* Sheikh Yassin.

As if that were not enough evidence that Yassin was defendant's customer, plaintiffs showed the jury an interview on a Bahrain web forum with Abd al-Azis al-Rantisi, another founding member of Hamas who was also killed by Israel in 2004, who expressly called for donations to an Arab Bank account matching that of Sheik Yassin. This is compelling evidence that Sheikh Yassin was among the 10 or more accounts of designated terrorists for which defendant refused to produce documents.

In addition to the circumstantial evidence discussed above, defendant's decision to argue that its obligations began and ended by screening transactions against the OFAC list was completely undermined by the testimony of its own former employee. Defendant's counsel emphasized this theory of the case both in his opening and in his closing. Defendant argued, for example, that

> [t]here is no international banking standard that requires banks to do more than clear the transactions through the OFAC list in the United States of America. There is no need to check the Internet or do independent research by banks in order to figure this out. They use the OFAC list. That's the unrebutted testimony of the only banking expert that we had in this case.

This theory, the central tenet of the Bank's defense, was myopic. It allowed the possibility that a well-known Hamas figure could enter the Bank, be recognized as such by every employee there, and yet, if his name did not yet show up on an OFAC list, the Bank not only could, but would be required to treat him like any other non-terrorist customer. This theory not only tolerated willful blindness – it mandated it.

It is therefore no wonder that in making its "OFAC list-only" argument to the jury, defense counsel made no mention at all of the testimony at trial of its own employees, who

utterly rejected it – like that their head of U.K. compliance, Mr. Blackmore, who said that if the words "martyrdom operation" showed up as a payment designation, he "would never in a million years have dealt with a payment order such as" that, or that of their compliance director, Mr. Dabbour, who testified that: "[I]f upon discovering an unusual transaction by – by one of our customers as part of the investigation in the account of our customer, we might look to see if there is any information available in the public domain. And that would be part of the investigative process."

It may be that defense counsel did not address this testimony in his lengthy closing argument because there was no way to explain it within his OFAC list-only argument. But it left an enormous gap in defendant's central theory, and plaintiffs thoroughly exploited it. This failing in defendant's case had nothing to do with the brief instruction to the jury under the Sanctions Order and, in my view, it cast a much bigger shadow over defendant's case than did the instruction.

Finally, any prejudice to defendant from the permissive inference instruction in the Sanctions Order was also greatly overshadowed by the testimony of defendant's expert, Dr. Milton-Edwards, which backfired in spectacular fashion. I have to assume that the jury was as surprised as I was when, after testifying on direct examination that she had visited almost all of the Palestinian charities for a prolonged period and had never seen any pro-Hamas literature, and therefore had concluded that they were not in league with Hamas, it came out on cross-examination that she could not read Arabic. She apparently based her opinion on her lack of encountering any pro-Hamas literature written in the Queen's English.

And the way it came out on cross-examination made it seem like she, and defendant as the party who had proffered her, had attempted to conceal the lack of basis for her opinion on

direct testimony by not drawing the teeth on this point – such as when plaintiffs showed her a photograph bearing the words "Islamic Resistance Movement, Hamas" (taken from her own promotional video). By that point in the trial, I had seen the word "Hamas" in Arabic so many times that I immediately recognized it, and I suspect some of the jury may have as well. Yet the expert had to be prompted before she recognized it, and it only then came out that she could not read Arabic.

This was the most dramatic, but not the only, incident of friendly fire directed at the Bank by Dr. Milton-Edwards. As noted above, her testimony that the charities at issue were not Hamas affiliates was directly contradicted by what she had written in her book about Hamas. Her response to being confronted with that was flippant. She was similarly flippant when her knowledge of Hamas was tested by asking her to identify a picture of Salah Shehadah, the founder of the al-Qassam Brigades. She said she was unable to identify him because of the "whole big beard phenomenon," suggesting that all terrorists look alike to her.

When a party calls an expert witness, it essentially vouches for her expertise. The jury knows that these witnesses are prepared by the lawyers and it evaluates a party's case in conjunction with evaluating the expert's testimony. A reasonable disagreement with a point that an expert expresses does not necessarily doom the proponent's case. But when an expert is profoundly careless, there is a risk that the jury will attribute that carelessness to the proponent, not just the expert.

In short, given the abundance of circumstantial evidence in plaintiffs' case showing that defendant either had or deliberately ignored evidence that it was dealing with Hamas operatives, coupled with the miscues in defendant's theory and evidence, I do not believe that the modest permissive inference instruction played a very large, if any role, in the jury's verdict.

C. The Effect of the Preclusion Order

With respect to the preclusion aspect of the Sanctions Order, it was applied in a way that allowed defendant to present ample evidence supporting its "OFAC-only" and "routine banking practice" defenses. In an effort to avoid transforming it into that which Judge Gershon expressly did not intend – a dispositive sanction – the net effect was that defendant was, in fact, allowed to introduce extensive evidence and argument that it did not know that its customers were terrorists. Indeed, aside from an effort to raise doubts about the responsibility of Hamas for the 24 attacks (which comprised about one-third of the trial), virtually all of defendant's evidence (and its cross-examinations of plaintiffs' witnesses) was aimed at demonstrating its lack of knowledge that its customers were terrorists. As one commentator noted, "the jury heard evidence from both sides on Arab Bank's knowledge or ignorance of its customers and their financial transactions." David L. Hall and Claire Coleman, OUTSIDE COUNSEL, *Banking and Bombs: What the 'Linde' Verdict Portends*, NEW YORK LAW JOURNAL (October 15, 2014).

In opening, closing, and at every possible opportunity, defendant hammered the point that only a few of the many individuals identified by plaintiffs as Hamas leaders or operatives were designated as terrorists by the United States, the European Union, or United Nations. The Court permitted defendant to do so over plaintiffs' objections, reasoning that whether a given individual was designated or not was not something that would find "proof or refutation" in banking records. Further, this evidence was relevant to whether these individuals actually were Hamas leaders – albeit evidence of dubious weight in the case of people like Salah Shehadah, whose link to Hamas was well-established. But its primary purpose was plainly to convince the jury that defendant could not possibly have known that a given individual was a terrorist in the absence of designation.

It also proved difficult, in practice, to preclude much of defendant's evidence relating to its compliance programs. The reason for this difficulty was that this evidence straddled the line drawn by the Sanctions Order. For example, although defendant was permitted to argue that it did not know that Osama Hamdan was a terrorist, defendant's compliance evidence did not concern only his account. Instead, because defendant had adopted policies that applied broadly across its global operations, and had specific policies at branches in each country in which it operated, the Court allowed defendant to describe its programs generally, subject to a limiting instruction that the jury could only consider those programs with regard to the Osama Hamdan account. In contrast, when it became clear that defendant intended to discuss its programs in the Palestinian Territories specifically – branches for which no account records were produced – the Court precluded such testimony.[14]

These examples are only the beginning of the evidence that defendant was allowed to adduce regarding its knowledge of whether its customers were terrorists: defendant argued that Hamas operatives worked in secret;[15] that the Saudi Committee was purely a humanitarian effort to aid needy Palestinians;[16] that the names of Hamas leaders on certain wire transfers that

---

[14] This limited preclusion makes sense in light of the circumstantial evidence relating to Sheikh Yassin's alleged account, discussed above. Testimony and evidence that defendant's policies and procedures in the Palestinian Territories were in line with industry standards could have been rebutted by plaintiffs if those programs failed to detect documented donations to Sheikh Yassin. Further, defendant's non-production left plaintiffs with no way of testing on cross-examination how defendant's on-paper policies were applied in practice. Because no emails or internal reports were produced, whether any of defendant's employees raised suspicions about any accounts will never be known. Testimony concerning the strength of defendant's compliance programs in the Palestinian Territories would thus have invited the jury to take defendant at its word – an unfair proposition, when on cross-examination those witnesses would have refused to answer even the question "Did Sheikh Yassin have an account at Arab Bank?"

[15] Cf. Linde, 269 F.R.D. at 204 ("[D]efendant should be barred from asserting, through evidence and/or argument, that it did not have a culpable state of mind because certain people or organizations were not "generally known" to be terrorists. General knowledge is irrelevant; what matters is whether *the Bank* knew that a customer or beneficiary was a terrorist.") (emphasis in original).

[16] Cf. id. at 202 ("Defendant maintains that 'there is no basis to infer that [the withheld] records would establish' that the Bank knew the Saudi Committee sponsored terrorism and that the Bank supported the Saudi Committee's efforts. But the content of the Saudi Committee records that have been produced suggests otherwise.").

defendant processed were spelled differently than the way those names appeared on the OFAC list; that USAID and other organizations worked with many of the same charities that plaintiffs alleged were Hamas fronts; and that the English government investigated Interpal, designated by the United States as a Hamas fundraiser, and reached a contrary conclusion.

Indeed, the Court permitted several of defendant's employees to describe in some detail how they or their families had narrowly escaped physical injury or death or had in fact suffered financial loss as a result of the Hamas attacks at issue in this case. In one instance, the Court received testimony that a Bank officer's children attended a school very near to one of the attacks at issue in the case – the obvious purpose being to ask the jury to draw the inference that Bank officers would not knowingly support an organization that threatened their own families. The same was true of the testimony of the Bank's chairman that the Bank's operations were negatively affected by the Second Intifada – the clear purpose of this testimony was to encourage the jury to infer that the Bank would not knowingly support terrorism. All of this evidence was offered to show circumstantially that defendant did not know its customers were terrorists. This evidence was all received, and emphasized in summation, despite the Sanctions Order.

What had a greater impact on the case than the Sanctions order was the scenario that defendant itself created – the very absence of key records that gave rise to the Sanctions Order in the first place. This enabled plaintiffs' attorneys to ask most of defendant's witnesses if they had produced records, and required the witnesses to say "no." It enabled plaintiffs to have their own witnesses, principally their expert Mr. Spitzen, emphasize the point that they could not complete their analyses because defendant had failed to produce requested records. And it enabled plaintiffs' counsel, during closing argument, to stress the fact that the issues at trial could, in all likelihood, have been answered if defendant had merely produced the account records – and to

ask the jury to draw the obvious inference from that. The persuasiveness of that argument would not have been lessened by the absence of either the permissive adverse inference instruction or the preclusion order, and thus was not significantly enhanced by their presence.

In the same vein, it is worth noting that throughout defendant's moving papers, it deems plaintiffs' proof deficient due to gaps in the evidentiary record that it created. To give just one example, defendant stresses in its lengthy appendix that Abbas Al-Sayyed, the mastermind of the Park Hotel bombing, received only two transfers totaling $54,000 to his Tulkarem Arab Bank account a year before that attack was carried out. Maybe he did, and maybe he didn't – defendant never produced Al-Sayyed's account records, and thus to argue that the handful of transfers that happened to be routed through New York is the entire universe of funds defendant transferred to Al-Sayyed might have been regarded by the jury as disingenuous at best.

I also cannot accept defendant's contention that it would have been "futile" to proffer the in-court testimony of Mohammed Al-Tahan, Tayseer Sadeq, or Assad Saleh because of the Sanctions Order. The inculpatory deposition testimony from these Bank officers that plaintiffs showed to the jury concerned records that had been produced, and I have no reason to think that I would have excluded their live testimony to explain those statements. We can only speculate, of course, what would have happened, because defendant did not call them, despite having promised the jury that it would.

Finally, although I agree with Judge Gershon's exclusion of foreign law from this case, I do not believe that permitting defendant to argue its overruled bank secrecy objections to the jury would have appreciably changed matters either. Under Federal Rule of Evidence 403, I determined not to permit the jury to be presented with a mini-trial on whether foreign bank secrecy law trumped defendant's obligations under the Federal Rules of Civil Procedure. That

was a question of law for the Court.  Judge Gershon ruled on it, correctly in my view.  It was then defendant's choice to disregard her ruling.  I was not going to have a mini-trial on the proper balancing of United States law against alleged foreign law.

In sum, the Sanctions Order did not play out to be a critical factor in the case.  The strength of the plaintiffs' evidence of defendant's knowledge, the illogic of defendant's OFAC-only theory, the miscues within defendant's own case, and the gaping hole which defendant admittedly created by refusing to produce the key documents and testimony substantially overshadowed the Sanctions Order.

### D.  The Solicitor General's Certiorari Brief

Defendant sought mandamus review of the Sanctions Order in the Second Circuit; when mandamus was denied, defendant petitioned the Supreme Court for certiorari.  While defendant's petition was pending, the Supreme Court invited the Solicitor General to file a brief offering the views of the United States.  See Arab Bank, PLC v. Linde, 134 S. Ct. 500 (2013).  Although I had serious reservations about delaying this 2004 case further, I stayed the trial pending disposition of the petition for a writ, since the request to Solicitor General indicated an increased likelihood that the Supreme Court might grant certiorari.

The Solicitor General filed his brief, and argued that Judge Gershon's comity analysis was erroneous in some respects, but that the Supreme Court should nevertheless deny certiorari.  After the Court denied certiorari, at the pretrial conference, I declined to reconsider the Sanctions Order in light of the Solicitor General's brief.

Defendant now argues that this was error because the Solicitor General's views "pertained to issues of national interest and foreign policy that fall squarely within the province of the Executive Branch."  Defendant argues that "when the United States Government submits

statements of interest to federal courts, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy," citing Whiteman v. Dorotheum GmbH & Co. KG, 431 F.3d 57, 69 (2d Cir. 2005) (alterations and quotations omitted).

As an initial matter, Whiteman is inapposite because it concerned a Statement of Interest invoking foreign policy to urge dismissal of the plaintiffs' claims. See id. Judge Gershon long ago rejected defendant's invocation of the political question doctrine, and defendant has not requested reconsideration of that decision. See Lev v. Arab Bank, PLC, No. 08-cv-3251, 2010 WL 623636, at *4 (E.D.N.Y. Jan. 29, 2010) (holding that defendant offered "no sound support" for its argument that the complaint should be dismissed under the political question doctrine). And, as was true at the time the Sanctions Order was entered, after a decade of litigation the United States government has never submitted a Statement of Interest suggesting that this case be dismissed. See id.; see also Almog v. Arab Bank, PLC, 471 F. Supp. 2d 257, 285 (E.D.N.Y. 2007). The Solicitor General did not argue otherwise.

