UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

COURTNEY LINDE, et al.              :

                                            :     04-CV- 2799 (BMC)(VVP)

              Plaintiffs,     :     *and all related cases*[*]

                                            :

       -against-                 :

                                            :

ARAB BANK, PLC,              :

                                          :

             Defendant.     :

_____

# REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION TO STRIKE IN ITS ENTIRETY <u>THE EXPERT REPORT OF DR. MARC SAGEMAN</u>

---

[*]      *Litle, et al. v. Arab Bank, PLC,* No. CV-04-5449 (E.D.N.Y. 2004) (BMC)(VVP); *Almog, et al. v. Arab Bank, PLC,* No. CV-04-5564 (E.D.N.Y. 2004) (BMC)(VVP); *Coulter, et al. v. Arab Bank, PLC,* No. CV-05-365 (E.D.N.Y. 2005) (BMC)(VVP); *Bennett, et al. v. Arab Bank, PLC,* No. CV-05-3183 (E.D.N.Y. 2005) (BMC)(VVP); *Roth, et al. v. Arab Bank, PLC,* No. CV-05-3738 (E.D.N.Y. 2005) (BMC)(VVP); and *Weiss, et al. v. Arab Bank, PLC,* No. CV-06-1623 (E.D.N.Y. 2006) (BMC)(VVP).

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

I.    UNDER THE ATA, DEFENDANTS ARE SUBJECT TO JOINT AND SEVERAL
      LIABILITY. .............................................................................................................. 1

II.   VIOLATIONS OF THE ATA ARE INTENTIONAL TORTS. ......................................... 3

III.  THE ATA'S LEGISLATIVE HISTORY SUPPORTS APPLICATION OF
      TRADITIONAL JOINT AND SEVERAL LIABILITY. .................................................. 6

IV.   *PAROLINE* DOES NOT REQUIRE APPORTIONMENT IN THIS CASE. .................. 7

V.    DR. SAGEMAN'S EXPERT REPORT IMPROPERLY RESTS ON A MISLEADING
      SUB-SET OF THE EVIDENCE. .................................................................................. 8

CONCLUSION ...................................................................................................................... 11

# TABLE OF AUTHORITIES

## Cases

*Boim v. Holy Land Found. for Relief & Dev. (Boim III)*,
   549 F.3d 685 (7th Cir. 2008)…………………………………………...............2-3, 4, 5

*Estates of Ungar and Ungar ex rel. Strachman v. Palestinian Authority*,
   325 F. Supp. 2d 15 (D.R.I. 2004)………………………………………………………3

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010)……………………………………………………………………….9

*Knox v. Palestine Libertation Organization*,
   442 F. Supp. 2d 62 (S.D.N.Y. 2006)………………………………………………...3

*Kurisoo v. Providence & Worcester R. Co.*,
   68 F.3d 591 (2d Cir. 1995)…………………………………………………………...5

*La Day v. Catalyst Technology, Inc.*,
   302 F.3d 474 (5th Cir. 2002)………………………………………………………5-6

*Linde v. Arab Bank Plc*,
   920 F. Supp. 2d 282 (E.D.N.Y. 2011)……………………………………………….1

*Linde v. Arab Bank, Plc*,
   944 F. Supp. 2d 217 (E.D.N.Y. 2013)……………………………………………….1

*Linde v. Arab Bank*, No. 04–cv–2799 (BMC)(VVP),
   2015 WL 1565479 (E.D.N.Y. April 8, 2015)………………….………………...2, 4, 8, 10

*Mazyck v. Long Island R. Co. (LIRR)*,
   896 F. Supp. 1330 (E.D.N.Y. 1995)………………………………………………….1

*Morris v. Khadr*,
   415 F. Supp. 2d 1323 (D.Utah 2006)………………………………………………...3

*Nash v. Port Auth. Of New York and New Jersey*,
   51 A.D.3d 337 (1st Dept. 2008), *rev'd sub nom. In re World Trade Ctr.
   Bombing Litig.*, 17 N.Y.3d 428, 957 (2011)…………………………………………3

*Paroline v. U.S.*,
   134 S. Ct. 1710 (2014)……………………………………………………………1, 8

*Smith v. the Islamic Emirate of Afghanistan*,
 262 F. Supp. 2d 217 (S.D.N.Y. 2003)……………………………………………3, 5