Whatever weight the Solicitor General's views in this context are due, they are not dispositive. See Presbyterian Church of Sudan v. Talisman, No. 01-cv-9882, 2005 WL 2082846, at *3 (S.D.N.Y. Aug. 30, 2005). And although the views of the Solicitor General were certainly entitled to appropriate weight, they do not persuade me to reconsider Judge Gershon's carefully-reasoned Sanctions Order.

At the outset, I have to note the very peculiar structure of the Solicitor General's submission to the Supreme Court. It spends almost 13 pages arguing that the Sanctions Order was erroneous – and then urges the Supreme Court *not* to grant certiorari. It may be questioned why the Solicitor General would expend such an effort in persuading the Supreme Court that an

error has been committed and then urge the Court not to correct the error.  What is the point of asserting error that one does not wish to see corrected?  The answer may lie in the suggestion in at least one newspaper article that the Departments of State and Justice had opposing positions on this issue, and the Solicitor General's submission reflects a political compromise of those positions.  See Charlie Savage, *Terror Suit Tests Diplomacy and Bank Secrecy Laws*, N.Y. TIMES, at A3 (April 2, 2014) (describing the Solicitor General's need to balance the interests of different executive agencies, in other words the "unusual trade-offs between . . . diplomatic efforts to achieve Middle East peace, the rights of American victims of terrorism, and an American campaign to tear down Swiss banking secrecy laws that have long aided tax evasion").

Any such disagreement is of no moment to this Court.  It is axiomatic that dictum from a higher court is not controlling precedent; even less is dictum from one or more government agencies.  It is enough for me to reject that one portion of the Solicitor General's argument that urges error because the argument is flawed.

The brief, and defendant's position, disregard a critical aspect of other interests purportedly overlooked by Judge Gershon – including undermining the United States' close relationship with Jordan, and threats to stability in the Middle East – issues that would appear to be implicated not just by the Sanctions Order, but by *any* verdict against defendant.  But again, the United States has not sought dismissal of this case.  Cf. Rosenberg v. Pasha, 577 F. App'x 22 (2d Cir. 2014) (summary order) (affirming dismissal of certain defendants in ATA case where Department of State provided Statement of Interest asserting that those defendants were protected by sovereign immunity).

In any event, the brief also misunderstands certain facts, e.g., that Judge Gershon concluded that defendant did not act in good faith "simply because petitioner previously

produced some of the documents to the Departments of the Treasury and Justice." First, there were many other reasons for that finding, namely defendant's mischaracterization of the lawsuit to foreign authorities, and the years of delay caused by defendant's recalcitrance in discovery. See Linde, 269 F.R.D. at 199-200.

Moreover, even as to that production, "selective disclosure" was only part of the story. Judge Gershon noted not only that defendant was not prosecuted for producing to the United States government, but also that defendant never sought permission before doing so. See Linde, 269 F.R.D. at 197. In other words, defendant produced records without hesitation to the United States government, but claimed it needed to seek permission before producing records to plaintiffs, which could very well indicate that defendant's purported need to seek permission was pretextual. Viewed in light of Judge Gerson's actual reasoning, the Solicitor General (and defendant, and Jordan, and the Union of Arab Banks) grossly overstated the impact of the Sanctions Order as a disincentive to cooperate with United States anti-terrorism and anti-money laundering efforts.

In this respect, the Solicitor General's brief appears to go beyond merely explaining the foreign policy implications of the Sanctions Order, and offers its own analysis of how the various comity factors should have been weighed in light of the facts as he understood them. Cf. Von Saher v. Norton Simon Museum of Art at Pasadena, 754 F.3d 712, 724 (9th Cir. 2014) ("This factual discrepancy also makes us wary of giving too much credence to the Solicitor General's brief because it demonstrates that the Solicitor General goes beyond explaining federal foreign policy and appears to make factual determinations.").

I believe that Judge Gershon and Magistrate Judge Pohorelsky accurately described and balanced the core interests to be weighed in determining the appropriateness of sanctions: the

interest of the United States (and of the foreign jurisdictions at issue here) in combating terrorism, against the interest of foreign states in enforcing their bank secrecy laws.  See Linde, 269 F.R.D. at 208; see also Linde v. Arab Bank, PLC, 463 F. Supp. 2d 310, 315 (E.D.N.Y. 2006) (Magistrate Judge decision), aff'd, No. 04-cv-2799, 2007 WL 812918 (E.D.N.Y. Mar. 14, 2007). Although the Solicitor General's brief suggested that the balance of these interests "is materially different when a private party seeks documents located in foreign jurisdictions," courts have often reached the opposite conclusion in litigation under other statutes that similarly encourage the advancement of the United States' interests through private litigation.  See Minpeco, S.A. v. Conticommodity Servs., Inc., 116 F.R.D. 517, 523 (S.D.N.Y. 1987) ("[A]lthough the interest of the United States in criminal and civil enforcement suits is normally stronger than its interest in private disputes, the formal posture of these cases is less significant in that the plaintiffs here are asserting private rights of action under the antitrust, commodities, and racketeering statutes" that Congress intended to be enforced by private attorneys general); see also In re Air Cargo Shipping Servs. Antitrust Litig., 278 F.R.D. 51, 54 (E.D.N.Y. 2010) ("[T]his is a case involving violations of antitrust laws whose enforcement is essential to the [United States'] interests in a competitive economy. . . . [E]nforcement through private civil actions such as this one is a critical tool for encouraging compliance with the country's antitrust laws.").

Particularly in light of the extensive delays throughout discovery, I did and do not believe that the Solicitor General's brief provided good reason to revisit, just before this decade-old case finally went to trial, the previous holdings that the foreign states' asserted interests in their bank secrecy laws "must yield to the interests of combating terrorism and compensating its victims." Linde, 463 F. Supp. 2d at 315.

Moreover, in my view, any interest in enforcing foreign bank secrecy laws only withstands scrutiny when described in the abstract, as in the Solicitor General's statement that the laws at issue "reflect legitimate sovereign interests in protecting foreign citizens' privacy and confidence in the nations' financial institutions." This sounds like an important interest until one considers exactly whose privacy defendant is seeking to protect. Specifically, plaintiffs are correct that the Solicitor General misunderstood the nature of the account information being withheld. These were not accounts that were "allegedly maintained . . . for certain terrorist organizations," they were accounts that defendant had *admitted* were held in the name of designated terrorists.

For example, Abbas Al-Sayyed was convicted and sentenced to thirty-five life terms for his role in orchestrating Hamas terrorist attacks, including the Park Hotel bombing on March 27, 2002. According to Israeli court documents, Al-Sayyed strapped a bomb to a young man, Abdal-Baset Odeh, who subsequently detonated it amidst a group of elderly Holocaust survivors enjoying Passover Seder at the Park Hotel. American citizens were among the thirty people killed and 160 injured. There is no need to rely on circumstantial evidence to determine whether Al-Sayyed had an Arab Bank account or used money sent to it to further Hamas' "military activities," because he admitted it himself.

Vindicating the right of a convicted mass-murderer like Al-Sayyed to the privacy of his financial records over the right of his victims to compensation is not in the interest of any nation. As defendant continually emphasizes, Jordan is staunchly opposed to terrorism and a strong ally in the United States' counter-terrorism efforts. It thus seems unlikely that the Jordanian authorities would criminally prosecute defendant for disclosing the bank records of imprisoned terrorists like Al-Sayyed or those who were killed long ago, like Sheikh Yassin or Salah

Shehadah. Yet defendant's position is that even answering a question at a deposition as to whether these individuals ever had bank accounts would result in criminal prosecution.

Even at this late date, defendant has not pointed the Court to any cases where banks have faced criminal prosecution for violating the foreign bank secrecy laws at issue. In the absence of such evidence, and given the close relationship between defendant and the governments of Jordan and Palestine – the Kingdom of Jordan is a 16% shareholder, numerous Bank executives have served in government roles, and the current head of the Palestinian Monetary Authority, Shukry Bishara, is a former Bank employee – Judge Gershon had an adequate basis to conclude that defendant did not face a real risk of prosecution should it produce the documents at issue. Cf. Wultz v. Bank of China Ltd., 942 F. Supp. 2d 452, 468 (S.D.N.Y. 2013) (Bank of China made inadequate showing of hardship where it "produced no evidence of a bank or its employees being meaningfully punished for disclosing confidential information to a U.S. court in contravention of Chinese law" and stating that "it cannot be ignored that the PRC has a majority interest in BOC, and thus has a special interest in protecting BOC from discovery and the risk of liability"); Tiffany (NJ) LLC v. Forbse, No. 11-cv-4976, 2012 WL 1918866, at *9 (S.D.N.Y. May 23, 2012) ("Although we are reluctant to conclude with any certainty how a foreign nation will choose to implement its own laws, we cannot ignore the reality that the Chinese government holds large ownership interests in the Banks and that the Banks have not been sanctioned for complying with discovery orders issued by a U.S. court under similar circumstances."); Milliken & Co. v. Bank of China, 758 F. Supp. 2d 238, 250 (S.D.N.Y. 2010).

The Solicitor General was at best equivocal in asserting otherwise. The brief did not say outright that defendant would have been prosecuted for complying in discovery. Instead, it argued that a foreign state considering whether to prosecute "may view the matter differently

based on whether the party requesting the information is a government entity or a private one."

As the Second Circuit pointed out, while this does not necessarily mean that a foreign

government would not prosecute, "the converse is also not necessarily true:  The foreign states

would not necessarily prosecute the Bank or any of its employees for the disclosure of sensitive

banking information to private civil litigants in the context of the current proceedings."  Linde v.

Arab Bank, PLC, 706 F.3d 92, 114 (2d Cir. 2013).

Most tellingly, *amicus* the Hashemite Kingdom of Jordan does not challenge this aspect

of Judge Gershon's ruling.  Jordan argues for certification of the broader issue to the Court of

Appeals, but carefully avoids any assertion that in fact, defendant (to whom its "economic

wellbeing is tightly linked") was likely to have been prosecuted for violations of the secrecy laws

in question.  If anyone were in a position to rebut Judge Gershon's determination, it would be

*amicus*, and it has declined to do so.  While I give weight to Jordan's interest in its sovereign

prerogative to regulate its financial services industry, I cannot find that the balancing of interests

that underlie the Sanctions Order warrant reconsideration.

## II.    "Act of International Terrorism"

Defendant assigns error to a number of legal principles on which the jury charges in this

case were based; it makes sense to first address the threshold question of whether the provision

of financial services can constitute an "act of international terrorism" under the ATA.  Defendant

requested that the jury be charged on each constituent element of an "act of international

terrorism" under 18 U.S.C. § 2331.  Specifically, defendant requested that the jury be charged

that the Bank's actions must (1) "involve violent acts or acts dangerous to human life"; (2)

"qualify as 'a violation of the criminal laws of the United States or of any State' if it were

committed within a United States jurisdiction"; (3) "'appear to be intended' to intimidate a

civilian population, influence government policy, or affect the conduct of government by certain specified means"; and (4) "occur primarily outside the United States or transcend national boundaries." See Licci v. Lebanese Canadian Bank, SAL, 673 F.3d 50, 68 (2d Cir. 2012).[17]

I agree with those courts that have held that a violation of 18 U.S.C. § 2339B is itself an act of international terrorism. See Goldberg v. UBS AG, 690 F. Supp. 2d 92, 112-15 (E.D.N.Y. 2010) (collecting cases); Strauss v. Credit Lyonnais, S.A., No. 06-cv-0702, 2006 WL 2862704, at *1 (E.D.N.Y. Oct. 5, 2006) ("Violations of 18 U.S.C. § 2339B & § 2339C are recognized as international terrorism under 18 U.S.C. § 2333(a)."). Defendant misstates Weiss v. National Westminster Bank PLC, 768 F.3d 202, 207 n.6 (2d Cir. 2014), in stating that the Second Circuit "expressly held that a violation of Section 2339B is not, by itself, 'an act of international terrorism.'" On the contrary, the Circuit expressly did not reach the issue.

Completing a wire transfer generally cannot be described as "violent" or "dangerous to human life" in the colloquial sense. But other courts have concluded, and I agree, that providing material support to a terrorist organization is an act "dangerous to human life." See, e.g., Boim v. Holy Land Found. for Relief & Dev., 549 F.3d 685, 690 (7th Cir. 2008) ("Boim III") ("Giving money to Hamas, like giving a loaded gun to a child (which also is not a violent act), is an 'act dangerous to human life.'"). The same is true for the requirement that the act "appear to be intended" to intimidate. See id. at 694 (because donations to Hamas increase Hamas' ability to launch terrorist attacks, "such donations would 'appear to be intended . . . to intimidate or coerce a civilian population' or to 'affect the conduct of a government by . . . assassination.'"). Defendant's suggestion that knowingly providing financial services should be treated differently than knowingly donating money is unpersuasive; such financial services increase Hamas' ability

---

[17] Shortly before trial, defendant stipulated that the attacks in which plaintiffs were injured were "acts of international terrorism" within the meaning of the ATA. Previously, defendant maintained for over a decade of litigation that plaintiffs could not prove that suicide bombings fit the definition of "acts of international terrorism."

to carry out attacks in the same way, and Congress made no distinction between these different forms of material support in criminalizing them. See 18 U.S.C. §§ 2339A(b)(1), 2339B(a)(1), 2293B(g)(4).