*Weiss v. National Westminster Bank*,
 768 F.3d 202 (2d Cir. 2014)…………………………………………………………….5

*Weiss v. Nat'l Westminster Bank PLC*,
 453 F. Supp. 2d 609 (E.D.N.Y. 2006)……………………………………………7

*Wultz v. Islamic Republic of Iran*,
 755 F. Supp. 2d 1 (D.D.C. 2010)………………………………………………….4

## Other Authorities

*Antiterrorism Act of 1990, Hearing before the Subcommittee on Courts and Administrative Practice, Senate Committee on the Judiciary*, 101st Cong., 2d Sess. (1990)……………………6, 7

*Dobbs Law of Torts* §385……………………………………………………………….2

*Restatement (Third) of Torts: Apportionment Liab.* § 12 (2000)……………………………2, 3

S. Rep. No. 102-342…………………………………………………………………….7

*W. Page Keeton, Prosser and Keeton on Torts* § 52…………………………………………...2

<u>PRELIMINARY STATEMENT</u>

Not for the first time, Arab Bank proffers a putative expert to make legal arguments to the jury[1] and to re-argue the law of the case.[2] Moreover, it does so largely on the basis of the Supreme Court's *Paroline* opinion that it has consistently told the Court was irrelevant. Finally, even assuming that the Court accepted the Bank's belated invitation to pioneer a new federal common law apportionment rule for intentional torts under the Anti-Terrorism Act ("ATA"), Dr. Sageman's expert opinions rest on a selective and plainly misleading sub-set of the evidence, and therefore subvert the statute's intent and violate the preclusion sanction in this case.

For all these reasons, the Court should grant Plaintiffs' motion to strike Dr. Sageman's expert report and to preclude Defendant from making any argument at trial that states or implies that it is not jointly and severally liable for the injuries at issue.

**I.    UNDER THE ATA, DEFENDANTS ARE SUBJECT TO JOINT AND SEVERAL LIABILITY.**

Better late than never, the Bank now admits that "[t]here is no question that Congress intended the ATA to incorporate tort law." Bank mem. at 10. *Paroline* supports that admission, by looking to background principles of American tort law in construing a statutory tort, and embracing "alternative causal tests" to vindicate the statute's purposes when the "but-for" principle would produce an anomalous result. *Paroline v. U.S.*, 134 S. Ct. 1710, 1723-24 (2014). But then the Bank urges the Court to follow the alleged trend of states that have adopted comparative responsibility and apportionment for non-intentional torts (usually by statute) and to extend it to intentional torts, all without ever citing the traditional tort standard in its brief. Bank

---

[1] "It is well established that '[t]he question whether the harm to the plaintiff is capable of apportionment among two or more causes is a question of law,' that is to be decided by the court, and not the jury" (*Mazyck v. Long Island R. Co. (LIRR)* 896 F. Supp. 1330, 1334 (E.D.N.Y. 1995) *citing Restatement (Second) of Torts* § 434 cmt. d, at 448 (1965)), let alone by the jury based on a putative expert's testimony.

[2] *See Linde v. Arab Bank Plc*, 920 F. Supp. 2d 282 (E.D.N.Y. 2011); *Linde v. Arab Bank, Plc*, 944 F. Supp. 2d 217 (E.D.N.Y. 2013); August 1, 2014 Order, *Linde* ECF No. 1049 at *1.

mem. at 2-3. That standard is familiar and longstanding: "Each person who commits a tort that requires intent is jointly and severally liable for any indivisible injury legally caused by the tortious conduct." *Restatement (Third) of Torts: Apportionment Liab*. § 12 (2000).[3] As this Court has observed, "joint and several liability is commonplace" in the law of torts. *Linde v. Arab Bank*, No. 04–cv–2799 (BMC)(VVP), 2015 WL 1565479, at *28 n.18 (E.D.N.Y. April 8, 2015).