The civil liability provisions of the ATA are derived from a complicated series of incorporations by reference. But for a claim brought under 18 U.S.C. § 2333(a) and 18 U.S.C. § 2339B(a)(1), those incorporations by reference distill to relatively simple questions: Did the defendant know that it was providing material support to Hamas, and did the defendant know that Hamas was a foreign terrorist organization (or "engaged in terrorist activity" or "terrorism")? If those are the only questions that need be answered to determine whether a defendant committed an "act of international terrorism" with the requisite mental state – and they are – then they are the only questions a jury should be asked.

## III.    Causation

In denying defendant's motion for summary judgment from the bench on April 24, 2013, Judge Gershon held that ATA plaintiffs are not required to show "but for" causation under either Rothstein v. UBS AG, 708 F.3d 82 (2d Cir. 2013), or In re Terrorist Attacks on September 11, 2001 (Al Rajhi Bank, et al.), 714 F.3d 118 (2d Cir. 2013). She also rejected defendant's argument that plaintiffs were required to trace specific dollars to specific terrorist attacks. On June 18, 2013, Judge Gershon denied defendant's motion for reconsideration.

Over a year later, defendant's proposed jury instructions requested that the Court charge the jury with the causation standard that Judge Gershon twice rejected. Defendant again argued that Judge Gershon's previous ruling was erroneous, and added that the Supreme Court's subsequent decisions in Univ. of Texas Southwestern Med. Ctr. v. Nassar, 133 S. Ct. 2517

(2013), and <u>Burrage v. United States</u>, 134 S. Ct. 881 (2014), required plaintiffs to prove "but for" causation in order to recover under the ATA.

Proposed jury instructions, of course, are not the proper procedural vehicle for a motion for reconsideration. Defendant did not provide any reason why, if it viewed these decisions as an "intervening change of controlling law" justifying reconsideration, <u>see</u> <u>Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.</u>, 956 F.2d 1245, 1255 (2d Cir. 1992), it failed to make any motion on this basis for over a year. The reason is apparent: <u>Nassar</u> and <u>Burrage</u> did not change the controlling law applicable here because in those cases, the Supreme Court was interpreting different statutes that involved different contexts and even used different language to establish their respective causation elements.

For the reasons discussed below, I hold that Judge Gershon's original ruling was correct. As the only cases to directly address the issue have held, requiring "but for" causation would effectively annul the civil liability provisions of the ATA. That cannot have been the intent of Congress in enacting them. Requiring but-for causation would render it practically impossible for an ATA plaintiff to recover from a defendant that has knowingly provided material support to a terrorist group over an extended period of time, as the jury found happened here. I further hold that the jury instructions given in this case conformed to that ruling and to the legal principles behind it, and that plaintiffs adduced sufficient evidence on this issue that it was not unreasonable for the jury to find causation.

A. <u>Governing Law</u>

The ATA is different than other statutes that reference causation. The tort it condemns is one of secondary action, not primary action. It assumes the existence of a tort by a third party, and then renders the defendant liable for providing support to that third party, not for supporting

45

any particular conduct by that third party. That groups like Hamas are likely to continue to carry out terrorist attacks with or without specific sources of aid is inherent in their definition as foreign terrorist organizations. That is why, in passing 18 U.S.C. § 2339B, Congress "prohibited the provision of 'material support or resources' to certain foreign organizations that engage in terrorist activity. That prohibition is based on a finding that the specified organizations 'are so tainted by their criminal conduct that *any* contribution to such an organization facilitates that conduct.'" Holder v. Humanitarian Law Project, 561 U.S. 1, 7, 130 S. Ct. 2705 (2010) (emphasis added).

Thus, although there is no aiding and abetting liability under the ATA, see Rothstein, 708 F.3d at 97, "[p]rimary liability in the form of material support to terrorism has the character of secondary liability. Through a chain of incorporations by reference, Congress has expressly imposed liability on a class of aiders and abettors." Boim III, 549 F.3d at 691-92.

But-for causation in that context is not simply absent from the facts of this case, it is nearly impossible to prove, because money is fungible. Even if an ATA plaintiff could show that a particular dollar was used in furtherance of a particular attack – a requirement rejected by this Court – that plaintiff still could never prove that absent the defendant's providing that dollar, a group like Hamas would not have made up the shortfall from elsewhere. See Gill v. Arab Bank, PLC, 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012) ("'But for' cause cannot be required in the section 2333(a) context. In most instances, if a particular contribution was not made, money from other sources could be redistributed to make up for the shortfall, and an attack could take place without a substantial donation.").

As an initial matter, I agree with Judge Gerson's interpretation of Rothstein and Al Rajhi. To be perfectly clear, contrary to defendant's repeated assertions, neither case holds that but-for

cause is a requirement of the ATA. To understand why, it is important to understand that proximate and but-for causation are analytically distinct concepts, and neither one is simply a less demanding subset of the other. But-for causation is a factual inquiry, which requires a fact-finder to assess the likelihood of a counterfactual: Would X still have happened if Y had not. Proximate cause is a legal inquiry – focusing largely on foreseeability – that asks whether X and Y are sufficiently connected to justify holding one accountable for the other as a matter of legal policy.

Defendant's assertion that those cases "expressly hold[] that the 'by reason of' language incorporated into the ATA requires a showing of both 'but for' and []proximate causation" would be wholly unsupportable, were it not for the Second Circuit's passing reliance, without elaboration, on cases in which but-for cause was present, but not at issue. For example, examining the history of anti-trust legislation incorporating the same "by reason of" requirement that is found in the ATA, the Court noted the Supreme Court's holding "that a plaintiff's right to sue under § 4 [of the Clayton Act] required a showing that the defendant's violation *not only* was a 'but for' cause of his injury, but was the proximate cause as well." Rothstein, 708 F.3d at 95 (citing Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 112 S. Ct. 1311 (1992)) (emphasis added).

Despite such language, there is no valid argument that Rothstein or Al Rajhi preclude relief here because they are factually analogous, i.e., that they stand for the proposition that *proximate* cause was not shown here. The Rothstein Court held that "[w]e cannot agree that the Complaint sufficiently alleges proximate cause," and went on to note that there was no allegation that the defendant "was a participant in the terrorist attacks," that it "provided money to Hizbollah or Hamas," that the currency it transferred to Iran "was given to Hizbollah or Hamas,"

and that if it had not transferred currency to Iran, then that country, "with its billions of dollars in reserve, would not have funded the attacks . . . ." 708 F.3d at 97. While this list of absent proof cannot be taken as a holding that any of those things alone would have been sufficient, the nature of the proof listed is a strong indication that the Court did not intend to establish a but-for cause requirement simply by citing <u>Holmes</u>. The better view is that if the Second Circuit had intended to set forth a but-for cause requirement, it could have done so expressly, and I decline defendant's renewed invitation to read such a holding into that case or into <u>Al Rajhi</u>, which followed it.

More importantly, neither <u>Nassar</u> nor <u>Burrage</u> require a conclusion to the contrary, most significantly because both cases were interpreting statutes that differed significantly from the ATA. I therefore consider these cases in light of the background principle, stated in <u>Burrage</u>, that "*[w]here there is no textual or contextual indication to the contrary*, courts regularly read phrases like 'results from' to require but-for causality." 134 S. Ct. at 888 (emphasis added). The <u>Burrage</u> court also acknowledged, even though it declined to adopt, a "less demanding (but also less well established) line of authority, under which an act or omission is considered a cause-in-fact if it was a 'substantial' or 'contributing' factor in producing a given result." <u>Id.</u> at 890; <u>see also</u> <u>Paroline v. United States</u>, 134 S. Ct. 1710, 1724 (2014) ("[T]ort law teaches that alternative and less demanding causal standards [than but-for cause] are necessary in certain circumstances to vindicate the law's purposes.").[18] The question, therefore, is not whether but-for causation is

---

[18] Defendant cites <u>Paroline</u> for the proposition that if but-for cause is not required in this case, damages should be apportioned to that amount of plaintiffs' losses that can be ascribed to defendant. Although this argument is premature, because we have yet to try damages in this case, I note that <u>Paroline</u> so held in the context of criminal restitution, where there is a "bedrock principle that restitution should reflect the consequences of the defendant's own conduct," <u>id.</u> at 1725, a principle that is not unbending in the law of torts, where joint and several liability is commonplace. Moreover, neither the facts nor the jury instruction given in this case suggests that there was a finding of liability based on "very minor" contributions to plaintiffs' losses, as was the case in <u>Paroline</u>.

required by every statute using "by reason of" language, but whether the ATA is one of those statutes.  I hold that it is not.

Nassar addressed the issue of causation in the context of a Title VII retaliation case.  See Nassar, 133 S. Ct. at 2529-31.  In that context, the causation inquiry is entirely different.  The Court in Nassar was evaluating the extent to which impermissible motives led to otherwise permissible conduct.  Although the majority established a requirement for but-for causation within the intent inquiry against a "background" of tort law and its "default rules," id. at 2525, its conclusions about the proper standard in that setting have little bearing on the application of the same background principles to this case, which concerns the causal link between conduct and injury.  Moreover, I agree with the Nassar dissent's view that the Court oversimplified what "textbook tort law" requires, by disregarding alternatives to but-for causation.  See id. at 2546.

Burrage is, admittedly, more closely analogous, as it concerned the causality requirement of a sentencing enhancement for certain drug offenses when death or bodily injury "results from the use" of the substance that the defendant provided.  134 S. Ct. at 885.  I must give some weight to the Supreme Court's determination that in enacting the statute at issue in Burrage, Congress "chose . . . to use language that imports but-for causality."  Id. at 891.  But I am not bound by it, because the language of the statute at issue here is not "results from," but "by reason of."  Moreover, the Court noted that its determination was made "[e]specially in the interpretation of a criminal statute subject to the rule of lenity."  Id. at 891.  In light of that, and the many other "textual and contextual" considerations at play, I reject the notion that, because of Burrage, I must view the *different* language of § 2333 as imposing a clear textual command to "import" but-for causation.

Even more importantly, in Burrage, the Court's review of the proof supporting convictions in past cases revealed that "but-for causation is not nearly the insuperable barrier the Government makes it out to be." 134 S. Ct. at 891 (citing United States v. Krieger, 628 F.3d 857, 870-71 (7th Cir. 2010), and United States v. Webb, 655 F.3d 1238, 1254-55 (11th Cir. 2011), as examples where the Government demonstrated "but for" causation under the Controlled Substances Act). In other words, the Court expressly noted that finding but-for causation was not impossible, avoiding a "policy disaster." Id. That is simply not the case with the ATA.

The ATA presents a different context than Nassar or Burrage, the impossibility of proving "but for" causation, and strong textual and contextual reasons for declining to impose a "but for" requirement. Those textual and contextual reasons lie in Congress' intent to impede terrorism by "the imposition of liability at any point along the causal chain of terrorism." S. Rep. No. 102–342, at 22 (1992). There is no question that "the 'by reason of' language of the statute restricts the imposition of such liability to situations where plaintiffs plausibly allege that defendants [sic] actions proximately caused their injuries." Al Rajhi, 714 F.3d at 125 (citing Rothstein, 708 F.3d at 95). But to also require proof of "but for" causation would make it impossible for the victims of terrorist attacks to hold a terrorist group's "financial angels" liable, Boim III, 549 F.3d at 690, and thereby eviscerate the civil liability provisions of the ATA.

And although it should go without saying, nothing in Nassar or Burrage changes what the Second Circuit did or did not say in Rothstein or Al Rajhi. The Rothstein Court's discussion of the construction of "by reason of" causation in anti-trust and RICO statutes, 708 F.3d at 95 (citing Holmes, 503 U.S. 258, 112 S. Ct. 1311), simply because there was also a passing citation to Holmes in Burrage, 134 S. Ct. at 889, does not suddenly mean that Rothstein created a but-for

cause requirement under the ATA. That is because in <u>Holmes</u>, but-for causation was not at issue; the question before the Court was whether proximate causation was *also* required in a RICO case.[19] One might even question whether the <u>Burrage</u> Court's characterization of <u>Holmes</u>, which it cites as "explaining that a statute permitting recovery for injuries suffered by reason of the defendant's unlawful conduct requires a showing that the defendant's violation was, among other things, a but for cause of his injury," 134 S. Ct. at 889 (internal quotation marks omitted), is a fair characterization of the proposition stated in that case, in which the Supreme Court analogized the RICO case before it to prior anti-trust cases, and recalled that "we held [in a prior case] that a plaintiff's right to sue under § 4 required a showing that the defendant's violation not only was a "but for" cause of his injury, but was the proximate cause as well." <u>Holmes</u>, 503 U.S. at 268, 112 S. Ct. at 1317.

In short, nothing in these later cases, in my view, disturbs the reasoning that Judge Posner applied to this question in <u>Boim III</u>, upon which this Court relied in its extant ruling on this issue. The principle is that when a tortfeasor acts with the knowledge that its conduct will, in concert with that of others, result in harm that would not otherwise occur, it is appropriate to hold each tortfeasor accountable. For example, in an environmental nuisance case,

> [e]ven if the amount of pollution caused by each party would be too slight to warrant a finding that any one of them had created a nuisance [<u>i.e.</u>, caused injury,] pollution of a stream to even a slight extent becomes unreasonable [and therefore a nuisance] when similar pollution by others makes the condition of the stream approach the danger point. The single act itself becomes wrongful because it is done in the context of what others are doing.

---

[19] Even if the statute in <u>Holmes</u> were properly viewed as analogous to the ATA in every respect, which it clearly is not, the Court's assumption that but-for causation is required in that context is not the same as a holding to that effect. <u>See</u> <u>In re Stegall</u>, 865 F.2d 140, 142 (7th Cir. 1989) ("A point of law merely assumed in an opinion, not discussed, is not authoritative."); <u>cf.</u> <u>Getty Petroleum Corp. v. Bartco Petroleum Corp.</u>, 858 F.2d 103, 113 (2d Cir. 1988) ("[A] *sub silentio* holding is not binding precedent.") (internal quotation marks omitted).