Because it is indisputable that the Plaintiffs' injuries – death, dismemberment, pain, and severe emotional distress – are indivisible,[4] the Bank is forced to argue that "joint and several liability is no longer 'commonplace.'" Bank mem. at 7. Whether or not this is true in general, as a matter of state law, or more especially as a matter of federal common law, the Bank offers no support for the proposition that joint and several liability is no longer commonplace for *intentional* torts, let alone that it is not "commonplace" for ATA torts. It never cites, much less distinguishes, the leading ATA authority applying the rule, the Seventh Circuit's *en banc* decision in *Boim v. Holy Land Foundation*, which provides:

> So consider an organization solely involved in committing terrorist acts and a hundred people all of whom know the character of the organization and each of whom contributes $1,000 to it, for a total of $100,000. The organization has additional resources from other, unknown contributors of $200,000 and it uses its total resources of $300,000 to recruit, train, equip, and deploy terrorists who commit a variety of terrorist acts one of which kills an American citizen. His estate brings a suit under section 2333 against one of the knowing contributors of $1,000. *The tort principles that we have reviewed would make the defendant*

---

[3] *See also Dobbs Law of Torts* §385 at p. 1077 ("Apart from *statutory* changes, four fundamental rules governed the apportionment of responsibility among multiple tortfeasors and the plaintiffs: . . . . If the injury was indivisible in nature (*a death* or a single broken arm for examples), then each tortfeasor who contributed proximately to that injury was liable for the entire judgment, although the plaintiff could not collect more than one full recovery. This is often referred to as a rule for concurrent torts, but concurrence in time is not required. The essence of the rule is that each tortfeasor is liable in full for an indivisible injury.") (emphasis added).

[4] Arab Bank did not "partially" murder Abigail Litle; it substantially assisted Hamas in ways that made her murder vastly more likely. So too, the Bank's provision of material support to Hamas did not lead to *one* of Eugene Goldstein's gunshot wounds. Terrorist injuries are simply not divisible. *See, W. Page Keeton, Prosser and Keeton on Torts* § 52, at 347–48 (5th ed. 1984) ("Certain results, by their very nature, are obviously incapable of any reasonable or practical division. *Death is such a result* . . . . No ingenuity can suggest anything more than a purely arbitrary apportionment of such harm. Where two or more causes combine to produce such a single result, incapable of any reasonable division, each may be a substantial factor in bringing about the loss, and if so, each is charged with all of it.").

2

> ***jointly and severally liable*** *with all those other contributors. The fact that the death could not be traced to any of the contributors . . . and that some of them may have been ignorant of the mission of the organization (and therefore not liable under a statute requiring proof of intentional or reckless misconduct) would be irrelevant. The knowing contributors as a whole would have significantly enhanced the risk of terrorist acts and thus the probability that the plaintiff's decedent would be a victim, and this would be true even if Hamas had incurred a cost of more than $1,000 to kill the American, so that no defendant's contribution was a sufficient condition of his death.*

*Boim v. Holy Land Found. for Relief & Dev. (Boim III)*, 549 F.3d 685, 697-98 (7th Cir. 2008)

(emphasis added).

Unsurprisingly, when courts have awarded damages under Section 2333(a), they have uniformly done so without apportionment.[5] In fact, the only ATA case that the Bank cites anywhere in its brief that even mentions apportionment, *Smith v. the Islamic Emirate of Afghanistan*, 262 F. Supp. 2d 217 (S.D.N.Y. 2003) (cited at Bank mem. at 24), expressly asserts that the New York rule of apportionment is "inapplicable" to ATA intentional torts, instead invoking the traditional joint and several liability rule from *Restatement (Third) of Torts* §12 (quoted *supra*).[6]

## II.   VIOLATIONS OF THE ATA ARE INTENTIONAL TORTS.

Implicitly recognizing that it relies almost entirely on non-intentional tort cases, the Bank argues perhaps for the first time in this 11-year litigation that the ATA tort is *not* intentional, an argument it wisely buries at the end of its brief. Bank mem. at 22-25. Of course, this argument is

---

[5] *See* verdict form in *Sokolow v. Palestine Liberation Organization*, 04-cv-397 (GBD)(RLE) (S.D.N.Y. 2015), ECF No. 825 (attached as Exhibit A); *Estates of Ungar and Ungar ex rel. Strachman v. Palestinian Authority*, 325 F. Supp. 2d 15 (D.R.I. 2004); *Knox v. Palestine Liberation Organization*, 442 F. Supp. 2d 62 (S.D.N.Y. 2006); *Morris v. Khadr*, 415 F. Supp. 2d 1323 (D.Utah 2006).