<u>Boim III</u>, 549 F.3d at 696-97 (quoting W. Page Keeton et al., *Prosser and Keeton on Torts* § 52, p. 354 (5th ed. 1984)).  As to the somewhat more problematic situation in which three fires, one of natural origin, combine to burn down a house, Judge Posner observes that traditional tort law "requires proof only that there was a substantial probability that the defendants' fires (or rather either of them) were the cause."  <u>Id.</u> at 697.  This is exactly the level of causation that the jury was instructed to apply here.

In short, <u>Boim III</u>'s reasoning is precisely on point with this case, and remains the only decision by a Court of Appeals to address this particular question under this particular statute. As Judge Posner made clear, a but-for causation requirement would eviscerate the civil remedy available under § 2333.  I cannot conclude that Congress enacted a meaningless provision here.

In light of these considerations, although defendant strenuously urges that <u>Rothstein</u>, <u>Al Rajhi</u>, <u>Burrage</u>, and <u>Nassar</u> command a result different than the one that has been reached here, it is clear to me that none of them do.  The Second Circuit's cases, as Judge Gershon has already held, are not addressing the question presented here.  The Supreme Court's cases have nothing to do with the ATA, and are distinguishable on their facts.  The fact remains that no court has expressly held that the ATA's civil remedy requires a showing of but-for causation.  And in the only Court of Appeals decision to actually decide the issue, Judge Posner set forth a detailed and compelling explanation of why it does not.

B.  <u>Jury Charge</u>

The jury charge given in this case conformed to the legal principles set forth above. Plaintiffs requested that the jury be charged that plaintiffs must prove that defendant's alleged support "by augmenting Hamas's resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel and the Palestinian Territories at the time of the 24

attacks at issue in this trial," and that it was reasonably foreseeable that the alleged support would do so. This charge was rejected as too argumentative and fact-specific. Instead, the Court proposed what it viewed as a generic proximate cause charge. See Rothstein, 708 F.3d at 95-96.

Plaintiffs rightly pointed out, however, that some of the Court's proposed language concerning the "directness" of the relation between plaintiffs' injury and defendant's acts was inappropriate in the ATA context. No one has ever "directly" been injured by a wire transfer, and further, the language was too suggestive of a requirement to trace specific dollars to specific terrorist attacks, a requirement that had been rejected by this Court and others. See Gill, 893 F. Supp. 2d at 507; see also Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 433-34 (E.D.N.Y. 2013) ("[P]laintiffs who bring an ATA action are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard. Such a task would be impossible and would make the ATA practically dead letter."). The Court therefore adopted plaintiffs' proposed changes. The causation charge the Court gave focused solely on whether defendant's acts were a substantial factor in causing plaintiffs' injuries, and whether such injuries were a foreseeable result of those acts. The Court instructed the jury that "[a]ctivities that are too remote, too indirect, or too attenuated are insufficient" to show proximate causation.

### C. Sufficiency of the Evidence

Plaintiffs provided evidence that from 2000-2001, defendant processed approximately $3.2 million in transfers from Yousef El-Hayek to accounts that plaintiffs identify as belonging to Hamas leaders and their wives. From 1999-2004, the 11 Hamas-controlled charities received approximately $32 million into their Arab Bank accounts, approximately $15 million of which was originated by the Saudi Committee. The originating parties for much of the remaining funds were organizations that plaintiffs identified as part of the Hamas worldwide fundraising network,

including Interpal, a British charity designated by OFAC in 2003; Comité de Bienfaisance et de Secours aux Palestiniens ("CBSP"); Association de Secours Palestinien ("ASP"); the Al-Aqsa foundation, all designated in 2003; and the Holy Land Foundation, a United States charity designated in 2001.

Hamas carried out the terrorist attacks in which plaintiffs were injured between 2001 and 2004, the time period during which tens of millions of dollars were flowing to the Arab Bank accounts of Hamas leaders and charities. Just as the Strauss court concluded in denying summary judgment in similar litigation involving the Hamas fundraiser CBSP,

> [o]n this record, a reasonable juror could conclude that the sizable amount of money sent from Defendant to Hamas front organizations was a substantial reason that Hamas was able to perpetrate the terrorist attacks at issue, and that Hamas' increased ability to carry out deadly attacks was a foreseeable consequence of sending millions of dollars to groups controlled by Hamas.

925 F. Supp. 2d at 432. This reasoning applies with even greater force here: The charities' accounts at Arab Bank provided a place to which international Hamas fundraisers could send money, and unlike in Strauss, the evidence in this case also included funds transfers to accounts held directly by senior Hamas leaders.

Defendant does little to contest this evidence, focusing its argument on plaintiffs' failure to prove but-for causation. But defendant is even incorrect that plaintiffs have failed to trace specific funds transfers to any of the terrorist attacks at issue, although they were not required to do so. Plaintiffs identified Saudi Committee "martyr" payments to the immediate relatives of the Hamas suicide attackers who perpetrated four of the terrorist attacks at issue: (1) the June 1, 2001 Dolphinarium bombing; (2) the August 9, 2001 Sbarro Pizzeria bombing; (3) the December 1, 2001 Ben Yehuda Street bombings; and (4) the December 12, 2001 shooting attack on Bus No. 189 in Emmanuel. Defendant's emphasis on the fact that these payments were made after

the attacks occurred misses the point; the jury was entitled to find that the prospect that the families of dead Hamas terrorists would be financially rewarded was a substantial factor in increasing Hamas' ability to carry out attacks such as these.  See Boim III, 549 F.3d at 698 ("Hamas's social welfare activities reinforce its terrorist activities both directly by providing economic assistance to the families of killed, wounded, and captured Hamas fighters and making it more costly for them to defect (they would lose the material benefits that Hamas provides them), and indirectly by enhancing Hamas's popularity among the Palestinian population and providing funds for indoctrinating schoolchildren.").

Plaintiffs were similarly able to trace some of the transfers for Hamas leaders to specific attacks, despite defendant's failure to produce account documents.  On December 18, 2000, Osama Hamdan sent a check for $10,000 to Yousef El-Hayek in Lebanon.  From February 2001 to May 2001, El-Hayek sent $123,000 to Abbas Al-Sayyed in Palestine, routed through Arab Bank New York.  Al-Sayyed planned and supervised the Park Hotel bombing that occurred less than a year later, on March 27, 2002.  In his interrogation by the Israeli police, Al-Sayyed stated that he used funds sent to his Arab Bank account from abroad to buy weapons.

Defendant argues that even this evidence is insufficient, because Al-Sayyed stated only that he used the funds he received through Arab Bank to purchase rifles and pistols, and not the bomb that was detonated during the Park Hotel Passover Seder.  As an initial matter, I disagree; even if plaintiffs were required to trace specific dollars to specific attacks – and again, they were not – a jury could reasonably infer that because Al-Sayyed confessed to using money sent through Arab Bank for some terrorist purposes, he also used it for others, including the Park Hotel bombing for which he was convicted.

Defendant's argument on this point does not persuade me that the evidence is insufficient, but it does reinforce my view that the causation standard that has been applied in this case is the correct one.[20] The Al-Sayyed confession is a rare, possibly unique, piece of evidence. A terrorist, who has been convicted in a court of law both of planning a terrorist attack in which some plaintiffs were injured and of leading a Hamas terrorist cell, specifically tells the police that he used money transferred to his Arab Bank account from abroad to further Hamas "military activities." But according to defendant, this is still not enough, because the terrorist stated that he used those funds to purchase rifles rather than bombs.

This underscores why the ATA is not a statute that requires tracing dollars to bombs. Congress has found that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104–32, § 301(a)(7), 110 Stat. 1214, 1247 (1996). Defendant's position is precisely to the contrary: Only specific, identifiable contributions directly connected to terrorist activities facilitate an FTO's criminal conduct, and such contributions can facilitate only the specific crimes to which they are connected and no others. In order to cut terrorist groups off from their sources of financing, the ATA takes the more commonsense view that putting money in the hands of terrorist groups increases their ability to carry out attacks. See Boim III, 549 F.3d at 698; Strauss, 925 F. Supp. 2d at 434.

## IV. Attribution to Hamas

Although defendant states in passing that it believes that plaintiffs "have failed to prove Hamas' responsibility for perpetrating all 24 attacks," an assertion not remotely supported by the

---

[20] As discussed above, defendant's motion suffers from a failure to address the sufficiency of the evidence under the correct causation standard. Judge Gershon held over a year ago that plaintiffs had to prove neither but-for nor "direct" causation. Defendant addresses the causation standard she held applicable in a single conclusory footnote, stating that "[p]laintiffs have also failed to prove that the Bank's financial services were a substantial factor in causing each of the 24 attacks and that their injuries were the foreseeable result of those financial services."

record, defendant moves for judgment as a matter of law only as to two: the January 29, 2004 suicide bombing on Bus No. 19, and the mortar attack on Neve Dekalim on September 24, 2004. As to these two attacks, defendant is correct.

The facts surrounding the Bus No. 19 attack, although somewhat complicated, are not substantially in dispute. Plaintiffs do not contest the evidence of the Al-Aqsa Martyrs Brigade's role in the attack. Rather, they rely on Mr. Shaked's testimony that Hamas and the AAMB shared responsibility for the attack, essentially because Hamas' role in preparing the suicide bomber for the initial, aborted attack made it easier for the AAMB to recruit him for the one that was actually carried out.

Hamas certainly bears some moral responsibility for the bombing of Bus No. 19. But that is not enough, in light of the uncontroverted evidence that the AAMB built and supplied the bomb, that the bomber himself wrote in his will that he was working on behalf of the AAMB, and that several AAMB operatives were convicted for planning the attack. Ultimately, attribution of the attack to Hamas is not a question of moral responsibility, but one of whether Hamas's involvement in bringing about the attack was sufficient for a reasonable jury to find by a preponderance of the evidence that Hamas committed the attack. The evidence demonstrated that the AAMB used its resources to carry out the Bus No. 19 attack, including building the actual bomb used. If Hamas did not use its resources to carry out the attack in which plaintiffs were injured, then defendant's support in augmenting those resources could not have been a substantial factor in causing that attack.

As for the mortar attack on Neve Dekalim, plaintiffs' only evidence was Hamas' claim of responsibility. That claim of responsibility did not identify the perpetrators, who were never arrested or captured. Although this does not, as discussed below, render the claim inadmissible,

it does lessen its probative value. Further, unlike for the other attacks, plaintiffs did not corroborate the claim of responsibility with other evidence, for example from either Hamas or Israeli sources. And, as plaintiffs' expert conceded on cross-examination, there were reports that another terrorist group had also claimed responsibility for this attack. In all, this evidence was at best evenly balanced.

With respect to both of these attacks, I find as a matter of law that there was insufficient evidence to support the jury's finding that plaintiffs had proven that Hamas committed these attacks by a preponderance of the evidence. Defendant's Rule 50 motion is therefore granted as to these two attacks only.

### V. Scienter

At trial, defendant requested a jury charge that the improper intent required for an ATA claim brought pursuant to 18 U.S.C. § 2339B(a)(1) could be demonstrated by a finding that defendant "engaged in deliberate wrongdoing with malice or an evil motive or in such conscious or deliberate disregard of the interests of others and of the potential for harm to American nationals that the conduct may be called willful or wanton." Only now, in its post-trial motions, does defendant argue that plaintiffs could only satisfy the scienter element by proving that defendant acted with "an evil motive" or an "intent to harm someone." This argument is incorrect.

The cases agree that 18 U.S.C. § 2333(a), because it provides for treble damages, requires proof of intentional misconduct. See, e.g., Boim III, 549 F.3d at 692. An organization's knowing provision of material support to a terrorist organization (or its deliberate indifference as to whether or not it provided material support to a terrorist organization) qualifies as intentional misconduct. See id. ("To give money to an organization that commits terrorist acts is not

intentional misconduct unless one either knows that the organization engages in such acts or is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care."); see also, e.g., Goldberg, 690 F. Supp. at 113-14. Since a knowing violation of § 2339B(a)(1) constitutes "intentional misconduct" sufficient to send a criminal defendant to prison for decades, it is more than enough to require a civil defendant to pay money.

Therefore, the Court instructed the jury that it could find defendant acted with the requisite intent if it found, for example, that defendant "knew that it was providing material support to Hamas, and also knew that Hamas engaged in terrorist activity." The jury was also charged that it could find that defendant acted knowingly if it found that defendant "deliberately closed its eyes" to the fact that it was providing material support to Hamas. In order to make such an inference, the jury had to find that (1) "defendant was aware of a high probability of the fact in question," and (2) "defendant consciously and deliberately avoided learning of that fact." Days later, the Second Circuit described the scienter requirement in nearly identical terms. See Weiss, 768 F.3d at 208 ("Thus, to fulfill § 2339B(a)(1)'s scienter requirement, incorporated into § 2333(a), Plaintiffs must show that NatWest both knew that it was providing material support to Interpal and knew that Interpal engaged in terrorist activity.").

Weiss is fatal to defendant's arguments concerning the scienter required for an ATA claim brought pursuant to § 2339B(a)(1). Weiss involved neither evidence nor an allegation that the defendant had a subjective intent to "harm someone" by its provision of financial services to the Hamas fundraiser Interpal. Even in this context, the Second Circuit expressly held that the defendant's knowledge that Interpal provided material support to a terrorist organization was sufficient. In fact, Weiss held that the district court erred by suggesting that the plaintiffs were

required to show the defendant's knowledge that Interpal was funding Hamas' terrorist attacks, rather than the defendant's knowledge that Interpal was providing funds to Hamas. See id. at 206 ("Plaintiffs were obliged to show that NatWest had actual knowledge that, or exhibited deliberate indifference to whether, Interpal provided material support to a terrorist organization, irrespective of whether the support aided terrorist activities."). The nexus is even more direct in this case. Plaintiffs put forth evidence that defendant knowingly provided financial services *directly* to Hamas leaders and charities.