[6] The only other "terrorism case" (Bank mem. at 13) Defendant cites, *Nash v. Port Auth. of New York and New Jersey*, 51 A.D.3d 337 (1st Dept. 2008), *rev'd sub nom. In re World Trade Ctr. Bombing Litig.*, 17 N.Y.3d 428, 957 (2011), is a *negligence* case against the World Trade Center landlord arising out of the 1993 attack. Its apportionment discussion is controlled not by federal common law, but by New York's statutory allocation rules, which "categorically exclude[]" intentional tortfeasors, according to the court. *Id.* at 353.

contrary not just to the law of the case, but the uniform current case law. This Court has already found:

> The cases agree that 18 U.S.C. § 2333(a), because it provides for treble damages, requires proof of ***intentional misconduct***. *See, e.g., Boim III*, 549 F.3d at 692. An organization's knowing provision of material support to a terrorist organization (or its deliberate indifference as to whether or not it provided material support to a terrorist organization) qualifies as intentional misconduct. *See id*. ("To give money to an organization that commits terrorist acts is not intentional misconduct unless one either knows that the organization engages in such acts or is deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism but one does not care."); *see also, e.g., Goldberg*, 690 F. Supp. at 113-14. ***Since a knowing violation of § 2339B(a)(1) constitutes "intentional misconduct" sufficient to send a criminal defendant to prison for decades, it is more than enough to require a civil defendant to pay money***.

*Linde*, 2015 WL 1565479, at *25 (emphasis added). Similarly, *Boim III* expressly held that the ATA tort is intentional. *Boim III*, 549 F.3d at 692. ("A volitional act that causes an injury gives rise to tort liability for negligence if the injurer failed to exercise due care, period. But more is required in the case of intentional torts, and we can assume that since section 2333 provides for an automatic trebling of damages it would require proof of intentional misconduct even if the plaintiffs in this case did not have to satisfy the state-of-mind requirements of sections 2339A and 2332 (but they do)."); *Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 42 (D.D.C. 2010) ("[T]he ATA requires allegations of intentional misconduct—in addition to other state-of-mind requirements incorporated in §§ 2339A–2339C—and proximate causation.") (citations omitted).

Without citing or discussing this authority, or this Court's prior rulings, the Bank argues that for the ATA tort to be deemed an intentional tort for purposes of the traditional joint and several liability rule, the tortfeasor must have the specific "intent to bring about harm." Bank mem. at 23 (*citing* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL

Harm § 1 (2010)). Yet, expressly flagging the *Restatement*, *Boim III* held that knowingly giving money to a terrorist is a form of criminal recklessness that would satisfy *both* the civil and criminal standards.

> . . . . [I]f you give a gun you know is loaded to a child, you know you are creating a substantial risk of injury and therefore your doing so is reckless and if the child shoots someone you will be liable to the victim. That case should be distinguished from one in which the gun is given to an adult without adequately explaining the dangers—a case of negligent entrustment. To give a small child a loaded gun would be a case of *criminal* recklessness and therefore satisfy the state of mind requirement for liability under section 2333 and the statutes that it incorporates by reference. For the giver would know he was doing something extremely dangerous and without justification.

*Boim III*, 549 F.3d at 693 (citations omitted).[7] Knowingly providing material support to an FTO or an organization one knows is engaged in terrorist acts is sufficient.

Undaunted, the Bank goes further. It asserts that Plaintiffs must prove it knew that its conduct "'will bring about harm to a particular victim or to someone within a small class of potential victims within a localized area,'" quoting from an inapposite comment in the *Restatement* about a toxic dumping hypothetical, and citing two cases. Bank mem. at 24. The first case, *Kurisoo v. Providence & Worcester R. Co.*, 68 F.3d 591, 596 (2d Cir. 1995), is a Second Circuit decision construing the words ""Wilful or Malicious" in a Connecticut statute in a case involving a plaintiff who was fishing when a passing train caused a rock to strike the plaintiff and severely injure his leg. *Id.* at 24 n. 12. The second case, *La Day v. Catalyst Technology, Inc*., 302 F.3d 474, 484 (5th Cir. 2002), assessed a Louisiana law involving workplace harassment, where the court held that: "There is no evidence that Craft intended to