Defendant's argument that Weiss only addressed the intent requirements imposed by § 2339B, and not the issue of whether § 2333(a) imposes a separate and additional intent requirement, is expressly contradicted by the Second Circuit's opinion. Weiss held that "[w]hile § 2333(a) does not include a mental state requirement on its face, it incorporates the knowledge requirement from § 2339B(a)(1), which prohibits the knowing provision of *any* material support to terrorist organizations without regard to the types of activities supported." Id. at 207. Therefore, in this context, the scienter standards for § 2339B(a)(1) and § 2333(a) are one and the same.

Undaunted by the express holding of Weiss, defendant argues that plaintiffs have failed to show that it acted with an "evil motive" or an "intent to harm someone," which is defendant's preferred liability standard, not the correct one. Notwithstanding this fact, plaintiffs satisfied their burden of proving defendant's intent under the proper legal framework. Plaintiffs needed to prove that defendant knew that it was providing financial services to Hamas, and that defendant knew Hamas was a foreign terrorist organization (or engaged in terrorism or terrorist activity). See Weiss, 768 F.3d at 206.

Plaintiffs introduced ample evidence at trial demonstrating that defendant provided financial services directly to senior Hamas leaders and operatives (and other U.S.-designated terrorists), and from which a reasonable jury could infer that defendant did so knowingly. First and foremost, defendant processed several transactions into the account of Osama Hamdan, a well-known spokesman for Hamas who regularly appeared on television to claim responsibility for terrorist attacks, on which the transferor listed the beneficiary party as "Hamas." Some of these transactions were apparently initialed and approved by one of defendant's senior executives.[21]

Defendant argues that the transfers "misidentified the accountholder as Hamas," and that the Bank "confirmed that the proper accountholder was Osama Hamdan (and *not Hamas*)." Therefore, defendant seemingly draws a distinction between funds transferred to Hamas and funds transferred in Hamas' name to the account of Osama Hamdan, who is undisputedly a member of Hamas.

I find this distinction unpersuasive, to say the least. Defendant's argument implies that unless a terrorist formally opens up an account in the name of Hamas, that terrorist should be presumed to be acting in his personal capacity, rather than as a member of Hamas. Terrorist groups do not operate this way. Given that terrorist groups "do not maintain legitimate financial firewalls" between funds used for charity and funds used for violent activities, Humanitarian Law Project, 561 U.S. at 31, 130 S. Ct. at 2725-26, there is even less reason to believe that individual terrorists would maintain separate bank accounts for "personal activities" and "terrorist activities."

---

[21] Although defendant maintains that these transactions were small both in number and in amount, which is true, defendant did not produce full account records for any accounts other than Hamdan's. Therefore, it is unknown whether defendant processed other transfers for the benefit of Hamas.

The notoriety of the Hamas terrorists for whom defendant maintained accounts also provided circumstantial evidence of defendant's knowledge. As discussed above, Sheikh Yassin, an Arab Bank customer, was the most famous founding member and leader of Hamas. Several of defendant's employees confirmed that they knew this. Yassin was designated a SDT by the United States in 1995, but remained an Arab Bank customer until 2001. Defendant offered no evidence to refute plaintiffs' contention that Yassin was a customer of the Bank, and it was defendant's policy to require photo identification of its customers.

Plaintiffs also provided evidence that Ismail Haniyeh, Yassin's chief of staff and a Hamas leader who was acknowledged as such by defendant's employee Mohammad al-Tahan, was an account holder who received payments via the Bank totaling more than $420,000. In addition, as discussed above, the Bank completed transfers for 11 accountholders, each of whom the Bank admitted were United States designated terrorists at the time. Finally, defendant transferred funds to numerous designated terrorists after they were designated as such, in amounts totaling over $2.5 million.[22]

Based on this evidence that defendant maintained accounts for well-known senior leaders of Hamas (and other designated terrorists), and processed transactions explicitly for the benefit of Hamas (and other designated terrorists), the jury could reasonably infer that defendant did so knowingly.

Defendant's principal response is that most of the Hamas operatives who held accounts with the Bank were not designated as terrorists by OFAC, the United Nations, or the European Union. For those that were designated on the OFAC list, defendant points out that their names

_____

[22] We cannot know whether these payments were made only to Hamas, or whether they included other terrorist groups, because the Bank refused to turn over its records. However, again, defendant cannot profit from such withholding.

were spelled differently on the transfer forms than they were on the OFAC list. These were arguments for the jury, and the jury rejected them.

Plaintiffs also submitted evidence that defendant provided financial services to the 11 Hamas-controlled charities. Defendant first contends that plaintiffs failed to prove that the charities at issue were controlled by Hamas. It claims that plaintiffs were required to satisfy all of the traditional corporate veil-piercing factors in order to establish that the charities were controlled by Hamas.[23] In support of its position, defendant cites Strauss v. Credit Lyonnais, 2006 WL 2862704, at *10, where the court adopted the D.C. Circuit's "alias status" concept and explained that "[f]actors to be considered include whether the organizations share leadership, whether they commingle finances, publications, offices, etc., and whether one operates as a division of the other." See also Nat'l Council of Resistance of Iran v. Dep't of State, 373 F.3d 152, 157-58 (D.C. Cir. 2004).

I share the skepticism later expressed by the court in Strauss as to whether "legitimate corporations are sufficiently analogous to terrorist groups such that every corporate veil piercing factor applies." Strauss, 925 F. Supp. 2d at 435 n.14. The absurdity of instructing a jury to consider whether Hamas observes corporate formalities is self-evident. Additionally, the traditional corporate veil-piercing factors do not include whether governments or intelligence services have found an organization to be controlled by Hamas, which would be strong evidence of such a link. Therefore, although these factors can serve as a useful guide in determining whether an entity is dominated and controlled by a terrorist group, they are not a rigid checklist.

---

[23] Those factors are: "(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities." MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 63 (2d Cir. 2001).

Indeed, on similar evidence, the defendants in the Holy Land Foundation trial were convicted for providing material support to Hamas in violation of 18 U.S.C. § 2339B for providing funds to many of the very same charities at issue in this case. See generally United States v. El-Mezain, 664 F.3d 467 (5th Cir. 2011). The jury instructions in that case did not mention any of the corporate veil piercing factors that defendant claims should apply here, and the Fifth Circuit concluded that "[t]he evidence of Hamas control of the zakat committees was substantial." Id. at 489. If the government can prove Hamas' control of these charities beyond a reasonable doubt in a criminal case and without reference to the alter ego test advocated by defendant, plaintiffs can do the same in this civil case.

The testimony of plaintiffs' experts, Dr. Levitt and Mr. Spitzen, supplied a substantial record on which the jury could reasonably conclude that these charities were controlled by Hamas. For example, the evidence included that many of the charities were founded by senior Hamas leaders or had Hamas operatives on their boards; findings by the governments of the United States, Germany, and Israel that the charities were controlled by Hamas; funds routed to these charities from United States designated Hamas fundraisers like Interpal; and the charities' promotion of Hamas' ideology and political goals. See Strauss, 925 F. Supp. 2d at 435-36 (similar evidence regarding several of the same charities sufficient to withstand summary judgment). Defendant's expert, Dr. Milton-Edwards, of course, gave her opinion that none of the charities at issue were controlled by Hamas. Deciding between these competing accounts was the province of the jury.

The record also contained sufficient evidence to support a jury finding that defendant was aware of, or at least willfully blind to, the charities' Hamas connections. Again, plaintiffs' expert Mr. Spitzen identified numerous well-known Hamas leaders who occupied leadership

roles in the charities, and it was defendant's policy to collect information about the boards of its customers who were entities, whether or not those entities had charitable purposes. For instance, there was testimony that the Islamic Center, Gaza was founded by Sheikh Yassin, who, along with other founding members of Hamas, participated in the charity's activities. Yassin was also featured in the charity's promotional materials and was listed as its founder and spiritual authority even after his death. Another of the charities, the Al Nur Prisoner Society, was founded by Salah Shehadah, the leader of Hamas' military wing, for the purpose of providing support to Hamas prisoners. Sheikh Bitawi, who held leadership positions in the Nablus Zakat and the al-Tadamun Society, was also publicly associated with Hamas. There was also testimony that Hamas made little effort to conceal its control of these charities because it needed to publicly promote its charitable activities in order to reap political benefits.[24] In sum, there was a cornucopia of circumstantial evidence to support a jury finding that defendant knew or was willfully blind to the charities' Hamas affiliations.

Lastly, the testimony of David Blackmore and evidence of "martyrdom" payments, discussed above, provided ample basis on which the jury could reasonably have found defendant knew or was deliberately indifferent to its clients' association with terrorism. In particular, as to the latter, when asked about these lists at his deposition, Mohammed Al-Tahan, one of defendant's senior employees, stated that he now found the lists suspicious, but only "for one reason: the Bank does not pay persons who are deceased." In other words, he found the lists suspicious only because they did not list the names of the beneficiaries' family members and were therefore "incomplete," not because the Bank was facilitating payments to the families of suicide bombers. Defendant was free to argue to the jury, as it did, that there was nothing wrong

---

[24] Defendant's expert Dr. Milton-Edwards disagreed that there was any public affiliation between these charities and Hamas, but it was up to the jury to decide whom to credit.

with facilitating these transactions, and that distributing such "charity" provided neither support to Hamas nor incentive for suicide attackers. The jury was equally free to reject that argument, as it did.

Similarly, the evidence indicated that defendant was aware that Hamas-controlled charities like the Al-Salah Society and Islamic Society of Hebron selected Saudi Committee beneficiaries, and defendant relayed instructions from these charities to the Saudi Committee. Combined with the circumstantial evidence of defendant's knowledge of these charities' Hamas control, there was sufficient evidence for the jury to infer defendant's knowledge.

Finally, defendant ignores the collective weight of the evidence. Plaintiffs provided evidence that defendant maintained accounts for senior Hamas leaders, *and* Hamas-controlled charities, *and* facilitated Saudi Committee payments to Hamas charities, Hamas prisoners, and the families of Hamas suicide bombers, all during the extreme violence of the Second Intifada. It was reasonable for the jury to consider the totality of this evidence and to conclude that defendant acted knowingly.

## VI. *Respondeat Superior*

In what can be viewed as another procedurally infirm motion for reconsideration, defendant's proposed jury charges renewed its contention, also previously rejected by Judge Gershon, that it could only be held liable if one of its high-ranking officers or directors committed the unlawful acts of which plaintiffs complained. In the alternative, defendant requested a charge adapted from the criminal context, which included the instruction that the Bank could not be held liable if its agent "performs an act which the Bank has, in good faith, forbidden its officers, directors, employees, or agents to perform."

Judge Gershon rejected defendant's effort to impose a standard higher than traditional *respondeat superior*. She was correct to do so. The ATA incorporates "general principles of tort law." See Gill, 893 F. Supp. 2d at 558 ("Applying general principles of *respondeat superior*, it is essential that plaintiff can rely on that doctrine . . . ."). I agree with the careful reasoning of Circuit Judge Janice Rogers Brown's concurrence in Estate of Parsons v. Palestinian Auth., 651 F.3d 118, 148 (D.C. Cir. 2011) (Brown, C.J., concurring). The basic presumption is that Congress creates federal torts against the background of general tort law, and "[*r*]*espondeat superior* liability is an elementary principle of tort law and must therefore inform our interpretation of the federal torts created in the Anti-Terrorism Act." Id.

Defendant analogizes to the civil RICO statute, pointing to the fact that both it and the ATA are quasi-criminal in nature and impose treble damages. But a treble damages provision alone is not sufficient to overcome the presumptive application of general *respondeat superior* principles. See id. More fundamentally, the cases that defendant cites that hold *respondeat superior* liability unavailable in RICO actions make clear that this conclusion is based in the unique language and purpose of that statute. See Banque Worms v. Luis A. Duque Pena E Hijos, Ltda., 652 F. Supp. 770, 772 (S.D.N.Y. 1986) ("By its plain terms, RICO only imposes liability on corporations that benefit from the racketeering activity. Indeed, the initial intent of the statute was to *protect* corporations from criminal infiltration, not to make them the responsible parties.") (emphasis in original); Rush v. Oppenheimer & Co., Inc., 628 F. Supp. 1188, 1194 (S.D.N.Y. 1985) ("[Plaintiff] cannot rely on theories of *respondeat superior* to accomplish an end-run around this required distinction between person and enterprise under section 1962."). Defendant does not point to anything in the language or legislative history of the ATA that suggests that

Congress intended the statute to protect anyone other than the victims of terrorism, nor that it intended the application of anything other than the traditional principles of *respondeat superior*.

As for defendant's alternative charge, traditional principles of *respondeat superior* provide that the principal is liable for his agents' unlawful acts committed in the course of the agent's employment, even if those acts were contrary to the principal's instructions:

> The rule of "*respondeat superior*," or that the master shall be civilly liable for the tortious acts of his servant, is of universal application, whether the act be one of omission or commission, whether negligent, fraudulent, or deceitful. If it be done in the course of his employment, the master is liable; and it makes no difference that the master did not authorize, or even know of the servant's act or neglect, or even if he disapproved or forbade it, he is equally liable, if the act be done in the course of his servant's employment.

> There may be found, in some of the numerous cases reported on this subject, dicta which, when severed from the context, might seem to countenance the doctrine that the master is not liable if the act of his servant was in disobedience of his orders. But a more careful examination will show that they depended on the question, whether the servant, at the time he did the act complained of, was acting in the course of his employment, or in other words, whether he was or was not at the time in the relation of servant to the defendant.

Philadelphia & Reading R.R. Co. v. Derby, 55 U.S. 468, 486 (1852) (citing Joseph Story, COMMENTARIES ON THE LAWS OF AGENCY § 452, at 465 (1839)); see also In re Parmalat Sec. Litig., 598 F. Supp. 2d 569, 575-76 (S.D.N.Y. 2009) ("For centuries, the principal has been liable for the torts, including the intentional torts, of its agent as long as the agent acted within the scope of its employment – and regardless of whether the principal directed or caused the agent to engage in the tortious activity.").