---

[7] Again, the only ATA authority the Bank cites (notwithstanding its "e.g.") is *Smith*. It claims that *Smith* requires defendants "to have acted intentionally." Bank mem. at 24. The assertion is misleading. *Smith* actually held that the ATA did not apply to claims against Iraq and Saddam Hussein, and then borrowed the ***Boim I*** requirement that plaintiffs show knowledge and intent to construe the terrorism exception to the Foreign Sovereign Immunity Act. 262 F. Supp. 2d at 226 & n. 12. If *Boim I* intended to require specific intent under the ATA, it has been superseded by the *en banc* opinion in *Boim III*, holding that knowledge is sufficient, as well as the Second Circuit's holding in *Weiss v. National Westminster Bank*, 768 F.3d 202 (2d Cir. 2014).

inflict severe distress or that he knew such distress inevitably would occur.… Another person might have been able to shake off Craft's obnoxious advances with little or no lasting distress, or at least without severe consequences." *Id.*

Defendant's knowing transmission of tens of millions of dollars to Hamas is not analogous to an errant rock dislodged by a train, nor can a victim of a suicide bombing "shake off" a terrorist attack. The Bank's violation of Section 2339B was sufficiently "intentional" to send a criminal defendant to prison for decades. No greater "intentional conduct" is required here.

## III.  THE ATA'S LEGISLATIVE HISTORY SUPPORTS APPLICATION OF TRADITIONAL JOINT AND SEVERAL LIABILITY.

The Bank argues that the ATA's legislative history supports its argument for apportionment under the ATA, but then ignores the legislative history most directly on point. Bank mem. at 10. Former high-level Department of Justice attorney and General Counsel of the United States Information Agency, Joseph A. Morris, testified in the hearings on the Section 2333 remedy. Rebutting a suggestion that the bill should spell out tort standards, Mr. Morris reminded the Senate Subcommittee that:

> the bill as drafted is powerfully broad, and its intention, as I read it, is to bring focus on the problem of terrorism, and reaching behind the terrorist actors to those who fund and guide and harbor them, bring all of the substantive law of the American tort law system. . .. Let us make all the tort law in the country available to see what we can do to sort out these suits, all the doctrines of vicarious and ***shared liability, joint and several liability,*** and so forth, and let us see if we can't nail all the tort-feasors down the chain, from the person who starts spending the money to the person [who] actually pulls the trigger.

*Antiterrorism Act of 1990, Hearing before the Subcommittee on Courts and Administrative Practice, Senate Committee on the Judiciary*, 101st Cong., 2d Sess. (1990) at 136-37 (emphasis

added). The traditional rule was thus expressly brought to the attention of the ATA draftsmen, and there is not the slightest evidence that they intended to alter it.

Furthermore, the legislative history also bespeaks Congress's intent that by imposing "liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of money." S. Rep. No. 102-342, at 22 (1992).[8] The apportionment of liability proposed by the Defendant would negate the entire purpose of the statute, as the suicide bombers and terrorist operatives would, under the Bank's formulation, always bear the lion's share of liability. Congress did not enact the ATA so that American terror victims would pursue lawsuits against the estates of suicide bombers nor did it intend to allow what Judge Posner termed the "financial angels" of terrorism to evade meaningful accountability merely because the killers they supported are apportioned greater relative culpability for these crimes.[9]

## IV.   *PAROLINE* DOES NOT REQUIRE APPORTIONMENT IN THIS CASE.

As recently as its January 15, 2015 letter, the <u>Bank</u> told this Court:

> In *Paroline*, the Court reached the unremarkable conclusion that where the express words of the statute required the defendant to pay the plaintiff, the defendant could not escape liability by arguing that the plaintiff would have been injured regardless of his or her particular criminal conduct. *Id.* at 1727. **The statute at issue in Paroline is therefore not analogous to the ATA.** [*Linde* ECF No. 1216 (emphasis added).]

But that was yesterday. Today, the Bank argues that it would be "a distortion of the fundamental principles underlying *Paroline* to restrict its holding to restitution cases," and that its analysis of

---

[8] At the 1990 hearing, Professor Wendy Perdue specifically noted that a meaningful remedy for victims would have to extend beyond those who actually commit the violent acts, because they are unlikely to have assets in the United States. Hearing, at 126.