Here, the unlawful acts of which plaintiffs complain were wire transfers and other financial services. It is difficult to see how opening an account, initiating or receiving a wire transfer, or paying a customer would be outside the scope of any bank employee's employment.

What defendant really wanted was for the Court to suggest to the jury that, because defendant had a general policy against providing financial services to terrorists, whatever employee processed the transactions or opened the accounts at issue surely must have been acting outside the scope of his or her employment. This not only would have represented an incorrect legal standard; it would have been fundamentally unfair, because defendant itself blocked the necessary discovery to meet that standard.

No one but defendant knows who the employee was who opened an account for Sheikh Yassin, the founder and leader of Hamas – if indeed it was his account. Defendant requested a "rogue agent" charge, but blocked all evidence that would identify who those rogue agents might be, what acts they committed, and whether those acts were within the scope of those agents' employment. The Court therefore gave a general *respondeat superior* charge, stating in relevant part that a corporation is liable for its agents' unlawful acts, "provided the unlawful acts are done within the scope of their authority, as would usually be the case if done in the ordinary course of their employment, or in the ordinary course of the corporation's business."

## VII.    Evidentiary Rulings

### A.    Authentication Generally

Federal Rule of Evidence 901 "does not erect a particularly high hurdle" for authenticating evidence. United States v. Dhinsa, 243 F.3d 635, 658 (2d Cir. 2001). "[T]he standard for authentication is one of 'reasonable likelihood,' and is 'minimal.'" United States v. Gagliardi, 506 F.3d 140, 151 (2d Cir. 2007). "Generally, a document is properly authenticated if a reasonable juror could find in favor of authenticity." Id. The proponent does not need to eliminate "all possibilities inconsistent with authenticity or to prove beyond any doubt that the evidence is what it purports to be." Id. (quotations omitted). The hurdle for authenticating

evidence may be cleared by circumstantial evidence.  See Dhinsa, 243 F.3d at 659.  Although Rule 901(b) sets forth examples of evidence that satisfy the authentication requirement, these methods are not exhaustive.  See id.

Most relevant here is Rule 901(b)(4), which permits authentication by "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances."  The Advisory Notes to Rule 901(b)(4) state that "[t]he characteristics of the offered item itself, considered in the light of circumstances, afford authentication techniques in great variety."

1.    *Authentication of Website Postings*

A proponent seeking to authenticate a website posting must show a reasonable likelihood that the information was posted by the individual or organization to which the postings were attributed.  See, e.g., Boim III, 549 F.3d at 703 (explaining that authentication of similar web postings "would typically require some type of proof that the postings were actually made by the individual or organization to which they are being attributed – in this case, Hamas – as opposed to others with access to the website") (quoting Boim v. Holy Land Found. for Relief and Dev., 511 F.3d 707, 752-54 (7th Cir. 2007)).

In this case, plaintiffs' expert Evan Kohlmann authenticated two websites, Palestine-info.com and alqassam.ps, as authentic mouthpieces for Hamas.  Mr. Kohlmann has given similar testimony in criminal prosecutions, see United States v. Ali, 2011 WL 4583826, and was more than qualified to give such testimony in the context of this civil case.

At trial, Mr. Kohlmann testified in detail as to the factors, both extrinsic and intrinsic, that led him to conclude that these two websites were authentic.  Those factors included:  the reliance of the United States and other governments on the webpages as authentic sources of

Hamas communications; the language and facts used in postings; the posting of exclusive interviews with Hamas leaders and nonpublic details of their lives; and the fact that the websites contained official Hamas seals and watermarks.  Cf. United States v. Vayner, 769 F.3d 125, 131 (2d Cir. 2014) (finding a website to be inadequately authenticated where witness testified only that he visited the website and that it was presently accessible, without providing evidence that the defendant was the webpage's author or otherwise tying the webpage to the defendant).  In Mr. Kohlmann's expert opinion, Hamas had posted authentic claims of responsibility for each of the 24 attacks at issue in this case.  His testimony was sufficient to show a "reasonable likelihood" that the postings were authentic, and to allow a reasonable jury to conclude that the claims of responsibility were indeed issued by Hamas.

2.      *Authentication of Videos*

The Court also admitted certain video recordings at trial.  Videos may be authenticated "on the same principles as still photographs," Mikus v. United States, 433 F.2d 719, 725 (2d Cir. 1970) (citations omitted), and still photographs may be authenticated by a witness familiar with what is pictured.  See Kleveland v. United States, 345 F.2d 134, 137 (2d Cir. 1965) ("The witness qualifying a photograph, however, does not need to be the photographer or see the picture taken.  It is only necessary that he recognize and identify the object depicted and testify that the photograph fairly and correctly represents it.").  "Evidence of how the [video] tapes were made and handled" before they came into the proponent's possession is not necessarily required to authenticate them.  United States v. Damrah, 412 F.3d 618, 628 (6th Cir. 2005) (district court did not err in admitting video tapes seized from a third party that depicted the defendant speaking at Palestinian Islamic Jihad fundraising events, where defendant offered no proof that the Government had altered the tapes after their seizure, and there was no dispute that they

accurately depicted the defendant's likeness and words). As described below, the circumstantial evidence in the record was sufficient such that a reasonable juror could find that the video recordings were authentic.

      B. Declarations Against Interest

          1. *Website Postings*

All the web postings that the Court admitted, save one, were claims of responsibility by Hamas for terrorist attacks. The Court has noted its disagreement with decisions by other district courts that have held that a claim of responsibility by a terrorist group categorically cannot qualify as a declaration against interest. See Gilmore v. Palestinian Interim Self-Gov't Auth., No. CV 1-853, 2014 WL 3719160, at *9-10 (D.D.C. July 28, 2014); Strauss, 925 F. Supp. 2d at 449; Gill, 893 F. Supp. 2d at 569.

Defendant's Rule 59 motion, which again objects to the admission of these claims of responsibility, raises no new arguments. It merely reiterates defendant's reliance on these cases, without addressing the Court's previous decision expressing its disagreement with them and the authorities cited therein. Nevertheless, I will explain my rationale once more.

First, claiming responsibility for a terrorist attack is plainly against Hamas' penal interest. For a statement to be admissible under Rule 804(b)(3), a court must determine that "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest." United States v. Saget, 377 F.3d 223, 231 (2d Cir. 2004). The rule does not require that the declarant be aware that the incriminating statement could subject him to immediate criminal prosecution, but only that it tended to subject him to criminal liability. See United States v. Lang, 589 F.2d 92, 97 (2d Cir. 1978).

This part of the analysis is relatively straightforward. It is beyond reasonable dispute that Hamas' claim of responsibility for a violent terrorist attack on Israeli civilians could subject the organization and its members to penal consequences, including crackdowns, arrests and even assassination by Israel. For example, on August 19, 2003, a suicide bomber blew himself up on a bus in Jerusalem, and Hamas claimed responsibility that night. According to Mr. Spitzen's expert report, Ismail Abu Shanab, a senior Hamas leader, was killed by the IDF two days later, on August 21, 2003. This is not to say that Shanab's killing was solely in response to Hamas' claim of responsibility. However, it cannot be disputed that Israel takes punitive action against Hamas when it perceives that Hamas has committed a terrorist attack. Hamas claiming responsibility for a terrorist attack tends to increase that perception, and Hamas is aware of these facts.[25]

In its Rule 59 motion, defendant does not seriously contest that claiming responsibility for a terrorist attack could subject Hamas to the criminal consequences described above. Rather, it relies on select quotations from plaintiffs' experts to argue that Hamas had an ulterior motive to lie, negating the assumption underlying Rule 804(b)(3) that people "do not make statements which are damaging to themselves unless satisfied for good reason that they are true." This effort is not persuasive.

As I have previously held, the fact that Hamas may have other motivations for claiming responsibility for a terrorist attack does not automatically render such claims inadmissible. After all, it is rare for anyone to say anything purely for the sake of getting himself in trouble. Courts regularly admit statements under Rule 804(b)(3) despite the argument that the declarant had another motive for making the statement. See United States v. Gupta, 747 F.3d 111, 128-29 (2d

---

[25] Claiming responsibility for terrorist attacks can also contribute to other sanctions. The United States' August 22, 2003 designation of several Hamas fundraising charities and leaders as SDGTs specifically cited Hamas' claim of "responsibility for the despicable act of terror on August 19."

Cir. 2014) (rejecting argument that the declarant "was merely attempting to impress" the person to whom he was speaking); <u>see also</u> <u>United States v. Williams</u>, 506 F.3d 151, 155 (2d Cir. 2007) (noting that declarant "was boastful regarding his participation in the murders"); <u>United States v. Hamilton</u>, 19 F.3d 350, 357 (7th Cir. 1994) (rejecting argument that statements were mere "jailhouse boasting"); <u>United States v. Mills</u>, 704 F.2d 1553, 1562 (11th Cir. 1983) (rejecting as "disingenuous" the argument that "that under the circumstance of one inmate bragging to another about crimes committed, the statement was not against penal interest at the time it was made" because the declarant "well understood the possibility that his statement might be overheard by prison guards . . . and that penal consequences might result").

Thus, the question is not whether Hamas' claims of responsibility were undiluted by other motives, but whether Hamas, or rather, its members, were aware that they faced severe penal consequences for making these claims. The fact that Hamas claimed responsibility for these attacks signals only that it thought the risk of penal consequences was outweighed by its collateral goals, not that there were no penal consequences attached to the statements. Plaintiffs were entitled to argue to the jury that Hamas would not have made these statements unless they had a least a kernel of truth. With the potential penal consequences as severe as they are in this case, Hamas' propaganda motives are insufficient to render its statements inadmissible.

It bears mentioning that this is not a criminal case. Thus, Rule 804(b)(3)(B)'s requirement that a statement against interest "supported by corroborating circumstances that clearly indicate its trustworthiness" does not apply, because the statement is not "offered in a criminal case as one that tends to expose the declarant to criminal liability." Nevertheless, many of the claims of responsibility in this case were corroborated by Israeli government reports

assigning blame to Hamas, and by court records showing convictions of Hamas operatives for the attacks.

Defendant rightly pointed out the lack of such corroboration for some of the statements on cross-examination. It also pointed to claims of responsibility by other groups,[26] and expounded on its argument that Hamas may have incentives to lie for propaganda purposes. But as a factor countervailing Hamas' motives to lie, plaintiffs' experts also testified that a claim of responsibility that turns out to be false can damage a terrorist organization's reputation.

These competing contentions were presented where they should have been presented: to the jury. See Gupta, 747 F.3d at 129. It is not the Court's role to determine the weight of the evidence before determining its admissibility, especially where the statements at issue so plainly carry significant penal consequences, and those penal consequences are not clearly outweighed by a motive to fabricate. A jury can and should consider all of the factors that each party pointed out when determining the weight to assign to Hamas' claims of responsibility. These factors do not, however, render the statements inadmissible.

Ironically, had defendant been successful in excluding all reference to Hamas' claims of responsibility for terrorist attacks, I may have been forced to grant a directed verdict to plaintiffs on the issue of attribution of many of the attacks. That is because with few exceptions, the only evidence that defendant offered to show that the attacks were not carried out by Hamas were claims of responsibility by other terrorist groups. Without those competing claims, plaintiffs' evidence and expert testimony would have gone uncontradicted. See Boim III, 549 F.3d at 704-05 ("[W]ith [expert testimony regarding attribution] in the record and *nothing* on the other side

---

[26] The fact that certain of those claims were presented in newspaper articles, however, added an extra level of hearsay and rendered them inadmissible.

the court had no choice but to enter summary judgment for the plaintiffs with respect to Hamas's responsibility for the Boim killing.") (emphasis in original).

Finally, the Court admitted one website posting that was not a claim of responsibility, but was instead a statement on the website Palestine-info.com, which called for donations to Hamas at a particular Arab Bank account. In hindsight, it is not clear what statements on this webpage were being offered for their truth, and thus they may not have been hearsay at all; certainly, plaintiffs were not contending the truth of the statement that supporters of Hamas should donate to a particular account. The document's primary relevance lies in the fact that an Arab Bank account number was listed on an authenticated Hamas website, not in the veracity of the statements featured on the website.

Nevertheless, there is a readily identifiable penal interest implicated by the statements on the website: soliciting donations for Hamas is a crime under the laws of the United States, Israel, and other countries. The purportedly "ulterior" motivation for making these statements is equally obvious: the desire to raise money. But again, a statement is admissible as a declaration against penal interest if it is sufficiently self-inculpatory, even though the statement might also serve the declarant's other interests. See Saget, 377 F.3d at 231 n.4 ("To the extent that Saget's argument is that Beckham's statements were not truly against his interest because Beckham made the statements in an attempt to persuade the CI to enter into the conspiracy, it is misplaced. Even if the statements were in Beckham's *pecuniary* interest, they were clearly self-inculpatory and therefore against his *penal* interest, as required by Rule 804(b)(3).") (emphasis in original).

Moreover, to the extent that any statements on the website were offered for their truth, they were reliable and well-corroborated. The desire to raise money does not provide a motive to fabricate. Soliciting donations for a fake bank account would have the undesired effect of

ensuring that the intended recipient never received those donations.  In addition, the statements were corroborated by SWIFT transfers to the account number listed on the website – the account of Osama Hamdan.  Some of those transfers bore the notation "Palestine Information Center," the name of the website that posted the statements.

2. *Hamas Website Videos*

Most of the videos at issue originated from the Hamas websites that Mr. Kohlmann authenticated.  That each video was found on a Hamas website supports the finding that it is reasonably likely that the videos were what plaintiffs professed them to be.  Another factor in favor of authenticity is that plaintiffs' expert witnesses, Messrs. Kohlmann and Shaked, who were both familiar with the likenesses of these terrorists from their extensive review of other Hamas materials, identified the individuals depicted in the "video wills" as the same individuals who carried out the attacks in question.