[9] The Bank's textual ATA argument fares no better. It asserts that because 18 U.S.C. § 2339B(a)(2)) imposes a civil penalty of $50,000 per violation on financial institutions for violating the statute's retention and reporting requirements (or twice the amount the bank should have retained), "Congress did not contemplate unbridled joint and several liability for financial institutions." Bank mem. at 10. Once again, the Bank altogether ignores the case law. Construing this provision, the court in *Weiss* reasoned that, "Congress might have intended to create criminal and civil liability for banks that are providing basic banking services to FTOs and to impose *additional* duties on banks to report and freeze any assets of FTO's in their possession." *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 624 (E.D.N.Y. 2006) (emphasis added).

restitution under 18 U.S.C. §2259 is controlling in this ATA case. Opp. Mem. at *7. Plaintiffs agree that *Paroline's* discussion of proximate cause and tort law is relevant to the ATA because it discusses multi-causational torts, but that does not mean that the restitution statute in that case is identical in structure or purpose to the ATA. As the Supreme Court itself noted, "[T]his case does not involve a set of wrongdoers acting in concert, . . . ; for Paroline had no contact with the overwhelming majority of the offenders for whose actions the victim would hold him accountable." 134 S. Ct. at 1725.

Whereas the defendant in *Paroline* did not know the criminals who sexually assaulted the victim in that case, Arab Bank was found liable for knowingly providing material support to its own customers, i.e. Hamas. Paroline did not substantially assist in the commission of the sexual assault, nor was he a part of the "casual chain" that led to the victim's assault. His possession of pornographic images of the victim constituted a separate (additional) injury, outside the chain of causation of the victim's prior injuries. In stark contrast, Arab Bank provided material support to Hamas and it entered the causal chain *before* the Plaintiffs' injuries occurred. The jury found that the material support Defendant provided to Hamas was a substantial factor in causing the acts of terrorism that injured the Plaintiffs. Furthermore, "Paroline's possession of two images of the victim was surely not sufficient to cause her entire losses from the ongoing trade in her images." *Id.* at 1723. But in this case, it cannot be argued that providing $3.2 million to Hamas leaders, approximately $32 million to Hamas-controlled charities, and hundreds of thousands to the perpetrators of some of the specific attacks at issue, *Linde*, 2015 WL 1565479, at *33, was insufficient to cause those attacks.

## V.   DR. SAGEMAN'S EXPERT REPORT IMPROPERLY RESTS ON A MISLEADING SUB-SET OF THE EVIDENCE.

The premise of Dr. Sageman's report is that the Bank's contribution to the causal chain of

any terror attack is limited to funds provided to the particular terror operation and the terror operatives who conducted it. As he explains, "I therefore assumed, as a hypothetical plaintiffs' maximal favorable case: that the Hamas-affiliated individuals and organizations identified by them were the source of *all operational funds* for the Three Attacks, which were transferred to the *operatives* through the Bank." Sageman Report at 101 (emphasis added). The key words are "operatives" and "operational funds." Dr. Sageman's selective focus on operational funds, and then only on those evidenced by the court records and police interrogations Plaintiffs' liability experts reviewed, is highly misleading for two reasons.

First, by looking only at the Hamas operatives involved in the attacks, Dr. Sageman excises all of Hamas's non-operational activities and the Bank's support for those activities. This is a not-too-subtle-effort to negate the reach of §2339B by ignoring the impact funding has on Hamas's recruitment (through mosques, schools, health clinics), ideological cohesion (student and prisoner stipends, "martyr" benefits, etc.), and propaganda (websites, rallies, newspapers, mass funerals, etc.). As the Supreme Court noted in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010):

> When it enacted §2339B in 1996, Congress made specific findings regarding the serious threat posed by international terrorism.…"[F]oreign organizations that engage in terrorist activity are so tainted by their criminal conduct that *any contribution to such an organization* facilitates that conduct." (citation omitted) (emphasis in original).