The video wills of suicide bombers are declarations against interest – they expose a declarant to significant criminal liability.  For example, if the video fell into Israel's hands before the declarant was able to carry out his attack, Israel would make great efforts to capture or kill the declarant before he could do so.

Defendant's argument that the video wills were not against the declarants' penal interests because the statements contained therein "cannot conceivably imply any fear of post-suicide prosecution" is without merit.  First, as explained above, at the time the videos were recorded, a declarant did face severe penal consequences if Israeli authorities obtained the video prior to his carrying out the attack.  Second, for each video will that was admitted, there was corroborating evidence that the terrorist depicted ultimately did carry out a terrorist attack.

For the remaining Hamas website video – a video of the funeral of a Hamas bombmaker – plaintiffs' expert Mr. Spitzen testified that he recognized and personally met some of the individuals depicted in the video, and he recognized the area portrayed in the video as the town square of Nablus. The video was not introduced for the truth of any statements made by the individuals appearing in it, but rather to depict those individuals appearing together, which tended to connect them to Hamas.

### 3. *Videos From Other Sources*

The Court also admitted several video clips from other sources. All but one of these was adequately authenticated by testimony from plaintiffs' experts, who were familiar with the individuals depicted in the video clips. The lone exception was plaintiffs' exhibit 1132, a video depicting children dressed up as terrorists at an event for one of the charities at issue, which was authenticated by testimony from Dr. Levitt based on the fact that he recognized the logo of the television station on which it was broadcast, and that he was personally familiar with this video and its use by law enforcement in several countries.[27]

Osama Hamdan's statements on CNN,[28] in which he declared Hamas' responsibility for the Park Hotel bombing, were admitted as declarations against penal interest.[29] He identified

---

[27] Defendant argued that this video may have been "staged." But this objection missed the relevance of the video. Obviously, the kindergarten video was staged: Children do not dress up as terrorists unless they are prompted to do so. However, the very fact that this event was "staged" at one of the charities at issue in this case is where the video's relevance is found.

[28] In terms of authentication, Mr. Kohlmann testified that the individual in the video was Osama Hamdan, the spokesman for Hamas. The record also contained Mr. Hamdan's passport. The picture on that passport demonstrated that the Osama Hamdan in the CNN video was the same individual who held an account at Arab Bank. In addition, the video itself was effectively self-authenticating. It bore CNN logos and showed no signs of being edited. Before beginning the interview, the anchor identified Osama Hamdan, both by name and as a spokesman for Hamas. Simply put, there is no doubt that the CNN video was authentic. Indeed, forging such a video would be extremely difficult. Cf. Advisory Committee Notes to Fed. R. Evid. 902(6) ("The likelihood of forgery of newspapers or periodicals is slight indeed. Hence no danger is apparent in receiving them.").

[29] The video was also independently relevant for the not-for-truth purpose of rebutting defendant's argument that Hamas operatives like Hamdan hid their Hamas affiliations and conducted their affairs in a secretive manner.

himself as a member of Hamas, and acknowledged that Hamas carried out the bombing. Membership in Hamas is a crime under United States, Israeli, and other law, and a terrorist bombing is illegal everywhere. The penal consequences that Hamdan faced from claiming responsibility for this terrorist attack on behalf of Hamas were significant enough to bring them well within the rationale behind the exception, i.e., that a reasonable person would not likely have made these statements unless they were true. These statements were also extensively corroborated by other evidence in the record, including convictions of Hamas operatives for the Park Hotel bombing as well as Israeli government reports assigning blame to Hamas.

The Court also admitted a video of Khaled Mash'al, a Hamas leader, and Sheik Yousef Al-Qaradawi speaking at a conference in which they discussed raising money for Hamas, supporting suicide bombings, and joking about how they were both terrorists. The video's primary relevance was to show the connection between the Union of Good, the charity led by Al-Qaradawi, and Hamas. Nevertheless, to the extent the truth of certain statements in the video was relevant – most notably statements that the Union of Good had raised tens of millions of dollars to support Hamas and the Intifada – the penal interests implicated were clear: Membership in Hamas and raising money for Hamas are crimes under United States and Israeli law. Further, the association between the Union of Good and Hamas was corroborated by the United States' designation of the Union of Good as a SDGT in 2008, which described that organization's role in sending "tens of millions of dollars a year to Hamas-managed associations."

The remaining video clip – one showing Sheikh Bitawi, an individual connected to some of the charities at issue, speaking at the funeral of Jamal Mansur and Jamal Salim, two alleged Hamas leaders – was not admitted for the truth of any statements contained in it, but to depict the

connection between the individuals portrayed therein, Hamas, and the charities at issue in this case.

Finally, with respect to Rule 403, the subject matter of each of these videos was provocative to varying degrees. But for each one, the probative value of the video – whether proving Hamas' responsibility for a given attack or showing the connection between certain individuals and charities to Hamas – outweighed the risk of undue prejudice.

### C. Foreign Law

Judge Gershon denied defendant's motion to put foreign law before the jury. See Linde v. Arab Bank, PLC, 944 F. Supp. 2d 217 (E.D.N.Y. 2013). I will not now revisit that decision in detail, as this issue was thoroughly litigated before it was decided against defendant. However, a few brief points are worth mentioning.

Evidence of foreign law is irrelevant to whether certain bank transactions violated the ATA. The sagacity of Judge Gershon's holding to that effect was confirmed at trial when one of defendant's former senior executives, Shukry Bishara, testified that (to his knowledge) Osama Hamdan had not been blacklisted by the government of Lebanon to that day. In other words, Mr. Bishara testified that over one decade after the United States designated Hamdan as a terrorist based on his public association with Hamas, he still believed that it remained legal to do business with Hamdan under the laws of Lebanon.[30]

Indeed, Hezbollah, a foreign terrorist organization designated by the United States long ago, operates openly in Lebanon. Knowingly providing financial services to Hezbollah would be a violation of the ATA regardless of whether doing so would be illegal under Lebanese law. Therefore, whether or not it was legal for defendant to do business with terrorists under foreign

---

[30] As discussed above, Mr. Bishara was also permitted to testify that the Bank believed it had "no choice" but to return to Hamdan the funds in his account in order to close it despite knowing that Hamdan was a SDGT and senior Hamas leader because the Bank provided discovery concerning that account.

law is plainly irrelevant to whether defendant knowingly violated the ATA, which applies extraterritorially. See Weiss v. Nat'l Westminster Bank PLC, 453 F. Supp. 2d 609, 633 (E.D.N.Y. 2006) (finding no case which holds that "an American Court must decline to apply the laws of this country to a defendant over which the court has jurisdiction because the laws of the defendant's own country are more lenient").

The jury's question in Court Exhibit 3 – "What is the law regarding the return of money when the SIC [Lebanon's Special Investigation Commission] doesn't respond to an inquiry?" – does not indicate otherwise. It was obvious from the context that the jury's question was directed at what the SIC's failure to respond would mean under United States law, and not at whether Lebanese law was relevant to defendant's state of mind. Furthermore, Judge Gershon had already ruled that this meant nothing. The jury was specifically instructed that it was not to consider the legality or illegality of defendant's conduct under any foreign law. Defendant would have the Court infer that the jury disregarded this instruction based on its reference to the SIC. The law almost invariably presumes otherwise. See, e.g., Zafiro v. United States, 506 U.S. 534, 540-41, 113 S. Ct. 933 (1993).

Nor do I believe that Judge Gershon erred in prohibiting defendant from rearguing to the jury its discovery objection regarding foreign bank secrecy laws. Judge Gershon and Magistrate Judge Pohorelsky held that defendant's bank secrecy objections were not a valid excuse for refusing to participate in discovery. Despite these rulings, defendant proposed to argue to the jury that its reasons for not producing certain documents were valid. They were not; permitting this argument would have allowed defendant to "defeat the court's analysis, mislead and confuse the jurors, and improperly invite them to decide legal issues." Linde, 944 F. Supp. 2d at 20.

D. <u>Israeli List of Unlawful Associations and Terrorist Organizations</u>

Defendant also argues that I erred in admitting an Israeli list of Unlawful Associations and Terrorist Organizations, because it concerns foreign law, which is irrelevant (and was therefore excluded), and because the document was not properly authenticated and was prejudicial. These arguments are unpersuasive.

First, the Court's previous rulings on the applicability of foreign law do not control whether this list was properly admitted. The question was not whether the listed entities were deemed to be controlled by Hamas as a matter of Israeli *law*, but rather that the Israeli government found as a matter of *fact* that these organizations were controlled by Hamas. This distinction is critical. Therefore, the jury was able to consider the list in determining whether certain organizations were in fact controlled by Hamas.[31] The Court specifically instructed the jury that it could not consider whether defendant's actions were legal under Israeli law.

In addition, plaintiffs' expert Mr. Spitzen stated that the list was published in the Israeli equivalent of the Federal Register – a fact that cannot be disputed – and thus was publicly available during the relevant time period. Defendant's expert witness Dr. Milton-Edwards rebutted that testimony with her own opinion. She stated that while visiting some of the charities at issue during the relevant time period, she did not see any evidence of the Israeli list being enforced. Weighing this evidence was for the jury.

Second, defendant's authenticity objection is without merit. The document itself contains a certification by a Yitzchak Blum, a Deputy Director of the Israeli Ministry of Justice, stating that he reviewed the Israeli Official Gazette and found that the listed organizations had been declared illegal. The Certification was "sealed and authenticated with the Seal of the Ministry of

---

[31] Defendant's related argument that during a sidebar I said the jury could draw an inference based on the list that the Bank knew or was reckless in not knowing about this list is moot. Plaintiffs never offered testimony or argued about defendant's knowledge of the Israeli list, and still do not do so.

Justice of the State of Israel." The document contains other official logos as well as the relevant address of the Israeli Ministry of Justice. All of this is sufficient to authenticate the document through its distinctive characteristics. <u>See</u> Fed. R. Evid. 901(b)(4). If that were not enough, Mr. Spitzen testified that he recognized the document as authentic. Finally, as with all of the documents the Court admitted, defendant has had years to investigate the authenticity of this document, but offered no facts at all to suggest that it was inauthentic. <u>See</u> Fed. R. Evid. 902(3)(A).

Finally, I reject defendant's Rule 403 argument. That certain charities were declared illegal by the Israeli government due to their Hamas affiliations is highly probative evidence that these charities were affiliated with Hamas. This list was one piece of evidence that tended to establish that fact. Also, as described above, defendant suffered no unfair prejudice by its admission.

      E.   <u>FinCEN Assessment</u>

Before trial, the Court ruled that plaintiffs could admit a certain portion of the 2004 assessment against defendant by FinCEN. However, plaintiffs failed to lay the proper foundation to introduce this evidence during their case-in-chief. Therefore, the Court refused to allow plaintiffs to read the document into the record.

That might have been the end of it. But then, defendant called Brian Billard, the head of compliance for defendant's New York branch, who described the Bank's compliance program in New York in glowing terms. For example, Mr. Billard repeatedly testified that defendant "strictly adheres" to the applicable U.S. laws and regulations, and always followed them to the "strictest degree." He also testified that in order to apply for a license at OFAC, the Bank needed to have, and in fact did have "very good records."

FinCEN's investigation, however, found the Bank's compliance programs lacking in several critical respects. FinCEN's factual findings included that "Arab Bank – New York did not file the majority of its suspicious activity reports regarding terrorist financing until after the Office of the Comptroller of the Currency commenced a review of its funds transfer activity in July 2004," and "Arab Bank – New York failed to review information in its possession that would have shown it was clearing funds transfers for individuals and entities dealing with subsequently designated terrorists and terrorists organizations, failed to analyze this information, and failed to file Suspicious Activity Reports."

Consequently, the Court permitted plaintiffs to use portions of the assessment for cross-examination because FinCEN's findings directly impeached Mr. Billard's characterization of defendant as an eminently compliant financial institution, but did not admit it into evidence. The portions of the assessment plaintiffs used to impeach the witness were the factual findings that FinCEN made in the process of discharging its legal duty to investigate. Those portions were detailed in a section headed "determinations." They contained no statements by defendant, no offers of compromise, no evidence of the amount defendant paid, no evidence of defendant's conduct during compromise negotiations, nor any reference to the fact that defendant declined to litigate FinCEN's findings.

Courts have disagreed on Rule 408's effect on the admissibility of the factual findings of a government investigation, where the investigation ends in a settlement. Compare Option Res. Grp. v. Chambers Dev. Co., Inc., 967 F. Supp. 846, 850 (W.D. Pa. 1996) ("[T]he findings and opinions/conclusions of the SEC, being rendered pursuant to the SEC's independent obligations to enforce the securities laws and not as a part of the actual compromise negotiations, are not governed by Rule 408."), with Carpenters Health & Welfare Fund v. Coca-Cola Co., No. 00-cv-

2838, 2008 WL 9358563 (N.D. Ga. Apr. 23, 2008) (disagreeing with <u>Option Resources</u>).

Nevertheless <u>Option Resources</u> continues to be cited with approval by courts in this Circuit. <u>See,</u>

<u>e.g.</u>, <u>Mazuma Holding Corp. v. Bethke</u>, 1 F. Supp. 3d 6 (E.D.N.Y. 2014); <u>S.E.C. v. Pentagon</u>

<u>Capital Mgmt. PLC</u>, No. 08-cv-3324, 2010 WL 985205 (S.D.N.Y. Mar. 17, 2010).

Defendant points out that the latter two cases are inapposite because they permitted the

use of settlement fact-finding to defend an action. But that is not the full story as to the <u>Pentagon</u>

<u>Capital</u> case. There, the factual findings of the SEC in previous, settled enforcement actions

were offered against the SEC, as tending to refute the SEC's allegations against the defendant.

<u>See</u> <u>Pentagon Capital</u>, 2010 WL 985205, at *4-5. In other words, the SEC's prior factual

findings were offered "to disprove the validity . . . of a disputed claim," Fed. R. Evid. 408,

notwithstanding the fact that the SEC was a party to the settlements in the prior actions.