*Id.*, 561 U.S. at 29. The Court also noted, "'Material support' is a valuable resource by definition. Such support frees up other resources within the organization that may be put to violent ends. It also importantly helps lend legitimacy to foreign terrorist groups—legitimacy that makes it easier for those groups to persist, to recruit members, and to raise funds—all of which facilitate more terrorist attacks." *Id.* By proffering an expert report that artificially

circumscribes Arab Bank's material support to "operational funds," Defendant improperly attempts to circumvent the legal standard embodied in Section 2339B by challenging *Congress*'s specific findings. Second, Dr. Sageman also wrongly assumes that the full scope of funding – operational or otherwise – can be determined solely through the evidence Plaintiffs' liability trial experts considered.[10] The inescapable fact is that the full measure of Arab Bank's material support to Hamas can only be determined by examining Arab Bank's (withheld) financial records.[11]

One example from the liability trial should suffice. At trial, Plaintiffs were able to show that from February 2001 to May 2001, Yousef El-Hayek sent $123,000 to Abbas Al-Sayyed, the mastermind of the Park Hotel bombing, through Arab Bank New York. *Linde*, 2015 WL 1565479, at *33. During his interrogation by the Israeli police, Al-Sayyed stated that he used funds sent to his Arab Bank account from abroad to buy weapons. But Al-Sayyed never said precisely how much money was sent to his Arab Bank account, and the Bank has never produced his account records. Al-Sayyed's statement to the Israeli police also did not even mention all of the payments he received through Arab Bank. Thus, had Dr. Sageman assessed the Park Hotel attack, his "methodology" would have assumed that the universe of "operational funding" was either *just* the $123,000 that went through AB-NY or, alternatively, *just* the smaller sums mentioned in Al-Sayyed's interrogation. Either approach falsely presumes to reflect the "maximal" material support Arab Bank provided to such an operative. Such distortions of the evidentiary record are precluded by the sanctions order, because the "proof or refutation" of Dr. Sageman's assumptions can only be found in withheld documents." ECF No. 625 at 32.

---

[10] Dr. Sageman states that he reviewed Plaintiffs' expert reports, and he cites various indictments that were not admitted into evidence at trial. He therefore appears to have relied upon materials that were not in evidence at trial.

[11] *See, e.g.* Sageman Report at pp. 88-90, discussing Abdallah Barghouti's role in the Café Moment bombing and his accounts at Arab Bank – but omitting the fact that all of his account records were improperly withheld by Defendant. The same infirmity is illustrated in the example of Abbas Al-Sayyed which Dr. Sageman did not address.

**<u>CONCLUSION</u>**

For the reasons set forth above and in Plaintiffs' Memorandum of Law in Support of Their Motion to Strike in its Entirety the Expert Report of Dr. Sageman, Plaintiffs respectfully request that the Court strike Dr. Sageman's expert report in its entirety and preclude Defendant from making any argument at trial that states or implies that it is not jointly and severally liable for the injuries at issue.

Dated: July 22, 2015
      Hackensack, NJ

                              Respectfully submitted,

                              OSEN LLC

By:    /s/ Gary M. Osen
            Gary M. Osen, Esq.
            Ari Ungar, Esq.
            Aaron Schlanger, Esq.
            Peter Raven-Hansen, Esq., Of Counsel
            2 University Plaza, Suite 201
            Hackensack, NJ 07601
            (201) 265-6400

            KOHN, SWIFT & GRAF, P.C.
            Steven M. Steingard, Esq.
            Stephen H. Schwartz, Esq.
            Neil L. Glazer, Esq.
            One South Broad Street, Suite 2100
            Philadelphia, PA 19107
            (215) 238-1700

            ZUCKERMAN SPAEDER LLP
            Shawn P. Naunton. Esq.
            399 Park Avenue, 14th Floor
            New York, NY 10022
            (646) 746-8655

11

TURNER & ASSOCIATES, P.A.
C. Tab Turner, Esq.
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
(501) 791-2277

Attorneys for *Linde* and *Coulter* Plaintiffs

MOTLEY RICE LLC
Michael Elsner, Esq.
John M. Eubanks, Esq.
28 Bridgeside Boulevard
P.O. Box 1792
Mount Pleasant, SC 29465
(843) 216-9000

Attorneys for *Almog* Plaintiffs

SAYLES WERBNER
Mark S. Werbner, Esq.
4400 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
(214) 939-8700

HEIDEMAN NUDELMAN & KALIK, P.C.
Richard D. Heideman, Esq.
Noel J. Nudelman, Esq.
Tracy Reichman Kalik, Esq.
1146 19th Street, NW
Fifth Floor
Washington, DC 20036
(202) 463-1818

STONE BONNER & ROCCO LLP
James P. Bonner, Esq.
145 West 45th Street,
New York, NY 10036
(212) 239-4340

Attorneys for *Litle*, *Roth*, and *Bennett* Plaintiffs