Defendant's broad view of Rule 408 would thus have required a different result in <u>Pentagon</u>

<u>Capital</u>.

Moreover, Rule 408 could not be used to preclude all mention of the investigation.

Whether plaintiffs should have been permitted to ask defendant's witnesses whether FinCEN

investigated the Bank implicates only Rule 403.

At the end of the day, defendant's position is essentially that because it settled the

FinCEN investigation, its witnesses were free to testify as if that investigation had never

occurred and the factual findings made by FinCEN did not exist. I do not believe that either

Rule 408 or Rule 403 permitted defendant to mislead the jury this way, and the proper balance

was to allow the agency findings to be used for impeachment only.

F.  Saudi Committee Experts

Defendant argues that Judge Gershon erred in excluding the testimony of two of defendant's experts, Robert Lacey and David Rundell, who would have testified as to the Saudi Committee's purportedly legitimate, humanitarian motives.

Judge Gershon explained in detail the reasons for her finding that Mr. Lacey was "wholly unqualified" to offer opinions about the Saudi Committee.  See Linde v. Arab Bank, PLC, 922 F. Supp. 2d 316, 328-29 (E.D.N.Y. 2013).  Defendant offers no reason why this conclusion was incorrect, other than to say that Judge Gershon's observation that Mr. Lacey lacks any expertise whatsoever in terrorism "improperly presupposed the truth of plaintiffs' allegations that the Saudi Committee . . . was a terror-affiliated entity" and that Mr. Lacey should have been permitted to share his opinion to the contrary.  This argument makes little sense.  Expert testimony that the Saudi Committee was *not* "terror-affiliated" is just as reliant on expertise in terrorism as testimony that it was.  Defendant implicitly concedes that Mr. Lacey lacks any such expertise, and his exclusion as an expert was therefore proper.

In addition, both the testimony of Mr. Lacey and of Mr. Rundell fell within Judge Gershon's broader exclusion of expert testimony regarding the charitable intent of the Saudi Committee.  See Linde v. Arab Bank, PLC, 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011).  Judge Gershon held this testimony inadmissible because issues of motive and intent are not the proper subject of expert testimony.

Defendant next claims that this Court improperly applied a double standard by permitting plaintiffs' expert Mr. Spitzen to opine on the intent of the Saudi Committee to support Hamas. This argument distorts the record.  Mr. Spitzen testified that the Saudi Committee was part of the Union of Good, an umbrella organization that was designated in 2008 as a Hamas fundraiser.

The portion of the transcript that defendant quotes – a reference to the Union of Good having the "primary purpose" of "divert[ing] charitable donations to support Hamas members and the families of terrorist operatives" – is not even Mr. Spitzen's own words. Rather, it is a quote from the United States government's designation of the Union of Good as a SDGT. Mr. Spitzen simply agreed with the United States government. He also testified that the Saudi Committee made payments to Hamas, including its operatives and suicide bombers, which bolstered his conclusion regarding the relationship between the two organizations. Finally, Mr. Spitzen commented briefly on the stated purpose of the Saudi Committee, embodied in its full name, the "Saudi Committee for the Support of the Intifada Al-Quds," and noted that the death benefits distributed by the Saudi Committee were relatively high when compared to the per capita income of Palestine. None of this references the subjective intent of the Saudi Committee.

This testimony is fundamentally different in kind than the proposed testimony of defendant's experts that, for example, the Saudi Prince appointed to head the Saudi Committee "would be the last person to want the [Saudi Committee] money to fall into terrorist hands" or that Saudi Arabia is "inherently opposed to terrorism." Indeed, neither of defendant's experts even mentioned the Union of Good in their reports, much less disputed that the Saudi Committee was part of it.[32] Nor did either of these two experts dispute that the Saudi Committee distributed funds through charities that plaintiffs identify as Hamas-controlled. Rather, they opined that the Saudi Committee had good reasons for doing so, for example that "the Committee considered these organizations to have a well-developed and reliable understanding of who the neediest individuals were in the communities they served."

---

[32] Defendant does not dispute Mr. Spitzen's opinion that the Saudi Committee was a part of the Union of Good; this opinion was based in part on the Union of Good website, which explicitly lists the Saudi Committee as a member organization.

Finally, to the extent defendant objects that Mr. Spitzen's brief reference to the stated purpose of the Saudi Committee was improper testimony concerning the Saudi Committee's intent, that objection is without merit. Testimony that an organization called the "Saudi Committee for the Support of the Intifada" was founded to support the Intifada is not an expert opinion about intent; it is reading the organization's name out loud.

Moreover, expert testimony about the Saudi Committee's humanitarian efforts would be largely irrelevant. As most recently reiterated in <u>Weiss</u>, there is no such thing under United States law as "legitimate" charity distributed through Hamas. <u>See</u> <u>Weiss</u>, 768 F.3d at 208 (noting, *inter alia*, that "foreign terrorist organizations do not maintain legitimate financial firewalls between those funds raised for civil, nonviolent activities, and those ultimately used to support violent, terrorist operations. Thus, funds raised ostensibly for charitable purposes have in the past been redirected by some terrorist groups to fund the purchase of arms and explosives") (quoting <u>Humanitarian Law Project</u>, 561 U.S. at 31, 130 S. Ct. 2705). Testimony concerning the Saudi Committee's humanitarian activities would be relevant only to the extent that it might indicate that defendant was unaware that the Saudi Committee was sending money to Hamas-controlled charities and the families of Hamas suicide bombers and prisoners. But testimony about what defendant understood about the Saudi Committee's activities or aims cannot come from experts; it must come from defendant's employees. In any event, notwithstanding the Sanctions Order, I permitted defendant's employees to testify at some length about their understanding of the Saudi Committee's humanitarian efforts.

In sum, I adhere to Judge Gershon's holding that defendant's proffered Saudi Committee experts were unqualified, offered no relevant expert testimony, or both.

## VIII. Trial Structure

Defendant argues that it was prejudiced by the trial structure, which grouped together the liability trials for the 24 attacks that plaintiffs allege were carried out by Hamas. Defendant raised this argument in the parties' Proposed Joint Pretrial Order. I rejected it as untimely and without merit in July 2013, and stick to that holding now.

Judge Gershon adopted plaintiffs' proposed trial structure over defendant's proposals at a pretrial conference held on July 22, 2010. Defendant filed a letter objecting to the trial structure on evidentiary and due process grounds on May 22, 2013. Although framed as an "evidentiary" objection, based on the purported irrelevance of certain evidence with regard to certain attacks, defendant's letter was clearly a vastly untimely motion to reconsider the trial structure. The letter did not seek the exclusion of any particular items of evidence, but rather that the entire trial structure be reconsidered.

Initially, it is at least surprising, if not entirely disingenuous, that defendant now complains about prejudice from aggregating 24 Hamas attacks under only the ATA when defendant at one time recommended a three-phase trial structure to "resolve all of the 6,580 plaintiffs' claims – arising from 389 separate alleged incidents." Defendant's position is in any event without merit. It is primarily based on the mistaken premise that evidence relating to one attack is necessarily irrelevant to all other attacks. That is true only if one accepts that the evidence must be viewed piecemeal, without consideration of the whole.

Plaintiffs' theory of the case, accepted by the jury, is that defendant engaged in a lengthy course of conduct that provided material support to Hamas. For example, the evidence included that defendant processed transactions for senior Hamas leaders in 2001, received lists of beneficiaries containing the names of suicide bombers in 2002, and returned a bank account

balance to the known terrorist Osama Hamdan in 2005. Defendant's position is that each of these actions must be viewed in isolation, but a jury could reasonably infer from defendant's course of conduct subsequent to 2001 that it was deliberately indifferent to or even supportive of its customers' Hamas affiliations in 2001. The fact that defendant had no qualms about paying the families of suicide bombers in 2002 might suggest that defendant was equally indifferent to providing financial services to Hamas leaders in 2001. In other words, although defendant may have had an answer for everything, the jury could reasonably find that it had too much to answer for. That is enough to satisfy the minimal requirements for relevance under Rule 401.

Defendant, moreover, vastly overstates the complexity of the evidence before the jury. The evidence relating to attribution of each of the 24 attacks was relatively simple, consisting largely (although not entirely) of Hamas claims of responsibility, criminal convictions of Hamas operatives in Israeli courts, and the factual findings of the Israeli government as to responsibility for the attacks. Some attacks had evidence from all of these categories. Some did not. But this fact did not necessarily disadvantage defendant. Indeed, defendant could have compared the amount of evidence available for the different attacks to highlight the attacks for which plaintiffs' proof was thinner. Defendant attempted to do so, to a certain extent, but the credibility of this argument was likely undermined by defendant's somewhat quixotic attempt to persuade the jury that plaintiffs could not prove that Hamas had carried out *any* of the 24 attacks. It was of course defendant's right to hold plaintiffs to their proof, but the wisdom of doing so was questionable in the case of attacks like the Park Hotel bombing, where Hamas said they carried it out, the ISA said Hamas carried it out, and the Israeli courts convicted the perpetrators for both the bombing and their membership in Hamas.

The evidence as to the material support defendant provided was similarly straightforward, consisting solely of financial transactions it processed on behalf of Hamas leaders, charities, and the Saudi Committee.  Defendant is correct that plaintiffs did not link certain attacks to specific transactions, but Judge Gershon held that they did not have to do so.  Instead, the jury could – and did – consider the overall support that defendant provided to Hamas during the relevant time period.

In short, this case was nothing like the mass proceedings described in the authorities that defendant cites.  Malcom v. National Gypsum Co., 995 F.2d 346, 349 (2d Cir. 1993), involved a mass asbestos trial and a "maelstrom of facts, figures, and witnesses, with 48 plaintiffs, 25 direct defendants, numerous third-and-fourth party defendants, and evidence regarding culpable non-parties and over 250 worksites throughout the world."  The Second Circuit quite reasonably held that the jury's ability to focus on the liability of an individual defendant was unfairly compromised.  See id. at 352.  In re Repetitive Stress Injury Litig., 11 F.3d 368, 373 (2d Cir. 1993), similarly involved plaintiffs bringing claims under the laws of numerous states for various injuries based on an assortment of devices sold by different defendants.

Defendant appears to suggest that the only option was to hold 24 liability trials.  The inefficiency and wasted resources that would have resulted from proceeding that way are obvious.  Witnesses would have had to testify multiple times to multiple juries, for example, as to the background of Hamas as an organization and the relationship, or lack thereof, between the charities at issue and Hamas.  Witnesses based abroad – which is most of them – would have had to fly to the United States repeatedly.  The overwhelming expense of doing that might well sound the death knell to plaintiffs' ability to finance this case, and since I am cognizant of that, I have to assume that defendant is as well.

Malcom instructs that in considering whether to consolidate, courts must consider

> whether the specific risks of prejudice and possible confusion [are] overborne by
> the risk of inconsistent adjudications of common factual and legal issues, the
> burden on parties, witnesses, and available judicial resources posed by multiple
> lawsuits, the length of time required to conclude multiple suits as against a single
> one, and the relative expense to all concerned of the single-trial, multiple-trial
> alternatives.

995 F.2d at 250. Here, the risks of prejudice and confusion were not substantial. There were 24
attacks at issue, but the liability trial involved just one defendant, engaged in a single course of
conduct, allegedly in violation of a single statute, and no individualized claims of damages by
the plaintiffs for the jury to consider. In short, the evidence in this case was relatively simple,
consolidation did not cause appreciable prejudice to defendant, and dividing this case into
multiple additional proceedings would have been expensive, time-consuming, and wasteful.

## IX.    Defendant's 1292(b) Motion

"Section 1292(b)'s legislative history reveals that although that law was designed as a
means to make an interlocutory appeal available, it is a rare exception to the final judgment rule
that generally prohibits piecemeal appeals . . . . [Section 1292(b)] is reserved for those cases
where an intermediate appeal may avoid protracted litigation." Koehler v. Bank of Bermuda
Ltd., 101 F.3d 863, 865-66 (2d Cir. 1996). Accordingly there is an "historic federal policy
against piecemeal appeals," Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 8, 100 S. Ct.
1460, 1465 (1980), and certification is only warranted in "exceptional cases." Telectronics
Proprietary, Ltd. V. Medtronic, Inc., 690 F. Supp. 170, 172 (S.D.N.Y. 1987). Indeed, the Second
Circuit has held that

> [i]t does not normally advance the interests of sound judicial administration or
> efficiency to have piecemeal appeals that require two (or more) three-judge panels
> to familiarize themselves with a given case, instead of having the trial judge, who
> sits alone and is intimately familiar with the whole case, revisit a portion of the

> case if he or she has erred in part and that portion is overturned following the
> adjudication of the whole case.

Harriscom Svenska AB v. Harris Corp., 947 F.2d 627, 631 (2d Cir. 1991).

The upcoming damages trial in this case will allow a judgment under Rule 54(b) which will bring all of the issues defendant raises in its § 1292(b) motion before the Circuit. That by itself is sufficient reason to deny certification. In any event, defendant has not shown that the substantive standards of § 1292(b) are met for any of the issues on which it seeks certification. With respect to the ATA's causation standard and whether terror financing is an "act of international terrorism" under the ATA, I do not believe that there is "substantial ground for difference of opinion," as required by the statute. Moreover, even if there were substantial grounds for difference of opinion as to whether the Sanctions Order improperly balanced the relevant interests on its face, defendant clearly seeks to challenge it as applied. (Even defendant's *amicus* the Hashemite Kingdom of Jordan appears to concede the same, arguing that "[t]he sanctions order, as applied at trial," poses a controlling question of law.) There is therefore no pure question of law that could be resolved by the Court of Appeals without resort to the record, making certification inappropriate. See Morris v. Flaig, 511 F. Supp. 2d 282, 315 (E.D.N.Y. 2007).

## CONCLUSION

For the foregoing reasons, defendant's Rule 50 motion is granted in part and denied in part, and its Rule 59 and § 1292(b) motions are denied.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       April 8, 2015